**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

In the Matter of E.Z. and S.Z. )          No. 21-cv-6524-MKV
                               )
ARNALDUR SCHRAM,               )
                               )          Hon. Mary Kay Vyskocil
          Petitioner,          )
                               )
     vs.                       )
                               )
TANIA ZARAK,                   )
                               )
          Respondent.          )
_____        )

**RESPONDENT TANIA ZARAK'S**
**<u>PRETRIAL BRIEF</u>**

CHEMTOB MOSS FORMAN & BEYDA, LLP
527 Madison Avenue, 7th Floor
New York, New York 10022
Tel: (212) 317-1717
Fax: (212) 317-1555

*Attorneys for Respondent Tania Zarak*

Dated:  September 27, 2021

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

I.  INTRODUCTION .......................................................................... 1

II. THE REQUIREMENTS FOR RETURN OF A CHILD UNDER THE
    HAGUE CONVENTION .................................................................. 2

III. BACKGROUND FACTS ................................................................. 2

    a.  The Parties Early Relationship, Marriage and the Birth of Their
        Children ........................................................................................ 3

    b.  The Children's Lives in New York ................................................ 4

    c.  The COVID-19 Pandemic Caused the Family to Temporarily Stay in
        Mexico ......................................................................................... 5

    d.  The COVID-19 Pandemic Caused the Family to Temporarily Stay in
        Iceland Where Schools Remained Open and In-Person ........................... 6

    e.  There Was Never Any Joint Parental Intent to Permanently Relocate to
        Iceland ......................................................................................... 6

    f.  The Parties Never Abandoned Their and Their Children's Habitual
        Residence in New York ................................................................. 13

    g.  The Children Are Not Sufficiently Acclimatized to Iceland ...................... 16

    h.  Ms. Zarak's Temporary Residency Status in Iceland ............................. 20

IV. MR. SCHRAM CANNOT, AS A MATTER OF LAW, INVOKE THE
    PROTECTIONS OF THE HAGUE CONVENTION BECAUSE THE
    CHILDREN ARE NOT HABITUAL RESIDENTS OF ICELAND ........ 21

    a.  Petitioner Cannot Show by a Preponderance of the Evidence that the
        Children are Habitual Residents of Iceland .......................................... 21

i

i.  The Effect of COVID-19 as a Factor to Be Considered in the Totality of Circumstances ................................................................... 26

ii.  Mr. Schram Cannot Establish That the Children's Habitual Residence Changed from the United States to Iceland ................. 27

b.  The Parties Did Not Share a Joint Intention to Remain in Iceland Indefinitely ................................................................................. 34

c.  There is No Evidence that the Children Were Sufficiently Acclimatized in Iceland ........................................................................................ 37

d.  Even if the Children Have Acclimated to Some Degree, Mr. Schram Cannot Meet His Burden to Show that Iceland is the Children's Habitual Residence ............................................................................................ 40

V.  **CONCLUSION** .............................................................. 44

# TABLE OF AUTHORITIES

## Cases

*Abou-Haidar v. Vazquez*, 419 F. Supp.3d, *1 (D.C.C. Oct. 9, 2019). ........................ 34, 35

*Blackledge v. Blackledge*, 386 F.3d 169 (3d. Cir. 2017). ................................................ 43

*Chambers v. Russell*, 2020 WL 5044036 (M.D. N.C. 2020) ........................................... 26

*Choi v. Kim (In re Kim)*, 404 F.Supp. 2d 495 (S.D.N.Y. Dec. 5, 2005) ......................... 25

*Darin v. Olivero-Hoffman,* 746 F.3d 1 (1st Cir. 2014) ................................................... 37

*Farr v. Kendrick*, 824 Fed. Appx. 480 (9th Cir. 2020) .................................................... 33

*Feder v. Evans-Feder*, 64 F.3d 217 (3d Cir. 1995) .......................................................... 41

*Gitter v. Gitter*, 396 F.3d 124 (2d Cir. 2005) .................................................. 7, 25, 33, 36

*Grano v. Martin*, 443 F.Supp. 3d 510 (S.D.N.Y March 11, 2020) *aff'd* 821 Fed. App'x 26,
    2020 WL 4045801 (2d Cir. 2020) ............................................................................ 26, 37

*Guzzo v. Cristofano*, 2011 WL 6934108 (S.D.N.Y. Dec. 30, 2011), *aff'd* 719 F.3d 100 (2d
    Cir. 2013) ........................................................................................................................ 39

*Guzzo v. Cristofano*, 719 F.3d 100 (2d Cir. 2013) ............................................................. 7

*Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603 (E.D. Va. May 6, 2002). ................... 25

*Headifen v. Harker*, 549 Fed. Appx. 300 (5th Cir. 2013). ............................................. 38

*Hofmann v. Sender*, 716 F.3d 282 (2d Cir. 2013) ........................................................... 41

*Holder v. Holder*, 392 F.3d 1009 (9th Cir. 2004) ........................................................... 27

*Karkkainen v. Kovalchuk*, 445 F.3d 280 (3d. Cir. 2006) .................................... 27, 28, 30

*Koch v. Koch*, 450 F.3d 703 (7th Cir. 2006) .................................................................... 42

*Maxwell v. Maxwell*, 588 F.3d 245 (4th Cir. 2009) ........................................................ 41

*Monasky v. Taglieri*, 140 S. Ct. 719 (2020) ........................................................ 26, 27, 28

*Mota v. Castillo*, 692 F.3d 108 (2d Cir. 2012) .......................................................... 25, 37

*Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001) ......................................................... 26, 36

*Neergaard-Colon v. Neegaard*, 752 F.3d 526 (1st Cir. 2014) ........................................ 37

*Papakosmas v. Papakosmas* ............................................................................................. 40

*Paz. v. Mejia de* Paz, 169 F.Supp.2d 254 (S.D.N.Y. 2001), *aff'd* 47 Fed. Appx. 22 (2d Cir.
    2002) ........................................................................................................................... 43, 44

*Poliero v. Centenaro*, 373 Fed. Appx. 102 (2d. Cir. 2010) ............................................ 43

*Redmond v. Redmond*, 724 F.3d 729 (7th Cir. 2013) ...................................................... 26

*Rishmawy v. Vergara,* 2021 WL 1760303 (S.D. Ga. May 4, 2021) ................................39

*Robert v. Tesson*, 507 F.3d 901 (6th Cir. 2007) ................................................30

*Rodriguez v. Lujan Fernandez*, 500 F. Supp. 3d 674 (M.D. Tn. Nov. 8, 2020)..............30

*Ruiz v. Tenorio*, 392 F.3d 1247 (11th Cir. 2004) .................................. 31, 35, 36

*Saada v. Golan,* 2019 WL 1317868 (E.D.N.Y. March 22, 2019), *aff'd in part, vacated on other grounds*, *930* F. 3d 533 (2d. Cir 2019) ..............................................33

*Saada v. Golan*, 2019 WL 1317868 (E.D.N.Y. March 22, 2019), *aff'd in part, vacated in part, remanded*, 930 F.3d 533 (2d Cir. 2019).............................................25

*Sain v. Sain*, 2021 WL 2784324 (M.D. Fl, July 2, 2021).................................29

*Sanchez-Londono v. Gonzalez*, 752 F.3d 533 (1st Cir. 2014)........................31, 37

*Schwartz v. Hinnendale*, 2020 WL 611634 (E.D. Wi. Oct. 16, 2020) ............................ 31

*Silvestri v. Oliva*, 403 F. Supp. 2d 378 (D.N.J. 2005) ................................35

*Smith v. Smith*, 976 F.3d 558 (5th Cir. 2020) ..............................................32

*Stirk v. Lopez*, 2021 WL 1139664 (M.D. Fl. March 25, 2021) ..........................................31

*Sundberg v. Bailey*, 765 Fed. Appx. 910 (4th Cir. 2019)..................................41

*Watts v.* Watts, 935 F.3d (10th Cir. 2019) ..............................................44, 45

**Statutes**

Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980.
Art. 13(b), T.I.A.S. No. 11670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg., 10,494...... 7

International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq* ............................ 7

## I.    <u>INTRODUCTION</u>

1.      In March 2020, at the height of the COVID-19 pandemic, Respondent Tania Zarak ("Ms. Zarak") along with her husband, Petitioner Arnaldur Schram ("Petitioner" or "Mr. Schram"), and their three children, E.Z., R.Z., and S.Z., fled their home in New York City to temporarily stay in Mexico and then on July 31, 2020, left again to temporarily take refuge in Iceland, with the intent to return to New York when the ravages of the COVID-19 pandemic had subsided, so that E.Z. and R.Z. could attend school again in-person.

2.      On July 21, 2021, Ms. Zarak, accompanied by E.Z. and S.Z. (the "Children"), returned to the United States through Mexico where she and the Children visited with her family, with Mr. Schram's knowledge and consent. Mr. Schram refused to let R.Z. travel with Ms. Zarak and his siblings and accordingly, R.Z., who is not a subject of this proceeding, continues to be retained in Iceland by Mr. Schram who is in possession of R.Z.'s United States passport.  Ms. Zarak and the Children remain in New York.

3.      Following conversations with Mr. Schram during which he suggested that Ms. Zarak live in New York with E.Z. and S.Z. and he remain in Iceland with R.Z., which were immediately rejected by Ms. Zarak, Ms. Zarak commenced an Action for Divorce in the Supreme Court, New York County, seeking, among other things, the immediate return of the R.Z. to New York. Thereafter, on August 13, 2021, Mr. Schram filed a petition in this Court under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980. Art. 13(b), T.I.A.S. No. 11670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg., 10,494 (Mar. 26, 1986) ("Hague Convention"), implemented in the United States through the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.* (formerly codified at 42 U.S.C. § 11601 *et seq.*) ("ICARA"), seeking the return of E.Z. and

S.Z. to Iceland.  ECF #1 (the "Petition"). Mr. Schram contends that the Children have been wrongfully retained in the United States.  However, since the United States is the Children's habitual residence and accordingly, there has been no wrongful retention, Mr. Schram's petition should be dismissed.

## II.     THE REQUIREMENTS FOR RETURN OF A CHILD UNDER THE HAGUE CONVENTION

4.     As a threshold matter, Petitioner "cannot invoke the Hague Convention unless the child to whom the petition relates is 'habitually resident' in a State signatory to the Convention and has been removed or retained in a different State." *Gitter v. Gitter*, 398 F.3d 124, 130 (2d Cir. 2005) (quoting Hague Convention, art. 4). As relevant here, if Mr. Schram fails to demonstrate that Iceland was the Children's habitual residence at the time of their retention in the United States, the petition must be denied. *Id.* at 130-31; *accord Guzzo v. Cristofano*, 719 F.3d 100, 103 (2d Cir. 2013) (affirming denial of petition).

## III.     BACKGROUND FACTS

5.     Ms. Zarak was born in Mexico and raised in Mexico and New York City, where she attended a year of high school at the Hewitt School in Manhattan in 1997. She subsequently returned to Mexico where she attended college and then returned to New York City when she was 24 to work at the Tribeca Film Festival.  Ms. Zarak attended Graduate School at the New School in Manhattan and received a Master's degree in Media Studies.  She also attended Columbia University in New York where she pursued a Master of Fine Arts in film. Ms. Zarak is a citizen of Mexico and a lawful permanent resident of the United States.

6.     Mr. Schram was born and raised in Iceland.  He attended college in California and received a master's degree from Columbia University. Mr. Schram is a citizen of Iceland and has an O-Visa until 2023 which enables him to lawfully reside in the United States.

**A.     The Parties Early Relationship, Marriage, and the Birth of their Children**

7.     The parties met during the summer of 2013 while both of them were residing in New York City.  Tr. [ ]. In December 2013, Ms. Zarak became pregnant with the parties' child, E.Z.  Tr. [ ]. Several months later, Mr. Schram moved into Ms. Zarak's studio apartment in Manhattan located at 11 West 81ST Street, Apartment #PHC, New York, New York ("#PHC"). E.Z. was born in 2014 in New York. Tr. [ ].

8.     Ms. Zarak and Mr. Schram were legally married in New York on April 9, 2015. Tr. [ ]. By the end of 2015, the parties had moved from #PHC into a larger unit within the same building, Apartment #6A, also owned by Ms. Zarak. The parties' two sons were born in the United States, specifically, R.Z. was born in 2016 in New York and S.Z. was born in 2019 in California. Tr. [ ]. During the first few years of their marriage, Ms. Zarak stayed home and cared for the Children. Tr. [ ]. Prior to the COVID-19 Pandemic, for all but several months in 2018-2019, from in or about December of 2015 through the start of the COVID-19 pandemic, the parties and their children lived as a cohesive family-unit in Manhattan in Ms. Zarak's apartment located in the Hayden House by Central Park and across the street from the Museum of Natural History and Rose Planetarium, i.e., 11

West 81st Street, Apartment #6A, New York, New York (the "NY Residence"). Tr. [ ], R-99[1].

**B.   The Children's Lives in New York**

9.      E.Z., R.Z. and S.Z. each received their United States citizenship on their births. Tr. [ ], R-4. Prior to the COVID-19 pandemic, the Children attended school in New York, specifically, E.Z. attended their local New York City Public School 9, The Sarah Anderson School ("P.S. 9") and before that, the Broadway Presbyterian Church Nursery School in Manhattan and R.Z. attended the Broadway Presbyterian Church Nursery School. Tr. [ ], R-23, R-26-27, R-57-60. The Children consistently visited the playground near their apartment, rode scooters through their neighborhood, took trips to museums throughout New York City, and had playdates with their close friends year-round. Tr. [ ], R-37-38, R-96, R-158, R-169, R-171.   The Children also participated in a variety of organized extra-curricular activities in New York City, including, swimming, karate, gymnastics, and participated in Forest school in Central Park. Tr. [ ], R-20-22, R-30-36, R-39, R-41, R-62. The family celebrated major holidays such as Thanksgiving and Christmas together with friends and family in New York, and occasionally with Ms. Zarak's extended family in Mexico. Tr. [ ], R-94-95.

10.     The Children's pediatrician, Dr. Mark Nesselson, was and continues to be in Manhattan as does their dentist, chiropractor, and other providers. Tr. [ ], R-125-126, R-130, R-190-192. The Children have received all their vaccines in New York; none in

---

[1] The abbreviations "R-1, R-2," etc. refer to Respondent's Exhibits; "P-1, P-2," etc. refer to Petitioner's Exhibits, and "Tr. [ ]" refers to expected trial testimony.  Abbreviations in the format "R-8/8A, R-9/9A," etc. refer to audio or video exhibits and corresponding transcripts.

Iceland. Tr. [ ], R-24-25. The Children's medical records all remain in New York; none of their records were ever transferred to Iceland. Tr. [ ], R-183, R-189. While in Iceland, the family maintained the NY Residence, have never sublet it, and it is in the same condition as it was when they fled New York as a result of the pandemic. Tr. [ ], R-118-119, R-121, R-153.

11.     There is no disputing that the only reason the family fled New York on March 16, 2020, went to stay in Mexico with Respondent's family (where COVID-19 was not as rampant at that point) and then left for Iceland on July 31, 2020, was (a) to temporarily escape the COVID-19 pandemic in New York, and (b) to ensure that the Children would be able to continue their schooling in person, since the schools in Iceland were open and COVID-19 cases appeared to be under control and were fewer and further between. Tr. [ ].

### C.    **The COVID-19 Pandemic Caused the Family to Temporarily Stay in Mexico**

12.     While the family was temporarily staying in Mexico, E.Z. completed Kindergarten and R.Z. completed nursery school, both via Zoom. Tr. [ ], R-154. Although both of the Children were able to complete their schooling via Zoom, it was not without issues and its difficulties. Tr. [ ], R-110. Specifically, E.Z., who is a very active child, had a lot of difficulty spending her day staring at a computer screen in a room without any of her peers.. Tr. [ ].

13.     In or about late May/early June 2020, while the family was still temporarily quarantining in Mexico, they made plans to return to New York so that the Children could resume school in-person that fall. Tr. [ ]. To effectuate their re-enrollment at their New York schools, Ms. Zarak submitted all of the necessary paperwork to enroll the Children

in school in Manhattan for the 2020-2021 academic year. Tr. [ ], R-29, R-63. At that time, since the infection rate COVID-19 in New York was on the decline, it was the parties' shared intention to return from Mexico and remain in New York. Tr. [ ].

**D.    The COVID-19 Pandemic Caused the Family to Temporarily Stay in Iceland Where Schools Remained Open and In-Person**

14.    Soon thereafter, the parties began to hear rumors that in September 2020, schools in New York were going to remain largely, if not entirely, virtual. Tr. [ ], R-64. At that point, Mr. Schram suggested, and Ms. Zarak agreed, to weather the COVID-19 pandemic temporarily for one to two years in Iceland where the schools remained open. Tr. [ ].

15.    Accordingly, in July 2020, the family traveled from Mexico back to their home in New York to pick up some personal property before going to temporarily reside in Iceland. Tr. [ ]. At that time, the family remained in New York for three (3) weeks. Tr. [ ]. While in New York, the Children were thrilled to be back in their home, sleeping in their beds, seeing their friends, and playing with their toys just as is the situation at the present time. Tr. [ ], R-121.

**E.    There Was Never Any Joint Parental Intent to Permanently Relocate to Iceland**

16.    Ms. Zarak advised her friends, family, and the Children's providers, including their schools, among others, that, like so many other New Yorkers, they were temporarily staying outside Manhattan during the COVID-19 pandemic. Tr. [ ], R-61. When it came time for the family to leave New York, Ms. Zarak packed one (1) suitcase for each of the Children and herself and some boxes with some of their toys and some other items of personal property, while leaving the rest of their personal property in Manhattan because they planned to return to  New York as soon as they could. Tr. [ ], R-

104, R-111, R-159. The family's trip to Iceland during the COVID-19 pandemic was only a temporary absence from New York until the Children could resume in-person school in Manhattan, which is documented in the dozens of communications the parties shared with their friends, family, medical providers, business associates, the Children's school, and many others. Tr. [ ], R-77-84, R-86, R-89-90, R-147, R-151-152, R-160, R-212.

17.     Further evidencing the parties' shared intentions to only be in Iceland on a temporary basis was the fact that upon their arrival in Iceland, Ms. Zarak only applied for a one-year Icelandic residency permit.  Moreover, Ms. Zarak only obtained health insurance for six (6) months in Iceland, again, because their joint plan was to only be in Iceland temporarily. Tr. [ ], R-162.

18.     With a single suitcase for each of the Children in hand, the family traveled from New York City to Boston by Amtrak and then from Boston to Iceland.  The family arrived in Iceland on August 1, 2020. Tr. [ ]. Once in Iceland, Ms. Zarak continued to advise people that the family was in Iceland temporarily during the pandemic. Tr. [ ], R-123. At Mr. Schram's insistence and realizing that the month-to-month and/or one (1) year Airbnb rentals were very expensive, the parties determined that it made financial sense to take advantage of the zero percent interest rates and invest $60,000 from the settlement proceeds she received from a lawsuit that was in the bank not earning any interest, by purchasing a small apartment that would have a monthly mortgage/carry costs that would cost them approximately $1,500 instead of continuing to pay rent for an Airbnb of approximately $2,900 per month. Tr. [ ], R-139.

19.     The following evidence further illustrates the fact that they only temporarily left New York and it was never their shared intention to make Iceland the habitual residence of the Children:[2]

a.      On June 23, 2020, Mr. Schram emailed the parties' immigration lawyer in the United States to tell her about their potential plans and travels and in his email, he indicated that they would be staying in Iceland "at least through the kids school year, until summer 2021." Tr. [ ], R-109.

b.      On July 26, 2020, Ms. Zarak sent an email to the Broadway Presbyterian Church Nursery School, R.Z.'s previous school in New York, indicating that they were temporarily going to be in Iceland and that she would love to have S.Z. attend when they returned.  In that message Ms. Zarak indicated, "…schools are open in Iceland and life is as normal there as it could be. On the other hand, our Green Cards were recently approved (!) so we will be returning eventually. I am guessing next summer?" Tr. [ ], P-39.

c.      On August 3, 2020, Ms. Zarak sent an email to P.S. 9 in New York to let them know that the Children would not be attending school in the Fall of 2020 and indicated that: "After much consideration and months of dialogue, we have decided to spend the school year in Iceland, my husband's home country. Life in Iceland right now is as normal as the current world circumstances allow. I will miss you very much and hope to see you when we are back in 2021." Tr. [ ], R-65.

d.      On July 22, 2020, Ms. Zarak sent a WhatsApp message to Mariana Barrera. "We're leaving to Iceland for the school year….There's school over there, at least." Tr. [ ], R-86.

---

[2] The communications listed herein are just a few of the communications which Ms. Zarak will testify to and introduce at trial.

e.      On July 23, 2020, Ms. Zarak sent a text message to a friend, Ai Ikeda. "We decided to spend the rest of the year in Iceland." Tr. [ ], R-164.

f.      On July 26, 2020, Ms. Zarak left a voice note for Bernardo Sepúlveda informing him that she will not be accepting the position he was offering her in Mexico because she will be spending some time in Iceland. Amongst other things, she informed him that schools were not opening in Mexico or New York and that Iceland was doing a wonderful job containing the pandemic. Tr. [ ], R-77.

g.      On July 26, 2020, Ms. Zarak sent an email to her former assistant, Guillermo indicating that ". . . we're in NY and we're staying in Iceland for fall+winter. Long story, but schools are open there (well, LIFE IS OPEN THERE) [sic] and we think it's best for the kids' - and our - mental health to actually have them in school. It's not a permanent move, we left NY's apartment semi-mounted and we're going to regroup in December". Tr. [ ], R-124.

h.      On August 4, 2020, Ms. Zarak left a voice note for a friend, Lynn Fainchtein saying that she will be spending "a school year" in Iceland because the schools in New York and Mexico will not open in the Fall. Tr. [ ], R-83.  On the same date, Ms. Zarak informed P.S. 9 parent Jessie Prunell that "[w]e're staying [in Iceland] for the school year... schools are open here. Life is basically normal. So, we decided to try it out for a year. Elisa's school is in English." Tr. [ ], R-165.

i.      On August 12, 2020 Ms. Zarak was contacted by family-friend Nan Nadar, who inquired about her family's status after learning of their departure to Iceland. Ms. Zarak responded that "we are actually spending the year in Iceland – it was a long, tough decision (for me mainly) but schools and LIFE [sic] is open here and the response to the Covid crisis has been top of the line." Tr. [ ], R-157.

j.      On August 28, 2020, Ms. Zarak sent an email to Columbia University professor, Katherine Dieckmann indicating that "My husband is Icelandic and we always fantasized about spending some time here. Well, Covid made it happen. We'll be here for the school year and then see what happens." Tr. [ ], R-84.

k.      On September 3, 2020, Jim Stark, a film producer sent the following message to Icelandic celebrity and actor Ingvar Sigurðsson introducing him to Ms. Zarak. "Tania is a film producer from Mexico who is spending the pandemic in Reykjavik." Tr. [ ], R-123.

l.      On September 23, 2020, Ms. Zarak sent an email to talent agent Matt Solo indicating that "I moved to Reykjavik for the year (my husband is Icelandic) because the situation in New York re: Covid got a little sad." Tr. [ ], R-176.

m.     On October 18, 2020, Ms. Zarak sent a Facebook message to Vala Pálsdóttir (Mr. Schram's cousin) indicating that "We moved to Iceland for a little while, New York got crazy with Covid." Tr. [ ], R-90.

n.      On November 7, 2020, Ms. Zarak sent an email to PS9 teacher, Ms. Lelekidis indicating that "We actually moved to Iceland (my husband is from Iceland) for a year." Tr. [ ], R-123.

o.      On November 24, 2020, Ms. Zarak sent a text message to friend and professional acquaintance Amanda Krentzman stating that "[w]e decided to spend the year here because of Covid...." When asked by Ms. Krentzman whether the parties "kept [their] place in [New York]," Ms. Zarak responded: "Yes, we kept it. I think we'll be here 1-2 years?" Tr. [ ], R-152.

p.      On November 29, 2020, Ms. Zarak sent an email to a doctor in New York, Terrence Dulin, indicating that "I would like to make an appointment with the doctor. We temporarily relocated to Iceland, so I am 5 hours ahead of EST." Tr. [ ], R-123.

q.      On December 7, 2020, Ms. Zarak sent an email to Ericka Tornero, teacher at Los Angeles Family School, indicating that "We are spending the year in Iceland -- both New York and Mexico are still fighting it hard." Tr. [ ], R-201.

r.      On December 25, 2020, Ms. Zarak sent the following WhatsApp message to her aunt, Delia Zarak indicating that "We are spending the year in Iceland." Tr. [ ], R-151.

s.      On January 28, 2021, Ms. Zarak sent an email to Alison Benson from HBO indicating that "I temporarily relocated to Iceland - - my husband is Icelandic - - where school never closed (aleluya!) and things are as normal and open as they can be within the bigger picture." Tr. [ ], R-202.

t.      On February 3, 2021, Ms. Zarak sent an email to Joel Englestein from Hulu indicating that "For Covid reasons, we temporarily relocated to Iceland." Tr. [ ], R-203.

u.      On April 23, 2021, Ms. Zarak sent an email to Lissett Avila, Head of Los Angeles Family School, the Children's former school in Los Angeles, indicating "After Covid first hit, we went to Mexico for a few months and then decided to spend the school year in Iceland. My husband is from here and they've done a pretty good job here re: Covid (schools have remained open this entire time, most businesses, etc.) Tr. [ ], R-204.

v.      On May 21, 2021, Ms. Zarak received an email from Dr. Karen Erickson confirming S.Z.'s general pediatric checkup appointment in New York in May, 2021 to which Ms. Zarak physically took him. Tr. [ ], R-205.

w.      On June 2, 2021, Mr. Schram advised P.S. 9 that "We have not arrived back to NY, so we don't have in our hands the student ID's and account creation code the

11

myschool website for our kids for next year [sic]. Would it be possible to get it like this via message or we need to wait until we're physically on NY?" Tr. [ ], R-172.  In this email, Mr. Schram confirms that it was always the parties' intention to return to New York and for the Children to attend school in New York in the Fall of 2021. After P.S. 9 responded, Mr. Schram wrote back to them on June 2, 2021, stating, "Thank you for the email. Just to confirm couple of last things. Does [E.Z.] use her old ID or will she get a new one? When is the latest [E.Z.] and [R.Z.] need to show up to finalize registration?" Tr. [ ],  R-172. Mr. Schram also contacted Amy Webb at Broadway Presbyterian Church Nursery School by telephone about S.Z.'s attendance for the Fall 2021 semester. Tr. [ ]. R-166.

20.     Further demonstrative of the parties' shared intention to be in Iceland temporarily is the fact that when they arrived in Iceland, they only looked for one-year leases. Tr. [ ], R-138. There were no open houses due to COVID-19 restrictions and the family stayed in three different Airbnbs while they continued to search for rental properties. Tr. [ ], R-159, R-214.

21.     Mr. Schram proposed that the parties rent a fully-furnished townhouse until June 2021, because as he told Phoebe Jenkins in his email of November 8, 2020, "[w]e didn't pack furniture when we left NY." Tr. [ ], R-214. Then he proposed that paying exorbitant prices for monthly rent made not fiscal sense and that it was cheaper to put a down payment on an apartment and pay monthly mortgage fees. Tr. [ ], R-139-140, R-213. Accordingly, as indicated above, the parties purchased a small apartment, as an investment property and/or vacation home, which is much smaller than their New York Residence. Tr. [ ], R-161, R-174-175. Ms. Zarak was never provided with a copy of the purchase contract let alone a translation of any documents Mr. Schram had her sign.

22.     In July 2021, as proof that the parties' shared intention to be in Iceland was only temporarily, Mr. Schram terminated the month-to-month lease on the car rental from Hertz which Ms. Zarak had been using while in Iceland. Tr. [ ], R-112.  He also, upon information and belief, did not sign an enrollment agreement with E.Z.'s school for the 2021-2022 academic year as he did for the previous year. Tr. [ ], R-168.

23.     Simply put, the parties never jointly intended to reside in Iceland with the Children. Indeed, on May 31, 2020, Mr. Schram sent an email explicitly confirming that their intention was to be in Iceland only temporarily when he said, "Fly to NY beginning of August." R-141.

24.     Mr. Schram also wrote to Teresa Woods indicating that the family would be back in "summer 2021." R-109. Moreover, Mr. Schram repeatedly admitted to Ms. Zarak that the only reason they went to Iceland was because of COVID-19. Tr. [ ]. He even told her that he would not stop her from returning home to New York. Tr. [ ]. While R.Z. is not a subject of this proceeding, it is important for this Court to note that , despite his claims, Mr. Schram continues to  retain R.Z. in Iceland and refuses to let him return home and be with his mother and siblings.

**F.     The Parties Never Abandoned Their And Their Children's Habitual Residence in New York**

25.     The parties purchased one-way tickets in July 2020 to Iceland only because they did not know what would happen with COVID-19 and when they would be able to return home to New York. Tr. [ ], R-188. This is similar to the tickets purchased by the family when they traveled from New York to Mexico in March 2020.

26.     Mr. Schram continues to rely on work from New York; upon information and belief, he has not severed his professional or personal ties with New York. Tr. [ ]. He

received an email from Thomas Zoli in April 2020 confirming a job offer in New York starting in October 2020. Tr. [ ], R-68. Mr. Schram also sent an email to photographer Sofia Verzbolovskis in March of 2021 to follow up on a project he had in New York and refers to the family's time in Iceland as being Pandemic-related. Tr. [ ], R-156. Mr. Schram has continued to maintain professional relationships with New York because the parties were always only in Iceland because of the Pandemic; the parties never had any mutual intent to relocate to Iceland.

27.     In addition to the foregoing, Mr. Schram still has his personal belongings in the parties' New York Residence and in the storage units for the New York Residence, including  an old vintage chair he owned for over 15 years. Tr. [ ], R-208. The majority of the Children's and Ms. Zarak's belongings are in the New York Residence, for example, two strollers, most of the children's toys, books, art supplies, bath toys, clothes, toy cars, and stereo. Tr. [], R-194, R-208.  Moreover, the parties left their dining table, beds and mattresses, sofa, water filter, mini oven, coffee maker, fans, bookshelves and books, children's furniture, plates, pots and pans, posters and wall art, shoes, piano, toy chest, chairs, scooters, helmets, linens and towels, expensive pots and pans and S.Z.'s crib in Manhattan. Tr. [ ], R-194.

28.     While some of the family's belongings are in Iceland, it is vital to note that they did not know how long they would be there given the ever-changing status of COVID-19, but they certainly needed clothes, some toys and books for the Children and toiletries which they brought with them. Tr. [ ]. These are the same types of things the parties would take when they traveled on vacation prior to COVID-19. Looking to the invoices and inventories provided by the moving companies which helped the parties during their permanent shift from California to New York in July 2019 and during their temporary

relocation to Iceland, in addition to photos of their items as they were prepared for the move from California, it is apparent that Ms. Zarak and Mr. Schram took just a small fraction of their family's innumerable personal possessions with them when leaving New York, and the COVID-19 pandemic, for Iceland. Tr. [ ], R-104, R-111, R-131-132, R-159.

29.     In addition to leaving the bulk of their property in New York in the fully-furnished NY Residence, once in Iceland, the family did not purchase new belongings for the apartment which was purchased for investment purposes and/or to use as a vacation home.  Instead, majority of the furniture, toys and books in Iceland are hand-me-downs.. Tr. [ ], P-109.

30.     Crucially, Ms. Zarak, with Mr. Schram's assistance, maintained her close connections with the parties' residence at Apartment #6A. For the entirety of the parties' temporary stay in Iceland, Ms. Zarak continued to make timely payments towards the wireless internet and other utilities in connection with Apartment #6A, in addition to frequently exchanging text messages with their building's super, Reinardo Quinones, about matters related to their residence in Apartment #6A, Ms. Zarak's former studio apartment #PHC, and even reflecting the long history which the families had shared over Ms. Zarak and the Childrens' many years at Hayden House. Tr. [ ]. R-R-118-119, R-206.

31.     The parties' connection to their apartment in Manhattan is historical, deep-rooted, and significant to the family. From California and in an email to Jan Lochtenberg, a member of the building's board of directors, dated March 19, 2019, Ms. Zarak explained that "Hayden House is where my first two children were born and it's our home. That's the area where I hope they can go to school, continue to grow..." Tr. [ ], R-101.

32.     As further proof that the parties intended to return to New York, Mr. Schram communicated with nursery school in New York about S.Z. and with P.S. 9 about E.Z. and R.Z. attending in the Fall 2021. Tr. [ ], R-166, R-172.

33.     Likewise, the Children have maintained all their health care providers in New York. Tr. [ ]. Their pediatrician, dentist and chiropractor are still in New York. Tr. [ ], R-190-192. Their medical and dental records are still in New York and were never transferred to Iceland. Tr. [ ], R-183, R-189, R-193. In fact, the Children have not had a single annual checkup in Iceland or any vaccinations there. Tr. [ ]. They only went to the clinic when they were ill, *i.e.* food poisoning and ear pain which necessitated immediate treatment. Tr. [ ]. It is the same reason S.Z. had emergency dental treatment; it was an emergency and needed to be taken care of and if it was not, the dental issue would have exacerbated.

### G.     **The Children Are Not Sufficiently Acclimated to their Environment in Iceland**

34.     During their time in Iceland, the Children have not acclimatized to Iceland. Specifically, when the parties arrived in Iceland and were exploring schools for E.Z. and R.Z. to attend (S.Z. was too young for school), they explicitly sought English-speaking schools because they never intended for their family to remain in Iceland past the crisis of the COVID-19 pandemic. Tr. [ ]. Toward that end, they enrolled E.Z. in an international school with other international students where all teaching was done in English and from which they would easily be able to transition E.Z. back to P.S. 9 in Manhattan. Tr. [ ], R-66. She also did not participate in any extra-curricular activities and rarely attended play dates after school or during the weekends. It is also important to note that like E.Z., the parties wanted to enroll R.Z. in the Landakotsskoli International school with E.Z.;

however, due to his age, he was not eligible to attend as the school only accepts children over the age of 5-years-old. Tr. [ ]. Moreover, he was put on the wait list at another English-speaking pre-school and the only reason he temporarily attended an Icelandic-speaking pre-school is because it was the only spot available for him. Tr. [ ].

35.     In addition to the Children not being acclimated to Iceland, the Children's contacts with and within Iceland remain extremely limited. Tr. [ ]. Before deciding to take refuge in Iceland for COVID-19, R.Z. had only been to Iceland once; the family only spent one Christmas there in 2017 and S.Z. had never met Mr. Schram's family (except his grandfather who came to New York to visit the family right before COVID-19) or been in Iceland. Tr. [  ]. While the family was in Iceland, except for seeing their paternal grandfather, the Children did not see extended family in Iceland often; only their grandparents and sometimes their uncles. Tr. [ ]. In fact, from August 2020, through at least February 2021, the family rarely socialized due to COVID-19 restrictions that were in place. Tr. [ ].

36.     On the other hand, prior to the pandemic, the Children regularly visited with family and friends in New York. Specifically, the Children have two maternal aunts and cousins in New York and Ms. Zarak's sister, who lives in Miami, comes to New York every other month. Tr. [ ]. They also traveled to Mexico regularly. Tr. [ ]. In fact, one reason the parties lived in New York was the close proximity to Mexico, where Ms. Zarak's extended family resides and owns a family residence that the Children spent time at along with their large extended family.

37.     To the extent that there is any notion that the Mr. Schram and Ms. Zarak took actions to make Iceland the Children's habitual residence, it should be duly noted that Mr. Schram unilaterally controlled the entire process of registration of the Children

in schools while they were in Iceland and Ms. Zarak was not included in any of his conversations with the schools. Tr. [ ]. To that end, although she was the parent in charge of caring for the Children's everyday needs in New York, Ms. Zarak did not sign any papers to register any of the Children in Iceland for the 2021-2022 school year. Tr. [ ].  Mr. Schram also unilaterally obtained Icelandic citizenship for the Children without Ms. Zarak's knowledge or consent. Tr.. She only learned of S.Z's Icelandic citizenship after asking a friend to translate the citizenship document which was surreptitiously obtained by Petitioner and forwarded to Ms. Zarak without explanation. Tr. [ ], R-137, R-198.  Until then, Mr. Schram had said absolutely nothing to Ms. Zarak about the fact that he had submitted and obtained Icelandic citizenship unilaterally without her signing a single document. Tr. [ ].  Although in June 2020 the parties placed E.Z. on the waitlist for the 2020-2021 school year in Iceland, Mr. Schram's statements themselves dispel any notion that E.Z.'s wait-listing was anything other than a contingency in anticipation of COVID-19 related changes to their presumed return to New York that Fall, noting in an e-mail to the school that it was "just in case if we [*sic*] needed to make alternative arrangements for the upcoming school year." Tr. [ ], R-215. In the same e-mail thread, Ms. Zarak clearly notes that "[t]he Coronavirus crisis keeps altering our plans but we are planning on arriving in late July, early August at the latest," as it was early in the year and COVID-19 still loomed large over New York City; schools were still not operating in-person and Ms. Zarak did not want E.Z. to lose her spot and only chance to avoid months of additional remote learning, with which E.Z. struggled. Tr. [ ], R-110, R-154, R-215.

38.     Other than E.Z. attending school, the Children participated in no extracurricular activities in Iceland. Tr. [ ],. E.Z. was waitlisted for gymnastics. Tr. [ ]. Although the parties wished for E.Z. to participate in activities to fill her time, E.Z. only

did trial classes in soccer and basketball and did not continue with those programs because she could not understand the coaches or the other children. Tr. [ ].

39.     This is because E.Z. is neither fluent nor proficient in Icelandic; the International school she attended in Iceland taught classes in English. Tr. [ ], R-66-67. E.Z. did not take any Icelandic language classes while in Iceland (nor anywhere else, including New York) where she would have learned to interact with the other children her age, shopkeepers, paternal family members and the like. S.Z., who is not very verbal, only says a few words and those are in English and Spanish. Tr. [ ]. Unfortunately, R.Z. was being bullied in school in Iceland; he cried every morning and the parties had to see a Behavioral Specialist twice because of the problems he was having in school precisely because he is not acclimatized in Iceland. Tr. [ ], R-163, R-197. Even though his preschool was in Icelandic, he also could not understand the teachers or children in order to interact with them in a meaningful way.

40.     On or about May 11, 2021, Ms. Zarak saw that New York "was back" and she raised the issue of the family moving back to New York with Mr. Schram. Tr. [ ]. She was not able to get a straight answer from him on this issue. Then, in late May 2021, when she traveled home to New York with S.Z., Ms. Zarak confirmed that it was not only safe for the family to return to New York, but she also heard that schools in New York would be in person for Fall 2021. Tr. [ ]. In addition to the foregoing, Ms. Zarak observed and received information that New York was reopening. People were once again out and about, restaurants were reopening, museums were reopening and critically, unlike in August 2020, people were to returning to working and  residing in Manhattan. Tr. [ ], R-107.

41.     The Children have also not acclimatized to the daily routine in Iceland, which is a dramatic departure from their lives in New York; they don't like Icelandic food and they can't get used to the cold weather or the hours of daylight in summer and hours of darkness in winter. Tr. [ ], R-211. During the summer, when it's bright for 18 hours, it's impossible to put them to sleep and they cannot get into any consistent schedule. Tr. [ ].

**H.     Ms. Zarak's Temporary Residency Status in Iceland**

42.     Ms. Zarak only has temporary residency status in Iceland for a period of one year which is to expire in May 2022. Tr. [ ], R-114-116. Accordingly, she would need to renew her residency permit again in May 2022 and, having initiated a divorce action against Mr. Schram, it will be substantially more difficult and complicated for her to renew said permit. Tr. [ ], R-180. Furthermore, Ms. Zarak does not speak Icelandic, is not employed in Iceland, has no family in Iceland, no bank accounts in Iceland, virtually no friends in Iceland, and had to apply for a residency permit because tourists can only be in Iceland as one of Schengen Zone countries for 90 days at a time. In addition to Iceland not being the habitual residence of the Children, it is also not the habitual residence of their mother.

43.     Moreover, Ms. Zarak still maintains her New York City Identification card and continued to pursue multiple avenues of ensuring that she maintained a lawful residency status in the United States, including her successful O-series Visa and Permanent Resident Card Applications, even while in Iceland. Her application for Icelandic residency was not in furtherance of a desire to move her family there permanently. Tr. [ ]. Confused about her legal status in Iceland, Ms. Zarak sought the opinion of Mr. Schram who stated that she "need[s] to submit the kennitala [*sic*] application. Even if you don't have all the documents. You're not here illegally. Probably

in a gray area. But not illegal." Tr. [ ], R-199. Fearing even the remote possibilities of being separated from her Children, or jeopardizing her U.S. immigration applications as a result of her potentially improper immigration status in Iceland, and at Mr. Schram's insistence, Ms. Zarak then submitted an application for a kennitala, or Icelandic Identification Number, which she did not receive until approximately May 2021. As a Mexican citizen staying in a country that does not have a Mexican Embassy, Ms. Zarak was not afforded any of the protections she is accustomed to ordinarily having as a habitual resident of the United States, within miles of the Consulate-General of Mexico in New York. While Ms. Zarak could have taken steps to make her legal status in Iceland more permanent, she did not do so, as the families' plan was had always been to  return to New York when the dangers and ravages of COVID-19 subsided.

## IV.   MR. SCHRAM CANNOT, AS A MATTER OF LAW, INVOKE THE PROTECTIONS OF THE HAGUE CONVENTION BECAUSE THE CHILDREN ARE NOT HABITUAL RESIDENTS OF ICELAND

### A.   Petitioner Cannot Show by a Preponderance of the Evidence that the Children are Habitual Residents of Iceland

44.    "The court's inquiry in a Hague Convention case is not the best interests of the child, as it is in a state custody case; rather it is the specific claims and defenses under the Convention, namely whether a child has been wrongfully removed to, or retained in, a country other than the child's habitual residence and, if so, whether any of the Convention's defenses apply to bar the child's return to his habitual residence." *Choi v. Kim (In re Kim)*, 404 F.Supp. 2d 495, 511 (S.D.N.Y. Dec. 5, 2005) (citing *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 610-11 (E.D. Va. May 6, 2002).

45.    This Honorable Court is well versed in the analytical framework in which to determine whether a removal was wrongful:

A petitioner bringing a Hague Convention action for the wrongful retention of a child must show that (a) the child was "habitually resident" in one contracting state and was retained in another contracting state; (b) the retention breached the petitioner's custody rights under the law of the contracting state of habitual residence; and (c) the petitioner was exercising those rights at the time of retention or would have been exercising those rights but for the retention. The petitioner must prove these elements by a preponderance of the evidence. *Saada v. Golan*, 2019 WL 1317868, at *14 (E.D.N.Y. March 22, 2019), *aff'd in part, vacated in part, remanded*, 930 F.3d 533 (2d Cir. 2019) (citing *Gitter v. Gitter*, 396 F.3d 124, 129 (2d Cir. 2005); *Hofmann v. Sender*, 716 F.3d 282, 291 (2d Cir. 2013)).

46.     As is relevant in this matter, absent proof by the preponderance of the evidence that E.Z. and S.Z. were habitual residents of Iceland, Mr. Schram may not invoke the protections of the Hague Convention. *Gitter v. Gitter*, 396 F.3d at 130; *Mota v. Castillo*, 692 F.3d 108, 113 (2d Cir. 2012) ("the child must have been removed to or retained in a Contracting State other than her State of habitual residence for the Convention to apply").

47.     In *Monasky v. Taglieri*, the Supreme Court clarified the standard for how to determine a Child's habitual residence and found that a child's habitual residence depends on the totality of the circumstances specific to the case. 140 S. Ct. 719, 723 (2020). While not overruling previous factors and tests that courts had used to determine a child's habitual residence, including shared parental intent and child acclimatization, the Court held that "no single fact is dispositive across all cases." *Id.* at 727; *see also Grano v. Martin*, 443 F.Supp. 3d 510, 538-39 (S.D.N.Y March 11, 2020) *aff'd* 821 Fed. App'x 26, 2020 WL 4045801 (2d Cir. 2020) ("Following *Monasky*, the parties' last shared intent is still a relevant consideration, although it is not dispositive"); *see also Chambers v. Russell*, 2020 WL 5044036, *4 (M.D. N.C. 2020) ("Finally, since *Monasky* did not

overturn the two-prong approach outright [as laid out in *Mozes v. Mozes*, 239 F.3d 1067, 1075 (9th Cir. 2001)], this court will still apply it, cognizant of the Supreme Court's directive that the inquiry is fact intensive and that the Hague Convention exists 'to ensure that custody is adjudicated in what is presumptively the most appropriate forum — the country where the child is at home.'")

48.     Because locating a child's home is a fact-driven inquiry, courts must be "sensitive to the unique circumstances of the case and informed by common sense." *Monasky,* 140 S. Ct. at 727 (citing *Redmond v. Redmond*, 724 F.3d 729, 744 (7th Cir. 2013)). Determining a child's habitual residence is a "fact-sensitive inquiry, not a categorical one." *Id.* at 726.

49.     Yet as the Court in *Monasky* noted, a child's habitual residence will often lie in "the family and social environment in which [the child's] life has developed." *Id.* "Common sense suggests that . . [if] a child has lived in one place with family indefinitely, that place is likely [the] 'habitual residence.'" *Id.*

50.     There is a "common" understanding to determine habitual residence: The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence. *Id.* (citing *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291 (3d. Cir. 2006)). "Residence in a particular country can be deemed 'habitual,' however, only when her residence is more than transitory." *Id.*

51.     In this matter, a temporary relocation to Iceland during a worldwide pandemic did not make Iceland the Children's home and certainly not their habitual residence. The parties did not move to Iceland indefinitely. The Children's family and social environments where their lives developed was, and continues to be, the United States. The Children's home is and has always been with Ms. Zarak in the United States,

who is and has been their primary caretaker and custodian. This is the case regardless of whether this Court determines the Children to be older and capable of acclimating or younger and unable to acclimate.

52.     For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant. *Id.* at 727. These facts considered by Courts are listed in Footnote "3" of the *Monasky* Opinion, which explains that the facts courts have considered include

> (a) change in geography combined with the passage of an appreciable period of time; (b) age of the child; (c) immigration status of child and parent; (d) academic activities; (e) social engagements; (f) participation in sports programs and excursions; (g) meaningful connections with the people and places in the child's new country; (h) language proficiency; and (i) location of personal belongings. *Id.* at n.3 (citing Federal Judicial Center, J. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 67–68 (2d ed. 2015)).

53.     For children like S.Z. (and R.Z.) who are too young or otherwise unable to acclimate and are dependent on their parents as caregivers, the intentions and circumstances of caregiving parents remain relevant considerations. *Id.*; *see also Holder v. Holder* 392 F.3d 1009, 1019 (9th Cir. 2004) (five-year age gap between the two children was "relevant to the acclimatization analysis" and that therefore a separate discussion of the boys' acclimatization was warranted).

54.     Thus, "[t]he inquiry into a child's habitual residence . . . cannot be reduced to a predetermined formula and necessarily varies with the circumstances of each case." *Id.* (citing *Karkkainen*, 445 F.3d at 291). "The signatory nations sought to afford courts charged with determining a child's habitual residence "maximum flexibility" to respond to the particular circumstances of each case. *Id.* (citation omitted).

55.     In the matter before this Court, the totality of the circumstances analysis must include the fact that the only reason the family left New York when they did was because of the COVID-19 pandemic, a (hopefully) once-in-a-life pandemic that devasted New York City beginning in March 2020 and that the parties, due to their financial status, were lucky to temporarily escape from in order to allow their Children to have some semblance of normality during these tumultuous times.

56.     This Court's totality of the circumstances analysis must also include, but is not limited to, the facts that both parties are permanent residences of the United States, that both parties continued to maintain ties, including employment relationships, with contacts in New York, that it was never a shared parental intention to permanently relocate to Iceland, that the parties continued to maintain and pay bills for the NY Residence, the parties continued to receive mail at the NY Residence, that neither the Children nor Ms. Zarak were acclimatized in Iceland (importantly, the fact that E.Z. was enrolled in an international school and was not taught nor did she learn to speak Icelandic, did not participate in extracurricular activities, and did not have her medical records transferred to Iceland), that the bulk of the Children's and Ms. Zarak's personal property remain in New York, and that Ms. Zarak continued to maintain ties, including social and educational, for herself and the Children in New York.

57.     Put simply, the totality of the circumstances conclusively demonstrates that the parties temporary stay in Iceland was never for an indefinite period of time, that that the parties never abandoned their home in New York, and that the Children were not properly acclimated in Iceland at the date of Mr. Scrahm's alleged wrongful retention.

**1.    The Effect of COVID-19 as a Factor to Be Considered
in the Totality of Circumstances**

58.     In the matter before this Court, the fact that the parties' temporarily went to Iceland because of COVID-19 is a factor that must be given paramount importance when considering the totality of the circumstances in determining the Children's habitual residence..  To that end, in the matter of *Sain v. Sain*, the Court found that China was the subject-child's habitual residence even after the parties spent nine consecutive months in the United Kingdom due to COVID-19 lockdown restrictions. *Sain v. Sain*, 2021 WL 2784324, *2 (M.D. Fl, July 2, 2021). Noting that "the COVID-19 pandemic has disrupted the lives of millions of people across the globe,"  the Court found that "China's pandemic-related border restrictions constitute the sole reason why their return failed". *Id.* at *1, *20.

59.     Ms. Zarak and Mr. Schram left New York in March 2020 to escape the worst of the COVID-19 Pandemic in New York. They went to Mexico with their Children for approximately four-months, and because schools in New York were not going to be in-person for the 2020-2021 school year, they returned to New York, packed a few belongings, and went to Iceland where schools were in-person so E.Z. and R.Z. could attend school. The only reason the family left New York was because of the COVID-19 pandemic - both parties repeatedly told third-parties that their absence from New York would be temporary (one to two years at most) and that they would return when it was safe to do so. When Ms. Zarak traveled to New York with S.Z. in May 2021, she saw that New York was back. When the parties learned schools in New York would be in-person, Mr. Schram communicated with nursery school in New York about S.Z. and with PS 9 about E.Z. and R.Z. attending in Fall 2021. Tr. [ ], R-172.

60.     Accordingly, the temporary nature of the trip to Iceland to escape the COVID-19 pandemic in New York, the absence of evidence that the parties intended or acted to abandon their familial residence in New York, and the evidence that the parties sought to maintain the NY Residence, that the Children continued to use their New York healthcare providers, and continued to stay in contact with the Children's schools in New York, are jointly sufficient to establish that at all relevant times, the Children's habitual residence remained the United States, and did not, at any point, change to Iceland.

### 2.     **Mr. Schram Cannot Establish That the Children's Habitual Residence Changed from the United States to Iceland**

61.     It is not disputed that the Children's habitual residence prior to their temporary stay to Iceland was the United States. Aside from brief vacations to Mexico to visit Ms. Zarak's family, and only three vacations to Iceland throughout their lives (except S.Z. who had never been to Iceland prior to August 1, 2020), the parties' Children have usually and customarily resided in the United States for their entire lives .

62.     "Where there is no dispute as to what the child's country of habitual residence was as of a certain date, it is appropriate for the court to reframe the question in terms of whether the country of habitual residence *changed* after that date." *Rodriguez v. Lujan Fernandez*, 500 F. Supp. 3d 674, 702 (M.D. Tn. Nov. 8, 2020); *see also Robert v. Tesson*, 507 F.3d 901, 997 (6th Cir. 2007) ("[T]he remaining question is whether or not [the children's] habitual residence changed from the United States to France during their three week stay [in France]."; *Karkkainen*, 445 F.3d at 294 (framing the issue as whether the children's "habitual residence changed from Finland to the United States" as "it 'seem[s] implicit in the concept of acquiring a new 'habitual' residence that the previous 'habitual' residence has been left behind or discarded). Yet as shown by the documentary

evidence, Mr. Schram has not, and will not be able to show that the Children's habitual residence changed to Iceland during the parties temporary stay.

63.     Courts have noted that "[w]e must take care to distinguish "between the abandonment of a prior habitual residence and the acquisition of a new one." *Sanchez-Londono v. Gonzalez*, 752 F.3d 533, 540 (1st Cir. 2014) (internal quotation marks and citation omitted). "A person cannot acquire a new habitual residence without forming a settled intention to abandon the one left behind. Otherwise, one is not habitually residing; one is away for a temporary absence of long or short duration." *Id*. "Absent a shared parental intent to move a young child, a claim that an earlier habitual residence has been abandoned warrants great skepticism." *Stirk v. Lopez*, 2021 WL 1139664 (M.D. Fl. March 25, 2021) (citing *Ruiz v. Tenorio*, 392 F.3d 1247, 1255 (11th Cir. 2004).

64.     In *Schwartz v. Hinnendale*, the Court found that even though the parties shared "an address in Mexico for five years and the children spent most of their young lives in Mexico," the father failed to meet his burden of establishing that the children were habitual residents of Mexico." 2020 WL 611634, *3 (E.D. Wi. Oct. 16, 2020). In *Hinnendale*, the Court found that there was no shared intention to abandon the United States for Mexico, as they "frequently spoke of returning 'home' to the States," and the mother remained in Mexico on a tourist visa without taking steps to secure residency status. *Id*. The record indicated that the children were issued United States passports, the parties retained their United States licenses, the parties maintained a joint United States bank account, and that the mother was not fluent in Spanish and focused on staying home and taking care of the children. *Id*. In sum, the Court found that the parties "appeared to have lived as visitors, rather than individuals seeking to become citizens of Mexico." *Id*.

65.     In this matter, Ms. Zarak (and Mr. Schram) consistently spoke of returning back to New York, Ms. Zarak did not apply for citizenship, the Children have United States passports, Ms. Zarak holds a New York City Identification Card, Ms. Zarak maintains a United States bank account (Mr. Schram maintained a United States bank account as recently as December 2020), and Ms. Zarak is not fluent in Icelandic and only focused on staying home and taking care of the children when in Iceland.

66.     In *Smith v. Smith*, the Fifth Circuit upheld the District Court's finding that the children's habitual residence was the United States, even though the children were in Argentina for two years after the parties decided to move there together and shared a marital home. 976 F.3d 558, 563 (5th Cir. 2020). The District Court's finding was supported by factors including that

> both parents all the children were born in the United States and continued to be United States citizens; [the father] was eligible to apply for Argentinian citizenship and did not do so; [the father's] work contract was at-will, contained provisions for "home leave" which referred to the United States . . . the parties brought all of their personal belongings with them to Argentina, but [the mother] continued to own, and [the father] was aware of, land in Texas that she inherited prior to the move abroad . . . all four children were enrolled in an "American style" school in Buenos Aires . . . [and the mother] does not now qualify for anything other than an Argentinian tourist visa, which would only allow her to stay in the country for up to three months. *Id.* at 560.

67.     In this matter, both parties have permanent lawful residency in the United States, all of the Children were born in the United States and have United States citizenship, Ms. Zarak was eligible to apply for a longer residency permit but did not (not to mention the parties pending divorce complicates any further permanent residency), Ms. Zarak continued to maintain work contacts and employment in United States based businesses, Ms. Zarak and the Children's personal belonging are in New York, along with

the marital residence that she continues to own and maintained throughout the parties time in Iceland, and E.Z. went to an English speaking international school in Iceland.

68.     In *Farr v. Kendrick*, the Ninth Circuit affirmed the District Court's determination that the parties did not have a shared, settled intent to abandon the United States as their habitual residence when they moved to Mexico. 824 Fed. Appx. 480, 481 (9th Cir. 2020) (deeming it unnecessary to remand to the District Court to reconsider under *Monasky)*. In *Farr*, the District Court found that the mother "viewed the move as temporary and believed the family would remain in Mexico for three to five years." *Id*. The District Court found "most telling" an email exchange where the mother "described Houston, Texas as their home and permanent residence, and rather than dispute the characterization, sought to postpone deciding when the move would occur." *Id*. The record also contained a text message where the mother expressed "uncertainty about whether they would stay in Mexico, writing, for example, that it was difficult for the family to settle in Mexico and make friends because "we don't know month to month if we'll be here or not." *Id.; see also Gitter v. Gitter*, 396 F.3d 124, 134-135 (2d Cir. 2005) (affirming the dismissal of the petition where it found that the parents did not intend to abandon the family's habitual residence in favor of Israel where the parents only agreed to move to Israel temporarily for a one-year conditional period. "The question in these cases is not simply whether the child's life in the new country shows some minimal degree of settled purpose, but whether we can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child out of the family and social environment in which its life has developed."); *Saada v. Golan,* 2019 WL 1317868 (E.D.N.Y. March 22, 2019), *aff'd in part, vacated on other grounds, 930* F. 3d 533 (2d. Cir 2019) (citations

omitted) (finding Italy as the habitual residence where a child spent almost the entirety of the first two years of his life and thus was the country where he "usually or customarily lives." The District Court cited the child's birth in Italy, various forms of Italian identification, his doctors, previous schooling,, and residency as relevant facts.)

69.     In this matter, Ms. Zarak viewed the move to Iceland as temporary  and for the limited purposes of escaping the COVID-19 pandemic, and believed that the family would remain in Iceland for one to two years. Messages between the parties also demonstrate that Mr. Schram did not dispute the characterization of Ms. Zarak's calling New York the parties home, and Ms. Zarak's communications clearly indicate that she expressed uncertainty about staying in Iceland. In fact, Mr. Schram even expressed that he did not know whether they would be in Iceland in the near future. Tr [].

70.     In *Abou-Haidar v. Vazquez*, the Court found that there was no shared intent to abandon France as habitual residence in favor of United States, where they had temporarily relocated. 419 F. Supp.3d, *1 (D.C.C. Oct. 9, 2019). The couple in this matter was married in France, primarily lived in an apartment in Paris, the child attended nursery school there, and the parents and child had strong social ties to the country. In addition, their jobs were in Paris, and while the clear intent was to remain in Washington D.C. for at least 18 months (with a possible extension of another 18 months), this was dependent on renewal of Respondent's contract. The Court in this matter went on to hold that given the marital strife, "the court cannot find whatever enthusiasm they shared about remaining in Washington D.C for more than 18 months. *Id. a*t *14. The Court noted that

> What is clear, based on the full record, is that the parties did not leave France in a manner that supports a shared intent to relocate indefinitely to the United States. Ample evidence supports this conclusion.... Respondent did not dissociate herself

31

from her university position, instead she took leave akin to a sabbatical. Though Respondent explained that she maintained her university position to continue her pension eligibility, that action only reinforces the parties' intent to return to France . . .the parties did not dispose of valuable personal property, such as furniture and appliances. Instead, they rented a storage unit in the same building as their former shared home in Paris. See *Berezowsky v. Ojeda*, 765 F.3d 456, 472 (5th Cir. 2014) ("Selling the family's home or cars, for example, may indicate the intention to make a more permanent move."); *see also Larbie*, 690 F.3d at 299 (citing as evidence of non-abandonment of habitual residence in the United States that the mother left substantially all of her belongings in United States when flying to England) Finally, the parties did not communicate an intention to leave permanently to family and friends. The absence of a going-away party or a similar acknowledgement of permanent departure is telling." *Id.* at *14-15.

71.     Ms. Zarak and the Children left for Iceland with one suitcase each, leaving the vast majority of their belongings in the NY Residence. The family did not have a farewell party when leaving New York - instead, both parties, repeatedly told friends and colleagues that they were going to Iceland only until they could return to New York when their Children could resume in-person schooling at their respective schools in New York.

72.     Furthermore, the parties did not ship furniture, including the children's beds and other belongings to Iceland for their temporary move. *See Silvestri v. Oliva*, 403 F. Supp. 2d 378, 381, 385-86 (D.N.J. 2005) (shipping furniture including the children's bed and other belongings from Argentina to the United States was evidence of the United States becoming habitual residence). Ms. Zarak (and Mr. Schram) maintained bank accounts and credit cards in the United States. *See Ruiz*, 392 F.3d at 1255 (11th Cir. 2004) (the mothers maintaining bank accounts and credit cards in the United States was cited as evidence that "the family was in limbo during its stay in Mexico" and supported a finding that the United States remained the habitual residence of the children).

73.     In this matter, the vast majority of the Children's belongings remain in the New York apartment. Tr. [ ], R-194. Mr. Schram's belongings are still in the storage unit for the New York apartment. Tr. [ ], R-208. Moreover, upon information and belief, Mr.

Schram continues to look for work in New York, maintain his New York cellular phone number, continues to receive mail in New York and still maintains his bank account in New York. Tr. [ ], R-128. Indeed, the parties never even forwarded their mail, let alone changed their address through the U.S. Postal Service.

74.     The parties are also in the middle of a pending divorce and have been having marital issues for a long time. *Id.* (moving at a time of marital instability can be viewed as supporting evidence that at least one of the parents did not intend to live at the new location indefinitely, and thus there was not intent to establish a new habitual residence); *see also Gitter*, 396 F.3d at 129, 135 (2d Cir. 2014) (move for a "trial period" did not support a change in habitual residence).

75.     Finally, Ms. Zarak's actions evincing her intention to not seek a more permanent residency status in Iceland support a finding that the Children's habitual residence in the United States was not abandoned. *See Ruiz*, 392 F.3d at 1255 (finding there was not shared intent to abandon residence in the United States when the mother "and the children went to Mexico on tourist visas, and there is no evidence that either [the mother or father] sought to acquire permanent legal status or Mexican citizenship for [the mother] and the children); *Mozes*, 239 F.3d at 1082 (9th Cir. 2001) (suggesting the habitual residence of the children may be Israel rather than the United States when the mother "and the children left for the United States with a temporary visa, casting considerable doubt on whether they would be allowed to remain here indefinitely even if they wished to"). Furthermore, Ms. Zarak had only been in Iceland less a year, and Courts have observed that "[w]hile an unlawful or precarious immigration status does not preclude one from becoming a habitual resident under the Convention, it prevents one from doing so rapidly." *Id.* at 1082 n.45.

76.     It stands to reason that if the parties' shared intent was to abandon New York and make Iceland their habitual residence, Ms. Zarak would have taken steps to make her legal status in Iceland more permanent.  However, she did not do so because there was never an intention or plan to make Iceland their permanent home – instead, the plan was always to return to New York when the dangers and ravages of COVID-19 subsided.

## B. <u>The Parties Did Not Share a Joint Intention to Remain in Iceland Indefinitely</u>

77.     "If only one party has a conditional intent to relocate, and the other party does not, it cannot be said that the parents shared an intent." *Martin*, F. Supp. 3d at 536. "In the event that the parents disagree as to their children's place of habitual residence, we look to the intent of the parents "at the latest time that their intent was shared." *Mota*, 692 F.3d at 112). "This finding of shared intent is critical, as the wishes of one parent alone are not sufficient to change a child's habitual residence." *Neergaard-Colon v. Neegaard*, 752 F.3d 526, 531 (1st Cir. 2014) (citing *Darin v. Olivero-Hoffman,* 746 F.3d 1, 11 (1st Cir. 2014)). In the absence of shared parental intent, "a district court should be "slow to infer" that an earlier habitual residence has been abandoned in favor of a new one." *Sanchez-Londono v. Gonzalez*, 752 F.3d 533, 543 (1st Cir. 2014) (two-and-a-half years in Columbia did not establish habitual residence).

78.     In the matter before this Court, Mr. Schram cannot demonstrate that the parties had a shared intent to change their and their Children's habitual residence from New York to Iceland. Ms. Zarak, as shown in her communications with third parties, including friends, family, and the Children's schools, never had an intention to remain in Iceland, either at the time the family temporarily relocated to Iceland or at any time

during her stay. The change in geography in this matter was due to the global COVID-19 pandemic. The last shared intention of the parties was to stay in Iceland due solely to the global COVID-19 Pandemic. As schools were open for in-person learning in Iceland and given the difficulties E.Z had with remote learning in Spring 2020, the parties agreed that Iceland was where they would temporarily stay until schools reopened for in person learning in Manhattan.

79.     While Mr. Schram's actions might demonstrate that, at some point after their arrival in Iceland, he changed his mind about returning to New York, or even that unbeknownst to Ms. Zarak always intended to remain in Iceland and duped her into going there with him when he did, that is insufficient to change the Children's habitual residence and accordingly, the Children's habitual residence remains New York.

80.     In *Headifen v. Harker*, the District Court affirmed the dismissal of the petition where the child's overseas residence was intended to be temporary, not indefinite. 549 Fed. Appx. 300, 301 n.1 (5th Cir. 2013). The District Court found that the shared intent of both parents was for Texas, not New Zealand, to be the habitual residence, even though  the parties had lived in New Zealand for over three years, moving from Texas in December 2009, since they planned to return as a family to Texas in March 2013. The children were also not found to be integrated into New Zealand or acclimated there. *Id.*

81.     Likewise, in this matter, the parties herein did not go to Iceland "for the foreseeable future" or "indefinitely." Rather, they were temporarily in Iceland for a year or two until it was safe to return to New York due to COVID-19 and once their Children would be able to attend school in New York in-person again. When Ms. Zarak broached the topic of returning to New York as had always been the parties' shared intent, Mr.

Schram even contacted E.Z.'s school in New York to inquire about re-enrolling her, demonstrating that even he intended to return to New York until he later changed his mind and withheld E.Z.'s and R.Z.'s passports and then subsequently retained R.Z. in Iceland.

82.    In *Guzzo v. Cristofano*, the District Court found that the parties relocation to Italy was temporary in nature where mother and child entered on temporary visas and "retained numerous connections to New York." 2011 WL 6934108 (S.D.N.Y. Dec. 30, 2011), *aff'd* 719 F.3d 100 (2d Cir. 2013). These connections included a real estate and law practice in New York, her New York drives license and bank account, and the majority of her possessions, including furniture, books, and clothing. *Id*. At *9. The facts of the matter before this Court are similar to *Guzzo* in that the parties maintained real estate in New York, they maintained bank accounts in New York, the majority of the Children's and family's possessions remain in New York, including furniture, books and clothing and the Children have lived the majority of their lives in New York, where E.Z. and R.Z. attended school prior to the Fall 2020 semester.

83.    The correspondence of the parties and the evidence will demonstrate that the family's presence in Iceland was always intended to be temporary, not definite and that they never abandoned or supplanted New York as the Children's habitual residence.

84.    Furthermore, Mr. Schram's unilateral and secretive actions to obtain Icelandic citizenship for the Children and his actions to coerce Ms. Zarak to stay in Iceland by withholding the Children's passports constitute special circumstances that this Court should take into account when determining the Children's habitual residence. *See Rishmawy v. Vergara,* 2021 WL 1760303, *21 (S.D. Ga. May 4, 2021) (citing *Monasky*

and stating that coercion to reside in a country should "figure in the calculus of determining the child's habitual residence").

### C.   There is No Evidence that the Children Were Sufficiently Acclimatized in Iceland

85.   As indicated throughout this submission, the primary motivation for the parties traveling to Iceland on July 31, 2020, was to escape the COVID-19 Pandemic in New York and so that their Children could attend in-person school in Iceland because schools in Manhattan were to be remote for Fall 2020.  Yet in Iceland, E.Z. attended an International English-speaking school, she took no classes or tutoring to learn Icelandic and she participated in no extracurricular activities outside school because she could not understand the other children. S.Z., who is only two-years-old and barely verbal, speaks no Icelandic and participated in no activities in Iceland. While the family were in Iceland, the Children did not see extended family in Iceland often; only their grandparents and sometimes their uncles. Tr. [ ]. For the first 6 months, the family did not socialize and saw virtually no one due to COVID-19 restrictions. Tr. [ ]. Moreover, none of the Children's primary care providers – pediatrician, dentist, or chiropractor – are in Iceland and the Children's medical records were also never transferred to Iceland.

86.   In *Papakosmas v. Papakosmas*, the Ninth Circuit upheld the District Court's finding that Greece was not to the habitual residence when "the district court noted that the evidence showed that the couple's son was not adapting well to his new environment, and often had headaches and crying fits." 483 F.3d 617, 626 (9th Cir. 2007). The Court also noted that  "that although the passage of time itself is not dispositive on the issue of acclimatization, it is instructive that the children spent nearly all of their lives in the United States, spoke little Greek, and had visited the country only three or four

times for two to three weeks at a time. With the irregular set-up of their household in Greece, four months was an insufficient time for the children to 'develop[ ] deep-rooted ties to the family's new location.'" *Id*. at 627 (citation omitted).

87.   In this matter, the Children spent nearly all of their lives in the United States prior to their temporary move to Iceland, only visited Iceland three times prior to the move, R.Z. was severely bullied, and E.Z. does not speak Icelandic, not to mention the irregular nature of moving to escape a worldwide pandemic.

88.   Acclimatized children would begin to become fluent in Icelandic, participate in extra-curricular activates, and attend Icelandic public schools with other children their age. The Children did not do this. On the contrary, the Children were raised in New York for their entire lives, have friend groups in New York, attend cultural institutions in New York, and have a sense of community in their New York City neighborhood.

89.   Although the Children were in Iceland from August 1, 2020, until June16, 2021, this was not enough time for them to have become acclimatized to Iceland to a degree sufficient to warrant a change in their habitual residence.

90.   In *Hofmann v. Sender*, the Court held that there was no acclimation to New York where child had lived there for "over a year" but had moved within the state and had maintained "close ties to friends and caretakers in Canada". 716 F.3d 282 (2d Cir. 2013). Likewise, in *Sundberg v. Bailey*, the Court found that the parents did not have a shared intent to make the United States the child's habitual residence instead of Sweden where the parents only agreed to bring the child to the United States for several months. 765 Fed. Appx. 910, 912 (4th Cir. 2019).

91.   In *Sundberg*, the Court found that "attending school for one school year does little to show that the child's life has sufficiently 'developed' in her new surroundings

to make it her home." *Id*. at 914. The parties agreed that they would "re-evaluate in May 2017 to determine 'a future agreement' and 'plan' for the future.  *Id*. This agreement provided for a temporary move until the parties discussed the future in May 2017. While the agreement does not expressly state that Ms. Bailey and the child would return to Sweden, it is apparent from the agreement that the move to Asheville was not meant to be permanent." *Id*. (citations omitted); *see also Maxwell v. Maxwell*, 588 F.3d 245, 253 (4th Cir. 2009) (no intention to abandon the United States as the habitual residence when, *inter alia*, she manifested an intent to return her child to American school); *contra Feder v. Evans-Feder*, 64 F.3d 217, 223 (3d Cir. 1995) (change in habitual residence found when the parties moved to Australia "for the foreseeable future").

92.     Moreover, E.Z.'s education was purposefully done in English at the International school where she could understand the classes and so that when she returned to P.S. 9 she would be able to progress as if she had remained at P.S. 9 and not missed a semester. *Contra Koch v. Koch*, 450 F.3d 703 (7th Cir. 2006) (habitual residence was Germany when the parties moved with the intention to stay until certain financial goals were met, they lived in Germany for three years, they closed U.S. bank accounts, they took nearly all of their possessions, they set up their new home, the children attended school in Germany, and both parents had spent nearly their entire adult lives in Germany, among other factors).

93.     In this matter, the parties met in New York, both attended graduate school in the United States and even in New York, got married in New York, and two of their three Children were born in New York (S.Z. was born in California). The Children have lived the majority of their lives in the United States and were in Iceland solely as a result of the COVID-19 Pandemic. When the family traveled to Iceland, they left the New York

apartment intact, leaving the vast majority of the Children's and Ms. Zarak's belongings in New York. Indeed, Mr. Schram even left his personal belongings in the NY Residence and in storage in New York. The parties continued to pay maintenance and utility bills on the New York apartment, maintained their bank accounts in New York and even kept their New York cellular phone numbers. While the Children were in Iceland, they retained close ties to friends in New York and family in the United States and Mexico. These facts demonstrate that New York was never abandoned as the families habitual residence nor were the Children or the family acclimatized in Iceland.

94.     In *Blackledge v. Blackledge*, the Court found the minor child to be habitually resident in the United States because, among other factors, "by the time of the retention date, [the United States] was the longest and most stable residence he had known in his fairly nomadic early years," and the child also had extended family in the United States and was a United States citizen. 386 F.3d 169 (3d. Cir. 2017).

95.     E.Z., who is seven years old, has spent almost 6/7 of her life in the United States. S.Z., who is two years old, has spent approximately half his life in the United States. The United States is the longest and most stable residence the Children have had.

### D. Even if the Children Have Acclimated to Some Degree, Mr. Schram Cannot Meet His Burden to Show that Iceland is the Children's Habitual Residence

96.     Even in cases where children were found to have acclimated to some degree in a new country, Courts have found the children's habitual residence to be the prior country on similar facts to this matter.

97.     In *Poliero v. Centenaro*, the Second Circuit affirmed the District Court's finding that Italy was habitual residence where all of the children were born in Italy, and the parties did not sell their family home in Italy, maintained personal belongings and

furniture in Italy, and only leased apartments in New York for dates to coincide with the school year for the children. 373 Fed. Appx. 102, 105 (2d. Cir. 2010). The parties also maintained continuous connections with Italy even though they didn't live there the majority of the year. *Id.* While the Court in *Centenaro* noted that the children had adjusted well to living in New York and even expressed a preference for remaining there, they were not so acclimatized to the United States as to render it their habitual residence. *Id. a*t 106.

98.    *Paz. v. Mejia de Paz* is instructive. 169 F.Supp. 2d 254 (S.D.N.Y. 2001), *aff'd* 47 Fed. Appx. 22 (2d Cir. 2002). In *Paz*, the Second Circuit affirmed the District Court's dismissal of the petition, finding that the petitioner did not meet his burden to show that New Zealand was the habitual residence. *Id. a*t 259. Even though the child spent nine to ten months in New Zealand, attended school in New Zealand, made many friends, and developed a personal attachment, the evidence was viewed in light of the frequent relocations. *Id. a*t 258. The Court noted that this evidence included that the child also attended school in Peru and the U.S. for extensive periods before her stay in New Zealand, had friends in New York, and had extended family in the United States. *Id.* Further, the parties' intentions established that the child would live in New Zealand during 2000 "on a temporary basis only." *Id.*

99.    In the matter, the Court should dismiss Mr. Schram's petition because he cannot establish by preponderance of the evidence that the Children's habitual residence is Iceland, since the Children attended school in the United States for extensive periods of time, have friends in the United States, have extended family in the United States, and only intended for the move to Iceland to be temporary to escape the epicenter of the COVID-19 pandemic – New York in March 2020. This Court should also view the family's

temporary escape to Iceland in the context of their frequent trips, including to Mexico, while always continuing to maintain the United States as their habitual residence.

100.   *Watts v. Watts* is instructive as well. 935 F.3d 1138 (10th Cir. 2019). In *Watts*, the family lived in North Carolina for 10 years (from 2006 to June 2016) and raised three children who were dual citizens of Australia and the United States. *Id*. at 1141. Then, in 2016, they prepared to move to Australia for two-and-a-half years for their son's medical treatment. *Id*. At that point, they rented out their home and had "many conversations about their intentions to live in Australia only long enough to obtain [their son's] healthcare." *Id*. They at first rented a home, yet later bought a home because their rental home became too small.  They shipped many of their belongings to Australia, and the wife was granted a temporary visa enabling her to remain in Australia. *Id*. They enrolled their children in school in Australia. *Id*. Concerned she could not work if they later divorced, the wife applied for a permanent visa. *Id*.

101.   Yet the parents' already-strained relationship started to deteriorate. *Id*. at 1142.  On August 17, 2017, the wife took the children and flew back to Utah without telling the husband. The family were in Australia for just over 11 months. While the Court noted that the children "attended school, made friends, explored Australia, and 'interacted somewhat' with Shane's family," it also noted that "the children had known that they would be in Australia for a limited time, that the lived in two different houses while in Australia, and that they had "never considered Australia home." *Id*. Thus, the Court found that there had been no acclimatization to Australia. The Court also found that there was no shared intent to settle in Australia, as the parties moved for one reason - their child's expensive orthodontic needs. The Court noted that the family also kept their home in North Carolina and left many of the family's sentimental items in Utah while in Australia,

in addition to leaving open their bank accounts in the United States, while the husband continued to operate a business in North America. and Shane continued to operate a business in North America. *Id*. at 1143.

102.    In the matter before this Court, there was no shared intent to settle in Iceland. The parties went to Iceland for one reason – so their Children could attend school in-person in Iceland while in-person schooling was not an option in New York.  This family kept their home in New York, leaving it virtually untouched when they went to Iceland on July 31, 2020. Tr. [ ], R-194. They kept their two storage lockers in the building which not only contains Ms. Zarak and the children's belongings but also many of Mr. Schram's personal belongings.  In addition, Mr. Schram continued to work on a contract-basis including on his clients in New York and Mr. Schram even continues to seek work in New York through his New York contacts. Tr. [ ], The parties continued to maintain their New York bank accounts, still maintain their New York cellular phone numbers and Mr. Schram continues to receive mail to the residence in New York. Tr. [ ]. While in Iceland, the children have lived in four (4) different places including three (3) Airbnbs and even though E.Z. attended school in Iceland, she never acclimatized to Iceland.

103.    Both Ms. Zarak and Mr. Schram maintained continuous connections with New York even while in Iceland, with Ms. Zarak even returning with S.Z. in May 2021, with Mr. Schram's knowledge and express consent. They maintained the New York apartment which continues to contain the vast majority of their furniture and belongings, particularly those of the Children. The Children have not acclimatized to Iceland. E.Z. even attended an English-speaking international school in Iceland and never took any Icelandic classes to learn the language. S.Z., given his tender years, is barely verbal and only speaks a few words of English and Spanish, but no Icelandic. The Children's habitual

residence continues to be New York not only because it was never the parties' shared intention to abandon New York but also because their actions reinforced that New York remained the habitual residence.

## V.   **CONCLUSION**

104.   As set forth above, the Mr. Schram has not, and cannot, establish a *prima facie* case for wrongful removal or retention in the United States. This is because the United States, not Iceland, is, and always has been, the Children's habitual residence at the time Mr. Schram commenced this proceeding. The period of time that the family has been in Iceland was temporary in nature and not intended to be a permanent change in the habitual residence of the Children or the parties. The parties never abandoned New York as their home. But for the COVID-19 Pandemic, the family would never have moved to Iceland. Mr. Schram's attempt to have the Children returned to Iceland is not authorized by the Convention and would, in fact, be contrary to the purposes of the Convention.

105.   Accordingly, based on the facts and analysis set forth above, this Court should conclude that Mr. Schram has not met his burden to show that Iceland is the Children's habitual residence and therefore dismiss Mr. Schram's petition with prejudice.

Dated:   New York, New York
             September 27, 2021

**Chemtob Moss Forman & Beyda, LLP**

By:   *Michael F. Beyda*
        Michael F. Beyda
527 Madison Avenue, 7th Floor
New York, NY 10022
Tel: (212) 317-1717

*Counsel for Respondent Tania Zarak*