UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ARNALDUR SCHRAM,

Petitioner,

v. 21 CV 6524 (MKV)

TANIA ZARAK,

Respondent.

------------------------------x

New York, N.Y.
October 4, 2021
12:00 p.m.

Before:

HON. MARY KAY VYSKOCIL,

District Judge

APPEARANCES

BURGER GREEN & MIN, LLP
Attorneys for Petitioner
BY: RICHARD MIN
KENNETH GLASSER
MICHAEL BANUCHIS

CHEMTOB MOSS FORMAN & BEYDA
Attorneys for Respondent
BY: MICHAEL F. BEYDA
MUDITA CHAWLA

THE COURT: Good morning, Ms. Dempsey.
Good morning, counsel.
Ms. Dempsey, would you call the appearances.
COURTROOM DEPUTY: Counsel, starting with the petitioner, please, state your name for the record.
MR. GLASSER: Kenneth Glasser.
Good morning, your Honor.
THE COURT: Good morning, Mr. Glasser.
Will you be taking the lead for the petitioner?
MR. GLASSER: No. My colleague, Richard Min, is lead counsel.
THE COURT: Okay. Thank you.
MR. MIN: Richard Min, on behalf of petitioner.
Good morning, your Honor, and counsel.
THE COURT: Good morning, Mr. Min.
We're quickly approaching afternoon.
MR. BANUCHIS: Also for petitioner, Michael Banuchis.
Good morning, your Honor.
THE COURT: Good morning.
MR. BEYDA: For the respondent, Michael Beyda.
Good morning, your Honor.
I will be taking the lead today.
THE COURT: Thank you, Mr. Beyda.
Good morning.
MS. CHAWLA: Good morning, your Honor.

Mudita, Chawla, also for the respondent.

THE COURT: Good morning.

Are there any other appearances?

All right. Do we have the parties on the line or no?

MR. BEYDA: Ms. Zarak, the respondent, is on the line, your Honor, and Mr. Schram, THE petitioner, your Honor, is on the line.

THE COURT: Okay. I do see both of you.

Good morning. Good afternoon.

All right. A couple matters for us to attend to before we begin the testimony in this matter. First, I have the motion by petitioner for entry of -- Well, it's an in limine motion to preclude the admissibility into evidence of certain transcripts.

You all can hear me?

(Yes)

THE COURT: All right. Thank you.

All right. I'm sorry. So, I have a motion as I say by the petitioner to preclude the admission into evidence of certain transcripts. One, of a conversation between Mr. Schram and Ms. Zarak, and the other two being transcripts of marriage counseling sessions that were conducted via Zoom. The response that I received this morning says that the respondents are withdrawing their Exhibit Number R177 from their exhibit list. R179, as I understand it is the conversation between Ms. Zarak

and Mr. Schram and the other is the transcript of the counseling session.

The Court does agree that, clearly, there is a privilege that applies with respect to the counseling sessions. However, privileges can be waived. It is unclear to me at this point the use for which these exhibits may or may not be made during the course of this evidentiary hearing. I do not find that by producing the materials in discovery there was any waiver. The materials were simply produced to the other side which includes the, which is the counter-party to the conversation. So, by producing them to the other participants there certainly was not any waiver of any applicable privilege in the Court's view however, and no disclosure to any third parties, putting aside the issue of counsel who are acting as agents for the counter-party.

However, I really don't know the use to which Mr. Schram may make of the sessions of, the substance of the sessions of the conversations during his presentation of evidence. So, it may well be that depending on what the petitioner does during its case in chief, there may be a waiver of the privilege. I don't know. If any of that information if disclosed during the course of this evidentiary hearing, certainly, that would be putting those matters at issue and that constitutes in the Court's view a waiver of any applicable privilege but I cannot tell that at this point in time.

So, the motion to preclude is denied without prejudice to renewal at the time that Ms. Zarak may try to use those materials and at that point we'll see whether there has been a waiver or not. All right. So that's my ruling with respect to the in limine motion.

Now, there was also some discussion when we met on Friday about whether there would be opening statements. I think the way we left off was that the parties wanted to make brief -- and by "brief", I mean in the neighborhood of five minutes, opening statements.

Is that correct?

MR. MIN: Your Honor, I believe at the end of the day we agreed with opposing counsel that we would waive opening statements in its entirety.

THE COURT: All right. For the record, I should have said this is an open-court proceeding as if everybody were in court. It is open to the press and the public. I am in open court.

I would add that we have a court reporter with us. I believe some of you may be getting Real Time transcripts. I assume you are going to be ordering daily transcripts. When you do speak, please, identify yourself for the record so that we have an accurate record of who it is that is speaking.

So, who was it who told me that you believe you agreed to waive openings?

MR. MIN: Your Honor, it was me who said that. I believe Mr. Beyda and I agreed to waive opening statements.

I did have a question to follow-up on what your Honor just stated afterwards --

THE COURT: One moment. Before we get to that.

Mr. Beyda, is it correct that you are on behalf of the respondent waiving opening statements?

MR. BEYDA: That is correct, your Honor.

THE COURT: All right. Thank you.

All right. Mr. Min, your question?

MR. MIN: Yes, your Honor, regarding your question of us ordering daily transcripts, the issues of summations versus post trial briefs was discussed on Friday. I believe that Mr. Beyda and I both said that we would be fine with your Honor making a ruling from the bench and waiving post trial briefs. And your Honor, I believe, said that you would consider those options and let us know. I think that would affect whether or not we're ordering daily transcripts.

THE COURT: All right. I don't think I ever said I would rule from the bench. It has never been my intention. In fact, I think I am required to have written findings of fact and conclusions of law.

MR. MIN: Your Honor, I apologize.

THE COURT: Whether I need or would like post hearing written submissions from the parties was the question or

whether you were going to do summations or both, that was what we left open. And frankly, I would still like to leave that issue open until we see how the evidence comes in. It may be that at the conclusion of the evidence, I have everything I need and you can do summations if you want or not but it may be that there are further things that I need the parties to address in written submissions. So, I'm not prepared to say yet. I want to hear from the witnesses.

So, you need to be guided accordingly in deciding whether you are going to order daily transcripts or not but if I say I would like submissions or if I say I would like written submissions, you need to be prepared. Okay?

Counsel, you know you're all very experienced in handling these types of matters. It seems to me that this is the kind of thing that you really shouldn't need guidance on. I'll give you a brief bit of time. I mean, a minute or two to think about it and let the court reporter know whether you want daily transcripts or not.

MR. MIN: Your Honor, on behalf of the petitioner, we'll order the daily transcript.

(Pause)

THE COURT: All right. Thank you, Ms. Moore.

Mr. Min, would you call your first witness, please.

MR. MIN: Thank you very much.

On behalf of petitioner, we'd like to call our first

witness Arani Bjorn Helgason, who is present here on Teams.

THE COURT: All right. Sir, are you able to hear us clearly?

THE WITNESS: I am.

THE COURT: Ms. Dempsey, would you swear the witness, please.

ARNI BJORN HELGASON,

called as a witness by the Petitioner,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. MIN:

Q. Mr. Helgason, thank you for appearing, I believe your afternoon, in Iceland. If you need me to repeat any question, please, don't hesitate to ask. Okay?

Do you know Arnaldur Schram or Tania Zarak?

A. I don't know Arnaldur. I know of Tania. I mean, we've met once and have communicated through email.

Q. Okay. And how do you know Tania?

A. I know her from 2017 when she emailed us and said that she was bringing a project to Iceland that didn't come of anything and then she e-mailed me back about a year ago saying that she'd moved to Iceland and was looking into getting into the film business in Iceland.

Q. Did you meet with her in-person in Iceland?

A. Yes. She came to my office.

Q. Okay. And do you recall, approximately, when Ms. Zarak came to your office to meet with you in person?
A. It was a year and a week ago-ish.
Q. Okay. So, approximately, September 2020?
A. Yes.
Q. Okay. And how long did you and Ms. Zarak meet for?
A. Say an hour and a half, something like that.
Q. Okay. And what did you and Ms. Zarak discuss during this meeting?
A. Well, we discussed her situation. She, with Netflix and all of that and she moving to Iceland as she had an Icelandic husband. We spoke about her becoming involved in the production side in Iceland. Yeah, along those lines.

MR. MIN: Okay. I want to follow-up on a couple things, please.

Your Honor, our second witness has joined and I just would like to ask him to mute himself or, perhaps, the Court could have him wait in the lobby. We just wanted to note that.

THE COURT: Your tech person? Is that what you said?

MR. MIN: Our second witness.

THE COURT: Oh, yes. Is there a waiting room, Ms. Dempsey?

Who is your second witness?

MR. MIN: The name on the screen says "Danny". It's Mr. Halfdan Pedersen.

THE COURT: Thank you. Hold on.

(Pause)

THE COURT: This is a reminder. Could everyone else, please, put their lines on mute.

Mr. Beyda, you can keep your line un-muted in case you have an objection.

MR. BEYDA: Thank you.

THE COURT: Mr. Min, are you able to put your next witness in the waiting room or is that something we control here?

You're muted.

MR. MIN: Your Honor, that is something that I believe the Court controls but I am happy to have the witness call back. I just didn't want to have the delay between finishing with the first witness and then having to instruct the second witness to call in and waste those precious minutes but I'm fine having him call back.

THE COURT: It would be best, sir, if you could --

(Technical difficulties stopped the transmission)

THE COURT: All right. Mr. Min, go ahead.

MR. MIN: Your Honor --

MR. BEYDA: Your Honor, I lost video of Mr. Min and the witness.

It's Michael Beyda speaking.

THE COURT: Is that on your end? I don't know. I can

see both. Do you want to try to reconnect, Mr. Beyda?

MR. BEYDA: I see them now.

THE COURT: All right. Great. Go ahead, Mr. Min.

MR. MIN: Thank you, your Honor.

Q. Mr. Helgason, and my apologies. The audio might have cut out a little bit. I think you said something about Ms. Zarak wanted to talk to you about production side or something about production in Iceland. Could you repeat that part of the answer?

A. Yes. I believe she was looking into getting into the Icelandic film industry. So that's what we spoke about.

MR. BEYDA: Objection, your Honor, in terms of what the witness believes. It's either what Ms. Zarak said or and what he heard.

A. It is what we spoke about.

THE COURT: It is what you spoke about? Is that what you said, sir?

THE WITNESS: Yes.

THE COURT: All right. Thank you.

Q. At any point during this conversation or any of your correspondence or any communication with Ms. Zarak, did she ever indicate to you that she was moving to Iceland temporarily?

A. No. All of our emails prior to the meeting and my introductions when I introduced her to people in the industry

here, her -- and everything stated that she was moving to Iceland.

Q. But you said --

MR. BEYDA: Objection, your Honor. Move to strike as non responsive everything after the word "no".

THE COURT: Overruled. Go ahead.

Q. Mr. Helgason, you said you sent that email introducing Ms. Zarak to other individuals in Iceland?

A. Yes, I did.

Q. Okay. Why did you do that?

A. I offered to introduce her to producers, directors and such in Iceland, so she could meet them and possibly start her career.

Q. Is this something that Ms. Zarak asked you to do?

A. I can't recall whether I offered or she asked.

Q. What is your connection to the Icelandic film industry?

A. I am a former producer, talent agent now.

Q. And did you discuss with Ms. Zarak any other career opportunities in Iceland aside from the film industry?

MR. BEYDA: Objection to the form.

THE COURT: Overruled.

A. We spoke about, I told her that there were no, for example, literary agents in Iceland, that that was something that she could perhaps pursue.

Q. And what was Ms. Zarak's reaction or response to you

mentioning the lack of literary agents in Iceland?
A. I can't recall her reaction. I'm sorry.
Q. Okay. And you said you met with Ms. Zarak for approximately an hour and a half. Did you, what percentage of that meeting was devoted to discussing Ms. Zarak's interest in pursuing job opportunities or career opportunities in the film industry in Iceland?
MR. BEYDA: Objection; compound between job and/or career.
THE COURT: Overruled. This is a bench trial. If the witness doesn't understand or can't answer, you can tell me that, sir. But if you are able to answer, I'd appreciate your response.
A. I mean, I believe we went, first half hour we went over her situation with Netflix and all of that and the rest of the time was feeling out the Icelandic industry and if she had any business in it.
MR. MIN: One second, your Honor.
(Pause)
MR. MIN: No further questions, your Honor, of this witness.
THE COURT: Thank you.
Mr. Beyda, cross-examination?
MR. BEYDA: Thank you, your Honor.
CROSS-EXAMINATION

BY MR. BEYDA:
Q. Mr. Helgason, you mentioned that you're a talent agent, correct?
A. Yes, I am.
Q. And you live in Iceland, correct?
A. I do.
Q. Prior to your encounter with Ms. Zarak in September of 2020, how many times have you met in person with Ms. Zarak?
A. Never.
Q. How many times had you spoken with Ms. Zarak?
A. We spoke over email but not in person, never.
Q. How many times have you spoken over the telephone with Ms. Zarak prior to your meeting with her in Iceland in September 2020?
THE COURT: Wait. Let him finish the question.
A. No, I've never spoken to her on the phone as I recall.
Q. You had not discussed with her why her family was -- withdrawn.
How many children does Ms. Zarak have, if you know?
A. I believe --
MR. MIN: Objection.
THE COURT: What's the basis of the objection?
MR. MIN: I'll withdraw the objection, your Honor. It's already answered.
THE COURT: Mr. Helgason, do you know?

A. I believe there are three.
Q. What time of the day did you meet with Ms. Zarak, Mr. Helgason?
A. Around two/three o'clock, something like that.
Q. And Ms. Zarak brought her child with her to that meeting, correct?
A. No, she didn't.
Q. He was downstairs, correct?
A. No, he wasn't. There is no downstairs.
Q. Was he outside?
A. Absolutely, not. We're on a busy industrial street. There is no outside.
Q. Isn't it true that the meeting with Ms. Zarak took place in the morning, not in the afternoon?
A. It may have.
Q. Did Ms. Zarak tell you that her son was waiting in the car with her father-in-law?
A. I do not recall. I'm sorry.
Q. Would it surprise you if the meeting with Ms. Zarak did not last an hour and a half?
A. Yeah. We spoke about many things. So, yeah, it would surprise me, an hour, hour and a half.
Q. So, an hour or an hour and a half is a difference. There's a difference between an hour and an hour and a half, correct?
A. Not at all, no.

Q. Well, you said you spent the first half hour of the meeting speaking about Netflix, correct?
A. Yes, "ish".
Q. And then you spent the second portion of the meeting discussing the Icelandic film industry, correct?
A. Well, yes, but --
Q. And then after your meeting --
THE COURT: Let him finish, Mr. Beyda.
Were you finished, sir?
A. I was going to say, you know, it wasn't, there was no time. I mean we spoke about great many things and they overlapped and all of that. So, no, it is very --
Q. Mr. Helgason, before coming to court today via Microsoft Teams, have you had discussions about your testimony with anyone?
A. I spoke to Mr. Min when he was getting me on this, but other than that, no.
Q. Did you discuss any portion of this case with the petitioner, Mr. Schram?
A. He called me once to tell me that his lawyers would be in contact with me.
Q. And how long was your conversation with Mr. Min?
A. I think we've spoken twice, for about five minutes.
Q. When was your last conversation with Mr. Min before, actually, when was your last conversation with Mr. Min?

A. Well, Friday, I believe, something like that.
Q. Now, going for a moment back to your conversations with Ms. Zarak, Mr. Helgason, during your meetings with Ms. Zarak, she told you that she was in Iceland because of the COVID pandemic, correct?
A. It was a part of it, that Iceland was a better place as I recall.
Q. And she told you that it was a better place because of the situation in New York at that time, correct?
A. Sure.
Q. And you were aware of the situation in New York at that time, correct?
A. Yes.
Q. And compared to the situation in Iceland, it was a much better situation in Iceland, correct?
MR. MIN: Objection as to the basis of knowledge, comparing Iceland to New York.
THE COURT: Sustained, if that's what he and Ms. Zarak discussed but he doesn't have a basis to really know.
Q. Mr. Helgason, during your meeting with Ms. Zarak, it was obvious to you why her family was in Iceland, correct?
MR. MIN: Objection as to form.
THE COURT: Sustained as to form. Sustained.
Q. Was it obvious to you as to why the family was in Iceland, Mr. Helgason?

MR. MIN: Objection.

THE COURT: Sustained. You haven't established the predicate fact.

Q. Mr. Helgason, you discussed with Ms. Zarak the COVID 19 pandemic, correct?

A. We probably did.

Q. Okay.

THE COURT: I'm sorry. "We probably did", is that what you said.

THE WITNESS: Yes.

THE COURT: Thank you.

Q. When you say you probably did, what did you discuss about the COVID pandemic with Ms. Zarak?

A. I don't recall what we spoke about, specifically, about the COVID pandemic, just conversation in general, I believe.

Q. Did you discuss at all how the COVID pandemic had impacted Ms. Zarak and Mr. Schram?

A. I can't recall.

Q. Did you discuss where Ms. Zarak was living while in Iceland?

A. No.

Q. Did you discuss where her children were living while in Iceland?

A. No.

Q. So, when you met Ms. Zarak for the first time and you were

introducing yourself to her and she was introducing herself to you, did you exchange pleasantries with one another?
A. Yes.
Q. Were you not curious as to why Ms. Zarak and her family were in Iceland?
A. Not particularly, because she introduced herself in the e-mail prior to our meeting saying that she had moved to Iceland because her husband was Icelandic.
Q. Did she mention anything in those communications about COVID?
A. I don't think so, no.
Q. Did she -- and she also did not indicate in those emails that she had permanently moved to Iceland, correct?
A. She didn't say permanently but she said moved to Iceland.
Q. Now, following your meeting with Ms. Zarak, you had no additional meetings with her, correct?
A. No, I did not.
Q. You had no additional communications with her directly, correct?
A. No, I did not.
Q. You sent messages to various third parties after your meeting introducing Ms. Zarak to those people, correct?
A. Yes, I did.
Q. To your knowledge, did any of those people hire Ms. Zarak?
A. No, not to my knowledge.

Q. To your knowledge?
A. I believe our level of production she would probably not get hired to probably be the one that was hiring.
Q. During your meeting with Ms. Zarak, did she tell you that she had a business or a company?
A. Yes, she did.
Q. What was the name of her company?
A. Bonita Films, as I recall.
THE COURT: Bonita Films; is that what you said, sir?
THE WITNESS: Yes.
THE COURT: Thank you.
Q. And did Bonita Films have an office in Iceland?
A. No, I don't think so.
Q. Did Bonita Films have any employees in Iceland?
A. I don't believe so.
Q. Do you remember -- Withdrawn.
Would it surprise you, sir, if Ms. Zarak had not met any of the producers who you had put her in touch with?
MR. MIN: Objection.
THE COURT: Sustained.
Q. Do you know Mr. Schram?
A. No, I don't.
MR. BEYDA: One moment, your Honor, please? Thank you.
(Pause)

Q. You mentioned that you offered to introduce her to producers, directors in Iceland so she could possibly start her career.

Do you remember that?

A. I don't recall if I said I offered. I can't remember which if she asked or if I offered, is what I said.

Q. What kind of career was Ms. Zarak looking to start?

A. I believe she was trying to continue her producing career.

Q. Do you know when Ms. Zarak last produced anything?

A. No. It's totally irrelevant I believe.

Q. Did Ms. Zarak provide you with her credentials?

A. Not -- she didn't send a CV or anything like that, no.

Q. Do you generally, did you ask her for a CV?

A. No.

Q. Were you introducing Ms. Zarak to people because Ms. Zarak asked you to introduce her to people?

MR. MIN: Objection; asked and answered.

THE COURT: Sustained. I think he said twice he doesn't remember whether she had asked or she offered.

MR. BEYDA: I have no further questions, your Honor.

THE COURT: Thank you.

Any redirect?

MR. MIN: No, your Honor.

THE COURT: Thank you.

Thank you, sir, Mr. Helgason. You are excused. Thank

you for being with us today.

THE WITNESS: Thank you.

THE COURT: The next witness, Mr. Min?

MR. MIN: Yes, your Honor. Also, if I could ask for a two-minute bathroom break and we can coordinate the next witness and then we'll be ready in the next few minutes.

THE COURT: All right. We'll wait.

(Pause)

MR. MIN: Whenever the Court and opposing counsel is ready, we're ready to begin.

THE COURT: Thank you.

(Pause)

THE COURT: All right. I see Mr. Beyda. I don't see Mr. Min though.

All right. Would you call your next witness, Mr. Min.

MR. MIN: Thank you, your Honor.

On behalf of the petitioner what I'd like to call our next witness Halfdan Pedersen, who is here on the Teams platform by video audio.

THE COURT: All right. Ms. Dempsey, would you swear the witness, please.

HALFDAN PEDERSEN,

called as a witness by the Petitioner,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. MIN:

Q. Mr. Pedersen, if you need me to repeat any question, please, don't hesitate to ask.

A. Okay.

Q. Mr. Pedersen, do you know Arnaldur Schram?

A. Yes, I do.

Q. How do you know him?

A. We have been friends for 25 years or so. We met in Los Angeles during which time I lived there and so did he.

Q. Do you know Tania Zarak?

A. Yes, I do.

Q. How do you know her?

A. I attended her wedding in Iceland and I met her through Arnaldur, of course, during their visits to Iceland as well as when they moved back.

Q. And where do you live currently?

A. In Reykjevik, Iceland.

Q. How long have you lived there?

A. Born and raise and lived there all my life, aside from; 94 to 2004.

Q. You mentioned earlier that Arnaldur and Tania moved to Iceland. Do you recall when that was?

A. I believe that was last year, spring of last.

MR. MIN: Your Honor, I think I lost Mr. Pedersen. I

don't know if that's everyone.

THE COURT: I can still see Mr. Pedersen.

Can you hear the Court, Mr. Pedersen?

THE WITNESS: Yes, I can, your Honor.

MR. MIN: Okay. I am not sure if that answer cut out.

Your Honor, may I repeat the question?

THE COURT: He said the spring of last year, correct?

THE WITNESS: Yes, correct.

THE COURT: Thank you.

Q. Did you talk to Arnaldur prior to Arnaldur and Tania moving to, Arnaldur Tania moving to Iceland?

A. Yes, I did. He told me about their move while they were in Mexico during COVID, yeah.

Q. Okay. And what did he tell you about the move to Iceland, if anything?

A. They told me that they were moving back to Iceland and they would be, you know, they were going to New York from Mexico to pack their belongings and ship things back.

Q. Okay. Did Mr. Schram tell you that there were any future plans to leave Iceland?

MR. BEYDA: Objection; form.

THE COURT: Overruled.

A. No, he did not.

Q. Did you speak or see Mr. Schram or Ms. Zarak after they arrived in Iceland?

A. Yes. They came to visit me at my then home in Reykjavik. They brought their kids and we had a dinner and a little get-together, yes, along with other friends.
Q. Okay. Did you ever go visit them in their home in Reykjavik?
A. Yes, I did.
Q. Okay. And can you describe the home that they had in Reykjavik?
A. A modest two-bedroom apartment in the house of Reykjavik and, yeah, downtown Reykjavik, three bedrooms, I believe. Sorry.
Q. Okay. What is your profession?
A. I am an interior designer.
Q. And did you talk to Ms. Zarak or Mr. Schram when visiting their home about any potential renovations to their home?
A. Yes. We spoke about, just randomly about artwork on the walls and some carpeting in the kids' room and then, yeah, we had some, we had a, they invited me for brunch and then we went to the backyard afterwards where there's a little shack that they spoke about future plans for that shack, just sort of nothing set in stone, just talking about ideas.
Q. Okay.
A. How to potentially open up the flat and have a staircase leading to the backyards with a little balcony and just things like that.

Q. Was Ms. Zarak a participant in this conversation?
A. Yes, she was.
Q. Was she on active participant in the conversation about possible renovation ideas?
A. Yes, she was.
Q. Okay. Did you have any conversations with Ms. Zarak while she was residing in Iceland about career possibilities or job prospects while in Iceland?
A. Yes. I come from the film business and I offered her to introduce her to some people which are in the film industry in Iceland but she had already met them, the people I intended to introduce her to at that point. So, she seemed to have -- yeah, one step ahead of me.
Q. Do you recall when that conversation took place your offer to introduce her to people?
A. I believe that was shortly after their arrival while they were visiting my home and then a recap on that conversation in during a five-year-old birthday party of their son at the grandparents' house.
Q. Okay. Did Ms. Zarak express to you that she was interested in working in the film industry in Iceland?
A. Yes, she did at that time.
Q. Did she specify what she was interested in pursuing as a career opportunities or an opportunity in the Icelandic film industry?

A. Well, there was a particular project a feature film that was under way from a mutual friend of Arnaldur and mine, a director, and she was going to get involved with that project on a level of financing and seek finances from America or somewhere for that particular film.
Q. Okay. And did you and Ms. Zarak discuss this project of hers?
A. No, not so much.
Q. Did there come a time when you and Ms. Zarak had a conversation about how long -- about the length of stay in Iceland, how long Ms. Zarak and Mr. Schram might stay in Iceland?
A. No, not until she shared with me that they had planned to be in Iceland for two years.
Q. And when did she share that with you?
A. She shared that with me last -- this spring, in May, I believe while visiting. They were visiting my home and the summer home that I have visited with their kids. And during this time we had this conversation.
Q. So, approximately, May 2021 Mr. Schram, Ms. Zarak and I believe you said their children visited you at your summer home in Iceland?
A. Correct.
Q. How long did they stay there for?
A. A long weekend. I believe, three nights.

Q. Was anyone else present at this long weekend except for, aside from Mr. Schram, Ms. Zarak, their children and you and, perhaps, your family, anyone else?
A. Yeah. My two sons were present and another couple from New York and the two children that I have. So, there was -- yeah, three couples.
Q. And can you describe your interactions with or interactions with Ms. Zarak over this long weekend?
A. There was a big group of people. So, there was no specific interaction between Tania and myself aside from at one point we went for a walk along the village.
Q. When did you and Ms. Zarak go for a walk along the village?
A. Sorry. Why?
Q. Why did you take a walk along the village?
A. Well, I sensed that she was at unease and I wanted to offer my help for to chat and talk if there was something I could help with and she accepted my offer on that. So, we walked for a while and we sat on a stone --
Q. How long?
THE COURT: Let him finish.
Q. You spoke for about an hour?
A. I would say so, yes.
Q. What did Ms. Zarak tell during this conversation about their plans in Iceland?
A. Well, this is the fist time that I learned that they were

planning to stay in Iceland for two years but she shared with me that she felt that there was no real career for her in Iceland and that she left her career in New York. And, yeah, she spoke about, yeah, the fact that the film business in Iceland and very microscopic compared to the one in the states.

Q. Okay. And you said this is the fist time that you had heard Ms. Zarak express that the plan was to stay in Iceland for two years?

A. Yes.

Q. Okay. And prior to this conversation, had you ever heard from Mr. Schram that the plan was to stay in Iceland for two years?

A. No, I have not.

Q. Did you -- after hearing this from Ms. Zarak, did you speak with Mr. Schram about this plan that Ms. Zarak expressed to you about staying in Iceland for two years?

A. No. I don't believe I did.

Q. Did Ms. Zarak express to you any --

MR. MIN: Sorry, your Honor. I thought I heard something but it might have been feedback.

Q. Did Ms. Zarak express to you any other career opportunities she had in the film industry aside from New York?

A. No, she did not.

Q. Did Ms. Zarak ever express to you what the plan was after two years in Iceland?

A. No, nothing really concrete. Just -- no. I assumed that they were going back to Mexico or New York.

Q. Why Mexico? What led you to assume that Mexico was a possibility?

A. Well, the fact that she told me she missed Mexico and she told me that, you know, she had something going there for her as well in Mexico.

Q. When you say "something going there as well", what do you mean by that?

A. Well, that she had left some business, film business in Mexico as well.

Q. Did Ms. Zarak tell you about any -- withdrawn.

Did Ms. Zarak ever express to you any conversation she had for travel in the summer of 2021?

A. Yes. She was about to go to Mexico for a reunion, a family reunion and she invited me and the rest of the people there to come join here in Mexico at any time and an open invitation. And, yeah, this was about maybe two weeks before she left for that reunion.

Q. And did she tell you, Ms. Zarak, that is, did Ms. Zarak tell you whether she intended to return to Iceland after this trip to Mexico?

A. Yes, she did tell me she was going to return.

Q. OK. And did you have a conversation, specifically, with Ms. Zarak about returning to Iceland after her trip to Mexico?

A. Well, she asked me if it would be okay if her mother and her would come to this house that I have. She said that her mother would really like it there. I believe the plan was for her mother to come to Iceland in August of that same, of August of this year. And I said, sure, of course, any time.

MR. MIN: Your Honor, if I could have one moment, please?

THE COURT: Sure.

(Pause)

MR. MIN: Your Honor, no further questions at this time.

Thank you, your Honor.

THE COURT: Thank you.

Cross-examination?

MR. BEYDA: Thank you.

CROSS-EXAMINATION

BY MR. BEYDA:

Q. Mr. Pedersen, you've known Mr. Schram for 25 years?

A. Yeah, approximately, so.

Q. The two of you grew up together?

A. No. I was living in Los Angeles and I knew his brother before him who was also living in Los Angeles at the same time and then Arnaldur came to Los Angeles and we met his brother.

Q. That was 25 years ago?

A. Yes, approximately, so.

Q. And since your meeting with Mr. Schram, prior to the family's arrival in Iceland, how many times had you met Tania?
A. Only once during the wedding.
Q. And after their wedding, how many times had you seen Tania before their arrival at Iceland?
A. Maybe three times/four times, I would guess.
Q. Where did you see her?
A. Well, I invited them to my house shortly after they landed. They invited me to their home when they had recently purchased it.
Q. Now --
A. And I met her on the streets randomly downtown at one point.
Q. Where was this?
A. This was in Reykjavik all of it, all the countries.
Q. And this is after the family came to Iceland?
A. Correct.
Q. In August of 2000?
A. Correct.
Q. I'm sorry. 2020?
A. Correct.
Q. Now, is it fair to say that you're interior designer?
A. Yes, it is.
Q. And is that your occupation?
A. Yes, it is.

Q. You said that you thought that the family that the, home where the family is staying in Iceland had three bedrooms?
A. Yes. Well, it might be a tiny room that had been sectioned off as a bedroom. I am not entirely sure but there were definitely, yeah, there were definitely three bedrooms.
Q. Now, were there three rooms with beds in them?
A. No. One was the children's room, a playroom.
Q. Would it surprise you if there's only two bedrooms in this house?
MR. MIN: Objection.
A. Not really. Like I said, one of the three rooms that I am referring to might have been a dining room which was sectioned off, you know. But it was open enough. You entered not through a door but through a wide space.
Q. When is the last time that you were in the residence?
A. That would be late this summer, maybe August of this year.
Q. Was that before -- So that was after Ms. Zarak left Iceland with the children, correct?
A. Correct.
Q. And before that when were you previously in the residence?
A. That would be, probably, I would say May.
Q. May of 2020, correct?
A. May of?
Q. Sorry. 2021. Did you notice a difference in the residence between May of 2021 and August of 2021?

A. No. I can't say that I have. There was carpeting in the kids' room.
Q. Did you notice anything different about the walls in the apartment?
THE COURT: Mr. Beyda, slow down and let him finish his answers, please.
MR. BEYDA: I apologize. I thought he was done.
A. About the walls? Sorry.
Q. Did you notice anything different about the walls?
A. No, I did not.
Q. Did you notice anything different about the decorations in the apartment?
A. I can't say that I do.
Q. Did you notice anything different about the furnishing in the apartment?
A. I can't say that I do.
Q. Now, you mentioned being at the residence and speaking to the parties about plans to, I think you said open up the home or to -- I don't remember your exact word. I apologize.
A. I referred to two things which was a shack in the backyards and the potentials that shack would have on the future property and potential boundaries so one could exit the apartment down to the yards through a patio door and staircase.
Q. Now, there was no renovations made to the residence after the discussion you described with Mr. Schram and Ms. Zarak,

correct?
A. Nothing that I can, nothing drastic. There might have been small things but I don't recall anything specifically, no.
Q. Did you have discussions with Ms. Zarak about the family's arrival in Iceland when they did arrive there?
A. Sorry. I am not quite --
Q. I'll rephrase it. Did you have a discussion with Ms. Zarak about why the family came to Iceland when they did?
A. No, I did not.
Q. You never asked the family why they came to Iceland at the time that they did?
A. No. Like I said, I had been talking to Arnaldur before while they were in Mexico. So, I knew the reasons why they came. And COVID and work was one.
Q. What does Mr. Schram do for a living?
A. He's an architect.
Q. When you say -- sorry. You said "work was one". Was it work for who?
A. Work for (inaudible).
Q. While the family was in Mexico, did you have any conversations with Ms. Zarak?
A. I did not, no.
Q. When the family arrived in Iceland, did you discuss any, working with Mr. Schram?
A. Yes, I did.

Q. Did you advise Ms. Zarak about that?
A. No. I don't think I did. The conversation between Arnaldur and myself at one point.
Q. Now, you mentioned a walk that you took with Ms. Zarak on a day that she came to your home for a long weekend with the family, right?
A. Correct, yes.
Q. At that time are you aware of where the children -- who had possession of the children's passports?
A. I have no idea.
Q. Did Ms. Zarak tell you that Mr. Schram was in possession of the children's passports?
A. That, I don't recall.
Q. Did you subsequently come to learn from Mr. Schram who you've known for about 25 years that he was in possession of the children's passports while they were at your home that weekend?
A. No, I did not.
Q. Prior to your testimony today, did you discuss your testimony with anyone?
A. No, I did not.
Q. Have you discussed this case with Mr. Schram?
A. Not at all. Apart from him saying that anything that I would, that I recalled truthfully would be nice to have written down and therefore, I wrote a letter recalling my conversation

with Zarak.
Q. You wrote a letter. Okay.
Mr. Pedersen, who asked to you write a letter?
A. Arnaldur told me it would be good to have that in writing, whatever I was describing to him.
Q. How would you describe your relationship with Mr. Schram?
A. Friends. We share things.
Q. Are you close?
A. Yeah, we are close.
Q. Were you curious as to why Mr. Schram was not going with Ms. Zarak to the family reunion in Mexico that she was telling you about?
A. I knew they were having problems. So -- yeah.
Q. Mr. Schram told you about those problems, correct?
A. That's correct.
Q. And he confided in you about their marital issues, correct?
A. I would not say he confided with me but he shared with me that they were having marital issues. But we did not go into specifics on that.
Q. Did you inquire?
A. No. I figured I'd let him begin the talking if there was such a need. I did not ask him questions about specifically what that was.
Q. Did you ask him if it had anything to do with the family being in Iceland?

A. No. I recall him sharing with me prior to their arrival that things have been having a bumpy road.
Q. When did Mr. Schram first tell you that they were having a bumpy road?
A. During their time in Mexico during COVID.
Q. Did you speak with Mr. Min before your appearance in court today?
A. Yes, I did.
Q. When did you last speak with Mr. Min?
A. Day before yesterday, I think.
Q. Saturday?
A. Sorry. Friday.
Q. How long was that --
A. It was a short conversation on Friday.
Q. How long was that conversation?
A. I would say maybe five minutes.
Q. How many times have you spoken to Mr. Schram's counsel in connection with this case?
A. Twice.
Q. When was the fist time you spoke with his counsel?
A. Wednesday of last week, I would think.
Q. I'd like to direct your attention to June of 2021 for a moment. Were you in communications with Mr. Schram at that time?
A. Sorry. Which time?

Q. The first week of June 2021.

A. I might have.

Q. Did Mr. Schram tell you that he was contacting the authorities in Iceland to put them on notice about the children, perhaps, being taken out of the country by their mother?

MR. MIN: Objection.

THE COURT: What's the objection?

MR. MIN: Relevance.

THE COURT: Overruled.

(Continued on next page)

Q. Did you say no?
A. Yes, no.
Q. I'd like to direct your attention to May of 2021. Were you in communication with Mr. Zarak -- I'm sorry -- Mr. Schram, upon Ms. Zarak's return from New York?
A. Was I in contact with Mr. Schram, about her returning from New York? Is that the question?
Q. Upon her return from New York.
A. I'm sorry. Can you rephrase, please.
Q. Sure. I'd like to direct your attention to May of 2021. Specifically --
MR. BEYDA: Actually, your Honor, I'm going to withdraw the question.
THE COURT: Your repeating it is not rephrasing.
Q. Mr. Pedersen, are you aware that Ms. Zarak was in New York in May of 2021?
A. Yes, she flew -- well, see, I knew that she was going to return to New York on her way back from Mexico.
Q. I'm directing your attention to May of 2021.
A. Yeah, okay. So I did not know was she in New York of May of 2021.
Q. You do not know; is that what you're saying?
A. Yes, I do not know.
Q. Did Mr. Schram tell you in May of 2021 that Ms. Zarak indicated a desire to return to New York with the children?

A. He might have.
Q. And what did you say to him at that point?
A. Well, to be frank, I'm not quite sure we had this conversation in May of '21. They were both living in Iceland at that time, and we were -- the next thing were we were going to -- yeah, so June of 2021 is the time that she was planning to go to Mexico and then New York after Mexico.
Q. So Ms. Zarak was planning to go to New York after stopping in Mexico in June of 2021?
A. That's correct, to my understanding.
Q. Now is that what Mr. Schram told you?
A. Yes.
Q. And did he tell you that in person?
A. I believe so, yes.
Q. And was Mr. Schram angry at that point about Ms. Zarak, or about what -- withdrawn.
Did you know who would be accompanying Ms. Zarak to New York when Mr. Schram was telling you this?
A. No. I mean, I assumed this is just a family returning from this family reunion so her children and --
Q. Did you know which children would be traveling with Ms. Zarak to Mexico for the family reunion that you mentioned?
A. I did not.
Q. Did you ask?
A. No, I don't think I did.

Q. Did you ask whether or not the children were enrolled in school for the fall or starting in September 2021 at that time?
A. No, I did not, but Arnaldur had shared with me that they had been enrolled.
Q. When did he share that with you?
A. In June, maybe, after, after -- yeah, after sometime mid-June, maybe.
Q. Did he just -- where was Ms. Zarak at that time?
A. She was away, back in New York or still in Mexico. I'm not sure.
Q. Did he tell you he signed a contract for the children's enrollment?
A. That she did?
Q. Did he tell you that he signed a contract for the enrollment in school of a child?
A. No, he did not.
Q. Are you aware that the family lived in Manhattan before their arrival in Iceland?
A. Yes, I am.
Q. Had you ever been to that apartment?
A. Yes, I had.
Q. Can you compare for the Court those -- the apartment in Manhattan and the residence in Iceland. Let's start with the size.
A. I would imagine, New York City -- I mean, they had been --

it was high ceiling, I would guess approximately the same square footage. I stopped there very briefly before leaving the apartment again. It was a short stop. And my memories of that apartment are very slim, very small memories of that. It was full of stuff.
Q. When you say it was full of stuff, what do you mean?
A. Just children's toys and then -- and what have you. It was just a -- a lived-in apartment.
Q. Upon the family's arrival in Iceland, did you ask them what they did with their apartment in Manhattan?
A. Yeah, I recall them saying that it was -- yeah, it was -- it belonged to the family. It was -- it was a -- they owned it so -- no, I do not know if they would rent it out or left as is. I know they packed it before they came.
Q. When you say you know that they packed it, who told you that?
A. I was in direct contact with Arnaldur a few days before his arrival. I bought some stuff off Amazon or something that I asked him to transport to Iceland for me, something that, you know, to put on a pallet or put in a container, however they were doing things, and then that -- that's pretty much the -- the conversation we had about it, because they were packing things for Iceland, at that time.
Q. Do you know whether they packed everything that they had in Manhattan and brought it to Iceland with them?

A. No, I do not know if they packed everything, and I -- I don't assume they did. I don't assume they packed any other thing other than light boxes as opposed to furniture.

Q. Did you ask them why they left their furniture in New York?

MR. MIN: Objection to form. That wasn't the answer, they did or did not.

THE COURT: I don't understand the objection or the question. So why don't we try again, Mr. Beyda.

MR. BEYDA: Sure.

BY MR. BEYDA:

Q. I asked you, Mr. Pedersen, do you know if they packed everything? Do you remember that?

A. Yes. I have -- I do not know if they packed everything.

Q. You had mentioned Ms. Zarak telling you that she intended to be in Iceland for two years, I think is what you said?

A. Yes.

Q. Was that two years from their arrival on August 1, 2020?

A. That's how I understood it, yes.

Q. So you did not understand her intention to be that being in Iceland was a permanent move to Iceland, correct?

MR. MIN: Objection as to what this witness understood. How is that relevant to these proceedings?

THE COURT: No. Overruled. He can tell me what he understood. If he doesn't have an understanding, he doesn't have one.

Sir, are you able to answer?

THE WITNESS: Yeah, yeah.

A. No. To my understanding it was -- it was a two-year visit, two-year stop. From the time I understand it to be a plan for two years, but that's the first time I understood it was to be two years. Whether -- where they were planning to leave from there, that was never discussed really, specifically.

Q. Did you ever sit down with Mr. Schram and Ms. Zarak and have a conversation amongst the three of you as to what their intentions were in terms of Iceland?

A. Not that I recall, no.

Q. So all of your conversations, aside from the time you sat down on the rock with Ms. Zarak, were with Mr. Schram, correct?

A. Correct.

Q. Now going back to you being an interior designer, you did not design or renovate any portion of the property that they bought in Iceland, correct?

A. Correct, I did not.

Q. And you --

A. I did give a reference for a carpet layer and a framer, but that's about the extent of it.

Q. And do you know who put the carpet in?

A. I do not know who put the carpet in. It was Arnaldur who got the contact from me and then it was Tania who got the contact about a picture framer, to frame pictures and hang, you

know --
Q. Now after the family arrived in Iceland, you offered Mr. Schram a job, correct?
A. Correct.
Q. And you offered him that job because he was in part your friend, correct?
A. No. I offered it to him because I thought he was the right man for that particular job.
Q. Did that job ever materialize?
A. It did not.
Q. Okay.
A. It was placed on hold.
Q. How many times have you observed Ms. Zarak with the children, if at all?
A. Many times.
Q. How many?
A. Five, six times, maybe.
Q. And was one of those times during the long weekend at your house?
A. Yes.
Q. How many times have you seen the children since July 26, 2021 -- or RZ, I should say, since July 26, 2021?
MR. MIN: Objection. Relevance.
THE COURT: Sustained.
Q. How many times have you spoken to Ms. Zarak since July 26,

2021?
A. July 26. I don't know what that date -- after she left, that's the last time I saw her. I never saw Tania personally after she left for the reunion. We did speak on the messenger. She sent me a picture from Mexico of a lamp that I have in my country house that I happened to buy in Mexico once upon a time. She told me that there is plenty of them there. But yeah, only messenger contact on a couple of occasions.
Q. Now you mentioned that Mr. Schram -- or you were aware that they were having marital problems, correct?
A. Correct.
Q. And you were aware of that as far back as when they were in Mexico 2020, correct?
A. Correct.
Q. You are aware that being in Iceland was an issue for Ms. Zarak, correct?
A. Yes, she shared that with me.
Q. And she told you that she was far from her family in Mexico when in Iceland, correct?
A. Yes.
Q. And she told you that she missed New York City where she and the children lived before coming to Iceland, correct?
A. She told me she missed New York City, yes, primarily because of career reasons is how I understood that. There were some comments on the work availability here.

Q. Iceland is a small country, correct? Fewer work opportunities in Iceland than in New York City, per se, right?

MR. MIN: Objection.

THE COURT: Gentlemen, come on. Both of you.

Q. Now Ms. Zarak came to your apartment to do a podcast one night, correct?

A. No. She asked if she could use the apartment to do a podcast. I said of course, any time. But she never actually did come and do that podcast there.

Q. Do you know why she wanted to come to the apartment to do a podcast?

A. Yeah, she told me that she wanted to -- she needed to be focused for an hour's duration or 90 minutes, or however that was specifically long, and that having the kids around would not give her that privacy to properly conduct that podcast.

Q. Did she mention that the apartment was too small --

A. No.

Q. -- for that?

MR. BEYDA: Just one moment, your Honor.

Q. To your knowledge, Mr. Pedersen, what role did the COVID-19 pandemic play in the family's decision to come to Iceland?

A. I would say that it played a large role.

Q. And who told you that?

A. Nobody did. It was a -- it was a difference here in Iceland. I don't recall that being said in so many words.

Q. Well, not said in so many words, but was it ever part of a discussion that you had with Ms. Zarak and Mr. Schram?
A. No. I don't recall it being a personal conversation, no.
Q. Was it something that you specifically discussed with Mr. Schram while the family was in Mexico?
A. No, it was not.
Q. Was it something you discussed with Mr. Schram before he brought you the item that you bought on Amazon and he brought to you in Iceland?
A. No. I don't recall it ever being said that COVID was a reason why they wanted to move to Iceland, but it was a -- it's during a -- a plain conversation back and forth, the situation in Iceland was a lot more liberating than -- than it was in a major city like New York City or Mexico City, or Mexico, where they were living. There was no -- there was not a -- there was not a curfew or, if you will, the -- the restrictions were much lighter. And so to answer the question specifically, it was not a part of -- it was never shared that it was actually their reason to come to Iceland.
Q. Did you ask them why they were in Mexico, when they were?
A. Yes, I did. That was -- the answer was to -- to escape New York. From then just it was a recent, very recent thing in New York City that COVID hit, so yeah, they shared with me that it was -- yeah.

MR. BEYDA: No further questions, your Honor.

THE COURT: All right. Thank you.

Any redirect?

MR. MIN: Your Honor, if I can just have one moment.

Your Honor, no further questions.

THE COURT: All right. Thank you.

Thank you, Mr. Pedersen, for being with us. You can log off. Thank you.

THE WITNESS: Sure. Thank you.

(Witness excused)

THE COURT: All right. Mr. Min, how many more of your witnesses are available today?

MR. MIN: Yes. We were going to call our expert next, but originally we had thought we would call her at around 11:30. That is not happening, so she will not be available till tomorrow. We have two more fact witnesses scheduled for later on in the afternoon and then petitioner. We would like to take our expert tomorrow -- and we're working on her availability tomorrow -- out of turn, if the Court has no problem with that and if opposing counsel has no problem with that, but to the extent we have time left over today, we would start with petitioner.

THE COURT: All right. Who are your two fact witnesses for today?

MR. MIN: Waleska and Phaedon. I can get the last names. Waleska Giraldo Thorsteinsson. And I do apologize in

advance for my mispronunciation of a lot of the names. I hope no one takes disrespect from that. And Phaedon Sinis, your Honor.

THE COURT: Okay. So Nos. 3 and 4 on your witness list.

MR. MIN: Yes, your Honor. And that is the extent of our non-party, non-expert witnesses.

THE COURT: All right. And who is your expert?

MR. MIN: Inga Brynjolfsdottir.

THE COURT: Okay. Expert on immigration law, you're saying.

MR. MIN: Yes.

THE COURT: Okay. And is that the sum of your witnesses?

MR. MIN: Aside from petitioner, yes, your Honor.

THE COURT: Yes. Okay.

MR. MIN: Yes.

THE COURT: All right. Why don't we take a brief break now for lunch, and I don't think we should need terribly long, I hope. We'll resume at 2 p.m. The Court has to attend to one other matter. I had mentioned to you all I was on emergency duty this week, so I do need to attend to that, but I will see you back at 2 p.m.

MR. BEYDA: Thank you.

MR. MIN: Your Honor, before we recess, so we can

schedule witnesses tomorrow, do we have a sense of what time we might begin tomorrow?

THE COURT: I have to do a hearing before we begin, so I think 10:00 would be the earliest I can resume.

MR. MIN: Thank you, your Honor.

THE COURT: All right. 10 a.m. tomorrow, but I'll see you all at 2 p.m., all right? Thank you, everybody.

ALL COUNSEL: Thank you, your Honor.

(Luncheon recess)

AFTERNOON SESSION

2:04 p.m.

(Case re-called)

THE DEPUTY CLERK: Good afternoon, your Honor.

THE COURT: Good afternoon, Ms. Dempsey, and good afternoon, everyone. Are we ready to proceed?

MR. MIN: Yes, your Honor.

MR. BEYDA: Yes, your Honor.

THE COURT: And we have a court reporter, Ms. Sellin, with us. Are you able to hear us all?

THE REPORTER: Yes, your Honor.

THE COURT: All right. Mr. Min, your next witness, please.

MR. MIN: Thank you. On behalf of petitioner, we call as our next witness Waleska Giraldo Thorsteinsson. And I apologize, again, for my mispronunciation.

THE COURT: All right. Ms. Dempsey, would you swear the witness, please.

THE DEPUTY CLERK: Yes. Please raise your right hand.

(Witness sworn)

THE DEPUTY CLERK: Thank you. Can you please state and spell your name for the record.

THE WITNESS: Yes. Waleska, W-A-L-E-S-K-A, Giraldo, G-I-R-A-L-D-O, Thorsteinsson, T-H-O-R-S-T-E-I-N-S-S-O-N.

THE COURT: Mr. Min?

MR. MIN: Thank you, your Honor.
WALESKA GIRALDO THORSTEINSSON,
called as a witness by the Petitioner,
having been duly sworn, testified as follows:
DIRECT EXAMINATION
BY MR. MIN:
Q. Good afternoon, and if you have any confusion about any of the questions, please don't hesitate to let me know and I'll repeat myself, okay?
Do you know Arnaldur Schram and Tania Zarak?
A. Yes, I do.
Q. And how do you know them?
A. Their daughter is of the same -- was at the same school, the same age with my younger daughter.
Q. Okay. And that's their daughter EZ?
A. Yes.
Q. Okay.
THE COURT: I have to remind people that this is an open proceeding, so somebody this morning used one of the children's names. You just again did the same. I'm going to just admonish you about that, please.
MR. MIN: Your Honor, can I just use initials?
THE COURT: Yes. Explain to the witness that you're going to refer -- this is EZ we're talking about, right?
MR. MIN: Yes, your Honor.

THE COURT: The couple's oldest child?
MR. MIN: Yes.
BY MR. MIN:
Q. Just for reference sake, I will refer to the children by their initials. So EZ, RZ, or SC, as appropriate, okay?
A. Okay.
Q. And you can refrain from naming your children as well.
A. Okay.
Q. And so you were saying that your daughter was in the same school as EZ?
A. Yes, she is.
Q. And that was in Iceland?
A. Yes.
Q. Okay. Sorry. What grade was that?
A. By that time was the first grade.
Q. Okay. And then how did you come to meet Mr. Schram or Ms. Zarak?
A. Because of our daughters, and we just met like a normal parents meeting other peers' parents.
Q. Okay. When did you meet Mr. Schram for the first time?
A. Probably when my youngest daughter birth -- or older daughter birthday. Anyway, like -- well, no, probably before, but just when he will come and pick up their daughter to our home or when I would pick up my daughter to their home, just like hi, bye, kind of a thing, but then like properly on her

birthday.
Q. Which was when, approximately? Just give me the month and the year. You don't have to give me the day.
A. May, probably, 2021.
Q. Okay. And what about Ms. Zarak, did there come a time when you developed a friendship with Ms. Zarak?
A. Yeah. Kind of the same, like just parent/daughter meeting, but because she's like from Latin America, or at least Latin, like I am, we would talk a little bit more when I pick up the -- when they pick up their daughter or I pick up my daughter or like at the school, so yeah, like --
Q. Was your daughter friends with EZ?
A. Yes, she was; she is.
Q. And can you describe their friendship that developed in Iceland.
A. Yeah. They were really good friends. They liked to do a lot of things together. They have a lot of things in common. I guess everyone in their group, specifically the girls, they were really close to each one, so it was like really nice group together, so --
Q. And when you say the group, how many -- I believe you said girls. How many girls were in the group of friends?
A. I believe at least this close group was my daughter, their daughter, and at least two other friends' daughters. They were in the same class. One of them is one year older than the --

our daughters, but it wasn't -- because the small group, they're two groups together of the same.
Q. And how often did your daughter interact outside of school with EZ?
A. Kind of often, but not that often because my daughter practiced ice skating so she's kind of busy, but then when she would have time, either on the weekend or some day after school, then they will -- at least asked to play together.
Q. Okay. So your daughter would ask to play with EZ, when she had free time?
A. Yes, or -- yeah, or vice versa.
Q. Okay. And you were mentioning before that you would interact with Mr. Schram and Ms. Zarak typically when one of you were picking up your children, was that right?
A. Yes. Yes, correct.
Q. And did you mean picking up the children from school or picking them up from play dates or both or -- could you explain that.
A. Yeah, both. Both. Usually -- yeah.
Q. Okay. So were there play dates that occurred at your home between your daughter and EZ and perhaps some other friends?
A. Yes, few times, as well as their house.
Q. As well as the home of Mr. Schram and Ms. Zarak?
A. Yes.
Q. Okay.

A. Correct.
Q. And would you leave your daughter at their home and then go pick her up at the end of the -- at the conclusion of the play date?
A. Yes.
Q. Okay. And would they do the same thing?
A. And I think -- yeah, yeah, it would be the same. And actually, one of the times my daughter will stay like for the whole night, like a sleepover, at their place, so --
Q. How often did that happen?
A. At least once that I recall.
Q. Outside of play dates at one of either your home or Ms. Zarak's home, did your daughter and EZ ever do any other activities together?
A. Not -- like I say, my daughter practiced figure skating so she's like in an advanced group, so anyway, they wouldn't practice the same, together. They wouldn't be in the same group, so --
Q. Did you ever take EZ on any trips with you or any excursions around Reykjavík?
A. Yes. I have horses so we went to the stables, at least once, and I took her with me on one of those play dates.
Q. And when there were play dates at your home between your daughter and EZ, were other children sometimes around, like other friends of theirs?

A. Yeah, few times, but most of the time it would be just them -- just the two of them. Sorry.
Q. Did the girls ever converse in Icelandic with each other?
A. No. Mostly in English or some words in Spanish together. But yeah, Icelandic. Like other two languages but usually in English.
Q. So mostly in English but some Icelandic and some Spanish as well?
A. Yeah.
MR. BEYDA: Objection. I thought that mischaracterized a portion of the testimony and I object to the form, your Honor.
THE COURT: All right. Can you break it down, Mr. Min.
MR. MIN: Sure.
THE COURT: And Ms. Thorsteinsson, let me just caution you, if there's an objection, can you just pause so that I can rule on it before you answer.
THE WITNESS: Okay.
THE COURT: All right. Mr. Min, break it down, please.
MR. MIN: Sure.
BY MR. MIN:
Q. Did you ever observe your daughter and EZ conversing in English?

A. Yes, I did.
Q. Did you ever observe them conversing in Spanish?
A. Yes, few times, yeah, few times.
Q. Did you ever -- sorry. Did you ever observe them conversing in Icelandic?
A. Yeah, few times as well.
Q. Okay. But mostly in English.
A. Yes, correct.
Q. Did you ever have an opportunity to have more than a fleeting conversation with Ms. Zarak while she resided in Iceland?
A. Yes, at least two times.
Q. Okay. And did you ever talk to Ms. Zarak about how long she planned on staying in Iceland?
A. Yes. We did talk about few things related to that.
Q. And did Ms. Zarak ever tell you how long she planned on staying in Iceland?
A. No. She didn't mention like a specific date, but there was more -- like they came to Iceland because of the COVID, so they were just taking it basically like day-by-day basis, just to see how things were going to be developing.
Q. What kind of basis did you say? I'm sorry. I didn't catch that.
A. Day-by-day basis, just like seeing what's happening in the country, the world. With the COVID situation, really difficult

to just plan something, so --
Q. A day-by-day basis is what you said.
A. Yeah, yeah, so by that time when we were talking, it was -- the restrictions were still on so we were still talking about here in Iceland.
Q. And you say when this conversation took place. Do you recall when that particular conversation took place when she told you they were going to take it day by day?
A. Yeah. Like I say, a few times, first in the beginning, but then on my daughter's birthday, it was at a mini golf place, we talked for a long time, and we just -- we discussed more things, and --
Q. And that was in May --
THE COURT: When was your daughter's birthday that you're referencing at the miniature golf place?
THE WITNESS: In May or -- I don't remember if it was the older one or the youngest one, but I -- she was in -- their daughter was invited to. I think it was my oldest daughter birthday and so it was in the beginning of June.
THE COURT: And that's this year or last year?
THE WITNESS: This year. Yeah, I just met them last year in August after the school started, so --
THE COURT: Thank you.
BY MR. MIN:
Q. At any point prior to June 2021 did Ms. Zarak ever tell you

that there was a date or a plan to leave Iceland in the future?
A. No. Like I say, we were just talking, just like the COVID situation. By the time I was also planning on moving, but this COVID changed all my plans so I'm staying. So it's just, yeah, we weren't talking about anything -- anything. Like I say, it was more day-by-day basis situation.
Q. Did you ever discuss with Ms. Zarak around this time, around May 2021 or June 2021, any plans for the girls for the summer, for the rest of the summer?
A. Yes, we did. And the school finish in the beginning of June so they usually -- the kids usually go to summer camps in June and then again in August, and we were talking -- like she asked me a few times like what my daughters would be going to -- what we're going to be doing, and she just mentioned few times like maybe to visit together in August after she moved back from vacation, in the beginning of July.
Q. And Ms. Zarak told you she was going on vacation?
A. Yes.
MR. BEYDA: Objection.
A. She did.
MR. MIN: Your Honor, should I wait for the objection or continue?
THE COURT: I'm sorry. I didn't hear the objection.
MR. BEYDA: I did state objection.
THE COURT: Sorry. What was your objection?

MR. BEYDA: Form, leading.

THE COURT: She told you she was going on vacation?

MR. BEYDA: He insinuated the answer in his question the way it was phrased, but I might have misunderstood. I appreciate it's a bench trial.

THE COURT: If you look at the question and the answer before, it says after she moved, something -- I'm losing the transcript. But it mentioned vacation, so overruled. Go ahead, Mr. Min.

MR. MIN: Thank you, your Honor.

BY MR. MIN:

Q. Did Ms. Zarak tell you where she was going on vacation in the summer 2021?

A. Yeah, she was going to Mexico. I think it was for a wedding or something, visiting her family there.

Q. And she told you she was going to Mexico in the summer 2021, she told you that in May, in or around May 2021?

A. Yeah.

Q. Okay. And did Ms. Zarak tell you that she would be back in Iceland after that vacation?

A. Yes, she told me that she will be back I think it was July 10th, by that time, and then we were going to plan to do something, like I say, the summer, on the summer camp in August before the school starts again.

MR. MIN: Your Honor, if I may have one moment.

THE COURT: Yes.

MR. MIN: A couple more questions.

Q. What school did your daughter and EZ attend together for first grade in Iceland?

A. International School of Iceland -- International Department of Alþjóðaskólinn.

Q. Is your daughter currently enrolled at Alþjóðaskólinn?

A. Yes.

Q. Second grade?

A. Yes, correct.

Q. And did you have any discussion with Ms. Zarak about your daughter and EZ attending Alþjóðaskólinn second grade together this school year?

A. Yes. Like I say, we were just talking about maybe to have them together in a summer camp in August, but that was just like that.

MR. BEYDA: Objection. Non-responsive. Move to strike. The question was about school and the witness was answering about summer camp.

THE COURT: Are you able to answer more specifically about whether you ever discussed the children being in school together, starting in the fall? Does school start in the fall?

THE WITNESS: Yes, at the end of August, beginning of --

THE COURT: So did you ever have discussions with

Ms. Zarak about the girls going to school together in the fall?

THE WITNESS: Like not directly exact words, but yes.

MR. MIN: No further questions, your Honor.

THE COURT: All right. Mr. Beyda?

MR. BEYDA: Thank you.

CROSS EXAMINATION

BY MR. BEYDA:

Q. When is the last time you spoke with Ms. Zarak, Ms. Thorsteinsson?

A. Yeah, most likely around their daughter's birthday. I think it was last month or something.

Q. Do you know where Ms. Zarak was when you spoke with her?

A. Yes, in United States.

Q. Who initiated that call?

A. I did.

Q. And you called Ms. Zarak because Mr. Schram contacted you, correct?

A. Yes, correct.

Q. And --

A. Like about a birthday present for --

Q. I'm sorry. He contacted you regarding a birthday present?

A. Yes, for his daughter.

Q. Can you elaborate on that?

A. Yes. So he contacted us to ask if my daughters wanted to send their daughter a birthday present because she was away.

Q. And did you in fact send a birthday present to --
A. Yes, we did.
Q. -- EZ?
A. Yes, we did.
Q. You stated at the beginning of your testimony that the family was there for COVID, I believe is what you said. Does that sound correct?
A. Yeah.
THE COURT: Just ask a question, Mr. Beyda.
Q. Can you elaborate on the conversations you had with Ms. Zarak about the family being in Iceland because of COVID.
A. Like I said, we were just talking about they moving here and we also have another friend that the daughter was also in school with their daughter and my daughter that also came from the States because of COVID, and we were just talking like a normal -- like, yeah, because of COVID, we don't know the situation around the world. The schools in the States were closed, but here in Iceland they were open, so it's better for them to be here right now, at least.
Q. The Alþjóðaskólinn school has two separate programs, correct?
A. Yes, correct.
Q. And one of the programs is taught in English and the other program is taught in Icelandic, correct?
A. Correct.

Q. You mentioned that your daughter and EZ attend school together, or attended school together, correct?
A. Yeah, correct, in the English side.
Q. Now what is the difference between the English side and the Icelandic side of the Alþjóðaskólinn school?
A. Apart from the language, the curriculum, the academic curriculum is totally different and -- yeah.
Q. Now did you have discussions with either Mr. Schram or Ms. Zarak about why their child was in the English curriculum program?
A. No, not directly, at least that question directly.
Q. Did you have any discussions with them about the program that EZ was enrolled?
A. Yeah, like I say, on a normal discussion, we were talking -- me and Tania were discussing the same -- like the schools here in Iceland are totally different, our -- her culture, my culture are more alike than the Icelandic culture, and then, you know, me, I was planning on moving abroad, so for me, it would be easier to have them in the English side because if we move, then it will be easy. And also, even if I stay here, for our daughters, what's the best, like I say, academically, what is more challenging, the English side than the Icelandic one.
Q. Now in the Iceland -- in the English side, did they speak to the children in English and the children communicate back to

the teachers in English, correct?
A. Yes, correct.
Q. And EZ was enrolled in part, in the English side, if you know, because she doesn't speak Icelandic, correct?
A. Yeah. I don't know if she speaks Icelandic or not, but, yeah, they weren't -- at least her mainly language was English, yes.
Q. And you said that you -- that the children conversed in English, correct?
A. Yeah, mostly, yes.
Q. Mostly in English. And they also conversed in Spanish, correct?
A. Yeah, few sentence. I would talk -- I usually speak Spanish to my daughter, and when their daughter were at our place, I would also speak Spanish to them.
Q. Did you speak to the children, when they were together, in Icelandic?
A. Not myself but maybe my husband. Like I say, I only spoke English or Spanish to them.
Q. And did you hear EZ speaking to your daughter?
A. Yes.
Q. And she was speaking to your daughter in English, correct?
A. Yes, correct, but they also used the other languages, at least words in between, yeah.
Q. And the other language that they would use was Spanish,

correct?
A. Yeah, and Icelandic as well, yeah.
Q. What did you hear EZ say in Icelandic?
THE COURT: Excuse me. Do you speak Icelandic?
THE WITNESS: Yes, I do.
THE COURT: Okay. Thank you.
Q. What did you hear EZ saying in Icelandic?
A. Like I say, I don't recall exactly the words, but at least most likely, like I said, when my husband was around or he was talking to them, they maybe answer "yes" or "no" or "I don't know," maybe about food, but for me, myself, I mostly spoke Spanish to them.
Q. Now you mentioned your child is involved in an activity after school?
A. Yes, correct.
Q. And sometimes on the weekends?
A. Yes. She practice five days a week, so --
Q. EZ was not involved in that activity with her, correct?
A. Yes, correct.
Q. To your knowledge was EZ involved in any organized after-school activities?
A. Not that I know of, at least.
Q. And your child and EZ had some play dates, correct?
A. Yes, correct.
Q. Do you know how many -- approximately how many play dates

they had from August 1st until the middle of June 2021?
A. I would say at least two to three times per month. It was often, like I say, either at my house or their house, but yeah, they would play a lot.
Q. Did you ask specifically of Ms. Zarak what dates she was returning from Mexico to Iceland when you heard she was going to Mexico?
A. No. She asked -- she told me she will be back in the -- July 10th and that we should just met afterwards with the girls.
Q. Did you know that she did not have a return plane ticket purchased?
A. I didn't know. I did not know about it.
Q. Did you discuss today's testimony with anyone before coming in to court today?
A. No, just with the lawyers that let me know that I was testifying.
Q. Did they tell you what they would be asking you today?
A. No. They just told me just to be honest of what I know, what I've heard, what I have seen.
Q. Did you see Ms. -- withdrawn.
You said that EZ stayed one time overnight at your home?
A. No. My daughter at their home.
Q. Did your daughter have play dates at other children's

homes?
A. Yes.
Q. More frequently than play dates with EZ?
A. I wouldn't say more frequently, because like I said, she is in practice five days a week, so I was just trying to balance with whom they play, and usually there were more than two together but -- yeah.
Q. Ms. Thorsteinsson -- I'm sorry I mispronounced your last name.
A. That's okay.
Q. You said your daughter was in practice five times a week, correct?
A. Yes, correct.
THE COURT: Her daughter is not before the Court so let's --
MR. BEYDA: I understand.
THE COURT: -- just --
BY MR. BEYDA:
Q. And then also had activities on the weekends, correct?
A. Yes, correct, on certain days.
Q. Now when did your daughter specifically see EZ three times a month if there were practices five days a week and she also had practices or games, competitions, on the weekends?
A. Yeah, like I said, at least one day a week she have available day to play, and then few times after school or after

practice I would either drive her to -- to their house or, for example, when the sleepover was, she stay at their house, and I just pick her up earlier to go to practice the Saturday after.

Q. Has your daughter called EZ since August 1, 2021 --

A. No.

Q. -- in New York?

A. She has not.

THE COURT: How old are these children?

THE WITNESS: 7 years old.

THE COURT: 7 years old?

THE WITNESS: Yeah.

THE COURT: Thank you.

MR. BEYDA: May I have just one moment, please.

THE COURT: Yes.

(Pause)

MR. BEYDA: No further questions, your Honor.

THE COURT: All right. Thank you.

Any redirect?

MR. MIN: Yes, a few questions, your Honor.

REDIRECT EXAMINATION

BY MR. MIN:

Q. You mentioned in your cross testimony that you had spoken to Ms. Zarak and I believe a mutual friend talking about -- who also had moved from the US to Iceland after COVID?

A. Yes.

Q. Who was that mutual friend?
A. Is also called Tanya.
Q. Okay. Tanya Sleiman?
A. Yes.
Q. Okay. She's married to someone named Phaedon Sinis; is that right?
A. Yes, correct.
Q. And they have children, correct?
MR. BEYDA: Objection. Scope?
A. Yes, correct.
THE COURT: It's a fair point, Mr. Min.
MR. MIN: Your Honor, they were talking about the conversations that they had with this mutual friend. They were talking about COVID. I just want to get some information about who these mutual friends are and their relationship with each other.
THE COURT: Was that on cross?
MR. BEYDA: No.
MR. MIN: Yes. He asked on cross did you talk --
THE COURT: I thought it was during your questioning.
MR. MIN: Well, on cross-examination, Mr. Beyda asked about the conversations about COVID, and the answer was that they had a conversation with Ms. Zarak and a mutual friend who also was in the US and moved to Iceland after COVID.
THE COURT: That is true. All right. Go ahead.

BY MR. MIN:
Q. Verifying that they have kids, children also, this mutual friend?
A. Yes, yes.
Q. Okay. Is that -- are any of their children friends with your daughter and EZ?
A. Yes.
Q. Okay. How long have you lived in Iceland for?
A. 16 years.
Q. And how is your daughter's Icelandic?
A. It's -- she's fluent. She's born here.
Q. And she's on the international side of the school?
A. Yes, correct.
Q. Primarily in English?
MR. BEYDA: Objection, relevance.
A. In English, yes.
MR. BEYDA: Objection, your Honor.
THE COURT: Overruled.
MR. MIN: No further questions, your Honor.
THE COURT: All right. Thank you.
Thank you very much, Ms. Thorsteinsson, for being with us. You can log off. Thank you, ma'am.
THE WITNESS: Yes. You're welcome. Bye.
(Witness excused)
THE COURT: Mr. Min, your next witness?

MR. MIN: Yes, your Honor. And I believe maybe the Court has Mr. Sinis in the waiting room because I saw he joined earlier and then he was removed. I'm not sure if that was on his own volition or if the Court did that. If he did remove himself of his own volition, I'd instruct him to log back on.

THE COURT: I don't think you let us know that he had logged on so I don't think -- Ms. Dempsey, we didn't do anything, right?

THE DEPUTY CLERK: We didn't, but he just joined.

THE WITNESS: Hi.

MR. MIN: Thank you, your Honor. And for our next witness we would call, on behalf of petitioner, Phaedon Sinis.

THE COURT: All right.

THE WITNESS: Hi, everyone.

THE COURT: Ms. Dempsey, would you please swear the witness.

THE DEPUTY CLERK: Mr. Sinis, please raise your right hand.

(Witness sworn)

THE DEPUTY CLERK: Please state and spell your name for the record.

THE WITNESS: Okay. So my first name is Phaedon, spelled P-H-A-E-D-O-N, and my last name is spelled S-I-N-I-S. Sinis.

MR. MIN: May I proceed, your Honor.

THE COURT: Yes.

MR. MIN: Thank you.

PHAEDON SINIS,

called as a witness by the Petitioner,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. MIN:

Q. Good afternoon. If you have any confusion or need me to repeat a question, please don't hesitate to ask, okay?

A. Okay. Thank you.

Q. Mr. Sinis, do you know Arnaldur Schram and Tania Zarak?

A. Yes, I do.

Q. Okay. How do you know them?

A. I moved to Iceland with my family in July of 2020, and we met them in late August, I think in the -- during the first week of school.

Q. Okay.

A. Our daughter is -- was in the same first grade classroom as their eldest daughter.

Q. And we are going to be using initials today, and you can feel free to refrain from using your daughter's name, and when I refer to Mr. Schram's children and Ms. Zarak's children, I will refer to them using their initials, okay?

A. Got it. Okay.

Q. Thank you.

And as you were saying, your daughter is in the same first grade as Ms. Zarak and Mr. Schram's eldest child EZ, correct?
A. As of the last academic year, yes, they were in the first grade last year.
Q. And this is Alþjóðaskólinn?
A. Alþjóðaskólinn, yes, yeah. That's correct.
Q. Did you develop a friendship with either Mr. Schram or Ms. Zarak in the last year or so?
A. Yes.
Q. And prior to moving to Iceland where were you residing?
A. We lived in Palo Alto, California.
Q. And how long had you been living in the United States prior to moving to Iceland?
A. Well, I was born in the United States, and apart from sort of like defined periods of time that I was outside of the United States -- I lived in Turkey for -- for about a year, and I lived in Iceland 16 years ago for about four months, but other than those periods, I lived in the United States since -- since I was born.
Q. Are you married?
A. I am.
Q. And your wife is Tanya Sleiman?
A. That's correct.
Q. And she was also friends with Ms. Zarak?

A. Yes.
Q. And is your wife Icelandic?
A. No, she's not.
Q. And why did you and your family decide to move to Iceland in summer 2020?
A. Right. So we had been talking for years about a move towards Europe. My family background is from Greece, and it was long important for me to get closer to the continents so that I could also expose my daughter to -- to her culture, background.

MR. BEYDA: Objection, Judge. Relevance. I was seeing where it was going to go, and that's why --

THE COURT: You're supposed to object before the answer, though. Now that he started, he can finish. But I do agree, Mr. Min, that we're getting a little far afield here.

THE WITNESS: I'll try to keep it short. How's that?
A. Europe was on our radar for a long time, and with the pandemic, Iceland seemed like a good place for us to -- to kind of relocate our family during the pandemic and possibly thereafter, so --

THE COURT: Mr. Min, let's talk about Ms. Zarak and Mr. Schram and their family.
Q. Okay. Did your daughter develop a friendship with their daughter EZ?
A. She did, yes.

Q. And I want to direct your attention to approximately August of last year, right after school started. Did your daughter attend a birthday party for EZ?
A. She did, yes.
Q. Okay. And how soon after school started was that, approximately?
A. If I remember correctly, I think it was the first weekend after the start of school, and as I recall, we were maybe one of the two or three families from the school that had been invited there, so it was a chance to kind of meet members of our new community and socialize and have our daughter kind of start to develop a connection with her new classmates in a new country.
Q. Okay. And do you recall if there were other children from the school present at this birthday party?
A. Yes, there -- there was a little girl who has since left. I actually don't remember her name, and it's probably not relevant. But, yeah, there was --
(Unintelligible cross-talk)
THE COURT: Let him finish, and don't keep interrupting like that. The court reporter can't get an accurate transcript and I can't hear, so please let him finish.
All right. You were saying, sir, that there was a little girl who left, you don't remember her name, it's probably not relevant. Probably isn't.

THE WITNESS: Probably not relevant. Maybe I'm not supposed to use names.

A. But anyway, yeah, there was another little girl who had been in the class the year before, and she -- she had been invited to the birthday party, yeah, so I remember -- I remember the birthday party fondly. It was a nice -- nice chance to meet everybody.

Q. And were there other people -- do you recall meeting any other friends or family of Ms. Zarak or Mr. Schram at this birthday party?

A. Yeah. So I -- as I recall, it was the immediate and the extended family of Arnaldur as well as some friends who were kind of, you know, peers of ours, let's say, like cousins, or maybe they were distant cousins or something like this. I think one of them worked in the arts and that was interesting to my wife, who is also in the arts, so --

Q. How often did your daughter socialize with Ms. Zarak's daughter EZ outside of the school environment?

A. So outside of the school, it was -- it was relatively frequent and, you know, because as we all know how the kind of COVID year went, there were -- there were moments that families were a little bit more conservative about having their kids socialize outside of school, and there were times that we were less so because we were in Iceland where things were managed very effectively. But if I -- if I had to put a number on it,

I would say that it was often the case that during the pickup, the kids would sort of spontaneously ask for impromptu play dates and we would try to kind of facilitate that, maybe every -- once every one or two weeks. That was -- that's kind of my memory of it.
Q. When you say spontaneous play dates, do you mean that the children would go to either your home or Ms. Zarak's home to spend an afternoon together?
A. Yeah. I mean, they kind of mob you when you try to pick them up and they're shouting "play date" and chanting, and, you know, just to give an example, I remember one time my daughter had a piano, like a mini piano recital -- and we're calling her E, EZ? -- EZ volunteered at the last minute to -- to, you know, be in the audience to listen to my daughter play the piano for two minutes, and I contacted the parents and they said that was great, so, you know, so I took her, and that was -- so that's an example. And we might have gone to get ice cream afterwards or something like that. Yeah. So it might have been at somebody's home, it might have been sort of an outside activity outside -- outside the home.
Q. And if it was at somebody's home -- let's say, for example, your home -- would Ms. Zarak or Mr. Schram typically be present during this play date or would they simply just let EZ spend some time at your home and pick them up later on?
A. Yeah, it would be more like a pickup or maybe we would drop

the daughter back off at her house. So sometimes, for example, it would be at the local swimming pool and then, you know, maybe we would meet up there, maybe we would like walk back to the house. It just sort of depended.
Q. Did your daughter and EZ develop a close group of friends at Alþjóðaskólinn during the first grade?
MR. BEYDA: Objection. Objection.
THE COURT: Overruled.
A. I think the question was: Did they develop a close group of friends?
THE COURT: At school.
A. Yes, at school, yes.
Q. Okay. How many children were in this close group of friends, as far as you understood?
A. I think it was typically a gaggle of about maybe four of them, four, five, something like that.
Q. I believe you said your daughter, EZ, of course, was one of the children, also Waleska's daughter?
A. Yes.
Q. Do you know Waleska?
A. Yes, I do.
Q. Okay. And was another child the child I think you mentioned earlier that was in the first grade the year before, presumably was in the second grade when your daughter was in the first grade?

A. I struggle to think because we weren't that close socially, so I tended not to hear so much about that child, yeah.

Q. Okay. Did you and Mr. Schram discuss moving from the United States to Iceland?

A. Yes, we did.

Q. Okay. And what did you and Mr. Schram discuss about moving from Iceland -- from the United States to Iceland?

A. So one, I guess, you know, we -- we were trying to figure out some of the logistical issues around -- around the move, and, you know, to this date, a lot of our household belongings are still in a storage unit in California. So we were trying to figure out if it would make sense to ship our household belongings to Iceland, and we -- we kind of ended up never making a decision on that. There was a discussion about moving the stuff to Greece, you know, let's put it in a garage there, or -- or to Iceland or, you know, but it -- I had spoken with him about the logistics of how they might have moved their household belongings, using one of the two shipping companies that seems to, you know, shuttle back and forth between the United States and -- and Iceland.

Q. Now is it your intention -- well, I'll withdraw that question.

Does your family have a plan to move back to the United States?

MR. BEYDA: Objection. Relevance.

THE COURT: Sustained.
Q. Did you purchase a home in Iceland?
MR. BEYDA: Objection. Relevance.
THE COURT: Sustained.
Q. Did you talk to Mr. Schram about how long he intended -- or withdrawn.
Did you have a conversation with Mr. Schram about how long the family might stay in Iceland?
MR. BEYDA: Objection. Which family, your Honor, just so we're clear?
MR. MIN: Mr. Schram's family.
MR. BEYDA: Thank you.
A. Sorry. Let me clarify. The question was how long Tania and Arnaldur intended to remain in Iceland, if we had a conversation about that?
Q. Yeah.
A. I -- I don't think we had a specific conversation that was talking about like long-term, like, you know, specific dates or anything like that.
Q. Was it your understanding -- withdrawn.
Did Mr. Schram or Ms. Zarak ever tell you that they had a plan to move back to the United States?
A. No.
Q. Did you understand or did you know whether Mr. Schram and Ms. Zarak had purchased a home in Iceland?

MR. BEYDA: Objection. What he understood is not relevant, your Honor. He's a fact witness.

THE COURT: Hold on one minute, please.

Hold on one minute, please.

All right. The parties handed in or filed on ECF at some point, it looks like this morning, a stipulation of facts. And I see Stipulation of Fact No. 20.

MR. MIN: Yes.

THE COURT: Why are we covering this?

MR. MIN: Well, I mean, I think the question is whether he knew whether they bought a house.

THE COURT: What relevance is that?

MR. MIN: Well, I would point to -- your Honor, if I could make --

THE COURT: Go ahead.

MR. MIN: With Mr. Pedersen, I had to raise an objection as to what he understood the purpose of the move to be. The objection was overruled because his understanding as to the length and purpose of their move was relevant, so my purpose in asking these questions is to ultimately ask Mr. Sinis what he understood the purpose of the move to be and whether or not it was, you know, a short-term move or long-term move.

THE COURT: So ask him that.

MR. MIN: Thank you, your Honor.

BY MR. MIN:

Q. Mr. Sinis, did you understand Ms. Zarak and Mr. Schram's move to be one of a temporary duration or more of a long-term duration?

A. I understood it --

THE COURT: Hold on.

THE WITNESS: Oh, sorry.

THE COURT: All right. You can answer.

THE WITNESS: Okay. And do I have to answer with like a yes or no or should I elaborate?

THE COURT: You can answer however you're able. That was part of my pause, to be perfectly honest.

THE WITNESS: Okay. I'm trying to --

THE COURT: If you are able.

THE WITNESS: Yes.

A. I understood it to be, let's say, a longer-term move in the sense that early -- I guess early on when we met, and, you know, we were kind of exchanging notes about like, you know, how did you get here and why are you here, and it was a natural question for people to ask us, without any apparent connections to Iceland, that, you know, I understood by moving here, that they might have kind of been breaking some ties to the US.

Q. Well, when you were having this discussion about shipping belongings with Mr. Schram and asking him questions about that, did that -- was that any indication to you as to how long the

move might be?

MR. BEYDA: Objection.

THE COURT: Sustained.

Q. Did you ever have any conversations with Mr. Schram about his employment in Iceland?

A. Yes.

Q. Okay. And did Mr. Schram talk to you at all about his employment opportunities in Iceland in connection to one of the reasons that they moved to Iceland in the first place?

MR. BEYDA: Objection to the form. This is leading.

THE COURT: Just clarify a little bit, Mr. Min.

Q. Did Mr. Schram -- did you ever have any conversations with Mr. Schram about his employment opportunities in Iceland? I'll withdraw it. I'll rephrase.

Did Mr. Schram ever tell you that his employment opportunities in Iceland were one of the reasons the family moved to Iceland?

A. I -- I'm not sure -- like the way that the question is stated, I'm not sure that the employment opportunities specifically were mentioned as a motivation for the move.

Q. But did he tell you about his employment opportunities in Iceland?

MR. BEYDA: Objection. Asked and answered.

THE COURT: No. That question wasn't asked and answered.

You can answer, sir. Did you ever talk to Mr. Schram -- it's a different question. Did you ever talk to Mr. Schram or did he ever talk to you about his employment opportunities in Iceland?
A. Yes, he did, and there was a period of time that we engaged his -- his services. In terms of, you know, full disclosure about our connection to his employment opportunities in Iceland, we were -- we were one of his clients.
Q. What did Mr. Schram say about his employment opportunities in Iceland?
A. Well, he -- he had -- as I understood, he had regained employment at a firm that he used to be employed at before he left Iceland to move to the US. And I believe that it was in that office that we met with him for some of the -- some of the contract work that he -- that he did for us.
Q. What sort of contract work did he do for you?
A. So we purchased a condo in January of 2021, and we had been considering doing a renovation project on that, so we met with him, and he did the kind of conceptual design work that involved, you know, just imagining how you might kind of re -- reshape the space.
Q. Did you have any conversations with Ms. Zarak while she was residing in Iceland about returning to New York?
A. We did not.
Q. Okay. Did she ever tell you that there was a plan to

return to New York to live in the future?

A. I don't think so, no.

MR. MIN: Your Honor, if I can have one moment.

THE COURT: Yes.

(Pause)

(Discussion off the record)

MR. MIN: Your Honor, can you hear me now?

THE COURT: Yes.

MR. MIN: Okay. Apologies.

I have no further questions at this time.

THE COURT: Thank you.

Cross-examination, Mr. Beyda?

MR. BEYDA: Thank you.

CROSS EXAMINATION

BY MR. BEYDA:

Q. Mr. Sinis, you've never had any one-on-one conversations with Ms. Zarak about why she moved to Iceland at the time that the family did on August 1st, correct?

A. I did not, correct.

Q. You've never had any conversations with Ms. Zarak about why the family moved to Mexico when they did in March of 2020, correct?

A. I don't know that that's exactly correct. And the reason I say that is when we were first getting to know each other on the school grounds and, you know, just talking about how we all

got to Iceland, my understanding from talking with -- with both of the parents about -- about that is that Mexico was a kind of, you know, first stop during the pandemic and then they decided to move here. So I understood -- basically, to answer your question, I understood it to be a pandemic-related move. I don't know if my understanding was correct or not.

THE COURT: You understood Mexico to be pandemic related or Iceland to be pandemic related?

THE WITNESS: Actually, both. I mean, they were both relevant as, you know, places where each member of the couple had family members, and I -- my impression was that Mexico happened at the beginning of the pandemic, like they were just trying to get out of New York, which was hit hard early on in the pandemic, and again, I don't -- I don't know detailed dates and my timing could be -- could be off, but that was -- that was my understanding.

THE COURT: Thank you.

Mr. Beyda, I'm sorry. Go ahead.

Mr. Beyda?

MR. BEYDA: Yes, I'm sorry. I was just looking at a note. Thank you.

BY MR. BEYDA:

Q. Mr. Sinis, did you have an understanding about why the family decided to come to Iceland when they did on October 1st?

A. Sorry. What happened on October 1st?

Q. Oh, I'm sorry. August 1st. I misspoke. Did you have an understanding as to why the family arrived in August when they did, on August 1, 2020?
A. 2020. Okay. Yes. My understanding was that it was -- it was a move to be closer to the husband's family, and so, you know, it was kind of the next step in the -- the pandemic year migrations of the family. Yeah.
Q. Do you know whether or not the family has a home in New York?
A. I -- I do not.
Q. Did you ever have any discussions with anybody about where the family lived before they arrived in Iceland on August 1, 2020?
A. My understanding was that immediately before they were in Mexico, and prior to that I'm -- I'm a little bit hazy on the details. I know that there was an LA chapter in the family's move or in the United States, and that was primarily I guess motivated by a corporate employment that Tania had, and I knew that New York was somewhere in the timeline, but I -- I didn't remember the exact details.
Q. And your daughter was in EZ's class at Alþjóðaskólinn?
A. Correct, yes, they were in the same class together.
Q. Since EZ returned to New York, your daughter has not communicated with EZ, correct?
A. My daughter doesn't have a digital device so no, she has

not communicated with -- with EZ. Sorry. I'm trying to not use names.

Q. When you say your daughter doesn't have an electronic device, I get that because of her age, but have you ever given her your electronic device, if you have one, to use to communicate with EZ?

A. I have not, no.

Q. Now the children were in the same class together as well as the same school at Alþjóðaskólinn, yes or no?

A. Yes. They were together, to be specific, in the first grade -- it was a mixed, kindergarten plus first grade of the international division of Alþjóðaskólinn, so yes, they were in the same classroom together with the same teacher.

Q. Did you have any discussions with Mr. Schram or Ms. Zarak about why they elected to put their daughter in the international program at Alþjóðaskólinn?

A. No. I never questioned it because we made the same decision, just by default, so it was never something that came up.

Q. You said that Mr. Schram did some work for you?

A. Correct.

Q. How much did you pay him in connection with that job?

MR. MIN: Objection.

THE COURT: I'm going to allow it. If you're concerned about the -- somebody needs to mute their line.

We're getting feedback.

If you're concerned about the amount, I can order this portion of the record sealed. But arguably, it's fair game.

THE WITNESS: Okay. Should I answer the question then?

THE COURT: You need to tell me first if you're concerned about this being in the transcript or not. If you are, I will seal this portion.

THE WITNESS: Thank you. I'm assuming that the transcript is hard to get anyway and -- yeah.

A. No, I mean, the amount -- I don't have the exact amount off the top of my head, but I think that it was on the order of about maybe 700,000 Icelandic Krona, which would be about $5,500, something like that.

THE COURT: Thank you.

THE WITNESS: All right.

BY MR. BEYDA:

Q. Prior to testifying today did you have any discussions about coming to court, with Mr. Schram?

A. No. I mean, only just over text message saying that I would be -- I would be testifying.

Q. Did Mr. Schram tell you what you would be testifying about?

A. No. You mean -- you mean the general subject, or what -- like the fact that there's -- there's a case? I already knew what it was about.

Q. Who told you what it was about?
A. Well, first of all, it was a -- it was a matter of public record.
Q. Can you just answer the question. Who told you what it was about?
THE COURT: Excuse me, Mr. Beyda. I'll instruct the witness, not you.
MR. BEYDA: Okay.
THE COURT: Okay?
Okay. Go ahead, sir.
A. Yeah. I first learned about it from RÚV, which is the state broadcaster in Iceland. There was a newspaper story about the case, and it didn't use any names, but it was -- it was obvious from the context what the case was about. So I knew about this case since -- I don't remember the exact time, but -- it came out, but it probably would have been early August, or mid-August, somewhere around there.
Q. So aside from what you read, did you have any discussions with Mr. Schram regarding what you would be testifying about?
A. No.
Q. Did you have any conversations with Mr. Schram's counsel?
A. Yes.
Q. How many conversations did you have with Mr. Schram's counsel?
A. Two.

Q. How much time did you spend speaking to Mr. Schram's counsel in your last conversation?
A. It would not have been more than half an hour.
Q. When was that conversation?
A. Friday, I think, last Friday.
Q. Your conversation prior to last Friday, how long was that one with Mr. Schram's counsel?
A. It was maybe just over a half hour. I think it was scheduled for a half-hour discussion and it might have gone to 40 minutes so -- but not more than that.
Q. And during those conversations you discussed what you would be discussing or testifying about in this case, correct?
A. Do you mean the general topic or --
Q. Are you able to answer the question?
A. We didn't discuss anything else.
Q. Were you told what you would be asked?
A. No.
Q. So what did you discuss?
A. It was sort of an informational thing so they, you know, could get to know like who I was and what our connection was to the family.
Q. Have you retained either of these lawyers in connection with -- either of Mr. Schram's lawyers in connection with your own personal life?
THE COURT: There are two lawyers. I don't know who

you're referring to. I assume Mr. Min is one of them.
A. I don't think I've ever retained a lawyer in my life except maybe to buy a condo in Park Slope, you know, 20 years ago, so, no.
MR. BEYDA: Okay. I just need a minute, your Honor, and I think I'm done.
THE WITNESS: Okay.
(Pause)
MR. BEYDA: No further questions, your Honor.
THE COURT: All right. Thank you.
Any redirect, Mr. Min?
MR. MIN: Just quickly, your Honor.
REDIRECT EXAMINATION
BY MR. MIN:
Q. Mr. Beyda was asking you about school, Alþjóðaskólinn. Does your daughter speak Icelandic?
A. She speaks a little bit, yeah.
MR. MIN: No further questions, your Honor.
THE COURT: Thank you.
All right. Thank you very much, Mr. Sinis. We appreciate your being here to help us try to sort through things.
THE WITNESS: Thank you, your Honor.
THE COURT: Have a good evening, I take it.
THE WITNESS: Yes. Thank you.

(Witness excused.)

THE COURT: All right. Mr. Min, your next witness?

MR. MIN: Yes, your Honor. Our next witness will be petitioner, Arnaldur Schram. Can I ask for a two-minute bathroom recess before we begin?

THE COURT: All right. Why don't we take a five-minute recess, and I'll see everyone back here shortly.

(Recess)

(Continued on next page)

THE COURT: All right. Good afternoon, everyone.

Mr. Min, are you ready?

MR. MIN: Yes, your Honor.

THE COURT: Everyone other than Mr. Min needs to mute their lines.

Mr. Glasser, it may be you. Thank you.

MR. BEYDA: Your Honor, it's Michael Beyda speaking.

May we just, before the direct of Mr. Schram commences, just find out who if anybody is present in the home, and if the youngest the child is there, just make sure that he is not in the room and that there's nobody else in the room with Mr. Schram?

THE COURT: Sir, is anyone else in the room with you?

THE WITNESS: No.

THE COURT: Doesn't look like it, but --

THE WITNESS: No. Nobody.

THE COURT: Thank you.

All right. Mr. Min.

MR. GLASSER: Judge, my microphone is not muted because we're using an external mic which is why Mr. Min's microphone is muted but mine is not. So, we just had a slip-up with our microphone muting coordination when we experienced that echo before which hopefully that will not happen again.

THE COURT: All right. That's fine.

Mr. Min.

MR. MIN: Thank you, your Honor.

As I said earlier, our next witness will be petitioner Arnaldur Schram.

THE COURT: All right. Sir, good afternoon.

Ms. Dempsey, would you swear Mr. Schram, please.

ARNALDUR SCHRAM,

called as a witness by the Petitioner,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. MIN:

Q. Mr. Schram, good afternoon.

If you have any difficulty hearing a questions, please, don't hesitate to ask. I am happy to repeat myself.

Are either you or Ms. Zarak U.S. citizens?

A. No. Can you hear me properly? No.

Q. Yes. After you and Ms. Zarak were married in 2015, you were living in New York, correct?

A. Correct.

Q. So, after you and Ms. Zarak were married, did there ever come a time when you and her Ms. Zarak discussed leaving New York and moving out of New York?

A. Yes.

Q. Do you recall approximately when you first had such a conversation about relocating outside of New York?

A. Starting 2017.

THE COURT: I'm sorry. I didn't hear you.
A. Starting 2017.
THE COURT: Thank you.
Q. And do you recall the circumstances around -- Withdrawn.
Was that one single conversation or did you have a series of conversations with Ms. Zarak on the possibility of relocating out of New York?
MR. MIN: Series of conversations.
Q. Mr. Schram, I would just ask, perhaps, you can get a little bit closer to the computer because I am having a little bit of difficulty?
A. Yes. Yes, of course.
THE COURT: That's better.
A. Am I clear now? Is it better?
THE COURT: It is better. Thank you.
Q. Okay. You said it was a series of conversation, right, just to clarify?
A. Yes.
Q. Do you recall the circumstances or the, what Ms. Zarak said to you and what you said to Ms. Zarak in 2017 regarding the possibility of relocating outside of New York?
A. I was frustrated with life in New York. I didn't feel like we had roots there. I felt frustrated by the expenses, lack of immediate family, small apartment. It just didn't feel real rooted there.

Q. Okay. So, you mentioned a few things here I just wanted to ask about you. You said there was no immediate family in New York. Where was your immediate family again in 2017?
A. In Iceland.
Q. Iceland. And your immediate family consists of who?
A. I have both my parents living in Iceland and I have two brothers here and of course, multiple cousins and then they have -- they have two, total three children my two brothers.
Q. Okay. And Ms. Zarak's family, immediate family, where did they reside in 2017?
A. In Mexico but one of her sisters lived in Miami.
Q. But none in New York?
A. Right.
Q. And you complained, were expressing to Ms. Zarak in 2017 that you were unhappy with the size of the apartment that you were residing in; is that correct?
A. Yes.
Q. Where were you residing in 2017 when you were having these conversations with Ms. Zarak about possibly relocating outside of New York?
A. We were living in, on 11 West 81 Street, Apartment 6A.
Q. Can you describe that apartment, Apartment 6A, please?
A. It's a one-bedroom apartment, two bathrooms, large living room and then adjacent TV room that has a little mezzanine alcove.

Q. You mean like a loft space?
A. Little loft space within the volume of that TV room.
Q. Around this time in 2017 you had two children, correct?
A. Yes.
Q. Okay. And as you, I am sure you heard from the other witnesses, we'll refer to them by their witnesses EZ and RZ; correct?
A. Correct.
Q. And what were the sleeping arrangements in Apartment 6A again in 2017 with you, Ms. Zarak and the two children?
A. Me, Tania and the two children were sleeping in the bedroom all in the same bed and then our live-in nanny was sleeping in the loft mezzanine alcove in the TV room.
Q. You also stated in your answer that you were expressing to Ms. Zarak that there were financial difficulties just to --
A. Yes.
Q. There were issues with money, correct?
A. Yes.
Q. Okay. And what were those issues?
A. Well, like expense, expensive city.
Q. Okay. In 2017 were you working?
A. Yes.
Q. Was Ms. Zarak employed in 2017?
A. No.
Q. You met Ms. Zarak in 2013, correct?

A. Correct.
Q. And so between 2015 and 2017 when you began having these conversations was Ms. Zarak at any point employed?
A. No.
THE COURT: Outside the home, you mean?
MR. MIN: Outside of the home, yes.
A. Correct, outside the home, yes, correct.
Q. Did Ms. Zarak have a source of income between 2013 and 2017?
A. She got monthly allowance from her mother and she also had rental income from apartments she owned.
Q. Apartments she owned where?
A. 11 West 81 Street, Penthouse C.
Q. Same building where, Apartment 6A where you resided?
A. (Nodding).
Q. You said she got a monthly allowance from her family, from her mother?
A. Correct.
Q. Did you have an understanding in 2017 how much monthly allowance Ms. Zarak was receiving from her mother, approximately?
A. Five thousand dollars.
Q. What were you doing for work in 2017?
A. I was working as a contractor for a firm called Workshop APD.

Q. Workshop APD?
A. Yes, "APD".
Q. You said you were working as a contractor?
A. Yes. I was working as employee but on a contractor basis.
Q. Okay. So how was your income derived from Workshop APD?
A. I would bill them under an LLC that I have.
Q. And you would be paid per project or per job that you had with them?
A. No, no. It was monthly. I was like an employee. It was setup because my lease was tied to this LLC.
Q. What was your approximate income in or around 2017?
A. Between 80 and 100 Euro.
Q. And did you do any work again in 2017 outside of your contract work for Workshop APD in 2017?
A. Yes.
Q. And your work with Workshop APD in 2017, was that primarily projects in New York or outside of New York?
A. New York area.
Q. And just to clarify, and maybe this wasn't clarified for the record, what is your profession?
A. I am an architect.
Q. And did you have any projects outside the scope of your contract work for Workshop APD in 2017?
A. Yes.
Q. Okay. Where were those projects located?

A. Iceland.
Q. And how many such projects did you have in or around 2017 in Iceland?
A. I had one a big one, one substantial one and then working on a bunch of prospects, you could say.
Q. Okay. What was the name of the LLC that you billed workshop under?
A. Shift AS LLC.
Q. Shift AS LLC?
A. Yes.
Q. Why did you have projects in Iceland if you were living in New York in 2017?
A. My own company that I used to work for in Iceland THG, they contacted me and asked me if I wanted to do a job for them in Iceland.
Q. Were you actively pursuing job opportunities in Iceland at that time?
A. Yes.
Q. Why were you actively pursuing job opportunities in Iceland around that time?
A. Because I wanted to develop my regulation with my home country to create reasons (inaudible) he said because I want to develop my relation --
(Clarification)
-- relationship with Iceland to create more resources

to go there more often from New York for work reasons and ultimately I could rephrase and say creating a path to going there.
Q. One other thing that you mentioned is that you felt frustrated that you didn't have roots in New York. What did you mean by that?
A. I was living off a visa that I had to renew once a year. You know, transfer mostly colleagues, just didn't feel like it was a future home. It was just kind of a work opportunity.
Q. So, did you express this sentiment that you did not believe that New York was a future home to your family in or around 2017?
A. Yes.
Q. And what was Ms. Zarak's response when you communicated this to her?
A. She agreed for the most part.
Q. When you say "for the most part", what do you mean by that?
A. I mean she had her issues that were not exactly like mine. She had some issues that were not mine. But we were relatively parallel in our thoughts about, or parallel in our frustration regarding New York.
Q. So when you say "she had some issues", Ms. Zarak had some issues, that might be dissimilar to yours, do you recall what these issues were? Did she explain how or did she communicate to you what her issues with living in New York were in or

around 2017?
A. Yeah. She expressed anxiety. She expressed frustration regarding the inability to sell her Penthouse C apartment. She expressed frustration about job opportunities in New York or her interests in job opportunities in New York. So, and of course, the apartment being small and life there being expensive, it was very similar.
Q. Did Ms. Zarak ever express to you that she felt far away from her family in New York?
A. Yes.
Q. I want to direct your attention to an exhibit that's been premarked as Petitioner's Exhibit 166.

MR. MIN: And, your Honor, this is the first time we are doing this but we have a presenter who will be sharing the other screen with the Court and the witness. The witness has hard copies of all exhibits.

So, Mr. Schram --

THE COURT: If you prefer, you could feel free, please, to pull up the hard copy of exhibit 166 --

Did you say?

MR. MIN: Yes, your Honor.

THE COURT: While Mr. Schram is getting his copy of exhibits. You gave me in exhibit list with a blank column about objections. Have you all talked about this?

MR. MIN: Your Honor, I don't believe this exhibit had

an objection to it.

THE COURT: That's my question. Nothing on this chart has an objection listed.

MR. BEYDA: There was no objection to P166, your Honor.

THE COURT: It'll be admitted.

(Plaintiff's Exhibit 166 received in evidence)

THE COURT: All right. You can display it then.

Next time, Mr. Min, before putting something up or asking the witness to look at it let's deal with whether there are objections. Okay?

MR. MIN: Understood. Thank you, your Honor. I apologize and I will do that next time.

THE COURT: All right.

MR. MIN: Your Honor, may I proceed if Mr. Schram is ready?

THE COURT: Sure.

Q. Mr. Schram, are you ready? If you need a moment just let me know.

A. Yeah. Give me a moment.

(Pause)

THE WITNESS: I have to ask, this was added late?

THE COURT: Who is speaking?

THE WITNESS: Arnaldur Schram is asking about this exhibit because it wasn't in my printed package and I am

realizing it's the last exhibit number. So, is it okay that I work off the screen here for this one?

THE COURT: Sure. But Mr. Min, apparently, you didn't give Mr. Schram the full set of exhibits? I'm not hearing you, Mr. Min.

MR. MIN: Your Honor, I will talk to Mr. Schram after that and resolve this issue. It was my error. I apologize. But I will talk to Mr. Schram. It might have been a miscommunication but, your Honor, this is only one page. So hopefully, it will won't be an issue.

THE COURT: Wait. What I have is pages. It looks like two copies of two different pages.

MR. MIN: Yes, your Honor. I misspoke. I am only holding one page in front of me. That's my error and I apologize to the Court.

THE COURT: That's part of the problem with only having the on-screen copy.

But go ahead, Mr. Min.

MR. MIN: Understood.

Q. Mr. Schram, as we scroll down there, can you identify this for the Court?

MR. MIN: I'm sorry we admitted this document. So, I will move on with the questions.

A. Yeah, this is --

Q. Who's speaking on the left and who's speaking on the right?

THE COURT: I'm sorry. Who's speak on the left and who's speaking on the right?
Q. Whose messages appear on the left and whose messages appear on the right?
THE COURT: If you know.
Q. If you know.
A. I'm on the right. I'm light blue. She is dark gray.
Q. Understood.
So, do you recall Ms. Zarak writing to you in or around February of 2018, the idea of leaving for a year and then making a long-term decision?
A. Yes.
Q. Okay. Do you recall or do you know what Ms. Zarak was referring to when she wrote you this in and around February of 2018?
A. Yes. It was regarding Mexico.
Q. And were you and Ms. Zarak around this time discussing possibly relocating from New York to Mexico?
A. Yes.
Q. Okay. And how did that conversation or that idea of possibly relocating to Mexico come up?
A. It was regarding a possible solution for our frustration of living in New York.
Q. Okay. If we could scroll down a little bit, she mentioned to you that she had rather decide sooner than later be done

with the anxiety. Were you and Ms. Zarak around this time discussing Ms. Zarak's anxiety? Withdrawn.

Did Ms. Zarak communicate to you or explain to you why she was feeling anxiety about this decision to move to Mexico?

A. I wouldn't say it was anxiety about going to Mexico. It was anxiety about New York or uncertainty about the future. So, but also there was frustration regarding her hesitancy not selling.

Q. Okay. If we could scroll down to those messages.

Do you recall Ms. Zarak writing to you that I'm just very struck, very struck. My apartment won't sell. My mom is talking now about selling her apartment in around February 2018?

A. Yes.

Q. Was Ms. Zarak in the process of or attempting to sell her apartment Penthouse C on 81st Street?

A. Yes.

Q. And when she was referring to her mom selling her apartment, her mother's apartment, do you know which apartment she was referring to?

A. 6A.

Q. And that's the apartment that you, Ms. Zarak and the children were currently residing in?

A. Correct.

Q. While you were residing in apartment 6A, were you and

Ms. Zarak paying rent in that apartment?
A. We paid many of the expenses but not rent in the classical sense.
Q. Approximately, how much maintenance expenses did you pay on behalf of Apartment 6A when you were residing there?
A. 32/34 hundred around there per month.
Q. Did you and Ms. Zarak discuss where you, Ms. Zarak and the children might reside if her mother did sell Apartment 6A around that time?
A. Yeah. Either Iceland, Mexico or possibly Miami, even Cuba as an idea?
THE COURT: Did you say "Cuba"?
THE WITNESS: Yes.
Q. Okay. We are going to scroll down to the very end of this page.
Okay. Do you recall there saying that, perhaps, we just need to take a leap of faith and try either one?
A. Yes.
Q. What did you mean by either one at that time?
A. To choose either Mexico or Iceland.
Q. So, you just testified that you were discussing various options, Iceland, Mexico, possibly Cuba, Miami. Can you describe what conversations you and Ms. Zarak were having with respect to moving to Mexico?
A. Yeah. Well, we living arrangements that you could afford,

they were great. It was very affordable. You could get a house for not much money. Tania has a network of job opportunities in Mexico due to her network. But we would have to give up on security -- earthquakes pollution and securities issues.
Q. When you say "security issues" what do you mean by that?
MR. BEYDA: Objection, judge; relevance.
THE COURT: No, it's relevant. Overruled.
A. There's not that many -- in Mexico City, you can walk around safely.
Q. Physical safety?
A. Yes, exactly.
Q. Now, when you were discussing Iceland, can you describe the conversations you and Ms. Zarak were having again around this time February 2018 about possibly moving to Iceland?
A. The -- job security at least for me, healthcare and education pretty much for free. We can get a house for a good price compared to the U.S. at least in New York, definitely. We were close to family and it's my home country. So it creates, creating roots and stability. It was pretty great.
Q. You said roots and stability?
A. Yeah, like roots and feel at home, at least for me.
Q. You discussed Miami as an option. Can you describe the conversations that you and Ms. Zarak had around again February of 2018 about possibly moving to Miami?

A. Tania's sister lives in Miami. So she was keen as living in the same city as her sister. I wasn't, you know. And then to make that work we would have to make a lot of other things happen, for example, job and career opportunities and housing options, et cetera. But I was never really keen on Miami, to tell you the truth.
Q. You also mentioned Cuba being an option around this time. Can you explain your conversations you had with Ms. Zarak around the idea of moving to Cuba?
A. Yeah. It was, there's a film school in Cuba that Tania really liked, one of the filmmakers that was teaching there. So, it was you know it was a wild idea, you know. And I supported the idea. It was a one-year program but it didn't lead to anywhere. It was more of a, it was a fun idea to talk about.
Q. Did you have any conversations with anyone about possible job opportunities in Iceland again around this time 2017/2018, if you and Tania were to move to Iceland?
A. Yes.
Q. Who did you have conversations with?
A. Free-esh Frostson Partner at THG Architects, the firm I used to work for and restaurant I worked for while living in New York.
Q. And what was the job opportunity that -- withdrawn.
What possibilities existed in Iceland for you to

return there and work?

MR. BEYDA: Objection; hearsay.

THE COURT: It's not hearsay. He would know what opportunities he had and if he doesn't know he'll say that but it's not hearsay.

You can answer, sir.

THE WITNESS: Okay.

A. In short, he said if you move to Iceland, work for us --

THE COURT: I'm sorry. Hold on one second.

(Pause)

THE COURT: Give me one moment.

(Pause)

THE COURT: So, the question was what possibilities existed in Iceland for you to return there and work? And now I overruled the hearsay objection.

But, Mr. Schram, you started to give an answer that is hearsay. You're at telling me what somebody else said. So, just, that's not the question. The question is:

What opportunities were there?

THE WITNESS: Should I answer or --

THE COURT: Yes. Don't tell me what someone else said to you. Tell me what opportunities you understood existed.

A. A partnership at THG Architects.

THE WITNESS: You're mute.

Q. I want to direct your attention to petitioner's exhibit,

what's been premarked a Petitioner's Exhibit 168.

Your Honor, I don't believe there was an objection to this exhibit.

THE COURT: Any objection, Mr. Beyda? I'm sorry.

MR. BEYDA: I am looking at it, your Honor.

THE COURT: All right.

(Pause)

MR. BEYDA: Yes, your Honor.

May I voir dire if this is being offered?

THE COURT: Just give me one moment. All right?

MR. BEYDA: Yes.

THE COURT: This is Exhibit 168, correct?

MR. MIN: Yes, your Honor, that is correct.

THE COURT: All right. The list of objections that I have don't go that high.

Did you preserve an objection, Mr. Beyda?

MR. BEYDA: There was a supplemental, I believe or an amended exhibits produced is from what I understand which is why I think Mr. Schram does not have these and it was subsequent to our providing objections to exhibits, I believe.

MR. MIN: No, your Honor. That's not true.

THE COURT: Go ahead with the voir dire.

MR. BEYDA: Thank you, your Honor.

VOIR DIRE EXAMINATION

BY MR. BEYDA:

Q. Mr. Schram, who prepared this document?
A. I believe Tania Zarak.
Q. When was it prepared?
A. Sorry. You talking about the, cause I don't have it printed right here with me, talking about the astrological map text so I'm clear what I'm answering.
THE COURT: Mr. Schram, doesn't have the document. I think that's the problem, right? Now you are putting up a document as to which he might have an objection?
Go ahead, Mr. Beyda.
BY MR. BEYDA:
Q. When was this document prepared?
A. I don't remember.
Q. How did you get this document?
A. I recalled e-mailed to me from Tania.
Q. When?
A. If I were to guess 20 --
THE COURT: Don't guess. Give me your best -- if you don't know, you don't know.
A. I don't know but this was in the context of these discussions about where we would go next. So, it falls in the context of those discussions 2017, I would guess.
Q. You mentioned something a few moments ago but astrology, is that what this is? Does this have something to do with astrology?

THE COURT: Do you know, sir?

THE WITNESS: Do I know? What I know is what Tania told me about it. I can't qualify the details. I can tell you what she told me.

THE COURT: Mr. Beyda?

BY MR. BEYDA:

Q. Why did you use the word "astrology" a few moments ago, Mr. Schram?

A. Because that's a word I associated with these documents about leading them to the star charts. I can't well describe the science behind it but it has something to do with some kind of a where you were born, what the stars were aligned at the time and then they would somehow be, could indicate your future, some sort.

Q. Last question. You did not prepare this document, correct?

A. Yeah, correct.

MR. BEYDA: Your Honor, I am going to object on relevance. If this has anything to do with astrology and horoscopes and Mr. Schram is not the proper party to move this document which he did not prepare into evidence.

THE COURT: Okay. But as I understand it, under Title 22 U.S.C. Section 905, lack of authentication is no a grounds for objecting to the admissibility of a document in this type of proceeding. So you can object to specific questions about the document, but the document itself, I don't see your

objection.

MR. BEYDA: I also raised a relevance objection. I don't know how this is relevant in any way.

THE COURT: I don't either until I hear a question about it.

MR. BEYDA: Okay. Can we get an offer of proof, your Honor?

THE COURT: Mr. Min?

MR. MIN: Yes, your Honor.

THE COURT: That's a fair request with respect to this.

MR. MIN: Yes, your Honor. This document goes through the various locations that the parties were discussing in around this time 2017/2018 as to where they might relocate to outside of New York and also expresses opinions about the different locations, pros, cons again as stated by Ms. Zarak prepared by Ms. Zarak and sent to Mr. Schram.

THE COURT: Is he the proper witness?

MR. MIN: Well, Mr. Schram certainly had conversations with Ms. Zarak regarding this document and regarding these locations.

THE COURT: So, ask him about that.

MR. MIN: Right. But I mean this would be admission of a party, your Honor.

THE COURT: Why don't you ask Ms. Zarak about it is

the point.

UNIDENTIFIED FEMALE VOICE: Hello, your Honor.

THE COURT: Is that the court reporter?

Who was just speaking?

MR. BEYDA: Your Honor, that was Ms. Zarak. She thought she was being asked to answer questions. She was just introducing herself.

THE COURT: I'm sorry, Ms. Zarak. Not right now. I was saying to Mr. Min if he wants to ask questions about it, why doesn't he save those questions for you when you take the stand.

MR. MIN: Your Honor, I guess apologies if I'm having difficulties understanding. I guess, I am not understanding what the difference between text or/and communicated to Mr. Schram, which reflects her opinions or statements regarding the possible destinations and/or opinions of New York.

THE COURT: But he's already testified to that this is cumulative at best and you can ask Ms. Zarak about it, I am saying.

MR. MIN: Okay. Understood. I'll move along.

THE COURT: If you want to ask Mr. Schram about conversations, go ahead. But without the document itself, he didn't create it.

MR. MIN: Understood. I'll move along, your Honor.

THE COURT: All right. Exhibit 168 is marked for identification but not received at this point.

Go ahead, Mr. Min.

MR. MIN: Thank you.

Q. In or around this time 2017 to early 2018, did Ms. Zarak ever make statements to you about her unhappiness with living in New York?

A. Yes.

Q. What sorts of statements did she make to you about her unhappiness with living in New York around that time again?

A. That she just didn't like living in New York any more. That she was kind of to say anxious about going somewhere else being close to family, having more help. So, it was a very parallel frustration and views expressed about possibly relocating out of New York.

Q. Around this time, early 2018, was Ms. Zarak expressing interest to you in developing her career?

A. Yes.

Q. Okay. And did Ms. Zarak take steps to explore different career or job opportunities?

A. Yes.

Q. What sorts of steps did she take in order to explore such opportunities?

A. I can't say I know the details but you know she reached out to her network and an opportunity came up.

Q. When you say she reached out to her network, are you aware or did Ms. Zarak tell you about her, any prior work experience she had prior to meeting you in 2013?
A. Yes.
Q. What did Ms. Zarak tell you was her work experience prior to meeting you in 2013?
A. She worked in a film company. I think that owner was Robert De Niro in Tribeca and then also she said she ran a film division at a studio in Mexico City I believe called Arco studios or Argo. So, which was substantial job in Mexico.
Q. Again, in early 2018, did Ms. Zarak express to you that she had interest in re-entering the film industry?
A. Yes.
Q. And did Ms. Zarak in early 2018 receive any job opportunities or interest in job opportunities?
A. Yes.
Q. Where?
A. A company in Miami.
Q. Okay. And what sort of job opportunity developed in Miami for Ms. Zarak around this time early 2018?
A. It was, as a company it was focusing on say of markets, the represented lack of talents in the U.S. but they were interested in starting to create content for the Latin market. So which was the position or project that they were interested in having Tania onboard with.

Q. And did you or Ms. Zarak -- withdrawn.

Did Ms. Zarak travel to Miami to explore this job opportunity in early 2018?

A. Yes.

Q. Did you travel with her?

A. Yes.

Q. And was Ms. Zarak interested in this job opportunity?

A. Yes.

Q. And did this result in a job offer to Ms. Zarak?

A. I don't believe so, not a formal offer, no.

Q. Did this job opportunity or this discussion for job opportunity result in further networking for Ms. Zarak?

A. Yes.

Q. And did that lead to other job opportunities subsequent to not receiving this job offer in Miami?

A. Yes. I recall the contact person at this company referred Tania to Netflix and Apple who were looking for people with similar production -- for the Latin market.

Q. Did you have conversations with Ms. Zarak about these possibilities for a job at Apple for Netflix in 2018?

A. Yes.

Q. Did you have an understanding as where these job opportunities would be located? Meaning, were they New York, were they U.S. somewhere else?

A. I want to say Apple was in Miami and Netflix was in Los

Angeles.
Q. Did Ms. Zarak express to you that she was excited to leave New York to pursue these types of job opportunities?
A. Yes.
Q. Did the Apple opportunity result in any sort of job offer?
A. Sorry, Apple for the Netflix.
Q. Apple, Apple?
A. It did not result in job opportunity, no, not a formal one.
Q. Okay. Did the Netflix opportunity result in a job offer?
A. Yes.
Q. Okay. And when did Netflix offer Ms. Zarak a job as far as you know?
A. No. There was series of meetings, et cetera. I think a formal offer was made May of 2018.
Q. Okay. And did Ms. Zarak travel to Los Angeles -- withdrawn.
Where was this Netflix job located?
A. Hollywood, Los Angeles.
Q. Prior to -- withdrawn. Prior to this offer being made in May 2018, did Ms. Zarak travel to Los Angeles to explore this job opportunity?
A. Yes.
Q. Did you travel with her as well to Los Angeles?
A. Not on the first trip.
Q. Were there more than one trip?

A. No. I think it was just one trip and she went by herself with Roman and then we moved after that.
Q. And do you recall when that trip was to LA with Roman, Ms. Zarak and Roman?
THE COURT: Are we talking about one of your children here?
THE WITNESS: Oh, "RC". Sorry. Apologies. RC, the younger.
THE COURT: The baby at that point, right?
THE WITNESS: Yes.
Could you repeat the question, please.
Q. Sure. Do you recall when that trip with Ms. Zarak and RC occurred where they went to L A?
A. Early May, around that time.
Q. Okay.
A. Prior to the formal job offer.
Q. And while she, Ms. Zarak, that is while she was in LA did she look at schools for, the potential schools for the children as far as you knew?
A. Yes.
Q. Did Ms. Zarak tell you what the job offer was that Netflix made in May 2018?
A. It was a position in their international content production department. Probably not the right title but I aimed for the Latin market, specifically, the salary was $220,000 a year plus

benefits, relocation costs covered, et cetera.
Q. Okay. Did Ms. Zarak accept this job offer?
A. Yes.
Q. At this time -- withdrawn. When did Ms. Zarak accept the job offer for Netflix?
A. I want to say end of May, early June. Soon after the offer was, you know, made.
Q. Okay. And around this time May, June, 2018, where were you working?
A. I was working doing contract work for Workshop but I also had my own office space and I was doing some work for --
Q. You rented your own office space in New York aside from outside of confines of Workshop APD?
A. Yes.
Q. And did you and Ms. Zarak discuss the job offer that Netflix had made in May 2018?
A. Yes.
Q. And did you and Ms. Zarak discuss the impact that such a move would have on you and the family?
A. Yes.
Q. And were you excited about the possibility of moving from New York to LA?
A. Not so crazy about Los Angeles as a place to live.
Q. So would you say you were excited or were you not excited?
A. I was excited for her. This was an opportunity for her but

I expressed that this would be a sacrifice. From my end it would also be a sacrifice or children to just go to a new place. And this would, and I also expressed to her that this was not a solution to the issues we were having in Los Angeles least. This was specifically for her job opportunities to be further away from my family but further away from my work and Los Angeles is as expensive as New York. It was a move for her career.

Q. And you expressed that to Ms. Zarak that this move would be for her career?

A. Yes.

MR. MIN: Your Honor, I'd like to direct the witness's attention to a document that's been premarked as Petitioner's 167.

THE COURT: Are there any objections, Mr. Beyda?

MR. BEYDA: One moment, please.

THE COURT: Yes.

(Pause)

MR. BEYDA: No objection, your Honor.

THE COURT: All right. It'll be received.

(Plaintiff's Exhibit 167 received in evidence)

MR. MIN: We will put it up on the screen and ask some questions about it.

Q. I'd like to direct your attention to page two of this document. Do you recall writing this email to Ms. Zarak on

March 13, 2018?
A. Yes.
Q. And why did you write this email to Ms. Zarak in around March of 2018?
THE COURT: Are you talking about the second page?
MR. MIN: Yes.
A. I wanted to let her know that this is not an ideal solution. This is for her and her career alone. I talked about this as a move in the context of that I supported the idea of going to Mexico and that she's also shown, expressed interest in going to Iceland. But this is in some way just delaying what I think are called the inevitable that U.S. is not our home, a future home for our family.
Q. I want to direct your attention to the third paragraph in your email where you say it is I've come to realize that the core of our problem is that country.
What did you mean by that?
A. That we don't have family in this country. That we're -- life is temporary and so we just didn't have roots here, neither one of us.
Q. When you wrote after that if we don't feel at home in, here in New York, then why should we feel at home anywhere else in this country? Why do you say "we" in this sentence? Did you understand at that moment that Ms. Zarak agreed with you that you and Ms. Zarak did not feel at home in New York?

A. Yes.
Q. In the next paragraph you said you supported the idea of moving to Mexico last year despite numerous challenges for you personally. Why did you support the idea of moving to Mexico in or around 2017 even though it presented numerous challenges as you say for you personally distancing yourself from your new newest network and going further from Iceland?
A. For the idea of stability you know that we had, we could afford a larger home that would be fitting for our family, you know, Tania's job opportunities in this case and then develop potential job opportunities for me as an architect for family which is in construction and just an overall being that we could potentially afford in Mexico.
Q. When you said job opportunities in this case for Tania, you mean in Mexico?
A. Yes.
Q. And then you wrote your recent interest in going to Iceland was surprising and encouraging for me. Did Ms. Zarak recently prior to March 2018 express interest in moving to Iceland?
A. Yes, as part of our ongoing conversation as where we would end up or go we would talk about the pros and cons of Mexico and Iceland. We have a lot of things in common in terms of use of those places and sometimes not.
Q. Why was that encouraging for you? You say it was encouraging for you, her recent interest in going to Iceland.

Why?
A. I think previously she had reservations about going to Iceland but then in that case she expressed interests. She initiated the expression of interests to go to Iceland (Inaudible) Yes, came from her.
MR. MIN: I am going to remove the document, your Honor, and continue on.
Q. Ultimately, did you and Ms. Zarak and your children at this point EZ and RZ move to LA in pursuant of Ms. Zarak's job at Netflix?
A. Yes.
Q. When did you, ultimately, move?
A. June 30th of 2018, I recall.
Q. Okay. And did you tell your friends and family that you were moving to LA?
A. Yes.
Q. And what did you tell them?
A. I said we have moved to Los Angeles with no plans of returning. Please, come visit us in Los Angeles. Good bye.
Q. Did you anticipate when you moved to Los Angeles in the summer of 2018 that it might be a long-term relocation?
A. Yes.
Q. What preparations -- well, what led you to -- withdrawn.
What led you to that belief that moving to LA might be a long-term relocation for you, Ms. Zarak and the children?

A. Cause we packed up our things. We registered them in school in Los Angeles. We leased a car for a few years. We fundamentally relocated with all the caveats that come with that.
Q. How did this move to Los Angeles affect your employment with Workshop APD?
A. They -- so, I had one project with them, ongoing project which they wanted to keep me on because it was a very complicated project and I had been working on it since the beginning. They said they are fine with me moving to Los Angeles as long as I would come to New York every two or three weeks to show up for site meetings. It made it substantially more difficult to continue my jobs.
Q. But you continued your working relationship while you were in LA?
A. I did. And I also had a project office renovation in New York which under my own name which, obviously, I wasn't going to walk away. So, part of my moving back and forth was to maintain my income.
Q. Did you have any projects outside of New York at this time?
A. At that time, yes, I was working on a project in Iceland.
Q. Did you close down the office you had in New York that you said was outside the confines of Workshop/APD?
A. Yes.
Q. Did you open up a new office in LA?

A. Yes.
Q. Was that a Workshop/APD office or an office for that Shift AS LLC?
A. Shift AS LLC.
Q. Did moving to LA affect your ability to pursue different projects and earn income?
A. Yes.

(Continued on next page)

BY MR. MIN:
Q. How so?
A. Time difference, you know, distance from active jobs. I kind of cut ties with my long-term relationships in New York and I had to start fresh ones, which just takes time.
California has different ways of doing things than New York.
It was -- I was two flights away from the Icelandic work, so it was a massive challenge, if anything.
I had to also hire assistants that was based in New York for -- to be, you know, to show up at the meetings I was not able to show up on construction sites. So it was a massive effort, yes.
Q. Okay. And when you and the family moved to LA, the children were enrolled in school there, yeah?
A. Yes.
Q. And you and the family found somewhere to live. Did you buy a home? Did you rent a home?
A. We rented a home.
Q. Okay. For how long?
A. One-year lease.
Q. Okay. And prior to renting the home for one year did you stay at any temporary housing?
A. Yes. Netflix has things, apartment buildings that they just dedicate to -- for new employees that haven't relocated

yet.
Q. Okay. So I'd like to know -- prior to that, you were living in Apartment 6A. I'd like to know what you moved from Apartment 6A to LA in the summer of 2016 as part of your relocation.
A. We -- we packed up the things that belonged to us in the apartment, not the things that did not belong to us.
Right before leaving, Tania bought mattresses to move with us, because the bed in 6A did not belong to us, and the bed frame. We left the dining table, we left silverware, glassware, plates, a portion of it, but we did bring some in with us. We did not bring some chairs, some mirrors, artwork, pullout sofa, etc.
Q. You said you took the things that --
A. Sorry?
Q. No. I apologize. I thought you were done. Were you?
A. And then there were storage units which had stuff, storage stuff.
Q. You said there was a storage unit. What do you mean? Where? Where did you have the storage unit?
A. In the basement, there's cages, you know, that we used.
Q. Okay. How big is that storage space in the basement?
A. 5, 5 -- 5 x 10, 12 feet.
Q. Okay. Okay. You said -- you mentioned before that you took everything that belonged to you. What did you mean by

that? Were there things in Apartment 6A that did not belong to you?
A. Right.
Q. Who did they belong to, as far as you understood?
A. Tania's mother.
Q. And you had testified earlier that your understanding was that Apartment 6A belonged to Tania, Ms. Zarak's, mother, correct?
A. Correct.
Q. And was that still your understanding in 2018 when you moved to LA?
A. Yes.
Q. Did Ms. Zarak ever refer to that apartment as her apartment, Ms. Zarak's apartment?
A. No.
Q. I'd like to direct your attention to a document that's been marked as Petitioner's 1.
THE COURT: Any objection, Mr. Beyda?
MR. BEYDA: Just pulling it up, your Honor, to see what we're talking about.
THE COURT: This is one of the exhibits that was premarked, and I don't have any objections designated.
MR. BEYDA: And there is no objection, your Honor.
THE COURT: All right. It will be admitted.
MR. MIN: Your Honor, can I make a statement for the

record, please --

THE COURT: Go ahead.

MR. MIN: -- with respect to that.

Because Mr. Beyda said earlier that we provided supplemental exhibit lists. We did, as did they. The objections by respondent were submitted on Friday, I believe a little bit less than an hour before court. They were submitted -- I can't say off the top of my head, but a day, days after our supplemental list was exchanged.

So when Mr. Beyda said earlier that he believes the supplemental list was provided after the objections, that's just completely false, and I just wanted to let that be clear for the record.

THE COURT: Mr. Min, you have a habit of wanting to quibble about minutiae.

MR. MIN: Understood, your Honor.

THE COURT: The chart that I have, just for the record, since we're making a record here, which is Exhibit 35 -- is that the right exhibit? ECF 35.

MR. MIN: Oh, ECF.

THE COURT: -- filed on September 30th, that has a column that says Objections. And there are objections next to certain documents. But that list only goes up to Exhibit 165.

MR. BEYDA: That's correct.

MR. MIN: And there was --

THE COURT: Mr. Min, does it really matter at this point, is what I'm trying to say to you.

MR. MIN: No, your Honor. I just -- your question earlier, you made -- asked a question to Mr. Beyda about whether he preserved his objections in his objections list, and that's why I just wanted to clarify that for the record, but if it doesn't matter, then I will move on.

THE COURT: Well, it just seems to me as though, based on this document, that your list of exhibits only went up to 166. That's what I'm asking. Is that incorrect?

MR. MIN: Your Honor, give me one second.

THE COURT: 165.

(Pause)

THE COURT: I mean, your own client doesn't even have the best part of the exhibits, right?

THE WITNESS: Correct. That also might have been my mistake.

MR. MIN: Your Honor, I'll continue, because of course I can't answer that question right this moment, so --

THE COURT: All right. My point to you, Mr. Min, is simply, you know, I've been letting you put the exhibits in even if they were designated late, or if the objections were designated late, I'm giving Mr. Beyda an opportunity to look at them.

MR. BEYDA: Thank you.

THE COURT: What we're trying to do here is to get to the truth, and the right answers.

MR. MIN: Okay. I'll move on, your Honor.

THE COURT: Exhibit 1 -- I'm sorry, just to orient me again -- is that what we're talking about?

MR. MIN: Yes, your Honor.

THE COURT: All right. And that's admitted.

(Petitioner's Exhibit 1 received in evidence)

BY MR. MIN:

Q. Mr. Schram, can you tell me who Marta Quintana is.

A. She is Tania's mother.

Q. And this email was sent by Ms. Zarak in July 2018 on behalf of you and Ms. Zarak to her mother; is that correct?

A. Yes.

Q. Okay. And where she refers to -- where she thanks Ms. Quintana for allowing you and your family to stay in her beautiful New York apartment -- her being Ms. Quintana, right?

A. Correct.

Q. Do you recall or do you know or -- withdrawn.

How did Ms. Zarak refer to Apartment 6A when referring to who owned that apartment?

A. "My mother's apartment."

Q. I want to direct your attention to a document that's been premarked as Petitioner's Exhibit R86 -- P 86, P 86. Petitioner's 86.

THE COURT: P 86. Okay. Give me a moment, please.

Mr. Beyda, I assume no objection?

There's no objection preserved, right?

MR. MIN: Your Honor, we did not receive an objection.

THE COURT: I'm sorry? P 86 we're talking about, right?

MR. MIN: Yes, your Honor.

THE COURT: So Mr. Beyda, on Document ECF 35, next to P 86, there's no objection preserved, right?

MR. MIN: The respondent did object, your Honor.

And I want to clarify. That was our exhibit list that we filed. We leave that column in there so that when respondent receives it, that they can mark their objections within that document. So that is not -- to be fair to Mr. Beyda, that is not reflective of their objection.

THE COURT: Oh, I'm sorry.

MR. MIN: They gave us their objections on Friday.

THE COURT: I'm sorry. I'm looking at the wrong document.

Yes, thank you. Thank you very much. So I appreciate that, Mr. Min.

MR. MIN: And I do believe they objected to this document in 42, just to be clear.

THE COURT: Yes, you did. You objected on the grounds of hearsay -- I'm sorry, Mr. Beyda -- hearsay, except as to

certain admissions made by respondent, and then you say it lacks foundation.

MR. MIN: And I will only be asking questions with respect to statements made by respondent, if that resolves any objections on that basis.

THE COURT: Are you standing by your objections, Mr. Beyda?

MR. BEYDA: Yes. To the extent that Mr. Min is only using this document for Ms. Zarak's statements, which is I think what I heard him say, that's fine.

THE COURT: Okay. So it will be admitted for a limited purpose, which is Ms. Zarak's statements.

(Petitioner's Exhibit 86 received in evidence)

THE COURT: Mr. Schram, do you have a copy of this document?

THE WITNESS: Yes, I do.

THE COURT: Okay. Great.

All right. And the highlighting on this document was done by you, Mr. Min?

MR. MIN: Yes, your Honor. We can ignore that. To make the record clear, that was an alteration.

THE COURT: Okay. Go ahead.

BY MR. MIN:

Q. Mr. Schram, I'm going to direct your attention down below this first page to the second highlight, where Ms. Zarak says,

"The apartment is owned by my mother Marta, cc'd here. You also met her at Starbucks that day."

This is written by her on June 17, 2020, correct?

A. Yes.

Q. Okay. And so as of summer 2020, was it still your understanding that Ms. -- that Apartment 6A was owned by Ms. Zarak's mother and not by Ms. Zarak?

A. Correct.

Q. Did Ms. Zarak ever, in the course of your relationship with her, express that she had control over this apartment?

MR. BEYDA: Objection. I don't even know what that means.

THE COURT: Hold on.

MR. BEYDA: Sorry.

THE COURT: Mr. Beyda?

MR. BEYDA: Objection, I guess you could say to the form, because I don't even know what that means.

THE COURT: I don't know what it means either. Sustained.

BY MR. MIN:

Q. During the course of your relationship, did Ms. Zarak ever tell you that she had the ability to sell Apartment 6A?

MR. BEYDA: Objection, your Honor. The question lacks a good-faith basis.

And maybe the witness should be off line before I --

if I elaborate any on this.

THE COURT: Mr. Schram, are you able to -- or let me ask Ms. Dempsey: Are you able to put Mr. Schram in a breakout room where he can't hear us? Is that something that can be done?

Mr. Schram, I think we're going to isolate you.

THE WITNESS: That's fine. I'll survive.

(Pause)

(Discussion off the record)

(Witness not present)

MR. BEYDA: Thank you, your Honor. And I'll be very brief. The apartment is titled in Ms. Zarak's, the respondent's, name, with her sister, and I do not believe -- I'll double-check, but -- that the mother's name is even on the title.

So I've been silent for a really long time while these questions are being asked about the mother and -- but as far as ownership of this property and who has the right to sell it or not, it's in Ms. Zarak's name with her sibling. That's all I --

THE COURT: Well, you'll put on evidence to that effect.

MR. BEYDA: I just -- I know that we have limited time.

THE COURT: Hold on one second.

Actually, Ms. Zarak shouldn't be on either.

MR. BEYDA: Then -- okay.

THE COURT: Thank you, Ms. Dempsey.

MR. BEYDA: I'll ask her to step out.

(Ms. Zarak not present)

THE COURT: Is she in your office?

MR. BEYDA: Yes. She just left, to run to the restroom, actually.

So we're spending so much time on ownership of this property, and I know our time is limited, and counsel has the ownership documents. They were exchanged.

THE COURT: All right. But presumably you'll cross-examine him on this.

But I will tell you, Mr. Min, it is getting a bit cumulative, in any event, of the point you're trying to make. So I don't know how much more you have on this. This document is in evidence.

MR. MIN: Yes, your Honor. I have one more exhibit on this issue, and, your Honor, of course I think it will be a little bit more clear when we get to Ms. Zarak's direct and cross, but Ms. Zarak in her papers makes it clear that, you know, the family had a, quote, home in New York, Apartment 6A, which is hers, yet --

THE COURT: I understand. I understand the point of it all.

MR. MIN: Okay.

THE COURT: But if Mr. Beyda is saying she didn't own it, presumably he'll put on evidence to that effect, and then you're both going to argue to me what the consequence of that is.

MR. MIN: Understood. I have one --

THE COURT: While we just have the lawyers on the phone, I want to say just a couple of things. All of these documents -- I mean, so far you've used four documents. You've given me like seven binders that are 3 or 4 inches thick of documents. The parties need to talk about are there documents that you are intending to put into evidence. You don't need to necessarily question a witness on a document if you're in agreement that the document can come into evidence. But it is beginning to make me think that maybe we do need summations. Because if all the rest of these seven binders of documents are somehow relevant to what you're going to be arguing to me, I'm not going to sit here and read seven binders of documents without some guidance from you all on what you think the relevance of all this stuff is. Something for you all to think about. And we can talk about it after we let Mr. Schram and Ms. Zarak go for the day, or else first thing tomorrow morning.

So let's get Mr. Schram back. You can tell Ms. Zarak she's welcome to come back.

You're going to email Mr. Schram?

MR. MIN: Yes. We are emailing him right now.

THE COURT: All right. Thank you.

(Ms. Zarak present)

(Witness present)

THE COURT: All right. Welcome back, Mr. Schram and Ms. Zarak.

Mr. Min?

MR. MIN: Thank you, your Honor.

Your Honor, we will be -- again, the last document on this subject, Petitioner's Exhibit 129, 129. And I have in my notes that there was no objection to this particular document.

THE COURT: Give me a moment. I think it means I have to pull a different binder.

MR. BEYDA: Be careful. They're heavy.

THE COURT: No objections are preserved, right?

MR. BEYDA: No objection to this document, your Honor.

THE COURT: All right. Thank you. Give me one moment then, and let me pull it.

Ah, happens to be back in the very same binder.

Go ahead, Mr. Min.

MR. MIN: Thank you.

BY MR. MIN:

Q. Mr. Schram, is this an email communication between you and Ms. Zarak in November 2019?

A. Yes.

Q. Okay. Do you recall that Ms. Zarak wrote to you saying that -- withdrawn.

Do you recall that you and Ms. Zarak got into a disagreement about a HomeExchange listing?

A. Yes.

Q. And what was that about?

A. I was -- this was regarding a trip to Iceland over Christmas, so I put the apartment up on these listings of HomeExchange, and Tania disagreed with that.

Q. She wrote to you, "So I've only said no to the HomeExchange (BECAUSE IT IS MY MOTHER'S APARTMENT)." Do you see that in the middle?

A. Yes.

Q. As far as you understood, were you not permitted to list the home on the HomeExchange because Ms. Zarak did not have the authority to do that?

A. Yes.

Q. Prior to your family residing in -- or withdrawn.

When did you, Ms. Zarak, and the children begin residing in Apartment 6A?

A. In April 2016.

Q. Okay. And prior to residing in Apartment 6A in 2016, was anyone residing in Apartment 6A, since you've known Ms. Zarak in 2013?

A. No.

Q. So between 2013 and 2016, no one was residing in Apartment 6A, as far as you knew?
A. Correct.
Q. Okay. Do you know what that apartment was used for in those three years?
MR. BEYDA: Objection. Relevance.
THE COURT: Mr. Min, what is the relevance?
MR. MIN: Yes, your Honor. The relevance is that this apartment is, again, repeatedly used by Ms. Zarak --
THE COURT: I don't want to hear the answer. I want a proffer on --
MR. MIN: It's relevant as to whether or not 6A is someone's -- well --
THE COURT: All right. I'm happy to --
MR. MIN: The purpose of Apartment 6A is relevant to these proceedings. I don't want to give an answer, so, I mean, it's hard for me to say why it's relevant, but --
THE COURT: This is the same apartment we've been talking about in all these last few documents, right?
MR. MIN: Yes. Same apartment.
THE COURT: Let me just see something.
All right. You can just answer the question. Do you know what it was used for, Mr. Schram, or do you have an understanding of what it was used for, between 2013 and 2016 when you moved in in April?

THE WITNESS: Yes.

THE COURT: And what was that, according to your understanding?

THE WITNESS: It was for -- to be used by Tania's parents and sisters and sometimes close family when they were visiting New York.

BY MR. MIN:

Q. And did you know her family, Ms. Zarak's family, her mother and close friends, to stay in Apartment 6A between 2013 to 2016?

MR. BEYDA: Objection.

THE COURT: That's not relevant to this. It's enough. I get the point, Mr. Min.

Q. Did you move any of the furniture in Apartment 6A to LA when you moved?

A. Yes.

Q. What did you take with you?

A. Furniturewise?

Q. Yeah.

A. Sofa, coffee table, wall-hung shelves --

Q. And when you moved --

A. -- and some -- and some plastic drawers, and that's it, I recall. Oh, and then the mattresses, if you call that furniture, that was purchased right before leaving for Los Angeles.

Q. You purchased mattresses in New York right before moving to Los Angeles?

THE COURT: He's already testified to that.

Q. Did you purchase furniture when you moved to Los Angeles?

A. In Los Angeles, yes.

Q. Did you and Ms. Zarak look into buying any homes in Los Angeles when you moved there?

A. We -- I don't remember, but I do remember talking about purchasing in LA, and the conclusion was that we should get to know the city before we are able to make up our minds on a neighborhood, so it was just shelved.

Q. Did you purchase a car when you moved to LA?

A. We leased a car.

Q. For how long? How long was your lease?

A. Three years. Three years.

Q. When you returned -- withdrawn.

When you were living in Los Angeles, did you return to New York for a project you had ongoing, in New York?

A. Yes.

Q. And where did you stay when you would return to New York?

A. 11 West 81st Street, Apartment 6A, the apartment we lived in in New York when we were there.

Q. And how often did you travel back to New York while you were living in LA?

A. Every -- every few weeks.

Q. And how long did you live in LA for?
A. 13 months.
Q. And while you, Ms. Zarak, and the children were living in LA, how many times did the children return to New York?
A. EZ on one occasion right before moving to New York.
Q. Just remember to use initials.
A. EZ.
Q. You said EZ went back to New York one time prior to moving to New York?
A. Yes, 'cause she had to show her face at a school in New York to finalize the registration there.
Q. Okay. And did Ms. Zarak return and come -- travel to New York while you were living in LA?
A. As far as I remember, that was one trip, back and forth.
Q. Was Ms. Zarak renting her apartment penthouse C in that same building in New York while --
A. Yes.
Q. -- you were living in LA?
A. Yes.
Q. Ultimately was Ms. Zarak fired from her job at Netflix?
A. Yes.
Q. And when was this?
A. December 2018.
Q. And did there come a time when you, Ms. Zarak, and the children left Los Angeles?

A. You mean from Los Angeles or --
Q. Moved out of Los Angeles?
A. Yes.
Q. And when was that?
A. July 31, 2019.
Q. And after Ms. Zarak was fired from her job at Netflix, did you and Ms. Zarak discuss whether you wanted to continue living in Los Angeles?
A. Yes.
Q. And what did you and Ms. Zarak discuss with respect to that option?
A. I told her that we moved to Los Angeles for her job opportunity, if she wanted to find equivalent job opportunity before the lease ended, then she should act on it, because if she doesn't act on it, it goes back when the lease ends. But also, I told her about a job opportunity that was offered to me by Workshop/APD from New York, to open up a branch office in Los Angeles.
Q. Workshop/APD, the firm that you were doing contract work for, offered you the option to open an office in LA on their behalf?
A. Yes.
Q. Okay. Did you discuss this offer with Ms. Zarak?
A. Yes, I did. It was -- it was -- I didn't say yes or no immediately so it was a live topic for a while, but I said if

I -- if I were to take this offer, it would mean a three-year commitment to Los Angeles, because I wouldn't do -- I wouldn't say yes to this without being fully committed long term.
Q. And what was Ms. Zarak's opinion on this job offer?
A. She said if I wanted to do this, she would be supportive of staying in LA longer.
Q. And did you ultimately accept that job offer?
A. No.
Q. Why not?
A. I didn't want to live in Los Angeles, and we had the same problems we had in New York, in many ways.
Q. Many ways, in which ways?
A. We didn't have close family living in Los Angeles; I was far from Iceland, which I wanted to pursue jobs and increase -- establish more relationships with; and it was an expensive city, so it wasn't a solution; for me, at least.
Q. Okay. And when did you ultimately decide to decline this offer from Workshop/APD?
A. Probably late spring, early summer, of 2019.
Q. Okay. So did there come a time when you and Ms. Zarak discussed -- again, in 2019. Let's say, right now, spring 2019, did there come a time when you and Ms. Zarak discussed where you as a family might move to after Los Angeles?
A. Yes.
Q. Okay. And what options were discussed between you and

Ms. Zarak?
A. There was -- it was the usual, or the ongoing discussion, which was Iceland, Mexico, and I believe Miami was still floating around in the discussion.
Q. And had -- withdrawn.
MR. MIN: Your Honor, how late does the Court plan on going today? I'm just trying to figure out where a natural stopping point might be.
THE COURT: How much more do you have to go with Mr. Schram?
MR. MIN: I'd estimate maybe another --
THE COURT: Can you wrap up?
MR. MIN: I would say another hour and a half, about; two hours, maybe.
THE COURT: All right. Why don't you find a convenient breaking point around 5:00 and we'll break at that point then.
BY MR. MIN:
Q. I want to direct your attention, Mr. Schram, to a document that's been premarked as Petitioner's Exhibit 128.
THE COURT: There are objections to this.
MR. BEYDA: There's a --
THE COURT: Sorry?
MR. BEYDA: Yes, there was a -- it's a two-page document. I believe the second page was the issue about

hearsay.

THE COURT: What are you intending to use, Mr. Min, the whole document?

Mr. Beyda is saying the objection is to the second page. Am I understanding you correctly?

Mr. Beyda, is that correct?

MR. BEYDA: Oh, yes, that is correct. I didn't hear you. Sorry, your Honor.

THE COURT: That's okay. Your objection is to the second page?

MR. BEYDA: Yes, your Honor.

THE COURT: What are you intending to use, Mr. Min?

MR. MIN: Not for the truth of the numbers that are contained within but simply for the fact that Mr. Schram, you know -- to the extent he's going to testify to this, but -- the preparation of it and the discussion of the various options.

THE COURT: All right. The document will be admitted but not for the truth. It will be admitted for the limited purpose of showing that Mr. Schram, to the extent he says so -- and you need to lay a foundation before I say it's admitted, simply as evidence of the fact -- hold on one second. We're having a technical problem here.

Mr. Min, you have to ask some foundation questions.

MR. MIN: Understood.

BY MR. MIN:

Q. Mr. Schram, can you look at page 2 of this document, 128.
A. Yeah.
Q. Who prepared this document?
A. I did.
Q. Do you recall approximately when you prepared this document?
A. 2019.
Q. And why did you prepare this document?
A. To compare the living expenses between different locations we could look -- between different cities.
Q. And why were you preparing comparison of expenses between different cities around this time?
A. Because we were talking about the possibility of leaving Los Angeles. The question was where would we go and *where.
Q. And were these cities possible destinations that you and Ms. Zarak were discussing?
A. Yes.
MR. MIN: Your Honor, I'd move for admission of Petitioner's 128 in evidence.
THE COURT: Mr. Beyda?
MR. BEYDA: May I quickly voir dire, your Honor.
THE COURT: Sure.
VOIR DIRE EXAMINATION
BY MR. BEYDA:
Q. Mr. Schram, there are figures in this page 2 of this

Exhibit 128, correct?
A. Yes.
Q. And those are dollar amounts, correct?
A. Yes.
Q. What are those figures based upon?
A. Los Angeles was -- well, I start -- the email, I state that this is only for LA and Reykjavík, so Los Angeles is the costs that we were experiencing in Los Angeles; Iceland numbers were numbers that I was getting from friends and family when I inquired about the, you know, living expenses there.

MR. BEYDA: The objection remains as to hearsay in terms of what this page 2 is based upon, your Honor.

THE COURT: No, that's overruled. I said it's being offered, first of all, for the limited purpose that does not include the truth --

MR. BEYDA: I withdraw the objection.

THE COURT: All right. It will be admitted for the limited purpose that it was put together by Mr. Schram to consider the costs of these cities relative one to the other but not for the truth or the accuracy of the dollar amounts contained.

(Petitioner's Exhibit 128 received in evidence)

MR. BEYDA: Okay.

THE COURT: All right. Go ahead.

I think it's my microphone that's the problem. But

you can go ahead and it will stop.

MR. MIN: Your Honor, we have two minutes to 5. This is a pretty good breaking point, if your Honor feels --

THE COURT: Do whatever you're going to do with this document.

MR. MIN: I'm done with the document.

THE COURT: All right. It will be admitted.

We will take a break now. I will tell you this. I warned you at the outset that this is not going to go on, you know, for an unlimited amount of time, and you all need to be mindful of how much time each of you is using in terms of efficient use of the hearing time, all right?

We will resume tomorrow at 10 a.m. I have to take up a hearing on another matter first thing in the morning, so 10 a.m. tomorrow morning.

Mr. Schram, I just remind you you're under oath. You will remain under oath. You are not to discuss the substance of your testimony or have any communications with your lawyer other than strictly about logistics, how to log on and that sort of thing. Do you understand?

THE WITNESS: Understood.

THE COURT: All right. Thank you very much.

All right. And we'll adjourn for the evening.

Yes, Mr. Beyda.

MR. BEYDA: I was just going ask you, your Honor, in

terms of when my witness, Ms. Zarak, is testifying, I will have her, I guess, in a separate room from where I am. Is that what the Court's instruction would be?

THE COURT: That would be a separate room? Yes, I think that makes good sense.

MR. BEYDA: Okay.

MR. MIN: And your Honor, if I could just note -- I had mentioned it earlier -- we originally intended to call our expert witness today. Due to scheduling conflicts, it didn't work out. We would be requesting our timing -- our expectation is still to be done, finished by lunchtime, our directs finished by lunchtime tomorrow, as I said last week. You know, obviously, hopefully the Court doesn't hold me to that if I go a little bit over. So could we take our expert witness out of turn at 10 a.m., as soon as we start?

THE COURT: I don't have any problem with that. Mr. Beyda?

MR. BEYDA: No objection.

THE COURT: Yes, that's fine.

MR. MIN: And your Honor, I know -- and I truly apologize and I do not want to be beating a dead horse. I just want to be clear: ECF No. 35 that we filed, my record and my document marked ECF No. 35, goes up to 174.

THE COURT: Okay. I'll try to look at what's on ECF and see are we missing the last page for some reason.

MR. MIN: The last page starts with 154, and I'm looking at the ECF document in front of me filed on September 30, 2021. But I just wanted to clarify. I understand it's not affecting anything. I just wanted to make sure that, you know, my recollection was not off and that we were clear.

THE COURT: Okay. I was actually just looking. The objections are on ECF 42 filed on October 1st, but you are correct, Mr. Min. I apologize. It looks like ECF 35 is your exhibit list and 42 is the annotated version that reflects objections from respondents, and for some reason respondents stopped at 165. You're correct.

MR. MIN: Your Honor, obviously I don't think it's affecting anything, but I just wanted to be clear. That's all. Thank you so much.

THE COURT: All right. Mr. Beyda, with respect to the balance of the documents that were on ECF 35 --

MR. BEYDA: I'll take a look.

THE COURT: -- you should file a supplement.

MR. BEYDA: I'll take a look at it now. Thank you.

THE COURT: All right. Thank you.

MR. BEYDA: Have a nice evening.

THE COURT: Anything else, for the sake of good order?

MR. BEYDA: No, your Honor.

MR. MIN: No, your Honor.

THE COURT: All right. I hope everyone has a good evening. Thank you, all.

ALL COUNSEL: Thank you, your Honor.

(Adjourned to October 5, 2021, at 10:00 a.m.)

INDEX OF EXAMINATION

Examination of: Page

ARNI BJORN HELGASON

Direct By Mr. Min . . . . . . . . . . . . . . . . 8

Cross By Mr. Beyda . . . . . . . . . . . . . . . .14

HALFDAN PEDERSEN

Direct By Mr. Min . . . . . . . . . . . . . . . .23

Cross By Mr. Beyda . . . . . . . . . . . . . . . .31

WALESKA GIRALDO THORSTEINSSON

Direct By Mr. Min . . . . . . . . . . . . . . . .54

Cross By Mr. Beyda . . . . . . . . . . . . . . . .65

Redirect By Mr. Min . . . . . . . . . . . . . . .72

PHAEDON SINIS

Direct By Mr. Min . . . . . . . . . . . . . . . .76

Cross By Mr. Beyda . . . . . . . . . . . . . . . .89

Redirect By Mr. Min . . . . . . . . . . . . . . .96

ARNALDUR SCHRAM

Direct By Mr. Min . . . . . . . . . . . . . . . .99

PETITIONER EXHIBITS

Exhibit No. Received

166 . . . . . . . . . . . . . . . . . . . . . 108

167 . . . . . . . . . . . . . . . . . . . . . 127

1 . . . . . . . . . . . . . . . . . . . . . . 138

86 . . . . . . . . . . . . . . . . . . . . . 140

128 . . . . . . . . . . . . . . . . . . . . . 156