UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In the Matter of E.Z. and S.Z.

ARNALDUR SCHRAM,

Petitioner,

v. 21 Civ. 6524 (MKV)

TANIA ZARAK,

Respondent. Remote Bench Trial
------------------------------x

October 5, 2021
12:49 p.m.

Before:

HON. MARY KAY VYSKOCIL,

District Judge

APPEARANCES

BURGER GREEN & MIN LLP
Attorneys for Petitioner
BY: RICHARD MIN, ESQ.

GALLET DREYER & BERKEY, LLP
Attorneys for Petitioner
BY: KENNETH GLASSER, ESQ.

CHEMTOB MOSS FORMAN & BEYDA LLP
Attorneys for Respondent
BY: MICHAEL F. BEYDA, ESQ.
MUDITA CHAWLA, ESQ.

(Case called)

THE DEPUTY CLERK: Counsel, starting with the petitioner, please state your name for the record.

MR. MIN: Richard Min on behalf of petitioner. Good afternoon, everyone. Good afternoon, your Honor.

THE COURT: Good afternoon, Mr. Min.

MR. GLASSER: Kenneth Glasser. Good afternoon, your Honor.

THE COURT: Good afternoon.

MR. BEYDA: For the respondent, Michael Beyda of Chemtob Moss Forman & Beyda. Good afternoon, your Honor.

THE COURT: Good afternoon, Mr. Beyda.

MS. CHAWLA: Also for the respondent, Mudita Chawla for the respondent, your Honor. Good afternoon, your Honor.

THE COURT: Good afternoon, Ms. Chawla.

Good afternoon to Ms. Zarak and Mr. Schram.

So first, let me apologize to everybody for the delay in getting started this morning. I think we mentioned to people as we were concluding yesterday that I had an application that came in. I had told you all when we scheduled this trial that I was on the emergency part, and we had a hearing that had everybody working well into the wee hours of the morning last night, and we had over a thousand people accessing or attending the hearing. They couldn't all attend because of COVID restrictions and such. But in any event, I

apologize to you all that we had to push things back a little bit further while I attended to that hearing.

So Mr. Min, when we talked yesterday, you had asked me could your expert take the stand out of turn this morning. I assume that since we had to push it to this afternoon, that's no longer the plan?

MR. MIN: Yes, your Honor. My request would be if we can take her at around 4 p.m. today instead.

THE COURT: Is that acceptable, Mr. Beyda?

MR. BEYDA: Yes, it is.

THE COURT: All right. Thank you very much.

MR. MIN: Your Honor, we just want to clarify, we would hope -- and obviously depending on the court reporter's availability, but we don't anticipate that direct and cross should take more than an hour, hour and a half tops, but of course I don't know Mr. Beyda's plans for possible cross, but of course to the extent that we run over a little bit past 5, we would like to finish with the witness today. I think that would make --

THE COURT: I would like to finish with the witness today too. So why don't we get started and let's see how we're doing, all right? And we can talk about logistics when we take a break or as the afternoon progresses. All right?

MR. MIN: Okay. Perfect.

THE COURT: So Mr. Schram, you're still under oath.

Mr. Min.

MR. MIN: Okay. Thank you.

ARNALDUR SCHRAM, resumed.

DIRECT EXAMINATION CONTINUED

BY MR. MIN:

Q. Good afternoon, Arnaldur. I'm going to continue on where we left off yesterday.

So while you and Ms. Zarak were residing in Los Angeles, how did you and Ms. Zarak come to the decision to move to New York in the summer of 2019?

A. Is there an echo?

Okay. We were -- I'm trying to remember where we left off. So we were in Los Angeles and -- I hear an echo. Does anyone else hear an echo?

THE COURT: I was hearing an echo earlier, Mr. Schram. I'm not hearing it now, but apparently other people are as well, and they're nodding their heads. So does that mean that somebody -- Mr. Glasser, do you have yourself muted, and Mr. Min?

MR. MIN: That's where -- we're using Mr. Glasser's microphone is what we're using.

THE COURT: Oh, I'm sorry.

Mr. Beyda, are you muted?

MR. BEYDA: I was not muted. I don't know if you're getting an echo now that I'm speaking. Is anybody?

THE WITNESS: Is it from me, maybe, when I talk specifically?

THE COURT: Excuse me, Mr. Schram?

THE WITNESS: No? Okay. Is it specifically my voice that's echoing, like maybe my device?

THE COURT: I was hearing one before, but I'm not hearing it any longer on my end.

Is anyone else getting the echo still? You are, Mr. Schram?

THE WITNESS: No, not right now.

THE COURT: Okay. So hopefully we took care of the problem.

All right. So the question that was asked to you, do you need it repeated?

THE WITNESS: No.

A. So we were weighing -- I don't remember if we talked about this last night, but we were weighing our options of New York, Iceland, and Mexico when we were in Los Angeles. So how did we get to the conclusion of going to New York? Well, there was an earthquake in Mexico, I want to say in 2018, that held us at the airport in Mexico. It was quite bad; especially the neighborhood we wanted to live in, there were definitely collapsed buildings that collapsed there, and we -- we couldn't settle on going to Iceland, so --

THE COURT: Couldn't what, did you say?

THE WITNESS: We couldn't settle on going to Iceland, so New York was the option on the table.
Q. I'm sorry. Mr. Schram, when, after you and -- withdrawn.
While you and Ms. Zarak were deciding on where to go after Los Angeles, did you have any conversations with her about possibly renovating her apartment in New York, which is located on 81st Street, penthouse C?
THE COURT: Which apartment are you talking about?
MR. MIN: Penthouse C.
A. Yes.
Q. And did you and Ms. Zarak discuss the possibility of moving back into that apartment, Penthouse C?
A. Yes.
Q. And what were the conversations about with respect to renovating, possibly renovating that apartment?
MR. BEYDA: Objection, your Honor, relevance. The parties weren't living in that apartment before they moved to California, in the time frame discussed during Mr. Schram's previous testimony.
THE COURT: You don't think this is relevant to --
MR. BEYDA: Penthouse C is not the apartment where they were residing. They were residing in 6A before they went to California.
THE COURT: And they were apparently talking about moving back to Penthouse C.

Why don't you clarify, Mr. Min.

MR. MIN: That's fine.

BY MR. MIN:

Q. Mr. Schram, did you and Ms. Zarak at one point, in your relationship, reside in Penthouse C?

A. Yes.

Q. When was that?

A. 2014 to two thousand -- at the end of '16, and then we went to Brooklyn for a few months. Yeah. Sorry. Penthouse C from -- I'm hearing an echo, but --

Q. Me too.

THE COURT: Hold on.

Mr. Beyda, mute your line, please.

Thank you.

Try again, Mr. Schram. I think that's the problem.

THE WITNESS: Okay. It feels different now, so -- okay.

No, I still hear it. Is it a speakerphone, like it's echoing in the room somewhere?

THE COURT: I'm not hearing an echo. Is anyone else?

THE REPORTER: This is the court reporter. I am hearing an echo.

MR. MIN: The Court is muted, your Honor.

The Court is still muted, your Honor.

The Court is still muted, your Honor.

THE COURT: Does this work better? Now you're getting the echo.

MR. MIN: Yeah.

(Discussion off the record)

THE COURT: All right. I think we have all logged off and back on. Can you hear me?

MR. MIN: We don't see your face. We see your robe, or I see your robe, at least.

THE COURT: I'm trying to adjust. Okay. Can you hear me, though?

MR. MIN: Yes.

MR. BEYDA: Yes.

THE COURT: Okay. All right. Mr. Schram, are you getting an echo, still?

THE WITNESS: This feels better, right now.

MR. MIN: No echo on my part.

THE COURT: Okay.

MR. MIN: So, okay. So your Honor, if I may repeat the question.

A. So we were living in Penthouse C, 2014.

(Discussion off the record)

Q. Penthouse C, when were you living there?

A. April '14 to December 2017.

Q. December 2017? I apologize. I thought you were living in Apartment 6A in 2016 to 2018.

A. No. We -- we moved -- we lived in Penthouse C from 2014 to December 2017; we moved to Brooklyn for few months; and then in April 2018, moved into Penthouse C.
Q. And I apologize. I thought in 2018 you moved to Los Angeles.
A. I'm sorry. Let's shift this whole thing up one year. From 2014 to December 2015, and then December 2015 to April 2016, and then that's when we moved to Penthouse C. I'm sorry. I'm getting my years mixed up.
THE COURT: All right. I think you need to ask again, Mr. Min, and clarify, because now the record is completely confused.
MR. MIN: Yes.
Q. Mr. Schram, you just said you moved into Penthouse C in April 2016. My understanding was that what you testified yesterday --
THE COURT: Not your understanding. Ask him the facts.
Q. When you and Ms. Zarak were married, where were you residing?
A. Penthouse C.
Q. And when was that?
A. April -- first in New York City, April 9th and then 19th, September 19th, 2015.
Q. Okay. But when you got married earlier, April, you were

living in Penthouse C with Ms. Zarak?
A. Yes, yes.
Q. And then did there come a time when you moved out of Penthouse C?
A. Yes.
Q. When was that?
A. December 2015.
Q. Okay. And you moved to where?
A. Brooklyn.
Q. And then did there come a time when you moved out of Brooklyn?
A. Yes.
Q. When was that?
A. April 2016.
Q. Okay. And where did you move then?
A. 6A. 11 West 81st Street --
Q. Okay.
A. -- Apartment 6A.
Q. And how long did you live there till?
A. Until June 30th of 2018.
Q. When you moved where?
A. Los Angeles.
Q. Okay. So bringing you back to my original question --
MR. MIN: And your Honor, I may just repeat the question because I lost track of where we are, but --

Q. Did you have conversations with Ms. Zarak about renovating Penthouse C and moving back into that apartment?
A. Yes.
Q. This is in or around 2019 when you were discussing leaving Los Angeles?
A. Yes.
Q. And why were you and Ms. Zarak discussing possible renovations to Penthouse C, at this time?
A. Because we needed a bigger home. We needed a big home in New York.
Q. What was the size of that home, Penthouse C?
A. It was a -- we'll call it a one-bedroom apartment where the bedroom was an alcove, so it was mixture between a studio and a one-bedroom.
Q. Okay. And what possible renovations were you and Ms. Zarak discussing around this time?
A. The possibility of building on top of it.
Q. What do you mean by on top of it?
A. It's a top floor apartment and they were unused air rights, so -- and it has a setback from the perimeter of the building, so we'd build out to the perimeter and do a two-story apartment there. That was the conversation.
Q. And in early 2019, was Ms. Zarak pregnant?
A. Yes.
Q. Okay. And did Ms. Zarak or you seek approval from the

building to renovate apartment Penthouse C?

A. Yes, we -- we did couple packets with emails, back and forth with the board --

(Reporter interrupted for clarification)

MR. MIN: Your Honor, I'm still getting the echo too. I was trying to ignore it. My co-counsel was suggesting we all log off and log back on. I don't know if that will do anything, but it may be worth a shot.

(Discussion off the record)

THE COURT: So Mr. Schram had just said -- you asked a question about did he seek approval of the potential renovations, and there was an answer about something about emails with the board president.

MR. MIN: Should the witness repeat the answer or should we go on to the next question, your Honor?

THE COURT: Ms. Sellin, did you get the answer or do you need it repeated?

THE REPORTER: I need it repeated.

MR. MIN: I'm getting an echo, if anybody else hears an echo.

MR. BEYDA: Now I do as well. But it does sound like it's coming from the Court.

MR. MIN: I'm hearing an echo whenever anyone speaks besides the Court.

MR. BEYDA: Okay. I'll keep myself muted.

(Discussion off the record)

THE COURT: All right. Back on the record then. Thank you.

MR. MIN: Your Honor, I believe we left off, the court reporter needed the answer repeated about the renovations?

THE COURT: Yes.

THE WITNESS: I can repeat. Oh.

So we were looking into building out the Penthouse C apartment, the perimeter, and doing a two-story addition. I think that's where we left off.

THE COURT: And the question that was asked of you was, did you seek approval for that, and you said something about emails with the board president.

THE WITNESS: Right. Exactly.

THE COURT: So that last answer, can you repeat that, please.

THE WITNESS: Yes. So we -- we did an email correspondence with the board president regarding if that was a possibility.

BY MR. MIN:

Q. Okay. And did the board approve those renovations, as far as you know?

A. No.

Q. Did you have conversations with Ms. Zarak about that?

A. Yes.

Q. And so after the board did not approve those renovation plans, where did you and Ms. Zarak move to?
A. The Apartment 6A, in the same building.
Q. Okay. And did you look at other housing options in New York?
A. Was there an echo or -- okay. Sorry.
After we moved in, I recall, into the apartment, we were looking around Harlem, Upper West Side, around New York.
Q. And did you pursue any of these options?
A. No.
Q. Why not?
A. We couldn't afford them.
Q. Did you and Ms. Zarak around this time discuss whether living in Apartment 6A was a long-term option for you and your family?
A. Yes, yes. It was clearly not a long-term option.
Q. Why not? Why wasn't it?
MR. BEYDA: Objection. Objection. Non-responsive. It was -- I believe the question was --
THE COURT: Look, this is a bench trial, so the next question would have been: What did you discuss?
Go ahead, Mr. Min. Overruled.
Q. Why wasn't it clearly a long-term option?
A. Because the apartment was very small. It was much smaller than the house we moved from in Los Angeles.

Q. At some point in 2019 you had another child; is that correct?
A. Yes.
Q. And when was that?
A. May.
Q. And when did you move to New York after Los Angeles?
A. July 31st, 2019.
Q. And clearly you and Ms. Zarak and your three children were living in Apartment 6A at that time, correct?
A. Yes. And our live-in nanny.
Q. What were the sleeping arrangements in Apartment 6A when you moved to New York in July 2019?
A. The nanny was sleeping in the bedroom. We took out the beds that were in the bedroom and we put in a pullout sofa. We were sleeping in the TV room, in the bed frame that we brought from Los Angeles. The three children were sleeping in the bed with their mother, and I was sleeping in the mezzanine loft.
Q. Can you describe this loft mezzanine space you've mentioned a few times.
A. It's a -- it's like a built-in bunk bed that you have to climb up a ladder to get onto, and it's a twin mattress, I would call, I believe, that's up there.
Q. Mr. Schram, how high is this loft mezzanine space that you'd have to access?
A. It's -- the ceiling below it is 7 feet, 7½ feet, so you

climb up there, and then from the mattresses up is maybe 5 feet, maybe?

Q. Okay. What was the status of apartment Penthouse C when you moved to New York in the summer of 2018; was it empty or was it being occupied?

MR. BEYDA: Objection. Relevance.

THE COURT: Overruled.

A. It was -- it was being rented out.

Q. And did you and Ms. Zarak have any discussions about Ms. Zarak wanting to sell apartment Penthouse C around this time?

A. Yes.

Q. What did Ms. Zarak tell you about wanting to sell Penthouse C?

A. She -- she had been wanting to try to sell it for -- for a while.

Q. Did there come a time when she did sell that apartment?

A. Yes.

Q. Approximately when, as far as you know?

A. April, May of 2021.

Q. And you said earlier that you -- well, withdrawn.

What did you do with the car that you were leasing in Los Angeles?

A. We -- effectively, we paid up the lease and sold it to a car dealership.

Q. And what did you do with all the furniture and belongings you purchased in Los Angeles?
A. We moved it to New York.
Q. And did you place all the items in your apartment, Apartment 6A, when you moved to New York?
A. No.
Q. Why not?
A. It wasn't enough space.
Q. What did you do with the remaining items?
A. I took to my office space. Dining table, it was already a dining table in the 6A apartment. All my creative books, architecture books, everything of sorts, I took to the office.
Q. When you moved to New York in summer of 2019, what were you doing for work, after your arrival?
A. I was -- I was working on the project I took with me to Los Angeles and then back that was -- I was doing through Workshop, and I was working on a housing project in Iceland, yeah.
Q. And did you close the office you had opened in Los Angeles?
A. Yes.
Q. And did you open an office in New York when you arrived there?
A. Yes.
Q. Okay. Outside the confines of Workshop/APD or within the confines?
A. Outside.

Q. And was your LLC, Shift AS LLC, still in operation?
A. Yes.
Q. How did the move to Los Angeles -- or withdrawn.
How did the move from Los Angeles to New York affect your career prospects at that time?
A. I'm hearing an echo.
Okay. Well, I'll continue.
It was in some ways square one. It was quite difficult. My responsibilities for the -- for the job, the Workshop job, you could say, had, you know, slumped in a sense because it was under construction, so just follow-ups; and then at some point I recall during the fall the housing project in Iceland basically was put on hold. So it was -- it was a difficult situation I found myself in.
Q. Was Ms. Zarak, upon arriving in New York, considering her career options and talking to you about them?
A. Yes, yes.
Q. What were you guys discussing with respect to her career options at that point?
A. She was interested in becoming a postpartum doula. She was looking into that. She was also interested in developing a product line for women that have had cesarean operations, to heal the wounds.
Q. Was Ms. Zarak discussing opportunities in the film industry at this time, after arriving in New York?

A. No.
Q. After arriving in New York in summer of 2019, did there come a time when you and Ms. Zarak once again discussed leaving New York, moving out of New York?
A. Yes.
Q. I want to direct your attention to what's been premarked as Respondent's Exhibit 153.

MR. MIN: Your Honor, this is a respondent's exhibit. We have no objection to it, so we can stipulate to its admission.

THE COURT: Just give me a moment.

MR. MIN: Sure.

And your Honor, I apologize again. And I will strive not to make this error again, but it's Respondent's No. 10, not 153. Respondent's No. 10.

THE COURT: All right. Give me a moment.

(Pause)

THE COURT: All right. It will be admitted.

(Respondent's Exhibit 10 received in evidence)

BY MR. MIN:
Q. Mr. Schram -- and we are going to put this up on the screen, but Mr. Schram, I believe you have this in front of you. What is this document?
A. Messages between me and Tania.
Q. Who's talking on the left in light purple and who's on the

right in dark purple?
A. I am -- I believe I'm on the left, Tania is on the right.
Q. And you wrote to Ms. Zarak on February 4, 2020, "Let's move to Mexico." I'll refrain from saying the whole thing, but, "Let's move to Mexico," do you see that?
Mr. Schram, do you see that?
Mr. Schram?
A. Yes. Can you hear me?
Q. I don't know if you said something before, but I didn't hear anything from you.
A. Can you hear me now?
(Discussion off the record)
THE COURT: Mr. Schram, can you answer the question again. I think you said: Do you see this?
Your volume is a little low, sir. If you can lean in a little, that would help.
Thank you.
Okay. Repeat your question, Mr. Min.
BY MR. MIN:
Q. Why did you write to Ms. Zarak in February, "Let's move to Mexico"?
A. 'Cause she -- same problems that we left New York for were still upon us, in a worse way.
Q. What do you mean in a worse way? Withdrawn.
What problems are you referring to that were still

upon you?
A. The apartment were small when there were four of us plus a nanny, and now there were five of us plus a nanny; the city got more expensive; jobs prospects were kind of not good, given my two -- given that I relocated a couple of times in a matter of year and a half or 13, 14 months, so -- and I was just -- I was exhausted. I was completely physically, emotionally, financially just exhausted at that point. So I was giving up on New York.
Q. And had you and Ms. Zarak discussed moving to Mexico around this time, February 2020?
A. Yes. It was part of our ongoing discussion about Iceland versus Mexico.
Q. And did there come a time when you and Ms. Zarak did decide to leave and move out of New York in the spring of 2020?
A. Yes.
Q. Okay. And when, approximately, was that decision made?
A. March.
Q. And why did you and Ms. Zarak initially decide to move out of New York in or around March 2020?
A. Initially because my visa renewal got rejected.
Q. Were there other reasons?
THE COURT: What got rejected?
THE WITNESS: Visa renewal got rejected.
THE COURT: Your visa renewal. Okay. Thank you.

Q. Were there other reasons?
A. Then shortly after came the pandemic, or the schools closed because of the pandemic, so that created a double reason.
Q. And I want to direct your attention to a document that's been premarked as Respondent's Exhibit 153 -- 1, 5, 3.
MR. MIN: And your Honor, we have no objection, of course.
THE COURT: All right. It will be admitted.
(Respondent's Exhibit 153 received in evidence)
Q. Mr. Schram, let me know when you've had an opportunity to pull up this document, and we'll put it up on the screen.
Mr. Schram, I'm going to wait until the Court is ready.
THE COURT: I'm ready. You can go ahead.
MR. MIN: Okay.
Q. Can you explain what this document is.
A. A text correspondence between me and Tania.
Q. And who is writing on the right-hand side in dark purple, or blue, depending on your color, and then who's writing on the left in light gray?
A. I'm light gray; Tania is blue.
Q. Okay. And what were you and Ms. Zarak discussing at the beginning of this conversation?
A. The visa renewal rejection.
Q. Okay. What visa were you on in or around March 2020?

A. I was on an O-1 Visa.
Q. Okay. Did that give you the ability to work in the United States?
MR. MIN: And I don't know if it's just me, your Honor. I see his mouth moving. I did not hear an answer, and I'm not sure if everyone else did.
THE COURT: I didn't hear an answer that time.
MR. MIN: Okay.
THE WITNESS: Can you hear me now?
THE COURT: Yes. So I think the question was something about a -- I lost my live feed, so could the court reporter read back the last question.
(Record read)
A. Yes.
THE WITNESS: Did you hear me?
THE COURT: I can hear you now, but I didn't hear an answer.
(Discussion off the record)
MR. MIN: Your Honor, if I may request the Court to ask the court reporter to read back the last question that we missed the answer to.
(Question and answer read)
BY MR. MIN:
Q. Mr. Schram, what visa was Ms. Zarak on at that time, as far as you know?

A. O-3.
Q. And did that give Ms. Zarak the ability to work in the United States, as far as you understood?
A. No.
Q. And you said that one of the reasons you and Ms. Zarak decided to leave -- or withdrawn.
When did you discover that your visa had not been renewed?
A. On, I believe that day, 12th of March; 11th, 12th of March.
Q. Okay. And I want to direct your attention to the second last box on this page, where --
THE COURT: On the first page?
MR. MIN: On the first page, yes.
Q. -- where you say, "I feel we've been banging our head against the wall for a while now." What did you mean by that?
THE COURT: Hold on. Hold on.
MR. MIN: Yes.
THE COURT: This is 153?
MR. MIN: This is 153, yes, your Honor.
THE COURT: That's not what my 153 looks like.
MR. MIN: R 153. R 153.
THE COURT: Yeah.
Ah, the second sentence. Okay. Sorry. Go ahead.
MR. MIN: Sorry, your Honor.
BY MR. MIN:

Q. Yes. Can you tell me what you meant when you said, "I feel we've been banging our head against the wall for a while now"?
A. To try to live in New York, though it's an incredible and constant struggle.
Q. And you mentioned in the next sentence that, "We're going crazy over lack of money." Is that an example?
A. Yes.
Q. And then the following sentence, you said, "We have two great options on the table." What did you mean by two great options?
A. Iceland and Mexico.
Q. And were you and Ms. Zarak discussing Iceland and Mexico as possible destinations around this time?
A. Yes, as we had been for a while.
Q. And were you discussing those as options before schools closed in New York?
A. Yes.
Q. I want to direct your attention to the next page. Do you recall -- or do you see where Ms. Zarak wrote to you, in the third box, starting with, "But the real reason is because we love New York and New York suddenly got hard, too hard, perhaps, for us." And the next box, "Maybe even impossible." Next box, "That's been hard for me to accept." What did you understand that to mean when Ms. Zarak told you that "New York suddenly got hard, too hard, perhaps, for us, maybe even

impossible"?
A. That she was realizing as well as I was that -- that we couldn't lie in New York.
Q. And when you responded that it's been hard, you say, "Same here, hard to accept this," what did you mean by that?
A. I agreed. I agreed that -- that it's hard to accept the fact that we are unable to create a sustainable and stable life in New York.
Q. I want to direct your attention to what's listed as page 4 of 10, Bates stamped 11941.
A. R 119, you said?
Q. R 119? No, no. The same document, Mr. Schram, same document. What's been marked -- what is page 4 of 10, and Bates stamped 11941, the red letters on the top -- bottom right. You wrote to Ms. Zarak on March 12th, same day, that your subtle wish is this will turn out to be a blessing in disguise. What did you mean by that?
A. Give me a minute.
Q. Yes.
A. Okay. Meaning that this will get us to act on the problems we were having in New York, like something good will come out of this.
Q. Okay. So ultimately -- withdrawn.
As you and Ms. Zarak were having this discussion in or around March 2020, did you and Ms. Zarak make a decision as to

where you'd go after living in New York?
A. Yes, ultimately, yes.
Q. Okay. And where did you and Ms. Zarak decide to go to after leaving New York in March 2020?
A. To Mexico.
Q. And why did you make the decision to go to Mexico in March 2020?
A. Because -- because the -- because the pandemic was happening, so we can -- we asked ourselves, do we want to go to Iceland or Mexico? Iceland was four hours ahead time difference, Mexico one behind; weather is good in Mexico, still very much winter in Iceland; and we have an access to my parents-in-law house, which has a big garden and help at the house, so it felt like a good place to go to while we -- while we figured out our lives and what to do next.
Q. You said something about Iceland being three hours ahead and Mexico being one hour behind. Why was that a factor in your decision to go to Mexico with Ms. Zarak?
A. Because the expectation was that the -- what's called -- remote learning would start to take place, because the schools closed, so to be attending at a certain hour in New York was going to be easier in Mexico than Iceland, four-hour difference.
Q. And you said you had -- availability at your mother-in-law's house. Is that where you and Ms. Zarak

ultimately stayed while you were in Mexico?
A. Yes.
Q. And when did you ultimately travel from New York to Mexico? Do you recall the date, approximately?
A. 16th of March, 2020.
Q. And what did you and Ms. Zarak and the children pack to travel to Mexico?
A. We packed a suitcase each, I recall.
Q. And how long did you and Ms. Zarak discuss you might be in Mexico for?
A. I mean, we thought initially a month. You know, it was -- yeah, a month.
Q. Who else was residing at your mother-in-law's home in Mexico when you arrived there?
A. Well, it was my mother-in-law. My father-in-law was in Panama so he was not there. I don't remember if they already had arrived, but Tania's sister and her husband and their daughter.
Q. Where did they arrive from?
A. Miami. Also, their house help, you could call it, for lack of a better word. There were several of them working -- living at the house as well.
Q. And how long did you ultimately stay in Mexico for?
A. So until -- until July.
Q. And while you were in Mexico, were you working?

A. I did you could say quick work for an expo pavilion for the city of Reykjavík, expo in Reykjavík.
Q. Any projects in New York?
A. No. I believe in April, my responsibilities to Workshop and that project ended.
Q. April 2020?
A. Yes.
Q. Was Ms. Zarak working while you were in Mexico?
A. No.
Q. Was she seeking any career opportunities or job opportunities in Mexico, as far as you knew?
A. No. I remember a discussion about a -- about a film studio setup with some people she knew, but that was about it.
Q. Were you exploring work opportunities or career opportunities in Mexico while you were residing in Mexico?
A. No.
Q. Were you exploring career or job opportunities anywhere in the world while you were residing in Mexico?
A. At a certain point I reached out to Iceland, but not an active search, no.
Q. Did there come a time when you and Ms. Zarak had a discussion while you were in Mexico about leaving Mexico?
A. Yes.
Q. When did that conversation begin?
A. Probably sometime in April when -- when the realization was

that this pandemic was here to stay.

Q. And why did you and Ms. Zarak discuss leaving Mexico at that time?

A. Well, it was -- it was in the context of where we're going to live, so Mexico versus Iceland in that sense, so we were also discussing a possibility of living in Mexico -- I'm sorry. Maybe I'm not answering your question. Can you please repeat the question.

Q. I'll ask another question.

Were you and Ms. Zarak discussing the possibility of staying in Mexico and living in Mexico?

A. Yes.

Q. And can you describe those conversations that you had with Ms. Zarak, what her thoughts were on that, what your thoughts were on that.

A. We -- like the usual conversation, we would say -- we talked about the pros and cons; we looked at some housing options in Cuernavaca, where my parents-in-law lived; we talked about school options for the kids; we talked about some job potentials in Mexico as well. So it was the usual conversation, I would say.

Q. Did you ultimately decide that you and Ms. Zarak wanted to live in Mexico?

A. No.

Q. And do you recall the reasons why you and Ms. Zarak

concluded that Mexico was not the right option for the family at that time?

A. Well, in -- while discussing Iceland versus Mexico, I -- my take on the matter was this: I moved to Los Angeles for her job opportunity. I'm the one who sacrificed for her. And I said, I'm not going to do that twice in a row and you're not going to do it once, so it's your turn to make a sacrifice. So I -- so I said, I want to move to Iceland, and ultimately that became our decision.

Q. I want to direct your attention to a document that's been premarked as P 122, Petitioner's 122.

MR. MIN: Your Honor, while we're pulling up the document, I don't see Ms. Zarak on the screen. I'm not sure that it matters, but I just noted --

THE COURT: Is that a concern for you?

MR. MIN: Oh, no. I just wanted to note it in case there was some technical thing or --

THE COURT: There she is.

MR. MIN: Okay. Perfectly fine.

THE COURT: All right. There are objections to this. Mr. Beyda?

MR. BEYDA: Yes, there was, similar to the objections raised yesterday on a similar document.

THE COURT: All right. I'm sorry. Let me pull up the document itself.

MR. BEYDA: Thank you.

MR. MIN: Your Honor, our same position will be from yesterday's document, that we're not going to offer it for the truth of the matter, simply to the extent that the parties were discussing these options.

THE COURT: Just what?

MR. MIN: Just to the extent that this was a topic of discussion between the parties. Again, this is another spreadsheet that we're going to be talking about numbers within the spreadsheet, so similar to the document from yesterday.

THE COURT: With that clarification, Mr. Beyda, is there an objection still? He's not offering it for the truth, just for the fact that the analysis was done.

MR. BEYDA: No objection based on that. Thank you.

THE COURT: All right. Go ahead, Mr. Min.

(Petitioner's Exhibit 122 received in evidence)

MR. MIN: Thank you.

I want to direct the witness's attention -- your Honor, I'm not going to ask any questions about the document too -- Exhibit 148, Petitioner's Exhibit 148.

THE COURT: All right. Let me just make a note, please.

A. You said R 122, no?

Q. No, no. Petitioner's 148. P 148.

A. Okay.

THE COURT: And again, there are objections to this. Give me a chance to move these binders.

(Discussion off the record)

THE COURT: What page number are we talking about? This is a massive document.

MR. MIN: Yes, your Honor, and one of the objections was about any messages after the commencement of this action, and we can stipulate not to include any messages after the date of commencement of this action. It is the extent of the -- well, messages between the parties. I won't testify to it, but the page number -- we would want to offer the entire document into evidence. We will refer to specific messages along the way of this document.

THE COURT: No. If the objection is nothing after the litigation, and you're stipulating to that, then the whole thing is not coming into evidence. So tell me what pages you're withdrawing.

And with that caveat, Mr. Beyda, is there still an objection?

MR. BEYDA: There is, your Honor. Just give me one second. I just have to plug my computer in. The battery was getting low.

I mean, the messages that are being offered over here, they seem kind of cumulative and out of place in certain regards and irrelevant. It seems like, yes, the parties had

communications and these are text messages that they exchanged, but I'm not sure that I see all of the relevance of all of them in this, I guess -- how many pages is this document?

THE COURT: Well, he's going to withdraw anything post-litigation, so your relevance objection to those is basically mooted.

MR. BEYDA: That was the easy part. The more convoluted or complicated aspect of it is the -- I'm just -- it's a document dump, and they're just every communication between the parties. That's the issue.

THE COURT: That's your objection?

MR. BEYDA: Yes.

THE COURT: That's overruled.

But Mr. Min, what pages are we talking about?

MR. MIN: Up until Bates stamp 12415.

THE COURT: Everything after 12415 is withdrawn?

MR. MIN: Yes, your Honor.

Your Honor, one second. I'm sorry. One second.

MR. BEYDA: 12415.

(Pause)

THE COURT: So just the last little bit you're withdrawing.

MR. MIN: Your Honor, can I ask for one moment, because -- and I apologize, but because of your Honor's ruling on the motion *in limine*, we certainly want to ensure that we do

not inadvertently include or offer any documents that include anything about marriage counseling because that would not be our intention, so we want to --

THE COURT: Okay. You can withdraw your offer of this document for now, Mr. Min, and come back to it.

MR. MIN: Okay. I'll offer one page for now and we'll come back to the rest. Okay, your Honor?

THE COURT: What are you offering?

MR. MIN: Page 12000, 1-2-0-0-0.

THE COURT: Mr. Beyda?

MR. BEYDA: I'm just looking. I have to get there. I apologize. It's going to take one second.

THE COURT: That's fair enough. It's a massive document. It's fair to describe it as a dump.

MR. BEYDA: I'm sorry. I'm just going to pull up a hard copy. It will be easier.

I'm sorry. I'm supposed to go to document 12000?

THE COURT: Yes.

MR. BEYDA: Thank you.

MR. MIN: June 26, 2020, Michael.

MR. BEYDA: Thank you.

THE COURT: All right. By the way, while Mr. Beyda is reviewing this document, throughout the course of yesterday, from time to time on the record people used the children's names. Some of these documents contain names of the children,

including -- I'm looking in particular at this page. You all either need to fix that by replacing things with redacted versions of exhibits or tell me that you don't have any objection.

MR. MIN: Your Honor --

THE COURT: Now, Mr. Min, you really should have attended to these things beforehand.

MR. MIN: Your Honor, and I apologize, and I want to clarify, just so your Honor knows where I'm coming from on this issue, because -- I'm not saying this as a defense, more as an explanation, but, you know, we, having -- having litigated several of these cases in several different jurisdictions, the exhibits I've never had as matter of public record, so we've never redacted them previously.

With respect to naming the children on the court record, I understand your Honor's position. Truthfully, it's never been an issue before. We've always simply asked the court reporter afterwards to redact the children's names to the initials even though we mention the children's names, so it just has never come up.

Your Honor made a great point, and that's good practice. With the exhibits themselves, since we don't submit it or it's not -- my understanding was that it's not available to the public to see, there is no point in redacting it. This is a conversation I've had -- (Continued on next page)

THE COURT: Exhibits don't get filed on ECF. They are part of the public record. If the case goes anywhere on appeal the exhibits are part of the record. So, they're kept in the records of the courthouse. So, does the public come in and look at trial exhibits? Probably not. But they have a right to. These -- where country with free and open public access.

MR. MIN: Your Honor, whenever we do appeals on these cases, we always redact them prior to making them part of the appendix.

THE COURT: I don't want to spend a lot of time on this. Talk to Mr. Beyda and you guys figure out what you are going to do here.

MR. MIN: Understood.

THE COURT: Okay.

MR. MIN: There an objection, Mr. Beyda.

MR. BEYDA: I need one moment to just confer with my client for a quick second.

THE COURT: Um-hmm.

(Pause)

MR. BEYDA: Your Honor, may I, please, voir dire the witness for a quick moment on this page?

THE COURT: You have an objection to see as to authenticity.

MR. BEYDA: I have an objection as to the document, yes, because of the dates on it and what it purports to be.

THE COURT: Go ahead.

VOIR DIRE EXAMINATION

BY MR. BEYDA:

Q. Mr. Schram --

I am getting an echo. I don't know if anybody else is.

Mr. Schram, the message sent on June 26, '20 at 12:51 a.m. was sent by whom? To who, by who, to who?

A. Tania sending it to me.

Q. And when did Tania first send you that message?

A. Excuse me. Sorry. Let me just confirm that it was -- yes, it was Tania sending to me. Sorry. Apologize.

Q. And when did Tania send you that actual message?

A. This is originally --

MR. MIN: Your Honor, objection, your Honor. I am not, I don't understand the question or the form of the question.

THE COURT: Hold on.

Mr. Schram, do you understand what he is asking you? He is asking you when did Ms. Zarak send you that message.

THE WITNESS: Well, she sent me this message on June 26, 2020 at 12:51 for the second time.

Q. For the second time.

When was the fist time that this message was sent to you?

A. While we were --

MR. MIN: Objection, your Honor. These are cross questions.

THE COURT: I am going to give him a little latitude, Mr. Min.

Go ahead, Mr. Beyda. You said for the second time and you asked...

BY MR. BEYDA:

Q. When did you first receive that message from Ms. Zarak?

A. If I remember correctly, December 2019, when we were still living in Los Angeles. No. I'm sorry, 2018, then, while we were still living in Los Angeles.

Q. So, that message that is reflected on this document where it indicates it was sent to you on June 26th of '20, was initially sent to you in 2018, correct?

A. Yes.

Q. And the substance of that is referring to something out of the context in this, on this page, correct?

A. No.

Q. When you mentioned in that document however, three-year commitment to be discussed, you were referring to a job offer made to you while you were in Los Angeles in 2018?

MR. MIN: Objection.

THE COURT: Where does he say three-year commitment, Mr. Beyda?

MR. BEYDA: It says in the blue box, in the second box, the second to last line "however, three-year commitment to be discussed".

THE COURT: I thought he said earlier that was Ms. Zarak saying that to him. All right. That's enough by way of voir dire.

And Mr. Min is correct. This is more in the nature of cross.

Anything further from you, Mr. Beyda?

MR. BEYDA: No, your Honor.

THE COURT: Any objection?

MR. BEYDA: No, I will -- no objection.

THE COURT: All right. R122 will be admitted.

MR. MIN: May I proceed with questions?

THE COURT: Yes.

MR. BEYDA: Your Honor?

MR. MIN: This wasn't 122, your Honor. This was P148 Bates stamped page 12,000.

THE COURT: I'm sorry. Yes, P148.

(Plaintiff's Exhibit P148 received in evidence)

THE COURT: All right. Go ahead, Mr. Min.

MR. MIN: Thank you.

Q. Do you recall receiving this message on June 26 at 12:51 a.m. from Ms. Zarak?

A. Yes.

THE COURT: I am having trouble hearing Mr. Schram again. If you could lean up, sir, please.

THE WITNESS: Yes, is this low?

THE COURT: That's better. Thank you.

Q. Mr. Schram, do you recall or -- withdrawn.

Do you have an understanding as to why Ms. Zarak sent you this message on June 26?

A. Yes.

Q. What is your understanding of why she sent that message?

MR. BEYDA: Objection as to his understanding of her frame of mind.

THE COURT: He can tell me what his understanding was if he has one and then you can cross if you wish.

You are able to you can answer, sir, if you are able.

A. Okay. Yes. She sent it to me to remind me that she had already said she would commit my job opportunities being Los Angeles where ever they would be.

Q. Well, if she writes here specifically in the third sentence, if you get this Icelandic job, I think it's a possibility for discussion about moving.

You told Mr. Beyda that she originally sent this message in or around December 2018, correct?

A. Yes.

Q. Okay. So, around that time she originally sent this message, did you have an understanding why she said if you get

this Icelandic job I think it's a possibility for discussion about moving?

A. Repeat the question.

Q. Sure. So, do you have an understanding why she sent you that message regarding the Icelandic job in around December 2018?

A. To remind me that she is supportive of the idea of moving to Iceland.

Q. Did you have conversation with Ms. Zarak around this time in late spring/early summer 2020 about moving to Iceland?

A. Yes.

Q. Did you have conversations with Ms. Zarak around this time about work or career opportunities you would have in Iceland if you moved?

A. Yes.

Q. What did you and Ms. Zarak discuss with respect to your career options in Iceland if you were to move there?

A. If we were to move to Iceland our job opportunities had to be in place. So I reached out to Iceland and I was offered I got an offer for a job.

Q. Where?

A. THG Architects.

Q. What is THG Architects?

A. It's the architect firm I used to work for in the old days while I was living in Iceland. I opened up a branch office for

them in New York. They're the office that offered me to do --

MR. MIN: Mr. Schram, I think you're frozen, at least on my screen.

THE COURT: Mine as well.

(Pause)

MR. MIN: Your Honor, maybe I should try to reach out to him and let him know separate.

THE COURT: Yeah.

Mr. Schram, if you could hear us, maybe you should log off and log back on. You are frozen. If you can't hear us --

Mr. Min, go ahead and try to call, email or whatever you do.

Why don't we take a brief five-minute recess at this point and you can try to reach out to Mr. Schram.

MR. MIN: Thank you, your Honor. My apologies.

THE COURT: Okay. Thank you.

(Recess)

THE COURT: All right. Good afternoon, everyone.

All right. Mr. Min.

MR. MIN: Thank you.

BY MR. MIN:

Q. Do you recall approximately, Mr. Schram -- You are muted, Mr. Schram.

THE COURT: We can hear you. Don't look at your screen.

Mr. Beyda, you may have to mute your line. Okay.

THE WITNESS: Can you hear me?

MR. MIN: Your Honor, should I continue or --

THE COURT: Yes.

BY MR. MIN:

Q. Mr. Schram, do you recall, approximately, when you and Ms. Zarak made the decision to relocate to Iceland in 2020?

A. Yes. Around May and June, at that point.

Q. Did you and Ms. Zarak investigate housing options in Iceland prior to moving there?

A. Yes. We continued to do so.

Q. And did you and Ms. Zarak investigate school options for the children in Iceland prior to moving there?

A. Yes.

Q. And did you and Ms. Zarak discuss what neighborhoods or areas of Iceland you would want to move to upon relocation?

A. In the downtown area of Reykjavik.

THE COURT: Go ahead, Mr. Min.

MR. MIN: Okay.

Q. Why was that area attractive to you and Ms. Zarak?

A. I offered area to walk around and for Tania not to be dependent on a car.

Q. What schools did you and Ms. Zarak investigate in Iceland as possible options for the children?

A. Multiple schools. There were a few kindergartens we looked

into for Roman that were Montessori-esque, what you call Society-esk. And then there were, then we looked at a school called Monteskoli and another school, I don't remember what it was called for EZ.

Q. Was Ms. Zarak an active participant in these explorations of possible schools and possible neighborhoods and possible housing options for you and the family?

A. Yes.

Q. How so?

A. She was looking for houses just like I was. She was looking and reaching out to schools like I was. This was very much a life debate or conversations between us.

Q. Did you tell Workshop APD your contract employer in New York that you were moving to Iceland?

A. Yes.

Q. Approximately, when?

A. In July when we were in New York.

Q. What did you tell your employer?

A. Well, it was, I didn't have any job responsibilities or contract responsibilities with them at this time. So, I said you know, I am moving to Iceland. Hope to see you guys there.

Q. Did you and Ms. Zarak discuss possible career or job opportunities for her in Iceland?

A. Yes.

Q. Okay. And what did you and Ms. Zarak discuss as possible

career or job opportunities for her?
A. Film. Her potentials in the work and film in Iceland was that she was she had connections to the U.S. and U.S. Netflix that not a lot of producers in Iceland have. She was interested in doing, she had been interested in for a while to do a documentary about volcano eruptions in Iceland. So, that was discussed. Ultimately, the discussion came back to a product line that would benefit healing of scars of women that had cesarean operations.
Q. Did you inform your friends and family that you and Ms. Zarak had decided to move to Iceland?
A. Yes.
Q. I want to direct your attention to a document that's been premarked as Petitioner's Exhibit 112.
(Pause)
THE COURT: Are you offering this?
MR. MIN: Yes, your Honor.
THE COURT: It'll be admitted. No objections were preserved.
MR. MIN: Your Honor, I'd also like to offer P114 which I do note there was an objection to it.
THE COURT: Let's take them one at a time. Are you doing anything? I am sorry. Are you planning to do anything with 112?
MR. MIN: Yes, your Honor. But there's three exhibits

I just want to get in and I'll sort of ask questions about the three of them.

THE COURT: All right. 114 there are objections.

Mr. Beyda, do you wish to be heard? Let me just read it.

(Pause)

THE COURT: Mr. Beyda.

MR. BEYDA: I am looking very quickly, your Honor, and I withdraw my objection to Exhibit 114.

THE COURT: All right. Thank you. It'll be admitted.

(Plaintiff's Exhibit 114 received in evidence)

THE COURT: Mr. Min, you said there were three.

MR. MIN: Yes, 134.

MR. BEYDA: Oh, I apologize, your Honor. I was looking at 113. I apologize. I need to just take a good look at 114. I had the wrong document on my computer.

THE COURT: All right. Go ahead.

(Pause)

MR. BEYDA: No objection to 114.

THE COURT: All right. 114 is admitted.

The next document, Mr. Min.

MR. MIN: 134.

THE COURT: There are objections. And that's in a different binder.

(Pause)

MR. MIN: The objection I will note is hearsay, except by admission by respondent and we will only be using respondent's admission. So, I don't know if that --

THE COURT: Give him a minute to look at it.

(Pause)

MR. BEYDA: I would still have a hearsay objection in the context of, I mean simply because they are the statement of a party does not necessarily mean that they come in. They still are out of court. They aren't under oath and I don't know if I understand or see an exception to that hearsay component in this document, your Honor.

THE COURT: All right. Well, as I understand your objection, you say you don't object to certain admissions made by the respondent, correct?

MR. BEYDA: Correct.

THE COURT: Mr. Min, I thought I understood was offering only certain admissions within this document; is that correct, Mr. Min?

MR. MIN: Yes, your Honor.

THE COURT: All right. You need to for now the document is just marked.

MR. BEYDA: Okay.

MR. MIN: Then, your Honor, I will refer the witness to Petitioner's Exhibit 112 which is admitted.

Q. Mr. Schram, if you have it in front of you?

A. I do.
Q. Can you identify this document for the Court, please?
A. I'm sorry. I am looking at the wrong document. I'm sorry. 112?
MR. MIN: Right.
THE WITNESS: Okay.
A. Yes. This is text respondence between me and my friend that lives in New York.
Q. And who's writing to, on the right side in blue and who is writing on the left side in white/black?
A. I am the light blue on the right.
Q. Okay. On July 14, 2020, you wrote to your friend "We're preparing a departure to Iceland potentially permanent move. Be here for a couple weeks."
Why did you write that to your friend on July 14?
A. Because we were getting to leave and I was in correspondence to try to say good bye to him, letting him know that we're moving.
Q. In response to his question about how come permanent you wrote, "Regarding pertinent move I've been wanting to move to Iceland for a while. Better environment for children over all. We are going to take one year at a time but things need to get substantially better in the U.S. for me wanting to come back. This place is somewhat a disaster right now and it's going to take a while to get better, I think."

Do you recall writing this to your friend?
A. Do I recall sending this to my friend? Yes.
Q. Why did you send this to your friend on July 14, 2020?
A. To express my sentiments about living in the U.S. and how happy I was to move to Iceland.
Q. So when you and Ms. Zarak were discussing moving to Iceland, did you and Ms. Zarak discuss the reasons for that move?
A. Yes.
Q. Okay. And what were the reasons that you understood that you and Ms. Zarak and the children were moving to Iceland summer of 2020?
A. It was for -- well, it was for job and career opportunity. It was for more stable environment. It was for the idea of having a larger home for the family. It was for the idea of just finally making it happen to go to Iceland. We have been talking about it for so long.
Q. You write here though, "We are going to take it one year at a time but things need to get substantially better in the U.S. for me wanting to come back."
What did you mean by that?
A. It was in regards to both our overall problems of living in New York, the problems we were facing before but also the pandemic and the economical problem related to in the U.S. in the New York.

Q. So did you -- excuse me.
Did you and Ms. Zarak have the discussion for how long you might reside with Ms. Zarak and the children in Iceland?
A. Yes.
Q. Okay. And what did you and Ms. Zarak discuss with respect to how long you might reside in Iceland for?
A. The timeframe that was usually used was two/three years and see how it goes.
Q. When you say "see how it goes", what does that mean?
A. To do not say we're moving somewhere permanently. It was a little daunting for everyone. It's more like let's go see and see a better life there and see if we like it.
Q. And did you and Ms. Zarak ever have a discussion about what would happen next if, you know, you guys didn't like life in Iceland after two or three years?
A. Well, we never really could say took Mexico off the table necessarily, would not take U.S. off the table. It's just we're always continuously weighing our options and continuing to talk about where we could live.
Q. Did you and Ms. Zarak ever discuss a plan to return to New York after two or three years?
A. No.
Q. Did you and Ms. Zarak ever discuss a plan to move to Mexico after two or three years?
A. No.

Q. Did you and Ms. Zarak ever --
A. No. I was just saying to, again, I wasn't sure if you heard me. Sorry.
Q. Did you and Ms. Zarak ever agree that -- Withdrawn.
I want to direct your attention -- I withdraw that statement.
Did you and Ms. Zarak have a discussion about what circumstances would lead you and Ms. Zarak to decide to move to Mexico, for instance, after Iceland?
A. Job and career opportunities --
Q. Sorry. What?
A. Job and career opportunities in Mexico.
THE COURT: "First and foremost" I think you said, right?
THE WITNESS: Yes.
MR. MIN: That's the part I missed, your Honor. Okay.
Q. And did you and Ms. Zarak discuss what circumstances might need to arise in order to move to New York after Iceland?
A. Income security and job same, really. Job and income security to be able to afford it.
MR. MIN: I want to direct your attention to the document that was marked as 114 that, I believe, your Honor, was admitted.
Q. Mr. Schram, let me know when you have it up.
A. I have it up.

Q. OK. Can you identity this document?
A. It's an email I sent to Terrence Seah that lives in California, an architect I know.
Q. Why were you writing to your friend?
A. Architect friend of mine was looking for a California based architect regarding a job in his office.
MR. BEYDA: Objection; hearsay.
THE COURT: Hold on. No. It's overruled. Again, it is not for the truth. It is for his state of mind of why he did it.
You can continue your answer, Mr. Schram.
A. Okay. So I was just connecting two colleagues who got a job, one of them got in California. That was the reason, initial reason for this email.
Q. I want to direct your attention to the second last paragraph, small paragraph in the body of the e-mail starting with "we're in the process". You wrote to your friend:
"We're in the process of packing up no New York and moving to Iceland next week. Looking forward to the change of scenario and more simpler life."
Can you tell us what you meant when you said "looking forward to the change in scenario and more simpler life"?
A. What I meant by that was a stable income, living in environment that was not as expensive and demanding as New York had been or is probably and, yeah, you could say certain relief

to financial concerns just simple life.

MR. MIN: I want to direct your attention to a document that's been premarked. It's not in evidence, Exhibit P134, your Honor.

THE COURT: Just give me a moment.

(Pause)

THE COURT: All right. There are objections to this. This is the document we discussed before where you said you want to admit certain parties admissions.

MR. MIN: Yes, your Honor.

THE COURT: All right. Mr. Schram, shouldn't be looking at this yet.

But why don't you talk to me about what it is you want to admit and we'll hear whether Mr. Beyda has any objections.

MR. MIN: Sure. Yes, your Honor.

I would point to page three what's marked as page three of six and the page that's marked five of six. And, specifically, I have two statements by Mr. Schram I would like to ask him questions about. The first one is the second blue box on the right on page three starting with "Green Card". And the second one is the fourth message, fourth blue box on page five starting with "probably not".

THE COURT: You want to ask him questions about these or add just admit these as a party admission?

MR. MIN: Both.

THE COURT: Why don't we start with getting them admitted as a party admission and see if Mr. Beyda agrees with you. So, specifically, looking at three of six, do you want to admit the second box that you have a red square around on the right-hand side?

MR. MIN: Yes.

THE COURT: Any objection, Mr. Beyda?

MR. BEYDA: No objection.

THE COURT: All right. So that box will be admitted and that's the one that begins "Green Card application"?

MR. MIN: Yes.

THE COURT: Okay. All right. What's next, Mr. Min?

MR. MIN: The next box on page five, probably not. I was waiting for Mr. Beyda to let me know if he had objection to that box.

THE COURT: Which box?

MR. MIN: The fourth box on the right side, page five of six starting "probably".

THE COURT: Let me just get with you page five of six, fourth box saying "we did". I am looking at your red square.

MR. MIN: No. Above that, probably not.

THE COURT: All right. Mr. Beyda, the box that begins "probably not", do you have any objection to its admission?

(Pause)

MR. BEYDA: I have a relevance objection, your Honor.

THE COURT: That's overruled.

Any other objection?

MR. BEYDA: No.

THE COURT: All right. That box will be admitted as well.

(Petitioner's Exhibit "probably not" box received in evidence)

MR. MIN: Thank you, your Honor.

THE COURT: Mr. Min.

MR. MIN: Thank you.

If can pull up page three.

Q. Mr. Schram, can you in general identify what this document is?

A. This is a text correspondence between me and Thomas Zoli.

Q. Who is Thomas Zoli?

A. He is one of the partners at Workshop APD and a friend of mine.

Q. Can you turn to page three of that document and the box on the right-hand side that starts with "Green Card application"?

Is that your message to Mr. Zoli.

A. Yes.

Q. And was that sent on May 29, 2020.

Turn to the page before.

A. Yes.

Q. You wrote to him on May 29, 2020, I have to decide if I go

for the H1 visa or not?

THE COURT: Wait. where are you reading from?

MR. MIN: The middle of that box.

THE COURT: What page?

MR. MIN: Page three, that same box, the green card application.

MR. BEYDA: Can we have that entire box read so that the record is clear?

THE COURT: Sorry?

MR. BEYDA: We may we, please, have the entire box read so that the record is clear for anyone?

THE COURT: The box that reads "Green Card application".

MR. BEYDA: Started, yes.

THE COURT: All right. Mr. Min, please.

BY MR. MIN:

Q. Mr. Schram, you see the box starting with "Green Card"?

A. Yes.

Q. So you wrote to Mr. Zoli on May 29, 2020, green card application started the long process. We are expecting to get the "O" visa to renter mid July. I have to decide if I go for the H-1B visa are not. Doesn't feel like worth it right now. So thinking to pass on it.

Do you see that?

A. Yes.

Q. Again, around this time, what was your immigration status?
A. We did not have a visa in the U.S.
Q. Okay. Were you able to legally enter the U.S. -- withdrawn.
Where were you physical located at this moment in time?
A. Mexico.
Q. Were you legally able to enter the United States at that moment as far as --
A. I am not sure. Maybe as to tourist but that's maybe. I don't know.
Q. Okay. And you wrote that you're expecting to get the "O" Visa to re-enter mid July.
What did you mean by that?
A. That was, at that time we had decided what our visa solution would be in order to enter in order to go to New York to pack up our things on the way to Iceland.
Q. Okay. And what was your visa solution?
A. It was Tania getting the O1 visa and me getting the O3 visa.
Q. Did Ms. Zarak, in fact, get the O1 visa?
A. Yes.
Q. Did you get the O3 visa?
A. Yes.
Q. And is that how you and Ms. Zarak entered the United States

to pack up your belongings before moving to Iceland?
A. Yes.
Q. And as far as you understood, were you able to legally work in the United States on the O3 visa?
A. Mo.
Q. You also wrote:
"I have to decide if I go for the H-1B visa or not. Doesn't feel like worth it right now. So thinking to pass on it."
Did you ultimately pass on the H-1B visa?
A. Yes.
Q. Did you have a conversation with Mr. Zarak about passing on the H-1B visa?
A. Yes.
MR. MIN: Is it your understanding that getting the H-1B visa would allow you to work legally in the United States?
MR. BEYDA: Objection to the form. We're leading the witness a little bit.
THE COURT: Well, I mean, there's been leading throughout without objections.
MR. BEYDA: I know I am letting it go.
THE COURT: Yes. That's sustained.
Q. Do you have an understanding as to whether the H-1B visa would allow you to work in the United States?
A. Yes.

Q. What is your understanding of that?
A. That I am allowed to work after getting an H-1B visa in the U.S.

MR. MIN: I am going to direct your attention to page five.

And, your Honor, I am going to clarify, I am going to check my notes.

(Pause)

Q. Mr. Schram, I want to direct your attention to the messages on the page right now starting with "probably not". I'll read the whole paragraph:

"Probably not unless something comes up like travel restrictions or packing or shipping delays. You just need to come visit Iceland in 2022 when the U.S. is done with the pandemic"

The date of this message was July 3, 2020, correct?
A. Yes.
Q. Why did you write to Mr. Zoli on July 3, 2020, that I need to just come visit Iceland in 2022 when the U.S. is done with the pandemic?
A. It was regarding if he was going to be in New York in July so we could say good bye to each other.
Q. Okay. But why did you write to Mr. Zoli come visit you in 2022?

MR. BEYDA: Objection; asked and answered.

THE COURT: No. He can answer.
A. Because we didn't expect to come back to the U.S. for a while.
MR. BEYDA: Objection as to his reference to someone else's frame of mind.
THE COURT: Overruled.
Q. Did you -- withdrawn.
I want to direct your attention to a document that's been premarked as Respondent's 155, R155.
THE COURT: Are you finished with these documents Mr. Min, 112 and 134?
MR. MIN: Yes. And 115 I believe also.
(Pause)
THE COURT: One-five-five, you said?
MR. MIN: Yes, 155. We don't object.
THE COURT: Yes, it's admitted, no objection.
BY MR. MIN:
Q. Mr. Schram, can you identify this document?
A. This is on -- this is a social media post that I made.
Q. Okay. What did you mean when you posted on social media, Good bye, New York. We will miss you. Next chapter, Iceland?
A. Let everybody know that we have moved out of New York.
Q. Do you see right below the photo there's some like a thumbs up and a heart sign?
A. Yes.

Q. What does that signify?
A. That you like the post.
Q. Okay. And who is marked as "Zarak".
A. My mother-in-law.
Q. Who is "Anna Zarak".
A. Sister of Tania.
Q. Okay. And did they like your post?
A. Yes.
Q. I want to direct your attention to the messages below your social media post which is dated July 30, 2020. Who is Bill Simonian?
A. He is my old student counselor from my undergrad studies in Los Angeles.
Q. And he wrote to you, "Will you be back, Addie?"
Who is Addie?
A. That's my nickname in the U.S.
Q. And you responded anything is possible when the world has recovered from this turmoil we're in. I hope you are well, Bill.
What did you mean when you wrote, "anything is possible when the world has recovered from this turmoil we are in?"
A. Anything can happen in the future. Nothing is set in stone. It reflected the attitude we have about moving to Iceland like I know the place. We'll, what is the word? Every

two or three years and reevaluate, everything is open.
Q. So when you moved to Iceland in summer 2020, did you consider that you might in the future move to New York or move to Mexico or move somewhere else?
A. Yes.
MR. BEYDA: Objection; compound.
Could we break it down, your Honor?
THE COURT: Mr. Min, break it down.
MR. MIN: I'll rephrase the question if that's okay.
Q. Mr. Schram, when you moved to Iceland in the summer of 2020 did you consider it a possibility that you might not live in Iceland forever?
A. Yes.
Q. That the children might not live in Iceland forever?
A. Yes.
Q. When you moved to Iceland in summer 2020, did you and Ms. Zarak have a plan for returning to New York at any definitive point in the future?
A. No.
Q. Did you and Ms. Zarak discuss a plan to return to New York at any definitive point in the future?
A. No.
Q. When did you, Ms. Zarak and the children relocate from New York to Iceland?
A. July 31 was the flight to New York to Iceland.

Q. And did you fly on one-way tickets or round-trip tickets?
A. One-way tickets.
Q. July 31, what year?
A. Yes, 2020.
Q. And you testified earlier about reentering New York to pack your belongings. How long were you in New York for before you relocated to Iceland?
A. Three weeks.
Q. What did you do with your office space that you had in New York when you moved to Iceland?
A. I packed it up.
Q. Did you have a lease on that office space?
A. Yes.
Q. What happened with that lease?
A. I asked if I could cut it short. No business prospect on the table. Then I was moved to Iceland.
MR. BEYDA: Objection; move to strike the portion that was nonresponsive.
THE COURT: No. Denied. It's a bench trial. I heard it.
Q. Did you have any ongoing projects in New York in the summer of 2020 when you moved to Iceland?
A. No.
Q. Did you have any ongoing projects anywhere in the United States in the summer of 2020 when you moved to Iceland?

A. No.
Q. What was the last project you had in the United States prior to moving to Iceland?
A. It was that project that I had with Workshop that had ended in April of 2020 while in Mexico.
Q. Since then, had you had any projects based in New York?
A. No.
THE COURT: I'm sorry. Let me just hear the question again. Oh, based in New York; was that the question?
MR. MIN: Yes.
Q. That how you understood it, Mr. Schram.
A. Based in New York, yes.
THE COURT: Okay.
Q. Since then, have you had any project based in the United States?
A. No.
Q. When is the last time that you invoiced any clients based in New York?
A. I believe it's in April 2020.
Q. Did you move any of your belongings that were located in New York to Iceland in the summer of 2020?
A. Yes.
Q. Can you tell me what belongings you moved from New York to Iceland in the summer of 2020 as part of your relocation?
A. Everything that I had in my office space, we packed up

total 72 boxes, I recall. We packed up items like bicycles, children's books, our books, artifacts, plates, glass and silverware, kitchen stuff, some kitchen stuff, not all of it. Artwork, yeah.
Q. When you say you packed up "some of the kitchen stuff not all of it", why didn't you pack up all of it?
A. Cause it belonged to the apartment or Tania's mother.
Q. And were there things that remained in apartment 6A after you, Ms. Zarak and the children left and relocated to Iceland?
A. Yes.
Q. Such as?
A. Dining table, dining chairs, beds, mattresses, artwork on the walls, mirror, some furniture, keyboard.
Q. So the dining table that you mentioned, did that belong to you and the Ms. Zarak or did it belong to your mother as far as you understood, mother-in-law?
A. It belonged to my mother-in-law.
Q. What about the artwork on the walls?
A. Belonged to my mother-in-law. Some of it belonged to Tania.
Q. What about the bed?
A. The bed, well, it's a little complicated. When we came back we took out the beds, bed frame in the bedroom and, basically, threw it out. So we put up the bed frame we bought in Los Angeles in the TV room. When we stacked our old

mattress and new mattress on top of each other for the sake of storage. So, that was left behind.

Q. Of the 72 boxes you moved to Iceland or approximately 72 boxes, how many of those boxes contained office belongings, things you took from your office in New York?

A. Maybe half.

Q. And so then, approximately, half were personal belongings?

MR. BEYDA: Objection.

THE COURT: What, on leading ground?

MR. BEYDA: I don't know if they were personal belongings. We don't know what was those boxes.

THE COURT: That's the question.

What was in the other half of the boxes, Mr. Schram?

THE WITNESS: It was personal belongings from the apartment 6A. But I wanted to note that when we moved back from Los Angeles I put a lot of personal belongings into the office space, a lot of my creative books because there wasn't space in 6A. So it was not office versus home things. It was kind of a mixture of both, for example, like the table.

Q. "For example" what?

A. A dining table that we had bought in Los Angeles didn't have a space in the 6A apartment. So I stored it in the office space.

Q. And when you were saying that about half of the boxes were things from your office space, did you include some of the

mixed personal belongings that were also there?
A. Yes.
MR. MIN: Your Honor, I'd just like to move for admission Respondent's Exhibit 104. I'm not going to ask any questions about it but a Respondent's Exhibit which we have no objection to.
THE COURT: Mr. Schram, you don't need to pull it up. He is apparently not going to ask you any questions about it.
THE WITNESS: Oh, I'm sorry.
THE COURT: That's okay. That'll be admitted, 104, right, Mr. Min?
MR. MIN: Yes, Respondent's 104.
THE COURT: Oh, I'm sorry. Thank you.
(Respondent's Exhibit 104 received in evidence)
BY MR. MIN:
Q. Was the storage space that you had in the building in the basement that you said that was about five-by-five with taller height, was that full of your belongings when you left for Iceland?
A. Our belongings, also things that belonged to my mother-in-law, mixture.
Q. What sort of things did you leave behind that belonged to Ms. Zarak in the apartment or in the storage space below?
A. There were some boxes around Tania's movie posters. There were -- no. I'm looking at my tie. I am trying to remember.

I don't remember very well to tell you the truth.

(Continued on next page)

BY MR. MIN:
Q. Can you describe the children's belongings that you moved from New York to Iceland in summer of 2020.
A. Sorry. Could you repeat the question.
Q. Sure. Can you describe the children's belongings that you and Ms. Zarak moved from New York to Iceland in summer of 2020.
A. Clothes, toys, books, bicycles, bicycle helmets, yeah. Yeah, winter clothes, spring clothes, just --
Q. Mr. Schram -- and I apologize to the Court, but I'm going to ask you one question about Respondent's 104. I just need to identify what that document is, Respondent's 104, so it's clear for the record. Mr. Schram, I'll put it on the screen because it's one page. Might be easier.
A. Okay.
Q. Can you just identify what this document is.
A. This is the invoice for the shipment to Iceland.
Q. Okay. When did the shipment to Iceland arrive there --
A. August --
Q. -- approximately?
A. -- 12, 13, 14, somewhere around there.
Q. In 2020.
A. In 2020, yes.
Q. A couple weeks after you arrived.
A. Yes.
Q. And when you arrived in Iceland, where were you, Ms. Zarak,

and the children residing at first?
A. In an airbnb in the downtown area.
Q. And how did you find and choose to live in this airbnb at first?
A. Well, we found the airbnb, it was -- it's walking distances from the downtown area. It was -- seemed to be a suitable size for us. I originally had secured this apartment for the month of July. Because we delayed our move to Iceland, we only got the first two weeks of August, and we lost the other two, so --
Q. Okay. And then after you stayed there for a couple weeks, where did you and Ms. Zarak and the children move to next?
A. We found another airbnb, also in a similar area, pretty much the same area in downtown, and that's on the -- on the main strip by the big church there. We felt very cramped and it was not a very good choice, so we stayed in that apartment maybe six days.
Q. Okay. And then ultimately, did there come a time when you found more suitable long-term living arrangements for you, Ms. Zarak, and the children?
A. Yes.
Q. When did that occur?
A. On August 11th is the first time we went for open house at Ránargata 17.
Q. What is that address?
A. Ránargata 17 is the apartment we ultimately purchased.

Q. When you went to the open house on August 11th, who went to the open house? Who was there? Were you there?
A. Yeah, I was there. The broker was there.
Q. Was Ms. Zarak there?
A. Yes.
Q. Okay. And did there come a time when you purchased that home that you --
A. Yes.
Q. When did that --
A. We went two days later to see it again, and then I believe that day we made an offer, on the 13th.
Q. Okay. And when you're referring to "we went back two days later," "we made an offer," you're referring to yourself and Ms. Zarak?
A. Yes.
Q. And ultimately did you and Ms. Zarak close on that apartment? Did ownership transfer to you and Ms. Zarak?
A. Yes.
Q. When was that?
A. We signed the papers on September 14th, I recall.
Q. And why did you and Ms. Zarak decide -- withdrawn.
Did you and Ms. Zarak have discussions about purchasing a home in Iceland?
A. Yes, yes, and we had been doing so for a long time.
Q. Okay. And what were the reasons you and Ms. Zarak

discussed purchasing a home in Iceland in August, September 2020?

A. Well, it was -- finally we were able to buy a home. We were there, the conditions were right. We'd been talking about for years to buy a house in Iceland, so this was the opportunity to finally have a home of our own. And also, financially, because we would be there for that, you know -- for a few years or two years or so, that to be renting in the rental market as it was would be throwing money out the window.

Q. When you say finally a home of your own, what did you mean by that?

A. A home that we would actually own, ourselves, you know, 'cause we'd never owned a home before.

Q. When did you, Ms. Zarak, and the children ultimately move into that home?

A. November 1st of 2020.

Q. And why was there such a wait between September when ownership transferred and November 1st, to move in?

A. We were waiting for the building's owner to move out, which is customary in Iceland.

Q. What did you do with the belongings you had shipped over from New York that arrived in mid-August before moving into your home on November 1st?

A. We stored it at my brother's warehouse.

Q. In Iceland?

A. Yes.

Q. Okay. Were the homes that you were renting in the meantime furnished or unfurnished?

A. Furnished, all of them.

Q. And was the home that you had purchased furnished or unfurnished?

A. Unfurnished.

Q. And did you move the belongings that you had shipped from New York into the home that you purchased?

A. Yes.

Q. And ultimately, did you and Ms. Zarak have to purchase further items for your home in Iceland?

A. Yes, this was the plan.

Q. Did you and Ms. Zarak have conversations about purchasing further items for your home in Iceland?

MR. BEYDA: Objection to the form.

THE COURT: Hold on.

Overruled.

A. Yes.

Q. What sorts of items did you and Ms. Zarak discuss were necessary for your home in Iceland?

A. Everything, except the dining table. We had to buy shelves, we had to buy mattresses, bed frames, dining chairs, other kinds of chairs, coat hanging, coat -- coats rack for the -- and shoe rack for the entrance. It was -- we had to

furnish the apartment.

Q. I want to direct your attention to a document that's been premarked as Petitioner's Exhibit 117.

THE COURT: All right. There's no objection to the exhibit. Are you moving it into evidence?

MR. MIN: Yes, your Honor.

THE COURT: All right. It will be admitted.

(Petitioner's Exhibit 117 received in evidence)

Q. Mr. Schram, can you just identify what this document is.

A. I'm sorry. To clarify, which one is it? Can you pull it up on the screen so I'm absolutely sure what is the question?

Yeah, I mean, this is -- this is us discussing bed options for -- for the children.

Q. I'm going to show you a document, or I want to direct your attention to a document that's been premarked as Exhibit 118, 1-1-8.

THE COURT: All right. There was an objection preserved saying there was no certified translation. Is that objection still maintained? There seems to be a certification on the front of this.

MR. BEYDA: I have to --

MR. MIN: Your Honor, may I --

MR. BEYDA: Exhibit 118?

THE COURT: Yes. Am I looking at the wrong -- Petitioner's 118, right, Mr. Min?

MR. MIN: Yes. Your Honor, I think I can explain because on September 30th, at the same time we notified opposing counsel we had filed an amended exhibit list, around 3 p.m., we also sent the certified translation, translation. The next day they filed their objections, which didn't include the objections to the supplemental exhibits, and I believe they did not also see or notice that I had sent the certified translation, so it was sent --

THE COURT: All right. Give Mr. Beyda a minute to look at it. And then, Mr. Beyda, you can tell me if that satisfies your objection on certified translation grounds.

MR. BEYDA: Thank you. Bear with me one moment. I'm just going to take a look at it.

THE COURT: Yes.

(Pause)

MR. BEYDA: I have no objection to this document with that certification.

THE COURT: All right. It will be admitted.

(Petitioner's Exhibit 118 received in evidence)

BY MR. MIN:

Q. Mr. Schram, can you just identify this document for the Court.

A. This is --

(Discussion off the record)

A. This is a receipt for a IKEA purchase we made.

Q. Okay. Mr. Schram, there are several documents here as we scroll down, so I just want to make sure you've reviewed the document in its entirety.

THE COURT: Well, you really shouldn't have several documents marked as one exhibit, but -- what's the question?

Q. Are all of these documents receipts for items that you purchased?

A. Yes.

Q. In or around what time frame?

A. In -- in -- after we received -- after we got the keys to the apartment, so November, appears to be, when we were buying our main -- when we were buying the furniture for the apartment that we had. We needed to get beds to sleep in.

Q. Okay. And where was the -- were these purchases intended to be for your new home in Iceland?

A. Yes.

Q. And do you recall the items you were purchasing at IKEA, the types of items?

A. Yes.

Q. Okay. What were you purchasing?

A. Furniture and household belongings.

MR. MIN: Your Honor, I would like to direct the witness's attention to a document that's been marked as Petitioner's 44.

THE COURT: There's no objection. Are you moving it

into evidence?

MR. MIN: Yes, your Honor.

THE COURT: It will be admitted.

(Petitioner's Exhibit 44 received in evidence)

BY MR. MIN:

Q. Mr. Schram, I just want you to identify this document and what it is.

THE COURT: Are you able to make it larger?

Thank you.

Q. Mr. Schram, can you just identify what this document is.

Can you hear me?

MR. MIN: He's frozen on my screen, your Honor.

THE COURT: Sorry?

THE WITNESS: Can you see me? Can you see me again? I dropped off. Can you see me again?

THE COURT: Yes, we can see you, Mr. Schram.

THE WITNESS: I dropped off. There's a glitch -- I'm reconnecting here -- with the Teams thing. I don't know.

MR. MIN: Your Honor, on our end we're only seeing a frozen screen.

THE COURT: No. He's sitting there, and when he speaks, I can see his mouth move. But he's just sitting right now. So ask him a question.

MR. MIN: Oh, he just started moving. Okay.

BY MR. MIN:

Q. Okay. Can you identify this document, Mr. Schram.
A. Yes.
Q. Okay. What is it?
A. It's -- let me -- let me -- I need to find the printout so I can fully confirm. What's the sheet number?
Q. It's Petitioner's Exhibit -- Petitioner's Exhibit 44, starting with Bates stamp 16826.
A. Got it.
Q. Okay. Can you identify this document, please, for the record.
A. An email from me to Tania.
Q. Regarding what?
A. Regarding furniture options for the home.
Q. Okay. We can take that down.

Where does your family reside in Iceland with respect to its proximity to where you, Ms. Zarak, and the children bought a home?

MR. MIN: Your Honor, at least from my end, he's frozen now, I believe.

THE COURT: Mr. Schram, are you able to hear us?

Yes, it does appear he's frozen.

MR. BEYDA: Could we use this as an opportunity to take a three-minute break, or five?

THE COURT: That's all right with the Court. It's 3:40 right now. Why don't we say like 3:50 we'll be back; like

a 10-minute break.

MR. MIN: Your Honor, I will note we wanted to call our expert at 4. Should we discuss that? Because that would be our preference right now, just to be able to get her testimony done.

MR. BEYDA: If it's acceptable to the Court -- and I think we worked through lunch, and if we can have maybe this little gap to just grab a quick bite before the next witness. If this is an okay time to stop with Mr. Schram for the day?

THE COURT: Is that acceptable, Mr. Min?

MR. MIN: It is. Especially these technical difficulties seem to be mounting on his part, so I apologize.

THE COURT: He's back with us now, I think, so why don't you just let him answer this last question. You asked him what this was, right?

MR. MIN: Yes. It's starting a new topic, though, and I'd prefer to wait, because then I have follow-up questions to that, if that's okay.

THE COURT: Mr. Schram, what we talked about while you were frozen was that we would take an afternoon break now. I had said for 10 minutes, but Mr. Beyda, how long are you suggesting?

MR. BEYDA: Well, the next witness is scheduled to begin at 4:00. If maybe we could resume a few moments before to make sure our tech is all up to speed and we're ready to go?

THE COURT: Okay. That makes sense. We'll be prepared to go with -- Mr. Schram, the idea is that we're going to end your testimony for today and then pick up with the expert witness that your counsel wants to call and hopefully finish with that witness today, and then we'll be back with you again tomorrow.

THE WITNESS: Okay.

THE COURT: All right? That works from your end?

THE WITNESS: That works for me, yes.

THE COURT: All right. Thank you, Mr. Schram.

We'll adjourn now, and I'll see everybody who wishes to be on again at 4:00.

MR. BEYDA: Thank you.

MR. MIN: Thank you.

THE COURT: All right. Thank you.

(Recess)

THE COURT: Good afternoon. This is Judge Vyskocil. Are we ready to resume?

MR. GLASSER: Yes, your Honor. This is Ken Glasser. I'm going to be examining our next witness, if that's okay with the Court.

THE COURT: Sure. And your next witness is an expert witness; is that correct?

MR. GLASSER: Correct. Her name is Inga Lillý Brynjolfsdottir. I hope I got that right. And counsel has

stipulated that Ms. Brynjolfsdottir is an expert in Icelandic immigration law, and we have likewise stipulated that the respondent's expert should be qualified in the same area.

THE COURT: Icelandic immigration law?

MR. GLASSER: Correct.

THE COURT: Okay.

MR. GLASSER: Counsel has also stipulated that the reports that each expert has prepared will be received in evidence. Petitioner's expert's report has been marked as P 160.

MS. CHAWLA: And respondent's expert report, your Honor, is Respondent's R 180.

THE COURT: All right. Counsel can stipulate to that, but expert reports are hearsay and are not admissible in evidence. You can question the witness, but the report itself is not admissible in evidence. They're both marked as reports of your experts.

Let me just ask Mr. Beyda, is it accurate that you stipulate to the expertise of petitioner's expert on Icelandic immigration law?

MR. BEYDA: Yes, it is, your Honor. Also --

THE COURT: All right. Thank you.

MR. BEYDA: -- if I might state that Ms. Chawla, my colleague and partner, will be handling the testimony from here on in with regard to this witness.

THE COURT: Okay. Very good.

I'm sorry, Ms. Chawla.

MS. CHAWLA: That's okay, your Honor. It's always better to be safe than sorry.

THE COURT: All right. Are we ready to proceed?

MR. GLASSER: Yes.

THE COURT: All right. Mr. Glasser, do you want to, just for the record, call your witness, please.

MR. GLASSER: Petitioner calls Inga Lillý Brynjolfsdottir.

THE COURT: Ms. Dempsey, would you swear the witness, please.

THE DEPUTY CLERK: Please raise your right hand.

(Witness sworn)

THE DEPUTY CLERK: Can you please state and spell your name for the record.

THE WITNESS: Yes. It's Inga Lillý Brynjolfsdottir. Last name is B-R-Y-N-J-O-L-F-S-D-O-T-T-I-R.

THE DEPUTY CLERK: Thank you.

THE COURT: All right. Mr. Glasser?

INGA LILLÝ BRYNJOLFSDOTTIR,

called as a witness by the Petitioner,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. GLASSER:

Q. Good evening. What is your occupation and your profession?
A. I'm an attorney of law in Iceland.
Q. Do you specialize in any particular area of law?
A. Yes. I specialize in Icelandic criminal law, Icelandic immigration law, and litigation.
Q. And how long have you been practicing Icelandic immigration law?
A. For approximately 14 years.
Q. Can you just very briefly describe your -- how you started as an Icelandic immigration lawyer.
A. Yeah. I started when I was an associate at a law firm in Reykjavík and we were handling foreign workers to come to work for Icelandic company, so that Icelandic company was our client, so we had to make sure that every foreign worker had the papers in order to come to work and live in Iceland, and also for their families.
Q. And can you briefly describe your immigration law practice.
A. Yes. I -- I assist foreign nationals to get -- to get worker's permit, or work permit, Icelandic citizenship.
Q. In what forums do you represent your clients in connection with their immigration matters?
A. Before the Icelandic Directorate of Immigration; before Appeals Committee, Appeals Board in Immigrations; before the Directorate of Labor; and before the Parliament.
Q. Icelandic Parliament?

A. Yes.
Q. What is the Directorate of Immigration?
A. It is administration forum, which handles -- which handles with all residence permits. It issues residence permits, it issues Icelandic citizenships, so if you want to receive any residence permits, you have to apply to the directorate.
Q. Since you began practicing immigration law, approximately how many clients have you represented before the Directorate of Immigration?
A. I would say about 150 -- 150 people, could be closer to a hundred, so -- since 2007.
Q. And you mentioned a moment ago the immigration appeals board. What is that?
A. That's the highest administrative authority. It handles all appeals of immigration cases.
Q. For approximately how long has the Appeal Committee of Immigration been in existence?
A. Since 2015.
Q. Since the formation of the Appeals Committee, have you had the opportunity to represent clients before that board?
A. Yes, I have.
Q. And approximately how many clients have you represented before the Appeals Board -- Appeals Committee? Excuse me.
A. Oh, I would say about, give or take, about 20 people. But before that committee was established in 2015, all appeals,

they went through the Ministry of Justice, so I would say about 20 people there also.
Q. What about the Directorate of Labor; what is that?
A. That's the administration -- administrative authority that handles all unemployment in Iceland and also issues work permits for foreigners who want to work in Iceland.
Q. And have you had occasion to represent clients before the Directorate of Labor?
MR. GLASSER: I think she froze.
MS. CHAWLA: I'm just getting a lot of distortion.
THE COURT: In the sound or in the picture?
MS. CHAWLA: In both.
THE WITNESS: Oh, I'm sorry.
THE COURT: All right. Hold on. I'm sorry. We're apparently having a technological issue.
Is it still continuing, Ms. Chawla?
MS. CHAWLA: I can now see.
THE WITNESS: Can you hear me?
MS. CHAWLA: Yes, I can hear you now. Thank you.
THE COURT: All right. Thank you very much.
All right. Was there a question pending?
MR. GLASSER: Can I have the last question read back? I just don't know if the court reporter was able to transcribe the answer.
(Record read)

THE COURT: I think it's frozen again.

MS. CHAWLA: It is.

THE COURT: Now you're back.

THE WITNESS: I'm back. Okay. I'm not sure what's happening. I have a very good connection, though, but --

BY MR. GLASSER:

Q. Have you had occasion to represent clients before the Directorate of Labor?

A. Yes, I have.

Q. And approximately how many clients have you represented before the Directorate of Labor?

A. I would say about 50 to 70, but it was more in my early days of immigration, 2007, when I was handling all the workers.

Q. What about the Icelandic Parliament, have you had occasion to -- withdrawn.

With respect to the Icelandic Parliament, can you tell me what role Parliament plays in connection with immigration matters.

A. Yes. When an applicant for an Icelandic citizenship does not fulfill the whole criteria of getting the citizenship, the Icelandic Parliament, it issues exemptions, so if you don't fulfill the criteria, you can apply to the Icelandic Parliament and it will hand out citizenship. And they do that twice a year.

Q. Have you had occasion to represent clients before the

Icelandic Parliament?
A. Yes, I have.
Q. Approximately how many clients have you represented in this capacity before the Icelandic Parliament?
A. I would say about 10. It's not very common.
Q. Where do you currently work?
A. I work in Digna law firm.
Q. Can you spell that.
A. D-I-G-N-A.
Q. For approximately how long have you worked at Digna law firm?
A. It's -- okay. I founded my own company in 2009. And I was handling a lot of cases. The name of the company was Abogada (ph), I'm the owner of Abogada, and then in 2015, the name of Abogada changed to Digna, so I've been working for Digna, which is since 2015.
Q. And is it fair to say that Abogada is a law firm as well?
A. Yes, all law firms.
Q. Can you please describe your position within the Digna law firm.
A. Yes. I'm the sole owner and general manager and litigator.
Q. How many attorneys work for you? Withdrawn.
How many attorneys work with you at the Digna law firm?
MR. GLASSER: I believe she's frozen.

MS. CHAWLA: I believe she's frozen again.

THE COURT: I know. Just waiting to see. There we go.

THE WITNESS: I'm so sorry.

THE COURT: That's all right. We've been having technical difficulties. I don't know that it's your problem.

THE WITNESS: Oh, okay.

THE COURT: So the question was how many lawyers work with you at the law firm?

THE WITNESS: Yeah. There's one attorney, your Honor; one other attorney with me.

THE COURT: Thank you.

BY MR. GLASSER:

Q. Now prior to the -- withdrawn.

Can you please describe your educational background.

THE COURT: All right. Mr. Glasser, the parties have stipulated to her expertise, so I gave you a little bit of leeway to give me a flavor, but we should move this along.

Q. Do you hold any professional licenses or certificates?

A. Yes, I do. I have a license -- a license to -- (unintelligible)

Q. I'm sorry. The connection does not appear to be very good.

THE COURT: We're not understanding you at all. Sorry. We lost you in the middle of your answer about you have a license to --

THE WITNESS: Yeah, I have a license to litigate, to practice law in Iceland, both for -- before the district court and the appeals court.

MR. GLASSER: Could I just have a moment, please.

THE COURT: Sure.

(Pause)

MR. GLASSER: Judge, do you think we should try having the witness dial in for the audio? I'm just wondering if it's the quality of the testimony --

THE COURT: She's okay for the moment. So why don't we just keep plugging ahead, and if it really gets to be a problem, we'll have to come up with another arrangement.

MR. GLASSER: Okay.

BY MR. GLASSER:

Q. You're licensed to practice law?

A. Yes.

Q. And when did you receive your law license?

A. In 2009 for the district court and 2018 for the appeals court.

Q. Can you please briefly describe what you need in order to become licensed in the appeals court in Iceland.

A. Yes. Should I tell you what route I went or tell you what I --

Q. Please tell me what route you went.

A. Yeah, okay. Before the appeals court was founded in 2018,

I started to go to the Supreme Court of Iceland. In order to be allowed to have a case in the Supreme Court, I had to have my district --

MS. CHAWLA: Your Honor, I know that counselor is frozen right now, but we've stipulated to her being an expert, so --

THE COURT: I agree. I already said that. So -- go ahead. I cut you off. Finish making your record.

MS. CHAWLA: I was going to say that I'm not really sure why these questions are necessary at this juncture.

THE COURT: All right. I'm going to say this for the record. We need to get this witness on and off the stand today. The Court is prepared to press on until roughly 6:00. So Mr. Glasser, you know, you are using up the time that you're going to have to put on this witness. The parties have stipulated to her expertise. I've gotten a sense, a flavor, of who she is and what she does and what her expertise is. I'd like to hear about the substance.

MR. GLASSER: Okay, Judge. I will move on.

BY MR. GLASSER:

Q. Could you please -- what is an Icelandic residence permit?

A. It's a permit for a non-Icelandic to live in Iceland, to reside in Iceland.

Q. Did you say a non-Icelandic citizen to live in Iceland?

A. Yeah. (Unintelligible)

MS. CHAWLA: Your Honor, I'm so sorry, but everything is garbled on my end.

THE COURT: It's garbled on my end too.

MR. GLASSER: What if we have the witness log off and log back on?

THE COURT: Why don't we try that.

Are you willing to do that, ma'am? I'm sorry. I don't know how to pronounce your last name because you were garbled when you pronounced it. So if you don't mind, why don't you try logging off and logging back on again.

THE WITNESS: I will do that. I'm sorry. Okay?

THE COURT: Thank you. No need to apologize.

(Pause)

THE COURT: All right. You are back.

Mr. Glasser?

BY MR. GLASSER:

Q. What is an Icelandic residence permit?

A. It is -- (unintelligible)

THE COURT: No. It's not working.

MR. GLASSER: Judge, can the witness dial in? I think there's a dial-in number, and the audio might be much crisper if she dials in.

THE COURT: You mean without the video?

MR. GLASSER: I mean, she can stay on the video if she has the technological means, but --

THE COURT: Let me just see. Is that an option, Ms. Dempsey?

You need to mute your computer, I believe.

THE DEPUTY CLERK: You have to mute the audio on your computer and then you can dial in with the phone number using the 917-933-2166.

THE COURT: But you need the +1 for the US.

THE DEPUTY CLERK: Yes, however you dial it internationally.

THE COURT: Do you want to try that? Thank you.

THE WITNESS: Can you please give me the number again.

THE DEPUTY CLERK: Yes, it's 917-933-2166.

THE WITNESS: Okay.

THE DEPUTY CLERK: And the conference ID is 527501, but I don't know how you dial internationally.

THE COURT: I think she dials the +1 for the international code. Does that work? Is that the whole conference number?

(Discussion off the record)

BY MR. GLASSER:

Q. What is an Icelandic residence permit?

A. It is permit for foreigners to live in Iceland.

Q. Are all residence permits permanent?

A. No.

Q. Is there an Icelandic law that governs the application and

issuance of Icelandic residence permits?
A. Yes, it's the National Foreign -- I'm sorry. The Foreign Nationals Act. I was --
Q. And are you familiar with --
THE COURT: Please don't be upset about the technology issue. We've been having it all day long. It's really not your responsibility.
All right. The Foreign Nationals Act? Is that what you said?
THE WITNESS: Yes. Yes, your Honor.
THE COURT: All right. Mr. Glasser?
BY MR. GLASSER:
Q. Are you familiar with Article 70 of the Foreign Nationals Act?
A. Yes, I am.
Q. What is Article 70 of the Foreign Nationals Act?
A. Article 70, it applies to spouses, or family members of Icelandic citizens or people who hold permits in Iceland.
Q. And are you familiar with the Icelandic regulation on foreigners?
A. Yes, I am.
Q. What is the Icelandic regulation on foreigners?
A. It's a regulation on foreigners who want to come to Iceland who are -- it's a -- it's a regulation of the Foreign Nationals Act.

Q. And again, under Icelandic law, what is a foreigner?
A. It's a non-Icelandic citizen.
Q. For the following question, I would like you to assume the following facts: an Icelandic citizen moves to Iceland with his foreign spouse. How would the foreign spouse of the Icelandic citizen become a lawful resident of Iceland?
A. The spouse would apply for resident permit at the immigration, Icelandic immigration.
Q. Okay. And can you please describe the application process that the foreign spouse would need to complete in order to obtain a residence permit.
A. The foreign spouse would have to apply in a special application form issued by the -- the Director of Immigration. You would have to submit necessary documents, but basically it's a -- it's a process where you prove who you are, you prove what your status is, from where you are basing your right to reside in Iceland. So you would have to, for example, give a copy of your passport, give a copy of your -- of your marriage certificate to the Icelandic citizen, and you have to prove you have sufficient funds to stay in Iceland. Yes.
Q. What about a -- are there any criminal background checks associated with a permit for a -- withdrawn.
Are there any criminal background check requirements associated with an application for a residence permit?
A. Yes. You (unintelligible)

THE COURT: You need to start your answer again. You were completely frozen and then just coming through in distorted format. So if you could start your answer again about are there any criminal background checks associated with an application for a residence permit.

A. Yes. An applicant would have to submit a criminal record, his criminal record to show that he hasn't been convicted for the last five years or has any big felonies on his record older than five years.

Q. And a criminal background check is from where?

A. From the place where he lived for the -- the last five years, so if you have lived --

Q. Five -- I'm sorry. Go ahead.

A. So if you have lived --

THE COURT: Are you able to hear us? No, I think the witness has frozen again.

All right. Now are you able to hear us? You started to say, "So if you have lived in --"

THE WITNESS: -- two different countries for the last five years, you have to have a criminal background check from both countries.

THE COURT: Thank you.

BY MR. GLASSER:

Q. And what about medical insurance? Are there any requirements with respect to medical insurance for a residence

permit application?
A. Yes, there is. You would have to -- in order to be -- to be issued a residence permit, you would have to purchase a medical insurance. Without it, you will not be issued a permit.
Q. And does the medical insurance need to be -- in what country does the medical insurance need to be purchased at the time of the application for the residence permit?
A. You -- you can buy it in Iceland. You can also have a foreign insurance company, but it has to be validated by Icelandic government, so you need to have a medical insurance -- (unintelligible)

THE COURT: So again, you froze. You need to have medical insurance?

THE WITNESS: That is valid.

THE COURT: Thank you.

MR. GLASSER: Judge, we just emailed the witness the telephone number and pin. Should we give that a try?

THE COURT: Yes. But why don't you keep pressing on in the meantime.

Are you suggesting you want to take a break and see about dialing in?

MR. GLASSER: I just don't want the witness to be distracted while I'm asking questions.

THE COURT: All right. Why don't you try that.

All right. We'll take a brief pause.

MR. GLASSER: Okay.

(Pause)

THE COURT: All right. Mr. Glasser?

MR. GLASSER: Thank you.

BY MR. GLASSER:

Q. Before the break, you were discussing the medical insurance requirement. Do you recall that?

A. Yes.

Q. What is the duration of a health insurance policy purchased in connection with a residence permit application?

MS. CHAWLA: Objection, your Honor. Objection.

THE COURT: Hold on. There's an objection.

MS. CHAWLA: Your Honor, that wasn't counsel's testimony. I think Mr. Glasser is mischaracterizing counsel's testimony because it didn't seem like the health insurance was necessary --

THE COURT: You can just object to the form of the question. And it's sustained.

BY MR. GLASSER:

Q. As part of the application process for a residence permit, is there a requirement for the applicant to procure health insurance?

A. Yes, it's a requirement in order to be issued a resident permit.

Q. And for how long -- withdrawn.
What is the duration of the health insurance policy purchased in Iceland for the purposes of the residence permit application?
A. It should be valid for six months from the day that you register into Iceland. The date that you registered is the date when you have been issued a permit and when you go to the immigration to have your picture taken, to have a card issued.
Q. So prior to the issuance of the permit, upon application for the residence permit, does the applicant -- is the applicant required to have medical insurance?
A. Yes. It's a necessary -- it's necessary for the application. It's one of the criteria needed when you apply.
Q. And is it possible to purchase a health insurance policy in Iceland for longer than six months?
MS. CHAWLA: Objection. No foundation.
THE COURT: Do you know, ma'am?
THE WITNESS: Do I know, your Honor? Probably like in any other country, you can buy whatever --
THE COURT: Are you speculating, though, or do you know based on your experience representing clients who apply for these permits?
THE WITNESS: Yeah. Regarding this particular medical insurance, it is valid for six months.
BY MR. GLASSER:

Q. Okay. And this particular medical insurance, is it valid for longer than six months? Withdrawn.

With respect to this particular type of medical insurance, what happens upon the expiration of the six-month period?

A. It -- okay. It depends on whether you have had your residence permit or not. Like if -- if you haven't received your residence permit, you would have to renew it, so it is valid for the six months after you get the permit.

Q. And if one does have a residence permit, what happens in the event that the medical insurance duration expires?

A. After six months of living in Iceland, like residing in Iceland, you will become a part of the universal health care system in Iceland, which is a very good system. You don't necessarily have to pay --

MS. CHAWLA: Objection --

A. -- for --

MS. CHAWLA: -- to the last portion, your Honor.

THE COURT: There's no harm with it.

Q. Can you please describe what privileges, if any, a residence permit confers upon a spouse of an Icelandic citizen.

A. Yes. That of course, to reside in Iceland, you need to become a member of the community, like you say -- like one would say. Of course the access to the universal health care system in Iceland, yeah.

Q. What about the right to work? Would the spouse of an Icelandic citizen who obtains a residence permit be permitted to work in Iceland?
A. Yes, but not until the residence permit is issued.
Q. So is a spouse of an Icelandic citizen permitted to reside in Iceland without a residence permit?
A. Not reside, no.
Q. So could you please describe what, if anything, would happen to a spouse -- withdrawn.

Is a spouse of an Icelandic citizen permitted to reside in Iceland while the residence permit is pending?
A. Yes. The spouse of an Icelandic is allowed to do that.
Q. Assuming a residence permit is granted to the foreign spouse of an Icelandic citizen, for how long is the permit valid?
A. One year.
Q. What law governs the duration of residence permits for spouses of Icelandic citizens?

MS. CHAWLA: Objection. Asked and answered, I believe, your Honor.

THE COURT: Let's just move it along. If you don't mind, if you'd answer it again, if it has been asked and answered. I don't recall.
A. Can you please repeat the question.
Q. What law governs the duration of residence permits for

spouses of Icelandic citizens?
A. What law? It's the Foreign Nationals Act.
Q. What article, for the duration of the residence permit?
A. Article 69.
Q. Now is it possible for a residence permit for a foreign spouse of an Icelandic citizen to be granted for longer than one year?
A. No, not in my opinion.
Q. Could you explain why.
A. In the -- yeah. Yes. Article 69 says it's generally issued for one year at a time and most definitely issued only for one year for the first time when you apply. In -- in practice, it's never done --
MS. CHAWLA: Objection.
A. -- never issued for longer.
MS. CHAWLA: Objection to the "in practice" portion, because Mr. Glasser is asking hypothetical questions.
THE COURT: No. Overruled. It's fine.
Q. Now in your experience, in your roughly 14 years of experience practicing immigration law in Iceland, have you ever seen an Icelandic residence permit issued to a spouse of a foreign -- withdrawn.
In your 14 years of practice in immigration law in Iceland, have you ever seen a foreign spouse of an Icelandic citizen obtain a residence permit after the first application

for longer than one year?

MS. CHAWLA: Objection.

THE COURT: On what grounds?

MS. CHAWLA: It's not relevant.

THE COURT: Yes, it is relevant. Overruled.

A. No, I have not seen it.

Q. Now is it possible for a residence permit -- for a foreign spouse of an Icelandic citizen to be granted a residence permit for less than one year?

A. Yes, that's possible.

Q. And under what circumstances could a residence permit be granted to a foreign spouse of an Icelandic citizen for less than one year?

A. For example, when applying for less than one year.

Q. Now --

THE COURT: If one applies for less than a year, you said, right? For example, if one applies for less than a year?

THE WITNESS: Yes.

Q. Is it possible for a foreign spouse of an Icelandic citizen to apply for a residence permit for longer than one year?

MS. CHAWLA: Asked and answered.

THE COURT: Sustained.

MR. GLASSER: I don't believe I asked that question.

THE COURT: Mr. Glasser, move on, please.

Q. Now did you prepare a report in connection with your

involvement in this case?
A. Yes.
Q. And what materials did you review in connection with the preparation of your report?

MS. CHAWLA: Objection, your Honor. I believe your Honor already said that the reports aren't coming into evidence.

THE COURT: That's correct. That's why he can ask questions. The report itself doesn't come in.

MS. CHAWLA: But he's asking about the report.

THE COURT: No. He's asking what documents the witness reviewed.

MS. CHAWLA: In preparation of the report, your Honor. I believe that was his question.

THE COURT: Correct. Correct. It's a proper question.

I'm sorry, ma'am. You can answer, please.
A. Yes. I think I saw the documents were issued in this court by both parties, and the affidavits. I have a list of them on my memo.

MR. GLASSER: Judge, may the witness look at her report, which has been marked as P 160? I believe the witness has a hard copy of her report that she can --

THE COURT: Do we really need this for what you're trying to establish through this witness, what documents she

looked at?

MR. GLASSER: It might become relevant in the next couple of questions. So let me see if I can elicit the answers without her looking at her report.

THE COURT: All right. Good.

BY MR. GLASSER:

Q. Now during the -- withdrawn.

During the preparation of your report, did you learn whether Tania Zarak applied for an Icelandic residence permit?

A. Yes.

Q. And how did you come to learn that Ms. Zarak applied for an Icelandic residence permit?

A. I read it in one of the documents issued by her.

MS. CHAWLA: Objection, your Honor.

THE COURT: Sustained.

Q. Well, did you review any affidavits that Ms. Zarak prepared in connection with the New York court case?

MS. CHAWLA: Objection.

A. Yes, I did.

THE COURT: Overruled.

A. Yes, I did.

THE COURT: Is there really an issue about this, counsel? This is not really directed to you, Mr. Glasser. It's really directed to the other side. This isn't something you could all stipulate to, whether Ms. Zarak did or didn't

apply?

MS. CHAWLA: We did, your Honor. It's part of the stipulation of facts.

THE COURT: All right. Then why are we belaboring this, Mr. Glasser?

BY MR. GLASSER:

Q. Well, do you know on what grounds Ms. Zarak applied for an Icelandic residence permit?

A. Yes, I assume it was as -- based on her marriage to the Icelandic citizen and of course --

Q. Were you able to review -- I'm sorry. Were you able to confirm this assumption?

MS. CHAWLA: Your Honor --

A. I believe my --

THE COURT: Hold on. Hold on. What's the objection?

MS. CHAWLA: Your Honor, if that's an assumption, then it's not based on knowledge.

THE COURT: Correct. Lack of foundation. Sustained.

Q. Did you review --

THE COURT: I would just point out that the stipulated facts do say, "In May 2021 --" this is paragraph 19 -- "the Icelandic Directorate of Immigration notified Ms. Zarak that her application for an Icelandic residency permit had been approved. Ms. Zarak's Icelandic residency permit is valid until May of 2022." Do we need more?

MR. GLASSER: I would just like to know if the witness knows the grounds upon which she applied for her Icelandic residence permit.

THE COURT: Do you know that, ma'am? Don't assume. Do you know?

THE WITNESS: Yes, I know. It's because of the affidavit, yeah.

MS. CHAWLA: Objection.

MR. GLASSER: It's the respondent's sworn statement.

THE COURT: That's admissible. Just admit the affidavit. Why are we going around about asking this witness about what she read in something that's otherwise admissible or the Court can take judicial notice of it? But again, I don't understand why there's an issue about this and why people can't just stipulate to this.

BY MR. GLASSER:

Q. Is Ms. Zarak's residence permit a permanent Icelandic residence permit?

A. No.

Q. And do you know when her residence permit was submitted?

MS. CHAWLA: Objection.

THE COURT: Does she know? What's wrong with that question?

MS. CHAWLA: Your Honor, if it's going to be based on what she read, then it's the same objection as before.

THE COURT: Then she doesn't know, if she read it.

I mean, you are a lawyer. You understand that you can only know what you know through your own senses, not what you read in a hearsay document, correct?

THE WITNESS: It's an official document, right?

THE COURT: That's an argument for counsel, but do you know on what you saw in Iceland with your own eyes or anything like that. But again, the stipulation says in May she was notified that her application had been approved and it's valid until May of 2022.

BY MR. GLASSER:

Q. Would Ms. Zarak have been --

MR. GLASSER: I'm going to withdraw the question, Judge.

THE COURT: Okay.

Q. At the time that Ms. Zarak applied for her residence permit, would she have been eligible for a permanent residence permit?

A. No.

Q. Can you explain why.

THE COURT: Is there such a thing as a permanent residence permit?

THE WITNESS: Yes, there is.

THE COURT: Okay. Thank you.

I'm sorry, Mr. Glasser. Go ahead.

THE WITNESS: Sorry, your Honor.
Q. Could you please explain why she would not have been eligible for a permanent residence permit at the time she submitted her application for a residence permit.
A. Because she can only get a permanent residence permit after having a residence permit for a couple of years, for three or four years.
Q. So is it your testimony that it's possible for a holder of a residence permit to ultimately obtain a permanent residence permit?
A. Yes, after a couple of renewals of the residence permit.
Q. And how often would a holder of a residence permit -- withdrawn.
How often would a holder of a residence permit need to reapply in order to obtain a permanent residence permit?
A. Are we -- are we talking about a spouse of an Icelandic citizen?
Q. Yes, yes.
A. Okay. One would have to renew the permit, so it would be three consecutive years of residence permit in Iceland.
Q. Now for the following question I would like you to assume the following facts: Ms. Zarak claims that applying for a one-year residence permit is indicative of an intent to remain in Iceland for a temporary period of time. In your opinion is the issuance of a residence permit for one year indicative of

an intent to remain in Iceland for one year or less?

MS. CHAWLA: Objection.

THE COURT: Sustained. Sustained.

Q. Would Ms. Zarak be able to apply for a renewal residence permit when hers expires in May of 2022?

MS. CHAWLA: Objection. It's speculative, your Honor.

THE COURT: No. I'm going to overrule it. You can cross on it. But you may answer. You may answer. If you can.

THE WITNESS: I can answer?

THE COURT: Yes.

A. If -- if a person is here, if she was going to renew her permit, she would be able to do that.

Q. And how would Ms. Zarak have to seek renewal of the residence permit upon the expiration of the one-year term?

A. She would have to apply for renewal four weeks prior, before it expires, before her permit -- permit expires.

Q. And what happens in the event that the grounds for the original residence permit no longer exist?

A. It would not be -- she would not be able to renew her current residence permit, but she would have to apply for a new one.

Q. Under separate grounds?

A. On a separate ground. On a separate ground.

Q. So for the following question, I would like you to assume the following facts: that Ms. Zarak and Mr. Schram are legally

divorced prior to the expiration of Ms. Zarak's residence permit; please further assume that the parties have children and that the children reside in Iceland. What impact, if any, would Ms. Zarak's legal divorce have on her ability to renew her residence permit?

A. Well, she would not be able to renew her current permit if she would be divorced at the time, at the time of the renewal, so she would have to apply for a new one, and the best way would be through her Icelandic children.

Q. So is it fair to say that Ms. Zarak would have a basis other than as a foreign spouse of an Icelandic citizen to obtain residence permit if she and Mr. Schram were to divorce prior to the expiration of her current residence permit?

A. Yes, on the basis of her three Icelandic children, and they are -- they were defined as a close family member, like a spouse, in the law of foreigners, the Foreign Nationals Act.

Q. Now in your experience, a residence permit -- withdrawn.

In your experience, are residence permit applications for a spouse of an Icelandic citizen subject to greater or less scrutiny than a residence permit application based on parentage of an Icelandic child?

MS. CHAWLA: Objection.

A. I would --

THE COURT: Hold on. Let me hear the objection. Grounds?

MS. CHAWLA: Your Honor, I think it's speculative.

THE COURT: Maybe. She may know and it may be purely factual. I really don't know, so overruled.

If you're able to answer, you may do so.

A. Can you please repeat the question.

MR. GLASSER: May I have it read back.

(Record read)

A. I would say the spouse permit is under more scrutiny than the -- than as parent of an Icelandic citizen because immigration in Iceland is trying to prevent like fake marriages, so it is very much, very -- I forgot the word, sorry, in English. They look at it with -- yeah, with great -- they look at it much more detailed, because when you apply as a parent of an Icelandic citizen, you submit the birth certificate, and you see the birth certificate. You don't think you're lying about having these children, if I'm making myself clear.

THE COURT: You are. Can I just ask you, English obviously is not your native language?

THE WITNESS: No. It's Icelandic.

THE COURT: All right. Thank you. You're doing very well. Don't worry about the language issue.

THE WITNESS: Thank you.

BY MR. GLASSER:

Q. And just to be clear, in order to apply, in order for a

foreigner to apply for a residence permit based on parenthood of a child, is it fair to say that the child who is the subject of the application must be an Icelandic citizen?

A. Yes, must be an Icelandic citizen, yes.

Q. What if a child is residing in Iceland but is not an Icelandic citizen, would a person still be able to obtain or apply for a resident permit based on the scenario that I just described?

A. Yes. It is permissible to have that kind of permit.

Q. So for the following question, please assume the following facts: that Ms. Zarak and Mr. Schram are legally divorced prior to the expiration of Ms. Zarak's residence permit; please further assume that Ms. Zarak submits a residence application based on parentage of her Icelandic citizen children; please further assume that Ms. Zarak's application for residence permit based on parenthood is not approved prior to the expiration of her residence permit based on her marriage to Mr. Schram. Would Ms. Zarak be permitted to remain in Iceland while her application for a residence permit based on parenthood is pending?

MS. CHAWLA: Objection, your Honor. In a Hague case, we look back, and this is asking counsel about what would happen in the future, and so I don't believe that it's relevant to the issues before this Court.

THE COURT: I'm going to allow it.

A. It kind of -- what you asked me, it's kind of -- seems like you were asking like she had one permit going on and was applying for a new permit.
Q. Correct.
A. Yeah. So when you have one permit -- okay. I'm going to try to explain. I'm not sure how to -- how to explain this question, my answer, because, well --
THE COURT: If you can't answer it as he's framed it, then he can ask a different question.
A. I -- I think I have it. If a -- okay. If she's applying for the first time as a parent of Icelandic citizen, the law doesn't assume -- like for a spouse of an Icelandic citizen, that she can stay, while the application is in process for application for parent of an Icelandic citizen. So we have a clock in the law that allows a family reunification applicant that can stay in Iceland while the application is processed. So for a mother of three young kids, Iceland citizens, I think the likelihood of her being able to stay while the application is pending is good. But of course, yeah, then you have, of course, the visa solution. You can apply for visa, you can apply for a long-term visa to stay, so --
MR. GLASSER: Could I have a moment, please.
THE COURT: Sure.
(Pause)
Q. Ma'am, you mentioned a visa. Are you familiar with

long-term visas in Iceland?
A. Mm-hmm, yes, I am.
Q. And what is the maximum duration of a long-term visa?
A. It's 180 days. It's like, when you don't have a visa to Iceland, you can stay here for 90 days. You can apply for a long-term visa, then the total duration of your time in Iceland is 180 days.
Q. But for the following question, I'd like you to assume the following facts: a foreigner comes to Iceland on a long-term visa, and prior to the expiration of the 180-day period, the foreigner applies for an Icelandic residence permit. Would the foreigner be permitted to stay in Iceland while the application for a residence permit is pending?
MS. CHAWLA: Objection. Objection, your Honor.
THE COURT: Grounds?
MS. CHAWLA: Because in this case we've already established and it's been stipulated that Ms. Zarak has a residence permit.
THE COURT: That is true.
MR. GLASSER: However, Judge, it's important because there were other options available to Ms. Zarak other than getting a residence permit.
THE COURT: So what?
MR. GLASSER: If one of the questions that this Court needs to determine is what her intent was, the path that she

took toward lawful residency in Iceland is relevant.

MS. CHAWLA: But, your Honor, we know what path she took. We've stipulated to what path she took.

THE COURT: I think that's correct. The objection is sustained.

MR. GLASSER: I have nothing further.

THE COURT: All right. Thank you.

Cross-examination?

MS. CHAWLA: Yes, your Honor.

CROSS EXAMINATION

BY MS. CHAWLA:

Q. Isn't it true that -- withdrawn.

I'm going to ask you a few hypothetical questions, and I'd like you to assume that there is a foreign spouse who is married to an Icelandic citizen. And upon the arrival of that foreign spouse into Iceland, couldn't that foreign spouse have applied for a two-year visa -- I'm sorry -- for a two-year resident permit?

A. No.

Q. So there is no option to apply for a residence permit for longer than one year.

A. Okay. The law, the Article 69 of the Icelandic Foreign Nationals Act, it says that in general, licenses are -- permits are issued for one year, but in first permit you cannot apply for longer than one year.

Q. And what part of --

THE COURT: Let her finish. Let her finish.

MS. CHAWLA: I'm sorry.

THE COURT: Go ahead.

A. Okay. Let me rephrase. You never get more than one year for the permit.

Q. But doesn't the law -- you said in general, you don't apply for more than one year. So doesn't that presume that there are cases where people apply for more than one year?

A. Of course you can write whatever you want on the application form, you can say, I want 10 years, but for the first permit, you will never get more than one. So the application will -- immigration will review. It is about one year, no matter what you wrote.

Q. But it's correct to say that you can apply, correct, for more than one year; yes or no?

A. You can, you can, right, yes, you can, you can apply, but you will not get it.

Q. Now isn't it also true that there are no special circumstances that are necessary for a foreign spouse of an Icelandic national to apply for the two-year residence permit?

A. Special circumstances. Okay. Like I said before, I've never seen a permit longer than one year --

Q. And how many --

A. -- in --

THE COURT: Let her finish. Just calm down a little bit, okay? Let her finish.

I'm sorry. Go ahead, ma'am.

MS. CHAWLA: I apologize.

A. Yeah, okay. I've never seen a permit longer than one year on my 14 years of this immigration law. It is true, it says in the Article 69, paragraph 4, that in general it's issued for one year, it can be up to two years, but it's an authorization clause, so it's not really used, and it will never be used for a first permit. It says also that, paragraph 4, it applies to renewals.

Q. And how many cases have you represented in applying for resident permits?

A. How many cases before the Directorate of Immigration?

Q. Yes.

A. About 150 cases, I would say.

Q. Okay. You would agree with me that the Directorate of Immigration receives more than 150 applications in the time that it's existed, correct?

A. Yes.

MR. GLASSER: Objection.

Q. And so you would agree with me that there may be cases that you don't know of where the Directorate of Immigration issued a two-year resident permit.

A. Of course I don't know any of immigrant cases, but it would

not be a first-time permit, like if you're applying for the first time for a residence permit.

Q. In the event -- now I'm going to ask you for the next few questions to assume the following facts if there are three children who have one parent who is an Icelandic citizen and all three children were born outside of Iceland, can the three children get Icelandic citizenship without both parents signing documents?

MR. GLASSER: Objection.

THE COURT: On the grounds of what?

MR. GLASSER: Beyond the scope of my direct examination.

MS. CHAWLA: No, your Honor, it's --

THE COURT: No, no. Overruled.

A. Can you please repeat the question.

MS. CHAWLA: Your Honor, could I ask the court reporter to read back the question, please.

THE COURT: Sure. Are you able to do that, madam court reporter?

(Record read)

A. No, the -- the -- the form to apply for a children of Icelandic citizenship, for a parent to apply for the children, it's -- it needs both signing the form.

Q. And when you say both signing -- I'm sorry, I just want to clarify -- do you mean it needs both parents to sign?

A. It needs both parents to sign the form, as a -- yeah, yeah.
Q. Now with respect to the questions that Mr. Glasser was asking you where you were to assume that the parties are divorced and Ms. -- the parties are divorced prior to Ms. Zarak's one-year permit expiring, isn't it true that the Directorate of Immigration could initiate withdrawal proceedings if they were to discover that the parties are divorced prior to Ms. Zarak's residence permit expiring?
A. It could do that, yes.
Q. And now you also testified that the Directorate looks more closely at applications based on being married to an Icelandic citizen -- so the spousal applications -- than it does with applications based on parentage.
A. Yes.
Q. Can you please explain to us, what does the Directorate look at with respect to the spousal applications versus with respect to the children applications?
A. They look at duration of marriage, they look at -- they can ask for additional documents about where the people were living before. Like in cases of people coming from -- or foreigners coming from maybe Asia, they're very -- they usually ask for like wedding photos and -- so yeah. In my experience, they are -- they are harder when it comes to marriage, but of course, it depends on the nationality of the applicant, the spouse.

Q. Have you had any experience representing clients who have Mexican passports?
A. Mexican. Not -- not for a residence permit, no.
Q. Now could you explain what the difference is between a permanent residence permit and citizenship.
A. A citizenship allows you to become a citizen of Iceland. I believe -- I believe the process -- not the process, the -- the rights are permanent when you become a citizenship -- when you become a citizen. And for -- for the residence, the permit, residence permit, it is -- it is not much worse. But you don't need to apply every year when you have that, and it also can be the basis of Icelandic citizen.
Q. Do you know what the requirements are for -- withdrawn. Withdrawn.

In the event that a parent applies for residence based on children who have Icelandic citizenship, while that parent is awaiting receipt of the application being granted, can that parent work?

THE COURT: Can that parent what? I'm sorry.

MS. CHAWLA: Work. Work.

THE COURT: Work. Thank you.

A. It cannot work in the Icelandic market, but of course we can have salary from somewhere else.
Q. So they cannot -- I'm sorry. They cannot work in Iceland?
A. No. You need -- you need a special work permit to work in

Iceland, like to register as a worker in Iceland.
Q. So they would need to apply for something else in order to be able to work, which is the work permit.
A. Which is the work permit, mm-hmm.
Q. Do you know what specific requirements the Directorate of Immigration has with respect to Mexican citizens becoming residents, permanent residents of Iceland?
A. It depends on their basis of their application, on their ties to Iceland. If they don't have any ties to Iceland, then it's not the same process every time.
Q. Okay.
A. Each case is --
Q. So if someone was applying based on being the spouse of an Icelandic citizen, what requirements are there for a Mexican citizen to get permanent residence in Iceland?
A. To get the permit in Iceland, it would be, like I said before, three consecutive years of a residence permit, and also they have to show sufficient funds, they have to show -- the English word, I'm sorry -- they have to show that they haven't received any help from the government, like on the social services.
Q. Now what do you mean by sufficient funds?
A. Sufficient funds. It means you have to show -- like if you're -- if you're -- normally you are applying as -- for a -- for a permanent residence, so if you have -- you're working,

you're -- you're a valid citizen of the -- of the country, you have to show something you have funds to provide for yourself while you are here.

Q. Is there an amount that is set forth by the Directorate of Immigration as to what sufficient funds are required?

A. As an amount? Yeah, the Directorate of Immigration issues every year, like -- I cannot say for sure what it is at the moment, but it's changing.

Q. So if the spouse of an Icelandic citizen was not working, how would that impact their application process?

A. You mean not working in Iceland?

Q. Yes.

A. Yeah. It could affect it, but you can also still, if you're not working, you can also show that you have some money in the bank.

Q. But if you're not working, where would someone get money in the bank?

THE COURT: You don't have to answer that. That's argumentative.

Q. So would you agree that if the spouse of an Icelandic citizen wasn't working, it would be much harder for them to get permanent residence?

A. It could be a factor. It could be a factor, yes, it could. Other factors can also --

Q. Now turning to a foreign national applying for permanent

residence through parentage, does that person also need to show sufficient funds?
A. Yes, of course.
Q. And would that parent also need to apply for a work permit in order to be able to work?
A. I'm sorry. If you have a permanent residence permit, a permanent, you will not be --
Q. Applying for permanent residence permit.
A. If you're applying for a permanent residence, you don't need a work permit. You don't get the permit, work permit. It's just you have a work permit while you have a residence permit, and then you get the permit --
Q. Now isn't it true that -- isn't it true that an individual with a residence permit as a parent cannot work as an independent contractor or be self-employed pursuant to Article 63 of the Foreign Nationals Right to Work Act?
A. Yes, but you are talking about being independent and being with your own company in Iceland. I think you can work from wherever. You can get salary from wherever.
Q. But you could not work in Iceland.
A. Not for an Icelandic company, no, or as yourself for Icelandic, yeah.
Q. Now isn't it true that an applicant who has a residence permit based on family reunification cannot leave the country for more than three months a year?

A. Yes, that's true, if she wants to keep her permit.
Q. Do you know where the rest of Ms. Zarak's family lives?
A. I would probably have to talk about the documents.
Q. Okay. That's fine.
MS. CHAWLA: Your Honor, if I could just have one minute.
THE COURT: Sure.
(Pause)
MS. CHAWLA: Your Honor, I have no further questions of this witness. Thank you very much.
THE COURT: All right. Any follow-up, Mr. Glasser?
MR. GLASSER: Very briefly.
REDIRECT EXAMINATION
BY MR. GLASSER:
Q. A moment ago you testified about working in the Icelandic market. Do you recall that testimony?
A. Yes.
Q. What do you mean by Icelandic market?
A. If you're going to come here, work for an Icelandic company or work for a company based in Iceland, you're going to pay taxes here and you get a work permit in Iceland. That's what I was talking about. But of course I think like if -- sorry.
THE COURT: No, no. Go ahead.
A. If COVID has taught us anything, you can work from anywhere.

Q. So I would like you to assume that a foreign national has a company based in Mexico and the foreign national is in Iceland based on a residence permit issued because the foreign national has children in Iceland. Is that foreign national permitted to work in Iceland if the work relates to the company in Mexico?
A. Yes. Of course they have to pay taxes also, but yes.
Q. And would the foreign national be permitted to work in Iceland based on the company in Mexico if the foreign national did not have an Icelandic work permit?
MS. CHAWLA: Objection.
THE COURT: Overruled.
A. Can you repeat the question.
Q. Sure. Would a foreign national who is in Iceland based on a residence permit because she has children in Iceland be permitted to work for a Mexican company without an Icelandic work permit?
A. Yes, I -- yes.
MR. GLASSER: One moment.
(Pause)
MR. GLASSER: Nothing further, Judge.
THE COURT: All right. I just have two quick follow-up questions.
When you were discussing what sufficient funds are -- do you recall generally talking about that topic?
THE WITNESS: Yeah.

THE COURT: Can a foreign national who applies for a permit, a residence permit, include funds of the Icelandic spouse or does the issuing authority look only to the income of the applicant?

THE WITNESS: No. It also looks at the -- like their marriage; they have the joint obligations to provide for one another in Iceland, so they will look at the both.

THE COURT: Okay. And I just wanted to make sure I understood another point that I think you were making. Is it correct to say that once you get a permanent residence permit, you do not separately need a work permit?

THE WITNESS: Yes, that's true.

THE COURT: All right. Thank you.

All right. Thank you very much for your time. I know it's late for you.

THE WITNESS: Yes.

THE COURT: We appreciate your help.

THE WITNESS: No problem. I'm sorry about the technical issues.

THE COURT: No. It all worked once you dialed in. No problem.

So we have a little bit of business we need to deal with, so we'll excuse you, and thank you very much for your time.

THE WITNESS: Thank you. Good luck.

THE COURT: All right. You can log off. Thank you.

MR. GLASSER: Thank you.

MS. CHAWLA: Thank you.

THE COURT: Thank you very much.

(Witness excused)

THE COURT: All right. So it is about 5:40. I think we should conclude for the evening.

Tomorrow, what is the agenda? How much longer, Mr. Min, do you have to go with Mr. Schram?

MR. MIN: I have maybe about another hour. What time does your Honor --

THE COURT: Really?

MR. MIN: Yes, yes. I hope it's not longer than that. I mean, hopefully maybe 45 minutes.

THE COURT: I'm telling you right now, it better not be longer than that. You were told you had three days for the entire trial. Now I know this morning I got held over with the other matter, the emergency matter I had to deal with, but you've used up far more than half of the time, so you need to spend tonight figuring out how you move things along tomorrow. But assuming you finish with Mr. Schram, do you have any other witnesses?

MR. MIN: No, your Honor. And your Honor, I wanted to know what time your Honor planned to start proceedings tomorrow?

THE COURT: We'll get to that in a minute. That's why I'm trying to get the lay of the land for tomorrow. Are you resting then after Mr. Schram's cross and any redirect?

MR. MIN: Yes. But the only reason I brought that up is because opposing counsel made a request to take someone out of turn.

THE COURT: All right. We'll deal with it in a minute. Let me just ask the questions I want to ask.

Do you have any other evidence that you intend to offer or will you be resting?

MR. MIN: Resting.

THE COURT: So out of the four volumes of exhibits, you have offered into evidence the only documentary evidence --

MR. MIN: Oh, no. We have -- I mean, with the conclusion of petitioner's case on the petitioner's witness, we'll have further documents, and then we have documents --

THE COURT: I'm asking you, do you have any other evidence after you finish with Mr. Schram or are you going to rest, and you said that's it, you're going to rest.

MR. MIN: Yeah, perhaps I'm still confused but yes, with the rest of the testimony of Mr. Schram, we'll have further documents --

THE COURT: Oh, okay.

MR. MIN: -- and then we'll have his cross-examination, but after he's done as a witness, we will

not be -- we have no further witnesses and we have no further exhibits for direct.

THE COURT: Okay. Thank you. And then we will move to respondent's case.

MS. CHAWLA: Yes, your Honor.

THE COURT: Who are your witnesses for tomorrow?

MS. CHAWLA: So, your Honor, for tomorrow, we had coordinated with our expert, and she said that she would be available at our 10 a.m.

THE COURT: Okay.

MS. CHAWLA: For tomorrow, we also have lined up the American immigration attorney, whose name is Teresa Woods. And we had tentatively asked her to reserve some time at 11 a.m. because we wanted to keep things going as quickly as possible; and then we were trying to coordinate a fact witness for 12:00, or 12:30, whose name is Marijta -- it's M-A-R-I-J-T-A -- and then the --

THE COURT: Ratkovic?

MS. CHAWLA: That's correct, your Honor. And then we had --

THE COURT: Roughly how long do you think that witness will be?

MS. CHAWLA: I don't think more than half an hour.

THE COURT: Okay.

MS. CHAWLA: And then we finally got the signed

subpoena back from the clerk's office, and so depending on what time we start, we were either going to put Ms. Zarak on for the remainder of the day and then -- because we still have another two witnesses that we need to get through, your Honor.

THE COURT: All right. Look, I had told people that I blocked out three days. Obviously I ate half of today with the emergency matter that I had. So it's clear to the Court that we're going to spill over into Thursday. I'm not going to, obviously, shortchange you in terms of the opportunity to present your evidence in what is to me a very important case, so I would suggest tomorrow -- oh, I should just say, I'm going to work backwards and tell you -- let me just look at something.

Ms. Dempsey, maybe you can help me. What time is our matter tomorrow afternoon? 4:30? Okay.

All right. I have a criminal matter on at 4:30 tomorrow that I need to attend to. So I'm prepared to start whenever the parties would like to start in the morning to be as productive as we can be, bearing in mind that we need to conclude a bit before 4:30 so that I can turn to that criminal matter at 4:30. So roughly 4:00 would be good for me, if we can plan to finish by then.

So with all of that lined up, Mr. Min, what time do you want to start?

You're muted. I'm not --

MR. MIN: I'm happy to start before -- we had no objection to taking the Icelandic expert out of turn. I have no problem with starting before then with my witness, but I would have an objection to taking the 11:00 and the 12:00 out of turn so that we can try to move to cross to some extent. I understand with Icelandic experts, you know --

THE COURT: No, that's fair. That's fair. That's fair.

All right. Do the parties want to start at 9 or do you want to just begin with the expert witness at 10? I'll leave it up to the parties.

MR. MIN: I mean, I personally would rather start with the expert witness at 10 so that we can just finish with Mr. Schram, finish the direct, go to cross and kind of have that continue unimpeded, but --

THE COURT: All right. Give me one moment to just check on one other thing.

Okay. All right. I have to say, honestly, that my reaction is, it does make sense not to keep putting Mr. Schram -- and I'm sorry to use, sir, to be putting you on the stand and off and on and off. So I really do think it makes the most sense to begin with your Icelandic expert first thing tomorrow morning out of turn. That's agreed to by everyone, right? No objection to taking that witness out of turn?

MR. MIN: No objection, your Honor.

THE COURT: All right. And is 10:00 the earliest that witness can be available, given the time difference?

MS. CHAWLA: Yes, your Honor.

THE COURT: All right. Then we'll start at 10:00 tomorrow morning, ready to go at 10:00 with that witness dialed in and ready to go.

MS. CHAWLA: Yes.

THE COURT: And then we'll circle back to finish up your testimony, Mr. Schram, all right? Does that work for everyone?

MR. MIN: Yes, your Honor.

THE COURT: Is there anything else we should talk about before we break for the day?

MS. CHAWLA: Your Honor, just one quick question. Then I will have my other witnesses lined up for Thursday, so that that way we can --

THE COURT: I'm not saying don't have any other witnesses for tomorrow, because I don't think Mr. Schram is going to fill up the rest of the day.

MS. CHAWLA: We would put Ms. Zarak on.

THE COURT: All right. That's fine. That's up to you, entirely up to you.

Anything else from anyone?

MR. MIN: Yes, your Honor. I have one issue I just

wanted to confirm. I spoke with opposing counsel, and I had emailed with Ms. Dempsey earlier, but I just wanted to just confirm. We had pared down Petitioner's Exhibit 109 in order to save time, in order to save references to papers, to 25 pages, which I think will be more manageable and it will shorten sort of our testimony as well, and so we had emailed that, and we will be providing two courtesy copies to the Court tomorrow. Those 25 pages all come out of 109 and they should, subject to opposing counsel's review, deal with at least one of the objections that they had.

THE COURT: All right. Well, I guess we'll hear from -- Mr. Beyda, it will be back to you then at that point, right? We'll hear from you tomorrow on whether you have any objections to the exhibit as pared down.

MR. BEYDA: Yes. Thank you.

THE COURT: Okay? I mean, in fairness, he needs time to look at it. So you've already sent to Mr. Beyda what your condensed version looks like?

MR. MIN: Yes, a few hours ago.

THE COURT: Okay. All right. Then we'll see everyone at 10:00 tomorrow and we'll go from 10 until 4 with a very short break in the morning and in the afternoon and a lunch break around midday. But otherwise I'd like to press through tomorrow. All right?

MR. MIN: Thank you.

THE COURT: Thanks, everyone. Have a good night. And thank you very much to our court reporter. Thank you.

ALL COUNSEL: Thank you.

THE COURT: Good night, everyone.

ALL COUNSEL: Good night.

(Adjourned to October 6, 2021, at 10:00 a.m.)

INDEX OF EXAMINATION

Examination of: Page

ARNALDUR SCHRAM

Direct By Mr. Min . . . . . . . . . . . . . . . 165

INGA LILLÝ BRYNJOLFSDOTTIR

Direct By Mr. Glasser . . . . . . . . . . . . . 244

Cross By Ms. Chawla . . . . . . . . . . . . . . 277

Redirect By Mr. Glasser . . . . . . . . . . . . 286

PETITIONER EXHIBITS

Exhibit No. Received

"probably not" box . . . . . . . . . . . . . 217

44 . . . . . . . . . . . . . . . . . . . . . 239

104 . . . . . . . . . . . . . . . . . . . . . 229

114 . . . . . . . . . . . . . . . . . . . . . 208

117 . . . . . . . . . . . . . . . . . . . . . 236

118 . . . . . . . . . . . . . . . . . . . . . 237

122 . . . . . . . . . . . . . . . . . . . . . 193

P148 . . . . . . . . . . . . . . . . . . . . 201

RESPONDENT EXHIBITS

Exhibit No. Received

10 . . . . . . . . . . . . . . . . . . . . . 180

153 . . . . . . . . . . . . . . . . . . . . . 183