UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In the Matter of E.Z. and S.Z.

ARNALDUR SCHRAM,

Petitioner,

v. 21 Civ. 6524 (MKV)

TANIA ZARAK,

Respondent. Remote Bench Trial
------------------------------x

October 6, 2021
10:15 a.m.

Before:

HON. MARY KAY VYSKOCIL,

District Judge

APPEARANCES

BURGER GREEN & MIN LLP
Attorneys for Petitioner
BY: RICHARD MIN, ESQ.

GALLET DREYER & BERKEY, LLP
Attorneys for Petitioner
BY: KENNETH GLASSER, ESQ.

CHEMTOB MOSS FORMAN & BEYDA LLP
Attorneys for Respondent
BY: MICHAEL F. BEYDA, ESQ.
MUDITA CHAWLA, ESQ.

(Case called)

THE DEPUTY CLERK: Good morning, your Honor.

THE COURT: Good morning, Ms. Dempsey. Do you have all the appearances?

THE DEPUTY CLERK: Counsel, stating with petitioner, please state your name.

MR. GLASSER: Good morning, your Honor. Kevin Glasser. Good morning, counsel.

THE COURT: Good morning, Mr. Glasser.

MR. MIN: Richard Min on behalf of petitioner. Good morning, your Honor. Good morning, counsel.

THE COURT: Good morning, Mr. Min.

MS. CHAWLA: Mudita Chawla on behalf of the respondent. Good morning, your Honor. Good morning, counsel.

THE COURT: Good morning, Ms. Chawla.

MR. BEYDA: Good morning, your Honor. Michael Beyda on behalf of the respondent.

THE COURT: Good morning, Mr. Beyda.

I hope everyone is well this morning.

MS. CHAWLA: Yes. Thank you, your Honor.

THE COURT: All right. Are we ready to proceed?

MS. CHAWLA: Yes, we are, your Honor.

THE COURT: All right. I think our agreement was that we were going to allow the respondent to call out of turn her expert witness; is that correct?

MS. CHAWLA: Yes.

MR. GLASSER: Yes, your Honor.

THE COURT: And Ms. Chawla, you're taking the lead with this witness?

MS. CHAWLA: I am, your Honor.

THE COURT: All right. Would you call your witness, then, please.

MS. CHAWLA: Your Honor, on behalf of respondent, I call Arndís Gunnarsdóttir. I am so sorry for mispronouncing your name.

THE COURT: Good morning, ma'am. Would you please raise your right hand.

Ms. Dempsey, would you swear the witness.

THE DEPUTY CLERK: Yes, your Honor.

THE COURT: Thank you.

(Witness sworn)

THE DEPUTY CLERK: Thank you. Will you please state and spell your name for the record.

THE WITNESS: My full name is Arndís Anna Kristínardóttir Gunnarsdóttir, and the last name is spelled K-R-I-S-T-I-N-A-R-D-O-T-T-I-R, G-U-N-N-A-R-S-D-O-T-T-I-R.

THE COURT: All right. First of all, good morning to our court reporter.

(Discussion off the record)

THE COURT: I'm having a little trouble hearing, so if

it's possible for you to keep your voice up, or to turn up the volume on your computer or whatever is your device, that will be helpful. Thank you.

Ms. Chawla.

ARNDÍS ANNA KRISTÍNARDÓTTIR GUNNARSDÓTTIR,

called as a witness by the Respondent,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. CHAWLA:

Q. Good morning. What is your occupation?

A. My current occupation is I'm an independently working attorney and a newly elected member of the Icelandic Parliament.

Q. And what licenses or qualifications, if any, do you hold?

A. I hold general license degree in law from Iceland and specialization master's from Belgium.

THE COURT: Did you say from Belgium? Is that what you said, ma'am?

THE WITNESS: Yes.

THE COURT: Okay. I still am having a little bit of trouble hearing. So I don't know if you can keep your voice up a little bit. That would be helpful.

I also have a question for counsel. Is there a stipulation with respect to expertise with regard to this witness as well?

MR. GLASSER: Yes, your Honor.

MS. CHAWLA: There is, your Honor, and I just wanted you to get a little bit of information about --

THE COURT: That's fine.

MS. CHAWLA: Thank you. And I'll be very quick.

THE COURT: No, that's fine. I just wanted to know for certain. Thank you.

BY MS. CHAWLA:

Q. Ms. Gunnarsdóttir, could you please tell the Court very briefly what your professional experience is with immigration law in Iceland.

A. Yes. I am specialized in immigration and asylum law. I have been working specifically in immigration since 2009 as an independently working attorney, as an attorney in a law firm also; and from 2014 until 2020, I was working full time with the Icelandic Red Cross, giving legal assistance and representation to asylum seekers, applicants for international defection in Iceland. I also worked at the Icelandic Ministry of the Interior and Human Rights -- this was in 2012 -- as a -- the legal expert, the only legal expert of the Ministry in immigration matters. Yeah.

Q. In what forums do you represent your clients?

A. I represent my clients before the Directorate of Immigration, which is the lowest administrative authority in immigration matters; the Immigration and Asylum Appeals Board,

which is the second, the upper and final administrative level; and I have a license to -- to litigate in district court.

Q. Have you published any -- have you been published in any legal journals?

A. Yes, I have a few published articles in peer-reviewed legal journals, all relating to immigration matters.

Q. What is your first language?

A. My first language is Icelandic.

Q. And do you speak any other languages? Obviously English.

A. I speak fluent English, Italian, and French, as well as Icelandic.

MS. CHAWLA: Your Honor, I know that the parties' expert reports were entered in for ID only, but Ms. Gunnarsdóttir's CV is attached to Respondent's 180, and I wanted to check with opposing counsel if they oppose that going in.

MR. GLASSER: I do object. We stipulated to the witness's expertise.

THE COURT: Ms. Chawla, for what purpose do you want it admitted, given the stipulation?

MS. CHAWLA: Just so that it's part of the record, but if there's no issue with that, then that's fine. I would have agreed to their expert's résumé going in as well, your Honor, but I'll move on.

THE COURT: Does that change your thinking,

Mr. Glasser?

MR. GLASSER: Can I have a moment, please?

THE COURT: Sure. Obviously if I receive one CV, I'll receive them both.

(Pause)

THE COURT: Mr. Glasser, I don't know if you were speaking, but you didn't come through.

MR. GLASSER: I maintain our objection with respect to the CVs.

THE COURT: All right. I don't need the CVs. You've both qualified your experts.

MS. CHAWLA: Your Honor, I'll get to the heart of the matter.

BY MS. CHAWLA:

Q. For the following questions, please assume that a foreign national is married to an Icelandic citizen. Can you please explain to the Court what options a foreign national would have with respect to filing for a residence permit in Iceland.

A. The main -- the main resident permit that would be applicable to the person in that situation would be the residence permit intended for the spouse of an Icelander or a foreigner with a residence permit in Iceland.

Q. And what Icelandic laws address this application?

A. It is mainly the Foreign Nationals Act, No. 80 from 2016, and the foreign -- Foreigners Right to Work Act as well.

Q. And is there any time limitation with respect to an application for resident permit as a spouse?

MR. GLASSER: Objection.

THE COURT: What's the objection?

MR. GLASSER: Time, time limitation for what? Object to the form.

MS. CHAWLA: I'll rephrase the question, your Honor.

THE COURT: All right. Thank you.

BY MS. CHAWLA:

Q. Is there a durational limitation on a resident permit, when a foreign national applies as a spouse?

A. Yes. There is -- such a permit can only be issued for one and maximum two years at a time.

Q. And how does one apply for a permit for two years?

A. By applying for residence permit for two years; by stating two years as the requested time of residence in the application.

Q. Now in your experience, in your experience, do you know of cases where a foreign national who is married to an Icelandic citizen has applied for a two-year permit?

MR. GLASSER: I'm sorry, Judge. I did not hear that question. There's a terrible echo that we're experiencing.

(Discussion off the record)

(Question read)

A. Yes.

Q. And are those permits granted?

MR. GLASSER: Objection.

THE COURT: Sustained.

Q. Do you know of any cases where a foreign national who's married to an Icelandic citizen has received a two-year permit?

MR. GLASSER: Objection.

THE COURT: Just yes or no.

A. Yes, I do.

THE COURT: That's fine. Thank you.

Q. Do you know how long the Directorate of Immigration takes to process resident permit applications?

A. It depends on the type of application, the type of permit requested. This type of permit, it would take a minimum, absolute minimum, of three months. It can -- it can go up to even six to twelve months, depending on -- on the specific application.

Q. Do you know how long the Directorate of Immigration was taking to process applications in January of 2021?

MR. GLASSER: Objection.

A. I don't -- I don't know exactly.

THE COURT: Sustained. Sustained. It's too broad. You need to be more specific.

Q. Do you know how long the Directorate of Immigration was taking to process resident permit applications with respect to foreign nationals who were applying based on having an

Icelandic spouse, in January 2021?
A. I don't have the exact average time, but in my experience, around six months.
THE COURT: You've answered. You've answered.
Q. Now if a foreign national who was married to an Icelandic citizen gets a divorce from the Icelandic citizen while the application is pending, does that impact the residence permit application in any way?
A. Yes, it can impact the application.
Q. And could you please explain to the Court how.
A. It would definitely create some complications and extend the processing time and possibly lead to a denial of the application.
Q. Would that be the case if a divorce is pending between the parties as well?
A. I would say there's a risk of that, yes.
Q. Now when a foreign national is divorced from an Icelandic citizen at the time that the residence permit expires, does that impact the foreign national's ability to apply for a renewal of the residence permit?
A. Definitely, yes. It will again create complications -- sorry.
Q. No. I'm sorry. I didn't mean to cut you off. Please continue.
A. It would create complications, extending the processing

time, and probably lead to a denial of the renewal.
Q. And what impact does having a divorce pending have on that foreign national's ability to apply for a renewal of the resident permit?
A. It would -- as I said, it would mainly extend the processing time, as it would create complications; the Directorate of Immigration would -- would probably request more information, and it could lead to a denial of the renewal.
Q. And in the event that an Icelandic citizen -- withdrawn.
In the event that a foreign national applies for a resident permit on the basis of being married to an Icelandic citizen, what is that foreign national's immigration status while the application is pending?
A. I'm sorry. Could you please repeat the question.
Q. In the event that a foreign national applies for a resident permit based on being married to an Icelandic citizen, what is that foreign national's status while the application is pending?
A. The Directorate of Immigration, which processes the application, has the right to compare information to -- the information, the personal information of applicant to the information in the National Registry and the -- it would -- it would possibly impact the -- the application procedure in the same way.
Q. Can a foreign national remain in Iceland while an

application for a permit is pending?
A. As a spouse, generally, they can, yes.
Q. Are there any restrictions on a foreign national who applies for a residence permit based on being a spouse of an Icelandic citizen?
MR. GLASSER: Objection.
THE COURT: What's the objection?
MR. GLASSER: "Restrictions" is a very broad term. Is there a way that we can narrow it down.
THE COURT: No. Overruled. The witness will deal with it as best she can. And if she can't, she'll tell us.
Go ahead. I'm sorry.
A. Could you please repeat the question.
MS. CHAWLA: Madam Court Reporter, could I ask you to read back the question, please.
(Record read)
A. I am so sorry. I'm not sure I understand -- understand the question very well.
THE COURT: Thank you.
A. The restrictions as in further conditions?
THE COURT: We'll ask the counsel to rephrase or to ask another question.
MS. CHAWLA: I will ask another question.
THE COURT: Thank you.
BY MS. CHAWLA:

Q. While a foreign national is waiting for an application to be granted or denied by the immigration -- I'm sorry -- by the Directorate, can the foreign national work in Iceland?
A. No. Well, as a spouse, yes. I'm so sorry. There are two permits in my head at the moment. As a spouse, they can -- they can work.
Q. Do they need to get any additional documentation?
A. To be able to work?
Q. Yes.
A. They need to apply for a kennitala. It is an Icelandic Social Security number, but it's not considered as private information as in many countries. We use it a lot.
Q. Can you explain to the Court what the difference is between the kennitala and the residence permit.
A. The kennitala is basically just a registration number that doesn't grant any -- any rights in itself. It is granted after the right to reside in the country has been granted. The -- it doesn't have any effect in itself. The -- to legally reside in Iceland, a foreign citizen needs to have a residence permit.
Q. Now are there any conditions on a foreign national who has applied for a resident permit based on being the spouse of an Icelandic citizen while the foreign national is awaiting confirmation or denial of the residence permit?
A. I'm not -- I'm not sure I understand the question.
Q. If a foreign national who has applied for Icelandic -- who

is married to an Icelandic citizen and applies for a residence permit, does having the kennitala obviate the need for them to apply for a renewal in the event that the residence permit expires?

A. The kennitala doesn't grant any rights in itself. A person, when they are -- if they're granted a residence permit, they are given a kennitala, and when their residence permit expires, they -- they still -- the kennitala still exists, and if it's -- if the residence permit is renewed, they will keep the same kennitala, but it doesn't grant any rights. So the -- the residence permit still is -- it expires when it expires, and the kennitala is just a number that doesn't grant any individual rights.

THE COURT: Is it basically just an ID number?

THE WITNESS: Basically, yes.

THE COURT: I'm sorry?

THE WITNESS: Yes.

THE COURT: Thank you.

Q. Now in the event that a foreign national is divorced from an Icelandic citizen and they have children in common, what options are there for that foreign national to apply for a residence permit?

A. They can apply for residence permit as the parent of -- of children that are Icelandic citizens.

Q. And are there any requirements in order for a foreign

national to be able to do this?
A. Yes. Yes. There are requirements. It depends on whether the -- the parent are living with the children or not. For a parent to -- who is divorced from the parent -- first of all, they need to be separated or divorced from the other parent, which also creates complications when switching between two types of permits. They need to --

I'm sorry. Can I -- can I just -- I'm a little bit -- I'm a little bit stressed here. I've never done this before. Can I -- would you allow me to read from the law in English so that I can -- so that I can give it correctly?

THE COURT: You want to look at the law while you're testifying; is that what you're asking?

THE WITNESS: Yes.

THE COURT: Well, you just need to make it clear that that's what you're doing, that you're not testifying from your own knowledge. If you're unable to -- why don't we do it this way. I'd prefer to have the question asked, and then you can tell me, I can't answer without looking at the law, and then you can look at the law.

MS. CHAWLA: Your Honor, I could also ask if there would be something that would refresh counsel's recollection.

THE COURT: She's already told us what would refresh her recollection, but yes, you can do that. So ask the question.

THE WITNESS: It would be enough just to have a few moments, just a -- just a few seconds.

MS. CHAWLA: Your Honor, would you like me to ask the question again?

THE COURT: I think the witness probably needs it back, right?

BY MS. CHAWLA:

Q. Are there any --

THE WITNESS: No, I know the question. Yeah, I'm sorry.

Q. I'm sorry. I didn't mean to interrupt you.

A. Sorry. Yes. Well, I believe I -- I know what the question is, but you can repeat it, of course.

Q. Are there any requirements for a foreign national to be able to --

I'm sorry. Withdrawn.

MS. CHAWLA: Madam Court Reporter, would you mind reading back the question, please. I apologize.

(Record read)

A. Yes, there are requirements.

Q. And could you please explain to --

A. Sorry?

Q. And what are those requirements?

A. The requirements are, first of all, that -- that the parent has custody of the children and either the -- the parent is

intending to live with the minor or not. If they are not intending to live with the minor, if they have visitation rights. They need to be separated from the parent, they need to have a written and confirmed contract on the visitation rights, and they need to have been legally residing in Iceland when the application is made, and that they don't have -- that they don't have the option for another type of -- of residence permit, that they had a -- that they cannot continue with the residence permit that they had before -- for example, if they had a -- a permit based on specialized skill occupation, a different type of permit, yes. And, yeah, these are the requirements.

Q. Now you said that there were two tracks, one where the parent lives with the minor and one where the parent doesn't live with the minor. On either of those tracks is the foreign national able to reside in Iceland while they're pending the approval or denial of the residence permit?

A. There is a -- the general rule is that you need to apply for a residence permit before coming to Iceland, so the general rule is that you have to leave the country, if you apply for a different type of permit. There are exceptions to this, and this exception needs to be granted by the Directorate of Immigration. This is -- this is actually the rule that is most problematic for my clients, in my experience, because the Directorate of Immigration often, even generally, does not

answer these requests, so -- a request for the exception to be able to reside in Iceland during the processing of the application. So if the permit is about to expire, the permit that they had before, or there is any doubt about them having another -- other legal grounds to stay in Iceland, they often have to risk being illegally staying just waiting for the -- for the exception to be granted by the Directorate of Immigration, which is basically granted afterwards, so it is -- it is a bit complicated situation.

Q. And in that scenario, in the event that the exception is not granted, what happens to the foreign national, if that foreign national --

A. They have -- it means that they have been illegally staying in Iceland from the time when their previous residence permit or grounds for staying in Iceland expires.

Q. Now under what circumstances can a foreign national work in Iceland?

A. Either -- either they are exempt from the requirement of the work permit or they need to have a work permit.

Q. Is there any requirement in the Icelandic law that the foreign national have sufficient funds to support themselves?

A. Yes. To be granted a residence permit, the person needs to show they have sufficient funds for the entirety of the duration of the -- of the permit.

Q. What is a residence permit based on family reunification?

A. That is a residence permit, for example, for a spouse, the parent of a minor, or -- yeah, these are the main permits based on family reunification.
Q. And are there any conditions on the foreign national who applies for residence permit based on family reunification?
A. I -- I don't understand the question. Could you please repeat it.
Q. Sure. If a foreign -- in the event that a foreign national applies for a residence permit based on family reunification, can that foreign national work in Iceland?
A. A spouse is allowed to work, but basically a spouse of an Icelandic citizen is exempt from the requirement of the work permit; the parent of a minor residing in Iceland is not. So the -- for it to be granted, a residence permit as the parent of a minor in Iceland, you need to have -- you need to apply separately for a work permit, and a work permit will not be granted until the residence permit has been granted.
Q. Now in your expert opinion would you say that a foreign parent who is divorced from her Icelandic spouse is on equal footing with that Icelandic spouse if the family are in Iceland?
MR. GLASSER: Objection.
THE COURT: Sustained.
Q. In your opinion is a foreign parent who is divorced from an Icelandic citizen on equal footing with that Icelandic citizen?

MR. GLASSER: Objection.

THE COURT: That's the same question. Objection sustained.

MS. CHAWLA: Your Honor, if I could have just a minute?

THE COURT: Yes.

(Pause)

MS. CHAWLA: I have one final question, your Honor.

BY MS. CHAWLA:

Q. Are there any differences in how -- withdrawn.

Is a foreign national treated the same way as an Icelandic citizen with respect to parenting in Iceland?

MR. GLASSER: Objection.

THE COURT: Give me a moment, please.

It's awfully vague and overbroad, but are you able to deal with the question as framed; the witness?

THE WITNESS: I would need context.

THE COURT: Yeah.

THE WITNESS: In what context.

BY MS. CHAWLA:

Q. In the event that there is a foreign national who is divorced from an Icelandic citizen and the parties are in an Icelandic court over a dispute concerning the children, are the parties treated equally, in your experience?

MR. GLASSER: Objection.

THE COURT: Hold on.

Sustained.

MS. CHAWLA: Your Honor, I have no further questions for this witness.

THE COURT: All right. Thank you.

Cross?

MR. GLASSER: Thank you, your Honor.

May I inquire?

THE COURT: Yes. Thank you.

CROSS EXAMINATION

BY MR. GLASSER:

Q. Good afternoon.

A. Good afternoon.

Q. You testified on your direct that you have provided legal assistance for individuals seeking international protection, asylum seekers, correct?

A. Yes, that's my main expertise, yes.

Q. And that is your main expertise, correct?

A. Yes, and other immigration matters, yes.

Q. And to your knowledge Tania Zarak did not apply for a residence permit based on international protection grounds, correct?

A. I'm sorry. I can't hear you very well. Could you please repeat the question.

Q. Sure. It is your understanding that Tania Zarak did not

apply for a residence permit based on international protection grounds, correct?
A. Absolutely, yes, of course.
Q. And it is your understanding that Tania Zarak did not apply for an Icelandic residence permit based on humanitarian grounds, correct?
A. Correct.

MS. CHAWLA: Your Honor, I'm going to object. There's a stipulation as to Ms. Zarak's application for the Icelandic permit.

THE COURT: No. I'm going to allow it. We'll see how far this goes, but for now I'm going to allow it.

Q. And you would agree with me, counsel, that there are different criteria that the Directorate of Immigration considers regarding resident permit applications based on international protection grounds and residence applications based on spouse of an Icelandic citizen, correct?
A. I feel that my expertise on other types of residence permit immigration matters is being doubted, and that is not the case. I have worked -- I also work with people who apply for different types of residence permits, not only --

THE COURT: I'm sorry. Nobody is doubting your expertise. The parties have stipulated to your expertise. He simply asked you a question about is the criteria different depending on whether you're applying for --

THE WITNESS: Yes, it's very different.

THE COURT: -- a residence permit or for international protection allowance.

THE WITNESS: International -- yes, international protection is, in its essence, a residence permit, but yes, there are very, very different criteria.

MR. GLASSER: Thank you.

THE COURT: Thank you, ma'am.

BY MR. GLASSER:

Q. Now you also mentioned on your direct testimony that a spouse of an Icelandic citizen would be permitted to work in Iceland without a work permit, correct?

A. Yes.

Q. And can you please tell the Court what you mean by working in Iceland.

MS. CHAWLA: Objection, your Honor. I don't understand the question.

MR. GLASSER: I'm sorry, Judge. We can't hear you.

MS. CHAWLA: We can't hear you, your Honor.

THE COURT: All right. Are you able to hear the Court at this point?

MS. CHAWLA: Yes, we are, your Honor.

MR. GLASSER: Yes, Judge.

THE COURT: All right. So the last question that was asked, and the answer, and then there was another question

apparently with an objection, I only know that because I can see it on the realtime. I was not able to hear any of that. So Mr. Glasser, do you want to frame your last question and then I'll --

MR. GLASSER: I will withdraw my last question and start again.

THE COURT: Okay. Thank you. Thank you very much.

BY MR. GLASSER:

Q. On your direct testimony you testified that there are certain conditions where a person would not be permitted to work in Iceland. Do you recall that testimony?

A. Yes.

Q. And can you please describe what you mean when you testified that a person would not be permitted to work in Iceland. What does it mean to work in Iceland?

MS. CHAWLA: Objection.

THE COURT: Are you able to answer?

THE WITNESS: Yes, I think so.

THE COURT: Okay. You may do so. The objection is overruled.

A. To -- to be able to work in Iceland, basically that would mean either by a contract with -- with a company as an employee or as an independent contractor. You can do either.

Q. And when you say with a company, so are you referring to working for an Icelandic company in Iceland?

A. Generally, yes.
Q. Okay. And when you say as a -- so you mentioned self -- independent contractor, somebody who's self-employed?
A. Self-employed, yes. It's also -- you're not allowed to work in Iceland as self-employed unless you are exempt from the requirement of a work permit. Even with a work permit, you cannot work as a self-employed or independent contractor.
Q. So if a foreign national has a work permit, is it fair to say that the work permit would permit that foreign national to work for an Icelandic company in Iceland?
A. Or a foreign company in Iceland.
Q. And somebody without a work permit, is it your testimony that a foreign national without a work permit would not be permitted to work for a foreign company in Iceland?
A. Correct.
Q. So if a foreign national -- it's your testimony that if a foreign national is employed by a New York company, that person would not be permitted to work for that New York company in Iceland; is that your testimony?
A. It's a bit complicated if people are not residing in Iceland.
Q. Okay. So for my first question I would like you to assume the following facts: a foreign national resides in Iceland; and the foreign national has a valid residence permit in Iceland. Would that foreign national be permitted to work in Iceland if

the employer is a New York-based company?
A. I can't answer the question.
Q. And you also testified on --
THE COURT: I'm sorry. I'm sorry. Hold on, Mr. Glasser.
When you say, "I can't answer the question," does that mean you don't know or there's something about the question that makes you unable to answer?
THE WITNESS: Whether the person is -- yeah, it's a little bit of both.
THE COURT: Okay. Thank you.
All right. Mr. Glasser, go ahead.
BY MR. GLASSER:
Q. Now you also -- do you recall on your direct testimony you were asked questions about a parent who would like to obtain a permit based on their children residing in Iceland? Do you recall that line of questions that Ms. Chawla asked you?
A. I'm sorry. I didn't get the question.
THE COURT: Just frame a question.
Q. During your direct testimony did you refer -- you mentioned on your direct testimony that you needed to refer to the law to answer a series of questions. Do you recall that?
A. No.
Q. So during your direct testimony did you testify that you needed to read the law in order to answer certain questions

that Ms. Chawla had asked you?
A. No, that was not my final answer. No.
Q. Well, my question is: Do you recall, did you give testimony that you needed to refer to -- I'm not asking you right now whether you referred to the law or not, but do you recall answering a question with an answer that said you needed to refer to the law in order to answer questions about visitation rights?
A. No.
Q. I'm sorry. Not visitation rights. Permit based on parenthood.
A. No, that was not my answer.
Q. Okay. Well, did you refer to anything during your testimony, any law during your testimony by answering the questions about applying for a resident permit based on children residing in Iceland?
A. Did I refer to the law? No. I just needed a moment to recall it because I'm -- I'm -- I'm under pressure here, and I asked if I could check the law. And I didn't have to do it because I just had 10 seconds and I --
Q. That's all right. I just wanted to know if you checked the law.

What law would you be referring to -- withdrawn.

What law would you need to check with respect to those series of questions that were asked about a parent seeking a

residence permit based on parenthood?

MS. CHAWLA: Objection, your Honor. She said she didn't need to check it.

THE COURT: The form objection is sustained. It mischaracterizes what she said.

Q. What law governs residence permits of parents of Icelandic children who reside in Iceland?

A. It is the Act on Foreigners, No. 80/2016.

Q. And what section or article governs resident permits based on parents of children residing in Iceland?

A. 71, if I'm not mistaken. Article 71, if I'm not mistaken.

Q. Article 71, not of the Foreign Nationals Act.

A. Sorry?

Q. It's Article 71 of the Foreign Relations Act?

A. Of the -- the Act on Foreign --

(Unintelligible cross-talk)

THE COURT: What act, ma'am? I think he misheard you. What act?

THE WITNESS: The Foreign Nationals Act, No. 80/2016.

THE COURT: Thank you.

Q. What is Icelandic system identification number?

A. What is it? I'm sorry. I didn't hear you.

Q. Yes. What is an Icelandic system ID?

A. It's a -- it's a system ID. I'm not sure -- I'm sorry. I don't understand the question.

Q. So are you familiar with an Icelandic system identification number?
A. Yes, kennitala.
Q. Oh, so it's the same thing as a kennitala number.
A. Yes.
Q. Are you familiar with the process to register as a domicile of Iceland?
A. Sorry?
MS. CHAWLA: Objection, your Honor. It's beyond the scope.
THE COURT: No. It's fine.
Q. Are you familiar with the process to register as a domicile of Iceland?
A. No.
Q. Now you also testified that -- withdrawn.
For the following question, I'd like you to assume the following facts: a foreigner is in Iceland with a valid residence permit based on being a spouse of an Icelandic citizen; prior to the expiration of that residence permit, the parties get -- the foreign national and the Icelandic citizen get divorced; I would like you to further assume that there are Icelandic children who reside in Iceland; and I would like to you further assume that the foreign national seeks a residence permit based on parenthood. Would the foreign national be permitted to remain in Iceland while the application is

pending?
A. An exception can be granted by the Directorate of Immigration.
Q. And in the event that the exception is not granted, the foreign national can appeal that determination, correct?
A. Correct.
Q. And during the processing of the appeal, the foreign national would be permitted to remain in Iceland, correct?
A. No.
Q. Could you please tell me where in the Foreign Nationals Act the rules regarding the exception can be found.
A. It's in the -- I don't recall exactly where it is in the act. Are you asking for the number of the provision?
Q. Yes.
A. I would need to look to the law to give you that exact number of the provision.
Q. Isn't it also true that the Directorate of Immigration can institute withdrawal proceedings of a residence permit holder who has a permit based on being a spouse of an Icelandic citizen in the event the foreign national gets divorced from the Icelandic citizen?
A. They can do that, yes.
Q. And in the event the Directorate of Immigration institutes withdrawal proceedings, the foreign national would be notified of the withdrawal proceedings, correct?

A. Yes, yes, correct.
Q. And the foreign national has 30 days from the date of the notification to object to the withdrawal proceedings, correct?
A. Not -- it's not always the same. Yes, yes. They would have time to -- to object.
Q. And the foreign national would also be able to seek an extension to submit objections to the withdrawal proceedings, correct?
A. They could seek extension. It is not automatically granted.
Q. But they can request an extension, correct?
A. They can request that, but it's not always granted, yes.
Q. And if the withdrawal proceedings -- withdrawn.
If the Directorate of Immigration withdraws the permit, a foreign national has a right to appeal that decision, correct?
A. Correct.
Q. During the -- withdrawn.
Is it also true that the foreign national will remain in Iceland during the pendency of the withdrawal proceedings?
A. Correct.
Q. And the foreign national can remain in Iceland during the appeal of the withdrawal proceedings, correct?
A. Correct.
Q. And is it also true that if the Directorate of Immigration

were to institute withdrawal proceedings based on a divorce, assuming that the residence permit is based on the spouse of an Icelandic citizen, then the foreign national could apply for a different permit during the withdrawal proceedings; isn't that true?

A. The application would not be processed until the end of the withdrawal proceeding.

Q. But if the application --

A. Not proceeding; withdrawal process.

Q. But the application for a residence permit based on different grounds would be considered pending, correct?

A. Not necessarily, no.

Q. And you would also agree with me that it is true that a first-time resident permit application for spouse of an Icelandic citizen is generally only granted for one year, correct?

A. Generally, yes.

MR. GLASSER: Could I just have a moment, Judge.

THE COURT: Sure.

(Pause)

Q. What is the National Registry?

A. Sorry. You asked what is it?

Q. Yes.

A. It is the government entity that -- it has -- everyone is registered, the whole nation is registered, and generally

issues the kennitala and -- yes, I'm not sure what -- how extensive the answer should be.

Q. Are temporary visitors to Iceland required to register with the National Registry?

MS. CHAWLA: Objection. Beyond the scope, your Honor.

THE COURT: I'm going to allow it.

Q. Are temporary visitors --

A. Could you repeat the question, please.

Q. Are temporary visitors to Iceland required to register with the National Registry?

A. Absolutely.

Q. Can you please explain the purpose of children having kennitala numbers.

A. Sorry?

Q. Would you please explain the purpose of children having kennitala numbers.

A. The purpose. The purpose is the same as for everyone else. You basically cannot do anything in Iceland without the kennitala. To -- to register the child anywhere in -- in preschool or for just a summer course or whatever, to get a book from the library, you need the kennitala.

Q. In connection with your work in this case, have you reviewed the application that Tania Zarak submitted in connection with her residence permit?

MS. CHAWLA: Objection.

THE COURT: Grounds?

MS. CHAWLA: A hearsay document to --

THE COURT: No, he just asked if she reviewed it. It's a yes or no question. We haven't gotten to the document yet.

A. No.

Q. So apart from any conversations that you've had with Ms. Zarak's lawyers, do you have any understanding as to how long Ms. Zarak applied for a resident permit?

A. I'm sorry. I don't understand the question.

Q. Other than conversations that you've had with Ms. Zarak's lawyers, do you have any knowledge of how long Ms. Zarak applied for a residence permit in Iceland?

MS. CHAWLA: Objection.

THE COURT: Grounds?

MS. CHAWLA: To the form.

THE COURT: Do you understand the question?

THE WITNESS: I understand it as the same question, did I read the application. No, I didn't.

THE COURT: No. He's saying, do you have any other basis for knowing, other than perhaps what her lawyers might have potentially told you?

THE WITNESS: It is mentioned in other documents that I did review in the --

THE COURT: But only from documents, in other words.

THE WITNESS: Yes.

THE COURT: Thank you.

BY MR. GLASSER:

Q. And can you tell me what documents you reviewed. And the only reason I'm asking is because in your report -- withdrawn.

Can you tell me what other documents you reviewed.

MS. CHAWLA: Objection.

THE COURT: Grounds?

MS. CHAWLA: Again, it's getting into hearsay.

THE COURT: All right. It's not hearsay, but the reports did not come into evidence. I believe we had this same issue yesterday, what documents were looked at, etc. We did not get into it, so I'm going to cut off this line of questioning. I've told you already that the reports are not in evidence. You were free to question the witnesses about their opinions in those reports when you called your witnesses as part of your respective cases in chief. I don't know if you've done that or not, but expertise of the witnesses has been stipulated to, so I don't really know where you're going with this, but --

MR. GLASSER: I just would like to know --

THE COURT: -- I don't think it's proper.

MR. GLASSER: I would just like to know the basis for some of the testimony, but I withdraw the question, Judge. I hear you.

THE COURT: I don't believe the basis for any -- let me just ask a question in that regard.

Ma'am, all the testimony you've given, has it been based on any documents that you reviewed in connection with this case?

THE WITNESS: Yes, I've reviewed some of the documents. I didn't have time to read all of them, but yes, I did read some of the documents.

THE COURT: That's not the question I'm asking you. You've testified a lot today in response to questions about residence permits and the process in Iceland, etc. Is any of your testimony based on documents about this case that you've reviewed, or was it based on your personal experience as a lawyer handling these types of matters?

THE WITNESS: It's mainly based on my personal experience in this field.

THE COURT: That was the Court's sense, Mr. Glasser. Do you have any other questions?

MR. GLASSER: One second, please.

(Pause)

MR. GLASSER: No, Judge. I have nothing further.

THE COURT: All right. Thank you.

Is there any redirect, Ms. Chawla?

MS. CHAWLA: Just very quickly, your Honor.

REDIRECT EXAMINATION
BY MS. CHAWLA:
Q. In the event that there are withdrawal proceedings instituted against a foreign national, isn't it true that the foreign national needs to leave Iceland?
A. Not during the -- the proceedings, no; not until a decision is made.
Q. And in the event that the decision is that the foreign national cannot stay in Iceland, then the foreign national must leave Iceland, correct?
A. Yes.
Q. And in the event that the foreign national continues to stay in Iceland, what is the foreign national subject to?
A. They --
MR. GLASSER: Objection.
THE COURT: Hold on. Hold on.
Is there an objection?
MR. GLASSER: I said objection.
THE COURT: Grounds?
MR. GLASSER: Calls for speculation. It's overly broad.
THE COURT: No. Overruled.
Are you able to answer what the penalty is or what the consequence is if a foreign national continues to stay after there's a decision that they have to leave?

THE WITNESS: Yes. If they are staying in Iceland without a valid residence permit, they are illegally staying and this can lead to expulsion with -- with a re-entry ban.

BY MS. CHAWLA:

Q. So you said that residence permits are generally granted for one year. Have you had experience with residence permits being granted for two years?

A. Yes.

MR. GLASSER: Objection. Asked and answered.

THE COURT: No. And we have her answer.

Q. Now in the event that a foreign national is denied a residence permit and they appeal the process, are they able to remain in Iceland during the appeal?

A. It depends on many, many facts, many circumstances in the case.

Q. Could you --

A. I couldn't answer yes or no in general.

Q. Could you tell us in what circumstances a foreign national cannot remain in Iceland during the appeal process.

A. For example, if the application is -- if an application is denied on the grounds that it is obviously to be denied, then people are not allowed to stay during the appeals procedure.

MS. CHAWLA: Thank you, your Honor. I don't have any further questions for this witness.

THE COURT: All right. Thank you.

Anything further, Mr. Glasser?

MR. GLASSER: No, Judge.

THE COURT: All right. Thank you, ma'am. Thank you very much for being with us. We appreciate your testimony to help us sort through the issues in this case. I wish you a good evening, I guess, right?

THE WITNESS: Yes. It's afternoon here. Thank you as well.

THE COURT: Thank you.

THE WITNESS: Thank you as well. Have a nice day.

MS. CHAWLA: Thank you.

THE COURT: Thank you.

(Witness excused)

THE COURT: This might be a logical point for us to take a brief break, and then when we come back then, we're back to Mr. Schram being on the stand, correct?

MS. CHAWLA: Correct.

THE COURT: Mr. Min --

MR. MIN: Yes, your Honor.

THE COURT: -- is that correct?

MR. MIN: Yes, your Honor.

THE COURT: All right. Thank you.

All right. So it is now 11:20. Let's take a break until 11:30. When we resume, I would like for us to march through to finish up as much as we can of Mr. Schram, certainly

your direct, all right?

We'll stand in recess then till 11:30. Thank you.

MS. CHAWLA: Thank you, your Honor.

(Recess)

THE COURT: All right. Mr. Min, we're resuming the testimony of Mr. Schram?

MR. MIN: Yes, your Honor. May I proceed?

THE COURT: All right, sir. Hold on.

Sir, you remain under oath, Mr. Schram. Do you understand that?

THE WITNESS: Yes.

THE COURT: All right. Thank you.

Mr. Min, please.

MR. BEYDA: And if I may, your Honor -- it's Michael Beyda -- just so the court reporter is aware that I will be doing the objections and I will be doing the speaking going forward on behalf of the respondent.

THE COURT: Thank you.

Mr. Min.

MR. MIN: Thank you.

ARNALDUR SCHRAM, resumed.

DIRECT EXAMINATION

BY MR. MIN:

Q. Mr. Schram, can you describe the home you and Ms. Zarak purchased in Iceland.

A. Yes. It's -- it's a two-bedroom apartment, with one bath, bathroom.
Q. Okay. Can you describe anything else about the home, any other rooms that you have or --
A. It's -- it's a -- it's, as you call it, almost an Icelandic old townhouse, so it's a upper floor apartment, middle floor apartment, and then a small basement apartment. We're in the middle. There are two bedrooms, that we use as bedrooms, and then there's a playroom that is dedicated for the kids' toys, etc., bathroom, kitchen, living room, storage in the basement, and then we own half of a garage, and a garden that has some potential.
Q. Okay. Is there a backyard?
A. Yes.
Q. Okay. How big is the backyard, approximately?
A. Good question. Let's say hundred square meters, a hundred -- that's around a thousand square feet-ish, around there.
Q. Okay. And is there anything in the backyard, like a pool, a deck, or any other --
MR. BEYDA: Objection to the form.
THE COURT: Overruled.
A. A trampoline.
Q. A trampoline? Whose trampoline is it?
A. Ours.

Q. When did you and Ms. Zarak purchase the trampoline?

MR. BEYDA: Objection to form. Assumes a fact not in evidence.

THE COURT: Sustained. Sustained.

Q. Did you and Ms. Zarak purchase the trampoline?

A. Yes.

Q. When?

A. On SZ's birthday, XXXXXXXX.

MR. MIN: Your Honor, we would ask the court reporter to perhaps do it afterwards, redact the date of the birthday and any identification information.

THE WITNESS: And I used names.

THE COURT: And we should refer to this son, correct, by initials?

THE WITNESS: SZ, yes. My mistake.

THE COURT: S for his first name and Z, is that for Ms. Zarak?

THE WITNESS: Yes.

THE COURT: Yes. Thank you.

BY MR. MIN:

Q. How does the home in Iceland compare sizewise to the apartment in New York, 6A, that you were previously residing in?

A. I would say it's a similar size.

Q. Can you describe if Ms. Zarak was engaging in any -- was --

withdrawn.

Can you explain if Ms. Zarak was investigating any career or job opportunities in Iceland after you moved.

A. Yes.

Q. How so?

A. She reached out -- as far as I know, she reached out to Columbia alumni or got to know Columbia alumni in Iceland through a Columbia University professor; I introduced her to the filmmakers I know in Iceland, which are a handful; and there were some ongoing discussions about work in Iceland regarding the relationships that came out of that.

MR. BEYDA: Objection, hearsay, that portion.

THE COURT: Overruled. He didn't testify to the substance, he just said they took place.

MR. BEYDA: I think he was referring to third parties.

THE COURT: Overruled.

BY MR. MIN:

Q. Mr. Schram, did you have conversations with Ms. Zarak about what she was interested in pursuing as career options in Iceland?

A. Yes.

Q. And what did Ms. Zarak tell you she was interested in pursuing?

A. There were various of things. One of the initial ideas was her interest in doing a documentary about Surtsey, which is an

island south of Iceland that came out of a volcanic eruption --

(Reporter interrupted for clarification)

THE COURT: So you were saying this was an island that came out of --

MR. MIN: I have him frozen, your Honor, on my screen.

THE COURT: I see, yes. Okay. Thank you.

THE WITNESS: Am I back?

THE COURT: Yes, you are.

THE WITNESS: Okay. Great. Sorry. It dropped off for a second on my end.

THE COURT: Yes, I saw. Thank you.

A. Okay. So there was the -- my take on Tania's work in Iceland was she had networking ability to US, which a lot of producers in Iceland have, so she had potential in that regards. She also talked about --

MR. BEYDA: Objection, your Honor. The question was, did you have conversation, and the witness is not answering that question right now. He's giving a narrative.

THE COURT: Hold on. I think there's not a question pending right now, Mr. Schram.

Mr. Min, do you have a question?

MR. MIN: Yes.

BY MR. MIN:

Q. What did Ms. Zarak express to you -- well, withdrawn.

What interest did Ms. Zarak express to you in pursuing

as career opportunities after the move to Iceland?
A. To make an independent documentary about the volcano eruption; about representing Icelandic projects in the US for the purpose of funding; to continue to develop a product line regarding cesarean operations and specifically in Iceland regarding fishing industry by-products. Yes.
Q. As far as you know, did Ms. Zarak pursue these interests?
A. Yes.
Q. How so?
A. She -- she represented an Icelandic production, as far as I know, in the US, that was a TV series that a friend of mine, a filmmaker, was directing, so she worked with his producers on representation in the US.
Q. Did there come a time when Ms. Zarak expressed her interest in pursuing her education in Iceland?
A. Yes.
Q. When did that occur?
A. April, May was the first time it was mentioned.
Q. Of what year?
A. Of 2021.
Q. And what did she express to you she was interested in pursuing in terms of her education?
A. MBA program at the Reykjavík University.
Q. Okay. And did Ms. Zarak tell you that she had applied for the MBA program?

A. Yes.

Q. And was Ms. Zarak accepted into the MBA program, as far as you know?

A. Yes.

Q. Okay. And did Ms. Zarak tell you how long the MBA program was?

MR. BEYDA: Objection to the form.

THE COURT: Hold on. Hold on.

Overruled.

A. A two-year program.

Q. Did Ms. Zarak open up an Icelandic telephone number after arriving in Iceland?

A. Yes.

MR. MIN: Your Honor, I would move into evidence Petitioner's Exhibit 132. I do not believe there was an objection.

MR. BEYDA: I just need to pull it up.

THE COURT: Give me a moment, please.

MR. MIN: Of course.

THE COURT: There is no objection. It will be admitted. And are you able to put it on the screen?

(Petitioner's Exhibit 132 received in evidence)

MR. MIN: Yes, your Honor.

THE COURT: Are you intending to ask a question about it?

MR. MIN: Just simply to ask him to identify the document.

THE COURT: All right. So can you pull it up or do you need me and the witness to pull it out?

MR. MIN: No. We are pulling it up.

THE COURT: Thank you.

A. Yes, this is a text correspondence between me and Tania.

Q. Who's writing on the left, who's writing on the right?

A. I am on the right, she's on the left.

Q. And is that Ms. Zarak's Icelandic telephone number on the left?

A. Yes.

Q. And whose number is on the right? Is that your number on the right?

A. Right.

Q. Is that an Icelandic telephone number as well?

A. Yes.

THE COURT: Are we done with this document?

Q. Mr. Schram, can you just identify when Ms. Zarak -- approximately when Ms. Zarak obtained an Icelandic telephone number.

A. September 25, 2020.

THE COURT: Are you just reading from the document?

THE WITNESS: Yes.

THE COURT: The document is in evidence, Mr. Min.

MR. MIN: Okay. No further questions on this document, your Honor.

THE COURT: Okay. Then you can take it down. Thank you.

BY MR. MIN:

Q. Mr. Schram, do you have any bank accounts in Iceland?

A. Yes.

Q. Did there come a time when Ms. Zarak began taking Icelandic language lessons?

MR. BEYDA: Objection to form again.

THE COURT: Overruled.

A. Yes.

Q. When?

A. I would -- if I remember correctly, maybe October of 2020.

Q. Okay. And how did she take these lessons, as far as you know?

A. It was online, weekly, I recall.

Q. Did there come a time when Ms. Zarak ceased taking these lessons?

A. Yes.

Q. Approximately when?

A. I would -- if I remember correctly, late spring 2021.

Q. Okay. Did there come a time when you purchased a vehicle in Iceland?

A. Yes. Yes.

Q. Approximately when?
A. March 2021.
Q. Okay. And prior to March 2021 did you and Ms. Zarak have use of an automobile in Iceland?
A. Yes.
Q. How?
A. A rental.
Q. Okay. And under what terms were you and Ms. Zarak renting a car in Iceland, prior to March 2021?
A. A long-term rental, at Hertz.
Q. And why did you and Ms. Zarak purchase a car in March 2021?
A. We needed two cars.
Q. And after you purchased a car in March 2021 what was Ms. Zarak doing for a car?
A. So she took the rental and I used the purchased car.
Q. Did there come a time when you registered the children as having legal domicile in Iceland?
A. Yes.
Q. And what is the process for doing so?
A. You go to the National Registry, you fill out the form, and you apply -- yes, you apply. I -- you sign the paper, both parents sign the paper, and you hand it in, with supporting documents.
Q. That's the process for registering children as domiciles in Iceland?

A. Yes.
Q. Did there come a time when you registered the children as citizens of Iceland born abroad?
A. Oh. Right. No, the application -- no, if I remember now, it was -- yes, it was probably a parallel paperwork. I don't remember the details, but it was one operation, you could call it.
Q. Did there come a time when the children obtained kennitala numbers in Iceland?
A. Yes.
Q. Approximately when?
A. In August, this past.
Q. Okay. Are the children --
A. Oh.
Q. August of 2020?
A. Yes.
Q. Are the children Icelandic citizens?
A. Yes.
Q. And when did EZ become an Icelandic citizen?
A. She became a citizen in 2015, I recall.
Q. And what about RZ?
A. In August 2020.
Q. And what about SZ?
A. In August 2020.
Q. And did there come a time when Ms. Zarak applied for an

Icelandic residency permit?
A. Yes.
Q. Did you have discussions with Ms. Zarak about applying for an Icelandic residency permit?
A. Yes.
Q. And did Ms. Zarak express interest in obtaining one?
A. Yes.
Q. Did she tell you why she was interested in obtaining one?
A. No, she -- yes. I mean, so she could operate, you could say, in the Icelandic system like -- like a local.
Q. What do you mean by that?
A. Meaning you can open up a bank account to be formally registered as a parent in the school, to be formally registered for an apartment, to -- to get into the medical system.
Q. When you say get into the medical system, prior -- or withdrawn.
When did Ms. Zarak make an application for a residency permit?
A. The -- the application was, you could say, started maybe September, October, but then the issue came up of her obtaining the certificate of non-criminal record from Mexico, and as I remember correctly, because in the pandemic that office was simply closed in Mexico, so it became kind of a stopping point, so I -- the application might formally have not been completed until maybe February of 2021.

Q. And prior to that did you and your family have medical insurance in Iceland?
A. Yes.
Q. Through the national health care system?
A. We -- when we -- six months after arriving in Iceland, we were accepted into the national insurance system, yes.
Q. But prior to that what were you and your family doing for medical insurance?
A. We got a insurance through a standard insurance company in Iceland, which is what you're required to do.
Q. And were you and all three children covered under that private medical insurance?
A. Yes, and Tania.
Q. And Ms. Zarak? And after the six months, were you and your children entered into the national health care system?
A. Yes.
Q. Actually, when was that?
A. February 1st.
Q. 2021?
A. Yes.
Q. Okay. And was Ms. Zarak entered into the national health care system at that time as well?
A. No.
Q. Why not, as far as you know?
A. She didn't have a kennitala yet.

Q. I'm sorry. Can you repeat that?
A. She didn't have the kennitala yet. She didn't have a national ID yet. She -- the residency permit was not far along enough.
Q. Okay. Did you and Ms. Zarak discuss when she might be enrolled in the national health care system?
A. As soon as she would get -- as soon as she would get the -- the residence permit.
Q. Okay. And that's something that you and Ms. Zarak discussed?
A. Yes.
Q. Did Ms. Zarak express interest in being part of the national health care system in Iceland?
A. Yes.

MR. MIN: I want to direct the witness's attention to a document that's been premarked as Petitioner's Exhibit 133 -- or 131. I apologize. 131.

THE COURT: All right. Now there was an objection to this one on the grounds that there was not a certified translation. Has that been remedied?

MR. MIN: Your Honor, the document was sent in in English and it says, "English text below."

THE COURT: All right. Let me pull it up. Hold on.

Mr. Beyda?

MR. BEYDA: I'm looking at it now as well. I see that

the objection was made. I'm not -- I just need a moment.

THE COURT: Yes.

MR. BEYDA: I have a hearsay objection, I have a relevance objection, and I believe that this document sets forth opinion of someone who we don't know who he is and we don't know if this person is authorized to provide this Court with opinions.

THE COURT: Let me take them one at a time.

Are you withdrawing the no certified translation objection?

MR. BEYDA: I am not.

THE COURT: You're not withdrawing it?

MR. BEYDA: No, I am not.

THE COURT: All right. That objection is overruled.

The relevance objection is overruled.

Mr. Min, anything with respect to the hearsay and the opinion objection?

MR. MIN: Your Honor, I can ask a couple of questions that might resolve that.

THE COURT: Go ahead.

BY MR. MIN:

Q. Mr. Schram, can you look at this document that's been marked as Petitioner's Exhibit 131.

A. Yes.

Q. And can you identify what this document is.

A. This is an email from the National Registry, announcing that --
Q. I didn't ask you to tell me what it says.
THE COURT: No, no. Don't read from the document, sir. Just answer his limited questions, all right?
THE WITNESS: Okay.
A. Can you repeat the question.
Q. Sure. Can you just identify what this document is, not what it says but just what it is.
THE COURT: I think he did.
MR. MIN: Yeah, I know, but he asked me to repeat the question so I was doing so in case he wanted clarification, but I'll move on.
A. It's from the National Registry.
THE COURT: Thank you.
Q. And how did you obtain this document?
A. It was emailed to me.
Q. Was it emailed to you upon a request that you made?
A. No, an automatic announcement.
Q. Is that your understanding?
A. Yes.
Q. Okay. Was there some action you took in or around August 25, 2020, that resulted in this automatic action, as you describe it?
A. Probably sometime prior where I -- yes.

Q. Yes? Yes what?
A. Well, yes, I -- I registered us in a -- an address of my uncle's in Reykjavík.
Q. You registered -- when you say, "I registered us," what does that mean?
A. I reg -- I informed Registry that this was the home we were going to live in in Reykjavík.
Q. Is it your understanding that upon registering your home in Reykjavík, that you received this automatic email in response?
A. Yes.

MR. MIN: Your Honor, we re-move its admission.

MR. BEYDA: Same objection. It doesn't get around the hearsay issue. This is a statement from a non-party. None of that clarifies --

THE COURT: Is this seriously an issue about whether Mr. Zarak had established domicile in Iceland?

MR. BEYDA: Is that question pointed to me, your Honor?

THE COURT: I'm sorry, whether Mr. Schram had his domicile in Iceland?

MR. BEYDA: Is that a question towards me, your Honor?

THE COURT: Yes. I'm asking you, is there a dispute on that issue?

MR. BEYDA: Domicile in a legal sense? I have -- I mean, in a layperson term, there's many ways of addressing that

word. There's no dispute that the family got to Iceland on August 1st. That we know.

MR. MIN: Your Honor, we're certainly not asking for your Honor to make a legal finding of domicile. We're simply asking that the Court recognize that Mr. Schram took the action of registering the children as domiciles at this particular address at this particular time. That's it.

THE COURT: Okay. Ask him that then.

BY MR. MIN:

Q. Did you register the children as domiciles of Iceland when you arrived in Iceland?

A. Yes.

Q. And did there come a time when you changed their domiciles in Iceland?

A. Yes.

Q. And why?

A. We needed an address within Reykjavík County for them to be able to register in the schools in Reykjavík, so my parents don't live in that county, so we used my uncle's address until we get our address, until we would get our own.

Q. Did there come a time when you changed your domicile again?

A. Yes.

Q. When?

A. November 1st, 2020.

Q. And why did you register your children as domiciles of

Iceland?
A. They wouldn't have gotten into schools otherwise.
Q. And when you said you changed their domicile again November 1st, 2020, why did you change their domicile on that particular day?
A. Because we moved into our apartment that we purchased.

MR. MIN: Your Honor, again, is the document --

THE COURT: No, the document is not received, but the document has been marked. It is not received. It will just be marked as offered in evidence. But the testimony is what the testimony is.

MR. MIN: Your Honor, if I could just make a point on that document, just to --

THE COURT: Mr. Min, why do you need the document? It's cumulative of the testimony you just elicited, is it not?

MR. MIN: Understood, your Honor. Obviously, to the extent that we're not sure what respondent may testify to on her --

(Continued on next page)

THE COURT: Then I guess we'll see, right?

MR. MIN: Understood.

THE COURT: There are ways you could deal with the document but you haven't done it.

MR. MIN: Well, your Honor, I would simply argue that we believe it is a government record.

THE COURT: But you haven't established that.

MR. MIN: Your Honor, OK. I'll move on.

BY MR. MIN:

Q. Did you discuss with Ms. Zarak registering the children as -- well, withdrawn.

I want to direct your attention to document premarked as Petitioner's Exhibit 103.

THE COURT: No objection.

Are you offering it?

MR. MIN: Yes, your Honor.

THE COURT: All right. It is admitted.

(Petitioner's Exhibit 103 received in evidence)

THE COURT: Are you able to make in larger?

MR. MIN: Yes.

THE COURT: Thank you.

BY MR. MIN:

Q. Mr. Schram, can you hear me?

A. Yes.

Q. Can you identify this document, please?

A. This is an e-mail from Tania to me.
Q. Okay. Do you know why Ms. Zarak was e-mailing you on December 28, 2020 about these five items?
A. Yes.
Q. Okay. Why?
A. It's a checklist of things we needed to be done for the residence permit.
Q. What is the second one, confirmed domicile and registers Iceland?
A. It's a printout from the -- it's a document request to the register confirming that we are domiciled in Iceland.
Q. What is the Skatturinn?
A. Email. It's -- that's the form that you fill out to get the system ID.
Q. These were items that Ms. Zarak needed to accomplish in order to apply for her nationally -- withdrawn.
Are these items that Ms. Zarak wanted you to help her with in order to apply for the residence permit?
MR. BEYDA: Objection to the form.
THE COURT: "Leading" you mean?
MR. BEYDA: Yes.
THE COURT: Sustained.
I think he's already testified that she needed these items for registration.
BY MR. MIN:

Q. Did you discuss registering your children as Icelandic citizens after arriving in Iceland, again, just specify RZ and SZ with Ms. Zarak?
A. Repeat the question, please.
Q. Did you discuss with Ms. Zarak registering the children, RZ and SZ, as Islandic citizen upon arriving in Iceland?
A. Yes.
Q. Okay. And did you and Ms. Zarak complete a form to register the children as Icelandic citizens after arriving in Iceland?
A. Yes.
Q. To confirm, EZ was already an Icelandic citizen before arriving to Iceland?
A. Yes.
Q. I want to direct your attention to a document premarked as Petitioner's 99.

THE COURT: No objection. It is admitted.

"P99" you said?

MR. MIN: Yes, your Honor.

THE COURT: Thank you.

(Petitioner's Exhibit 99 received in evidence)

(Pause)

MR. MIN: Your Honor, it's translated but we're going to scroll down to the Icelandic version so Mr. Schram can look at the original.

(Pause)

Q. Mr. Schram, if you need a minute to find it, that's fine. Otherwise, you can look at the screen but I need you to identify this document.

A. I found -- this is a request to register a child that's born abroad.

Q. And the purpose of this document -- what is the purpose of this document as far as you understood?

A. It is to register children of Icelandic citizens that are born outside Iceland into the national registry.

Q. What is the purpose of submitting this application is they are part of the national registry?

A. In order to get, in order for them to be registered in schools and get into the medical system and also it makes them Icelandic citizens.

Q. Did you discuss this with Ms. Zarak, this process?

A. Yes.

Q. Okay. Did Ms. Zarak sign this document?

A. Yes.

Q. You can turn to what's been Bates stamped as 00760.

Is that Ms. Zarak's signature?

A. Yes.

MR. BEYDA: Your Honor, may I interrupt for a moment? In the document that I'm looking at the exhibit --

THE COURT: I have the same problem. You have an

electronic signature?

MR. BEYDA: No. If that's what it is, I didn't know that that's an electronic signature but I guess I have 2760s over here in this exhibit, one unsigned and one signed.

MR. MIN: Your Honor, I can explain. I think when the translator it seems translated, they probably kept the Bates stamp number on the bottom. So, it would be, the first half of it is the translation. The second half of it is the original Icelandic and I am referring to the second half.

And I apologize.

THE COURT: I see.

MR. BEYDA: Just so we're clear, so, basically, the first one version of this is not, I guess it what was prepared by the translator. It's the second. I understand.

MR. MIN: Right. And the one we have on the computer screen which is page eight of 11 of the actual document of the PDF is what I am referring to.

Q. Mr. Schram, is that Ms. Zarak's signature?
A. Yes.
Q. Is that your signature?
A. Yes.

MR. BEYDA: I don't have the pages.

THE COURT: Do you have the page, Mr. Beyda?

MR. BEYDA: Mr. Min just referred to page eight of the PDF.

THE COURT: In any event, do you have the page that's on the screen in your document? It's the second page that bears the number 007670.

MR. BEYDA: I do.

THE COURT: Thank you.

Mr. Min, you can proceed.

BY MR. MIN:

Q. I'd like to direct the witness's attention to document marked as P100.

THE COURT: Are you offering it?

MR. MIN: Yes.

THE COURT: There is an objection that there is not a translation. Has that been cured?

MR. MIN: We provided translation. This isn't the same issue yesterday where the translation was --

THE COURT: That's what I was asking.

Mr. Beyda, do you still have an objection?

MR. BEYDA: No, your Honor.

THE COURT: All right. Thank you. It is admitted.

(Petitioner's Exhibit 100 received in evidence)

Q. Mr. Schram, can you identify this document, please?

A. Give me a second. Wait. P100?

Q. Yes.

A. Which page -- which document, which page do you want me to identify?

Q. I just want you to identify the document. You can go to the Icelandic second half of it.
A. It's the same document that's before, but in this case it's regarding SZ.
Q. When you say it is the same document as before, what do you mean by that?
A. Meaning it's registering a child of an Icelandic citizen born abroad into the Icelandic registry.
Q. What was the purpose of filling out this form and submitting this form to the national registry?
A. To become an Icelandic citizen and to get the IT number required to be registered in schools.
Q. Any other purpose?
A. And to get into the medical healthcare system.
Q. Did this confer with, is the SZ to become an Icelandic citizen?
A. Repeat the question.
Q. Did this confer the ability for SZ to become an Icelandic citizen?
A. "Confirm"?
Q. I'm sorry. I did not hear you?
A. Are you asking me if it's confirmed -- sorry -- or confers?
Q. Was the purpose of this document also to provide SZ with Icelandic citizenship?
A. Yes. There is no way to get that ID without registering as

citizen.
Q. Did you and Ms. Zarak discuss this process before submitting this application?
A. Yes.
Q. Was Ms. Zarak aware as far as you know that the purpose of this document was to confer SZ the kenitalas number and Icelandic citizenship?
MR. BEYDA: Objection.
A. Yes.
MR. BEYDA: Can't know what she knows in her mind.
THE COURT: Sustained.
MR. BEYDA: Thank you.
Q. Did you tell Ms. Zarak that the purpose of this document was to confer SZ what kenitalas number an Icelandic citizenship?
A. Yes.
Q. And did you tell Ms. Zarak that a kenitalas number and Icelandic citizenship would give the children certain rights in Iceland such as being part of the medical system and going to school?
A. Yes.
Q. I want to direct your attention to page 766, the second one?
A. If I can add to this document, that one, the first --
MR. BEYDA: No question, your Honor.

THE COURT: There is no question pending, Mr. Schram. Wait. Your lawyer just asked you to look at a page and I don't know what the page is.

766?

MR. MIN: Yes, your Honor. It will be page nine of 11 of the PDF.

Q. Is that Ms. Zarak's signature on that page.

THE COURT: Hold on.

Mr. Schram, do you have that page?

THE WITNESS: Not yet. P100?

Q. It is page 766?

A. Yes.

Q. Is that Ms. Zarak's signature?

A. Yes.

Q. Is that your signature?

A. Yes. That signature, I don't know if I can add. No.

Q. I want to direct your attention to a document premarked as Petitioner's 138.

THE COURT: Are you offering it?

MR. MIN: Yes, your Honor.

THE COURT: It'll be admitted. No objection. Preserved.

(Petitioner's Exhibit 138 received in evidence)

Q. Mr. Schram, can you identify this document, please?

A. This is an email from me to Tania.

Q. Is there also an email from Tania to you, Ms. Zarak to you?
A. Yes. I am responding to an e-mail she sent first, yes.
Q. Okay. And what was Ms. -- Withdrawn.
What information were you provided to Ms. Zarak in this email?
MR. BEYDA: The document's in evidence, judge.
THE COURT: Correct. Sustained.
Okay. Give me one moment, please, so I can juggle the exhibit binders.
(Pause)
THE COURT: Are you able to make this larger on the screen?
MR. MIN: Yes, your Honor.
THE COURT: Thank you.
(Pause)
THE COURT: Is There a question?
MR. MIN: Your Honor, I will offer at the time Respondent's Exhibits 114 and 115, R114 and R115.
(Pause)
THE COURT: I am in the wrong list.
(Pause)
THE COURT: All right. They will be admitted 114 and 115, correct?
(Respondent's Exhibits 114 and 115 received in evidence)

MR. MIN: Yes, your Honor.

May I inquire, your Honor?

THE COURT: Yes.

Q. Did there come a time when you and Ms. Zarak had a discussion about -- withdrawn.

While you and Ms. Zarak were residing and prior to going to Mexico and ultimately Iceland, did you and Ms. Zarak employ a nanny for the children?

A. Yes.

Q. Who is that person?

A. Susa, Susana. Should I use initials? SV.

Q. Okay.

THE COURT: It is up to you but it's not really necessary. We're just trying to protect the confidentiality of the young children.

THE WITNESS: Okay.

Q. Did you and Ms. Zarak have discussions after arriving in Iceland about bringing the nanny to -- try to avoid using names -- to Iceland?

A. Yes.

Q. For what purpose did you and Ms. Zarak discuss bringing the nanny over to Iceland?

A. For the, to assist with taking care of the children, cooking cleaning, you know, what she did prior to us living in Iceland.

Q. Okay. Did she ultimately come to Iceland?
A. Yes.
Q. Okay. When?
A. She came on two occasions, first in January but had to leave back to Mexico abruptly approximately a week later but then she returned again in March.
Q. When you said she had to go back to Mexico, why did she have to go back to Mexico?
A. She worked or close family members died due to COVID.
Q. Where was she residing at this time at the time you brought her over to Iceland, as far as you understand?
MR. BEYDA: Objection.
THE COURT: What's the objection?
MR. BEYDA: Relevance.
THE COURT: Overruled.
A. Mexico.
Q. And what is your understanding as to the nanny's nationality and background?
A. She is Mexican citizen from Mexico.
Q. Is she a U.S. citizen?
A. No.
Q. I believe you said you had to go back and -- I apologize. I am just checking my notes.
Did she come a second time after going back because of unfortunate deaths?

A. Yes.
Q. Okay. And when did she return to Iceland after that?
A. I believe March.
Q. Then how long did she stay the second time?
A. Until June 17, 2021.
Q. What happened on June 17, 2021?
A. She departed with Tania, EZ and SZ.
Q. Did you and Ms. Zarak enroll your children in school in Iceland after your arrival?
A. Yes, before our arrival. EZ before, RZ after.
Q. Okay. Did you and Ms. Zarak discuss enrolling your children in school in Iceland prior to arriving?
A. Yes.
Q. I want to direct your attention to a document premarked as P93.

THE COURT: Are you offering it?

MR. MIN: Yes, your Honor.

THE COURT: There is an objection; is that correct, Mr. Beyda?

MR. BEYDA: Yes. There was a hearsay objection raised.

THE COURT: Let me pull the document.

(Pause)

THE COURT: Mr. Schram, you should wait to look at the document until I've ruled, all right?

THE WITNESS: Yes.

(Pause)

THE COURT: Mr. Min.

MR. MIN: Your Honor, I am simply going to be eliciting testimony about Ms. Zarak's own statements.

THE COURT: Why don't you do that with her?

MR. MIN: I'm sorry, your Honor.

THE COURT: It is hearsay.

MR. MIN: It's a party admission.

THE COURT: What part of this is an admission? If there's a discrete part that you want to offer in evidence, direct me to it to and I'll rule on it. Otherwise, you can deal with this later.

MR. MIN: Okay.

THE COURT: You'll have an appropriate witness.

MR. MIN: Okay. I will deal with it on cross. It's fine.

THE COURT: Okay. So, it's just marked at this point.

MR. MIN: One second.

Q. Did you and Ms. Zarak have -- withdrawn.

What school did you and Ms. Zarak ultimately enroll EZ in in Iceland?

A. Landakotsskoli.

Q. When did you and Ms. Zarak enroll EZ at Landakotsskoli?

MR. MIN: Your Honor, I have him frozen on my screen.

THE COURT: Yes. Let's wait a minute.

Mr. Schram, are you back with us?

THE WITNESS: Yes.

THE COURT: All right. So, I don't think we have your answer to the question about when you enrolled EZ.

A. I recall June.

THE COURT: Did you start to give a year?

THE WITNESS: Yeah. 2020.

THE COURT: Thank you.

Q. Did there come a time when you and Ms. Zarak enrolled RZ in a school in Iceland?

A. Yes.

Q. When?

A. I would say the registration was completed in August.

Q. What year?

A. 2020.

Q. Where? What school?

A. At Oldukot.

Q. Did there come to time when you and Ms. Zarak discussed enrolling SZ into school in Iceland?

A. Yes.

Q. When did you first have discussions about enrolling SZ into school in Iceland?

A. When we registered RZ.

Q. Okay. Did you and Ms. Zarak inquire into enrolling or --

withdrawn.

What school did you and Ms. Zarak want to enroll SZ into in Iceland?

A. Initially, my take on it was that we should enroll him in the same school at SZ is on the waitlist because that school doesn't take in children that are younger than two. So, he was year and four months or so at that time, three or four months at that time. And waitlists are a problem in Reykjavik. So we left it at that. So I want to say maybe in September Tania raised issue that we should definitely try to get SZ into school at that point which started the inquiry into different schooling that accepted younger children but they had long waitlists. So it was difficult to try to do it say for that school year.

MR. MIN: Okay. I want to direct your attention to a document that's been premarked as Respondent's 67.

I offer it, your Honor.

THE COURT: One moment, please.

All right. It's admitted.

(Respondent's Exhibit 67 received in evidence)

Q. Let me know when you have the document in front of you.

A. I have it.

Q. Can you identify this document for the Court?

A. This is report card, report -- this is report from Landakotsskoli on EZ.

Q. What grade was EZ enrolled in at Landakotsskoli?
A. First grade.
Q. Was EZ learning Icelandic at Landakotsskoli?
A. No. A little bit but not organized.
Q. Do any of your children speak Icelandic?
A. Roman does.
Q. How is RZ's Landakotsskoli --

MR. BEYDA: Judge, I apologize. I was muted. I was objecting to the relevance of Roman is not a party to this proceeding. He is not part of the petition.

THE COURT: Yes, it was not addressed simply to that child. The fact that the answer happens to be limited to him. Irrelevant but let me see. Is there a follow-up in. There is no follow-up question yet.

Overruled.

MR. BEYDA: I thought there was a question about how as RZ Land -- okay.

THE COURT: The question was:

Do any of your children speak Icelandic? And the answer included only the one child who, you are correct, who was not at issue here and then there's a question "How"? So, that objection is sustained as to that question.

Mr. Min.

MR. MIN: Yes, your Honor. One second, if I may?

Q. Mr. Schram, did EZ develop any friendships while at school

at Landakotsskoli?

MR. BEYDA: Objection to the form.

THE COURT: Overruled.

A. Yes.

Q. Okay. How quickly did EZ make friends at Landakotsskoli?

A. Very fast, immediately.

Q. And how soon after you arrived in Iceland did EZ have a birthday party?

A. Four weeks later.

Q. And were any children from Landakotsskoli in her grade or any of her friends from Landakotsskoli at her birthday party?

A. Yes.

Q. How many close friends would you say EZ had living in Iceland from Landakotsskoli?

MR. BEYDA: Objection. Assumes facts not in evidence. There.

MR. MIN: No testimony about having close friends, your Honor.

THE COURT: Sustained.

Q. Did EZ have any close friends in Iceland?

A. Yes.

Q. How many close friends did EZ have in Iceland?

A. Three, four.

Q. Can you identify them without using their names?

A. Yeah.

THE COURT: Hold on. What's the relevance of who the children are? And I don't know how you identify someone other than by their name. Ask another question, please.

Q. Were these close friends classmates of hers?

A. Yes.

Q. Were you friends with her close friends' parents as well?

A. Yes.

Q. Did EZ have playdates with her close friends?

A. Yes.

Q. Did she have playdates with her other friends that weren't as close?

A. Yes.

Q. How often did EZ have playdates while she was residing in Iceland?

A. Once, twice a week.

Q. Can you describe how these playdates would manifest, how they were organized?

A. Yeah. They would decide during school what they were going to do at the end of the day. It was like that. It was pretty spontaneous.

Q. So, give me an example. After school would you sometimes pick up EZ from school?

A. Yes.

Q. Sometimes Ms. Zarak would pick up EZ from school?

A. Yes.

Q. What were your observations as to how the children organized the playdates themselves?

MR. BEYDA: Objection as to what the children -- he wasn't there. He said that they organized.

THE COURT: Can you rephrase?

BY MR. MIN:

Q. Can you describe how playdates were organized after school when you would go pick up EZ?

MR. BEYDA: Objection to the extent that it's calling for any hearsay for what took place when he wasn't there. But as far as what he observed, I understand the question.

THE COURT: So, do you have an objection or you don't?

MR. BEYDA: I just want to make sure he is testifying as to what he observed.

THE COURT: That was the question.

A. How we came to know about playdates often was that they came --

MR. BEYDA: Objection. That wasn't the question. He is answering something that was not the question, your Honor.

THE COURT: Overruled.

Go ahead, Mr. Schram.

A. Yeah. During pick up when I would be in the yards EZ would say I want to go home with her or she is coming home with me.

MR. BEYDA: Objection. That's hearsay.

THE COURT: It's not offered for the truth. It's

offered for the fact that the statement was made which he heard. I'm not sure what the relevance of all of this is but it's a different matter.

Q. Mr. Schram, can you -- were some of the playdates at your home?

A. Yes.

Q. Okay. And were you present for some of the playdates between EZ and her friends?

A. Yes.

Q. Can you describe the interactions that EZ had with her friends during the playdates that you personally observed?

A. Well, play in the playroom or trashing the playroom, playing in the apartment, playing dress-ups, you know having snacks, go on the trampoline together, go in the garden together. Those are the ones that were, that's the nature of the playdates at the house.

Q. Okay.

THE COURT: I'm sorry. So, I have a clear picture in my head, this child is six or seven-years-old, right?

THE WITNESS: Turned seven this summer, yes.

THE COURT: All right. Thank you.

Q. Did EZ have any sleepovers with her friends?

A. Yes.

Q. Can you describe that?

A. As I recall, there were two sleepovers to our house and she

did one sleepover, one or two sleepovers at her friend's house.
Q. And can you just compare EZ's social life in Iceland versus New York prior to moving to Mexico?
A. The social life in Iceland was I would say more vivid and more active, I would say. The flow of plaintiffs was much easier because it didn't always require the other parent to be there which in my experience was the nature of playdates in New York. You know, if the other parent was often present during the playdates was very much an escorted playdate. So, it was very spontaneous and they enjoyed being able to make calls on playdates on the fly during the week.
Q. Did EZ have social interactions with her friends outside of the context of these playdates at one of the parents' home meaning out in the community or in some sort of structured activity?
A. With the classmate specifically or just other children?
Q. With her classmates, specifically.
A. Yeah. We would -- there would be weekend playdates, you know, hangouts or she would go with, until she would go with a friend to an ice hockey practice, to a horse stable, to I want to say sport classes but no, not really. She would go participate in their extracurricular activities on occasion.
Q. Did EZ participate in any extracurricular activities while in Iceland on her own?
A. Yes.

Q. Withdrawn. What sorts of extracurricular activities did EZ participate in while in Iceland?
A. She took music lessons at her school.
Q. What music lessons did she take after school?
A. We inquired about violin class, but it was fully booked so was availability for flute. So, she took flute for the school year.
Q. Can you describe this afternoon program?
A. It's something you have to register for. So, it's not an open class, you could say. And they would do progressive exercises and learn how to play tunes throughout the year.
Q. What time does school generally end at Landakotsskoli, the first grade?
MR. MIN: Your Honor, I have him frozen.
THE WITNESS: You can see me again?
THE COURT: Yes, sir.
A. Okay.
THE COURT: The question is, What time was school? That the question?
Q. What time did school end at Landakotsskoli?
THE COURT: Thank you.
A. I want to say two o'clock.
Q. And after school took place at Landakotsskoli or some other location?
A. At Landakotsskoli for the first grade.

Q. What were the hours or after school at Landakotsskoli?
A. It was up to, I want to say latest four or 4:30 if I remember correctly.
Q. Did EZ try any other extracurricular activities aside from this flute program in Iceland.
A. In that sense everything after two to pick up was called after school. So, it's organized activities by the school. I mean, I don't have extracurricular but that's at the school, we did sports, various sports tryouts.
Q. Such as?
A. Such as she tried karate. She tried Capoeira, which is at Brazilian martial arts. We went to soccer practices, basketball practices. I think that's it.
Q. Mr. Schram, do you have family in Iceland, correct?
A. Yes.
Q. Who?
A. My parents, two brothers, their children, total three and all my extended family, everyone is here.
Q. How old are your nieces or nephews?
A. The youngest one is now ten-years-old. I guess I can't say his name and then the other ones are 22 and 29, if I recall.
Q. Okay. You have cousins in Iceland, I believe you mentioned?
MR. BEYDA: Your Honor, I believe this --
MR. MIN: All asked and answered where Mr. Schram went

through his family in Iceland yesterday.

THE COURT: Not in this level of detail. Although, I don't know what the purpose of this level of detail.

MR. MIN: Your Honor, would you like an offer of proof?

THE COURT: No. I'm just giving you a hint that you might want to move it along a little.

MR. MIN: Understood.

Q. Mr. Schram, do you have cousins in Iceland?

A. Yes.

Q. Okay. Do they have children?

A. Yes.

Q. How far do your parents live from where you and Ms. Zarak were residing in Iceland?

A. Kilometer, four-minute drive.

Q. How often did your children interact with your parents while they were residing in Iceland?

A. Two sometimes, three times a week.

Q. Can you describe those interactions, generally?

A. It was they would do school pick-ups. We would go to the house for dinner. My father was very generous with his time to help Tania with errands, et cetera, throughout.

Q. And how often would the kids, would the children, would your children interact with your siblings or cousins and their children?

A. Every, average maybe every couple weeks, once a week, every two weeks or so.
Q. Okay. And does Ms. Zarak have any immediate family located in New York?
A. No.
Q. And where is the closest member of her immediate family located?
A. Miami.
Q. And how often would the children interact with Ms. Zarak's immediate family while they were residing in New York?
A. Maybe two times a year, two or three times a year.
Q. I want to direct your attention to a document that's been premarked as 109. It's the amended 109 that is --
THE COURT: Is this the petitioner's or respondent's.
MR. MIN: Petitioner's. We should have dropped off two courtesy copies to the Court this morning.
THE COURT: We didn't receive them yet but there's a delay coming from the mail room.
MR. MIN: I will be putting them on.
THE COURT: That's okay. Just tell me the number again. 109?
MR. MIN: It was quite lengthy in the book --
THE COURT: Yeah.
Mr. Beyda, is there an objection to the pared down version?

MR. BEYDA: There is. And I'll need to voir dire the witness, please.

THE COURT: Okay. Are you offering the entirety of the pared down, P109 exhibit?

MR. MIN: Yes, your Honor.

THE COURT: There is an objection and Mr. Beyda would like to voir dire the witness.

The objection is what, Mr. Beyda?

MR. BEYDA: Some would be relevance based on timeframe or as well as -- just need a moment as I parse through.

THE WITNESS: 109.

THE COURT: Hold on, Mr. Schram, until we deal the objections.

MR. BEYDA: Relevance.

THE COURT: Only relevance you are preserving in other words?

MR. BEYDA: Yes, your Honor.

THE COURT: Does the relevance relate to the timeframe?

MR. BEYDA: Timeframe as well as a -- I could be more specific in terms of one of the exhibits, the item P109, number 25 or page 25.

THE COURT: All right. So, the question I have for you, Mr. Beyda, is was P25 part of the original more expansive document? Because originally you objected relevance to any

photos taken after the commencement of this action and you had another objection which you are telling me you are not pressing as I understand it, correct?

MR. BEYDA: Can I just set forth my full objection, your Honor?

THE COURT: Can you what?

MR. BEYDA: Can I just set forth my objection, basically?

THE COURT: Go ahead. But bear in mind the point that I'm making is if this document was part of the original package, you can't offer a new objection now.

MR. BEYDA: Let me just see -- I understand that, your Honor. However, I would ask the Court to indulge me with regard to page number 25 of Exhibit Number 109.

THE COURT: What's your objection?

MR. BEYDA: I do not see any of the children or the parties in that picture. So, I do not see any relevance to this proceeding.

THE COURT: Mr. Min.

MR. MIN: Your Honor, we can remove page 25. That's fine.

THE COURT: All right. With page 25 removed is there an objection?

MR. BEYDA: There's an objection to page number one which, from what I can tell, was taken after the commencement

of this proceeding. There is an objection to page number 14.

THE COURT: One-four are you saying?

MR. BEYDA: Yes, your Honor.

THE COURT: All right. Thank you.

MR. BEYDA: Fifteen as well, 16, 17, 18, 19, 20, 21, 22, 23. No objection to 24.

THE COURT: All right. These objections that you are stating, are they based on the timeframe?

MR. BEYDA: Correct, your Honor, and therefore, the relevance.

THE COURT: Relevance because you say they're after the commencement of the action?

MR. BEYDA: That's correct.

THE COURT: Let me just take a look.

(Pause)

THE COURT: Mr. Min, can I get an offer of proof of what these represent? Not an argument. I just want to know where are these?

MR. MIN: Understood. Pages 14 to 23 and page one, I just want to be clear.

THE COURT: That's the Court's understanding. I didn't hear 19 but I assume it's part of the batch.

MR. MIN: Yes, it was.

THE COURT: All right. Thank you.

So, one and 14 through 23.

MR. MIN: Yes. I mean the purpose of it is simply to --

THE COURT: I didn't ask the purpose. I asked where are they?

MR. MIN: Oh, it's in the apartment in Iceland.

THE COURT: All right. The objection's overruled. They will be admitted minus page 25.

MR. BEYDA: Your Honor, may I voir dire the witness before we move into evidence so I could just find out some information about these particular documents that we're moving in.

THE COURT: Nope. You can do that in cross.

Go ahead, Mr. Min. They're admitted.

Q. Mr. Schram, we are going to run through this rather quickly. Can you identify this first page of this document?

A. Yeah. This is our backyard. How detailed should I be?

Q. This is your backyard of your apartment?

A. Yes.

Q. And you and Ms. Zarak purchased?

A. Yes.

Q. Okay. Moving on to page two, can you identify this photograph?

A. This is taken during our trip to the West Fjords. So, it's me, Tania and our children and that's a friend of our Spinka and her children and her spouse on this trip in this particular

day.
Q. On the right side of photo wearing the pink jacket, is that Ms. Zarak?
A. Yes.
Q. West Fjords, is that in Iceland?
A. Yes.
Q. Where is that in relation to Reykjavik where you live?
A. It's --
THE COURT: Mr. Min, does it really matter?
Put another question, Mr. Min.
Q. Mr. Schram, are your children photographed in this photo?
A. Yes.
Q. Were they on the trip with you?
A. Yes.
Q. Can you go to page three. Can you describe that photo?
A. EZ on her bicycle in my parents' street.
Q. Page four, can you identify this photograph?
A. Yeah. All of my three children including me in the backyard of my parents' house.
Q. The last two photos, page three and page four taken while you and your children were residing in Iceland in, approximately, the last year?
A. Yes.
Q. Page five.
A. This is the back patio of my patients' house during Roman's

birthday party.
Q. What month did that take place?
A. December of 2020.
Q. Can you -- one second.
THE COURT: Mr. Min, is there a question?
Q. Can you tell me who's in this photograph without identifying which child is which in this particular photo?
A. My three children, three children of my friend's.
MR. MIN: Your Honor, I have the witness frozen on my end.
THE COURT: Yep. Let's give him a minute and see.
THE WITNESS: Am I back?
THE COURT: Yes, you're back. So, we heard you say your three children and three children of your friends.
A. Two different friends and, yes, my nephew.
Q. Next photo, page six.
A. This is EZ going on a horseback ride on the south coast, with me there standing on the right.
Q. Approximately, when did this occur?
A. This is May.
Q. In 2021?
A. 2021. Sorry.
Q. In Iceland?
A. Yes.
Q. Next page, page seven. Can you identify this document?

A. This is EZ with two of her cousins during that same trip in May on the south coast.
Q. Next page, page eight?
A. These are my three children at my parents' house with their cousin.
Q. When was this taken, approximately?
A. This is, I would guess this last fall.
Q. 2020?
A. 2020, sorry.
Q. Page nine.
A. This is EZ with two of her friends.
Q. Can you identify the initials -- withdrawn.
Are these friends from Landakotsskoli?
A. Yes.
Q. Mr. Schram, do you want a minute?
A. I'm fine.
(Pause)
THE WITNESS: Continue.
Q. When was this taken, approximately?
A. Probably fall of 2020.
Q. Page 10.
THE COURT: All right. Mr. Min, why don't I suggest this? It's going on one o'clock. If you intend to go through each of these, I suggest we take a brief break for lunch.
Mr. Schram, are you okay.

THE WITNESS: Yes. I'm fine.

THE COURT: Do you prefer to continue or do you want to take a break?

THE WITNESS: No. Let's do this.

THE COURT: All right. Go ahead, Mr. Min.

Q. Page 10?

A. This is EZ in her playroom taken probably the spring of 2021.

Q. Page 11?

A. This is EZ on a trip on the south coast in August 2020.

Q. In Iceland?

A. Yes.

Q. Page 12?

A. This is EZ there with RZ's classmates and her brother and their father in a trip to the countryside of Iceland. I'll keep it simple name. This is winter this is probably January/February of 2021.

Q. Page thirteen?

A. This is EZ with her grandfather and her cousin in my grandparents' backyard, back patio.

Q. When?

A. Probably fall of 2020.

Q. Page 14?

A. This is the kitchen in the apartment at Ranargata. This is bedroom, same apartment.

Q. In that apartment you just spelled out the apartment, you and Ms. Zarak resided in after the past year, approximately?
A. Yes.
Q. Page 15 you said this is the children's room. I apologize.
A. This is EZ's room and RZ's room bedroom.
Q. Page 16?
A. This is the backyard looking out of our apartment.
Q. Page 17?
A. This is Tania's clothes in the bedroom of the same apartment in Iceland.
Q. When was this photo taken?
A. This was taken July 2021.
Q. Was this taken after Ms. Zarak left Iceland?
A. Yes.
Q. Is this an accurate depiction of that her closet looked like when she left Iceland?
A. This is part of it, yes.
Q. Page 18?
A. Playroom in the apartment, same apartment.
Q. Page 19?
A. Books in the playroom in the apartment.
Q. Page 20?
A. Toys, various toys in the playroom, same apartment.
Q. Page 21?
A. Bathroom in the same apartment.

Q. Page 22?

A. The entryway in the same apartment.

Q. Okay. Page 23?

A. Entryway, same apartment, stroller and helmets and gloves and such.

Q. For the last two photographs, page 2 and page 3, do you recall approximately when these photos were taken?

A. In July 2021.

Q. After Ms. Zarak left Iceland?

A. Yes.

Q. Page 24?

A. This is what's called a field trip of Elisa's class during the winter of 2021.

MR. MIN: No further questions on this document, your Honor.

THE COURT: All right. How much more do you have to o, Mr. Min?

MR. MIN: I don't have -- does your Honor want me to press on or do you want to take a short break?

THE COURT: I didn't understand your answer.

MR. MIN: I said I don't have to much more to go I would estimate maybe 15 or 20 minutes.

THE COURT: Mr. Schram, are you all right?

THE WITNESS: Yes.

THE COURT: All right. Let's press on, Mr. Min. And

I am warning you you have way extended any reasonable time limit. So, promptly move on.

BY MR. MIN:

Q. Did the children receive any medical care while living in Iceland?

A. Yes.

Q. Can you describe the type of medical care they've received in Iceland?

A. They went to dentists. They went to doctors. RZ went to a chiropractor.

MR. BEYDA: Objection to relevance of RZ; move to strike.

THE COURT: Overruled.

Q. Did any of the children have any major medical procedures while this Iceland?

MR. BEYDA: Objection to the form. I don't know what a major medical procedure is firstly and it's a bit leading.

THE COURT: It's not leading.

MR. BEYDA: Objection to the form. Objection to the use of the terms in the question major medical proceedings.

THE COURT: Mr. Schram, are you able to answer the question as phrased?

THE WITNESS: Yes.

THE COURT: All right. Could you do so, please.

The objection is overruled.

A. SZ had a dental procedure that required general anesthesia.
Q. When did that occur?
A. February 2021.
Q. Okay. And when did you Ms. Zarak discuss having that procedure done for SZ?
A. In September 2020.
Q. And why did you and Ms. Zarak wait until February to have this procedure done for SZ?
A. Because in February 1st he was admitted into the governmental healthcare system which then would cover most of the expenses of the procedure.
Q. Did you and Ms. Zarak file any joint U.S. income tax returns while you were residing in Iceland?
A. Yes.

MR. MIN: Okay. Your Honor, we would move for the admission of Exhibit P2, which I believe there was no objections to.

THE COURT: Give me a moment, please.

(Pause)

THE COURT: It is admitted.

(Petitioner's Exhibit 2 received in evidence)

Q. Mr. Schram, I need you when you have had a chance to pull it up and identify it for the Court, please?

MR. BEYDA: We're already identified it as the joint tax return. We are just wasting more time.

MR. MIN: If we can stipulate that's part of his joint tax return, that's fine too.
A. It's a tax return.
THE COURT: Thank you.
Q. Mr. Schram, I want to be clear that I am not asking you any questions about any discussions that you and Ms. Zarak had during any marriage counseling or other therapeutic settings. Okay?
A. Okay.
Q. So, ignoring anything that was discussed in any of those settings, did you and Ms. Zarak discuss enrolling the children into school in Iceland for the school year 2021 to 2022?
A. Yes.
Q. Did you and Ms. Zarak come to an agreement as to whether to enroll the children in a school in Iceland for the school year 2021 to 2022?
A. Yes.
Q. What did you and Ms. Zarak discuss regarding enrolling the children in a school in Iceland that year?
A. At least would go to second grade Landakotsskoli, RZ was going to be in stay in his -- the one he was currently at and SZ would go to the same school. Sorry the names.
THE COURT: It's all right. We can deal with that after.
THE WITNESS: Thank you.

A. SZ would go to RZ's school well.

Q. Did you and Ms. Zarak correspond with the various schools about the children's placement the following school year?

A. Yes.

MR. MIN: Your Honor, we'd move for the admission of P47 into evidence.

THE COURT: It'll be admitted.

(Petitioner's Exhibit 47 received in evidence)

(Continued on next page)

BY MR. MIN:

Q. Mr. Schram, if you can just look at the screen, I'm just going to ask you a couple questions. Who is Estelle Toutain?

A. She is EZ's teacher -- she was EZ's teacher during the first grade.

Q. Around this time, April 2021, did Ms. Zarak file an application to enroll RZ at Landakotsskoli?

A. Yes.

Q. Did she tell you that?

A. No.

Q. How did you discover that she had enrolled RZ at Landakotsskoli?

A. We were both saying we're excited to have RZ next year in school.

Q. Did you talk to Ms. Zarak about her filing an application for RZ to attend Landakotsskoli for the school year 2021-2022?

A. Yes.

Q. And what did you and Ms. Zarak discuss about that?

A. I said that he should stay in his current school because being the oldest in kindergarten would do him good.

Q. What was Ms. Zarak's position on RZ attending Landakotsskoli for the following year?

A. She disagreed and wanted him to go to Landakotsskoli instead.

MR. BEYDA: Objection as to what she wanted. The

question was -- we have to find out what she said, your Honor.

THE COURT: Sustained.

Q. What did Ms. Zarak say to you with respect to where RZ should go to school for the school year 2021-2022, in around this time?

A. Yeah, Tania told me that she wanted RZ to go to Landakotsskoli.

Q. Okay. Which side, the Icelandic side or the international side?

A. The international side.

Q. Okay. I want to direct your attention to a document that's been premarked as P 22.

MR. MIN: And your Honor, I'd move for its admission.

THE COURT: I didn't hear the end of what you said.

MR. MIN: I'd move for its admission into evidence.

THE COURT: I think there is an objection, so let me pull it up.

All right. I frankly don't understand the objection. Lacks personal knowledge? Is that a hearsay objection? Is it a foundation objection? I don't know what that means.

MR. BEYDA: I'm just refreshing myself by looking at this document again. I just need a moment. I'm sorry, your Honor.

THE COURT: That's all right.

MR. BEYDA: Thank you.

(Pause)

THE COURT: Mr. Beyda, have you finished reviewing or are you still looking at this?

MR. BEYDA: The only thought is that there's a reference to what somebody, a third party, not a party to this action, knows, which would be hearsay. The rest of the document is fine.

THE COURT: Mr. Min?

MR. MIN: Your Honor, I believe what he's saying is what Ms. Zarak stated in this email that somebody else knows. I'm not offering it for the truth of what that person knows, but certainly Ms. Zarak made that statement.

THE COURT: All right. It's not offered for the truth of the matter asserted in the hearsay document. Otherwise, it is admitted.

MR. BEYDA: There's one other objection. To the portion of what Mr. Schram is saying Ms. Zarak wants, it's calling for her frame of mind. He uses --

THE COURT: Mr. Min?

MR. MIN: Again, I think that's --

THE COURT: When you say you're not offering it for the truth, is that with respect to the entirety of this document?

MR. MIN: It goes to his state of mind at that time.

THE COURT: So you're not offering it for the truth,

you're offering it for the state of mind?

MR. MIN: Yes.

THE COURT: It will be admitted for that purpose.

(Petitioner's Exhibit 22 received in evidence)

BY MR. MIN:

Q. Mr. Schram, can you identify this document.

THE COURT: It's in evidence. He doesn't have to identify it. Just ask him what you want to ask him.

Q. Is this an email chain between you, Ms. Zarak, and Estelle Toutain?

A. Yes.

Q. Okay. And why did you write to Estelle and Ms. Zarak in June, on June 16th, that, "We want to have an Icelandic program next winter, he will either be in his current school or possibly at the Icelandic side at Landakot"?

A. Because we -- that's what -- that's what we wanted, him to continue in an Icelandic school. I did -- I was always referring to Oldukot school as his current school, but then also per discussion of the Icelandic side at Landakotsskoli.

Q. Mr. Schram, I'm sorry, because I believe you said Landakotsskoli twice. So Ms. Zarak -- I'll withdraw that question.

But did Ms. Zarak express to you that she wanted -- withdrawn.

Which child are you speaking about in this email?

A. RZ.

Q. Did Ms. Zarak express to you that she wanted RZ to attend the Icelandic side at Landakotsskoli?

MR. BEYDA: Again, objection to -- if we're now focusing on RZ, who is not even a party to this proceeding, it's completely irrelevant.

THE COURT: Sustained.

MR. MIN: Your Honor, may I make an offer.

MR. BEYDA: And I would suggest then that this document, now that we know it's pertaining to RZ, is irrelevant.

THE COURT: No. It's admitted.

MR. MIN: Your Honor, if I may.

THE COURT: We're going to take a break now. You're not going to -- even if you finish up with Mr. Schram, his cross has to continue, so let's take a lunch break at this time. Use the time to review your notes and figure out how you're going to wrap up when we resume. And then as I told you all, I have a criminal matter on this afternoon, so we need to finish by approximately 4:00 today.

MR. MIN: Your Honor, can I make an offer just on the last objection, please?

THE COURT: Go ahead.

MR. MIN: Your Honor, I think the relevance is whether or not the plan for one child was different than the plan for

all the children with respect to where they might reside. I do not --

THE COURT: The document is in evidence.

MR. MIN: Understood. Thank you, your Honor.

THE COURT: Okay. We'll take a break. It's now 1:14. We'll resume promptly at 2 p.m. That's New York time, obviously.

Mr. Schram, are you all right to continue into later your time?

THE WITNESS: Yes. Yes, that's fine. Yes.

THE COURT: We'll see everyone then in a short while. Thank you.

(Luncheon recess)

AFTERNOON SESSION

2:15 p.m.

THE COURT: All right. Good afternoon, everyone. Are we ready to proceed? Do we have everyone?

MR. BEYDA: Yes, your Honor.

THE DEPUTY CLERK: Yes, your Honor.

THE COURT: All right. Thank you.

MR. MIN: Thank you, your Honor.

THE COURT: All right. Mr. Schram, you're still under oath.

BY MR. MIN:

Q. Mr. Schram, again, without asking you to divulge anything that was said during any marriage counseling session, did you and Ms. Zarak have any discussions in 2021 about enrolling SZ into school, for the following school year?

A. Yes.

Q. Okay. And was SZ enrolled into school in Iceland, in 2021?

A. Yes.

Q. What school?

A. There's an echo.

It's Oldukot, the same school as RZ.

Q. I'm sorry. At least on my end you broke up. You said which school?

A. Oldukot, the same school as RS is currently in.

Q. RS? RZ, RS, same person?

A. RZ, RZ, yes.
Q. When did SZ begin school at Oldukot? And can you spell Oldukot for the record, please.
A. O-L-D-U-K-O-T. He started June 1st.
Q. 2021?
A. 2021.
Q. And was there an adjustment period for SZ at the beginning of his attendance at Oldukot?
MR. BEYDA: Objection to the form.
THE COURT: Overruled.
A. Yes.
Q. Did you -- did Ms. Zarak attend Oldukot with SZ as part of this adjustment period?
A. Yes.
Q. And did you attend Oldukot with SZ as part of his adjustment period?
A. Yes.
Q. How long did this adjustment period last?
A. It was four days, the last four days before summer break, I recall, yes, before summer break.
Q. And what grade was SZ enrolled in at Oldukot in the beginning of June 2021?
A. I think it's called in the US pre-K, for a 2-year-old.
Q. Is that a summer program or is that only during the school year?

A. That's -- those programs in kindergarten levels in Iceland are 11 months of the year.
Q. You said kindergarten levels?
A. Yeah, sorry. Pre-K and K, kindergarten, it's called, in the US, is 11 months of the year. There's only one month off.
Q. When is that one month that's off?
A. It varies between schools, but at Oldukot, it was three last weeks of June and the first -- first week of July.
Q. Was SZ scheduled or enrolled to attend Oldukot after the end of that one-month break in July 2021?
A. Yes. Yes.
Q. And to clarify, this was the --
A. Can I -- can I correct it. It's actually the last three weeks of July and first week of August. Sorry. It was one month back, the break. Sorry. I just want to clarify.
Q. Okay. And was he scheduled to attend Oldukot after that break in August?
A. Yes. Yes.
Q. And EZ goes to a different school; is that correct?
A. Yes. Landakotsskoli.
Q. When SZ left New York in March 2020, how old was he, approximately?
A. One year and three months.
Q. And --
MR. MIN: One second, your Honor.

Q. Just to clarify -- I may have asked the wrong question -- SZ was born in what month and what year?

THE COURT: This is stipulated to. This is stipulated to.

MR. MIN: Okay.

Q. When SZ left New York in March 2020 --

A. Yes.

Q. -- was he walking yet?

A. He was standing up but not walking.

Q. Was he talking yet?

A. Babbling.

Q. And in early June 2021, when SZ began school at Oldukot, was he walking?

MR. BEYDA: Objection to the form. There's no testimony that he began school.

THE COURT: Hold on.

Overruled. If there's something inaccurate, the witness can tell us. I don't see a problem.

A. Can you repeat the question, please.

Q. Sure. Was SZ walking when he started school in early June 2021?

A. Yes.

Q. Was he talking when he started school in early June 2021 at Oldukot?

A. He was babbling, but he had key words, you know, key --

key -- yeah, key phrases he would say.
Q. Okay. And in which languages did he speak words in?
A. Spanish, English, Icelandic.
Q. Do you recall in what language his first word was?
A. Spanish.
Q. Did there come a time when SZ began socializing with other children in Iceland?
A. Yes. When -- during pickups at his siblings' schools, when playdates were at the house, with his cousins when they were around.
Q. Regarding -- withdrawn.
Did you and Ms. Zarak discuss enrolling EZ into any extracurricular activities for summer 2021 or the school year 2021-2022?
A. Yes.
Q. Okay. And did you and Ms. Zarak in fact enroll EZ into any extracurricular activity for that time period?
A. Yes.
Q. Which ones?
A. So for the 2021 school year, she did music classes. For the summer, we were -- we were looking into registering her for gymnastics, summer camp week by week, and a discussion with Waleska, mother of one of the -- her classmates, about coordinating summer programs, and then she is currently enrolled for school year of 2021-2022 in the gymnastics and

piano at Oldukotsskoli.
Q. I want to direct your attention to a document that's been marked -- premarked as Petitioner's Exhibit 1. 91. P 91. Apologies.
THE COURT: P 91?
MR. MIN: 91, your Honor.
THE COURT: All right. Thank you.
All right. No objection, so it's admitted.
(Petitioner's Exhibit 91 received in evidence)
Q. Mr. Schram, can you just identify this document when you get a chance to look at it.
THE COURT: Can you make it larger, please.
A. Yes, sorry. Yes, this is a receipt for a registration at the gymnastics club for EZ for the 2021-2022 school year.
Q. Can I direct your attention to the document that's been premarked as Petitioner's Exhibit 95.
MR. BEYDA: Your Honor, there was an objection to P 91.
THE COURT: I'm sorry. Yes, I do see. There was an objection that it's not certified.
MR. BEYDA: It's not translated.
MR. MIN: Your Honor, that will go back to the same issue. We provided the certified translation on Thursday along with a supplemental exhibit list which, when they filed their objections on Friday, we never received the objections for the

supplemental list. Your Honor addressed that yesterday -- I think two days ago, asking Mr. Beyda to, you know, just confirm that and review that.

MR. BEYDA: Okay. So I'm not -- I'm not questioning your sincerity. So if you provided this in English, then I take your word. I just do not recall it offhand, nor do I have it on my note over here. As an officer of the court, I appreciate what you're saying. I'm assuming that's true and the document is in English.

MR. MIN: Your Honor, I believe your Honor should have a certified translation copy, correct?

THE COURT: I didn't pull the binder out, to be honest. I have an injured back, and these binders are not helping.

MR. MIN: Okay. So I apologize. And we will --

THE COURT: If you provided a certified copy, as Mr. Beyda said, you're an officer of the court; we're both taking you at your word.

MR. MIN: Yes. And the version we showed on the screen is that certified copy, and I can pull that up if Mr. Beyda wants to look at it.

MR. BEYDA: Please, just quickly, just to make sure that I -- thank you.

Okay. Thank you.

THE COURT: So no objection?

MR. BEYDA: No objection.

THE COURT: All right. Thank you, Mr. Beyda.

MR. MIN: I want to direct the witness's attention to Petitioner's Exhibit 95.

THE COURT: All right. This one, there are numerous objections preserved, including no certified translation? This is an email exchange between the two parties.

MR. MIN: Your Honor, it does involve a third party. I will say that we are putting this in for the statements made by petitioner and respondent on this email chain. In response to the third-party email, but the truth of that is not being offered.

THE COURT: Let me just look at it, please.

All right. I still don't understand the "no certified translation" part. What I have is in English.

MR. BEYDA: In the middle of the document, your Honor, there's a message from Donnie --

THE COURT: Oh, I'm sorry. I see.

MR. BEYDA: -- in what appears to be Icelandic, so --

THE COURT: I see. Do we need that portion, Mr. Min?

MR. MIN: No, no.

THE COURT: All right. Why don't you substitute a redacted copy, getting rid of that.

With respect to the rest of the document, is there an objection?

MR. BEYDA: No, your Honor.

THE COURT: All right. It will be admitted.

(Petitioner's Exhibit 95 received in evidence)

THE COURT: Mr. Min, please get us a replacement that redacts that middle portion.

MR. MIN: We'll email one today and send two courtesy copies tomorrow, your Honor.

THE COURT: Thank you.

MR. MIN: Thank you.

BY MR. MIN:

Q. When did the school year for EZ and RZ end in Iceland in 2021?

A. For EZ it was 30 June; RZ then it was the early July.

Q. And prior to June 2021 had EZ returned or traveled to New York since arriving in Iceland on August 1st, 2020?

A. No.

Q. Prior to June -- or between August 1st, 2020 and June 1st, 2021, had RZ at any time traveled to New York?

A. This is April 2020?

Q. August 1st, 2020, to June 1st, 2021.

A. No.

Q. Had either child traveled anywhere to the United States in -- during that year?

A. RZ and EZ, no.

Q. At some point did SZ travel to the United States between

August 1st, 2020, and June 1st, 2021?
A. Yes.
Q. Okay. Did Ms. Zarak accompany SZ to the United States during that trip?
A. Yes.
Q. When was that?
A. May 2021.
Q. Okay. Was that the only trip that Ms. Zarak took to the United States between that time period?
A. Yes.
Q. How long did she stay in the United States for?
A. Excuse me? How long?
Q. Yes.
A. Five days, I recall.
Q. Okay. And did they return to Iceland after that trip?
A. Yes.
Q. And did there come a time after they returned from that trip that Ms. Zarak left Iceland and traveled to Mexico?
A. Yes.
Q. And when was that?
A. June 17th, 2021.
Q. And was she -- withdrawn.
Did Ms. Zarak, when she traveled to Mexico, tell you that she would be returning to Iceland?
A. Yes.

Q. Did anyone accompany her on this trip to Mexico from Iceland?
A. Yes.
Q. Who?
A. EZ, SZ, and the nanny.
Q. Okay. And when did Ms. Zarak tell you she was going to return to Iceland after this trip?
A. Approximately three weeks later, or when her visa renewal was complete.
Q. Did Ms. Zarak tell you that -- withdrawn.
Did you and Ms. Zarak discuss any plans for the family in Iceland after she was supposed to return from this Mexico trip?
A. Yes.
Q. What plans did you and Ms. Zarak discuss after her planned return?
A. To remain in Iceland, but then there was a discussion more in regards to our marriage issues, that --
Q. I want to stop you. And again, so I want to be clear. Maybe my question wasn't clear. And I want to make sure that I'm not asking you any questions about anything that occurred in marriage counseling, okay?
A. Yes.
Q. Okay. What I'm specifically asking you is: Did you have any family plans that you and Ms. Zarak were discussing after

she was supposed to have come back from her Mexico trip?
A. Yes. Her mother coming to Iceland with her from Mexico.
Q. Okay. What was the plan with Ms. Zarak's mother in terms of traveling to Iceland?
A. Tania wanted to take her to the Westfjords, to our friend's house that was out there.
Q. Did you and Ms. Zarak discuss when this might occur?
A. Sometime in August.
Q. Did you and Ms. Zarak discuss any other summer plans after she was supposed to come back from Mexico?
A. We discussed EZ's gymnastic summer program.
Q. EZ?
A. EZ. Sorry. We discussed just general ideas of when I would take time off work so we could do a trip around the country or -- or something of the sort, go out on the countryside.
Q. Did -- sorry.
A. Yeah, that's it.
Q. Did Ms. Zarak return to Iceland after her trip to Mexico?
A. No.
Q. And did she remain in Mexico, as far as you're aware?
A. Yes.
Q. Ms. Zarak continues to be in Mexico, as far as you're aware?
A. Oh, no. For a certain duration, and then she went to New

York.
Q. When did Ms. Zarak arrive in New York, to the best of your knowledge?
A. Around July 20th.
Q. When Ms. Zarak traveled from Iceland to Mexico in June 2021, did you and Ms. Zarak agree that the children would continue to reside and go to school in Iceland?
A. Yes.
Q. Did there come a time that Ms. Zarak had begun -- had started divorce and child custody proceedings against you?
A. Ask the question again? Sorry.
Q. Did there come a time when you discovered that Ms. Zarak had started divorce and child custody proceedings against you?
A. Yes.
Q. Without disclosing how you found out, when did you find out?
A. August 23rd, Friday, I believe.

MR. MIN: Your Honor, I would move for admission Petitioner's 173 and 174.

THE COURT: Give me a moment, please.

No objection. They're both admitted.

(Petitioner's Exhibits 173 and 174 (***SEALED***) received in evidence)

THE COURT: Is that correct, that there's no objection, Mr. Beyda? This is the last group that I don't have

your objection sheet, necessarily.

MR. BEYDA: I am going to take a quick look just to be on --

THE COURT: Please, yes. I just realized.

MR. BEYDA: Thank you.

THE COURT: These are the filings, as I understand it, in the New York Supreme case.

MR. MIN: Your Honor, not all of them, but yes.

MR. BEYDA: We did object to No. --

THE COURT: I'm sorry?

MR. MIN: Your Honor, I said it's not all of the filings but --

THE COURT: I didn't say it was all of them.

MR. MIN: Oh. I just want to clarify.

MR. BEYDA: We did object to P 174 on relevance. That was the order to show cause that was filed.

THE COURT: All right. Overruled. I can take judicial notice of these things.

MR. BEYDA: Okay.

THE COURT: They're admitted. But they should remain under seal because I believe -- am I correct -- that New York Supreme filings in matrimonial matters are sealed?

MR. BEYDA: Yes, your Honor.

MR. MIN: Yes, Judge.

THE COURT: All right. So can our court reporter mark

them as under seal and separately reference this part of the transcript, if there's going to be testimony on this?

(Discussion off the record)

THE COURT: All right. Mr. Min.

MR. MIN: Your Honor, I have no questions on those documents, to let the Court know.

THE COURT: Okay. That's easy.

MR. MIN: Okay.

BY MR. MIN:

Q. Mr. Schram, did there come a time when you filed custody proceedings in Iceland?

A. Yes.

Q. Approximately when?

A. August 2nd, I believe.

Q. As far as you're aware, did there ever come a time when Ms. Zarak filed a request for custody or relocation before the Icelandic court?

MR. BEYDA: Objection, your Honor. Relevance. This has nothing to do with our Hague proceeding and the legal standards --

THE COURT: Hold on. Hold on.

I don't know what "or relocation" means.

MR. MIN: Okay. I can rephrase.

BY MR. MIN:

Q. Mr. Schram, as far as you're aware, did there ever come a

time when Ms. Zarak filed an application or a custody -- a custody application or an application to relocate with the children from Iceland to the United States before --

MR. BEYDA: Objection.

Q. -- before the Icelandic court?

THE COURT: Yes, sustained. First of all, can you break it down.

Q. Mr. Schram, as far as you're aware, has Ms. Zarak ever filed an application to relocate with the children before the Icelandic courts?

MR. BEYDA: Objection. Your Honor, may I -- should I give a speaking objection or --

THE COURT: Just let me think for one minute, please, all right? And let me look at the question.

All right. Are you concerned about Mr. Schram being on the line while you state your objection?

MR. BEYDA: No.

THE COURT: Okay. Go ahead.

MR. BEYDA: There's already a prior action pending in the New York County Supreme Court for divorce and custody of the children that was filed in June. We're now in -- July. Sorry, July of 2021. We're talking about questions that would have taken place -- I forget the question. There was already a prior action pending in New York County Supreme Court.

THE COURT: Yes. So?

MR. BEYDA: There was no need for her to file a proceeding in Iceland. The children -- we're litigating the very issue of --

THE COURT: Overruled. Overruled.

MR. BEYDA: -- the children's habitual residence.

THE COURT: Overruled. You can answer.

A. No.

Q. As far as you're aware, has Ms. Zarak ever filed any legal proceedings in the Icelandic courts with respect to the children?

MR. BEYDA: Objection. Again, relevance.

THE COURT: Overruled.

A. No.

Q. Mr. Schram, as of June 2021, what was your immigration status with respect to the United States, as far as you understand it?

A. An expired O-3 visa, so no visa status.

Q. When did your O-3 visa lapse, as far as you understood?

A. June 2021.

Q. And as of June -- well, after the O-3 visa expired, what is your understanding with respect to your ability to reside in the United States legally?

A. I don't believe -- an O-3 is a spouse visa, so if we're divorced, then I don't think I'm eligible for it anymore, so I don't have any visa status, or any visa to stay in the United

States beyond being a tourist.

Q. And Mr. Schram, what is your understanding of your current ability to work and earn income in the United States, legally?

A. None.

MR. MIN: Your Honor, one second.

No further questions at this time, your Honor.

THE COURT: All right. Mr. Beyda, do you need a few minutes or are you ready to proceed?

MR. BEYDA: I can start, your Honor. Thank you.

THE COURT: All right. Thank you. Cross-examination then, Mr. Beyda?

MR. BEYDA: Yes, your Honor. Thank you.

THE COURT: Thank you.

I'm sorry. Hold on one second. I should have asked you, Mr. Schram, are you okay to continue at this point?

THE WITNESS: Yes.

THE COURT: Okay. Can you do me a favor, sir: Say your last name for me.

THE WITNESS: "Skram."

THE COURT: "Skram." So I'm mispronouncing it. I'm sorry.

THE WITNESS: Quite okay.

THE COURT: Mr. Beyda, go ahead.

MR. BEYDA: Thank you, your Honor.

CROSS EXAMINATION

BY MR. BEYDA:

Q. Mr. Schram, you have been approved to receive a green card in the United States, correct?

A. I -- we -- me and Tania's application was approved. I don't know if -- what -- if that's a correct statement, but we have our -- our initial application was approved.

Q. Okay. That means you're awaiting a green card, correct?

MR. MIN: Objection.

THE COURT: What's the objection?

MR. MIN: It lacks --

THE COURT: If that's his understanding, he can tell us that. If it's not his understanding, he can tell me that.

MR. MIN: With respect to his understanding, yes, but whether that -- what that indicates I believe was an improper question as to form.

THE COURT: No. A witness can only testify to what he knows or understands, so if he doesn't have an understanding or he doesn't know, he can say that.

I'm sorry. Would the court reporter please read back the question.

(Record read)

A. As far as I know, because I have not provided documents to move the application forward, I am not waiting for a green card.

Q. Did you cancel the application for a green card?
A. I did not cancel it, no.
Q. You stated on October 4th that you did not have roots in New York. Do you remember that?
THE COURT: Wait, wait, wait, wait. You stated that on October 4th or --
MR. BEYDA: Yes.
THE COURT: -- on October 4th you did not?
MR. BEYDA: Sorry. I'll rephrase the question.
THE COURT: Thank you.
BY MR. BEYDA:
Q. At page 105 and 106 of your testimony from October 4th, 2021, in this court, you stated that you did not have roots in New York. Do you recall that?
MR. MIN: Objection as to form.
THE COURT: Just ask a question, Mr. Beyda. The record is what it is.
Q. Okay. Mr. Schram, you stated that you did not have roots in New York, correct?
A. Correct.
Q. Now you are 43 years old?
A. Yes.
Q. And you came to the United States when you were 21 years old, correct?
A. Yes.

Q. You attended college in the United States, correct?
A. University, but I don't know if it matters.
MR. MIN: Your Honor, I think Mr. Beyda is frozen.
THE COURT: I think so too. But let's give it a minute.
MR. BEYDA: Okay. It came back. Okay.
THE COURT: Yes. Thank you, Mr. Beyda.
MR. BEYDA: Thank you.
BY MR. BEYDA:
Q. And you attended university in 1999, correct?
A. Yes.
Q. You have lived in the United States for at least 19 years, correct?
A. Give or take, around that, yes, total.
Q. Of those 19 years, you were in New York for at least 13 years, correct?
A. 12, totally, closer.
Q. Well, you came to New York in 2007, correct?
A. Yes.
Q. And that was your second trip to New York; is that correct?
A. You mean as a tourist or like to go live?
Q. I wasn't specifically talking about as a tourist or to live; I was just mentioning this was your second trip to New York in 2007, correct?
A. I might have gone earlier for a short trip, but then moved

2007, possibly, yeah.
Q. You have referred to yourself in conversations with Ms. Zarak as a New York orphan. Do you recall that?
A. I remember talking about the concept of orphan for Thanksgiving, and I want to say it was with people that didn't go to their families. That's the only thing I remember of using that word, but -- an orphan in New York.
Q. And you felt like an orphan in New York because you rarely went to Iceland, correct?
A. No.
Q. Now focusing for a moment on Ms. Zarak, Ms. Zarak first came to New York in the 1990s, correct?
A. That sounds about right, yes.
Q. She attended a year of high school at the Hewitt School in Manhattan, correct?
THE COURT: Does Mr. Schram have knowledge of this? Is it personal knowledge?
MR. BEYDA: I believe so. They were married. I believe that they know each other's backgrounds and re --
Q. Mr. Schram, do you know where Ms. -- are you aware that Ms. Zarak went to high school in New York?
A. Yes.
Q. And --
A. I'm aware.
Q. And Ms. Zarak also attended college in New York, correct?

A. Yes.
Q. And she attended graduate school at the New School in Manhattan, correct?
A. I believe that's the same program, but I might be mistaken.
Q. She also attended Columbia University in Manhattan, correct?
A. One year, yes.
Q. Ms. Zarak has lived consistently in New York prior to March of 2020 for 13 years, with the exception of the time spent in California, correct?
A. I don't know.
Q. Ms. Zarak is a citizen of Mexico, correct?
A. Yes, I think so.
Q. And she's also a lawful permanent resident of the United States, correct?
A. I don't know about that.
Q. She has a green card, correct?
A. I don't know about that.
Q. You never discussed what Ms. Zarak's ability to be in New York was based upon?
A. The last thing I know is that she went to Mexico to do --
THE COURT: Let's see if he unfreezes.
Mr. Schram?
THE WITNESS: Am I back? Am I back?
THE COURT: Yes. So we have on the record: "The last

thing I know is that she went to Mexico to do --"

THE WITNESS: I can't hear you guys. Can you guys see me and hear me?

THE COURT: Yes, we can --

THE WITNESS: I can't hear you.

THE COURT: You might have to log off and back on again.

Mr. Min, do you want to send a note or -- I don't know how you communicate.

MR. MIN: Yeah, we'll send him an email.

THE WITNESS: Any better? I don't hear you guys. I don't hear you guys.

MR. BEYDA: I can now hear him. Mr. Schram, can you hear us?

THE WITNESS: Should I log off real quick?

THE COURT: Yes.

(Pause)

THE WITNESS: Can you hear me and see me now?

THE COURT: We can hear you. Can you hear us?

THE WITNESS: Yes. Much better.

THE COURT: All right. So you were answering the question: "You never discussed what Ms. Zarak's ability to be in New York was based on?" And you said: "The last thing I know is that she went to Mexico to do --" and then you froze.

THE WITNESS: To renew her O-1 visa.

BY MR. BEYDA:
Q. Okay. You are aware -- actually, withdrawn.
You currently have an O-3 visa, correct?
A. No. It's expired.
Q. Do you have any visa right now?
A. So when we got the O visas last year, we got something called a three-year permit, but they only issue the visas year at a time, so technically I don't have a visa right now, but I have this approval for three years, but I don't have a visa right now for it.
Q. So you have the option of obtaining the visa, correct?
A. I'm guessing not because it's a spouse visa connected to Tania, who, you know -- so you have to be a spouse to be able to do that.
Q. Are you divorced from Ms. Zarak at the present time?
A. Not at the present time, no.
Q. So you are her spouse at the present time, correct?
A. At the -- yes.
Q. So you have the ability to obtain that visa at the present time, correct?
A. Yeah, if I was able to. I -- I don't think -- yeah, at least I can't do it in Iceland, so --
Q. Now going back to New York for a moment, we were talking about Ms. Zarak's education in New York. You also went to university in New York, didn't you?

A. Yes.
Q. Where did you go to university in New York?
A. Columbia University.
Q. What year was that?
A. 2009 through 2010.
Q. And you lived in New York during that time?
A. Yes.
Q. You also attended university in California of the United States, correct?
A. Yes.
Q. When did you first learn that your green card was approved, Mr. Schram?
A. I never found out that my green card was approved. The green card application was approved, I want to say summer of 2020.
Q. Have you inquired as to when you might be receiving the green card?
A. As far as I know, I'm not in process to receive the green card.
Q. Have you ever inquired?
A. No.
Q. When did you submit the application for a green card?
A. I didn't.

THE COURT: Okay. Mr. Beyda, I'm going to give you some latitude here because Mr. Min went on for some period of

time, but frankly, I don't see the relevance of any of this. This proceeding is about the habitual residence of the children.

MR. BEYDA: Understood.

THE COURT: Okay.

BY MR. BEYDA:

Q. You met Ms. Zarak in 2013, correct?

A. Yes.

Q. At that time you were both residing in New York City, correct?

A. Yes.

Q. After you met Ms. Zarak you remained in New York City, correct?

A. Yes, but we moved to California at some point.

Q. Before moving to California with Ms. Zarak, you were living with her in New York City, correct?

A. Yes. Let's say eight months or so, I -- after meeting her, I moved in with her, yes.

Q. You moved into her apartment, correct?

A. In Penthouse C, yes.

Q. And subsequently you were married in a civil ceremony in New York, correct?

A. Yes, because her student visa was about to expire.

Q. And while living in New York, you had three children -- excuse me. While living in New York you had children with

Ms. Zarak, correct?
A. Yes.
Q. EZ was born in New York, correct?
A. Yes.
Q. She was born in 2014, correct?
A. Yes.
Q. And after EZ was born you and Ms. Zarak decided to have a second child, correct?
A. Yes.
Q. And you decided to have a second child at a time when you were living in New York, correct?
A. Yes.
Q. And your second child was born in December of 2016, correct?
A. Yes.
Q. And after your second child was born you and Ms. Zarak lived together with your two children in New York City, correct?
A. Yes.
Q. You would agree that you were establishing roots in New York City at that time with Ms. Zarak and the children, correct?
A. I was hearing an echo there for a second.
Didn't feel like it.
Q. You were living in an apartment in New York, correct?

A. I was living in her mother's apartment in New York.

Q. In her mother's apartment. Were you paying any expenses for that apartment?

A. Yes.

Q. What were you paying?

A. We were sharing the expenses, including what we call -- yeah, all expenses, basically.

Q. How much money were you paying her mother to live in that apartment?

A. Tania made the -- we didn't pay Tania's mother anything. We paid the maintenance on the apartment.

Q. And the apartment was in Ms. Zarak's name, your wife, correct?

A. No.

Q. Now going back to the roots, so you were living in New York with two children, married to Ms. Zarak, correct?

A. Yes.

Q. And you would take your infant children out for walks around New York City, correct?

A. Yes.

(Continued on next page)

BY MR. BEYDA:
Q. You would take them to parks in New York City when they were infants, I am focusing on right now, correct?
A. Yes, yes.
Q. And you did a whole bunch of things around New York with your children when they were infants, correct?
A. Like parents do, I guess.
Q. Because you were typical New York parents raising children in New York at that time, correct?
A. Yes.
Q. And your children were New Yorkers born in New York, correct?
THE COURT: Asked and answered multiple times and you've stipulated I believe that the children were born in New York, two of them.
Q. So, just very quickly, your -- SZ was born in California, correct, as we stipulated?
A. Yes.
Q. Now, the apartment that you first moved into with Ms. Zarak was an alcove studio, correct?
A. Yes.
Q. And you subsequently moved out of that apartment, correct?
A. Yes.
Q. And you moved out of that apartment because you were moving into a bigger apartment, correct?

A. Yes.
Q. And the bigger apartment that you were moving into was apartment 6A in the same building, correct?
A. No.
Q. Sorry. Moved to Brooklyn from THC, correct?
A. Yes.
Q. But you only stayed in Brooklyn for several months, correct?
A. Yes.
Q. In fact, you said there for approximately four months, correct?
A. Yeah.
Q. And you weren't happy in Brooklyn, correct?
A. Yeah. We had --
Q. So --
A. Yes, you could call it that, yes.
Q. You were happier in Manhattan, correct?
A. No. I wouldn't describe it that way.
Q. Well, you returned to Manhattan with Ms. Zarak and the children, correct?
A. We returned to a smaller apartment for convenience sake, yes.
Q. You returned to a smaller apartment than the Brooklyn apartment or PHC?
A. Than the Brooklyn apartment.

Q. But 6A was larger than PHC, correct?
A. That's correct.
Q. Smaller than the Brooklyn apartment, yet you moved to, you moved back to Manhattan, correct?
A. For convenience sake because now we found out Tania's pregnant.
Q. So, it was convenient for you to be in Manhattan at that time, correct?
A. Yes.
Q. It was convenient for schooling for purposes of schooling, correct?
A. No.
Q. It was convenient for purposes of their doctors, correct?
A. Not a factor really, no.
Q. It was convenient for your work?
A. Yes.
Q. Okay. So, it was convenient for you to be in Manhattan?
A. Yes, but --
THE COURT: Let him finish, Mr. Beyda.
A. The key was that when Tania's family would be in town to assist, you know, we would talk with all sides in the 6A apartment more than temporarily, rent another apartment in the same building. So, it was very much focused on the pregnancy.
Q. So, Tania's family would come and assist Tania with the children. I'm sorry, Ms. Zarak's family would come from Mexico

is that --
A. For the birth, yes.
Q. And they would come and they would assist Ms. Zarak in caring for your oldest child?
A. Yes, as well as the nanny.
Q. And they would stay in, they wouldn't stay in the same apartment as you and Ms. Zarak, correct?
A. On occasion they would, yes.
Q. They also stayed in other apartments, correct?
A. Yes. I want to say that after RC was born, that became the set up.
Q. In fact, when Ms. Zarak's mother would come from Mexico she oftentimes rented an Airbnb to stay in while she was in New York, correct?
A. Not really. It was in Penthouse A. It was not an Airbnb.
Q. Is Penthouse A the apartment that you live in with Ms. Zarak?
A. No.
Q. Who owns Penthouse A?
A. A neighbor.
Q. So, Ms. Zarak's mother came to New York from Mexico and stayed in the neighbor's apartment?
A. Yes, because we were living in 6A. No. Again, after RZ was born because it started to get pretty cramped in the apartment, that became the better setup for everyone probably

mostly for Tania's mother.
Q. How many years did you live in Apartment 6A with Ms. Zarak and the children?
A. So, we moved in April 2016 and we moved out June 2018. So, a little bit over two years.
Q. Isn't it true that you moved into the apartment in 2015?
A. No. That we moved out of Penthouse C December 2015 went to Brooklyn in April we came to the 6A apartment.
Q. In April of 2016 is your testimony?
A. Yeah, because RZ is born then that following December. So, yeah, leading up to his birth.
Q. So, you described Apartment 6A as a little loft as having a little loft space; do you remember that?
A. Yes.
Q. Actually, I'll come back to that. I'm sorry.
While you were living in the New York City apartment 6A it was a fully furnished apartment, correct?
A. For the most part, yes.
Q. And I'm talking about prior to you going to Los Angeles you had all of your personal property in that apartment, correct?
A. I had an office space. So I had some belongings in the office space and of course, we had some, utilized the storage space in the basement.
Q. So, you had your clothing in 6A, correct?
A. Yes.

Q. Tools in 6A's storage facility, correct?
A. Either there or upstairs. I don't remember at the time.
Q. But aside from stuff that maybe you kept in the office or in storage, all you have your stuff was in Apartment 6A, correct?
A. Yes.
Q. You and Ms. Zarak and your two children subsequently moved to Los Angeles, correct?
A. Yes.
Q. And that was in or about July 2018?
A. June 2018.
Q. You continued to maintain your connections with New York while you were in Los Angeles, correct?
A. Yes. Because it was our only source of income.
Q. And some of these connections were short term connections, people you had met immediately before going to California, correct?
A. Not sure what that means. I had two projects underway at that time which was kind of, which was the prime reason to attend to New York while I was in California.
Q. You maintained personal connections, relationships with people in New York is what I'm asking you, Mr. Schram. Can you answer that yes or no?
A. Yes.
Q. And some of those relationships were relationships that you

have had for many years, correct?
A. Yes.
Q. You have friends in New York from university, correct?
A. At that time not in contact, in like friendly contact I believe, no.
Q. You moved to California when Ms. Zarak was going to start a job with Netflix, correct?
A. Yes.
Q. Subsequently, Ms. Zarak was terminated from Netflix, correct?
A. Yes.
Q. And her last day of work with Netflix was in or about December 2018, correct?
A. Yes.
Q. While you were in California with Ms. Zarak, you and she discussed returning to New York, correct?
A. In addition to discussing Mexico and Iceland and Miami, yes.
Q. And you also I think you said that you were discussing Cuba, weren't you?
A. No, not at that point.
Q. Cuba came you later?
A. Much earlier.
Q. Earlier or later?
A. Much earlier.

Q. When were you talking to Ms. Zarak about moving to Cuba?
A. Tania was talking to me about moving to Cuba because she was interested in a school there that had a specific filmmaker that she wanted to study under and this is as early as 2016.
Q. Now, do you know whether or not Ms. Zarak has ever been to Cuba?
A. I don't know. I don't know. No, I don't know.
Q. Did she ever tell you she went to Cuba?
A. Not that I remember.
Q. Did she ever tell you, did the two of you ever go to Cuba together?
A. No, no.
Q. Did she show you pictures of a school in Cuba?
A. What school are you referring to?
Q. Any school.
A. Did she show me a picture of any school in Cuba? No -- she might have. We looked at the town the school was in and kind of discussed this is an idea.
Q. What town was that?
A. I don't remember.
Q. Now, ultimately, you returned from California to New York, correct?
A. Yes.
Q. And you returned back to the apartment that you were living in in New York immediately before you went to California,

correct?
A. Can you repeat the question? Sorry.
Q. You returned back to New York to the same apartment that you were living in before you went to California, correct?
A. We moved into 6A, yes, we did.
Q. And you started discussing with Ms. Zarak returning to New York as early as March 2019, correct?
A. We probably started talking about location option probably as early as January when after, soon after Tania was fired. So, we were talking like usual about Iceland versus Mexico versus Miami versus New York.
Q. Now, you sent Ms. Zarak a message on March 11, 2019 pertaining to the enrollment of EZ in PS 9, correct?
A. That sounds about right.
MR. BEYDA: Your Honor, may I have Respondent's 18 put on the screen, please.
THE COURT: Hold on until I look at it. Take it down until I look at it, please.
(Pause)
THE COURT: You said 18?
MR. BEYDA: Eighteen, your Honor.
THE COURT: Give me just one second.
(Pause)
THE COURT: All right. There's no objection. It's admitted. Are you offering it?

MR. BEYDA: Yes, I am your Honor.

THE COURT: All right. R18 is admitted.

(Respondent's Exhibit 18 received in evidence)

BY MR. BEYDA:

Q. Now, you sent Ms. Zarak a message indicating, "Okay, next school", correct?

A. Yes.

Q. And that's because the next school for your child was going to be PS 9 in New York, correct?

A. It's in the context of us realizing that PS 87 was not in the school zone. So we took PS 87 off the list. Say, okay. PS 9 list.

Q. Well, PS 87 became PS 9, right?

A. Nope.

THE COURT: I'm sorry. Can whoever is controlling the documents, make it bigger? I can't read it. Thank you.

All right, Mr. Beyda. I'm sorry. Go ahead.

BY MR. BEYDA:

Q. So, that message was sent to by you to Ms. Zarak on March 11, 2019, correct?

A. Give me a second to read the rest of the email.

(Pause)

A. Yeah. So, Tania reaches out to PS 87. PS 87 says this address is no longer in our school zone, PS 9 is. Tania forwards it to me says FYI and I said okay, great. PS 9, it

is.
Q. You actually said "Okay, next school"?
A. Yes. Okay, next school.
Q. Now, at that time it was decided that you were going to be returning to New York, correct?
A. I don't know.
Q. Well, at that time you did not send Ms. Zarak any messages about schools in Iceland, correct?
A. No. But we were in discussion about different, the proposed cause of different locations and we were, for example, talking about the costs of each location and I don't remember the dates of these documents I was sending over.

MR. BEYDA: Your Honor, can I just ask that the witness, some of these questions called for a yes or no --

THE COURT: He said no.

MR. BEYDA: Then he kept on talking. It'll probably go quicker if, but okay.

Q. You did not send any messages to Ms. Zarak about schools in Cuba, correct?
A. I don't know why I would. No.
Q. You didn't send her any messages about schools in Mexico, correct?
A. No.
Q. You didn't send her any messages about schools in Florida either, correct?

A. It was never my interest of going to Miami. So, no.
Q. You then ultimately returned to New York City with Ms. Zarak and three children in tow, correct?
A. Yes.
Q. So, and you went -- Withdrawn.
You are living in a house in Los Angeles, correct?
A. Yes.
Q. A nice house, right?
A. A normal house.
Q. It was bigger than the apartment you are currently living in in Iceland, correct?
A. As well as 6A.
Q. Can you just answer the question that I asked you instead of volunteering information, please?
It was bigger than the apartment you are living in in Iceland, correct?
A. Yes.
Q. In fact, it's significantly bigger than the apartment in Iceland, correct?
A. It's the biggest house we've ever lived in, yes.
Q. Before you left Los Angeles to go back to New York with your wife and three children you actually went to New York to visit schools, correct?
A. I went to couple of schools on one of my trips to New York. The reason for the trip was not -- no, no, the reason for the

trip was not to go --

THE COURT: Okay. Mr. Schram, I am going to ask you, please, just answer the question that was asked and then if your lawyer wants to do follow-up and ask you further questions he can do that. But it will move things along if you just answer the question that was asked.

THE WITNESS: Okay.

THE COURT: Thank you.

THE WITNESS: Even if I think I am answering in the wrong context or if I think that the question --

THE COURT: That's your lawyer's job. Just answer the question that's asked. If something is confusing, you can say that or if there's a problem, you can let me know. But that last question you answered it and then you went on to give something else. It's not a problem but let's just try to, I want to try to move things along and it's not going to move along with the way things are going.

THE WITNESS: Okay.

THE COURT: And that's a two-way street, Mr. Beyda. You are asking a lot of things that are stipulated to or argumentative.

MR. BEYDA: Your Honor, I understand. I'll move forward.

THE COURT: Thank you.

MR. BEYDA: May I please have, we have stipulated to

R129. There was no objection to that document. May I please have that put on the screen?

THE COURT: Just give me one moment, all right? 129.

MR. BEYDA: One-two-nine.

THE COURT: It'll be admitted, yes, you can play it.

(Respondent's Exhibit 129 received in evidence)

(Pause)

BY MR. BEYDA:

Q. Mr. Schram, on your screen is R129 in evidence. That's the house that you lived in California, correct?

A. Yes.

Q. And that's the backyard of the house.

Can you go back one.

(Pause)

A. That's the side yard.

MR. BEYDA: Okay. Mr. Wu, can you scroll down, please.

Q. What is that?

A. That's the living room looking into the kitchen.

Q. Okay. And what is that a picture of?

A. That's a photograph of the house.

MR. BEYDA: Thank you.

Your Honor, we had marked as Respondent's 131 for identification to which there was no objection a --

May I please have that put on the screen.

THE COURT: Are you moving it in?

MR. BEYDA: Yes.

THE COURT: It's admitted. You can display it.

(Respondent's Exhibit 131 received in evidence)

MR. BEYDA: Mr. Wu, can you go to the first picture over here 131. Is that it?

(Pause)

MR. BEYDA: Mr. Wu, can you scroll to the second picture.

Q. Mr. Schram, you had a large 18-wheel truck removing the contents of the California house when you moved out of it, correct?

A. No. I'm sorry. Yes, yes.

MR. BEYDA: Mr. Wu, can you scroll to page three.

(Pause)

MR. BEYDA: Can you scroll to page four, please.

Q. Mr. Schram, is that the truck on page 5 of this exhibit?

THE COURT: Finish the question.

Q. Mr. Schram, do you recognize the truck depicted on page 5 of this exhibit as the truck that was loaded with the family's personal property when you were leaving California?

A. Yes. And you can even see the stuff there in the doorway.

MR. BEYDA: Mr. Wu, can you pull down this exhibit. Thank you.

Q. Mr. Schram, the contents of that house were ultimately

delivered to New York, correct?
A. Yes.
Q. And the contents in that truck belonged to you and Ms. Zarak, correct?
A. Not all of it, no.
Q. What did not belong to you and Ms. Zarak that was in that truck?
THE COURT: Can I just ask you a question? Is Ms. Zarak in a different room?
MR. BEYDA: No, she's not.
THE COURT: She's in the same room with you. Is that who you just spoke with?
MR. BEYDA: I looked over. I didn't exchange words but, yes.
THE COURT: Go ahead, Mr. Beyda. Go ahead.
Q. Whose property was in that truck if it did not belong to Ms. Zarak?
A. The truck went to three other houses to fill up the car before it drives all the way to New York.
Q. And ultimately, your belongings were delivered to the apartment in New York City, correct?
A. Yes.
Q. And you returned to that apartment on or about August 1, 2019, correct?
A. Yes.

Q. Now, going back. Prior to your return to Apartment 6A in New York, you did not have any discussions with Ms. Zarak's mother about living in that apartment at that time, correct?
A. I did not, no.
Q. You did not sign a lease agreement with Ms. Zarak's mother to live in that apartment, correct?
A. No.
Q. You did not pay any money to Ms. Zarak's mother to live in that apartment, correct?
A. No.
Q. In fact, Ms. Zarak's mother never even had any communications with you about living in that apartment, correct?
A. She might have. But I don't remember. I don't remember.
Q. I was asking you a few moments ago about your trip from California to New York to look at schools; do you recall?
A. Yes, I remember that question.
Q. While you were in New York you met with a woman named Nadia Conial from the Rudolph Steiner School, correct?
A. I don't remember her name but I met someone from that school, yes.
Q. You also met with a lady named Rita Yoskowitz from PS 9, correct?
A. Yes.
Q. Both of those schools are a short distance from apartment

6A in New York, correct?
A. One of them is. Another one is across Central Park.
Q. Which one is within walking distance of Apartment 6A?
A. PS 9.
Q. And that's the school ultimately that your child attended upon your return to New York, correct?
A. Yes.
Q. Now, not only did you go and look at schools in New York while you were in California but Ms. Zarak also went from California to New York to look at schools, correct?
A. No.
Q. Ms. Zarak didn't go to PS 9 prior to your return from California with the children?
A. To finish the registration with Elisa because she had to be there in person but she didn't go to look at schools. She went to register applies too.
Q. So, she went in-person, Ms. Zarak, did to register Elisa, correct?
A. Because PS 9 requested Elisa to be there in person.
Q. And at that time SZ was how old?
A. EZ.
Q. No, SZ.
A. Oh, SZ.
THE COURT: The baby you are asking, right?
THE WITNESS: Yeah.

A. Tania went to New York to finish the registration was probably in June. So, a little bit more than month old, I guess.

Q. It was important for Ms. Zarak to go to New York at that time to finish the registration, correct?

MR. MIN: Objection.

THE COURT: Did you consider it important? Hold on. I am going to sustain the objection. You could clarify, please.

Q. You had a discussion with Ms. Zarak about going to finalize the registration for EZ at PS 9, correct?

A. Yes.

Q. And you and Ms. Zarak agreed that she would go to finalize the registration, correct?

A. Yes.

Q. And to your knowledge, are you aware of whether or not Ms. Zarak going there in person was important to Ms. Zarak?

MR. MIN: Objection.

THE COURT: Important to Ms. Zarak.

MR. BEYDA: Yes.

THE COURT: Hold on. You can answer if you are able.

THE WITNESS: Can you repeat the question, please?

MR. BEYDA: Your Honor, I'll withdraw it and rephrase it if that's okay.

THE COURT: Yeah. Based on many objections you've

made yourself.
Q. Are you aware, Mr. Schram, of whether or not it was important to Ms. Zarak to go to register EZ in person in school at PS 9 at that time?
A. I don't know. It was the only way.
Q. You could have taken EZ to register her, correct?
A. Correct.
Q. But you didn't, right?
A. Correct.
Q. Ms. Zarak to your knowledge wanted to go and meet with the administrators at PS 9, correct?
MR. MIN: Objection.
THE COURT: Sustained.
Q. You actually, Mr. Schram, set up that meeting for Ms. Zarak with PS 9, right?
A. I connected Rita and Tania. I might have in the conversation. I don't remember.
MR. BEYDA: Your Honor, Respondent's 19 was offered for identification and no objection has been made. May that be put on the screen, please?
THE COURT: You are offering it into evidence?
MR. BEYDA: Yes, your Honor.
THE COURT: Yes, it's admitted.
(Respondent's Exhibit 19 received in evidence)
THE COURT: Could you all do me a favor and make these

bigger? Thank you very much.

(Pause)

Q. Mr. Schram, can you describe your involvement --

MR. BEYDA: I'm getting feedback all of a sudden.

THE COURT: We are as well.

(Pause)

Q. Mr. Schram, can you describe your involvement in the process of enrolling EZ at the school in PS 9 in 2019?

A. Yes. So, I'm the first one that met Rita in-person, gave her the summary of our situation and then it's e-mail correspondence to coordinate the registration and when EZ had to be in New York. This looks about right.

Q. At the same time?

MR. BEYDA: We could take down the R19 that's in evidence now.

Your Honor, I am not going to be asking anything directly on it.

Q. At that time, same time in 2019, you were not exchanging any communications with any schools in Iceland, correct?

A. No, of course not.

Q. And you had not introduced Ms. Zarak to any administrators in Iceland, correct?

A. Correct.

Q. And that's because it was your intention to live in New York while you were -- Withdrawn.

And that's because it was your intention to return to live in New York in 2019, correct?
A. Yes. We made the decision to move back to New York exactly.
Q. While the children were in California you did not cut ties with their pediatrician in New York, correct?
A. I don't know.
Q. I am asking you personally?
A. I don't know.
Q. Did you cut -- did you personally have any of your children's medical records transferred from New York to California?
A. Me, personally?
Q. Yes, you personally?
A. No.
Q. You also did not have any dental records transferred to any providers in California, correct?
A. I don't remember that.
Q. You also did not terminate the services of, I believe it's Karen Ericson, the chiropractor, who was treating your children, correct?
A. Me, personally, no.
Q. In fact, all of those providers remained in place while you and Ms. Zarak and the children were in California, correct?
A. Can you, please, repeat the question? Sorry.

MR. BEYDA: May I, your Honor?

THE COURT: Do you want the court reporter to read it back or do you want to ask the question?

MR. BEYDA: I got it.

Q. In fact, all of the children's providers from New York remained in place while and Ms. Zarak and the children were in California, correct?

A. I mean, I want to say no to that because we did seek medical services in Los Angeles too.

Q. Well, Ms. Zarak brought SZ to see the chiropractor when she came traveled from California to New York, correct?

A. I don't know.

Q. Mr. Schram, aside from the location of PS 9, can you tell us some of the other reasons why you wanted your child to go to PS 9 in Manhattan?

A. The reason was because it was the public school of the address we, of the apartment we had access to.

Q. No other reasons?

A. We liked the neighborhood, you know.

Q. Was there anything about the school that you liked?

A. It was okay.

Q. Well, did you, subsequent to your return to New York, did you find anything in addition to what you just said that you liked about the school?

A. Can you repeat the question, please? I'm so sorry again.

Q. After your return to New York did you find anything else out about the school that you liked?
A. That's it -- as we got to know the school we realized it was a good school. We were happy that she was -- it was the only public school that we know in New York and it was overall pretty good experience.
Q. And did you have an opportunity to observe your daughter at that school?
A. Yes.
Q. Did you attend class with other parents at times with the children?
A. I don't remember. Maybe. I don't remember. There were some various visits but I don't remember the details of it.
Q. You and Ms. Zarak had conversations about PS 9 being one of the best public schools in Manhattan, correct?
A. That was a rumor, yes.
Q. And you were happy about your child attending one of the best public schools in Manhattan, correct?
MR. MIN: Objection.
THE COURT: On what grounds?
MR. MIN: Laying foundation to the form of the question that PS 9 was one of the best public schools in New York.
THE COURT: No. Overruled, based on the prior answers.

A. We were happy with PS 9, yes.
Q. The question was about you being happy that your daughter was attending one of the best public schools in Manhattan, correct?
THE COURT: That question, objection is sustained.
Q. Okay. While your daughter was attending PS 9 you attended parent's nights out with other parents, correct?
A. One.
Q. You attended a Halloween party with the children, correct?
A. Yes, in the schoolyard, yes.
Q. And you had an opportunity to observe your child at that event, correct?
A. Yes.
Q. Can you tell us what you observed?
A. She was having fun.
Q. Describe it. Describe what you observed?
A. They were different scary rooms in the school. There were like carnival games you would call them on the school yard. There was a blow-up like slide that turned into a path that turned into a slide. Yeah, it was a good Halloween party.
Q. Can you tell me about your observations of your child interacting with the other children, if she was.
A. She was, she would do a lot of these activities with her classmates.
Q. How many children were in her class?

A. I would guess, 20.
Q. Isn't it true there were 25 children in her class?
A. Possible.
THE COURT: He said "I would guess", Mr. Beyda.
MR. BEYDA: That's why I am asking if it was possible.
THE COURT: Go ahead.
Q. EZ was friendly with those children, correct?
A. Like she always is. Yes. Sorry.
Q. In fact, there was even an Icelandic boy in her class, correct?
A. No.
Q. In her school?
A. Yes.
Q. And she was friendly with that boy, correct?
A. Not particularly, no. Not particularly, no. I mean, yes, but not particularly.
Q. Isn't it your friend's son who I am referring to right now?
A. No.
Q. You don't know that Icelandic boy's parents?
A. We ran into them in a playground in Central Park but I didn't know them prior to that. I wouldn't call them friends. Acquaintances.
MR. BEYDA: Okay.
MR. MIN: Your Honor, sorry to interrupt. Are we going to go to four or 4:30? If we are going to go to 4:30, I

would request a one-minute bathroom break.

THE COURT: Take a bathroom break, by all means. Let's pause and everyone can have a short break.

MR. BEYDA: Are we going to 4:30 or four?

THE COURT: Let's just see where we're at.

MR. BEYDA: Very good.

(Recess)

MR. MIN: Everyone back and ready to proceed?

All right. Mr. Beyda.

MR. BEYDA: Thank you.

Q. Mr. Schram, in August 2019, you would agree that you are happy to be back in New York, correct?

A. No.

Q. You weren't happy to be settling in your old hood, for example?

A. I mean, give me a second. In some ways, yes.

Q. You were enjoying Central Park, for example, correct?

A. Yes.

Q. You enjoyed walking around Manhattan, correct?

A. Yeah.

Q. You enjoyed taking your children for walks around Manhattan, correct?

A. Yes.

Q. In fact, you sent an e-mail to your former landlord in Los Angeles about your happiness regarding the return to New York,

correct?
A. I don't remember.
Q. Do you remember expressing your happiness to Ms. Zarak about being back in New York?
A. I don't remember.
MR. BEYDA: Your Honor, R75 was marked for identification and no objection was made and I'd like to offer it into evidence.
THE COURT: Admitted.
(Respondent's Exhibit 75 received in evidence)
THE WITNESS: I dropped off. Can you hear and see me again?
THE COURT: Yes, we can. We are just taking care of admitting a document, R75.
MR. MIN: Admitted.
MR. BEYDA: Mr. Wu, can you please put on the screen R75 in large font?
THE COURT: Thank you.
(Pause)
THE COURT: Much better.
Q. Mr. Schram, are you looking for a hard copy of this?
A. Yes.
Q. Let us know when you are ready.
(Pause)
A. Yes. Found it.

Q. Are you ready for me to proceed?
A. Yes.
Q. Who is Leila Fakouri?
A. Our landlord in Los Angeles.
Q. In looking at this document, do you now recall sending a message to Ms. Fakouri that indicated in part we're slowly settling in our old hood enjoying Central Park extensively and walking about again?
A. Yes.
Q. That was sent approximately 11 days after you returned to New York, correct?
A. Yes.
Q. So, tell us what you liked about the return to the old hood in August of 2019, please.

MR. BEYDA: Mr. Wu, you could take the exhibit down.

MR. MIN: Objection as to form; assuming a fact not in evidence.

THE COURT: Can I see the document again, please?

(Pause)

THE COURT: Sustained.

Q. Tell us, Mr. Schram, what you enjoyed about Central Park extensively?
A. To be walking around again after, you know, adapting to our car, a city that you rely on a car for Los Angeles.
Q. Tell us what you meant by "settling in our old hood",

please?
A. Getting reacquainted with businesses and acquaintances in Upper West Side.
Q. So, who did you get reacquainted with in August of 2019?
A. Like family that owned a deli that's close by, the ice cream shops that are around, you know, the things that we enjoyed out and about in the neighborhood.
Q. No old friends?
A. In the neighborhood, old hood? No. I don't think we have any friends living in our neighborhood, so.
Q. No friends. You and Ms. Zarak did not have any friends in the neighborhood when you returned in August 2019?
A. There's a bunch of acquaintances, people we see on the streets, neighbors, et cetera. But if I would characterize anything as friends like we have them over for dinner kind of friends, no.
Q. I am confused. I'm sorry. Is it your testimony that you did not have friends in New York in August of 2019?
A. That's not the neighborhood. That's New York.
Q. Okay. So you did have friends in New York?
A. Yes.
Q. And did they live in Manhattan?
A. Some of them did and do.
Q. Did they also have children?
A. Some of them do, yes.

Q. Did they have children EZ's age, for example?
A. Yes, around, yes.
Q. What about RZ's age?
A. Being toward the time two and a half? Yeah, I guess, sure.
Q. What about SZ?
A. Yeah. At the time they were friends in New York with small babies, yeah.
Q. And your children would, you would bring your children to playdates with these children, correct?
A. Yes.
Q. There was Uky and Ray, for example?
A. Yes.
Q. Uky and Ray had children your children's ages, correct?
A. They have a child, one. Ray is Uky's daughter.

MR. BEYDA: Okay.

MR. MIN: If I could just ask make a request to use the initials of other children's names, perhaps?

THE COURT: How about we do this. Each day you can give a list and we'll ask the court reporters to for the final transcript switch to initials.

Is that workable for our court reporter? That way we don't have to keep interrupting.

COURT REPORTER: Yes, it is, your Honor.

THE COURT: Thank you.

Q. Did you also know someone named "Mandy"?

A. Yes.
Q. Did Mandy have a child?
A. Yes.
Q. Did they live in Manhattan?
A. No.
Q. Did they have contact with any of your children?
A. Mandy and Tania are old close friends through their mothers. I guess the children had contact.
Q. Okay. I am going to move forward and come back to this later on.

MR. BEYDA: Your Honor, are we going until four? I thought we said "four o'clock".

THE COURT: Let's keep moving. I am okay to keep going. I'll tell you when I need to stop.

BY MR. BEYDA:
Q. You played soccer in New York, right?
A. I used to.

(Continued on next page)

BY MR. BEYDA:
Q. When did you stop?
A. Prior to going to Los Angeles.
Q. And when you came back, you continued to socialize with friends from the soccer team, correct?
A. Couple of them, yes.
Q. And some of those friends had children as well, correct?
A. Yes.
Q. And your children interacted with those children, correct?
A. When we met up, yes, yes.
Q. And you also have a good friend named Tom who lives in New York, correct?
A. Yes.
Q. And his family lives with him in New York, correct?
A. Yes.
Q. And he also has children, correct?
A. Yes.
Q. And they interacted with your children, correct?
A. Yes, yes, yes, sometimes.
Q. You also know someone named Dushant(ph), correct?
A. Yes.
Q. And he has a family as well that lives in New York, correct?
A. Yes, yes.
Q. And your children interacted with his children, correct?

A. Yes.
Q. And there are more -- this is just a sample of people that obviously you know in New York, correct, Mr. Schram?
A. This is big portion of it.
Q. Well --
A. Yes.
Q. There's also -- there's -- I don't know how to pronounce his name. I think it's Bjarni?
A. Bjarni had moved to Iceland.
Q. They lived in New York in 2019, correct?
A. Yeah. Maybe they moved to Iceland during that time, yeah, possible.
Q. But you would agree that there are more people that you know in New York with children, right? I don't have to continue going through this list, do I?
THE COURT: There are 8 million people in New York.
THE WITNESS: Yeah.
Q. And Mr. Schram --
THE COURT: Maybe more.
Q. These people came to your apartment in Manhattan, correct?
A. On occasion, yes.
Q. And you went out and socialized and they brought their children to your apartment, correct?
A. Sometimes, yes.
Q. And your children had playdates with their children in the

apartment, correct?
A. It would be more in Central Park.
Q. Well, you would have a Thanksgiving brunch in the apartment, correct?
A. Yes, yes, yes.
Q. Your friends and their children would come to that brunch, correct?
A. Yeah. We tried to keep the tradition, but it wasn't always successful, but yes.
Q. Now I'm going to focus for a moment on the apartment, okay? You started -- the apartment has two bedrooms, correct?
A. No.
Q. How many rooms in the apartment have beds? Actually, let me rephrase that.
In March, in March of 2020, how many rooms in the apartment had beds?
A. One.
Q. Which room was that?
A. I'm sorry. Can you say the date again, just so I'm sure.
Q. March of 2020.
A. One. It was the TV room.
Q. There was no bed in the loft?
A. Yes.
Q. So, okay.
A. The loft is in the TV room.

Q. The loft is above the TV room, correct?
A. Yes, that's a better way to put it.
Q. So in the loft there was a bed, correct?
A. Mattress, yes.
Q. Mattress. You said it was a small mattress when you were testifying. Do you remember that?
A. I think it was a twin size.
Q. Would it surprise you -- isn't it true that it's a queen size mattress?
A. I'm not sure.
Q. Well, were you guessing when you said, "I think it's a twin size"?
A. Yes.

THE COURT: He said, "I think."

MR. BEYDA: He also just said he was guessing, your Honor.

THE COURT: Because -- go ahead.

Q. So aside from the queen size mattress that might have been in the loft, there were two other rooms in the apartment with beds in it, correct?

MR. MIN: Objection to the characterization of this loft space as a room. I mean, I think perhaps it's semantics, but I think the client has said -- the witness has described the space. Mr. Beyda keeps trying to requalify it as a room.

THE COURT: I think I have the picture. Overruled.

You can ask, Mr. Beyda.

MR. BEYDA: Thank you.

BY MR. BEYDA:

Q. The question was: Aside from the queen size mattress that might have been in the loft, two other rooms had beds in them, correct?

A. No.

Q. Who slept on the mattress in the loft?

A. I would usually do that.

Q. Where did the nanny sleep?

A. In a pullout sofa in the -- in the -- what was the old bedroom.

Q. So would that be another room that someone slept in at night?

A. That -- yes, yes.

Q. Okay. And then you said that there was another room that EZ and RZ slept in, correct?

A. No.

Q. Okay. So you said that you slept sometimes in the loft, correct?

A. That's inside the TV room.

Q. When you did not sleep in the loft that's inside the TV room, where did you sleep?

A. In the mattress -- in the bed that's in the TV room.

Q. Okay. So now we've established that there are two

mattresses, correct?
A. Yes, actually, there was the bed frame we brought from LA with two -- actually one on top of each other, if you want to count as mattresses.
Q. So then aside from the mattress in the loft, the mattresses in the TV room, there was also what's sometimes referred to as a daybed that the nanny slept in in a separate room, correct?
A. No. It's a sofa that you have to pull out to be able to sleep in. It's a sofa, not like the classic daybed.
Q. So it's a sofa bed.
A. It's a pullout sofa.
THE COURT: That's what he said, Mr. Beyda. He said that before.
Q. But you would close the sofa during the day and you would use that room for the children to play in when no one was sleeping in the bed, correct?
A. No. It was more like the nanny room, not a playroom. It was more like the nanny room. It was like her room.
Q. So in addition to these three separate places that we just described, there were also two bathrooms, correct?
A. I didn't -- I didn't agree to be two separate spaces. There was one space with a bed in it and then the mezzanine that's all open. This is no division of the space. It's not two different spaces. It's one space that we all slept in. But yes, two bedrooms -- bathrooms.

Q. Okay. There was a living room, correct?
A. Yes.
Q. There's a dining area, correct?
A. Yes.
Q. A kitchen, correct?
A. Yes.
Q. In total this apartment is approximately 1200 square feet, correct?
A. That's possible.
Q. In fact, that apartment is bigger than the property that you're living in in Iceland, correct?
A. If it's 1200 square feet, then yes, it is.
Q. Now the apartment you just described is located near Central Park in Manhattan, correct?
A. Yes.
Q. It's located near the Museum of Natural History, correct?
A. Yes.
Q. It's actually also in the vicinity of the Rose Planetarium correct?
A. Hayden Planetarium, isn't it called? But yes, the planetarium.
Q. And you've been to all three of those places with your children, correct?
A. Yes.
Q. You've been there numerous times, actually, with your

children, correct?
A. Yes.
Q. And you've observed your -- how did you observe your children's demeanor when you were at these places?
THE COURT: What place? Break it down.
Q. I'm sorry. When you were in Central Park with the children, can you describe how they -- what you observed of them.
A. They enjoyed the -- they enjoyed the playgrounds.
Q. Was that -- I'm sorry.
A. Oh, specifically the museum. They -- they liked the big whale, you know, in that room, they liked the dinosaurs, and the -- it's called a gallery, with all the dioramas, I think it's called? It was -- yeah, it's -- it's a great museum.
Q. In fact, you had a membership to the museum, I think, correct?
A. Yes. I believe we got a membership probably after -- after returning from Los Angeles. Maybe before. I don't know. But yes, yeah, we had membership.
Q. You testified about the sleeping arrangements of the children in the apartment between August 2019 and March 2020; do you recall?
A. Yes.
Q. You mentioned that the children would sleep in the bed with Ms. Zarak --

A. Yes.

Q. -- correct?

A. Yes.

Q. Now Ms. Zarak was nursing SZ at the time, correct?

A. Yes.

Q. And she was nursing him on demand, correct, if you understand what that means, that reference?

A. What do you mean?

Q. Whenever he was hungry.

A. Yeah, you probably can describe it that, but there was -- I think he was eating also along with that, but yeah.

Q. And what is the age difference between SZ and RZ?

A. Two years and six months.

MR. BEYDA: Your Honor, I might want to pull up an exhibit at this point. I'm sorry. I just need a moment.

THE COURT: Go ahead.

Q. Actually, Mr. Schram, you didn't have an issue with the children sleeping -- with the children's sleeping arrangements between August 2019 and March of 2020, correct?

A. I did.

Q. What issue did you have?

A. Well, that they were -- they all occupied the only bed we had in the house, so -- and they didn't have their own beds. It was just not -- I didn't like the setup.

Q. Did you have an issue with them sleeping with their mother?

A. No, but it was more like they -- I wanted -- I wanted them to have their own beds, you know.
Q. Isn't it true that there was a bassinet in the bedroom?
THE COURT: That there was what? I'm sorry.
MR. BEYDA: A bassinet.
THE COURT: Ah. Thank you.
A. So we had different bassinets, if you will, since EZ was born. I think the most of times bassinets were actually used was maybe, you know, handful of times. We just never used them. So I think it was stuff in storage. It was in storage, really.
Q. You also had a crib in the apartment, correct?
A. Yes. I mean, sorry, crib. Bassinet and a crib is the same, no, or what?
THE COURT: Are you using them the same way?
THE WITNESS: The bassinet is the same as a crib, essentially, no?
THE COURT: Well, when you answered the question about whether there was a bassinet, were you talking about the crib or were you talking about something else?
THE WITNESS: I was talking about what I understood -- understand is a crib, yes, yes.
THE COURT: Okay.
THE WITNESS: Yeah, yeah.
BY MR. BEYDA:

Q. Where was the crib located?

THE COURT: What period in time?

MR. BEYDA: Sorry. Between August 2019 and March 2020.

THE COURT: Thank you.

A. Might have by -- might have been by the window in the TV room, or it might be -- or I might be confusing before -- yeah, give me a second.

It's possible it was simply in storage downstairs, to tell you the truth. I just don't remember.

Q. Wasn't it next to the bed in the lower level below the loft?

A. Possible.

Q. Okay.

A. But not used for anyone to speak of.

Q. None of your children -- is that ever? None of your children ever slept in a crib in 6A?

A. Maybe -- I don't think SZ ever slept in a crib. Like maybe once or twice, maybe, but it was something we just never did. Despite buying I think three different sets of cribs for all the children, we just never used them as such.

Q. What about EZ's Montessori bed, where was that?

A. Well, Montessori bed, you mean like a small mattress for her, right?

Q. Yes.

A. So we -- before going to Los Angeles, I think we had one on the floor, but she would just sleep in the bed, then we looked -- then I don't know what happened. I think we stored it in Los Angeles -- New York. When we went to Los Angeles, we bought mattresses for the children, actually in New York, and shipped it over, and we tried to do -- I'm -- I'm sorry. I'm not answering the question 'cause I'm starting to do the history of the sleeping arrangements, but -- I can do that if you want to, but -- so when we came back from Los Angeles, the mattress might have been in storage. That mattress, particular one, along with the other mattresses that we -- that were intended for the children that were not used. Sorry.

Q. Mr. Schram, can you tell us some of the good things, from your perspective as a parent, raising three children, about raising children in New York City.

THE COURT: Hold on one minute.

MR. MIN: Objection.

THE COURT: Hold on one minute.

What's the objection, to the form?

MR. MIN: To the form and --

THE COURT: Sustained.

BY MR. BEYDA:

Q. Mr. Schram, are there any good things about raising children in New York City, from your perspective as a parent of three children?

MR. MIN: Objection.

THE COURT: He can answer.

You're basically asking for his opinion, right?

MR. BEYDA: Yes.

A. I mean, yes, there are -- I would say there are qualities to New York, Manhattan. So, I mean, we're talking about all of New York here or are we talking about specifically neighborhood? It's a little broad, like --

Q. Do you want to start -- we can start with Manhattan, to make it easier.

A. I want to say parks, public spaces are -- are well done; playgrounds are well done in Manhattan. That applies to our neighborhood as well. Parks -- yeah, I would say parks is absolutely the biggest thing for us. It always was. And I think even when we moved to Brooklyn and we were without our neighborhood park, we -- we really suffered in terms of outdoor space. So outdoor -- outdoor activities, I would say, are pretty good. You can go to the streets, again, you go to the parks, it's -- it's -- there's stimulation that you get that you don't necessarily get when you're sitting in a car. Yeah.

Q. In addition to parks, you testified earlier about the museum that was I think across the street from Apartment 6A?

A. Yes, yes, definitely, of course, yes.

Q. Definitely, of course, yes, what?

A. I mean, it's a great, great place. I mean, what parent

would not want to have Museum of Natural History, you know, in the neighborhood?
Q. And you and Ms. Zarak, as parents of three children, appreciated that as a benefit to your children, correct?
A. Yes.
Q. And you're an architect by trade, correct?
A. Yes.
Q. Did you ever take your children walking around New York and show them architecture?
A. No, not really.
Q. What about the education that children provide -- your children were receiving in New York; any benefit to that?
A. I mean, there are schools in New York, yes. I mean, like -- like other places.
Q. I know there are schools, like other places, in New York. I'm talking about the quality of them. Sorry if I was not clear. As a parent to three children, raising children in New York, you appreciated the quality of the schools in New York, correct?
THE COURT: All right. I'm going to ask you to narrow the question. That's overly broad. New York City schools can be all over the place, as you well know.
MR. BEYDA: Okay.
Q. I'm going to narrow this down significantly. Mr. Schram, what I'm asking you to do is please tell us the good things

about raising your children in Manhattan before leaving Manhattan in March of 2020.
A. Central Park was -- is a great thing; the Museum of Natural History; museum of history that's next to it; there is a kids museum, I recall, it's called, it's also on 85th Street, I think; we enjoyed being in walking distance to P.S. 9; we enjoyed the restaurants in the neighborhood. We liked also the Broadway Presbyterian Nursery School that's on 114th or 113th, I recall. This was a nursery school for EZ and one half a year before COVID hit for RZ. I think these are the key elements.
Q. Okay. So you --
THE COURT: All right. Mr. Beyda, now we're getting to the point where I need you to find a convenient breaking point, please.
Q. You said "we liked" and "we enjoyed" certain things just now, correct?
A. Yes, yes.
Q. And you knew that Ms. Zarak liked and enjoyed the ability to raise your children in New York because of the places you just described, correct?
A. Yes.
Q. And Ms. Zarak never expressed an opinion that she did not enjoy any of the things you just described in Manhattan, correct?
A. No.

Q. And in fact, Ms. Zarak --
A. I'm sorry. I'm sorry to -- can you rephrase -- can you repeat that question. I'm not sure if I answered it correctly. I'm sorry.

MR. BEYDA: Your Honor, may we please have the court reporter please read that last one back.

THE COURT: Read your question and read his answer.

MR. BEYDA: You're talking to me?

THE COURT: Yeah.

MR. BEYDA: Read my question and read his answer? I was asking if the court reporter --

THE COURT: Yes. Okay. Read it back. He's pointing out to you that there's a double negative. Read the question back and let Mr. Schram answer it again.

(Question read)

THE COURT: And answer.

A. Yes.

THE COURT: All right. Is this a convenient point for a break, Mr. Beyda?

MR. BEYDA: Sure.

THE COURT: Okay. All right. What is the plan for tomorrow in terms of witnesses? How long are you going to be with Mr. Schram?

MR. BEYDA: I imagine for -- I'm terrible at estimating this. I -- have to say at least -- at least two --

two hours, two and a half hours.

THE COURT: Okay. Give me one moment.

All right. And what happens after that? Mr. Min, do you have any additional witnesses?

MR. MIN: No, your Honor.

THE COURT: That would be the end of the petitioner's case?

MR. MIN: Yeah. I mean, barring any unforeseen rebuttal witnesses, but we don't foresee that being necessary.

THE COURT: That's what "unforeseen" means.

MR. MIN: Yeah. Good point, your Honor.

THE COURT: What about the respondent's case then? You've already put on your expert.

MR. BEYDA: We -- we will be going then --

THE COURT: Who's your first witness?

MR. BEYDA: Is it okay if Ms. Chawla speaks at the same time I do, because she's been coordinating with the non-parties?

THE COURT: Sure. Ms. Chawla?

MS. CHAWLA: Your Honor, we have Rita Yoskowitz from the school who is available to testify; we also have Marijta Ratkovic. I am sorry I'm butchering everyone's name. And we have Tanya Sleiman as well as a witness to testify.

THE COURT: Sorry. Who are those second two people that you mentioned?

MS. CHAWLA: It's Marijta --

THE COURT: No, not their names. What's their role?

MS. CHAWLA: They know the petitioner, they know the respondent; the parties made statements to them about their intention with respect to going to Iceland and why they were in Iceland.

THE COURT: All right. And those people would be about how long each?

MS. CHAWLA: I don't anticipate our questions would be more than 20 minutes, 20 to 30 minutes, at most, for each of them.

THE COURT: Okay. All right. And then? I'm sorry.

MS. CHAWLA: I was just going to say and Ms. Yoskowitz was the parent coordinator at P.S. 9. So she -- so both parties have communicated with her about the children's registration at P.S. 9.

THE COURT: All right.

MS. CHAWLA: Same length of time. We're trying to --

THE COURT: And that's a fourth person? I'm sorry. She's not one of the three. The three plus her.

MS. CHAWLA: Yes.

THE COURT: Okay. And then?

MS. CHAWLA: Respondent will be testifying, obviously.

THE COURT: Okay. And is Ms. Zarak your last witness?

MS. CHAWLA: Your Honor, we may put on Teresa Woods.

We just haven't confirmed yet. She is the immigration attorney who worked with Ms. Zarak and with whom Mr. Schram also communicated.

THE COURT: Okay. Mr. Min, you were trying to say something?

MR. MIN: Oh, I'm not sure, your Honor -- I just would want to confirm with Ms. Chawla that -- she had sent a list, it was a little bit longer, a couple days ago. Is this the final list? I just want to make sure that there's no more people --

MS. CHAWLA: We're trying to narrow it down considering how little -- considering we're already at Wednesday.

(Discussion off the record)

THE COURT: All right. Thank you, everyone. Have a good evening.

ALL COUNSEL: Thank you, your Honor.

THE COURT: Mr. Schram, I remind you again, you remain under oath, so please don't discuss your testimony with your lawyers, or anyone else. Thank you, sir.

THE WITNESS: Of course. Thank you.

THE COURT: Everyone have a good evening.

ALL COUNSEL: Thank you, your Honor.

(Adjourned to October 7, 2021, at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of: Page

ARNDÍS ANNA KRISTÍNARDÓTTIR GUNNARSDÓTTIR

Direct By Ms. Chawla . . . . . . . . . . . . . . 301

Cross By Mr. Glasser . . . . . . . . . . . . . . 318

Redirect By Ms. Chawla . . . . . . . . . . . . . 334

ARNALDUR SCHRAM

Direct By Mr. Min . . . . . . . . . . . . . . . 337

Cross By Mr. Beyda . . . . . . . . . . . . . . . 420

PETITIONER EXHIBITS

Exhibit No. Received

173 and 174 (***SEALED***) . . . . . . . . . . 414

2 . . . . . . . . . . . . . . . . . . . . . . 393

22 . . . . . . . . . . . . . . . . . . . . . 399

47 . . . . . . . . . . . . . . . . . . . . . 395

91 . . . . . . . . . . . . . . . . . . . . . 407

95 . . . . . . . . . . . . . . . . . . . . . 410

99 . . . . . . . . . . . . . . . . . . . . . 358

100 . . . . . . . . . . . . . . . . . . . . 361

103 . . . . . . . . . . . . . . . . . . . . 356

132 . . . . . . . . . . . . . . . . . . . . 343

138 . . . . . . . . . . . . . . . . . . . . 364

RESPONDENT EXHIBITS


| Exhibit No. | Received |
|---|---|
| 114 and 115 | 365 |
| 129 | 444 |
| 131 | 445 |
| 18 | 440 |
| 19 | 450 |
| 67 | 371 |
| 75 | 458 |