UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In the Matter of E.Z. and S.Z.

ARNALDUR SCHRAM,

Petitioner,

v. 21 Civ. 6524 (MKV)

TANIA ZARAK,

Respondent. Remote Bench Trial
------------------------------x

October 7, 2021
9:54 a.m.

Before:

HON. MARY KAY VYSKOCIL,

District Judge

APPEARANCES

BURGER GREEN & MIN LLP
Attorneys for Petitioner
BY: RICHARD MIN, ESQ.

GALLET DREYER & BERKEY, LLP
Attorneys for Petitioner
BY: KENNETH GLASSER, ESQ.

CHEMTOB MOSS FORMAN & BEYDA LLP
Attorneys for Respondent
BY: MICHAEL F. BEYDA, ESQ.
MUDITA CHAWLA, ESQ.

(Case called)

THE DEPUTY CLERK: Good morning, your Honor.

THE COURT: Good morning, Ms. Dempsey.

(Discussion off the record)

THE COURT: Good morning, everyone. We are back on the record in this matter.

Mr. Schram, you're still under oath.

And Mr. Beyda, I believe you are examining, right?

MR. BEYDA: Yes, your Honor.

THE COURT: All right.

MR. BEYDA: Your Honor, just in terms of logistics, on Monday morning when we began -- or Monday, when we began, I had mentioned to the Court that Ms. Zarak was sitting in my office with me during this portion of the trial. I just want to make sure that that's okay and there's no issues with that, because yesterday -- and there was no issue expressed when we began, and I made that note to everybody, to let everybody know that. I just want to make sure because the Court seemed surprised yesterday when Ms. Zarak was sitting in my office with me. I just want to make sure --

THE COURT: I wasn't surprised she's sitting in your office with you. I was surprised that you were communicating. But you do have a right to communicate with your client, so -- it just caught me off guard; that's all.

MR. BEYDA: Okay. Thank you.

THE COURT: It was just apparent to me that you were communicating; that's all.

MR. BEYDA: I understand.

ARNALDUR SCHRAM, resumed.

CROSS EXAMINATION

BY MR. BEYDA:

Q. Good afternoon, Mr. Schram, in Iceland.

A. Hello. Can you hear me well?

THE COURT: Yes.

Q. Yes. I am able to hear you.

A. Good.

Q. Can you hear us, Mr. Schram?

A. Yes. Okay. Let's try this. It's a little blurry, but let's try this.

Q. Yesterday before we broke for the day, you had testified about enjoying certain activities and things in Manhattan. Do you recall?

A. Yes.

Q. And you specifically referred, said that "we enjoyed." I just want to be clear as to who you're referring to when you say "we enjoyed;" for example, "we enjoyed being in walking distance to P.S. 9."

A. That refers to me and Tania.

Q. Okay. And you also said "we enjoyed the restaurants in the neighborhood." Who was that referring to?

A. Me and Tania.
Q. Okay. And you said that "we liked the Broadway Presbyterian Nursery School." Who was that referring to?
A. Me and Tania.
Q. Okay. Can you tell us what else you and Tania liked about living in New York prior to March 2020.
A. Yes. I believe I listed some items yesterday in terms of the schools, in terms of Central Park, in terms of the restaurants, in terms of the museums -- yeah, that's it.
Q. Did you like the culture of New York City?
A. Mixed feelings.
Q. Did you think that was productive -- was beneficial to the children, the culture of New York City?
A. Mixed feelings. Probably that's the best way to answer it.
Q. What about the theaters in New York City? Did you and Ms. Zarak enjoy those?
A. Movie theaters or like Broadway?
Q. Start with Broadway.
A. I never went to -- I've never gone to a Broadway show, so no.
Q. What about marionette?
A. I don't -- I have never been to a marionette show, so --
Q. Now in addition to the items you mentioned, did you enjoy riding scooters in Manhattan with the children?
A. Yes.

Q. In fact, you own a scooter of your own, correct?
A. It was the only way I could keep up with EZ, yes.
Q. So would you and EZ ride a scooter together in Manhattan?
A. Yes, on occasion.
Q. Is that something the two of you enjoyed doing together in Manhattan?

THE WITNESS: I hear a lot of typing.

THE COURT: Yes, the Court is hearing that as well. But I don't know where it's coming from since everyone's mics seem to be muted.

All right. Why don't we continue. Right. So if anybody is typing who's plugged in by phone, you need to mute your phone line if you're going to continue to type. I don't know if that's you, Mr. Min, but -- whomever it is.

All right. Let's try again, Mr. Beyda.

MR. BEYDA: Your Honor, may I have the last question read back from the court reporter, please.

(Record read)

A. Yes. You know, around the -- the neighborhood; not that we went up and down Manhattan; you know, in the neighborhood, yes.
Q. Now EZ's scooter is in Manhattan, correct?
A. Yes, I believe so.
Q. And when you left on July 31st, you left it in Manhattan, correct?
A. Yes.

Q. And you also left in Manhattan, on July 31st, your scooter, correct?
A. Yes, yes.
Q. And you left both of those scooters in Apartment 6A, correct?
A. Or in the storage, but essentially, yes.
Q. You also left your helmet for your scooter in Manhattan, correct?
A. Yes.
Q. And you left EZ's helmet for her scooter in Manhattan, correct?
A. Yes.
Q. Now in addition to you and EZ riding on scooters -- well, withdrawn.

When you and EZ would ride around Manhattan on the scooters, EZ would see people that she knew, correct?
A. I don't remember.
Q. Do you recall the shop owners that you would frequent -- the shops that you and EZ would frequent in Manhattan?
A. Yes.
Q. And do you recall, for example, the coffee shop, Starbucks, in Manhattan?
A. Yes, there's a Starbucks, yes, close by, yes.
Q. And EZ knew the people in the Starbucks close by, correct?
A. I don't know.

Q. What about -- there was Mary's? What is Mary's?
A. That's a family-owned grocery store close to the house.
Q. And that's a grocery store that you used to frequent in Manhattan with the children, correct?
A. Yes.
Q. And EZ would go there with you, correct?
A. It would be all of us, yes.
Q. And they -- EZ knew the people over there, correct?

MR. MIN: Objection.

THE COURT: On the grounds?

MR. MIN: Well, number one, as to personal knowledge; and number two, on relevance grounds, your Honor. You know, to some extent --

THE COURT: Look, it's relevant. I understand what Mr. Beyda is doing. I will tell you, Mr. Beyda, I think you're beating a dead horse a little bit here. That may not be the right expression, but we get the point. You're belaboring the point is a more accurate way to say it. I understand your point.

MR. BEYDA: Thank you.

Your Honor, we had previously marked for identification Respondent's 37 and 38, to which there was no objection to 37. Can we put that one on the screen for identification. And I guess I would like to move it into evidence.

THE COURT: So you're starting first -- I'm sorry -- with 37, you said?

MR. BEYDA: 37. 37.

THE COURT: There's no objection, so that is admitted, yes.

(Respondent's Exhibit 37 received in evidence)

BY MR. BEYDA:

Q. Mr. Schram, can you take a moment and peruse this document that's now in evidence.

A. 37, right?

Q. You have a hard copy, correct?

A. Yes. Scan through it, did you say?

Q. Actually, I'll direct you. If you could turn to page 1 of 91.

Who is that?

A. That is RZ with I recall a classmate from his school.

Q. Where was that picture taken?

A. This is in Apartment 6A.

Q. And can you take a look at page 2.

Is that the same day?

A. Yes. I believe so, yes.

Q. Can you take a look at page 4.

Who is that?

A. That is SZ with his cousin.

Q. Okay. And where was that picture taken?

A. This is at Tania's mother's house in Mexico, I believe.
Q. Can you turn to page 6.
THE COURT: I'm sorry. Before you leave that page, just for my own education, is SZ the baby, or the older child?
THE WITNESS: SZ is the youngest, our youngest, our younger child, exactly, in the picture.
THE COURT: Which of the children is SZ, the baby or the older child?
THE WITNESS: Baby.
THE COURT: The baby. Thank you.
BY MR. BEYDA:
Q. Can you please turn to page 6.
Who is in this picture?
MR. MIN: Your Honor --
A. This is -- I'm going to guess that's the same boy as in the previous photo, just younger, given the amount of hair I have.
THE COURT: Mr. Schram, don't guess, please. So your answer is no, you don't --
A. I don't know. Then I don't know. I can't say for certain.
Q. And where was that picture -- where is that picture taken?
A. If I'm not guessing, I don't know.
Q. Does it look like Central Park to you?
THE COURT: Hold on, Mr. Beyda.
I'm just going to say to you, and Ms. Zarak is on the phone so she'll hear this instruction as well: In answering

anybody's questions, no witness should guess. You're supposed to be telling me what you know. Okay?

All right. Thank you. Go ahead, Mr. Beyda.

BY MR. BEYDA:

Q. Is it possible that that picture is in Central Park in Manhattan?

A. Possible.

Q. Can you turn to page No. 9.

That's a picture of RZ and his cousins, correct?

A. That's RZ, EZ, and two of his cousins.

Q. Got it. And that picture was taken in Mexico, correct?

A. In Tania's mother's house.

Q. Can you turn to page 15 now.

Who is in that picture?

A. EZ -- EZ and probably a classmate.

Q. When you say probably a classmate, do you know that classmate's name?

A. No.

Q. Do you know of a friend of EZ named Franco?

A. I know the name, yes.

Q. Have you ever met that child, named Franco?

A. I don't remember. I -- I don't remember.

Q. EZ had many playdates with Franco in New York, didn't she?

A. I -- I can't tell for certain. I know the name. I know -- I -- I know there were playdates, but I don't know how many.

Q. Approximately how many?

THE COURT: Over what period of time?

MR. BEYDA: Sorry. Sorry, your Honor. Between August 1, 2019 and March 2020.

A. If I -- so I don't know. You want me to guess, you said?

Q. No, we do not want you to guess.

A. Okay.

Q. Now where was that picture taken?

A. Central Park.

Q. Can you turn to page 16.

Are you able to identify any of the individuals in that picture?

A. EZ.

Q. Anybody else? Are you able to identify anybody else?

A. No. Yeah, I mean, I'm back on the basis of guessing here.

Q. We don't want you to guess. Can you turn to page 24.

Do you recognize anybody in that picture?

A. I recognize the girl.

Q. Do you know where that picture was -- I'm sorry. I interrupted you. Sorry.

A. Yeah, I have -- I have a hard time seeing who the other child is.

Q. Do you know where that picture was taken?

A. No.

Q. Is EZ in that picture?

A. My printout isn't great.
Yes.
Q. Okay. Which one is EZ?
A. The one behind the teddy bear.
Q. And is the other person her cousin Maya?
A. They're not related, but that's -- that's the right name, yes.
Q. When you say they're not related, who is Maya's parents?
A. Her mother's Valeria. I don't remember her father's name Valeria. They're not by blood related, meaning that --
Q. Isn't Valeria -- I'm sorry. Isn't Maya's mother Ms. Zarak's cousin?
A. Not that I believe.
Q. Okay. And they had playdates together in Manhattan, correct?
A. Yes.
Q. And those playdates took place since actually EZ was born in Manhattan, correct?
A. Yes.
Q. How would you describe EZ's relationship with her cousin Maya?
A. I mean, I would consider them friends, you know, they would do the occasional playdate, yeah.
Q. Isn't it true that EZ even had a playdate immediately before the trip to Iceland on July 31st?

A. There, there were get-togethers because Maya's cousin just had a child and Maya's grandmother was in town, so there were I think couple of get-togethers prior to leaving.
Q. Can you turn to page 27.
Can you identify anybody in that picture?
A. EZ in front of the table; there's Maya and her mother Valeria behind the table.
Q. And do you know when this was taken?
A. Fall of 2019.
Q. And in fact, this picture is taken right in front of the apartment building where you were living in Manhattan, correct?
A. In the block, not right in front.
Q. When you say the block --
A. Right. It's in the block, you know, it's not right in front.
Q. Is that the view outside of the apartment building where you were living in Manhattan?
A. Approximately, yes.
Q. Can you take a look at page 29 of this exhibit.
Who is in that picture?
MR. MIN: Your Honor, if I may just clarify for the record, when we're referring to the page number, we're referring to the page number on the bottom of the particular page, not the page number of the pdf, right, since there's a cover page to the pdf? I just want to clarify that.

MR. BEYDA: Correct. That is correct. I'm referring to the numbers on the bottom of the page.

BY MR. BEYDA:

Q. Mr. Schram, can you turn to page 29 of this exhibit.

A. Yeah.

Q. Who is in that picture?

A. It's Tania with EZ and RZ, and then there's Valeria with Maya.

Q. Now I am looking at page No. 30 of this exhibit. We'll start to go a little faster. Where is that picture taken?

A. I can't say for certain. This might be at a dinner gathering at Valeria's old house, possibly, given how old EZ is there.

Q. And was that in the United States?

A. Harlem, yes.

Q. Was it in New York?

A. Yes, New York, yes.

Q. Does it look like -- would it refresh your recollection if you knew that that was around Christmastime?

THE COURT: He hasn't stated a failure of recollection. He said, "Harlem, yes."

MR. BEYDA: Oh, I didn't hear him say Harlem.

THE COURT: That's what the transcript says.

Is that what you said, Mr. Schram?

THE WITNESS: Yes.

BY MR. BEYDA:

Q. Can you please turn to page 35 of this exhibit.

A. 35. Let me see. Let me see it on the screen because I -- yeah, yeah. I see it on the screen.

Q. Who is in that picture?

A. EZ and Maya.

Q. And do you know where that picture was taken?

A. That looks like New York subway.

Q. Now it's true that your children enjoyed taking public transportation, correct?

A. Sometimes, yeah.

Q. They particularly enjoyed the subway; isn't that true?

A. Sometimes, yes.

Q. They would take the subway on their way to gymnastics in Manhattan, correct?

A. No.

Q. How did they get to gymnastics?

A. We would walk because it was few blocks walk, easier to walk than the subway; seemed to get us there so easily.

Q. How many blocks away was the gymnastics class in Manhattan?

A. 12.

Q. And you always walked to the gymnastics class 12 blocks away?

A. Well, it's not -- it's the block -- it's more like we had to go west two, three blocks and then down, so like, it wasn't

very efficient, necessarily, to -- to take a subway there. We were probably more likely to take a taxi there.
Q. Isn't it true you would actually also take the crosstown bus to gymnastics?
A. Maybe. Maybe that happened. But I don't -- I never did that.
Q. And like the subway, the children also enjoyed taking the crosstown bus, correct?
A. Yes.
Q. And those were things that both you and Tania and the children enjoyed doing -- namely, taking public transportation in Manhattan -- correct?
A. Not always, but yeah. Not always.
Q. In fact, part of what was enjoyable about events for the children was getting to the events with you and Ms. Zarak, correct?
A. I'm sorry. Can you repeat the question.
Q. Part of what was enjoyable about events that you attended in Manhattan for the children was actually the ride to the events with them, correct?
A. Not always.
Q. Sometimes?
A. Sometimes, yes, but not always at all.
Q. Okay. Direct your attention please to page 45 of Exhibit 37.

A. 35.
Q. Who is depicted in that picture?
A. Wait one second.
Q. Sure.
THE COURT: He asked you what page, and I think he's looking for the wrong page.
Q. Oh, 45.
A. 35? I have the subway picture as 35.
Q. No. Four, five. 45.
A. Oh, four, five. Sorry.
Got it.
Q. Who is in that picture?
A. That is EZ and RZ with Rae, daughter of Ukie (ph), if we're going to take this out later on, and Clara -- Clara, I recall, that used to live in Los Angeles -- that lives in Los Angeles. Sorry.
Q. Who is Ukie?
A. Ukie is Tania's friend.
Q. And where does Ukie live?
A. I believe she now lives in New York.
Q. And where was this picture taken?
A. Central Park.
Q. Directing your attention to page 56 of this exhibit.
Are you ready, Mr. Schram?
A. Yes.

Q. Who is in this picture?
A. EZ and her cousin Sophie.
Q. And how is EZ related to Sophie?
A. Sophie is the daughter of Tania's sister; cousin.
Q. And do you know where this picture was taken?
A. I don't.
Q. Is it in Apartment 6A?
A. I don't know. I can only see the bedsheets. I mean, I don't know.
Q. Where else might this picture have been taken, if it's not 6A?
MR. MIN: Objection.
THE COURT: Sustained. Sustained. You don't have to answer that.
Q. How does EZ refer to her cousin Sophie?
A. Her sister.
Q. And her cousin Sophie would come to New York to see her, correct?
A. And vice versa, yes.
Q. Where does Sophie and her parents live?
A. Miami.
Q. And EZ has, or had a good relationship with Sophie before March 2020, correct?
A. Yes.
Q. And that's because they frequently saw each other, correct?

A. I don't know what frequently means.
Q. How often would they see each other each year?
A. I would say couple of times a year, plus maybe Christmas or -- maybe two, three times a year.
Q. Well, is it possible that it was more than two, three times a year, closer to six?
A. I would say no.
Q. How did it come about that EZ fawned such a close relationship with Sophie and referred to her as sister if she was only seeing her two or three times a year?
A. Because their mothers are very close. When they would see each other, it would be at a week at a time, you know, or at Christmas, which would be two weeks at a time, so it would be -- and they are very similar age, so they bonded always very well from -- from the beginning.
Q. Okay. Can you turn to page 59, please.
Who is that?
A. That's RZ with Sophie.
Q. Is that the same Sophie as the previous picture?
A. Yes.
Q. Where is that picture taken?
A. Apartment 6A, 11 West 81st Street.
Q. What portion of Apartment 6A is that picture taken in?
A. In the TV room.
Q. Was there a bed in that room?

A. At that time, no.
Q. At any time.
A. I'm sorry. What was the question? Sorry?
Q. At any time was there a bed in the TV room?
A. When we moved from Los Angeles into the apartment, the bed we had in Los Angeles went into the TV room.
Q. Okay. Can you turn, please, to page 68 of this document.
Can you start on the top left. Actually, can you identify -- are your children in this picture?
A. Yes, one.
Q. What is this picture of -- withdrawn.
Prior to -- withdrawn. Withdrawn.
Prior to this litigation, had you seen this picture before?
A. You mean this -- this collage of photographs or individually?
Q. Yes. Yes, this collage of photographs.
A. I don't remember.
Q. Do you recall receiving this collage of photographs from Ms. Zarak's sister?
A. No, I don't remember it, no, but if you -- you know, that sort of -- that would look -- sound like her to do -- something she would like to do.
Q. Do you recognize this to be a collage of photographs of EZ and her cousin Sophia from birth onward?

A. Yes.
Q. Do you recall Ms. Zarak's sister mailing this collage to you at Apartment 6A?
A. I don't remember, no.
Q. Do you recall it being posted on Instagram?
A. I don't remember, no.
Q. Can you please turn to page -- actually, no.
82 of 91.
A. Yup, I have it.
Q. Can you please identify the children in that photograph.
A. That's EZ and Sophie.
Q. Where was that picture taken?
A. Central Park.
Q. Did you take your children to Central Park and put them on the swings often?
A. On occasion, yeah.
Q. When you say on occasion, what do you mean?
A. Well, yeah, I mean, it's -- we go to the park, we go to the playgrounds, and sometimes they're into the swings and sometimes not.
Q. And that was an enjoyable experience for you and Ms. Zarak in Manhattan, correct?
A. Yes.
MR. BEYDA: Okay. Your Honor, I'm done with this exhibit at this point. We can take it off the screen.

THE COURT: All right. Are we moving to 38?

MR. BEYDA: You know what, I'm going to skip forward. I'll skip forward.

THE COURT: Okay. I just want to know whether I need to drag out the binders.

MR. BEYDA: You do not. You do not.

Actually, you might need to, because I'm going to ask to have Respondent's 41 put up on the screen, and I'm just checking to see if there's an objection.

And there was no objection, so I'm going to move to have that admitted into evidence.

THE COURT: There is no objection preserved. It will be admitted.

(Respondent's Exhibit 41 received in evidence)

BY MR. BEYDA:

Q. Mr. Schram, when you have this document in front of you, please let us know.

A. 41, right?

Q. Yes.

A. Yeah. Yes, I have.

Q. Okay. Can you please peruse these 34 photographs and let us know where they were taken, what state in the United States they were taken.

A. I have to apologize but I don't seem to have the full print of all the photographs. I just have the -- the first one. Can

we scan -- skim through them on the screen? Is that okay?

THE COURT: Mr. Beyda, are you able to scan through them on the screen?

MR. BEYDA: We will do that. I thought it would be a little quicker. That's fine.

THE COURT: He doesn't have them he's saying.

MR. BEYDA: I just found out that he didn't have them.

Can you turn to page 4, please. Thank you, Mr. Wu.

BY MR. BEYDA:

Q. Mr. Schram, who is depicted in that picture?

A. EZ.

Q. Where is that picture taken?

A. I have to guess to be able to answer that.

Q. Now did you say EZ?

A. EZ, yeah.

Q. Isn't that RZ?

A. RZ, yes.

THE COURT: Are you having trouble -- hold on. Are you having trouble seeing this, Mr. Schram? You're turning your head sideways.

THE WITNESS: No, I'm just -- I'm tilting my head to see the facial expression to -- because it's a little smaller on my screen.

A. Yes, yes, RZ.

Q. And do you recognize the background of that picture to be

the New York City Public Library?
A. I never been in there so I would have to guess.
Q. Take a look at page 5.
MR. BEYDA: Actually, Mr. Wu, can you go to page 5, please.
Q. Mr. Schram, who is in that picture?
A. That's EZ.
Q. Now isn't it true that your family were members of the public library, you had a membership?
A. I believe so.
Q. And you are aware that Ms. Zarak would often take the children to the public library in Manhattan, correct?
A. Yeah. I recall it to be one kind of a stopping -- stomping ground.
Q. To your recollection was that an enjoyable event? Well, did Ms. -- did you and Ms. Zarak communicate about her taking the children to the library in Manhattan?
A. Yes.
Q. And did Ms. Zarak express to you that that was enjoyable times for her and the children?
A. Yes.
MR. BEYDA: Can you please turn to page 9, Mr. Wu.
Q. Mr. Schram, are you able to see that picture on your screen?
A. Yes.

Q. Who is in that picture?
A. That's me and RZ.
Q. Do you know where that picture was taken?
A. The -- yeah, the -- they call it the old theater inside the -- in the museum, the Museum of Natural History.
Q. And that's a picture of RZ sleeping on your lap, correct?
A. Yes, yes.
MR. BEYDA: Can you turn to page 10, Mr. Wu.
Q. Mr. Schram, is that a picture of you and the children?
A. Yes.
Q. And isn't it true that that picture was taken a few weeks before March 2020 and the COVID outbreak?
A. I was actually going to guess this one was taken in Los Angeles.
Q. Where is that then? Where do you think that picture was taken?
A. We went to a museum in Los Angeles, I would say when Tania's sister were visiting, and there was a walkthrough art museum. I don't remember the name of it right now.
Q. How old are your children in that picture?
A. You want me to guess?
THE COURT: No.
Q. I don't want you to guess. You don't know?
A. Yeah, I mean, so -- so I'm going to tell you the age I think they were when Tania's sister was visiting Los Angeles.

So that was -- that was in 2019, so EZ was like close to being 5 and RZ was then close to being then 2½.
Q. And in that picture do you think that RZ is 2½?
A. I can't -- I would guess. So I'm -- yeah, again, this is -- this is -- I -- my mistake of saying I would guess that this was taken in Los Angeles because I don't remember when this picture was taken.
Q. Now wasn't that stroller purchased after SZ was born?
A. No.
Q. Okay. Do you recognize the art in the background of that picture to be a Keith Haring that's hanging in the museum, in the MOMA, in Manhattan?
A. In MOMA? Okay.
THE COURT: Do you know what he means when he says MOMA?
THE WITNESS: I know Keith Haring. I don't know it so extensively that I would be able to identify all his artwork, but he -- again, if I would guess, yes.
Q. Did your daughter EZ wear winter boots in Manhattan often? I'm sorry. Did your daughter wear winter boots when she was in Los Angeles?
A. No.
Q. Here in this picture she's wearing winter boots, right?
A. That's correct.
MR. BEYDA: Can you turn to page 11, Mr. Wu.

Q. Do you recognize the person in that picture?
A. That is RZ.
THE COURT: Hold on, please. We're not up to it yet, right? Can you change on -- thank you.
Q. And do you know where that picture was taken?
A. Well, you kind of told me, so -- but that looks like a Richard Serra, so that makes me think it's MOMA.
MR. BEYDA: Can you turn to page 21, Mr. Wu.
Q. Do you recognize the individual in picture 21?
A. Yeah, that's EZ.
Q. Do you know where that picture was taken?
A. No, but -- yeah, again, I'm -- I'm speculating.
THE COURT: No, we don't want you to do that.
THE WITNESS: Yeah, so no. I don't know.
Q. Have you ever been to any bookstores in Manhattan with the children?
A. Yes.
Q. And have you ever been to a store known as Book Culture on the Upper West Side in Manhattan?
A. Yes.
Q. Did you go to that bookstore with Ms. Zarak and the children?
A. There were three locations of Book Culture on the Upper West Side, yes.
Q. There was actually a Book Culture -- there is actually a

Book Culture store that was a block from Apartment 6A in Manhattan, correct?
A. Yes.
Q. And that's the bookstore that you and Ms. Zarak would frequently take the children to, correct?
A. Not sure.
Q. Isn't it true that you would take the children to the bookstore on Sunday mornings?
A. Sometimes.
Q. And you would take them to the bookstore after you and Ms. Zarak stopped at the Starbucks on the way there to get a cup of coffee, correct?
A. Sometimes.
Q. And you would also stop at the farmers market sometimes on the weekends before going to that bookstore, correct?
A. Yeah, sometimes.
Q. And when you say sometimes, the farmers market in particular that you went to with Ms. Zarak and the children in Manhattan, that was on Sundays, correct?
A. Yes.
Q. And those were enjoyable experiences for you, Ms. Zarak, and the children, correct?
A. Yes. Yes.
Q. You would buy the children snacks when you were there, correct?

A. Yes.
Q. They enjoyed getting their pretzels; do you remember that?
A. Yes.
Q. They enjoyed the iced tea that you would get for them?
A. Sometimes, yes, yes, yeah. They liked it. At least EZ did.
Q. Overall it was a generally good experience for you, Ms. Zarak, and the children, correct?
THE COURT: What was?
MR. BEYDA: The Sunday trip to farmers market and the bookstore.
A. Yes.
Q. And you were attending or -- you were attending to those events as recently as March 2020, correct?
A. Yes. Probably. I don't know.
MR. BEYDA: Mr. Wu, can you please turn to page 26 of this exhibit.
Q. Mr. Schram, who is in that picture?
A. That's RZ.
Q. And what is -- which room -- where is that picture taken?
A. TV room.
Q. And what is outside the window in that picture?
A. The planetarium.
Q. And is that the view from your apartment?
A. Yes.

Q. Now RZ, in that picture, he's in SZ's crib, correct?
A. No.
Q. Did anybody sleep in that -- I'll call it a bassinet. Did anybody sleep in that bassinet?
A. The stuffies did. They're next to the crib right there.
Q. I'm sorry. I couldn't hear. I'm sorry.
A. No. The answer is no.
THE COURT: The stuffies.
Q. The stuffies did.
A. That are all lined up there in the window.
Q. So you bought the bassinet for the stuffies to sleep in?
A. Initially, no.
Q. Who slept in the bassinet at some point?
THE COURT: It's been asked and answered.
A. Nobody.
Q. I'll move on. I'll move on.
Can you please identify --
MR. BEYDA: Can you, Mr. Wu, please turn to page 29.
Q. Mr. Schram, can you take a look at that picture. Do you see it?
A. Yes.
MR. BEYDA: Can you now turn to page 30, Mr. Wu.
And then can you please turn to page 31.
Q. Mr. Schram, did you see those three pictures?
A. No. I'm still on 29.

Q. Okay.
A. Yeah, I missed 30, but -- but I get the idea.
Q. 30 is now on the screen.
A. Yeah.
Q. Okay. Those are pictures of your children in Manhattan, correct?
A. Yes.
Q. And there were three pictures of your children in bookstores, correct?
A. I believe it was all EZ, but I wasn't paying attention to that so much.
Q. Okay. There were three pictures taken on three different days, correct?
A. Can we even go back and forth a little bit to the pictures?
MR. BEYDA: Mr. Wu, can you go to page 29 and then 30 and then 31, please.
A. Yes, this is -- this is Book Culture that was close to the house.
Q. Okay. And you would scoot with EZ to Book Culture around the block from the house, correct?
A. When the weather would allow, yes.
Q. And that was an activity that you in particular did with EZ in Manhattan, correct?
A. I mean, yeah. We both did, yes. We liked the bookstore.
Q. Right. But Ms. Zarak didn't scoot with EZ because she was

pregnant, correct?
A. Either -- yeah, either pregnant or with a stroller, so -- and EZ was -- yeah, she liked the scooter, so yeah, it's a good point. I would probably be the one going after her on the scooter.
THE WITNESS: I'm sorry. I just had a glitch on my screen. Give me a second. You hear me though?
THE COURT: We can hear you, yes.
MR. BEYDA: Yes.
THE WITNESS: Yes. The usual glitch. Restart here.
(Discussion off the record)
(Pause)
MR. BEYDA: Your Honor, I'm going to be done with this exhibit, so if it's okay, Mr. Wu can take it down.
THE COURT: Sure.
THE WITNESS: Am I moving now?
THE COURT: Yes. That's better. Thank you.
MR. BEYDA: Thank you.
THE WITNESS: Sure.
MR. BEYDA: Mr. Schram, are you ready?
THE WITNESS: Yes.
BY MR. BEYDA:
Q. In addition to the museum, the bookstore, the farmers market, Starbucks, that we just went through, Central Park, movies, the children also participated -- in particular EZ for

a moment -- in organized activities in Manhattan, correct?
A. Yeah, yes.
Q. And focusing for a moment on EZ --
A. I'm sorry. What time frame are we talking about now? Are we talking about before Los Angeles or after Los Angeles?
Q. I'm going to focus on the time period between August 1, 2019, to March 2020, when you went to Mexico.
A. Okay.
Q. Okay? EZ was enrolled in a swimming program, correct?
A. Yes.
Q. EZ was enrolled in karate, correct?
A. I'm not sure.
Q. Are you aware of whether or not she was enrolled in gymnastics?
A. She was enrolled in gymnastics, yes.
Q. And she also participated in the forest school in Central Park, correct?
A. I think that was before we moved to Los Angeles.
Q. So actually, let me ask you -- because you mentioned Los Angeles -- in the one-year period before going to Los Angeles, can you tell the Court what activities EZ was enrolled in in Manhattan.
A. The forest school was I -- I recall, a summer activity when, you know, schools was not, you know, in -- you know, when schools had not started. I'm going to be guessing a lot here,

so this is a little difficult. I want to say for certain that's the only one.
Q. So did you attend gymnastics classes with EZ in Manhattan?
A. Before Los Angeles? Maybe a couple. There might have been some tryouts, but there was not a -- an enrolled program. Again, I'm also guessing here.
Q. Did you attend gymnastics classes with her in Manhattan between August 1, 2019 and March 2020?
A. Yes.
Q. Can you describe what you observed of your child at those gymnastics classes during that period of time.
A. She appeared to be liking it.
Q. RZ also enrolled in gymnastics during that period of time, correct?
A. RZ? Sorry.
Q. Sorry. My apologies. RZ, yes.
A. Yes.
Q. Can you describe what you observed of him during those gymnastic classes that he was enrolled in.
A. That he appeared to be liking it.
Q. And you had discussions with Ms. Zarak about the enrollment of the children in gymnastics in Manhattan, correct?
A. Yes, yes.
Q. And the two of you were in agreement that it was good for the children to be in those, correct?

A. Yes, they both attended gymnastics in Los Angeles and they loved it, so we wanted to try to continue something like that.
Q. And the two of you liked that they enjoyed it, correct?
A. Yes.
Q. It made you happy to see that your children were happy in Manhattan, for example, correct?
A. Yes.
Q. There was also a "Music Together" class that EZ was enrolled in, correct?
A. I don't know that there were -- I didn't take her, so I don't know the nature of the setup.
Q. RZ also went to a "Music Together" class in Manhattan, correct?
A. I don't know.
Q. Did you have discussions with -- okay.
The children also attended the New York Kids Club in Manhattan, correct?
A. The New York Kids Club?
Q. Yes.
A. Yes, yes, yes.
Q. What was the New York Kids Club?
A. It was a -- it was a facilities on 85th/6th Street or so that was kind of a open playground, educational playground type of place.
Q. Which of the children attended the New York Kids Club?

A. EZ and RZ.
Q. How often?
A. On the average, maybe every, you know -- every two weeks.
Q. How often did EZ go to her swimming class between August 1, 2019, and March 2020?
A. I don't know. I don't know.
Q. Where was the swimming class?
A. I never took her to a swimming class, but there was a birthday party at swim -- a place with a swimming pool, and I believe that's the place where the classes were held. In Manhattan. It was in Manhattan.
Q. So the children attended -- in particular EZ for a moment -- EZ would frequent I think the JCC on Amsterdam and 76th Street, correct?
A. I -- I never gone there so I don't know.
Q. Do you know what was located -- what is located inside the JCC on Amsterdam and 76th Street, based on conversations you had with Ms. Zarak?
MR. MIN: Objection as to form.
THE COURT: Sustained.
Q. Ms. Zarak would take -- are you aware that Ms. Zarak took EZ to swimming classes at the JCC in Manhattan?
A. Yes.
Q. And are you aware of whether or not those classes met once a week?

A. I don't remember.
Q. Was that a formal program, swimming program that EZ was enrolled in?
A. I don't know. I never took her there.
Q. Do you know whether or not she enjoyed the swimming classes in Manhattan?
A. I don't -- to tell you the truth, I don't remember.
Q. What about karate; how often did EZ go to her karate classes in Manhattan?
MR. MIN: Objection.
A. I want to say she went to a total -- handful.
MR. MIN: Objection.
THE COURT: Sorry. Hold on. What's the objection, Mr. Min?
MR. MIN: Well, it was stating a fact not in evidence yet, but the witness answered, so I'll withdraw my objection.
MR. BEYDA: I thought we had mentioned karate earlier.
THE COURT: Yes, I think the objection is to the classes part. Is that the objection?
MR. MIN: Your Honor, I'll withdraw my objection.
THE COURT: All right. Go ahead, Mr. Beyda.
BY MR. BEYDA:
Q. Did you attend the karate classes with EZ?
A. No.
Q. Do you know whether or not she enjoyed the classes?

A. I think so.
Q. Do you know, how did Ms. Zarak feel about EZ attending these classes in Manhattan, if you know?
A. Karate specifically or just in general?
Q. Karate specifically for a moment.
A. I -- I -- do I know how she felt about her attending karate? I think she liked that our daughter was in karate.
Q. And your daughter had a karate outfit, correct?
A. Yes.
Q. And you've observed her in that karate outfit, correct?
A. I maybe saw her once wearing it.
Q. And did you -- did you see her before she went to the class wearing it?
THE COURT: Does that really matter, Mr. Beyda?
MR. BEYDA: I think that the child's happiness in Manhattan and her involvement --
THE COURT: Yes, that matters. Whether he saw EZ wearing her Gi, does that really matter? I'm just trying to give you a heads up that time is going to run out at some point.
MR. BEYDA: Thank you.
THE COURT: You have a full opportunity to examine, but you might want to think about how you're using your time.
BY MR. BEYDA:
Q. There were also holidays that were celebrated with the

children in Manhattan, correct?
A. Can you please repeat again. Sorry.
Q. Mr. Schram, there were also holidays that were celebrated with the children in New York, correct?
A. Yes.
Q. And the family would celebrate the Thanksgiving Day holiday, correct?
A. Yes.
Q. Did you go to the parade?
A. In a way. I mean, the balloons were inflated in the street, so in a way we did attend to the parade.
Q. The balloons actually left from the doorstep of your apartment building, correct?
A. Part -- yeah, yeah. It was -- the street was used as a staging, you know, area for -- for parts of the balloons and the parade.
Q. And the children, were the children able to see the balloons from the apartment?
A. Yes.
Q. Did you sit with the children and watch the balloons in the front of the apartment for the Thanksgiving -- before the Thanksgiving Day parade?
A. Yes.
Q. And in fact, isn't it true that you even invited people to the apartment to view the balloons from inside your apartment?

A. I'm sorry. Can you say the first part again. It was a little blurry.
Q. Isn't it true that you also invited friends and their children, actually, to the apartment to see the balloons for the Thanksgiving Day parade?
A. Yes. When possible, I want to say, yes.
Q. When you say when possible, you had a Thanksgiving brunch for about 10 to 20 people in 2019, before the Thanksgiving Day parade, correct?
A. No. I don't think there were that many people that year, but we've had that many people before on Thanksgiving.
Q. So how many times did you have people over to observe the balloons from your apartment window, before the start of the Thanksgiving Day parade?
A. So we lived in the apartment for the -- four times. We -- four Thanksgivings we were in 6A. I want to say out of the four times, two of them we had people over. I think one time we were -- everything was canceled because of weather so nobody really came over, and the fourth time, you know, maybe a handful of people.
Q. Can you please describe your observations of the children when they were observing the balloons outside the window for the Thanksgiving parade.
A. They -- they liked what they saw.
Q. Can you describe their behavior.

A. They were excited to see the balloons.
Q. Can you describe that excitement.
A. They would point their fingers, say, look, or say, look at that one, you know. They -- yeah, they would -- yeah, they would just show overall excitement about the big balloons outside the window.
Q. What other holidays -- well, actually, did you feel -- how did you feel about being able to view the Macy's Thanksgiving Day parade from the window of your apartment in Manhattan?
A. I -- I enjoyed it.

(Continued on next page)

BY MR. BEYDA:
Q. To your knowledge do you think your children enjoyed it?
A. Yes.
Q. What other holiday did you celebrate in New York with your children and Ms. Zarak?
A. When we didn't travel to East Iceland or Mexico for Christmas we would have Christmas in New York, yeah. So Christmas, yeah, Christmas and of course, we would watch fireworks from the window on New Year's. Christmas is definitely the biggest holiday.
Q. And Christmas in New York was a special time for you and the family, correct?
A. Well, again, we always tried to travel to either Iceland or Mexico. That was a goal for every Christmas and when we stayed in New York because we couldn't travel.
Q. How many times did you travel to Iceland for Christmas? How many times when you were married with children did you travel to Iceland with the children for Christmas?
A. So, twice and then --
Q. What year?
A. I want to say 2015 and 2017, then Christmas 2020. And then we went to, so 2016 we stayed in New York cause RZ was born right before Christmas 2016. 2017 we probably went to Mexico that year. 2018 we were in Los Angeles actually, so we went to Mexico. So, two times in a row. 2019 we were in Los Angeles

because we were supposed to fly to Iceland with, the visa wasn't renewed before Christmas, so we stayed put. So, twice in New York, twice in Mexico, once in Iceland or twice in Iceland, actually, 2020. Two, two, two.
Q. So, prior to COVID you went to Iceland for Christmas after being married to Ms. Zarak one time, correct?
A. Yes.
MR. BEYDA: Your Honor, I am going to ask to have Exhibit Number 94, please, put on the screen and there was no objection to this exhibit.
THE COURT: It'll be admitted.
(Respondent's Exhibit 94 received in evidence)
Q. Do you have a hard copy of this exhibit?
A. Yes.
Q. Let us know when you have it in front of you.
(Pause)
Q. Do you have it in front of you?
A. Yes.
Q. You are looking through it?
A. Looking through it.
Q. Great. Can you, please, turn to page six of this document?
A. Yep.
Q. Where is that picture taken?
THE COURT: Can you hold on. Is that the one you mean?

MR. BEYDA: Yes, your Honor.
A. I'm sorry. R94, no?
Q. R94. There's numbers on the bottom of each picture.
A. 194, R194.
THE COURT: Just "94", not one-nine.
THE WITNESS: Sorry about that.
A. Yes, I recognize this picture.
Q. Who is in that picture?
A. That is EZ and her cousin, Sophie.
Q. Where is that picture taken.
A. That picture is taken in Apartment 6A Manhattan.
Q. Do you know when that picture was taken?
A. Christmas 2016.
MR. BEYDA: Can you, please, turn to page 7.
Mr. Wu, can you zoom a little bit in that picture and make it a little bit larger.
(Pause)
Q. Mr. Schram, what is in that? Who is in that picture?
A. It's me on the left, Tania's mother in the middle. It's possible this is a woman called Audriana on the right there but I'm guessing though and then on the sofa is EZ.
Q. Do you know when that picture was taken?
A. This is New Year's.
Q. What year?
A. 2016.

Q. When you say 2016 is it possible that it was 2019 when your mother-in-law was in the apartment for New Year's?
A. It's possible, yes. Looking at the visa site, I would say that's probably correct.
Q. That picture was taken in 2019, New Year's?
A. Yeah, the Christmas we weren't able to travel to Iceland, yes.
Q. When you say "the Christmas we weren't able to travel to Iceland", you remained in New York for that Christmas, correct?
A. Yes. We couldn't travel -- Mexico.
Q. Could you turn to page eight, the next page.
Mr. Schram, do you have a hard copy of these exhibits?
A. My printed is not great. It's clear on the screen. It's the black and white. Yeah. So, that's Tania's mother.
Q. Where is that picture taken? What state?
A. This is a restaurant close in the Upper West Side.
Q. Do you know when that picture would have been taken?
A. Around Christmas 2019.
Q. Is that your children in that picture?
A. That's EZ, yes.
Q. Now, do you recognize the cafe that they're in?
A. I would say this is a Mexican restaurant.
Q. Are you familiar with the cafe known as "Cafe Frieda"?
A. Yes.
Q. You would frequent that cafe often with Ms. Zarak and the

children, correct?
A. Not so often. We went maybe three times in starting there almost that might have been the first time we actually went there like three times.
MR. BEYDA: Your Honor, I'm done with this exhibit.
So, Mr. Wu can take it down.
(Pause)
MR. BEYDA: Mr. Wu, could you, please, put up on the screen respondent's 95 which has been marked -- there is no objection.
THE COURT: Moving it?
MR. BEYDA: Yes, please.
THE COURT: All right. Admitted R95.
(Respondent's Exhibit 95 received in evidence)
MR. BEYDA: Your Honor, for purposes of expediency, once the witness is ready can I ask Mr. Wu to scroll through these pictures giving a snapshot for everybody who is observing this and I'll ask the question after he scrolls through?
THE COURT: Sure. Let Mr. Schram get the hard copy.
THE WITNESS: "R95", right?
MR. BEYDA: Yes.
THE WITNESS: I have it.
MR. BEYDA: Okay.
Q. The color copies are on the screen and the paralegal in my office, Mr. Schram, is going to flip through each one. Let us

know when you're ready.
A. I'm ready.
(Pause)
MR. BEYDA: Thank you, Mr. Wu.
Q. Mr. Schram, did you see pictures of were those pictures from Thanksgiving in New York City?
A. Yes.
Q. Who was depicted in those pictures, was that you and your children and other friends and family?
A. Yes.
Q. There was also a picture of a child holding a pumpkin; do you remember that one -- H4?
A. Yes.
Q. Is that your child?
A. That's RZ.
Q. Do you know when that picture was taken?
A. I would guess around Thanksgiving or Halloween 2019.
MR. BEYDA: And if you can, Mr. Wu, can you please turn to page five.
(Pause)
Q. Where was that picture taken?
A. That's from the 6A apartment.
Q. Is that like an outdoor area for the 6A apartment?
A. I wouldn't call that an outdoor area. That's quite risky what they're doing.

Q. Fair. It's like a decorative -- it be on the building but not a good idea to step in on that?
A. They did. 4R. Wu, can you, please, turn to page 8.
(Pause)
Q. Mr. Schram, is that the same outdoor area that you were just referring to?
A. Yes.
Q. And those are two people sitting in that outdoor area?
A. Yes.
Q. And one of them appears to be holding a plate and eating?
A. Yes. It's the same one you see in this picture.
Q. I'm sorry?
A. It's the same person on the left in the previous picture, yes.
Q. Okay. But the other person that's holding a glass in this picture and sitting in that outdoor area was not in the previous picture, correct?
A. Correct.
Q. And you would oftentimes sit outside in that area, correct?
A. No.
MR. BEYDA: I have no further questions of this exhibit now in evidence, your Honor. We can take it down.
(Pause)
THE WITNESS: Can I request a two-minute stopping break?

THE COURT: I was going to ask Mr. Beyda to reach a convenient breaking point. Why don't we break for roughly five minutes, all right. We'll see everyone back shortly and then we'll go through to lunch.

THE WITNESS: Thank you.

(Recess)

THE COURT: All right. Is everyone able to hear from the courtroom?

MR. BEYDA: Yes.

MR. MIN: Your Honor, I can hear you. We're re-signed in.

THE COURT: All right. Mr. Beyda, we're back on the record.

MR. BEYDA: Thank you, your Honor.

BY MR. BEYDA:

Q. Mr. Schram, I would like to direct your attention to March 2020. At that point and to the time period specifically immediately before the family went to Mexico, okay, your children were in school in Manhattan on March 1, 2020, correct?

A. Yes.

Q. And they were attending their extracurricular activities in Manhattan from March 1, 2020 until you left Manhattan, correct?

THE COURT: Hold on. Mr. Glasser, I think it's your mic causing the feedback. Can you mute your line?

MR. GLASSER: We only have one microphone operating in

our room and it's my microphone.

THE COURT: But you are not muted.

MR. MIN: Your Honor, I was keeping it un-muted for objection purposes. Should I un-mute and it?

THE COURT: It's fine when you do that. Mr. Glasser's line, when he is speaking for some reason we get the echo. I don't know what the explanation is. But that's what seems to be happening.

MR. MIN: My computer is muted. We are using the microphone through Mr. Glasser's computer.

THE COURT: You are speaking. Right, it's fine but when it's showing on the screen with no muted microphone with Mr. Glasser I get the feedback. I don't know why.

MR. MIN: Well, can we try to log off and a log back on.

THE COURT: No. Let's keep going.

BY MR. BEYDA:

Q. Mr. Schram, your children were enrolled in extracurricular activities between March 1, 2020 and the departure to Mexico, correct?

A. Probably.

Q. And they were socializing with their friends during that period of time, correct?

A. Yeah. I wouldn't say that things were normal. So, yes.

Q. And you were working in Manhattan at that time?

A. I was. I had my office space in Manhattan, yes.
Q. And you were going to your office in Manhattan, correct?
A. Yes.
Q. And the family was purchasing groceries in Manhattan, correct?
A. Yes.
Q. And on March 1, for example, there was no intention to move to Iceland, correct, on your part?
A. On March 1 we were -- I mean, I don't know exactly the date but we had been ongoing discussions about the deal to move to Iceland and Mexico and they were a large period of time.
Q. You and Ms. Zarak had not come to an agreement to move to Iceland as of March 1, 2020, correct?
A. We did -- can you repeat the question?
Q. You and Ms. Zarak did not come to an agreement to move to Iceland on March 1, 2020, correct?
A. No.
Q. In fact, your life was operating as usual in New York on March 1, 2020, correct?
A. No.
Q. The children's lives were operating as usual in New York on March 1, 2020, correct?
A. Yes.
Q. Then in March 2020 you received, you started hearing about the COVID virus, correct?

A. I don't remember when we first, heard first about it. But, yeah, in March, yes.
Q. It's actually a possible -- not possible, actually, you and Ms. Zarak started talking about the COVID virus in or about February of 2020, correct?
A. It probably was coming up and as it was in the world news.
Q. Right. And you had sent a message to Ms. Zarak on February 28, 2021 about COVID in Iceland; do you remember that?
A. I mean, no, but that sounds about right though. I don't remember those details.
Q. And you then received information that the children's schools were closing in Manhattan; isn't that correct?
A. Yes. The confirmation was the weekend before it closed.
Q. When did you receive that confirmation, specifically?
A. It might have been during the week. So, 4th and 5th of March.
Q. So, at that point you and Ms. Zarak started making plans to, quote/unquote, escape Manhattan, correct?
A. Well, it was a continuation of a discussion of we had to leave because we lost our visa.
Q. You said over the weekend you received information about the kids' school closing, correct?
A. Yes.
Q. After receiving that information, you and Ms. Zarak immediately purchased plane tickets to leave New York, correct?

A. Yes.
Q. In fact, you had asked Ms. Zarak to purchase the plane tickets, correct?
A. Yes.
Q. And your communications with Ms. Zarak at that time were directly the result of the message that you received from the children's school that weekend, correct?
A. Direct result? We had to leave anyway because we had lost our visa but the urgency was created because we got that message.
Q. Now, prior to that weekend you had not purchased plane tickets to leave the country, correct?
A. Correct.
Q. You had not made hotel reservations in any other location to live, correct?
A. No.
Q. You had not reserved any Airbnb rentals in Iceland for example, correct?
A. Nor Mexico, correct.
Q. However, on three days after receiving that message from the school over the weekend, you, Ms. Zarak and your three children were on a plane to Mexico, correct?
A. Three days after receiving the message? I can't confirm that. But we left I believe on March 16 to Mexico.
Q. Do you recall what day of the week that was?

A. Monday.
Q. And you received a message from the school actually over the weekend. So, it might have been less than three days, correct?
A. Correct.
Q. At that time you were scared to be in Manhattan, correct?
A. Yeah. It was concerning, definitely, yes.
Q. And Ms. Zarak was scared to be in New York, correct?
A. I believe we were in the same sentiment on that, yes.
Q. And you were concerned for the safety of your entire family if you remained in New York, correct?
A. Yes.
Q. Now, based on that fear and your concerns for the safety of the children, you packed a suitcase for each of you and immediately went to the airport, correct.
Let me withdraw that question.
Before Ms. Zarak purchased the plane tickets to go to Manhattan you did not have any confirmed plans to go to Mexico on March 16th, correct?
THE COURT: Do you have live feed, Mr. Beyda?
MR. BEYDA: Live feed? Yes, I do.
THE COURT: You might want to look at the transcript and rephrase.
MR. BEYDA: No. I thought you were referring to the video.

THE COURT: Your question is:

Before you purchased the plane tickets to go to Manhattan you did not have any confirmed plans to go to Mexico?

MR. BEYDA: I misspoke.

Thank you.

Q. Mr. Schram, before purchasing the tickets to go to Mexico you did not have any confirmed plans to go to Mexico on March 16th, correct?

A. Nothing confirmed, no. A discussion.

Q. And you and Ms. Zarak were aware that New York was becoming the epicenter of the COVID pandemic in March 2020 at that time, correct?

A. I can't say it was what you call an epicenter, but it was clear we should get out of there.

Q. You actually sent text message to Ms. Zarak --

MR. BEYDA: I believe it's Petitioner's Exhibit 148 on page 75, your Honor.

THE COURT: Hold on. Is this in evidence?

MR. MIN: Your Honor, which exhibit?

MR. BEYDA: No, it's not in evidence.

THE COURT: Are you moving it now, P148?

MR. BEYDA: I need one second. I apologize.

(Pause)

MR. BEYDA: No, I'm not.

THE COURT: Mr. Schram, you don't need to look at it.

MR. BEYDA: If we could, please, pull up Respondent's Exhibit 216. That's been marked for identification and there's been no objection.

THE COURT: All right. I'm sorry. 216?

MR. BEYDA: Yes, your Honor.

THE COURT: There appears to be no objection. So, it will be admitted.

(Respondent's Exhibit 216 received in evidence)

MR. BEYDA: May I continue?

THE COURT: I'm sorry. But can you make that larger? Thank you.

Q. Mr. Schram, on March 16th and March 17th, you and Ms. Zarak exchanged text messages, correct?

A. Yes.

Q. And you exchanged an article that is on page three of this exhibit now in evidence titled, "New York is now the epicenter of the Coronavirus Crises in the U.S.", correct.

A. Yep.

Q. Now, at that time when you left New York you were worried about food supplies. You and Ms. Zarak were worried about food supplies in New York, correct?

A. Yes. I think that that came up as a potential problem.

Q. You were worried about the hospitals filling up, correct?

THE COURT: Is Mr. Schram frozen?

Sir, maybe you need to log out and log back in.

THE WITNESS: I got a glitch and restarted automatically. Am I back?

THE COURT: Yes, you are back.

THE WITNESS: Good. I am ready.

THE COURT: Is there pending question?

MR. MIN: Your Honor, on my screen he has not moved since the problem started.

THE COURT: We can see you but your image is frozen. So, I don't know if you are able to log off and back on again.

THE WITNESS: Still frozen?

THE COURT: Yes. There was a pending question. Do you need it read back?

THE WITNESS: Regarding food supplies?

THE COURT: There was a question you were worried about the hospitals filling up, correct?

THE WITNESS: I didn't hear that one.

THE COURT: It's pending though. Can you answer?

THE WITNESS: I was worried about what, the hospitals filling up?

THE COURT: Yes. That's the question.

A. Yes. I would say I was worried about that. This was in the news.

Q. And you were also worried about the schools shutting down, correct?

A. Yes.

Q. You were also hearing that Manhattan was going to be shutting down, correct?
A. Yes.
Q. And you had never once in your life before that heard that New York City, Manhattan, was shutting down, correct?
A. Correct.
Q. At that time when Ms. Zarak purchased a plane ticket for each of your family members and you, she purchased a one way plane ticket to Mexico, correct?
A. Yes.
Q. You did not tell her before you and Ms. Zarak had conversations before she purchased those plane tickets, correct?
A. I don't understand the question. We had conversations before she brought the tickets?
Q. I withdraw it.
Were you with Ms. Zarak when she purchased those plane tickets?
A. I don't remember.
Q. Were you aware that she was buying the plane tickets?
A. Yes.
Q. And did the two of you discuss the plane tickets that she was actually buying?
A. I don't remember.
Q. You were in agreement with Ms. Zarak to purchase those

plane tickets for your family, correct?
A. Yes.
Q. At that time there was no tickets purchased to go to Iceland, correct?
A. Correct.
Q. There are no communications between the time that you received the message from the school that weekend that you referred to and your departure to Mexico about going to Iceland, correct?
A. Can you tell me the timeframe again.
Q. From the time that you received the message about the school during the weekend that you testified about earlier until you left New York on that flight to Mexico?
A. Correct.
Q. Directing your attention to R153.

MR. BEYDA: Your Honor, that I would like to move into evidence, it's been --

THE COURT: Seems there's no objection. So, it'll be admitted.

(Respondent's Exhibit 153 received in evidence)

Q. Let us know when you are ready, Mr. Schram.
A. Thank you. Yep.

THE COURT: Again, can you make this exhibit larger, please?

(Pause)

MR. BEYDA: Turning to page two, Mr. Wu, can you please turn to page two of this exhibit.

(Pause)

THE COURT: It's fine the way you have it.

Thank you.

Q. Mr. Schram, your text messages in this exhibit are in the gray color boxes and Ms. Zarak's messages are in the blue; is that correct?

A. Yes.

Q. On March 12, 2020, you actually said to Ms. Zarak in response to Ms. Zarak's question about whether or not you were nervous about this, you actually went out and said more and more yes but more what is going to happen in the city, food supplies, hospitals, what will we do when the schools shut down? And it was based on that communication and those conversations that you and Ms. Zarak left Manhattan on March 16, correct?

A. Can you say that question again?

MR. BEYDA: Your Honor, may I have the court reporter read it back?

THE COURT: Madam court reporter, are you able to read it back?

(Question read back)

A. My answer is no.

Q. You continued to communicate with Ms. Zarak by text in this

string and you continued to communicate about leaving Manhattan, correct?
A. Let me read a little bit. Are you asking specific?
MR. BEYDA: I'll withdraw the question, your Honor.
Q. Mr. Schram, before you start reading, you had discussions at this time with Ms. Zarak about reducing expenses, correct?
A. It had been ongoing for a long time.
Q. I'm talking about on or about March 12.
A. Yes. Because again, it's been ongoing. I can't call up the exact dates when the conversation was being held but it was ongoing and frequent.
Q. In fact, you had discussions at this time about -- well, on March 12 you had already made the decision that you were going to be leaving New York City, correct?
THE COURT: On what date?
MR. BEYDA: March 12.
A. Yes, yes. It was clear that we had to leave the city after we spoke with my immigration lawyer about my visa denial.
Q. Okay. So, the hospitals filling up, COVID, schools closing, food shortages, those were secondary to your visa issue; is that what you are saying?
A. If the pandemic would not have happened we would have had to leave the city. If the pandemic won't happen without the visa situation, we probably would have left the city. So, I think they go hand-in-hand.

Q. Now, leaving the city didn't mean moving to Iceland, correct?
A. Correct.
Q. In fact, leaving the city is something that you've done in the past when you were in the process of renewing visas, correct.
A. Visa renewals always had happened in U.S. embassy abroad. So, that always had to happen.
Q. And it took place whenever visa expired, correct?
A. Yes.
Q. And this was done at times on a yearly basis, correct?
A. Yes.
Q. Sometimes you had to do it every two years, correct?
A. No. I don't remember exactly but I think my first approval gave me three years and then annual after that.
Q. So, the renewal process was not something foreign to you, correct?
A. Correct.
Q. It's a process that you were actually familiar with, correct?
A. Yes.
Q. And it's a process that Ms. Zarak was also familiar with, correct?
A. Yes.
Q. And it didn't cause you to ever have to purchase a plane

ticket within three days because of an emergency, correct?
A. Well --
Q. Yes or no?
THE COURT: No. Let him answer.
A. Yeah. This was the first time our visa renewal got denied. So, we had no embassy to go to to renew anything. It was fundamentally denied. We were without visa status as of March 12th.
Q. And at that point you and Tania, Ms. Zarak -- I'm sorry. Actually, Ms. Zarak was nervous, correct?
A. Regarding?
Q. What you just mentioned, the visa status?
A. Yeah, we had the phone conversation with the immigration lawyer who informed us we had no visa status. We were essentially illegal but some buffer time for us to leave. Like it was an emergency in and of itself and she asked about embassy and banging our heads against the wall.
Q. And at that point Ms. Zarak and you were in contact with your friend Tom Zoli, correct?
A. Yes.
Q. And you were in contact with Tom Zoli about him hiring you, correct?
A. Yes.
Q. And one of the options that was being considered by you and Ms. Zarak was you working with Tom Zoli and him sponsoring a

new visa for you, correct?
A. Yes. That was one of the options discussed, yes.
Q. And that visa would have enabled you to remain in the United States, correct?
A. Correct.
Q. I think more like we could return because that's a process that takes weeks or months to do?
A. So, there was no immediate visa solution for us.
Q. So. It would have enabled you return to the United States after your stay in Mexico, correct?
A. Or just any place outside the country, yeah. We had to get out of the country.
Q. But the communications with Tom and his hiring you and sponsoring you for a new visa was to enable you to return to live in the United States, correct?
A. So, there might have been immediate conversation to tell Tom right away that we lost our visa, you know could Workshop sponsor another visa. That was one other conversation that probably happened right in the beginning then when the -- okay.
Q. I didn't mean to interrupt.

THE COURT: Hold on. Can we place these conversations? I have no idea when you are talking about. I am asking Mr. Beyda to clarify the line of questioning.

MR. BEYDA: This is March 2020, your Honor.

THE COURT: I don't want your answer. I want you to

ask questions to elicit.
Q. Mr. Schram, when were these communications with it Tom Zoli taking place?
A. This discussion about Workshop sponsoring visa for me probably started immediately after we were announced that we lost our visa or visa renewal was denied.
Q. And those communications then continued into April 2020, correct?
A. Yes.
Q. And those communications were about you being sponsored for an H-1B visa, correct?
A. That was one of the options, yes.
Q. And that visa would not have only enabled to you to return to the United States but to remain in the United States, correct?
A. Yes, starting October 1st.
Q. And you applied to a lottery in order to be eligible for an H-1B visa, correct?
A. Yes.
Q. No one forced you to apply for that lottery, correct?
A. No. I mean we opened up the discussion with an immigration lawyer, Tom, and the immigration office said, listen, the lottery is due in a week. So, why don't we do that? So that's what we did.
Q. And you did it, correct?

A. Yes.
Q. And you actually won that lottery, correct?
A. Yes.
Q. And when you won that lottery you and Ms. Zarak were you were extremely excited, correct?
A. I wouldn't say "extremely excited".
Q. You were excited?
A. Well, because it wouldn't let us enter the U.S. until October 1st. So, it wasn't necessarily a great solution. So, it was a solution.
Q. It would have enabled you to come back to the country to work, correct?
A. After October 1st, yes.
Q. To live, correct?
A. On temporary employment visa, yes.
Q. For your children to return to their home, correct?
A. Yes.
Q. For them to sleep in their beds, correct?
A. Yes.
Q. Attend their school that they were attending, correct?
MR. MIN: Objection.
THE COURT: What's the objection?
MR. MIN: It's argumentative, your Honor.
THE COURT: No. I am going to allow it. It is cross.
A. Eventually.

Q. Socialize with their friends, correct?
A. Yes.
Q. Continue to be treated by their medical providers in Manhattan, correct?
A. Yes.
Q. It would have enabled you to go back to your office, correct?
A. No.
Q. Your Green Card application was also being processed at this time, correct?
A. What time period?
Q. Between March 2020 and July 9, 2020?
A. Yes. I don't remember when the application went in but -- when you say "process" what does that mean?
Q. You submitted paperwork for a Green Card. Withdrawn.
You had paperwork submitted for a Green Card, correct?
A. Tania did.
Q. Were you aware of that?
A. Yes.
Q. You didn't object to her doing so, correct?
A. No.
Q. You supported her doing so, correct?
A. I didn't object it.
Q. You didn't tell her to stop the process, correct?
A. No, no.

Q. Subsequently, you were approved for a Green Card, correct?
A. Our application for a Green Card was approved.
Q. And that was in July 2020, correct?
A. Yes, yes.
Q. And the H-1B visa was, the application for the H-1B visa was submitted while you were waiting for the Green Card -- Withdrawn. So, sorry.
H-1B visa application was submitted while you were still waiting on a decision on your Green Card application, correct?
A. No.
Q. When was that submitted?
A. We didn't submit it.
Q. Is that because you had the Green Card application in the process?
A. No.
Q. Are you sure it wasn't submitted?
A. I am sure it wasn't submitted.
Q. How do you know that?
A. Cause I didn't approve it.
Q. When did you?
A. I actually informed my immigration lawyer that we're not going to pursue the H-1B.
Q. When was that?
A. That was probably July.

Q. Is that the same time period that Ms. Zarak got her "O" Visa.
A. That's -- we got the "O" Visa beginning of July. So, yeah, around that time.
Q. Okay. And that "O" Visa enabled the return to New York, correct?
A. Correct.
Q. And that would enable you and Ms. Zarak to return to New York, correct?
A. Yes.
Q. And it would enable you, Ms. Zarak and the children to come to New York, correct?
A. Yes.
Q. And is that why you did not go forward with the H-1B visa application, Mr. Schram?
A. Well, the "O" Visa was a solution to be able to go to New York to pack up our things to go away to Iceland. The H-1B would allow me to work down the line bus. The "O" Visa does not allow me to work. So, hence, the question, why would I get a work permit in the U.S. when I'm not intending to work in the U.S.?
Q. You had an LLC in the U.S., correct?
A. Yes.
Q. The name OF that LLC is.
What's the name of that LLC.?

A. "Shift AS LLC".
Q. And that LLC was active in March 2020, correct?
A. Define "active".
Q. In March 2020 you didn't close that LLC, correct?
A. No.

(Continued on next page)

BY MR. BEYDA:
Q. That LLC was not closed in July of 2020, correct?
A. No.
Q. That LLC was not closed in June of 2021 either, correct?
A. No, not -- no.
Q. In fact, that LLC remains active, correct?
A. What do you mean by active?
Q. You haven't closed it.
A. Correct.
Q. And that's the LLC that you've been working under since you started working in New York in about 2014?
A. Yes.
Q. Is that the LLC that you would also receive payments through when you worked for clients outside of Workshop?
A. No, I would also bill Workshop through the LLC because they sponsored my visa; they had to be my employer, you could say.
Q. But focusing now back -- directing your attention to March of 2020, and now I'm going to shift a little bit, Mr. Schram, just to -- your family arrived in Mexico, correct?
A. March -- yes, yes.
Q. The children's school resumed at some point in March 2020, correct?
A. Yes. It took them about two weeks to get their online learning setup going.
Q. And that online school setup was for RZ and EZ, correct?

A. EZ.
Q. Only for EZ?
A. Yes.
Q. Okay. Now at this point Manhattan was virtually closed, correct?
A. I wasn't there, but it -- judging from the news, it sounds -- that sounds like a good description.
Q. So there was no work for you to do in Manhattan as an architect between March 2020 and July 2020, correct?
A. Yeah, yes. I mean, there was correspondence about stopping basically work, but no, we weren't going to work, no.
Q. So there was no work for you to do in New York during this period of time, correct?
A. In New York, no.
Q. And therefore, you were not personally in a rush to get back to New York at that time, correct?
A. Of course not.
Q. In fact, you and Ms. Zarak started discussing plans to go for a trip to Iceland during the summer of 2020, correct?
A. Yeah. That was one of the ideas, yeah.
Q. And one of the reasons or some of the reasons behind that was because offices in Manhattan were closed, correct?
A. I wouldn't say offices in New York being closed was the reason for us to go to Iceland on a vacation. I -- that doesn't make sense to me.

Q. Restaurants, dining in restaurants was very limited, correct?
A. Where?
Q. In Manhattan.
A. Again, I wasn't there, but probably -- sounds about right.
Q. Stores were closed?
A. I don't know.
Q. Well, your office was closed, correct?
A. Because I wasn't there. I'm the only one.
Q. While in Mexico, you stayed with Ms. Zarak's family, correct?
A. Yes.
Q. And you stayed with them at that point, or during this period of time, because it made sense for your family to go stay with them, correct?
A. Yes.
Q. It was almost like common sense, you would say, because it was an easy place to go, correct?
A. Well, there were some factors we discussed, and the conclusion was Mexico.
Q. And now while in Mexico -- and you actually testified about the children participating in Zoom school, correct?
A. Yes.
Q. What time did Zoom school begin for EZ?
A. What time during the day or like date?

Q. How many days a week was EZ in Zoom school?
A. I'm going to guess all five days of the week.
Q. What time did it begin?
A. Around 10 in the morning? It would be a two-hour session or so.
Q. Isn't it true that Zoom school began 8 a.m. in New York, New York time?
A. I don't know.
Q. And while you were in Mexico, it actually began at 7 a.m. because where you were in Mexico was an hour earlier, correct?
A. I don't know.
Q. You gave testimony about going to Mexico because it was easier for the children, or easy to participate in Zoom school because of the time difference. Do you remember that?
A. Yes.
Q. Now the time difference between New York and Iceland is how many hours?
A. During the wintertime, four.
Q. So is it your testimony that it was easier for EZ to go to Zoom school at 7 a.m. Mexico time compared to 12 p.m. Icelandic time?
MR. MIN: Objection as to form. Assuming facts not in evidence, the witness's testimony as to when Zoom school started.
THE COURT: That's a fair point.

Why don't you rephrase, and then, Mr. Beyda, we need to find a convenient breaking point for the lunch recess.

BY MR. BEYDA:

Q. Mr. Schram --

MR. BEYDA: Sorry, your Honor. I just need a second.

THE COURT: Sure.

Q. Do you not remember what time Zoom school began; is that what your testimony is?

MR. MIN: Objection. Asked and answered.

THE COURT: It was asked and answered. He said he didn't recall exactly.

Q. Do you have an approximate time that Zoom school began? Actually, withdrawn.

Can you give me an approximate -- did you take EZ to school in Manhattan?

A. I dropped -- can you hear me now?

Q. Yes. I can hear you. Did you take EZ to school in Manhattan?

A. Yes.

Q. What time would you bring her there?

A. 8:30 the doors closed, that I recall.

Q. So what time would you bring her there?

A. Right before 8:30.

Q. What time does your daughter wake up in the morning?

MR. MIN: Objection.

Q. I'll withdraw that last question.

Did school begin at 8:30 or did school begin earlier and was that just the latest you could bring them?

A. No, we would bring her on time.

Q. So what time was on time?

A. Before the doors closed at 8:30.

Q. Okay. So did the Zoom school between March and June of 2020 begin at 7:30 in the morning, when you were in Mexico, or 7 a.m., if you know?

A. You mean time zone Mexico City -- Mexico?

Q. Yes.

A. So I already said I don't remember exactly, so I can't answer that.

MR. BEYDA: Okay. Your Honor, I think this is a good place to stop.

THE COURT: All right. It's roughly 12:40. If we can, I'd like to resume at about 1:15. Does that work for everyone?

MR. BEYDA: Yes, your Honor. Thank you.

THE COURT: All right. A relatively, you know, quick lunch break. I have a criminal matter on at 3:30 today, so if we resume at 1:15, we'll go to 3:30, we'll take a very brief break, if people need a break.

MR. BEYDA: Thank you for the heads up.

THE COURT: Okay. That's the plan for today. All

right.

MR. MIN: Your Honor?

THE COURT: Yes.

MR. MIN: I'm sorry. You were saying you were going to take a brief break at 3:30 for the criminal matter or we're going to be done at 3:30 for the criminal matter for the day?

THE COURT: No, we're going to be finished for the day at 3:30 for the criminal matter, which will take up the rest of my day, and we'll take a brief break between 1:15 and 3:30; just a very short nature break, I'm saying. I'm trying to give you the plan for the rest of the day, okay?

MR. MIN: Understood, your Honor. Thank you.

THE COURT: Have a good lunch, everyone.

MR. MIN: Thank you.

(Luncheon recess)

AFTERNOON SESSION

1:27 p.m.

THE COURT: All right. Good afternoon, everyone. We're back on the record.

Mr. Beyda.

MR. BEYDA: Thank you.

BY MR. BEYDA:

Q. Mr. Schram, while the children -- while EZ was in Mexico, she participated in Zoom school five days per week, correct?

A. Yes.

Q. Can you describe her behavior during those -- withdrawn.

The Zoom schooling required EZ to be in front of a computer several hours per day, correct?

A. I wouldn't say -- I don't think several hours, but couple of hours -- two, three hours, maybe. I don't remember.

Q. When you say a couple of hours, are you saying -- is a couple to you two? What is a couple of hours?

A. Yeah, two hours. Yes, then there was homework, which added to those -- that time, yes. But that was not in front of a teacher.

Q. But a school day for EZ was longer than two hours, wasn't it?

THE COURT: Are you talking Zoom school now or regular school?

MR. BEYDA: Zoom school. Zoom school.

A. As I recall, it was -- yeah, around two hours of actual interaction with a teacher, and then there was couple of hours to do homework, etc., not in front of a teacher. I would -- that's -- I recall something like that.
Q. So how many hours per day was EZ looking at a computer screen on -- to participate in this Zoom program?
A. So it could be around -- around 4:00. I re -- I remember the idea of trying to get her to be done by 1 or so, so she would have the rest of the day off. I think that set the time frame a little bit, around that time, two, three, along two --
Q. Around 2 she was done; is that what you're saying?
A. No, no. I'm sorry. Yeah, like around 1 -- we would try to like finish everything in one setting so she would be done for the rest of day. Like that was a ballpark, the setup, I remember.
Q. So was that 1:00 now you're saying that that would happen?
A. It was a goal for her to be done with school and homework was around 1, maybe 2:00, but just to try to get it all done with so she wouldn't have homework later in the day. That was the general setup of the -- the homeschooling.
Q. And at this time EZ was approximately 5 years old?
A. Yes.
Q. And either you or Ms. Zarak would sit with her while she was in Zoom school, correct?
A. Yes.

Q. And EZ oftentimes -- can you describe EZ's behavior during these few hours that she was in Zoom school each day.
A. She would have a hard time focusing, you know, being distracted, didn't seem interested, and it dragged on to finish the tasks at hand.
Q. And what you just described of her behaviors was concerning to Ms. Zarak and you, correct?
A. Yes.
Q. And it worried you that if there was going to be another year of Zoom school, that would be difficult for EZ, correct?
A. For me and me alone?
Q. No, for you and Ms. Zarak.
A. Yes.
Q. Now RZ, before going to Mexico, was in a program three days per week in New York, correct?
A. That's right.
Q. And his program would run from -- would start 10:00 in the morning -- I'm sorry -- 11:00 New York time, correct?
A. I don't remember exact time. That sounds about right.
Q. Do you recall how long his program was each day, during the three days per week?
A. It would end about 2 or 3:00 -- 2:00 or so.
Q. And that was a -- and he would also, while in Mexico, participate in a Zoom program, correct?
A. I wouldn't call it a program. They did couple -- maybe

two, three group gatherings, you know, so the kids would see each other's faces. It wasn't more than that, that I recall.
Q. When you say two, three, are you saying that there were two, three sessions that he logged into?
A. Yes, throughout the whole period, yes.
Q. So from March 2020 until the end of the academic year for that program, there was only two or three times that RZ logged into a Zoom program?
A. About that time, yeah -- about that much, yeah. It wasn't that often.
Q. Now isn't it true that RZ's program was three days per week from March, when you got to Mexico, until the semester ended?
A. No.
Q. Did you take RZ out of his program that he was enrolled in before going to Mexico at any point while you were in Mexico?
A. No.
Q. Did you --
A. Sorry.
Q. Did you advise his teachers that he would no longer be participating in the program that he was enrolled in while in New York?
A. During that school year?
Q. Yes.
A. No. He was -- so we would withdraw him from the program off of spring semester, while the spring semester was in order;

is that what you are suggesting?
Q. Yes, sir.
A. I don't think we -- no, I don't think we would do that.
Q. In fact, he continued to be enrolled while you were in Mexico, correct?
A. That sounds about right, yes.
Q. And Ms. Zarak continued to be in touch with his teachers, correct?
A. Yes. Again, but it was very -- it was very little activity for his program, but yes.
Q. Describe how RZ reacted to being involved in that program, at least during the two or three times that you said he participated during this period of time. please.
A. I re -- I remember, you know, it being a fun session where all the classmates saw each other. I think they sang a song together and stuff like that, you know, which was -- which was common for that group of them.
Q. Now were those kids that he was seeing on the Zoom screen his friends?
A. Classmates.
Q. Okay. Were they -- were those classmates his friends?
A. I don't think I would describe any of them as friends. He did -- yeah, no, because he didn't see his -- his classmates much outside his class.
Q. What about Ilya?

A. Yes. What about her?
Q. Ilya is RZ's good friend, correct?
A. Classmate -- yes, a friend, actually. I would -- I would agree to that, yeah. That's -- he was -- he liked her the most. Let's put it that way.
Q. Okay. Now EZ also got to see her friends when she was in Zoom school, correct?
A. Yes.
Q. Now RZ had a friend also, RJ, who was in the Zoom school program with him, correct?
A. That sounds -- that sounds familiar, that name, yes.
Q. And RJ was more than just a classmate; that was a friend of RZ's, correct?
A. Yeah, you could -- you could describe him as a friend, yes.
Q. In fact, he's a friend of EZ's friend -- he's -- I'm sorry. He's EZ's friend Ava's brother, correct?
A. That's right.
Q. And these are connections that your children have to New York, correct?
A. These are classmates and friends, yes, that were in New York, yes.
Q. While in Mexico did your children miss their friends?
A. I don't know. Didn't ask them.
Q. While in Mexico was it difficult --
MR. BEYDA: I'm getting feedback.

I'm sorry. Is anybody else getting feedback?

THE WITNESS: Yes.

THE COURT: Did somebody touch something?

MR. MIN: Yeah, your Honor, it might be on our end. I mean, I did unmute ourselves.

THE COURT: Yes, I believe it is on your end.

MR. MIN: Because I'm not hearing the feedback, so --

THE COURT: All right. It stopped, whatever you did. Go ahead, Mr. Beyda. I'm sorry.

MR. BEYDA: Thank you.

BY MR. BEYDA:

Q. Now while you were in Mexico you did not enroll EZ in any Icelandic language classes, correct?

A. No.

Q. You did not enroll RZ in any Icelandic language classes, correct?

A. No.

Q. And Ms. Zarak did not take any Icelandic language classes, correct?

A. During what time period?

Q. Between March 2020 and July 9th, 2020.

A. Correct.

Q. You also did not purchase any books for the children in Icelandic, correct?

A. While in Mexico in the pandemic, with the -- no.

Q. Did you order things on Amazon?
A. No, nothing.
Q. Have you ever ordered anything on Amazon?
A. Yes.
Q. Have you ever purchased any other items from any other websites?
THE COURT: Ever?
A. I don't understand the question.
Q. Yes, actually, ever.
A. Ever, ever ordered anything of any other website, ever?
THE COURT: That's what he asked.
A. Yeah. I mean, yeah, I guess. Yes.
Q. Who is Mo Willems?
A. He is a author of children's books.
Q. While you were in Mexico, you ordered children's books that were delivered to the house, correct?
A. Did I order this book, you're asking me?
Q. You and Ms. Zarak.
A. Are you asking if we ordered them together, or separately?
Q. I'll withdraw the question.
While you were in Mexico, Mr. Schram, your children had books delivered to the house where they were staying, correct?
A. Yes.
Q. And if you wanted to have books in Icelandic delivered to

the house, you could have done so, correct?
MR. MIN: Objection.
THE COURT: Grounds?
MR. MIN: It's argumentative and relevance.
THE COURT: I think it asks him to speculate. Reframe the question or ask a different question.
MR. BEYDA: Sure.
BY MR. BEYDA:
Q. Mr. Schram, you are aware that books were delivered to the children at the house where you were staying in Mexico, correct?
THE COURT: You already asked that.
A. Yes.
Q. And those books were children's books, correct?
A. If I recall correctly, yes.
Q. Now --
THE WITNESS: Did I drop out?
MR. BEYDA: No.
THE COURT: No. You're still there. There's no question yet, though.
THE WITNESS: Okay. Sorry.
Q. You and Ms. Zarak discussed with each other the issues of the Zoom technology and the children sitting in front of the computer screen at length when you were in Mexico, correct?
A. We talked definitely about the issues of -- of the

homeschooling with EZ, yes.
Q. And you both had many concerns going forward about the children with homeschooling, correct?
A. More Tania than me, yes.
Q. Now you and Ms. Zarak are both well educated, you would agree, correct?
A. Yes.
Q. You both graduated from college, correct?
A. Yes.
Q. Even graduate school, correct?
A. Yes.
Q. And education is both very important to each of you, correct?
A. Yes.
Q. And you would agree that Ms. Zarak is a calculated person, correct?
MR. BEYDA: I think we lost him.
Mr. Min, do you maybe want -- I apologize. Your Honor, may counsel contact Mr. Schram?
THE COURT: Sure.
(Pause)
MR. MIN: Your Honor?
THE COURT: Yes.
MR. MIN: Mr. Schram just called us saying the whole power went out in his neighborhood. And so we just told him

we're letting the Court know and we would let him know. I just sent him an email, he didn't respond, so he just called us and that's what he told us, so --

THE COURT: All right. I don't know that what we can do about that then.

MR. MIN: I mean, your Honor, the only thing I would offer -- of course, subject to everyone's thoughts on this, but -- just asking him to try to call in, because obviously he has some telephone service, but that's --

THE COURT: I don't think that's very practical, though. I can't assess his demeanor, which is part of my credibility calculation, counsel can't see him, and his cellphone is going to die, right? I mean, if he doesn't have power. So I mean, I think -- Ah.

THE WITNESS: So I'm on the cellphone now.

THE COURT: Oh, you're on with your phone. Okay. We were just talking about whether that was a viable -- I'll let you turn yourself right side up.

THE WITNESS: Yeah, like it's -- the whole neighborhood seems like it went out.

THE COURT: Are you certain everything is okay and safe, first and foremost?

THE WITNESS: Yes. Yeah, it's just -- yeah, yeah. I mean, I'm -- I'm on the cellphone now. It seems to be fine.

THE COURT: Okay. Why don't we do this, Mr. Schram.

I did say to people, obviously if your power is out, at some point you're going to lose the power on your cellphone, but if you're comfortable with it, why don't we try to press on.

THE WITNESS: Yeah, that's right. I don't know.

THE COURT: All right. And obviously I'm going to say again, Mr. Schram, I don't know, you know, it could be just a routine thing that the power went out, but obviously if there's any kind of a problem or emergency, you should let us know that and you should, first and foremost, be safe.

THE WITNESS: Thank you. Yes. I mean, I don't -- I'm looking out the window. Doesn't seem to be any, like, issues.

THE COURT: Okay.

THE WITNESS: But my neighbor is knocking, so let me just see if everything is okay in the house. Thank you.

THE COURT: Okay.

(Pause)

(Discussion off the record)

THE COURT: All right. Mr. Beyda.

MR. BEYDA: I'm going to withdraw the last question. I do not believe there was an answer to it?

THE COURT: I don't even recall. But if you're withdrawing it, we don't have to find out.

MR. BEYDA: Okay.

BY MR. BEYDA:

Q. Prior to the family going to Iceland and while you were in

Mexico, Ms. Zarak, to your knowledge, did not have any communications with any schools in Iceland, correct? Verbal, I'm talking about verbal communications, to be clear.

THE WITNESS: Sorry. Let me -- you're jumping on my end, so let me see if I can -- is it possible to limit the amount of video I'm seeing or I can just -- it's a little bit -- seems to be an overload. Give me a second.

(Discussion off the record)

MR. BEYDA: I'm actually withdrawing that last question, also.

BY MR. BEYDA:

Q. Mr. Schram, before the family went to Los Angeles in 2018, Ms. Zarak went to look at schools in Los Angeles, correct?

THE WITNESS: You're dropping out. Can you hear me now? The voice is dropping.

MR. BEYDA: Your Honor, I'm not sure this is working out too well.

THE COURT: No, it's really not.

(Discussion off the record)

THE COURT: I'm sorry to say this, but I think we're going to have to adjourn either for the day, but that's really a problem -- and I guess I can talk with counsel separately about scheduling, we have to do that at some point anyway -- or we can break and Mr. Min and Mr. Glasser can let us know if they hear from Mr. Schram that he has power back. But I did

tell you I have a criminal matter on at 3:30 today anyway. So what is the preference here?

MR. MIN: Your Honor, our preference would be to stay on hold until 3:30 and see if Mr. Schram gets his power back because I agree that the telephone does not seem to be a viable option, but hopefully maybe he gets his power back in a few minutes or half an hour and we can get a solid hour or more.

(Discussion off the record)

THE COURT: I think we should adjourn for the day, I'm sorry to say, because I do think -- this is a formal court proceeding -- it is important that everybody be able to see one another and all. Tomorrow we will resume. I have a criminal matter on first thing in the morning that should be finished by 11, I'm hoping.

Hold on one second, please.

(Discussion off the record)

(Adjourned to October 8, 2021, at 11:00 a.m.)

INDEX OF EXAMINATION

Examination of: Page

ARNALDUR SCHRAM

Cross By Mr. Beyda . . . . . . . . . . . . . . 486

RESPONDENT EXHIBITS

Exhibit No. Received

153 . . . . . . . . . . . . . . . . . . . . 542

216 . . . . . . . . . . . . . . . . . . . . 539

37 . . . . . . . . . . . . . . . . . . . . 491

41 . . . . . . . . . . . . . . . . . . . . 505

94 . . . . . . . . . . . . . . . . . . . . 526

95 . . . . . . . . . . . . . . . . . . . . 529