UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In the Matter of E.Z. and S.Z.

ARNALDUR SCHRAM,

Petitioner,

v.

21 Civ. 6524 (MKV)

TANIA ZARAK,

Respondent.

Remote Bench Trial
------------------------------x

October 8, 2021
11:01 a.m.

Before:

HON. MARY KAY VYSKOCIL,

District Judge

APPEARANCES

BURGER GREEN & MIN LLP
Attorneys for Petitioner
BY: RICHARD MIN, ESQ.

GALLET DREYER & BERKEY, LLP
Attorneys for Petitioner
BY: KENNETH GLASSER, ESQ.

CHEMTOB MOSS FORMAN & BEYDA LLP
Attorneys for Respondent
BY: MICHAEL F. BEYDA, ESQ.
MUDITA CHAWLA, ESQ.

(Case called)

THE DEPUTY CLERK: Good morning, your Honor.

THE COURT: Good morning, everyone.

THE DEPUTY CLERK: Counsel, starting with petitioner, can I please get everyone's name for the record.

MR. MIN: Richard Min on behalf of petitioner. Good morning, everyone.

THE COURT: Good morning, Mr. Min.

MR. GLASSER: Good morning, your Honor. Ken Glasser on behalf of petitioner. Good morning, counsel.

THE COURT: Good morning, Mr. Glasser.

MR. BEYDA: Good morning, your Honor, and counsel. Michael Beyda on behalf of the respondent mother.

THE COURT: Good morning, Mr. Beyda.

MS. CHAWLA: Good morning, counsel, and your Honor. Mudita Chawla on behalf of the respondent mother.

THE COURT: Good morning, Ms. Chawla.

And good morning, Ms. Zarak and Mr. Schram.

So let me just say first, Mr. Schram, I heard that yesterday you went to your office to try to facilitate our moving forward. I appreciate very much how diligent you were to try to let us press forward. Unfortunately, when I went upstairs from the courtroom, I did not see the note that you had done that, and so by the time we saw it, it was too late for us to resume, so I apologize to everybody about that, and I

thank you for making the effort. Is everything back to normal in terms of your electric and your lighting and all?

THE WITNESS: Yes. It took couple hours, but -- half the city was pretty much out.

THE COURT: Wow. Okay. All right. So let's just talk for a brief couple of minutes before we get going about where we're at and about timing.

By the Court's count, the petitioner has so far used roughly eight hours of hearing time to elicit testimony and present its case. Today, I will be available from now until 1:00 and then, as I told you, I need to break for a long-scheduled lunch. We'll resume again around 2:30 and go until the end of the day. That will allow an additional roughly four and a half hours. Tuesday, I have moved around as many things as I can. I do have a court-related appointment between 1 and 2:30 that I cannot reschedule because it involves many other people, but otherwise, the Court will make itself available all day Tuesday to continue the hearing.

Respondent so far has used about five and a half hours of court time, hearing time. So I'm telling you, petitioner has used eight hours, respondent has used roughly five and a half. You're going to end up with equal time here, so I'm just giving you, Mr. Beyda, a heads up that, you know, you're not that far behind, about two and a half hours, and you will be caught up with petitioner. And then the remaining time, so

that's somewhere this afternoon, you are equal in time. And then the remainder of the time, Tuesday you will have roughly five hours, and then another hour, hour and a half this afternoon. You need to plan accordingly, because that time needs to be split evenly between the parties. So you need to think about how you're presenting your case. All right?

So with that, we're back on the record. Mr. Schram, you're still under oath.

And Mr. Beyda, I think you have the floor.

MR. BEYDA: Thank you, your Honor.

ARNALDUR SCHRAM, resumed.

CROSS EXAMINATION CONTINUED

BY MR. BEYDA:

Q. Mr. Schram -- I'm getting feedback. I don't know if anybody else is.

(Discussion off the record)

Q. Mr. Schram, before we broke yesterday, we were talking about the children's education. Do you recall that?

A. Yes.

Q. And the last question I believe that was posed to you was about education being important to both you and Ms. Zarak.

A. Yes.

THE WITNESS: There was a little bit of echo there.

THE COURT: Yes. Because the mic went off.

Q. Mr. Schram, you would agree that you and Ms. Zarak sought

to provide your children with similar educations while living in New York, correct?
A. Similar to what? Sorry.
Q. Similar in schools that they attended?
A. Can you rephrase the question. I don't know if I'm understanding it.
Q. When you enrolled -- you initially enrolled EZ in the Broadway Presbyterian Nursery School, correct?
A. Yes.
Q. You subsequently enrolled RZ in the Broadway Presbyterian Nursery School, correct?
A. Yes.
Q. And that was a conscious decision that you and Ms. Zarak made together, correct?
A. Yes.
Q. And you made that decision together because it was your intention for RZ to follow the plan that started with EZ attending the Broadway Presbyterian Nursery School, correct?
A. Yeah, I guess like he also went to the same school as she did in Los Angeles, so that makes sense, yes.
Q. And you were actually happy with the idea of RZ attending the same school as EZ, correct?
A. Yes.
Q. And it was then a conscious decision of you and Ms. Zarak to enroll RZ in the Brooklyn forest summer program in August

2019, correct?
A. August 2019. Yeah, it was -- we -- yes, we -- we had I think previously, we kind of encouraged these activities before the school starts, yeah, that sounds about right.
Q. And that was the same program that EZ attended three years prior, correct?
A. That's possible. I don't remember.
Q. Well, EZ attended the Brooklyn forest summer program in or about 2016, correct?
A. I don't remember the details, but she attended a program in Central Park.
Q. And that was -- you then subsequently enrolled RZ in the same program, correct?
A. That could be. That sounds about right.
Q. And then you took steps to enroll RZ in pre-K at P.S.9, correct?
A. At what point?
Q. In February -- on or about February 5, 2020.
A. I did not do that, so I don't know.
Q. Are you aware of whether or not RZ was -- an application was submitted for RZ to attend P.S.9 at any point before the trip to Mexico in March 2020?
A. I remember Tania telling me that he got in. I don't remember the application.
Q. And there was no objection that you raised at that time to

RZ attending P.S.9 when Tania told you about that, correct?
A. It was no need to object to it because we were talking about if we were going to live in Mexico or Iceland at the time. It was -- didn't matter to me.
Q. So as of February 5th, 2020, in your mind you were moving either to Mexico or Iceland?
A. No. Like I said, when she told me he got in, during the summer.
Q. Well, you and Ms. Zarak had discussions about RZ attending P.S.9, correct?
A. Yes.
Q. At no point did you tell Ms. Zarak that you did not want RZ to attend P.S.9, correct?
A. No.
Q. In fact, it was the intention of you and Ms. Zarak for the children to follow the same path in their attendance at these schools in Manhattan, correct?
A. If we would live in New York, yes.
Q. On March 16, 2020, you were advised that the school had accepted RZ's pre-K application, correct?
A. I'm sorry. On March 16th?
Q. May 16th, 2020.
A. May, May 16th. I don't remember -- I don't remember the date, but I remember Tania telling me that he got in.
Q. Would it surprise you if that was May 16th, in or about

May 16, 2020?
A. Surprise me. May. No. That -- that could be about right.
Q. And in fact, at that time Ms. Zarak was inquiring of the school as to whether or not the school will be open in the fall, correct?
A. I don't know.
Q. Well, were you inquiring -- actually, withdrawn.
You and Ms. Zarak were having discussions in May of 2020 as to whether or not the schools would be open in the fall of 2020, correct?
A. May? That sounds about right. It was in the context of Mexico, Iceland, New York, and then schools being a factor, definitely.
Q. In May of 2020 there were no communications that you and Ms. Zarak together were having with any schools in Mexico, correct?
A. I don't know. I wouldn't be able to have those conversations because I don't speak Spanish.
Q. Okay. And Ms. Zarak does not speak Icelandic, correct?
A. No. She started learning after she got to Iceland, so no, at that point, no, she didn't know any.
Q. Okay. And in May of 2020 there were no communications, no conversations that you and Ms. Zarak had together with any schools in Iceland, correct?
A. In May?

Q. Correct.
A. We reached out to schools in Iceland, I want to -- I want to say started in May.
Q. The question was whether or not you had any conversations with any schools in Iceland with Ms. Zarak in May.
A. You mean --
Q. Did you?
THE COURT: He answered the question. He answered the question.
Q. How did you reach out to schools in Iceland in May?
A. Yeah, if I remember the timing correctly, it was emails and then the phone calls were happening at a later -- later stage.
Q. When did the -- when did you and Ms. Zarak together exchange an email with a school in Iceland in May of 2020?
A. I'm sorry. Can you repeat the question.
Q. When did you and Ms. Zarak exchange an email together with a school in Iceland in May of 2020?
A. Exchange an email together with a school. Exchange -- what do you mean by exchange together?
Q. When did -- I'll rephrase it. When did you and Ms. Zarak send an email where you are both copied on it to a school in Iceland in May of 2020?
A. When in May. So I recall the -- these -- we -- the discussion about Iceland really picking up in May. It probably might have been later parts of May. So let's say the later

part of May correspondence happened. Whether she was in on every email, I don't remember that.

Q. Okay. I didn't ask you about every email. I just asked for one. Were there any emails that you and Ms. Zarak sent together, where you're both copied, to a school in Iceland in June of 2020?

A. At a -- at a certain point, Tan -- yeah, we were corresponding with Landakotsskoli either later part of May or June. I don't remember the dates.

Q. Now you haven't provided or produced any of those communications in connection with the discovery requested of you in connection with this case, correct?

A. We provided all -- we provided all correspondence with the schools.

MR. BEYDA: Now, your Honor, may I please have -- I'm going to -- sorry. I'm trying to figure out the most efficient way because there are a few exhibits.

Your Honor, there was no objection raised to Exhibits R 26, R 20, R 21, and R 57; actually R 57 and R 58.

THE COURT: Are you moving their admission?

MR. BEYDA: Yes, I am, your Honor.

THE COURT: All right. They will all be admitted. That's R 26, R 20, R 21, R 57, and R 58.

(Respondent's Exhibits 20, 21, 26, 57, and 58 received in evidence)

MR. BEYDA: I'm not going to be asking the witness any questions right now about those.

There was an objection to Exhibit R 29. If I can please have that brought up onto the --

THE COURT: No. Wait until we deal with the objection.

MR. BEYDA: Oh, yes. I'm sorry.

THE COURT: Give me one moment to just fix my notes here.

MR. MIN: Can I just ask for clarification. Was 26 and 27 admitted or was it one or the other?

THE COURT: He didn't say 27, as best my notes reflect.

MR. MIN: So 26. Thank you.

THE COURT: I'm sorry, Mr. Beyda. What was the number we're talking about, 29?

MR. BEYDA: Yes, your Honor, 29.

THE COURT: Let me pull it up.

All right. The objection, Mr. Min?

MR. MIN: No.

THE COURT: Are you saying no objection?

MR. MIN: No. The objection was hearsay, your Honor. I'll waive my relevance objection.

THE COURT: All right. Well, the relevance objection would have been overruled, but you're withdrawing it.

Mr. Beyda.

MR. BEYDA: I believe this would fall under an 803(6) exception. It's a record of regularly conducted activity from the school to the parties.

THE COURT: All right. But I don't think you have established the foundation for 803(6).

MR. BEYDA: I will inquire. If I may inquire, your Honor.

THE COURT: Yes, go ahead.

MR. BEYDA: Thank you.

BY MR. BEYDA:

Q. Mr. Schram, are you familiar with the MySchools -- withdrawn.

Mr. Schram, have you received emails from the MySchools@MySchools.nyc address?

A. Have I received an email from that email address. I believe so, yes.

Q. And Ms. Zarak would also forward you emails that she received from that email address for your review, correct?

A. I don't remember.

Q. What is the MySchools@MySchools.nyc, where does that -- withdrawn.

Who sends the emails from the MySchools@MySchools.nyc address?

A. You know, I think I have to guess to be able to say that.

THE COURT: Don't guess.
A. But -- yeah, then I don't know.
THE COURT: You've answered. You don't know.
Q. To your knowledge is that affiliated with the public schools in Manhattan?
A. Yes, it is.
Q. And to your knowledge is that a means of receiving communications from the public schools in Manhattan?
A. I want to say certain correspondence -- communications. I -- I don't remember.
Q. And would there be communications, for example, communication -- there would be communications regarding applications submitted to the school, correct?
A. I remember it coming from a person at the school but not from like a system email.
Q. But you have received emails from the MySchools@MySchools.nyc address, correct?
A. I would have to guess.
THE COURT: Mr. Beyda, you might do better to get this in through Ms. Zarak.
MR. BEYDA: That's fine. I'll move on.
THE COURT: It's addressed to her, is it not?
MR. BEYDA: Yes, your Honor. I'll move on.
Q. You found out on or about July 28, 2020, Mr. Schram, that P.S.9 would be going forward with a hybrid learning at that

point, correct?
A. Did you say July 9th?
Q. July 28, 2020.
A. I -- I can't verify this kind of -- that date. At some point we were informed during the summer that our -- that -- that -- so now I don't remember if I heard this from a friend of mine who was also in New York regarding the setup for the children or if I heard it directly from the school, but there were, as I understood it, the remote learning was very likely in the upcoming school year that year.
Q. And that was concerning to you and Ms. Zarak, correct?
A. Yes.
Q. And it was concerning because you wanted your children to be in person in school full time, correct?
A. Actually, at that point it didn't matter, 'cause we were already set to go to Iceland. We were all -- and EZ already enrolled in a school in Iceland, we were already moving to Iceland, so it didn't really matter what happened in the New York school.
Q. When you say EZ was enrolled in a school in Iceland, Ms. Zarak didn't enroll EZ in school in Iceland, correct?
A. I filled out the application form.
Q. And the application form was in Icelandic, correct?
A. I don't think so. I don't remember, but I -- I wouldn't think so. It was an international department at a school in

Iceland. I think they would have it in English.
Q. Isn't it true that EZ was wait-listed in a school in Iceland?
A. I think that wait-listed period was maybe two days. I think she got a spot pretty much in the beginning.
Q. Isn't it true that EZ didn't get confirmation of her enrollment until late August 2020 -- I'm sorry. Let me withdraw that.
Isn't it true that EZ did not get a confirmation that her application was accepted until late August?
A. No. That would feel odd. That feels late.
Q. When do you think --
A. I --
Q. We were speaking over each other. I apologize. I didn't get what you were saying.
A. We knew way in advance she would have a place in school.
Q. It's not true you were already in Iceland when you found out she was accepted?
A. No.
Q. Now prior to your arrival in Iceland Ms. Zarak had not been to the Landakotsskoli school, correct?
A. Correct.
Q. Had you been to the Landakotsskoli school in Iceland before you arrived there in August?
A. No. That would have been pretty much impossible.

Q. Ever? Were you ever there?
A. Well, it's a school that's next to the church we got married in. We knew what school it was, but we hadn't gone inside, no.
Q. To answer the question, you had never been there before.
THE COURT: He answered the question.
Q. Okay. Now, Mr. Schram, before the move to LA, Ms. Zarak went from New York to LA to look at the school that EZ would be attending, correct?
A. She went to Los Angeles for a job interview and looked at I think three different schools during that trip.
Q. And that's because Ms. Zarak was doing her due diligence, if you're familiar with that term, correct?
A. The primary reason for the trip was to do a job interview and then also scout for houses and homes -- or schools at the same trip.
Q. Okay. Now the scouting was something that you and Ms. Zarak discussed, correct?
A. She -- yeah, she kept me updated on her progress, you could say.
Q. Was there a discussion between the two of you about the progress?
A. Yes, like, I -- I looked at this home, this is what I thought of it, you know, etc., and then she briefed me I believe on the schools, either before coming back on the trip

or after she came back from the trip.
Q. Now there was no scouting in Iceland before you and Ms. Zarak went there on August 1st, correct?
A. No. There was a global pandemic with a limited flight ability so we did not do that, no.
Q. There was not even any online scouting, correct?
A. No.
Q. And when you say --
THE COURT: Hold on. I'd like Mr. Schram to clarify. When you say no, are you saying no, that's not correct or no, you didn't scout?
THE WITNESS: No, that's not correct.
Q. When did you and Ms. Zarak go together and online scout the Landakotsskoli school?
A. Well, if you mean online scouting, I mean, we're looking at the website, we're looking at the program, etc. There were two schools we were talking about in Iceland at the time, and the timing must have been late May, early June.
Q. Now after your scouting with Ms. Zarak that you just mentioned, online, Ms. Zarak didn't have any immediate communications with those schools, those two schools that you referred to, correct?
A. I don't know.
Q. You and Ms. Zarak didn't discuss reaching out to the Landakotsskoli school, for example, to request any information,

correct?
A. I remember I reached out, and I don't remember to what extent Tania was in that discussion, in the email correspondence, but of course I kept her updated on progress, if she wasn't in on those emails.
Q. When did you send those emails?
A. The -- late May, early June. June, somewhere around there, this is, around that time.
Q. And you didn't forward those emails to Ms. Zarak, correct?
A. I don't remember.
Q. In or about June of -- I'm directing your attention now to June of 2021, Mr. Schram. In June of 2021, you and Ms. Zarak contacted P.S.9, correct?
A. Please clarify, when you say we communicated, we contacted P.S.9.
Q. We, I am referring to you and Ms. Zarak.
A. I reached out to P.S.9 'cause I suspected Tania doing something behind my back. I inquired -- I tried to log on to this registration website of the school to see if they were enlisted. When I came to a point where I had to have their student IDs, I reached out to the school, saying, could you please give me the identification numbers of -- EZ in this case, which I was then forwarded to a -- the -- this head of register -- I don't know what the formal term is -- and that person informed me that she was talking to Tania on the phone

the previous day regarding how to finish the registration into P.S.9.

Q. And that was in 2021, correct?

A. This is June 2nd, 2021.

Q. In fact, on June 2nd, 2021, you sent a specific message saying, "We don't have in our hands the student IDs and account creation code for the MySchools website for our kids for next year." Correct? That's what you said.

A. Yes.

Q. And then you said, "Would it be possible to get it like this via message or do we need to wait until we're physically in New York?" Correct?

A. Yes.

MR. BEYDA: Your Honor, I am going to offer R 172. There was no objection to this email. I'm going to specifically be offering pages 1 and 2, with the exception -- so -- and there are additional pages to it that I am not offering at this point.

THE COURT: All right. Wait, wait, wait, wait. Let me just catch up with you.

Are you only offering two pages?

MR. BEYDA: Yes, I am. I'm sorry. Pages -- yes, it's pages 2 and 3 of the --

THE COURT: 2 and 3?

MR. BEYDA: 2 and 3 of the pdf, yes. My apologies.

THE COURT: Hold on. Let me pull it up.

MR. BEYDA: Yes.

THE COURT: Are you going to be displaying it?

MR. BEYDA: Yes, your Honor.

THE COURT: All right. Go ahead. Well, never mind. I have it here. But the question I have for you, so when you say pages 2 and 3, you're just telling me not the cover page where you have the exhibit number?

MR. BEYDA: Correct.

THE COURT: So in other words, Bates numbers 9289 and 90? Or 92?

MR. BEYDA: Correct.

THE COURT: Where are 90 and 91?

MR. BEYDA: These are -- actually, they appear to be out of order, the Bates numbers.

THE COURT: Yes, they certainly do.

MR. BEYDA: Page 1 is a separate email. That's why. And then page 2 and 3 are in an email chain. So this would be -- I apologize. I would be offering pages 1, 2, and 3, your Honor.

THE COURT: And now you're calling page 1 the pages of the actual document, not the cover --

MR. BEYDA: Yes, I am, yes.

THE COURT: All right. Let's do it by Bates number, all right? TZ9289 you're offering, right?

MR. BEYDA: Correct, your Honor.

THE COURT: All right. And then you're offering 9292 and hopefully 93, right?

MR. BEYDA: Yes, your Honor.

THE COURT: All right. There's no objection so they'll be admitted.

(Respondent's Exhibit 172 (Bates Nos. TZ9289, TZ9292, TZ9293 only) received in evidence)

MR. BEYDA: Just one moment, please.

BY MR. BEYDA:

Q. On page 2 of this document, Mr. Schram, the page Bates 9292 --

A. Yup.

Q. -- you sent an email to Rita Yoskowitz, correct?

A. Yes.

Q. Who is Rita Yoskowitz?

A. She is the parent coordinator at P.S.9.

Q. And you were in regular communication with Ms. Yoskowitz, correct?

A. No.

Q. Okay. You sent her a message inquiring about EZ's old ID, correct?

A. I initially emailed like the front desk -- I think that might be the former email of that, first email -- asking for the ID, and then I got forwarded to her, and then that's when

she stepped into the correspondence regarding the situation.
Q. Now to your knowledge isn't it true that the children were enrolled for the 2021-2022 school year at P.S.9 because they still had a New York address with the Board of Education?
A. Can you please repeat the question.
Q. To your knowledge isn't it true that the children were enrolled in the P.S.9 school -- or EZ, for purposes of this question, was enrolled in the P.S.9 school for the 2021-2022 school year because she has a New York address?
A. No.
Q. Did you ever advise P.S.9 prior to January 1, 2021, that EZ would never be returning to that school?
A. Tania sent, as far as I know --
MR. BEYDA: Your Honor --
Q. The question was whether you advised, Mr. Schram.
A. That she would -- no.
Q. And in fact, as of January 1, 2021, you and Ms. Zarak never discussed that the children would never be returning to their schools in New York in the future, correct?
A. Can you repeat the question.
Q. In fact, prior to January 1, 2021, you and Ms. Zarak never discussed that the children would never be returning to their schools in Manhattan again, correct?
A. That we never discussed they would never go to the school. Can you please paraphrase the question.

Q. Prior to January 2021, you and Ms. Zarak never discussed that the children would not be returning to their schools in Manhattan ever again, correct?
A. We never discussed -- we never discussed the school because we registered them in the school in Iceland.
Q. Yet you continued to receive communications, you and Ms. Zarak, from the schools in New York, correct?
A. I didn't.
Q. Ms. Zarak told you that she was receiving communications from the schools in New York, correct?
A. Not -- not that I remember.
MR. BEYDA: Your Honor, may I please have R 71. I do not believe there was an objection to this email. Let me just double-check.
THE COURT: It will be admitted.
MR. BEYDA: Thank you.
(Respondent's Exhibit 71 received in evidence)
MR. BEYDA: May I please have it put on the screen.
THE COURT: Yes, sure.
A. R71? Sorry. R 71?
Q. Yes.
A. R 71.
THE COURT: Can you make it larger, please.
Thank you.
Q. Let us know when you're ready, Mr. Schram.

A. Yes.
Q. On the top of this, on the top of page 1 of this exhibit is a message from you to Ms. Zarak where you write, "Are you getting these emails as well?" Correct?
A. Yes.
Q. And that's referring to the emails where you were monitoring COVID in New York, correct?
A. Emails were being sent to us regarding the COVID situation in New York, yes.
Q. And that was specifically regarding the COVID situation and the New York City Schools in New York, correct?
A. Well, let me read the email and I'll find out.
Yes, they seemed to be approximately weekly or so email bursts from buildings@nyc.gov, yeah.
Q. And in those messages it says -- for example, on page 18 of 29 --
A. Yeah, got it.
Q. -- it says this message is from the DOE COVID-19 Response Situation Room. Correct?
A. Yes.
Q. And DOE stands for Department of Education, correct?
A. I don't know.
Q. Now you received these emails -- or this string of emails starting -- or on page -- the last page of this document, second to last page, is dated -- is an email dated January 22,

2021, correct?
A. Yes. Yes.
Q. And the first message -- and you started receiving these emails at least in or about December of 2020, correct?
A. Right, yes. It seemed to be pretty intense email -- emails in December, yes, and into January.
Q. And you continued to receive those emails after January, correct?
A. Let me confirm.
Not to my knowledge.
Q. Did you advise the school to -- or did you advise rtsch@buildings.nyc.gov to stop sending you these emails?
A. I don't remember that.
Q. Okay.
MR. BEYDA: Your Honor, we can take this exhibit down because I'm done with it.
THE COURT: Sure.
Q. Mr. Schram, focusing now between the period of March 2020 and August 1, 2020, during that period of time you did not have any communications with the children's pediatrician asking him to transfer the children's pediatric records to a doctor in Iceland, correct?
A. Tania handled medical matters.
Q. Is that a no, you did not?
A. That's correct.

Q. You also did not communicate with the children's dentist during that period of time and ask to have the children's dental records sent to a dental provider in Iceland, correct?
A. No.
Q. In addition, you did not speak with the children's chiropractor and ask to have the children's chiropractic records sent to a chiropractor in Iceland, correct?
A. No.
Q. Now during that same period of time you did not obtain or meet with any -- withdrawn.
During that same period of time you did not have any virtual meetings with any pediatricians in Iceland to inquire as to whether they would be an appropriate fit for your children, correct?
A. Pedia -- no, the pediatricians in Iceland don't offer -- operate like in the US. It doesn't work like that.
Q. You also did not speak with any dental providers during that period of time, correct, dental providers in Iceland during that period of time, correct?
A. Before arriving? No.
Q. At some point while you were in Mexico in 2020, the amount of COVID cases began to increase there, correct?
A. Mexico? In Mexico?
Q. Yes.
A. Yes. Yes.

Q. And at that point, or during that period of time, you and Ms. Zarak began to discuss, or were discussing a return to New York, correct?
A. Not without a visa, no.
Q. At that time when the COVID cases were increasing in number in Mexico, you sent Ms. Zarak a message about taking a trip during the summer, correct?
A. Yes.
Q. And during that period of time all of the children's belongings were still in New York, correct?
A. Yeah, minus the suitcases we brought with us to Mexico.
Q. And all of your belongings were still in New York, correct?
A. Yes.
Q. All of Ms. Zarak's belongings were still in New York, correct?
A. Minus what she had at her parents' house, yes.
Q. In addition to your personal property, your work equipment was still in New York, correct?
A. Yes.
Q. On or about May 31st, 2020, you sent Ms. Zarak a message about traveling around the country in June, and the country you were referring to was Iceland, correct?
A. I have to guess. I would say yes. That sounds about right.
Q. And you told her you were thinking to plan to be in

Reykjavík early July, correct?
A. Yeah, that was one of the plans, yes.
Q. And then in that same message you said -- yes or no -- "Fly to New York beginning of August," correct?
A. To get --
THE COURT: Hold on. Hold on, Mr. Schram.
If you are reading from something, in fairness, put it in front of him.
MR. BEYDA: Sure. Your Honor, may I -- I believe R 141, there was no objection. Let me see.
I offer R 141.
THE COURT: It will be admitted.
(Respondent's Exhibit 141 received in evidence)
MR. BEYDA: Your Honor, may Mr. Wu put 141 on the screen?
THE COURT: Sure, yes.
MR. BEYDA: Thank you.
BY MR. BEYDA:
Q. Mr. Schram, this is an email --
THE COURT: Can you make it bigger, please.
Just do that automatically, if you would, so I don't have to keep asking. Thank you.
Q. Mr. Schram, this is an email that you sent to Ms. Zarak on May 31, 2020, correct?
A. Yes.

Q. And in that message you indicate in the first sentence, "This is the schedule I am proposing for Iceland," correct?
A. Yes.
Q. And you used the word "proposing" because nothing had yet been confirmed, correct?
A. Yes.
Q. And in that message you indicate that you would stay in the summerhouse initially, correct?
A. Yes.
Q. And then you would travel around the country in June, correct?
A. Yes.
Q. And the country you're referring to over there is which country?
A. Iceland.
Q. And then the plan was that you were proposing to be in Reykjavík early July, correct?
A. Yes.
Q. And then you were proposing to fly to New York beginning of August, correct?
A. Yes.
Q. Now at that point in time, on May 31st, 2020, there was no agreement between you and Ms. Zarak to permanently relocate to Iceland, correct?
A. There was no agreement to permanently relocate to Iceland.

Correct. That happened at a later date.

MR. BEYDA: Move to strike.

THE COURT: It's a bench trial, Mr. Beyda. Denied.

Q. Now at that point, in -- or following that email of May 31, you did not make any arrangements with any moving companies in New York to move property to Iceland, correct?

A. No. We didn't have any means to go to New York at that time, so no.

Q. But your proposal was to return to New York in August, the beginning of August, correct?

A. No.

Q. Well, R 141 indicates, "Fly to New York beginning of August."

A. Yeah, fly to New York.

Q. When you were flying to New York, isn't it true it was your intention to be in New York?

A. So now it's a question of when we came to agreement to be in Iceland, so --

MR. BEYDA: Your Honor, that isn't the question.

A. -- during this period we were talking about how to solve the visa situation.

THE COURT: Mr. Schram, hold on.

THE WITNESS: I'm sorry.

THE COURT: He simply asked you, if you were going to fly to New York, would you then end up in New York, be in New

York. He's not saying permanently; he's saying if you took a flight to New York, does that get you to New York? Is that your question, Mr. Beyda?

MR. BEYDA: Yes.

THE COURT: Okay.

A. If we fly to New York, yes, we arrive in New York, yes.

Q. And your proposal at that time was to then stay in New York, correct?

A. No.

Q. Well, you were not just going to fly into New York and then get on a flight and leave, correct?

A. Yes.

Q. Yes, that was your proposal?

A. Yes. Because --

Q. Hang on a second. I didn't ask a follow-up.

Now -- so you were going to fly from Iceland to New York and then immediately get on a flight and leave?

A. Immediately, no. Pack up our things and then go back, after we go to Norway to --

Q. So your proposal was to go to the apartment in New York when you sent that message on May 31, correct?

THE COURT: Hold on. Hold on.

Okay. You can answer.

A. Can you repeat the question, please.

MR. BEYDA: Your Honor, may I ask the court reporter

to have it read back, because I don't remember it.

THE COURT: Sure. Is the court reporter able to read it back.

(Record read)

A. Yes.

Q. Now in that message you did not indicate that the proposal was to go there to pack any of your belongings, correct?

A. In this message, no.

Q. In that message you did not mention anything about going back to Iceland after the return to New York in August, correct?

A. In this message, no, right.

Q. And in fact, after this message was sent, you and Ms. Zarak continued to have communications with the children's schools in New York, correct?

A. Tania might have. Not me. Maybe -- I don't remember. Give me a second.

Correspondence with the school in New York. Maybe. I would be guessing.

Q. Okay. And you had communications with the schools or Ms. Zarak had communications with the schools, to your knowledge, after this message was sent to her because it was her intention for the children to continue to attend those schools, correct?

A. She is the one that emailed the school that they will not

be attending.

Q. And that was on August 2nd, correct?

A. That's possible.

Q. It's not possible, it's correct, right?

A. It's possible. I don't know the dates that well.

Q. It was after you had left New York City, correct?

A. I'd be guessing if I say yes or no to this. Do you want me to guess?

THE COURT: Don't guess, no.

Mr. Beyda, again, if there's an email with a particular date, put it in front of him.

MR. BEYDA: I will. I didn't think this would be that difficult.

THE COURT: It's hard for him to remember the exact date.

MR. BEYDA: I'm going to pull it up. I just didn't --

Your Honor, may I please have R 65 put on the screen. There was no objection to this exhibit.

THE COURT: Yes, it will be admitted, and you may put it up.

(Respondent's Exhibit 65 received in evidence)

THE WITNESS: R 65?

MR. MIN: Your Honor, we don't object to this document, but as the document states, you know, it's a document between two individuals that are not testifying at this moment.

So I'm not entirely sure --

THE COURT: That's all right. So far it's in evidence so he can display evidence, and if there's a question, then you can object at that time. I don't think there's a question, is there?

MR. BEYDA: Not yet.

THE WITNESS: It was 65, R 65, 165?

(Discussion off the record)

MR. BEYDA: R 65.

THE WITNESS: Got it.

BY MR. BEYDA:

Q. And there's an email from Ms. Zarak to Rita, who you earlier testified about, indicating that, "After much consideration and months of dialogue, we have decided to spend the school year in Iceland, my husband's home country. Life in Iceland right now is as normal as the current world circumstances allow. I wanted to let you know that my children will therefore not be attending P.S.9 this fall."

You were aware of that message being sent to P.S.9 at that time, correct?

A. At that time, I'm not on this email, but I remember Tania telling me that she informed the school.

Q. And prior to that message being sent to Rita, there were no communications to the school advising them that your children will not be attending P.S.9 that fall, correct?

A. I'm sorry. Say that again. I'm sorry.

Q. Prior to that message being sent to Rita, there were no communications from you to the school that your children will not be attending that fall, correct?

A. From me? No, no.

Q. And there were no communications from Ms. Zarak that the children would not be attending school that fall, correct?

A. I don't know.

Q. Isn't it true, Mr. Schram, that it was only during the few weeks that you were in New York between July and August that the decision was made to go to Iceland so that your children could attend school there?

A. No.

MR. BEYDA: One moment, your Honor.

I'm done with this exhibit, so Mr. Wu can take it down. Thank you.

THE COURT: Okay.

Q. Mr. Schram, who is David Gronsbell?

A. He is an accountant.

Q. Is he your accountant?

A. He was at some point my accountant, yes.

Q. Have you exchanged email communications with him?

A. Yes.

Q. And you were in communication with him about the family going to Iceland, correct?

A. Yes, yes.
Q. And at the time you were actually specifically in communication with him on or about June 3rd, 2020; do you remember that?
A. I don't remember the date, but there was some correspondences, yes.
Q. And as of June 3rd, 2020, there still was not a confirmed plan to go to Iceland, correct?
A. Confirmed? That's possible. Sorry. Let me -- correct, yeah. Possible. I don't -- I don't remember the dates.
MR. BEYDA: Okay. Your Honor, may I -- I'm going to offer R 200.
THE WITNESS: Sorry. What number?
THE COURT: It will be admitted. No objections preserved.
THE WITNESS: Sorry. What's the number again?
MR. BEYDA: 200.
(Respondent's Exhibit 200 received in evidence)
MR. BEYDA: Mr. Wu, can you scroll down to -- sorry. Continue scrolling, please.
I need one moment, your Honor.
THE COURT: Sure.
THE WITNESS: Can I have a quick bathroom break? Is that possible?
THE COURT: Yes, of course. Why don't we take a

five-minute break. While Mr. Beyda figures out his exhibit and everyone can have a nature break.

MR. BEYDA: Thank you, your Honor.

THE WITNESS: Thank you.

(Recess)

BY MR. BEYDA:

Q. Mr. Schram, I'm directing your attention to page 2 of 6 of this document.

MR. BEYDA: Mr. Wu, if you can pull that up on the screen as well and make it large enough for everyone to see.

THE COURT: This is R 200, right, just for the record?

MR. BEYDA: R 200. The Bates number is ending in 428.

BY MR. BEYDA:

Q. All right. Mr. Schram, are you there?

A. Yes. Can you hear me?

Q. Yes. Directing your attention to the paragraph, the last paragraph of the email dated June 3rd, 2020, from you to Mr. Gronsbell.

A. Yes.

Q. In that message, in that paragraph, you end up -- you indicate, "If New York ends up not being feasible and reasonable place to spend the next year, then we are considering going to Iceland or Mexico, at least until this storm blows over," correct?

A. Yes.

Q. At that point, on June 3rd, 2020, there was no settled intent on your part and Ms. Zarak's part to relocate to Iceland, correct?

MR. MIN: Objection.

THE COURT: What's the objection?

MR. MIN: To the characterization of "settled intent."

THE COURT: You mean vagueness?

MR. MIN: Yes.

THE COURT: It's not a characterization.

Mr. Schram, are you able to answer the question?

THE WITNESS: Yes.

THE COURT: All right. Go ahead then, sir, please. The objection is overruled.

A. Can you please repeat so I make sure I answer correctly.

MR. BEYDA: Your Honor, may we ask the court reporter to read it back, please.

THE COURT: Sure.

(Record read)

A. So again, I can't -- I can't recall the exact date when it was fin -- the decision was finalized. This was an open discussion during that period.

Q. And the discussion was ongoing because there was no shared intent at that time, correct?

MR. MIN: Objection.

THE COURT: No. It's overruled.

A. At that time, June 3rd, settled? No. Probably no. Again, don't remember the dates exactly.
Q. In fact, as of June 3rd, 2020, you were still in the process of getting your green card, correct?
A. Still in the process of getting the green card. Yes. I don't remember when the application was put in, but yes, judging by this email, it sounds about right.
Q. And then subsequently the green card -- you received a confirmation that the green card was approved in July of 2020, correct?
A. No. We got a confirmation that the email application was approved.

MR. BEYDA: Your Honor, I'm done with this exhibit, if we can take it down.

THE COURT: Sure.

Q. Mr. Schram, do you know an individual named Teresa Woods?
A. Yes.
Q. Who is Teresa Woods?
A. She's an immigration lawyer.
Q. You have exchanged communications with Ms. Woods by email, correct?
A. Yes.
Q. Do you recall receiving an email from Ms. Woods indicating congratulations, green card was confirmed?
A. No. I believe that was forwarded from Tania to me.

Q. Was that referring to your green card?
A. No. Again, the green card -- we didn't receive a green card. The application was approved, and the first time I heard about that was when Tania forwarded an email that she received from Tania -- Teresa, if I remember correctly.
Q. Okay. So Ms. Zarak forwarded it to you, correct?
A. Yes.
Q. Now --

THE COURT: Can you please tell me the date or what time frame you're talking about here, Mr. Beyda, or better yet, put the email in the record if you're going to be referring to an email.

MR. BEYDA: Right. I'm not going to use -- I don't have that at this moment so I'm just going to continue so we don't waste time.

I will ask to please have R 109, to which there is no objection, moved into evidence.

THE COURT: That is received.

(Respondent's Exhibit 109 received in evidence)

THE WITNESS: R 109?

MR. BEYDA: Yes, sir.

Mr. Wu, can you please go to page 3 of this document in evidence. If you can scroll down, please. Thank you.

That's fine. Right over there, at the bottom. Scroll back up. Thank you.

THE WITNESS: Got it.

BY MR. BEYDA:

Q. Mr. Schram, you sent an email to Teresa Woods on June 23rd, 2020, correct?

A. Yes, yes.

Q. Now as of June 23rd, 2020, you and Ms. Zarak had not come to an agreement to abandon New York as the children's home, correct?

A. I don't remember. Again, can I have a minute to read the email to -- to put this in context? That's okay?

THE COURT: Of course you can read the email.

THE WITNESS: Yeah. Thank you. Thank you.

A. So if I wrote this on June 23rd, it sounds -- I would say that we had come to an agreement on relocating or moving to Iceland.

Q. That wasn't the question, sir.

MR. BEYDA: Your Honor, may I please have the question read back and ask the witness to answer that question.

THE COURT: No. I think it is a fair answer.

MR. BEYDA: The question was whether or not the family intended to abandon New York.

THE COURT: And he said, "We had come to an agreement on relocating or moving to Iceland."

MR. BEYDA: Okay.

BY MR. BEYDA:

Q. Mr. Schram, the agreement that you just referenced was not an agreement to permanently relocate to Iceland, correct?
A. Permanently. No, we avoided using that word.
Q. And it was -- you avoided -- and it wasn't your settled intent at that time to permanently move to Iceland with Ms. Zarak and the children, correct?
A. Permanently, no.
Q. And you and Ms. Zarak at that time, on June 23rd, 2020, did not have a shared intent to permanently make Iceland the children's new home, correct?
A. Permanently, no, but --
Q. In fact, in this email in Exhibit R 109, you indicate on page 4 that --

MR. MIN: Your Honor -- I wanted to wait till Mr. Beyda stopped, but Mr. Schram was in the middle of answering the question when Mr. Beyda interrupted him, and I don't know if the record caught that. I didn't hear what was said.

THE COURT: This is in response to the question: "And you and Ms. Zarak at that time, on June 23rd, 2020, did not have a shared intent to permanently make Iceland the children's new home, correct?" And the answer reflected on the transcript says, "Permanently, no, but --" and then there was an interruption.

Were you finished, Mr. Schram?

THE WITNESS: No.

THE COURT: Please continue.

THE WITNESS: But our home nevertheless.

THE COURT: Are you saying "our hope nevertheless"?

THE WITNESS: No. Our home nevertheless.

THE COURT: Oh, I'm sorry. Thank you. I see. I see.

BY MR. BEYDA:

Q. Mr. Schram, in the message that you sent to your accountant, you indicate that you would be staying at least through the kids' school year until summer 2021, isn't that correct?

MR. MIN: Objection to the question. It's not the accountant that this email pertains to, and the document speaks for itself, your Honor.

MR. BEYDA: That's my mistake.

THE COURT: Go ahead, Mr. Beyda.

MR. BEYDA: I'll withdraw the question and rephrase it.

BY MR. BEYDA:

Q. And in your message to Ms. Woods, you indicated that the intention was to stay at least through the kids' school year until the summer of 2021, correct?

A. Yes, at least through the kids' school year, exactly, yes, at least.

MR. BEYDA: Your Honor, I'm done with Exhibit 109.

THE COURT: Thank you.

Q. Mr. Schram, we were previously talking about the green card.

MR. BEYDA: Your Honor, may we -- I'm going to offer R 48 into evidence. I do not believe there was an objection.

THE COURT: I think there is an objection.

MR. BEYDA: Oh. That was 802. Yes, there was.

THE COURT: Let me just pull it up.

All right. The objection that was preserved is a hearsay objection, correct?

MR. MIN: Yes, your Honor.

THE COURT: Mr. Beyda?

MR. BEYDA: It's not being offered for the truth of the matter asserted but rather the witness's sense of impression and his frame of mind at that time.

MR. MIN: Your Honor --

THE COURT: Mr. Min?

MR. MIN: Your Honor, the email is not even addressed to Mr. Schram.

THE COURT: That's correct.

MR. BEYDA: Page 2 of the email is a government document as well, your Honor.

THE COURT: So if you want to offer the government document, you can offer that, but --

MR. BEYDA: Okay. I will. I will offer that.

THE COURT: All right. The second page of R 48 will be admitted.

(Respondent's Exhibit 48 (page 2 only) received in evidence)

THE COURT: Page 2 only.

MR. BEYDA: Thank you, your Honor.

BY MR. BEYDA:

Q. Mr. Schram, page 2 of R 48 in evidence now was forwarded to you by Ms. Zarak, correct?

A. This document? I don't remember that.

Q. Is this the first time you're seeing this document?

THE COURT: Hold on. Hold on. Hold on. That's a different question, correct, Mr. Beyda?

MR. BEYDA: Yes. Yes, it is.

THE COURT: Okay. So he's just asking you, Mr. Schram, is this the first time you're seeing this document.

A. I've seen a lot of these types of documents throughout the years. I have -- no way I could distinguish one from the other, to tell you the truth.

Q. Isn't it true that after you and Ms. Zarak received this document, the two of you celebrated the receipt of it?

A. Give me a minute to read this then, just to be absolutely sure what we're talking about here.

Yeah, this is the approval notice for Tania's O-1, yes. But I don't know if I recognize this document, but I know

what this is, you know.
Q. And the receipt of this approval notice was an exciting time in yours and Ms. Zarak's life, correct?
A. Yeah, you could say it was a -- it was a -- this is positive news, yes.
Q. And it was something that you and Ms. Zarak had been waiting for for quite some time, correct?
A. I wouldn't say -- what do you mean? Define "quite some time."
Q. You'd been working with immigration lawyers for how long, sir?
A. Well, this is approximately three weeks after my O-1 denial, so I'm going to guess we started working on this after that, after my visa renewal denial in March.
I'm sorry. Wait, wait, wait. I'm sorry. But this is just -- yeah, this is February 9th -- sorry, April 9th, so approximately two weeks later, if you want to -- yeah.
Q. You just referred to something, this being April 9th, correct?
A. Yeah.
Q. April 9th is the priority date on this document, correct?
A. No. I could see -- received date is -- is April 9th.
Q. Okay. And then the next box over indicates priority date, April 9th, 2020?
A. Yes.

Q. And the notice date was July 16th, 2020, correct?

THE COURT: Mr. Beyda, the document is in evidence.

MR. BEYDA: I understand, but this witness -- your Honor, these are -- all right. I'll move on.

THE COURT: You can argue from a document that's in evidence.

MR. BEYDA: I understand.

BY MR. BEYDA:

Q. On or about July 16, 2020, you, Ms. Zarak, and the children were in New York, correct?

A. Yes.

Q. And at that time you were sleeping in Apartment 6A, correct?

A. Yes.

Q. And the kids were sleeping, all three of them, in Apartment 6A, correct?

A. Yes.

Q. In fact, during the period of time from when you returned from Mexico and then left to Iceland, the children were also interacting with their friends in New York, correct?

A. They -- I would hardly say that. A lot of people had left. Yeah, so -- no.

Q. Whatever friends hadn't left, the children were interacting with some of those, correct?

A. We ran into some parents on a playground in the schoolyard,

then it might have -- then if I remember correctly, there might have been a playdate in Central Park, maybe two.
Q. And EZ saw her friend Franco, correct?
A. I don't remember who it was.
Q. What about Maya? Do you remember her interactions with Maya?
A. Yes, 'cause her cousin was about to have a baby and then I recall then had a baby, so it was -- there was a -- Tania went up there couple of times to their house.
Q. And she also saw her friend Ramona, correct?
A. I don't remember.
Q. Now you mentioned that people had left New York, correct?
A. Yes.
Q. And those people, do you know whether or not they left New York because of COVID?
THE COURT: I don't know what people we're referring to.
Q. Mr. Schram, are you referring to the children's friends?
THE COURT: No, no, no. My point was, I don't know who you're referring to in the question.
MR. BEYDA: Sure. I'll clarify.
Q. Mr. Schram, you, in your answer to a previous question, said whoever hadn't left New York. Who were you referring to?
A. Everyone. The city was -- was vacated in many ways.
Q. And how did that make you feel, that the city was vacant in

many ways at that time?
A. It was eerie, strange.
Q. And Ms. Zarak shared that feeling with you, correct?
A. Yes. I would say -- I would say yes to that.
Q. And in fact, some of your friends had even left New York because of that eerie feeling, correct?
A. Did my friends leave New York because of that eerie feeling?
MR. MIN: Objection.
THE COURT: What's the objection?
MR. MIN: The basis of knowledge of what -- why his friends left New York.
THE COURT: Sustained.
Q. Many of the people who reside in the apartment building where you and Ms. Zarak and the children resided were also outside of New York at that time, correct?
A. That was throughout the year regardless of pandemic or not. Very few people lived in that building.
Q. And in fact the neighborhood was very quiet, correct?
A. Yeah, yes, yeah.
Q. And that played a role in yours and Ms. Zarak's decision in July 2020 to leave New York at that time, correct?
A. No.
Q. The eerie feeling and the fact that the neighborhood was very quiet didn't play any role in yours and Ms. Zarak's

decision to leave New York at that time?
A. We had already made the decision by the time of coming to New York.
Q. It was only while you were in New York that you confirmed that the schools were not going to be opening for full-time, in-person learning, correct?
A. No.
Q. Okay. Do you recall, did you have any communications with the Broadway Presbyterian Church Nursery School in July 2020, you personally?
A. I don't remember. I don't remember how we -- yeah, I don't remember. I don't remember.
Q. Did you and Ms. Zarak discuss which one of you would be advising the school that RZ would not be attending?
A. I -- I don't remember. I would have to guess.
Q. Did Ms. Zarak share with you communications that she had with the school?
A. Again, I would guess she -- she shared with me correspondence with P.S.9. Maybe she shared correspondence with the Broadway Presbyterian school. I don't remember.
Q. Now ultimately you and Ms. Zarak made a decision to get on a plane and go to Iceland, correct?
A. Ultimately. The decision was already made by the time we came to New York, yes.
Q. When were the plane tickets purchased?

A. A week before, maybe, around that time.
Q. A week before what?
A. Before departing.
Q. And what day did you depart?
A. July 31st, evening of July 31st.
Q. So is it your testimony that the tickets were purchased on or about July 24th?
A. Or after. I mean, it was -- the -- the only flights from Iceland to North America was through Toronto and Boston, and they were all very empty, so there was no urgency in securing any tickets.
Q. But you did not secure any tickets prior to on or about July 24th, correct?
A. I don't remember which -- what day we bought the tickets.
Q. Now who bought the tickets?
A. I would have to guess. I don't remember.
Q. And the itinerary for that trip was that you were going to travel from New York to Boston, correct?
A. Yes.
Q. And then Boston to Iceland, correct?
A. Yes.
Q. And you took an Amtrak from New York to Boston, correct?
A. Yes.
Q. Ms. Zarak packed some of the children's belongings for them, correct?

A. Yes, yes.
Q. And she put their belongings in a suitcase, correct?
A. Yes. They had a suitcase each.
Q. And you carried those suitcases with you from your apartment to the Amtrak train in Manhattan, correct?
A. Yes.
Q. And then you left from Penn Station with a suitcase for each child and yourself and Ms. Zarak and went to Boston, correct?
A. Yes. We also had more suitcases.
Q. There was no moving truck that came to pick up any of the contents of the New York City apartment, correct?
A. No. That was done after us -- we couldn't depart in a day.
Q. You did not make any -- okay. You did not make any arrangements with the management company of the building to remove the contents of the New York City apartment, correct?
A. Can you repeat the question. Sorry?
Q. You did not make any arrangements with the management company of the building to remove the contents of Apartment 6A, correct?
A. I don't know why we should, or would, no, we never done that.
Q. You did not hire a moving truck to bring the property or the contents of the New York City apartment to the transport, correct?

THE COURT: At what time? Are you talking about that --

MR. BEYDA: Between July 24 and July 31.

A. Well, the dates matter. I hired a moving truck to pick up the stuff to take it to JFK.

Q. When?

A. I don't remember the dates, but I'm going to guess within a week of us -- of flying to Iceland.

Q. Isn't it true that you brought the stuff to JFK?

A. No. I hired a moving -- a mover that brought a truck and he brought us additional movers, so we first went to the office, we emptied out the office, went to the Upper West Side and loaded the car, and then -- with the boxes that I already prestacked up in the basement, and then it was driven to freight service company that was close to JFK.

Q. What was the name of the moving company you used?

A. It was -- it was through Task Rabbit, where you can hire a mover, movers at Task Rabbit with vans or trucks.

Q. And how big was this truck?

A. It was -- I don't know. I don't know how to describe it. A midsize truck?

Q. Now you didn't obtain a certificate of insurance for this moving company to remove stuff from the New York City apartment, correct?

A. No, because I already -- I moved everything down to the

door downstairs, so no insurance needed.
Q. It was not as big of a truck as the truck that you moved the stuff from Los Angeles back to New York City, correct?
A. Are you asking me if an 18-wheeler parked outside the apartment for this? No.
Q. And you did not have anybody help you bring down any of the stuff from the New York City apartment to the street level, correct?
A. The -- the doorman on duty, he helped me go down and up on the elevator.
Q. You live in a co-op, correct?
A. Yes, I believe it is a co-op, yes.
Q. And are you aware of whether or not the co-op requires advance notice about removing or moving stuff out of an apartment building?
A. If it -- if an outside person is doing the work, yes; if you're doing it yourself, then no.
Q. Now you didn't use the freight elevator or reserve the freight elevator for this removal of property, correct?
A. Reserve it. No. I just talked to the doormen and they helped out. It's as informal as that in that building.
Q. Now you did not remove all of the children's personal property from the New York City apartment at that time, correct?
Did we get an answer? I didn't hear it.

A. Sorry. I said correct. Sorry.
Q. You did not remove all of your property from the New York City apartment at that time, correct?
A. I think I left couple of things.
Q. Ms. Zarak did not remove all of her stuff from the New York City apartment at that time, correct?
A. Correct.
Q. In fact, you didn't even remove the children's paintings and artwork from the apartment, correct?
A. We took some and left some.
Q. You didn't even remove the stuff that was hanging on the refrigerator in the apartment, correct?
A. We took some and left some.
Q. Do you remember a picture of a sonogram, a sonogram picture that was hanging on the refrigerator in the apartment?
A. Mm-hmm, yes, yes.
Q. You didn't remove that when you left the apartment on July 31st, correct?
A. We knew nobody was going to be moving into the apartment. We didn't -- we didn't have to take everything. It's not like we were going to leave this apartment forever.
Q. In fact, you weren't -- not only were you not leaving it forever, you were planning on coming back, correct?
A. We were going to -- the plan, initial plan is that -- or hope, you could say, almost in hindsight, was that we could go

there for Christmas and basically grab what else we needed at that point.
Q. So how would you be traveling back to New York at that point, under what visa, for Christmas?
A. O visas.
Q. So you could have come back to New York between August 1st and December 31st, correct?
A. Between August 1st and December -- yes, yes, yes.
Q. There was nothing preventing you from coming back any time between August 1st and June 15th, 2021, correct?
A. Give me a second. So the -- 'cause there were travel restrictions. No, I think we -- no, I think the visas -- we would have been able to travel.
Q. But it is true that the borders were closed, which there were travel restrictions, correct?
A. Yes. But I think it was more only for tourists.
Q. Are you guessing?
A. Yeah, I mean, I'm trying -- I'm recalling -- yes, I'm guessing, so --
Q. Did those restrictions apply to you?
A. No, I don't think so.
Q. And they did not apply to you because your children are citizens of the United States, correct?
A. I don't know if that's enough, to tell you the truth, so I would guess there as well.

Q. Now prior to August 1st, 2020, how many times had Ms. Zarak been to Iceland with you?
A. Four, five times, I would guess.
Q. Isn't it true she had only been to Iceland with you three times?
A. That feels too low to me.
Q. How many times had RZ been to Iceland?
A. He had only been once.
Q. How many times had SZ been to Iceland?
A. Never.
Q. And what about EZ?
A. Four or five times, I would guess.
Q. Isn't it true that EZ had only been to Iceland three times before the August 1st arrival there?
A. Again, that feels low to me.
Q. Well, when did she go to Iceland?
A. Like in -- I can't qualify that. I'm just saying that feels low to me.
Q. When was the last -- the time before the August 1st arrival that she was in Iceland? Actually, withdrawn.
Isn't it true that the time before August 1, 2020, that EZ was in Iceland was in December 2017?
A. December 2017? Yeah, that's possible.
Q. And she had not been there, therefore, for two and a half years before August 1st, correct?

A. You're asking me to guess.
Q. Well, between December 2017 and August 1st, 2020, EZ had not been to Iceland, correct?
A. Can you say that again?
Q. Between December 2017 and August 1st, 2017, EZ had not been to Iceland, correct?
A. Yes, 'cause we were living in California, yes.
Q. You were not living in California that entire period of time, correct?
A. No, but it -- it disconnected us from Iceland severely in the years around it.
Q. In fact, when was the time before August 1st that you and Ms. Zarak actually went to Iceland?
A. That was probably the same trip. Again, these are your dates, December '17, December 2017.
Q. When you say they're my dates --
A. You're saying it, so I can't confirm it.
Q. Prior to December '17, when were you and Ms. Zarak in Iceland?
A. I would guess -- I would be guessing this answer. I would guess the previous year.
Q. Isn't it true that the time that you were there beforehand was your wedding in 2015?
A. I would guess that we went 2016 as well. We went twice in 2015.

Q. Isn't it true that you went in April 2015 when you were church scouting for the wedding?
A. Yes. That sounds about right.
Q. So therefore, since you were married, you cannot give us the date that you and Ms. Zarak were -- withdrawn.
Withdrawn.
Now between 2017 and August 1st, 2020, Ms. Zarak had -- actually, withdrawn. Withdrawn.
MR. BEYDA: Sorry, your Honor.
THE COURT: Just a reminder, Mr. Beyda, we need to break at 1:00.
MR. BEYDA: Okay.
Q. Upon your arrival in Iceland, Mr. Schram, you did not close your bank account in New York, correct?
A. Correct.
Q. Ms. Zarak also did not close her bank account in New York, correct?
A. I believe not. Sorry. I believe she did not, correct.
Q. You stated that Ms. Zarak got another phone while she was in Iceland, correct?
A. And a phone number, yes.
Q. And she did that because it would be less expensive to communicate in Iceland with an Icelandic telephone number, correct?
A. I don't remember the reasons.

Q. She maintained a New York cellphone number, correct? Or her previous cellphone number, correct?
A. Yes, but it didn't -- her -- that phone only works on WiFi, so I don't know what kind of setup she created.
Q. Do you have WiFi now where you are in the house?
A. Yes.
Q. And you're actually logged into this Teams court appearance on WiFi, correct?
THE COURT: Mr. Beyda, he already said he has WiFi.
Q. Now, Mr. Schram, Ms. Zarak didn't sign a long-term contract for a cellphone while she was in Iceland, correct?
A. I don't know. I don't know the nature of the contract.
Q. While you were in Iceland, you did not advise the post office to forward your mail that was being sent to the New York City apartment to Iceland, correct?
A. The US mail? Sorry?
Q. Yes.
A. No.
Q. And in fact, you continued to have mail sent to the New York City apartment, correct?
A. I didn't have any mail sent. Mail was sent. Excluding IRS papers, it all came to Iceland.
Q. Now while you were in Iceland, Ms. Zarak did not sell Apartment 6A, correct?
A. Not hers to sell, so no.

Q. She did not sublet Apartment 6A, correct?
A. It's not hers to sublet it, no.
Q. When you say it's not hers, is her name on the deed?
A. All I know is that the apartment has always been described to me as her mother's apartment.
Q. The question was whether or not her name is on the deed.
A. I don't know.
Q. Well, it's actually a co-op, so are the shares in her name? Do you know that?
A. I don't know.
Q. Did you inquire?
A. No.
Q. Ever? You never inquired.
A. Inquired? No, 'cause the -- the ownership of the apartment had made -- had been made clear to me on multiple occasions.
Q. I'm going to go back for a moment to the property that was left in that apartment, Mr. Schram.
MR. BEYDA: And I'll be done, your Honor, in four minutes for 1:00.
Q. There were toys of the children's that you left in the New York City apartment, correct?
A. I'm sorry. I was moving papers. Sorry. Can you please repeat the question.
Q. You left the children's toys in the New York City apartment, correct?

A. We left toys and we took some toys.
Q. You even left a piano in the New York City apartment, correct?
A. We left a keyboard, keyboard in the apartment, yes.
Q. That keyboard was purchased by you, correct?
A. It was given to me by my cousin many years ago.
Q. And you're the one who used that keyboard, correct?
A. More EZ.
Q. So EZ -- was it your -- so it was the family's keyboard, correct?
A. It was in the living room.
Q. How often would EZ use the keyboard? Withdrawn, actually.
You and EZ would play music on the keyboard, correct?
A. Yes, I was teaching her melodies.
Q. And she enjoyed you teaching her those melodies, correct?
A. I believe she did.
Q. And you enjoyed teaching her those melodies, correct?
A. Yes.
Q. And you left the keyboard in New York even though you were teaching her the melodies that you enjoyed teaching her because the intention was to return to New York, correct?
A. No.
Q. Now in addition to these items that we just discussed, you also have artwork in the New York City apartment, correct?
A. Are you talking about me or me and Tania?

Q. Well, there's artwork that you personally have purchased, correct?
A. No.
Q. Isn't there an Everest poster that was hanging in the apartment in July 2020?
A. Yes. I got it as a gift from a friend who moved out of the city.
Q. Is it a good friend?
A. It was a -- more of a neighbor who was just passing off stuff.
Q. And you left that gift in the apartment, correct?
A. Yes.
Q. And you have also in the past made artwork for Ms. Zarak, correct?
A. Yes.
Q. And you left that in the apartment, correct?
A. Yes.
Q. And while you were in California, you bought a king size bed that you brought back from California and put in the New York City apartment, correct?
A. Yes. The bed, the bed frame were in the TV room, yes.
Q. And you left that in New York City, correct?
A. Yes.
Q. And while you were in California there were chairs that you bought, purchased, that you then brought back to New York City,

correct?
A. Yes.
Q. And you left those in the New York City apartment as well, correct?
A. Yes.
Q. Now you stated during your direct examination that the property that was left in the apartment belonged to Ms. Zarak's mother. Do you remember that?
A. Part of it, yes.
Q. Now the toy trains and cars that were left in the apartment, those didn't belong to Ms. Zarak's mother, correct?
A. I didn't say her mother owned all of it. I said she owned some things too.
Q. Now you also built bookshelves that are hanging in the New York City apartment, correct?
A. Hanging up bookshelves. I didn't build them. I just hung up wall-hung shelves.
MR. BEYDA: It is 1:00, your Honor. Is it a hard stop?
THE COURT: It is a hard stop. I told you yesterday.
MR. BEYDA: No, that's all right.
THE COURT: All right. It's 1:00. We'll resume at 2:30.
MR. BEYDA: Thank you. Enjoy your lunch.
THE COURT: Before we break, how much longer do you

have to go with Mr. Schram?

MR. BEYDA: I imagine an hour and a half?

THE COURT: Really?

MR. BEYDA: Yes.

THE COURT: All right. I warned you when we started that you were approaching equal time with the petitioner and how much time we have left. So you need to be planning accordingly.

MR. BEYDA: Thank you.

(Luncheon recess)

AFTERNOON SESSION

2:44 p.m.

THE COURT: Good afternoon, everyone.

ALL PARTICIPANTS: Good afternoon, your Honor.

THE COURT: All right. Mr. Beyda, back on the record.

MR. BEYDA: Thank you.

(Discussion off the record)

BY MR. BEYDA:

Q. Mr. Schram, before we broke for lunch, we were talking about personal property in the New York City apartment. Do you recall that?

A. Yes, yes.

Q. I'm going to be done with that topic and I'm going to --

MR. BEYDA: Actually, your Honor, I'm done with that topic.

Q. In March 2020, Mr. Schram, and the nine months leading up to that period, how would you describe your marriage with Ms. Zarak?

A. March 2020 and nine months prior?

Q. Yes.

A. So -- so that's from July on.

Q. Yes.

A. How would I describe the marriage. We were having issues.

Q. And you were having marital issues?

A. Yes.

Q. And in fact, there were discussions about divorcing, correct?

A. The word divorce came up. It wasn't necessarily discussed.

Q. And you had communications with third parties about the marital issues that you were having with Ms. Zarak, correct?

MR. MIN: Objection, your Honor, to the extent that this gets into any patient-therapist privilege.

MR. BEYDA: I'll clarify.

THE COURT: Thank you.

BY MR. BEYDA:

Q. Mr. Schram, with the exception of any communications you might have had with any therapists or counselors, you had discussions with third parties about your marital issues with Ms. Zarak, correct?

A. During this time period? Can you hear me?

THE COURT: He asked you during this same time period, are you asking?

Q. Yes, during this same time period, sir.

A. Possibly, yes.

Q. In fact, you had conversations with your friend Downey about the marital problems you were having with Ms. Zarak, correct?

A. During this time period? I don't know.

Q. Did you have communications with Ms. Zarak's family members about the marital issues that you were having?

A. During this time period -- well, Tania's mother witnessed our marital issues when she was visiting during the Christmas. I might have mentioned something to her, but I don't remember.

Q. Ms. Zarak raised concerns with you about your drinking, correct?

A. Regarding my drinking. No.

Q. Do you remember on or about March 1st coming home under the influence of alcohol and exchanging messages with Ms. Zarak about that?

MR. MIN: Objection. Relevance.

THE COURT: No. I'm going to allow it.

A. If I'm remembering correctly, I think I came home from a dinner with a colleague and I had probably too much red wine to drink, so -- and I think I apologized to her the day after. That sounds -- that's probably it.

Q. And in fact, you had dropped RZ at that time and he has a mark on his head as a result, correct?

MR. MIN: Objection, your Honor, relevance.

THE COURT: All right. Mr. Beyda, the one thing I'm going to caution you about is, it is not part of this proceeding for me to get involved in any custody-related issues or what's in the best interests of the children or anything like that. You know that.

MR. BEYDA: I do.

THE COURT: I'm going to give you a little bit of

leeway about your question about use of alcohol, but don't go too far down this road.

MR. BEYDA: Sure.

BY MR. BEYDA:

Q. Mr. Schram, your marital issues with Ms. Zarak continued after March 2020, correct?

A. Yes.

Q. And they continued while you were in Mexico, correct?

A. Yes.

Q. They continued in fact during the few weeks you were in New York in July 2020 as well, correct?

A. Yes. I mean, we always had issues, so yes.

Q. And your issues involved disagreements over, for example, where to live, correct?

A. No, I wouldn't -- I wouldn't say that was a big topic.

Q. What would you have considered a big topic? Withdrawn, actually.

But it was a topic, correct?

A. I'm sorry. Repeat the question? Sorry.

Q. But it was a topic, correct?

THE COURT: A topic of what? Hold on. Hold on, Mr. Schram. The question needs to be clearer.

MR. BEYDA: Sure.

Q. Mr. Schram, I previously asked you about whether or not you had disagreements with Ms. Zarak about where to live. Do you

remember that?

A. Yes.

Q. Okay. And you said, "I wouldn't say that was a big topic"; is that correct?

A. I wouldn't say it was a big topic. It -- sorry. There's an echo.

THE COURT: Yes. Mr. Glasser, you need to put the mute on again.

All right. Mr. Schram, try again.

A. Yeah, I -- I wouldn't call it a big topic in the -- you could say more of an issue we were having. We had been talking about the idea of living in Iceland or Mexico or Miami since 2017, so discussion about where -- where we would live was, you know -- that's what I mean, not an argument, it was just an ongoing conversation.

Q. Was that an issue that caused stress in your relationship with Ms. Zarak?

A. Again, it wasn't a -- it wasn't an issue. It was just more of a conversation about where we would live, in proposing these locations.

Q. And to use the word "issue," your marital issues continued after you arrived in Iceland on August 1st, correct?

A. Yes, yes.

Q. And you continued to have disagreements over issues concerning where to live. I'll withdraw that.

Did you continue to have disagreements over where to live, yes or no?
A. No.
Q. Isn't it true that you and Ms. Zarak lived in a variety -- or withdrawn.
Upon your arrival in Iceland, you stayed in an airbnb, correct?
A. Correct.
Q. And in fact, you stayed in I think it was a total of three airbnbs, correct?
A. Correct.
Q. You subsequently -- those airbnbs were paid for by Ms. Zarak, correct?
A. No.
Q. Who paid the rental costs for the airbnbs?
A. I paid the first one; she paid the other two.
Q. You paid -- how long did you stay in the first one?
A. The first, I booked it for a whole month, but since we moved our arrival in Iceland back couple of times, we only were able to use up two weeks of those four weeks.
Q. Now while you were in the airbnbs -- withdrawn.
You subsequently purchased a property in Iceland, correct?
A. Yes. Less than two weeks after we arrived in Iceland, we made an offer on a property, which we eventually bought.

Q. And at that time in Iceland, can you describe the COVID situation.

A. I think Iceland had gone through I think you'd call it two waves during late spring, sometime in the summer, then I think the third wave happened, I believe the end of August or so, so it was around -- there were social distancing, there were limitations with gatherings, they were, you know, in the quarantine requirements, so there were a bunch of restrictions, you know, social behavior around, but felt like people were -- society was functioning.

Q. Right. The schools were open, correct?

A. Not when we arrived, no. Kindergartens, yes, I think kindergartens were open, yes, but -- yes, schools hadn't started yet, yes.

Q. Maybe I wasn't clear. The schools were not closed because of COVID, correct?

A. Correct.

Q. And the businesses were not closed because of COVID, correct?

A. It's possible restaurants and -- had limitations, but I don't remember. There were some limitations around.

Q. You and Ms. Zarak had conversations before purchasing the property in Iceland, correct?

A. We had conversations before purchasing it?

Q. I'm sorry. I'll be clearer. You had conversations about

purchasing a property in Iceland before you actually purchased it, correct?
A. For many years, yes.
Q. And you sent Ms. Zarak links to various rental properties, correct?
A. I'm sorry. Purchasing or rental?
Q. Rental properties.
A. Yes.
Q. Some were long-term rentals, correct?
A. Yes.
Q. Others were short-term rentals, correct?
A. Exactly.
Q. Some were furnished properties and others were unfurnished properties, correct?
A. I would say most of them were furnished.
Q. You said that Ms. Zarak paid for the second and third airbnb rental, correct?
A. Yes.
Q. In American dollars, can you tell us how much the third airbnb rental was each month.
A. Oh, the third one. 2,000?
Q. Isn't it true that it was closer to $2,900?
A. It's possible.
Q. What about the second airbnb rental, how much was that one?
A. I mean, we stayed there six days, so we realized as soon as

we got in there it was a mistake.
Q. I just asked you how much it was.
A. I don't remember.
Q. Now how much was the first airbnb rental?
A. You would be having me guessing, really.
Q. You don't remember?
A. Yeah, 2, $3,000, the month, probably.
Q. Now when you and Ms. Zarak discussed purchasing a property in Iceland, the expense of it was a factor that was considered by the two of you, correct?
A. What do you mean expense of it? What do you mean?
Q. The monthly expense, for example.
A. In utilities or mortgage?
Q. On the financial side, was it more -- did it cost you more money each month to live in the -- let me withdraw that.
Subsequently you purchased a property in Iceland, correct?
A. Yes.
THE COURT: You asked that.
Q. That's the property where you are today, correct?
A. Yes.
Q. Now that property was purchased by way of Ms. Zarak's paying the down payment, correct?
A. Correct.
Q. How much was the down payment?

A. Probably around 60,000.

Q. And --

THE COURT: Hold on one second. Hold on one second. Can you say it again? I didn't hear you, Mr. Schram.

THE WITNESS: I think around $60,000.

THE COURT: Six, oh, or five, oh?

THE WITNESS: Six; six, oh.

THE COURT: Thank you.

I'm sorry, Mr. Beyda.

BY MR. BEYDA:

Q. Now that $60,000 that was used by Ms. Zarak was the proceeds, a portion of the proceeds from the settlement she had with her Netflix litigation, correct?

A. Yes.

Q. And Ms. Zarak had that money in the bank and it was earning virtually no interest, correct?

A. I don't know what interest was in her bank account.

Q. Did you and Ms. Zarak have discussions about where she had this money?

A. No, not particularly, no.

Q. So this money was kept by Ms. Zarak in the United States, correct?

A. I believe so, yes.

Q. And it was transferred to a bank account in your name in Iceland?

A. Yes.
Q. Isn't it true that finances were a source of strain in your relationship with Ms. Zarak?
A. Yes.
Q. And it was a cause of many of your marital issues, correct?
A. Yes.
Q. And among the -- and one of the issues that was being discussed between you and Ms. Zarak while you were in Iceland at this time was the exorbitant cost of the airbnb rentals, correct?
A. No.
Q. So after the $60,000 was used by Ms. Zarak to make the down payment to purchase the apartment, what was the source of the remaining funds? Actually, how much was the apartment? Withdraw that last question and I'm going to ask you: How much was the apartment, Mr. Schram?
A. So it's 54½ million Icelandic, which would be in the ballpark of 400 maybe 20,000 US dollars, somewhere around there.
Q. And how was that paid in connection with this transaction to purchase this property?
A. I got a mortgage loan.
Q. And isn't it true that the mortgage loan was at 0 percent interest?
A. No.

Q. What is the interest rate on that loan?
A. I recall around 7 percent.
Q. The loan that you have on the apartment where you're living right now has a 7 percent interest rate?
A. If I remember correctly, yeah, it -- they're -- between 5 and 7 I think is kind of the market rate we were getting at the time.
Q. But is that the rate that you ultimately obtained the loan at?
A. I don't remember. I -- I don't remember.
Q. How much is your monthly mortgage payment?
A. Around $2,000.
Q. When you say around $2,000, isn't it true that it's closer to $1,200?
A. No.
Q. When is the last time you made a mortgage payment?
A. Last month.
Q. Now you and Ms. Zarak purchased this property because in part it was less expensive than paying for the airbnb rentals, correct?
A. As a long-term plan, definitely more affordable to buy a property than doing airbnbs.
Q. Now this property that we're talking about, is it bigger or smaller than the New York City apartment?
THE COURT: I believe you already asked that. You can

answer again, just in the sake of moving along. But I'm just reminding you, Mr. Beyda, you're going to run out of time at some point. And I don't just mean with this witness.

BY MR. BEYDA:

Q. Mr. Schram, can you answer that question?

A. Yes. Is it bigger or smaller? This apartment in square feet is smaller.

Q. Okay. Now what are the issues that you said that you and Ms. Zarak -- or not you said.

Ms. Zarak and you and the children moved into this apartment on or about November 6, 2020, correct?

A. We got the keys I think the night before November 1st; we might have moved in maybe the 3rd, more like it.

Q. Now this is not the first apartment that you owned in Iceland, correct?

A. Me personally?

Q. Yes, you personally.

A. Yes. I -- I used to own an apartment in Iceland.

Q. Now the apartment where you are right now, whose name is that apartment titled in?

A. Mine.

Q. And the apartment that you previously owned in Iceland, whose name was that one in?

A. Mine. But I had -- yeah, yeah, mine.

Q. When did you sell your previous apartment in Iceland?

A. I sold it, I want to say 2018. Early part of 2018.

Q. Did you say early part?

A. Yeah. I would say more late 2017.

Q. Now you sold that apartment in Iceland because you no longer needed it, correct?

A. No. I needed funds.

Q. Actually, weren't you using it as an airbnb rental?

A. Not very successfully.

Q. Now you said that you were having discussions with Ms. Zarak at that time, in 2017, about moving to Iceland, correct?

A. Did you say 2017? Sorry?

Q. Yes.

A. Yes. I want to say the conversations started in 2017, yeah, that sounds about right.

Q. And they -- and you said that they continued in 2018, correct?

A. Yeah, they -- I, you know -- we --

Q. Yes or no.

THE COURT: No, no, no, no. No, no, no. Let him answer the question.

A. We took a break from the conversation when we moved to Los Angeles because there was a, you know -- it was a direction we took, we moved to Los Angeles, but soon after, you know, Tania being fired and us realizing California wasn't a future place,

the conversation came back and it really never ended.
Q. But during that time you sold the property in Iceland, correct?
A. Yes.
Q. Now you said that "when we bought the apartment in Iceland, we finally owned property." Do you remember that, on your direct examination?
A. Property together.
Q. So you did not consider the apartment in Iceland property that you and Ms. Zarak owned together?
A. We didn't buy it together and we never lived there.
MR. MIN: Objection. Vagueness. Which property are we talking about that Mr. Beyda is referring to in that question?
THE COURT: Overruled. I think the witness understands. He started to answer it.
A. Yeah, 'cause -- thank you. Because together means that we find the property together, we buy it together, we move in together. It's -- it becomes kind of our property versus just something I had before. You know, it's sentimental more than anything.
MR. BEYDA: Your Honor, can I take a minute?
THE COURT: Sure.
MR. BEYDA: Thanks. I'm just going to turn my camera off for one second.

THE COURT: Sure.

(Pause)

MR. BEYDA: Sorry. Thank you very much.

THE COURT: Not a problem.

BY MR. BEYDA:

Q. Now, Mr. Schram, I'm directing your attention to November of 2020, after you moved into the apartment. At that time you and Ms. Zarak did not buy any wall coverings for the apartment, correct?

A. You mean wallpaper?

Q. Some people call it wallpaper, yes.

A. No, no.

Q. You did not -- you did not hire anybody to do any renovations to the apartment, correct?

A. Not initially, but at a later point.

Q. In fact, isn't it true that you put the -- you painted a room in the apartment?

A. Yes, the children's bedroom, and then we touched up under the -- on the toy room.

Q. Now you showed the Court on your direct examination some photographs of the apartment, correct?

A. Yes. My lawyer did, but yes.

Q. And those photographs were pictures of the apartment both before and after Ms. Zarak left Iceland, correct?

A. Yes, I think it was both, yes.

Q. And after Ms. Zarak left the apartment, you made some alterations to the apartment, correct?
A. Define alterations.
Q. You purchased some new things for the apartment?
A. No. Yes, no, I did. I purchased those shelving metals, shelving metals.
Q. And that was covered in one of the pictures that you provided to the Court, correct?
A. I don't remember the pictures that well, but it's possible.
Q. You also purchased furniture after Ms. Zarak left Iceland, correct?
A. No.
Q. And that was also in the pictures that you provided to the Court, correct?
A. I said no to the first question.
Q. Oh.
THE COURT: Ask it again because the record isn't consistent.
Q. Okay. You purchased furniture for the apartment after Ms. Zarak left, correct?
A. So those metal shelves that I mentioned but nothing else.
Q. You bought a new --
(Discussion off the record)
Q. Didn't you buy a new credenza that's in the apartment?
A. It was already purchased. Oh, I'm sorry. Before she left.

I'm sorry. My mistake. I bought a -- yeah, it's a -- it's called -- yeah, it's a credenza of sorts. It's more like a -- a drawer, a bedroom drawer, you could call it, yes.
Q. And you also purchased new art that you hung up on the wall of the apartment, correct?
A. No. I already had that.
Q. It wasn't hanging up in the apartment when Ms. Zarak left, correct?
A. Correct. I had that already though.
Q. In fact, there's photographs on the wall in the room that you're in right now that were not hanging in the room when Ms. Zarak left Iceland, correct?
A. Yes, correct, exactly.
Q. In fact, after Ms. Zarak left Iceland you modified the apartment, correct?
A. Define modified.
Q. Well, what else did you do to the apartment after Ms. Zarak left?
A. Yeah, that's a better way to I guess approach it.
So there were wall-hung shelves. I took half of it and I moved it over there, put the other half in the kitchen; and I put up a new -- basically the same set of shelves that were here before, just this time they had a desk, because Tania was going to start an MBA next fall, last August. So that's the change I did to this room. And I put -- took out

shelves -- shoe rack that was next to the dining table and I put a small old credenza that was here, I put it there. You know -- yeah. And then I put up this picture and I put up couple of pictures of the kids' artwork on the wall. That's about it.

Q. Before Ms. Zarak left there were no pictures of the children's artwork hanging in the apartment, correct?

A. No.

Q. And no meaning it is not correct?

A. There were artwork hanging up on the walls.

Q. Where was the children's artwork hanging?

A. They were on that wall over there. There was a sill that had artwork that ended up partially on that wall over there that I just basically put a nail in to put it up.

Q. Now you would agree that the apartment that you're in right now in Iceland is quite different from the one on Central Park West in Manhattan, correct?

A. Quite different. Yes, yes, it's a -- you could say that.

Q. When you compare the -- you lived in a full-service building in Manhattan on Central Park West, correct?

A. What does full-service mean?

Q. Doorman?

A. Doorman, yes.

Q. Porter?

A. What? Sorry?

Q. A porter?
A. What's a porter?
Q. A superintendent?
A. Yeah, superintendent, yes.
Q. And was the issue of -- withdrawn.
You and Ms. Zarak had issues living in the apartment in Iceland because of its size, correct?
A. I didn't have an issue with the size and I don't have an issue with the size. Tania expressed issue with the size.
Q. But you expressed issues with the size of the New York City apartment, correct, and it was bigger?
A. It's not a question of square feet when it comes to that.
Q. Now in February of 2021, you and Ms. Zarak had discussions about getting divorced, correct?
A. Divorce came up in a -- you could say text-based argument, and it was probably the fourth time we, you could say, threatened divorce in our debates.
Q. In fact you told her mother that you were getting divorced as well.
A. Yeah, I was that upset, yes.
Q. So it wasn't just that you were exchanging text messages about this; in fact, you told Ms. Zarak's mother that the two of you were getting divorced, correct?
A. I text -- I texted her. I didn't tell her.
Q. You texted her.

A. That was the first time actually I agreed to the concept of getting divorced after Tania yelling at me three times before divorce.
Q. But you were in agreement to get divorced in February of 2021, correct?
A. Absolutely not.
Q. Weren't you and Ms. Zarak actually in discussions about selling the property in Iceland?
A. She mentioned it, but that's not a discussion. Like -- like she's -- like she threatened me three times with divorce, we didn't get divorced though.
Q. When someone -- when Ms. Zarak mentioned this divorce, wasn't that a discussion that the two of you were having?
A. It was a text correspondence where we're angrily texting each other and the divorce came up, and we said yes, and then we stopped talking about it and the argument was over at some point, or the disagreement, so the topic did not come up again.
Q. One of the issues in that discussion or topic at that time was that Ms. Zarak had no support system in Iceland, correct?
A. She -- I mean, I don't know if it was -- I don't know if it was that particular argument or there was a cause of the -- I don't think that was the cause of the argument, but it was expressed in other times and her asking about having -- bringing our nanny to Iceland.
Q. I couldn't hear the end.

A. And, you know, the concept of bringing the nanny to Iceland.
Q. The nanny was supposed to be a support system for Ms. Zarak?
A. She really wanted the nanny to come to Iceland despite me offering other nanny or daycare options for SZ. Apparently, she felt better when the nanny was here.
Q. Do you remember telling Ms. Zarak's mother, "I don't know if Tania told you yet but we are getting a divorce"?
A. That's the text.
Q. And that's what you sent to Tania's mother, correct?
A. Yes. After -- pretty much right after our argument in February.
Q. And you also wrote to her, "I cannot live a life with a person like your daughter," correct?
A. Yes, same text.
THE COURT: When is that, please?
THE WITNESS: February.
THE COURT: 2021?
THE WITNESS: Yes.
MR. BEYDA: Yes, your Honor. Oh.
THE COURT: Thank you.
BY MR. BEYDA:
Q. And then you told Ms. Zarak's mother, I want to -- "I assume there will be a long and terrible process ahead. I

wanted to tell you directly. Hope you are well." Correct?
A. Same text message, yes.
THE COURT: Mr. Beyda, you're reading from a document. What is that document, please?
MR. BEYDA: My notes.
THE COURT: Is there a text that's an exhibit?
MR. BEYDA: There is. It is -- give me a second.
R 218.
THE COURT: Thank you.
THE WITNESS: Do I need to look at it?
THE COURT: No. Unless he asks you.
THE WITNESS: Yes, okay.
THE COURT: Thank you.
BY MR. BEYDA:
Q. Now at that time, Mr. Schram --
A. Sorry. Say again? Sorry.
Q. On or about February -- on February 24th, 2021, Ms. Zarak also told you, "I want to sell the apartment," correct?
A. I think that was the same argument.
MR. BEYDA: Your Honor, I'm referring to Exhibit R 213.
THE COURT: Are you moving it?
MR. BEYDA: I just want to confirm that there was no objection.
THE COURT: Yes.

MR. BEYDA: There is no objection. I am moving it.

THE COURT: All right. It's admitted. R 213.

(Respondent's Exhibit 213 received in evidence)

BY MR. BEYDA:

Q. Mr. Schram, please let us know when you're ready.

A. Got it. 213.

Q. Ms. Zarak indicates, "I want to sell the apartment. " She's referring in that message to the apartment in Iceland, correct?

A. Yes.

Q. And she indicates, "You can't afford it and I'm not going to pay for it. I don't like it."

Can you -- that was a continuation of the same conversation, correct?

A. Yeah, that -- I mean, yes. Yes. The concept of it.

Q. On page, Bates stamp -- page Bates ending in 260, Ms. Zarak indicates, "Depends. Not sure I'm in for another year." Do you see that?

A. Yup.

Q. That's referring to what, Mr. Schram?

A. That's her text message, not my text message.

Q. She then indicates that "this is a shit show," correct?

A. Yes, yeah, this is the argument right here, yeah.

Q. Did you agree with her that this was a shit show?

A. Yes.

Q. In fact, you said, "I couldn't agree more."

A. Yes.
Q. Now what was it that was being referred to over here that was a shit show?
A. This marriage.
Q. And then you write, "I think the only thing left for us to do is to get this divorce over with." Correct?
A. Yes.
Q. Now after this conversation, or discussion, you and Ms. Zarak discussed her going to New York in or about May of 2021, correct?
A. I don't remember when the trip to May -- to New York came up, but very soon before the trip, I recall. Because she was -- because she sold her Penthouse C apartment.
Q. And she brought SZ with her to New York at that time, correct?
A. Yes.
Q. And SZ attended a medical appointment during that trip, correct?
A. I have no idea.
Q. You didn't have any discussions with Ms. Zarak about SZ going to the chiropractor while he was in New York in May?
A. She might have mentioned it.
Q. And Ms. Zarak was in New York at that time for about -- I think we said five nights; does that sound correct?
A. Give or take, yes.

Q. At that time when Ms. Zarak went -- returned to New York in May of 2021, she stayed in the New York City apartment, correct, Apartment 6A?
A. Yes, I think with her sisters and her mother, I believe.
Q. And when you say "I believe," what makes you think her sister was in New York in the apartment with her?
A. She told me her sisters and her mother would be visiting at the same time.
Q. Now while Ms. Zarak was in New York you were in communication with her, correct?
A. Yes.
Q. You were also in communication with SZ, correct?
A. I was in communication with SZ? When Tania -- at the time, I guess, or -- or arranged it.
Q. You would FaceTime with them, correct?
A. Yes. I mean, we were also doing a trip in Iceland, EZ, RZ, and my grandfather and uncles and aunts and all that stuff, so I think we did FaceTime, yes, to kind of show what was going on on each end.
Q. And Ms. Zarak advised you that New York was a different place in May of 2021 than it was in July of 2020, correct?
A. Yeah, at some point she -- she -- she expressed that, you know, New York was good, yeah, she phrased it something like that, yes.
Q. And she told you that restaurants were open once again,

correct?
A. Yes.
Q. And there were people back in the city compared to -- more people in the city compared to July of 2020, correct?
A. Yeah, she could have -- that's probably -- sounds about right.
Q. And she expressed excitement about returning to New York City, correct?
A. No.
Q. She told you in fact that she wanted to return to New York City at this time, correct?
A. No.
Q. Now subsequently Ms. Zarak returned to Iceland, correct?
A. Correct.
Q. And when she returned to Iceland, you were angry with her, correct?
A. She refused to respect quarantine. I was kind of upset, yes. I wouldn't say angry. I was upset.
Q. When you say she refused to respect quarantine, she wanted to come back to the apartment to see the children and stay with the children in the apartment, correct?
A. Yes, but that would be breaking quarantine.
Q. And when she returned with SZ from New York and was with RZ and EZ in the apartment, you left, correct?
A. No. I put a mask on and I stood in the other corner

because she was breaking quarantine.

Q. Isn't it true that you left the apartment for three nights?

A. I left the apartment that one night so I wouldn't break quarantine, and then when Tania decided to go to a hotel that had a quarantine section and I offered to go to the summerhouse to finish the quarantine, I came back, so I was away for one night in order to be able to go to my office without breaking quarantine.

Q. Now there was no Icelandic law requiring Ms. Zarak to stay away from the apartment, correct?

A. You mean physically the apartment?

Q. The apartment where you were staying with the children while she was in New York with SZ.

A. The quarantine regulations don't ban anyone from going into spaces. They ban them from being around -- in proximity to other people. That's what the quarantine is about.

Q. Now upon Ms. Zarak's return from New York she continued to express a desire to return to New York, correct?

A. No.

Q. There was a Zarak family reunion that was scheduled to take place in June of 2021, correct?

A. End of June, I recall, yes.

Q. And that family reunion was something that the Zarak family and Ms. Zarak had been planning for about two years, if not more, correct?

A. I wouldn't say the Zarak family. The Quintana family, the extended family of -- I think they do this every two, three years, these big gatherings, so, yeah.
Q. And that gathering was for several hundred people, correct?
A. I only attended one of them. Yeah, it was a lot of people, 2, 300 people. It was a big -- it's a big gathering.
Q. And the gathering would be at a hotel in Mexico where the family would rent out the entire hotel, correct?
A. An extended uncle of hers is the -- and his siblings, his children own the hotel, so this is friends and family opening of a hotel. That's what it is.
Q. And you were planning to go with Ms. Zarak to this family reunion as of March 2020, for example, correct?
A. No.
Q. Yes?
A. No.
Q. Oh, you never had any intention to go to this family reunion?
A. No.
Q. When did you first express that to Ms. Zarak?
A. I don't remember. The -- the invites started coming in maybe late spring or so and then the location with emails, and I said I never said anything I would go, if anything, I expressed that I'm not interested in going. There's a pandemic going on.

Q. Now Ms. Zarak told you that she planned on going, correct?
A. Yes.
Q. And she told you that she wanted to bring the children with her, correct?
A. Yes.
Q. Now in or about this time in May 2021 -- actually, prior to Ms. Zarak's return from New York -- well, withdrawn.
Prior to Ms. Zarak going to New York with SZ in 2021, the children's passports were kept in the open in the apartment, correct?
A. Yeah. There was a kind of a sack that kept the passports.
Q. In fact, they were on a shelf in the apartment, correct?
A. I don't remember exactly where, but yeah, they were easily found. We could easily find them.
Q. Weren't they in the living room?
A. Yeah, or in the bedroom. I don't remember.
Q. Now upon Ms. Zarak's return and her telling you that she wanted to return to New York, you took all of the passports that were in the, I think -- did you say sack?
A. When I asked Tania what she's gonna do about the quarantine, the night of her flight, she got very, very angry at me and she told me that she has lawyers and I should get mine and then if I make this quarantine thing any more harder on her, I would never see her again. So she was basically telling me my marriage was ending. So my father came over

after the children fell asleep and I just -- I told him what was happening and I asked him to take the passports of RZ and EZ with him because I didn't know if she was going to arrive in the morning, take the children, and head out right away. That's what I was expecting that she was going to do and I was petrified.
Q. Ms. Zarak didn't know you were taking the passports, correct?
A. No.
Q. You didn't ask Ms. Zarak if you could take the children's passports at that point, correct?
A. No.
Q. Ms. Zarak had not had -- had not told you that she was leaving on a plane the next day with the children, correct?
A. Say again? Ask me for that? Sorry?
Q. Ms. Zarak had not told you that she was leaving on a plane out of Iceland with the children the next day, correct?
A. No.
Q. So on what date did you take the children's passports and give them to your father?
A. She arrived the morning of the 25th or the 26th of -- of May, so that's when he took it, the evening before, and then he gave it back to me couple of nights later.
Q. And then you did not -- when -- so you gave your father the passports while Ms. Zarak was still in New York, correct?

A. No. That when she was flying, so not while she was -- at some point while she was in New York. The evening of her flight back, when she expressed that she had hired a lawyer and she -- I was never gonna see her again if I asked her to respect quarantine, then I took -- then my father came over and took the passports. So the evening of her flight back to Iceland.
Q. When you say your father took the passports, you gave him the passports, correct?
A. Yes, he came over and I handed him the passports.
Q. Now --
A. And then he gave it back to me couple of nights later.
Q. And you did not put them back in a sack in the room where they were before you gave them to your father, correct?
A. No. I put them in -- in the -- in my sock drawer, something like that.
Q. In your what? I couldn't hear.
A. In my sock drawer, something like that, you know, they were around.
Q. Now you did not tell Ms. Zarak where the passports were at that time, correct?
A. She didn't realize at that point that they were missing. But I didn't tell her. It was just like not even a discussion. We settled our differences and things went back to normal really in that sense.

Q. But then you took the passports out of the house again, correct?
A. Yes, when I discovered that she had -- without telling me, was in the process of registering RZ and S -- EZ in -- at P.S.9 in New York, without telling me, so when I realized that, I took the passports again and then I left the house for two nights, I believe.
Q. Now you're referring to a conversation that Ms. Zarak had with the school in New York?
A. No. That's -- that's the correspondence I initiated with the school to see if Tania was registering them in school and discovered that she had, day before, on June 1st, had a phone conversation with parent coordinator about how to finalize the registration of EZ and RZ into the school, without telling me about it.
Q. Now so just so it's clear, you first had a conversation with the children's school in New York before -- well, you reached out to the school in New York?
A. Yes. Tania's behavior was odd, to say the least, so given what was happening, I felt -- I felt something was -- something was going on, so my hunch told me to contact the school to see if anything was happening, and it turned out to be right.
Q. When you say her behavior was odd, her behavior was that she wanted to return to New York, correct?
A. No.

Q. Her behavior was consistent with the quote-unquote discussion that you guys had about divorce, correct?
A. No. She said she wanted to bake a -- a cake for my father, and she's never baked a cake in her life so that I think was the -- I knew something was up when she said she was gonna bake a cake.
Q. Her behavior in wanting to go back to New York was also consistent with the text message that you sent her about getting divorced, correct?
A. She didn't talk about going back to New York.
Q. So the return to New York at this time was the first you were hearing of it?
MR. MIN: Objection as to form. Assuming a fact not in evidence.
THE COURT: He's asking a question. He's not assuming a fact. But the question is argumentative.
Q. Mr. Schram, you were not happy that Ms. Zarak spoke with the children's schools in New York, correct?
A. Correct.
Q. At the same time, though, or during that same time, you were actually emailing with the children's schools in New York, correct?
A. Because I suspected she was doing something behind my back.
Q. And in fact this is when you sent the message that's in evidence now as R 172 about not having the children's student

IDs, correct?
A. Yes, because I wanted to see what information was happening at the school, and the email I got back confirmed my suspicions.
Q. So you were playing dumb when you sent that message, that's your testimony, the message of June 2nd, 2021?
A. Yes, because Tania told me that the school had reached out to her asking for the student -- for the student IDs, so I responded to the school, do we, like -- are we using the old ID or would you be giving it to us? You're the one with the ID. Are you reaching out to us to get the ID? Why would you guys ask for IDs? And we're like, does EZ hold on to her old ID? And they confirmed, yes, she holds onto her old ID. So why would a school that issued an ID be reaching out to the parents asking for the kids' ID? That's -- that was the, quote, nature of the second correspondences, just to confirm, and I did it only because Tania was trying to lie about the situation by saying they reached out to me asking for the ID, so it didn't make any sense to me.
Q. Now, Mr. Schram, in or about this time, June 2021, you were in communication with Teresa Woods once again, correct?
A. Yes, yes, yes. June, probably, yeah.
Q. And you were in communication with Ms. Woods about your possible entry into the United States, correct?
A. Yes. Friend of mine Steven was getting married in Detroit

on July 10th, so Tania was supposed to return around July 7th, so discussion was, is it even worth thinking about the possibility of going to a wedding, so we were following up at that time about that.

Q. So you knew that, you knew in or -- you knew as of June 5th, 2021 that Ms. Zarak was returning to New York, correct?

A. No.

Q. Isn't it true that Ms. Woods sent you an email that she copied Ms. Zarak on that addressed a request for expedited appointment for a visa application to New York?

A. That had nothing to do with New York. It's just a question of expedited process in the embassy in Mexico, U.S. Embassy in Mexico.

MR. BEYDA: Your Honor, I'm going to ask -- I believe R 53, there is no objection to this document. I'm going to move it into evidence, please.

THE COURT: Admitted.

(Respondent's Exhibit 53 received in evidence)

THE WITNESS: Sorry. Are you waiting for me? 53?

BY MR. BEYDA:

Q. Yes, sir. On June 5th, Saturday, June 5th, Ms. Woods sent you and Ms. Zarak an email enclosing an expedite letter, correct?

A. Give me a minute.

So you mean as attachment?
Q. Correct. Attachment to the email.
A. I don't see an attachment to this email, but I see some other documents. I don't know if it's an attachment.
Q. Directing your attention to the last page of this document, Bates 7842.
MR. BEYDA: Mr. Wu, can you enlarge it.
A. I don't see this as an attachment to the email. But sure, I'm looking at this.
Q. Now you were provided with a copy of this letter before Ms. Zarak left Iceland, correct?
A. I was -- again, I don't see any letter attachment in the text of the -- of the email here so I can't respond to that.
Q. Now in the email on page 1 of 9 of this exhibit, Ms. Woods writes to you, please see -- "Please also see the expedite letter I drafted for Tania today."
A. Okay, yes.
Q. Now the expedite letter put you on notice in fact that Ms. Zarak was planning on going to New York, correct?
A. That didn't have any meaning, though.
Q. Well --
A. A similar -- a similar letter was created to create the expedited process when we were stuck in Mexico in 2020. A letter was put together, at least Tania produced, so we could easily get to US because of a production emergency, please

process her visa through expedited process. There was no film project, there was no seriousness to it, just like I could take a letter like this seriously, so I actually would rather believe what my wife would say than some attachment in a -- in a -- in yet another fake letter to support any visa document.
Q. Now at this time, Mr. Schram, you were in possession of the children's passports, correct?
A. What time?
Q. June 5th, 2021.
A. They were at the house. No, I'm sorry. Give me a minute.
So the P.S.9 correspondence happened on June 2nd, so yes, I had the passports at that time.
Q. And in fact, you were refusing to give Ms. Zarak the children's passports so they could accompany her both to Mexico and then to the United States in accordance with this letter that was sent to you and Ms. Zarak from Ms. Woods, correct?
MR. MIN: Objection as to form. Objection as to form.
THE COURT: Sustained. Sustained.
Q. You at this time were refusing to give Ms. Zarak the children's passports, correct?
A. I mean, I was not refusing, but, yeah, you could -- yeah, I was refusing to give them, give her the passports, but we were in a discussion about how we could solve the situation.
Q. And in fact, you would only give Ms. Zarak the children's passports if she agreed to leave RZ behind in Iceland with you

and not have him accompany her on the trip to Mexico, correct?
A. No, no. That's -- that's --
THE COURT: He said no.
Q. Now ultimately you gave Ms. Zarak the children's passports, correct?
A. Correct.
Q. And that was when Ms. Zarak agreed to leave RZ in Iceland, correct?
A. She agreed to leave one child behind, and she -- she mentioned RZ, so we came to a mutual agreement that RZ would stay behind.
Q. And at this time you told your friend who testified on your direct case that Ms. Zarak would be going to New York at this time, correct?
A. No.
Q. Now you and Ms. Zarak -- ultimately Ms. Zarak went with two of the children to Mexico, correct?
A. And -- and the nanny, yes.
Q. And your friend Danny testified during this proceeding about you telling him that Ms. Zarak was going to New York as part of that trip, correct?
A. No. I expressed to him concerns that Tania might go to New York, given that she had registered RZ and EZ in a school without letting me know.
Q. In fact, you knew that Ms. Zarak was going to go to New

York, correct?
A. No.
MR. MIN: Objection, your Honor. Objection, your Honor.
THE COURT: Sustained.
MR. MIN: The question is --
THE COURT: All right. I sustained it.
Q. While Ms. Zarak was in Mexico, you continued to have discussions with her about New York and Iceland, correct?
A. I wouldn't call that --
Q. You had telephone communications with Ms. Zarak, correct?
A. Now we're talking about therapy sessions.
Q. You had conversations with Ms. Zarak where nobody else was on the line with the two of you, correct?
A. That happened -- that would happen too, yes. Only -- that would happen, yes, without therapy, yes.
Q. And you spoke almost daily while she was in Mexico, correct?
A. No.
Q. How often did you speak while she was in Mexico?
A. Every -- every three days.
Q. And Ms. Zarak would FaceTime or speak with RZ while she was in Mexico, correct?
A. I would say big majority of all correspondence was regarding the FaceTime between the children. Private

correspondence between me and Tania weren't happening.
Q. Now before Ms. Zarak and the children left Iceland you had told her that you were not going to let her go with the children to Mexico, correct?
A. No.
Q. While Ms. Zarak was in Mexico she had an appointment at the embassy to renew her visa, correct?
A. Yes.
Q. You were aware of that appointment, correct?
A. Yes.
Q. And you were on notice as to why Ms. Zarak wanted to renew her visa, correct?
A. As it was, as she explained it to me, it was important to her to remain in status for her green card application.
Q. And those communications are addressed in R 53 in evidence, correct, the communications with Ms. Woods, correct?
A. You'll have to give me a minute.
At a quick glance, I can't say that the green card was discussed here. This seemed to be about the O, O visas, O visa renewals and options of how I could or when I could renew myself.
THE COURT: Mr. Beyda, it would be good for you to find a convenient breaking point. Not for the day, for a break.
MR. BEYDA: Okay. Once he answers this, if he's not

done yet.

THE COURT: He did, didn't he?

MR. BEYDA: Then we can take a break right now.

THE COURT: Are you finished, Mr. Schram, with your answer?

THE WITNESS: Well, I just -- I see the green card mentioned just one time. Gets me wondering if I have -- if I wouldn't renew the O visa right away, would there be any consequences, but that's about it.

BY MR. BEYDA:

Q. When you say consequences, what are you referring to, consequences?

A. Like, would I -- would I compromise -- yeah, compromise the green card application, like because Tania told me that, you know, remain -- remaining in status was important, so I just -- I wanted to understand the consequences of me not renewing my O-3 visa.

MR. BEYDA: This is a good breaking pint, your Honor.

THE COURT: Okay. Thank you. Back in five minutes. We're just taking a short break.

(Recess)

THE COURT: We're back on the record at 4:00.

MR. BEYDA: Thank you.

Q. Mr. Schram, you recall Ms. Zarak mentioning to you that you might need to get divorced in New York, correct?

A. Yes.
Q. And that was as early as February 24th, 2021, correct?
A. Yes.
Q. You did not disagree with that statement by her that you might need to get divorced in New York, correct?
A. I was puzzled by it. I didn't reply to it.
Q. You were puzzled by it, but that was in response to your message, "I couldn't agree more. I think the only thing left for us is to get this divorce over with."
A. And then she said --
THE COURT: Hold on, hold on, hold on. Mr. Schram, that's not a question.
Q. Mr. Schram, you said you were puzzled with her comment about getting divorced in New York; is that correct?
THE COURT: That's what the record reflects. Don't argue. Go ahead.
Q. Now Ms. Zarak stated her intention to get divorced in New York, correct?
A. She mentioned a threat, a type of threat that she's threatened me with before, so I take these threats with salts of grain, as most people do in an argument, so this was not a discussion about getting divorced in New York. I was puzzled by the fact that she thought about like where we would get divorced. To me, it was just an extension of the idea of us getting divorced. That was the puzzling part.

Q. But at the same time you were communicating with Ms. Zarak's mother that the two of you were getting divorced, correct?

A. Yes.

MR. MIN: I want to object, your Honor. I want to make my objection.

THE COURT: Hold on.

Go ahead, Mr. Min.

MR. MIN: Mr. Beyda has been asking a series of questions which is reflected in a document, and I believe there's a misrepresentation as to what the document says, and obviously I think the document is the best piece of evidence for the line of questioning, so I think to the extent that Mr. Beyda is referring to a document, which I know he is, that document should be shown to the witness, because I do believe Mr. Beyda is misrepresenting what the document says from Ms. Zarak, which is in writing.

THE COURT: It's in already; is that what you said?

MR. MIN: It's in writing. I'm sorry.

THE COURT: In writing. Oh, okay.

I mean, Mr. Beyda, I have repeatedly asked you that if you're reading from a document, I do think the fairest thing to do is, if it's a document that you've marked for admission, that you ought to put it in front of the witness and not just read snippets of it. I do think that's fair. But -- hold on.

But the email exchange that Mr. Beyda is referring to I believe is in evidence, correct?

MR. BEYDA: Yes.

THE COURT: Yes. So if Mr. Schram would like to see it, you can certainly say that, sir. If you can't remember or can't answer without seeing a document, you can certainly say that, okay?

THE WITNESS: I would like to see the document. It's a text correspondence, I recall.

THE COURT: All right. Well, let's see if there's a question first, because I don't think there's a pending question, is there?

MR. BEYDA: There is not. I'm actually going to go to another topic.

MR. MIN: Your Honor, again, with all due respect, your Honor, and again, I --

THE COURT: With all due respect to me; is that what you just said?

MR. MIN: To -- to Mr. Beyda, who's trying to move on to another subject.

THE COURT: It's his examination. If he doesn't want to ask any more about this, he doesn't have to.

MR. MIN: I understand, your Honor, but Mr. Beyda started asking questions, and I pulled up the document that he was referring to and it took me a couple of seconds --

THE COURT: You'll get an opportunity for redirect, Mr. Min.

MR. MIN: Understood, your Honor. Thank you.

THE COURT: Go ahead, Mr. Beyda. You have the floor right now.

BY MR. BEYDA:

Q. Mr. Schram, while Ms. Zarak was in Mexico with the children -- withdrawn.

Before Ms. Zarak went to Mexico with the children, the family had two cars, as you testified earlier, correct?

THE COURT: If he testified earlier, why are you asking him again? We're going to run out of time.

Q. While Ms. Zarak -- withdrawn.

While Ms. Zarak was in Mexico, you returned her car to Hertz, correct?

A. Yes.

Q. And that's because Ms. Zarak told you that she was not coming back to Iceland, correct?

A. Yeah, yes, it was -- well, at that point I thought the car was still under my name, and I -- I think at that point it was clear, if she told me or not or just it was clear to me that Tania was not coming back, or any time soon, I don't know, so I didn't want the car to be sitting outside here and bills to be coming in my name, so I'm like, all right, I'll just let them know that the car's not gonna be used anymore.

Q. On July 26, 2020 --

MR. BEYDA: Your Honor, there's Petitioner's 148 that was offered that was not moved into evidence. I would like to offer -- it's a, I think, a 574-page document. I'm going to offer one page in that document. It's Page No. 545 of Petitioner's Exhibit --

THE COURT: Petitioner's what number? I'm sorry. 148.

MR. BEYDA: 148, Page No. 545.

THE COURT: 545. Okay.

MR. MIN: Your Honor, there's a Bates stamp number to that. 545 is not one of the Bates stamp numbers on the document.

MR. BEYDA: Okay. I'm looking at the pdf. The Bates stamp number ends in 2409.

(Discussion off the record)

THE COURT: All right. Mr. Min, do you have the page?

MR. MIN: Yes, your Honor, I have the page.

THE COURT: Mr. Min?

MR. MIN: Your Honor, obviously acknowledging that this is our exhibit, I mean, this page, particular page, is certainly after the commencement of this action, so I'm not entirely clear what the probative value of this page would be, the relevance of it.

THE COURT: So look, the reservation that I have --

hold on. The reservation that I have is this document, as I understand it, it's 500 something pages, and it consists of a series of text messages, right?

MR. BEYDA: Yes, your Honor.

THE COURT: And you want to pull one page of text messages out from the whole rest of the context.

MR. BEYDA: I understand. We should perhaps move the page afterwards also so that you'll have the -- so that the record will reflect the full communication chain on the date of the date in question. That would be 12410 as well.

THE COURT: Mr. Min?

MR. MIN: Your Honor, I mean, the same sort of issue I think arises, which is, this is after the date in question of the date of removal and wrongful retention, so the relevance of it is not seemingly clear to me.

THE COURT: Oh, you're raising a different point.

MR. BEYDA: Your Honor, that is I don't believe fully accurate. The petition was not filed in this case until after --

THE COURT: After the date of removal. He didn't say the date of the petition, I didn't think.

MR. MIN: I said date of removal and retention.

THE COURT: Yes, that's right.

MR. BEYDA: I also don't know that that's entirely accurate.

THE COURT: But that's sort of besides the point. The issue that I'm raising with you too is, this is still part of a whole series of texts back and forth. And this is after the date -- when did Ms. Zarak come to New York with the children?

MR. BEYDA: I think it's July 27th.

THE COURT: And when did she say "I'm not coming back"?

MR. BEYDA: Way before. That's been their discussion throughout.

THE COURT: So this is after the removal. I'm not going to put the word "wrongful" removal on it because that's what we're here to talk about, but it was after the children were taken to the United States.

MR. BEYDA: No. The children were not yet in the United States when this was -- this July 26th message was exchanged. This is when -- I have to double-check because I don't want to misspeak about the date.

THE COURT: Well, she says something about SZ is -- well, I shouldn't --

MR. BEYDA: This is --

MR. MIN: Your Honor --

MR. BEYDA: If we want to put the whole thing in, I can move the entire thread of text messages in. I have no objection.

MR. MIN: Your Honor, I will also just -- with respect

to the date, there was an allegation I believe in the state court papers that July 21st is when the children came to New York, and that is when respondent agrees, and that is also a date where a filing was made in New York State proceedings, so certainly before July 27th the children were in New York. I will not -- we would not stipulate, obviously, the entire document going in because there are some issues about the privilege that arose subsequent to us marking this as an exhibit.

THE COURT: I understand.

MR. MIN: Mr. Beyda and I can work together to redact those portions. That certainly would be fine. And to the extent that it goes to a specific date and time up until the children were in New York, that also would be fine.

MR. BEYDA: Your Honor, this is petitioner's exhibit that they offered into evidence.

THE COURT: No, but Mr. Beyda, you made -- hold on one minute. Let me just look at something.

Is there more that you can turn to and come back to this while I look at something, so we don't waste time?

MR. BEYDA: Let me see.

THE COURT: Well, if not, does that mean you're getting close to finishing?

MR. BEYDA: Yes, I certainly am.

THE COURT: All right. Just give me one minute.

MR. BEYDA: Your Honor, may I say one thing while your Honor is looking --

THE COURT: Sure.

MR. BEYDA: -- about this exhibit? I believe we've already moved in a page from this exhibit.

THE COURT: And you didn't object, did you?

MR. BEYDA: No, no, because it was -- I did not. I did not.

THE COURT: Look, I mean, there's a lot of stuff you're both doing that if I were the lawyer in the case, I'd be objecting, but you're not. So -- just give me one moment. I want to just talk to my clerk about something.

(Pause)

THE COURT: I'm not going to receive into evidence the entirety of this document.

MR. BEYDA: Will the Court receive the portion of the two pages requested initially?

THE COURT: Yes, I'll receive them, and you can do whatever you want on cross, Mr. Min.

MR. MIN: Okay.

THE COURT: So just so the record is clear, the Bates Nos. 12409 and 12410 are admitted out of Petitioner's Exhibit 148. The remainder of 148 is not in evidence.

(Petitioner's Exhibit 148 (Bates Nos. 12409 and 12410 only) received in evidence)

THE COURT: All right. Go ahead, Mr. Beyda.

BY MR. BEYDA:

Q. Mr. Schram, on July 26, 2021, and before, you were having discussions, you and Ms. Zarak directly, about her coming back to New York, correct?

A. I'm sorry. I'm sorry. I'm not looking at a document? I'm sorry. I got confused there. Should I look at the document? I was told to put it away.

THE COURT: He's just asking you a question independently, it sounds like.

THE WITNESS: Okay.

THE COURT: Madam Court Reporter, could you read it back.

(Record read)

A. On July 26th, 2021?

THE COURT: That's what he said, yeah.

A. When she was already in New York. I --

MR. BEYDA: It was and before, the question was, your Honor. It wasn't limited to July 26.

A. I came to realize that Tania was in New York on the 21st, I believe, so the correspondence at that -- at that one point was like, what are you doing in New York? And like, well, the day after, I got the divorce papers, so it became pretty evident.

Q. And -- sorry. Are you done? I didn't mean to interrupt.

A. Yes, yes.

Q. And those discussions about Ms. Zarak coming to New York commenced prior to July 26th, correct?
A. No. This is therapy discussions.
Q. So it's true that you had a telephone conversation with Ms. Zarak on July 19th, 2021, where you had discussions about her coming to New York?

MR. MIN: Objection, your Honor, with respect -- this is a question that's referring to the date where there's a transcript in question, I think Respondent Exhibit 179, your Honor, which was the subject of a motion *in limine* and subject to your Honor's ruling. Which is dated July 19th. So presumably the same date that Mr. Beyda is now asking about.

THE COURT: And this is not the therapy session, right?

MR. BEYDA: No, it is not.

THE COURT: He can answer.

MR. MIN: Well, your Honor, if I may?

THE COURT: Briefly, Mr. Min.

MR. MIN: Certainly we are not aware of who was present on that phone call on July 19th. We are aware that there were several discussions between the parties with respect to what happened during the marriage counseling sessions.

THE COURT: All right. We'll take it one question at a time. Right now the question is just: Did you have a conversation? Right? Isn't that the question, Mr. Beyda?

MR. BEYDA: I -- I believe so, yes. I can't recall the exact question.

THE COURT: I believe the question is: "So it's true that you had a telephone conversation with Ms. Zarak on July 19th, 2021, where you had discussions about her coming to New York?"

A. So I don't remember -- we were having discussions outside therapy. What specifically was spoken in those conversations, you know, versus what was spoken in therapy, I do -- I can't remember.

Q. And you subsequently exchanged written communications with Ms. Zarak where you discussed potential future scenarios with regard to the children and coming to New York, correct?

THE COURT: Hold on. I just want to read the question.

When did Ms. Zarak come to New York with the children?

MR. BEYDA: I think it's July 21, as Mr. Min stated.

THE COURT: All right. If you're intending to go on to these emails at this point --

MR. BEYDA: Yes, your Honor. The text message on page 2409 that's in evidence.

THE COURT: Your question talks about future scenarios with regards to the children and coming to New York. And you just told me they came to New York on July 21st.

MR. BEYDA: Correct. And the --

THE COURT: So that's not coming to New York in the future.

MR. BEYDA: This was on July 19th I was talking about, your Honor, the question.

THE COURT: So between July 19th and July 21st, did you have conversations, before she got to New York, about her coming to New York; is that what you're asking?

MR. BEYDA: Yes, your Honor.

THE COURT: All right. Mr. Schram, do you understand?

MR. MIN: Your Honor, I have an objection I'd like to note for the record. Your Honor, respondent has not lodged a consent or acquiescence defense in their pleadings, and to the extent this is relevant, it would be relevant under a consent or acquiescence defense, that petitioner consented to the children, you know, leaving and residing in New York, but that defense is not pertinent to these proceedings so -- which makes that question irrelevant.

THE COURT: I understand your point. I have it well in mind. Believe me, Mr. Min. I understand. But I'm going to let him answer the question about whether, between July 19th and the time that Ms. Zarak came to New York with the children, did you have any conversations about her coming to New York and future scenarios with regards to the children, other than potentially in therapy.

You're not asking that, Mr. Beyda, right?

MR. BEYDA: No, I am not.

THE COURT: Okay.

A. I don't remember.

Q. Isn't it true that you suggested to Ms. Zarak that she come to New York with two of the children and you would remain in Iceland with one of the children?

MR. MIN: Objection. Relevance.

THE COURT: When?

MR. BEYDA: In July 2021.

THE COURT: Mr. Schram, you can answer that.

A. The -- there's an echo.

THE COURT: Yes. Mr. Glasser, again, it's whenever you're not showing the mute. Thank you.

A. I remember reflecting on the scenario that was taking place -- okay, so I have to -- sorry. I'm trying to narrow it down so it's not therapy discussions. But on reflecting the idea that -- give me a minute. Again, I'm stepping into therapy territory quite easily.

It was becoming obvious to me that Tania did not intend to return to Iceland, so I recall describing the situation that she was creating with -- which was that RZ was with me and EZ and SZ was with her. I recall that's about the, you know, the scenario that was --

MR. MIN: Your Honor, this feels like it's going into settlement discussion territory as well.

THE COURT: Yes. Look, I think we're getting to the point where the dispute is crystallized timewise and I don't know -- I'll hear the question, but I don't know that any more questioning on this point is appropriate, frankly. I think you already asked about the scenario where Ms. Zarak was going to take two of the children to Mexico and one child, RZ, was going to stay, or did stay, and that's the point at which everything broke down.

MR. BEYDA: No further questions.

THE COURT: All right. Mr. Min. Redirect. Redirect examination.

MR. MIN: Thank you, your Honor.

THE COURT: Mr. Min, I'm warning you now, I told you all the clock earlier. You're roughly equal now in the amount of time you've used, so to the extent you use up time with Mr. Schram, you're eating into time you're going to have during the respondent's case in chief. Understood?

MR. MIN: Understood, your Honor. Can I --

THE COURT: And we're not going to just extend this indefinitely.

MR. MIN: Understood, your Honor. I've been keeping a clock of the time. Is it okay if we compare the time because --

THE COURT: No. Just ask your questions. Let's go.

REDIRECT EXAMINATION

BY MR. MIN:

Q. Mr. Schram, I'm going to direct your attention to a document or --

MR. MIN: Your Honor, I'd like to admit Bates stamp page 12260 of Petitioner's 148.

THE COURT: I don't have a 12260 in this version. Let me just make sure, this is the big thick document we've just been talking about, Mr. Min?

MR. MIN: Yes, your Honor, dated -- well, February 2021.

THE COURT: No. Mine ends with -- oh, sorry.

All right. I'm sorry, Mr. Min. I do have it. Just give me a minute to take a look at it.

Now you're doing the same thing, though, that you just objected to. This starts and ends on this page in the middle of a text chain.

You're muted.

Mr. Min, we're not hearing you.

MR. MIN: I'll start with the page before and end with the page after so the dates are clear.

THE COURT: 12259 --

MR. MIN: Yes, to 12261.

THE COURT: -- to 61?

MR. MIN: Yes.

THE COURT: Is there an objection, Mr. Beyda?

MR. BEYDA: So we're using the dates of 2/23/21 and below from 9:24 a.m. on 259 until, did you say, 261?

MR. MIN: Yes, Mr. Beyda.

MR. BEYDA: So we'll go until 2/24/21 at 9:41 on that page, so the record's clear?

MR. MIN: That's fine.

MR. BEYDA: Okay.

THE COURT: Any objection, Mr. Beyda?

MR. BEYDA: No objection.

THE COURT: All right. Thank you. Go ahead, Mr. Min.

(Petitioner's Exhibit 148 (Bates Nos. 12259 through 12261 only) received in evidence)

BY MR. MIN:

Q. Mr. Schram, I want to direct your attention to this message on the middle of the page there on the right --

THE COURT: Which page? I'm sorry. Which of the three pages?

MR. MIN: Sorry. I was looking at the screen. Page 12260.

If I may inquire, your Honor?

THE COURT: Yes.

BY MR. MIN:

Q. Mr. Schram, do you recall hearing questions from Mr. Beyda talking about divorce with Ms. Zarak in February 2021?

A. Yes.
Q. Are these the messages that you were referring to?
A. Yes. Yes.
Q. Okay. And do you see there where Ms. Zarak says, "Ok, we might have to do it in New York, not sure how it's even done, actually"?
A. Yes.
Q. Okay. What did you understand that to mean, "we might have to do it in New York"?
A. That we should get divorced in New York, locationwise.
Q. Why?
A. Why would she say that or why? It's unclear.
Q. Did you have an understanding of why Ms. Zarak believed that you might have to get divorced in New York?
A. I mean, I -- I guess I do now, but at the time, no, I was -- I was puzzled by it.
Q. Okay. When you made --
MR. MIN: Your Honor, we'll put the exhibit down.
Q. When you left for Mexico in March 2020, for the nine months prior to that, was anyone living in your New York City Apartment 6A besides you, Ms. Zarak, and the children?
A. Nine months before, up to -- I'm sorry.
Q. Up to March 2020, yes.
A. The nanny was living with us in the apartment.
Q. Okay. And when the nanny was in Iceland in 2021 for a few

weeks, where was she residing?
A. In a -- in an airbnb, studio apartment somewhere.
Q. And when you testified earlier that, you know, the difference in terms of size of the New York City apartment and Iceland apartment was not a matter of square feet, what did you mean by that?
A. Meaning that this is a true bed -- this is a true two-bedroom apartment with additional playroom, while the New York apartment is a true one-bedroom apartment, so this -- how this space is utilized is -- is more important than square feet, in my mind.
Q. Well, when you were residing in Iceland, did the children have their own room?
A. RZ and EZ had their own bedroom.
Q. And did they have their own bedroom while you were residing in Apartment 6A prior to moving to Mexico, or going to Mexico in March 2020?
A. No.
Q. I want to --
MR. MIN: With respect, your Honor, I want to offer P 115, and there was an objection as to translation, but we will get rid of the last three pages and only use the first two pages.
THE COURT: I'm sorry. 115?
MR. MIN: Yes. Your Honor, we did provide a certified

translation anyway, just to be clear.

THE COURT: You did or you did not?

MR. MIN: We did. There was an objection on it, but we did.

THE COURT: Yes. So did you clear the objection or are you just taking those pages out, are you telling me?

MR. MIN: We'll offer the whole thing.

THE COURT: You will offer the whole thing, are you saying now?

MR. MIN: Yes. Yes, your Honor.

THE COURT: All right. Mr. Beyda? Does your objection stand?

MR. BEYDA: No objection.

THE COURT: No objection?

All right. It's admitted.

(Petitioner's Exhibit 115 received in evidence)

THE COURT: Give me a moment to flip the pages, please.

MR. MIN: Yes, your Honor.

THE COURT: Okay.

BY MR. MIN:

Q. Mr. Schram, can you identify this document, please.

A. Yeah, this is a list I made as we were packing to write down what was in each box.

Q. Why did you create this list?

A. When we moved back to Los Angeles -- to New York, we lost some boxes and we didn't realize until later, so I wanted to be diligent about what was in each box and mark it well, just make sure our stuff didn't get lost.
Q. And these documents were for which move, just to specify?
A. From -- from New York to Iceland.
Q. Okay. And is this an accurate list of the boxes that you moved from New York to Iceland?
A. These are the boxed items and then there were the odd-sized items.
Q. I'm sorry. What items?
A. These are the boxed, you know, the boxed items, and then there are the odd-sized items also.
Q. What are the odd-sized items, for example?
A. They were the bicycles -- yeah, the bicycles, I believe; that might have been it.
Q. Mr. Schram, do you recall the questions Mr. Beyda was asking you on cross about the children going to museums, stores, bookstores, supermarkets, parks in New York City prior to March 2020?
A. Yes.
Q. Did you do similar activities with the children in Iceland?
A. Yes.
Q. Such as? Can you describe, please.
A. Such as going to a whale museum; going to this ride show

kind of adventure trip of fly over Iceland, fly over Canada; go to the local zoo; go to local restaurants that we could walk to; museums; feed the geese, you know, just -- and of course multiple road trips. Sorry, yes, but I would say that's similar.

Q. Can you describe some positive things about raising children in Iceland, in your opinion; Reykjavík specifically, where you live.

A. It's --

MR. BEYDA: Objection. Objection, your Honor.

THE COURT: On what grounds?

MR. BEYDA: Mr. Min could have gone through this on his direct with Mr. Schram.

THE COURT: No. You had quite expansive cross that may well have made this relevant when it wasn't relevant before. I'm going to allow it.

You're allowed to answer, Mr. Schram.

THE WITNESS: Thank you.

A. It's easy to refer to studies on what are the best places in the world to raise children, and Iceland is always in the top five, if not the highest spot.

MR. BEYDA: Objection. Move to strike.

THE COURT: No. That's perfectly fine. What's one of the positive things about Iceland, raising his children in Iceland? He says there are studies that it's one of the best

places in the world to raise children.

MR. BEYDA: Him referring to studies that are not in evidence?

THE COURT: Don't argue with me.

MR. BEYDA: Okay. Okay.

THE COURT: Studies are not coming in.

Go ahead, Mr. Schram.

A. Okay. So it's -- Reykjavík is an incredibly safe city; there is, you could say, an infrastructure designed for children; there are sports clubs available; there are sport -- there's extracurricular all over the place; we're in close proximity to nature; schools are very affordable; there was -- actually, the amount of money I can spend on public schools is I think the second or the third in the world, second in the world after Norway; the food that is in the schools is quality, clean air, clean food, clean water; overall, a healthy environment. It's -- yeah. And also, of course, proximity to -- to close family for us.

Q. Did you -- I apologize. Are you done?

A. Yeah, I'm done.

Q. Did you take advantage of your close proximity to nature, as you just described?

A. Yes.

Q. How so?

A. To go on bicycle routes, bicycle paths around the city; we

would do trips to the summerhouse; we would do trips to waterfalls; we went to trips to the north, to the wests -- to the Westfjords, to -- to experience nature.

Q. How far is Landakotsskoli from your apartment?

A. 300 -- 300 yards.

Q. Walking distance?

A. Yes.

Q. What about Oldukot?

A. 150 yards.

Q. Walking distance?

A. Yes.

Q. What, if anything, did the children enjoy about living in Iceland?

MR. BEYDA: Objection. Based on his observations, if anything.

THE COURT: Fair enough.

Mr. Schram, based on what you observed of your children, what did they enjoy?

A. They enjoyed having their grandparents around, they enjoyed their schools, they enjoyed their classmates, they enjoyed their play, their playdates, they enjoyed the backyard, they enjoyed going out to get, you know -- to a local pizza place. RZ enjoys -- and EZ too -- learning Icelandic. We enjoyed the multiple cats we have in the neighborhood. They were always excited to see cats in this neighborhood. So there's just

overall ease of life.

Q. Did you and the children and Ms. Zarak celebrate any holidays while you were residing in Iceland?

A. Yes.

Q. Which ones?

A. Well, there is Christmas and there's Easter and then there is an Icelandic festivities in the fall. There were Halloween at the schools. We were trying out American traditions here. Yeah, I think that's it for holidays.

Q. How did you and Ms. Zarak and the children celebrate Christmas in 2020?

A. We were in -- in -- oh, 2020. Sorry. Yeah, at my parents' house.

Q. Who else was there?

A. That was -- my brother was there and -- and in the evening, his son also came, joined us, and my oldest brother was there also and his wife.

Q. What about for Easter 2021, how did you celebrate that holiday?

MR. MIN: I'll withdraw the question, your Honor. I'll withdraw the question.

Q. I want to direct your attention to an exhibit that was already admitted into evidence, R 37.

MR. MIN: And your Honor, we'll pull that up on the screen.

THE COURT: Thank you.
Q. And we will go down the page to page 3. I just wanted to ask you, Mr. Schram, can you identify where this photo took place?
A. This is Tania's mother's house.
Q. In what country?
A. Mexico.
Q. Okay. And the next page, can you identify where -- which country this photo took place.
A. This is the same house in Mexico.
Q. And the next page, can you identify page 5 now, which country this photo took place?
A. Same house in Mexico.
Q. And page 7? If you know, Mr. Schram.
A. Yeah, I'm not sure where. I'm going to guess actually same house in Mexico.
Q. Page 9?
A. Same house in Mexico.
Q. Page 11?
A. Same house in Mexico.
Q. Page 13?
A. Same house in Mexico.
Q. Jump down to page 25.
A. This is --
THE COURT: Do you want to know where it is, Mr. Min?

Is that your question?

MR. MIN: Yes. I apologize, your Honor. It's a series of questions.

Q. What country?

A. This is -- I think this is New York.

Q. Okay. Page 28?

A. I don't know.

Q. Okay. What about page 31?

A. That is Mexico.

Q. And who is in this photograph?

A. This is Maya and EZ.

Q. Page 54?

A. This is Tania's mother's house in Mexico.

Q. Page 72?

A. This is Mexico.

Q. 74?

A. Mexico. Tania's mother's house.

Q. Who is in that photograph?

A. It looks like Sophie and EZ.

MR. MIN: Your Honor, I'm going to pull down this exhibit. And I'm going to direct your attention to the next exhibit, respondent's 94.

Q. Mr. Schram, I'm going to ask you the same questions on this document.

THE COURT: Mr. Min, I hope you're going to do it a

little more quickly, and I hope you're not just trying to run the clock out.

MR. MIN: Oh, no. I have questions. I'm trying to rush as much as I can.

BY THE COURT:

A. Tania's mother's house in Mexico.

Q. Page 3?

A. Tania's mother's house in Acapulco.

Q. Okay. Who is in this photograph, just generally speaking?

THE COURT: What does a picture in Acapulco have to do with the issues before me?

MR. MIN: Your Honor, there was a lot of testimony about relationship with the family, but clearly a lot of that relationship did not occur in the United States, which is the question in issue, your Honor, and we want to be clear, with the documents that are submitted, that there are significant amount of documents where the family got together not in the United States, which is ultimately what respondent is simply trying to argue.

MR. BEYDA: Actually, your Honor, may I be heard in response to your question? It actually --

THE COURT: Go ahead.

MR. BEYDA: It actually pertains to the location in that New York is closer to Mexico, and as the Court will hear during Ms. Zarak's testimony in this case, the importance of

the travel to and from Mexico during the course of the children's lives was of utmost importance, which is why she would have -- and she'll testify, if the Court will allow.

THE COURT: You all just spent more time arguing about this than was needed to tell me this is a picture in Acapulco. Can we move on.

MR. MIN: Yes, your Honor. Let me just get three pages which are in sequence, pages 13 to 15, and then we're done.

BY MR. MIN:

Q. Pages 13 to 15 --

A. Tania's mother's house in Mexico.

Same house in Mexico.

Q. And 15, last one?

A. Same house in Mexico.

Q. On direct you testified that you had a U.S. bank account. What, if anything, happened -- has happened to that U.S. bank account?

A. It was Chase basically closed it down because of inactivity.

Q. When was that?

A. I -- I found out about that probably in -- by November, so before November.

Q. 20 what year?

A. 2020.

Q. Okay. And what bank is holding the mortgage on your home in Iceland?
A. Landesbanken, it's called.
Q. Is that an Icelandic bank or U.S. bank?
A. Yes, Icelandic bank.
Q. The name of your accountant that Mr. Beyda asked you about, David Gronsbell was the name?
A. Gronsbell, something like that.
Q. Is he still your accountant?
A. No.
Q. Okay. When was he last your accountant?
A. For the -- for the tax return that would be filed last year, 2020.
Q. You filed in 2020 for 2019 or you filed in 2021 for 2020?
A. No. We filed in 2020 for the year 2019. That's the last time he worked as my accountant.
Q. Was he -- did you file joint taxes with Ms. Zarak in that year?
A. Yes.
Q. Okay. So he was both of your accountant at that time?
A. Yes, at that time, yes.
Q. Prior to March 16, 2020, how many projects did you have ongoing in New York, for your job either through your LLC or through Workshop/APD?
A. You said prior to 2016?

Q. Prior to March 16, 2020.
A. Ongoing or just like the list?
Q. I don't know what the list means.
A. You mean active.
Q. Yes, active, ongoing projects prior to, let's say -- withdrawn.
In the six months prior to March 16, 2020, how many ongoing projects did you have in New York City?
A. One. One ended during that period.
Q. And the ongoing project, not the one that ended during that period but the ongoing project during that period, when did that end?
A. April 2020.
Q. Okay. When is the last time your LLC, Shift AS LLC, received payments?
A. I think April 2020.
Q. When was the last time it invoiced anyone?
A. That month. That was the last month of activities.
Q. When was the last time you did any work under that LLC?
A. That was when my -- when -- when I invoiced for that work. That was the, you know -- that was the last --
Q. What month, what year, just to be specific?
A. Oh, April 2020.
Q. Do you have an understanding as to how long after you received your visa denial letter on March 12, 2020, you had to

leave the country?
A. I wouldn't -- as soon as possible I think was the message.
Q. Do you have an understanding of the green card process as it stands now with respect to Ms. Zarak and to yourself?
A. All I know, that Tania -- Tania reached out to me I believe in August asking me what I wanted to do and I did not respond, so I haven't done anything about the green card application. I don't know where she stands.
MR. MIN: One second, your Honor.
Q. Do you have an understanding as to whether the divorce that Ms. Zarak filed against you in New York would affect any potential green card status you may have, now or in the future?
A. I don't -- I don't know. I didn't inquire about this.
MR. MIN: Your Honor, we would offer Petitioner's Exhibit 6 into evidence.
THE COURT: There are objections. Did we talk about this previously? No?
MR. MIN: Your Honor, I do not believe so, but, you know, I hope -- I hope I'm right about that, but I don't have any recollection of this exhibit being discussed previously.
THE COURT: Okay. Okay.
MR. MIN: And your Honor, with respect to the objection, we're only relying on the portion of the statements from respondent, so we're happy --
THE COURT: You're only what? I'm sorry. I didn't

hear you.

MR. MIN: Relying on the portion of the statements made by respondent, so we can stipulate, if that resolves the objection, to only admit that portion.

MR. BEYDA: That's fine. So stipulated.

THE COURT: No objection then, Mr. Beyda?

MR. BEYDA: No objection. No objection to that.

THE COURT: All right. So just -- I'm sorry. Go ahead. Finish, Mr. Beyda.

MR. BEYDA: That would be Ms. Zarak's email dated June 9th, 2021. We have no objection to that going in.

THE COURT: Meaning the bottom portion of the page.

MR. BEYDA: Correct.

THE COURT: Mr. Min, is that what you're offering?

MR. MIN: Yes, your Honor.

THE COURT: All right. So the top portion should be redacted. The bottom portion will be admitted. Please give us a substitute exhibit.

(Petitioner's Exhibit 6 (as redacted) received in evidence)

MR. MIN: Yes, your Honor.

THE COURT: All right. Thank you.

BY MR. MIN:

Q. Mr. Schram, do you see the document on your screen, the bottom of Petitioner Exhibit 6 from Ms. Zarak dated June 9,

2021?
A. Yes.
Q. Okay. Who is Rita Yoskowitz?
THE COURT: Haven't we already discussed this?
Q. Do you know why on June 9th Ms. Zarak sent this email to Ms. Yoskowitz saying, "I would like to immediately cancel EZ's and RZ's pre-registration/registration process for next year. It was all a misunderstanding"?
A. Because we had settled on EZ and RZ to be enrolled in the schools in the upcoming school year.
Q. Where?
A. In Iceland.
Q. Specifically what school?
A. At -- EZ would be continuing being in Landakotsskoli; and RZ would continue being in Oldukotsskoli -- Oldukot. Sorry.
MR. MIN: One second, your Honor.
A. It's also, if I may --
THE COURT: I'm sorry?
A. I have -- if I may continue, you know, adding -- adding information to this answer?
THE COURT: Mr. Min?
Q. Sure.
A. 'Cause in -- in that discussion regarding me finding out about Tania registering RZ and EZ in P.S.9, she convinced me that she didn't mean anything by it, that she didn't intend to

enroll them, so this is her way to show that that was true.

MR. MIN: Okay. Your Honor --

THE COURT: Yeah.

MR. MIN: I was just waiting.

Your Honor, I'd like to offer Petitioner's Exhibit 111.

THE COURT: Let me get it.

All right. Mr. Min, there are objections.

MR. MIN: Yes, your Honor. Well, with respect to the relevance, well, we believe it's relevant --

THE COURT: I don't know what this is. All right. Let me just look at it.

Go ahead.

MR. MIN: Yes, your Honor. On relevance, Mr. Beyda asked some questions about where EZ's address was noted in the DOE or in the New York City public school system, and then on the issue of completeness, I'm not entirely sure why this is not a complete document, so --

THE COURT: I don't think it says completeness. I thought it said competence. Didn't it? Did I read it too fast? Oh, it does say completeness? I'm sorry. I'm getting tired too.

MR. MIN: Your Honor, the only purpose of this document is to demonstrate, you know, the information on EZ within the school system.

THE WITNESS: RZ, you mean?

THE COURT: Hold on one minute, Mr. Schram.

Are you talking about the address portion, Mr. Min?

MR. MIN: Yes, the address portion.

THE COURT: Mr. Beyda?

MR. BEYDA: For what period of time? Because this is dated 8/25/21.

THE COURT: Correct. I'm going to admit the top portion of it, deleting the exam history profile. That's your completeness part, right, Mr. Beyda?

MR. BEYDA: Yes, but then in the same breath this would --

THE COURT: The top part is relevant for whatever it's relevant for; the time period, I mean.

MR. BEYDA: Wouldn't this go to the same issue that we had with the other exhibits about it being post-removal or postdate of filing of the petition?

THE COURT: No, because you put it at issue where the New York City schools had the children registered.

MR. BEYDA: Okay.

THE COURT: You did. So the top portion only is admitted. I'd like to redacted version of this as well, Mr. Min.

MR. MIN: Yes, your Honor, of course.

THE COURT: All right. Mr. Min, let's go.

MR. MIN: I only have maybe two questions left.

BY MR. MIN:

Q. Mr. Schram, I want to direct your attention to two exhibits that have been admitted into evidence. Maybe you can just look at them. Respondent's Exhibit 141 and Respondent's Exhibit 109.

THE COURT: Are you going to put them up? Yeah, thank you. Which one is this, Mr. Min?

MR. MIN: 141, your Honor.

THE COURT: All right. Thank you.

BY MR. MIN:

Q. I'm sorry. Mr. Schram, if you do want to look at the screen, this one is short. This one is dated May 31st. Mr. Beyda asked you some questions about your plan here. I just want you to look at it. Okay? If you've had an opportunity to look at it, I will then show you the next exhibit.

THE COURT: When you say May 31, this is 2020, right?

MR. MIN: Yes, your Honor.

Q. And then I'll show you Exhibit R 109. Bates starting with Bates stamp 16450?

A. Should I look at the documents here also?

Q. You can look on the screen.

THE COURT: All right. He can look on the screen, but Mr. Schram, if, looking at it, you want to look at the hard

copy document, you're certainly entitled to do that. It may be the question is simple enough, we don't know yet, but you don't need to -- so let's hear the question.

Q. This is an email sent from you on June 23rd to Ms. Woods -- if we can scroll down to the second paragraph right there -- where you tell her about a plan, and I just want to understand, looking at both of these documents, what your plan was with respect to traveling in the summer of 2020.

A. So after deciding we're going to move to Iceland, we were trying to figure out the paths. One option was go to fly to Canada, because we didn't have a way to going to the US without a visa, so we can go from Canada to Iceland. And then we found that the U.S. Embassy in Norway was possibly issuing visas, so we contacted them. Turns out to be unreliable. We also talked about the idea of going to Europe, to Iceland, and then possibly Norway as well, and then when we had the visa, we could go in August, pack up our things, and go back to Iceland. This is how wild the plan was at a certain point. And to -- and the idea came up to write up a -- produce a film production emergency which would require Tania to be in the U.S. immediately. It created -- the priority process at the U.S. embassy in Mexico was -- enabled us to get visa -- visa beginning of July.

Q. As a result of getting that visa in the beginning of July, did you follow through with this plan that you wrote to

Ms. Woods about in late June 2020?

A. No, no.

Q. And was this project that created this emergency basis getting to the United States that Ms. Zarak submitted with her visa request a real project, as far as you know?

A. No.

Q. Was this plan that you just described the same plan you were describing on -- in the May 31st email that we showed previously marked as R 141? Which we can show you if you need?

A. This is the process she was going to go through in the summer when she was there.

Q. No. The travel plans over the summer, is that the same plan you were describing in this particular email that's on the screen?

A. Yes, May 31st, yes.

Q. So when you wrote this email to Ms. Zarak on May 31st, was it your intention or were you describing a plan where you would remain in New York as of August 2020 for that upcoming school year?

A. No.

MR. MIN: One second, your Honor.

A. We were already in contact with the schools in Iceland at this point.

MR. MIN: No further questions, your Honor.

MR. BEYDA: Very quickly, your Honor, please?

THE COURT: Go ahead, but I'm going to keep you on a very tight leash, Mr. Beyda.

MR. BEYDA: Thank you.

RECROSS EXAMINATION

BY MR. BEYDA:

Q. Respondent's 141 that you were just looking at, Mr. Schram, there's no mention in that email about returning to Iceland, correct?

A. The one we just looked at. Sorry. No.

Q. The Petitioner's 111 with the 17 Ránargata address, the date of that document is August 25th, 2021, correct?

MR. MIN: Objection. The document is in evidence.

THE COURT: Let him answer. I can read though, Mr. Beyda.

A. What does it say? What is the document so I can look at it again?

THE COURT: It's the school record that we looked at -- it's P 111 -- where we're going to redact the bottom and it just has the top, on the right-hand side. He's asking you the date.

A. That's the date this was issued upon my request by P.S.9. The report, printout, that is this date.

Q. Did you give them that address?

THE COURT: What is the date?

A. No.

Q. Sorry. You said no? How did they get the address at 17 Ránargata?

MR. MIN: Objection as to form.

A. I don't know.

Q. Who did you speak to on August 25th, 2021 to get this document?

MR. MIN: Objection as to form.

MR. BEYDA: He says he spoke to them.

THE COURT: Overruled. You can answer, Mr. Schram.

A. I had email correspondence with the P.S.9 principal.

Q. And in those communications did you provide the principal with the 17 Ránargata address?

A. No.

Q. How did they get the address, if you know?

A. I don't know.

THE COURT: That's been asked and answered.

MR. BEYDA: Petitioner's Exhibit 6 that was just moved into evidence, if we can look at that, please, your Honor.

THE COURT: Are you going to put it up? Thank you.

Q. Mr. Schram, this is the email communication dated June 9, 2021, correct?

A. Yes.

Q. On June 9, 2021, you were in possession of the children's passports, correct?

A. No, I think we had come to an agreement of how to --

regarding the trip to Mexico.
Q. The question was whether or not you were in possession of the children's passports, yes or no?
A. They left the house, yeah. I mean, again, I don't look at it as I had it in my possession because we had agreed how the trip would be conducted so there's no need to have had it in my possession, you know.
Q. Ms. Zarak did not have control of RZ's passport at this time, correct?
A. She could have asked for it, but no.
Q. Ms. Zarak did not have EZ's passport at this time either, correct?
A. Same.
Q. And there's no written communication between you and Ms. Zarak confirming that you were in agreement at this time for her to go to Mexico with the children, correct?
A. You mean like written correspondence?
Q. Yes.
A. No. It was verbal.
Q. In fact, you gave Ms. Zarak EZ's passport the day she left Iceland, correct?
A. Yes, it was time to give it to her because it was time the trip was happening.
Q. Now if Ms. Zarak knew where the passport was in the house, why did you have to give it to her?

MR. MIN: Objection.

THE COURT: Argumentative.

Q. Isn't it true, Mr. Schram, that when you gave her the passport, you walked into the house with it?

A. I don't remember that.

Q. Isn't it true, Mr. Schram, that you notified Border Patrol about Ms. Zarak potentially leaving the country at this time?

MR. MIN: Objection. Beyond the scope of redirect.

THE COURT: It is.

MR. BEYDA: Okay. I'll move on.

Q. You mentioned that Chase closed your bank account. Do you remember?

A. Yes.

Q. You also have a Bank of America account, correct?

A. No.

Q. You had a Bank of America account during the marriage, didn't you?

A. We applied to have a joint account at Bank of America but we never deposited anything, so I think it was closed due to inactivity. Nothing was done with it.

Q. You had a Citibank account, correct?

A. Citi, yeah, Citibank account or Bank of -- Citibank account, yes.

Q. So in addition to the Chase account, you also have a -- had a or have a Citibank account, correct?

A. No.
Q. Did you close that account?
A. Again, we never did anything with it. We never deposited any money into it. I don't know what happened to it. As far as I know, it was closed.
Q. Didn't Tania attempt to transfer money into that account for the purchase of the apartment in Iceland?
A. Oh. Right. No, right. So -- yes. I apologize. Yes. We -- we -- we discovered that we -- it was still active and we -- we were having transfer issues, so we were able to use that bank account to get money to Iceland, yes.
Q. So in fact the bank account that you testified to that was -- well, is that the Chase account or the Citibank account?
A. That's the Citibank account.
Q. Isn't it true that that was the Chase account?
A. What was the question again? I'm sorry.
Q. The account that you were discussing with Ms. Zarak transferring the money into.
A. So the checkings account I had with Chase was closed. Turns out I have a savings account that I've never used really, but it was there. I inquired with Chase: Can I use this or can this account be used basically to send some money to Iceland? For some reason Tania wanted to send the money first through by Chase, Chase said yes, so when push came to shove, the money was pretty much locked in there so we had to find

ways to get the money back into her account, and after multiple attempts, the way to get the money back into Tania's account was via that joint account, but in the meantime she already sent the money directly to my bank account that I said to make a final payment for the -- for the apartment.

Q. Mr. Schram, you said that in November Chase closed your account, correct?

A. Yeah, my checking account, yeah, the account that I used.

MR. BEYDA: Your Honor, may I please pull up on the screen R 170 and offer it into evidence. There was no objection.

THE COURT: If there's no objection, it is admitted.

(Respondent's Exhibit 170 received in evidence)

Q. Mr. Schram, directing your attention to December 9, 2020, at 5:17 p.m. What's the status of this?

A. So this is R 70, right?

THE COURT: R 170.

Q. This is R 170.

A. What's the page number? Oh.

Q. Let us know when you're ready.

A. Yes, I'm ready.

Q. Okay. On December 9th, 2020, you sent a message to Tania, Ms. Zarak, that you spoke with Chase, correct?

THE COURT: He just asked if you sent that message.

A. Yes, yes, yes.

Q. And that's the same Chase account that you were referring to when you said that Chase closed your account in November, correct?
A. No. That's the savings account.
Q. So you had a checking and a savings account in New York at Chase?
A. Yes.
Q. So which account was closed by Chase?
A. The checking account.
Q. And the savings account was left open?
A. Yes, to my surprise.
Q. Were those two accounts linked?
A. I don't know what that means.
Q. You subsequently ended up receiving a transfer of funds into that account from Ms. Zarak, correct?
A. Yes.
Q. That's the transfer of funds that was used to purchase the apartment, correct?
A. The second payment.
Q. And that's on page 2 of this exhibit, correct?
A. Yes.
Q. Now you stated that your children were enjoying school in Iceland, correct?
A. Yes, I mean, with some -- with some bumpy roads sometimes, but yes.

Q. Isn't it true that RZ was being bullied in school?
A. I wouldn't use the word "bullied," no.
Q. Well, didn't you and Ms. Zarak exchange communications using the word "bullied"?
A. Tania used the word "bullied." I never agreed to it.
Q. Tania expressed concerns to you about RZ being in school and being bullied, correct?
A. Yes, she expressed concerns that she thought he was being bullied, yes.
Q. And that was in December of 2020, correct?
A. That's possible.
Q. That's merely two months before Ms. Zarak told you -- you and Ms. Zarak discussed getting divorced and her going back to New York, correct?
MR. MIN: Objection. Objection as to form.
THE COURT: Overruled. I can do the math.
MR. MIN: Your Honor --
Q. In fact, RZ was taken to see a counselor in Iceland, correct?
A. No.
Q. RZ would cry in the morning before going to school, correct?
A. Yeah, a couple of times.
Q. And in fact, he saw a counselor twice, didn't he?
A. No. He never saw a counselor.

Q. Are you familiar with a counselor who had the last name Gudrun, G-U-D-R-U-N?
A. Yes, but she didn't see -- didn't see RZ.
Q. Who did she see?
A. Me and Tania.
Q. So you actually -- you and Ms. Zarak met with Gudrun about RZ?
A. Yes, regarding potty training.
Q. I'm sorry?
A. Regarding his potty training.
Q. And that's all you discussed with Gudrun?
A. Essentially, yeah, it was -- it was a big topic regarding RZ.
Q. Wasn't this recommended by the school?
A. No. I asked for it.
Q. You asked his school for a recommendation of somebody to talk to about potty training your son?
A. Yes, I asked the school are there behavior, you know, therapists or specialists that we could talk to about potty training issues.
Q. And that had nothing to do with your son being bullied.
MR. MIN: Objection as to form. Assuming a fact not in evidence.
THE COURT: Sustained.
Q. It had nothing to do with your son crying before going to

school in the morning.
A. No, because it wasn't that often, and when I would take him to school, he would still walk in happily.
Q. Your son told you and Ms. Zarak that he was punched in the stomach on one occasion, didn't he?
MR. MIN: Objection, your Honor. I want to be heard on this, if I may, just on the issue of relevance. To some extent, of course, we would contend that RZ's experience in Iceland is relevant, as they relate to the other children's overall experiences in Iceland. However, his individual experiences in Iceland are not relevant because the question of his particular habitual residence is not in question, or particular acclimatization.
MR. BEYDA: You brought this up just now.
THE COURT: That is true. That is true. That child is not at issue in this case.
MR. MIN: He's not. He's not.
MR. BEYDA: Understood. I think I am done.
BY MR. BEYDA:
Q. You were asked questions about the nanny living in a separate apartment in Iceland, correct?
A. Yes.
Q. And in fact she was staying in an airbnb, correct?
A. Yes, I think so.
Q. You and Ms. Zarak agreed -- had a conversation about the

nanny staying in a separate airbnb, correct?
A. Yeah. I mean, it was -- it was -- it was obvious, so yeah.
Q. And the reason why you agreed that the nanny would stay in a separate airbnb in Iceland was because having her in Iceland and paying for her airbnb was still less expensive than the two of you hiring a caregiver in Iceland, correct?
A. I'm sorry. I'm hearing an echo.
But to tell you the truth, I don't know how much she makes, to tell you the truth. As far as I understand her, Tania's mother pays for her -- her core salaries and we give her -- you could say allowance, on the days off. That was my understanding. So I never have had an overview of how she would calculate into the family expenses beyond the weekly, you know, money we would give her.
Q. You submitted two different schedules or printouts of your calculations of the family's expenses to this Court, correct?
MR. MIN: Objection. Evidence speaks for itself. Beyond the scope.
THE COURT: Just point him to what you want to talk about, Mr. Beyda. There were two different documents that compared expenses.
Q. Mr. Schram, did you consider the cost of a child care provider in Iceland compared to the cost associated with the New York child care provider when you were going through your expenses?

A. Are you specifically talking about nannies now for SZ or you're talking about school?

Q. Just asking if you could answer. If you cannot answer the question, just let us know.

A. Yeah, I'm having a hard time understanding the question; that's why I'm just asking, could you please repeat or paraphrase.

Q. Didn't you introduce -- I'll withdraw the question.

Didn't you --

MR. BEYDA: You know what?

THE COURT: Mr. Beyda, I just remind you, the documents are in evidence. They speak for themselves. You're going to get a chance to argue.

MR. BEYDA: No further questions.

THE COURT: All right. Thank you.

All right. Mr. Schram, I thank you very much for your patience. It's been a long process, and I know, you know, each day it's late for you when we break.

So we're going to break for the day. I told you all Monday is a court holiday here, so we will be in recess on Monday, and I will see everyone Tuesday, first thing on Tuesday.

(Discussion off the record)

THE COURT: We'll begin at 9:30 on Tuesday.

I hope everyone has a nice weekend.

ALL PARTICIPANTS: Thank you, your Honor.

MR. GLASSER: Your Honor, one question. The Court's admonishment that we are not to communicate with our client, I assume that we can now discuss the remainder of our case with our client?

THE COURT: Yes. Mr. Schram is finished testifying, so just as Ms. Zarak has been communicating with her lawyers while she was not on the stand, your client and you are free to communicate. Once Ms. Zarak is sworn in, she'll be under the same admonition that Mr. Schram was, okay?

MR. GLASSER: Thank you, your Honor. Have a nice weekend.

THE COURT: Thank you, everyone. Have a nice holiday weekend.

MR. BEYDA: Thank you.

(Adjourned to October 12, 2021, at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of: Page

ARNALDUR SCHRAM

Cross By Mr. Beyda . . . . . . . . . . . . . . . . 4

Redirect By Mr. Min . . . . . . . . . . . . . . . 123

Recross By Mr. Beyda . . . . . . . . . . . . . . 147

PETITIONER EXHIBITS

Exhibit No. Received

6 (as redacted) . . . . . . . . . . . . . . . 140

115 . . . . . . . . . . . . . . . . . . . . . 127

148 (Bates Nos. 12409 and 12410 only) . . . 116

148 (Bates Nos. 12259 through 12261 only) . 124

RESPONDENT EXHIBITS

Exhibit No. Received

20, 21, 26, 57, and 58 . . . . . . . . . . . .10

109 . . . . . . . . . . . . . . . . . . . . . .40

141 . . . . . . . . . . . . . . . . . . . . . .28

170 . . . . . . . . . . . . . . . . . . . . . 152

172 (Bates Nos. TZ9289, TZ9292, TZ9293 only) 21

200 . . . . . . . . . . . . . . . . . . . . . .36

213 . . . . . . . . . . . . . . . . . . . . . .89

48 (page 2 only) . . . . . . . . . . . . . . .45

53 . . . . . . . . . . . . . . . . . . . . . . 101

65 . . . . . . . . . . . . . . . . . . . . . . .33

71 . . . . . . . . . . . . . . . . . . . . . . .23