UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In the Matter of E.Z. and S.Z.

ARNALDUR SCHRAM,

Petitioner,

v. 21 Civ. 6524 (MKV)

TANIA ZARAK,

Respondent. Remote Bench Trial
------------------------------x

October 12, 2021
9:40 a.m.

Before:

HON. MARY KAY VYSKOCIL,

District Judge

APPEARANCES

BURGER GREEN & MIN LLP
Attorneys for Petitioner
BY: RICHARD MIN, ESQ.

GALLET DREYER & BERKEY, LLP
Attorneys for Petitioner
BY: KENNETH GLASSER, ESQ.

CHEMTOB MOSS FORMAN & BEYDA LLP
Attorneys for Respondent
BY: MICHAEL F. BEYDA, ESQ.
MUDITA CHAWLA, ESQ.

(Case called)

THE DEPUTY CLERK: Good morning, your Honor.

THE COURT: Good morning.

THE DEPUTY CLERK: Counsel for the petitioner, please state your name for the record.

MR. MIN: Richard Min for the petitioner Arnaldur Schram. Good morning, your Honor. Good morning, counsel.

THE COURT: Good morning, Mr. Min.

MR. GLASSER: Good morning, everyone. Ken Glasser on behalf of petitioner Arnaldur Schram.

THE COURT: Good morning, Mr. Glasser.

MR. BEYDA: And for the respondent, good morning, your Honor, and counsel. Michael Beyda.

THE COURT: Good morning, Mr. Beyda.

MS. CHAWLA: Good morning, your Honor, and counsel. Mudita Chawla for the respondent as well.

THE COURT: All right. Good morning, Ms. Chawla.

And good morning, Ms. Zarak and Mr. Schram. And good morning too to our court reporter Ms. Sellin. I hope everyone had a restful weekend, anyway.

So Mr. Min, do you have any further evidence?

MR. MIN: No, your Honor.

THE COURT: So the petitioner rests?

MR. MIN: Yes, your Honor.

THE COURT: All right. Mr. Beyda, are you taking the

lead?

MR. BEYDA: Yes, your Honor. I am getting a little feedback. I do not know if anybody else is.

(Discussion off the record)

THE COURT: Who is your first witness, Mr. Beyda?

MR. BEYDA: It will be Tania Zarak, the respondent.

THE COURT: All right. Ms. Zarak, you will be taking the virtual witness stand.

Ms. Dempsey, would you swear Ms. Zarak.

THE DEPUTY CLERK: Yes. Ms. Zarak, please raise your right hand.

(Witness sworn)

THE DEPUTY CLERK: Thank you. Please state and spell your name for the record.

THE WITNESS: My name is Tania Zarak. T-A-N-I-A, Z like zebra, A-R-A-K.

THE COURT: Mr. Beyda.

MR. BEYDA: Good morning, your Honor, and counsel.

Your Honor, just before I inquire of the witness, I wanted to let the Court know that Ms. Zarak is in my office space but she is in a separate office sitting by herself, and the documents that she does have are the exhibits in three binders, the respondent's exhibits, with her.

THE COURT: All right. Thank you very much.

TANIA ZARAK,

called as a witness by the Respondent,
having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BEYDA:

Q. Ms. Zarak, how old are you?
A. I am 41.
Q. And what is your current address?
A. 11 West 81st Street, Apartment 6A, New York, New York, 10024.
Q. How long have you lived at that address?
A. On and off, since 2004.
Q. How do you know the petitioner?
A. The petitioner is my husband.
Q. When did you meet him?
A. I met him in the summer of 2013.
Q. Where did the two of you meet?
A. We met online, on a dating website called OKCupid.
Q. And did you subsequently get married?
A. Yes, we did.
Q. What is the date of your marriage?
A. We had a civil wedding, civil ceremony, in New York City on April 9, 2014 -- apologies, 2015.
Q. Did you have a religious ceremony as well?
A. Yes, we did.
Q. Where was that?

A. It was in Reykjavík, Iceland.
Q. After your marriage to the petitioner where did the two of you reside?
A. We resided in 11 West 81st Street, Apartment Penthouse C, New York, New York 10024.
Q. Prior to your marriage to the petitioner, where was Mr. Schram living?
A. He lived in Crown Heights, Brooklyn.
Q. Ms. Schram -- I'm sorry -- Ms. Zarak, for the Court, can you please tell us, have you attended any schooling in New York?
A. Yes, I have.
Q. What's your educational background in terms of New York?
A. I have a master's degree in media studies from the New York University -- the New School University, and I have an unfinished master's degree in film from Columbia University.
Q. Did you also --

THE COURT: All right. Can we pause for just one second. I need to take care of my computer. All right? One moment, please.

(Discussion off the record)

BY MR. BEYDA:
Q. Ms. Zarak, to your knowledge when did Mr. Schram move to New York?
A. In 2007.

Q. And when was the first time that you lived in New York?
A. The first time I lived in New York was in 1996.
Q. And why did you come to New York in 1996?
A. My family moved to New York.
Q. Did you attend school at that time?
A. Yes, I did.
Q. Where?
A. I went to the Hewitt School.
Q. And after Mr. Schram came to New York in or about 2007, did he attend any schooling in New York?
A. Yes, he did.
Q. Where?
A. He went to Columbia University.
Q. To your knowledge does Mr. Schram have any other -- did he attend any other educational institutions in the United States?
A. Yes, sir. He went to university called Azusa University in California. I believe he only attended for a year because he fell in love with architecture and subsequently changed to university called SCI-Arc, which is Southern Institute of -- it's a -- it's a university -- it's a university specific to architecture and similar disciplines.
Q. At the time you met Mr. Schram was he employed?
A. Yes, he was.
Q. In what capacity was he employed?
A. He was an in-house architect for a restaurant group. It

was a group that had I believe three or four restaurants in New York. But very soon after meeting, he changed -- he was hired by Workshop/APD.

Q. Did you and Mr. Schram discuss having children after your marriage? Or withdrawn. Withdrawn.

Do you have children with Mr. Schram?

A. Yes, I do.

Q. How many children?

A. We have three children.

MR. MIN: Mr. Beyda, one second.

Your Honor, I just wanted to say that we don't see your Honor on the video. I believe we're connected. I just didn't --

THE COURT: Okay. I fixed it.

MR. MIN: Okay.

BY MR. BEYDA:

Q. After your marriage to the petitioner where did the two of you reside?

A. We resided in 11 West 81st Street, Apartment Penthouse C.

Q. And how long did you reside in Penthouse C?

A. Until December of 2015.

Q. In December 2015 when you moved out of PHC, where did you and Mr. Schram relocate to?

A. We relocated to Clinton Hill, Brooklyn for four months, and then we came back to 11 West 81st Street, but now Apartment 6A.

Q. Whose apartment was Penthouse C when you and Mr. Schram were living in it? Who owned it?
A. I did.
Q. The apartment in Clinton Hill that you and Mr. Schram moved to, who owned that apartment?
A. We rented.
Q. And when you moved back to Manhattan, Apartment 6A, whose apartment did you move into?
A. My apartment, me -- me and my sisters' apartment.
Q. When you say "me and my sisters' apartment," is the apartment owned by the three of you? Or how many sisters do you have? Sorry.
A. I have -- I have two younger sisters, and we co-own Apartment 6A.
Q. Why did you and Mr. Schram move from Brooklyn back to Manhattan?
A. Because it was an -- it was a one-hour commute for Mr. Schram, who worked in Manhattan, and because the Brooklyn apartment was slightly smaller than Apartment 6A. I was -- we didn't know that part of Brooklyn. I was alone with a baby all day in an area that was pretty much residential. It was lonely. And also, why pay rent if I co-own Apartment 6A.
Q. After you moved out of PHC, what, if anything, did you do with that apartment?
A. I immediately sublet it.

Q. Now after your marriage to Mr. Schram, did the two of you discuss where you would live?
A. New York City.
Q. What, if any, discussions did you have about living in any other countries immediately after your marriage?
A. None.
Q. And why did you and Mr. Schram decide to live in Manhattan after your marriage?
A. Well, it's where we both -- it's where we both had individually been living for some years; it's where we both had gone to school and where he was at that time working; it is also close to Mexico and close to Iceland, so it was convenient in that it was a midpoint for us. It's actually a four-and-a-half-hour flight to Mexico City and a four-hour flight to Reykjavík, so that was good. We liked that. And it's where we met. It's where we were. It's where EZ had been born.
Q. Now you mentioned both Mexico and Iceland in your last answer. Do you have family in Mexico?
A. Yes, sir, I do.
Q. And of your immediate family members, who lives in Mexico?
A. My parents and one of my sisters.
Q. And do you have extended family also that live in Mexico?
A. Yes.
Q. Can you elaborate.

A. My -- my maternal family is from Mexico. She has six siblings. Those siblings have at least four children each, so I have a total of 25 first cousins, who for the most part are in the Mexico City area. My family is from Mexico.
Q. And how would you describe your relationship with your family members in Mexico?
A. We are extremely close; as close as it can be.
Q. And do you have any other family members that live in the United States?
A. Yes, I do.
Q. Who?
A. My sister lives in Miami. She used to live in New York. I have cousins in California, in San Diego; in New Jersey; in Denver, Colorado.
Q. How would you describe your relationship with those individuals?
A. Very close.
Q. Ms. Zarak, in the early years of your marriage, how often would you travel to Mexico, if at all, to see your family members?
A. I would say at least three times a year.
Q. Did Mr. Schram accompany you on those trips?
A. When work allowed, yes, definitely.
Q. What about your contacts with your family members who live in the United States; how often would you see them?

A. So I would see my sister from Miami at least once every six weeks, two months; and I have a cousin in New York City who I would see all the time, and by all the time, I mean we would see her daughter weekly, we would perhaps see her every month; and we would go to Miami as much as we could.
Q. You mentioned Iceland in your answer about where -- withdrawn.
To your knowledge does Mr. Schram have family in Iceland?
A. Yes, he does.
Q. Who are Mr. Schram's family members in Iceland?
A. All of his family is in Iceland -- his parents, his two brothers, multiple cousins, primarily from his father's side. His mother's side is not as big.
Q. Between 2015 and 2019, June of 2019, how often did you and Mr. Schram see Mr. Schram's family members each year?
A. We didn't see them each year. I would say we would see them every other year. Between 2015 and 2019, I went to Iceland three times.
Q. When did you go to Iceland during those three times, in that time period?
A. I went to Iceland in April of 2019 *[sic]* to look at churches and venues for the wedding; then I went to Iceland in September of 2019 *[sic]* for the actual wedding. That's the longest we had ever stayed. We stayed for three weeks. And

then we went for Christmas 2017.

Q. During those trips to Iceland -- withdrawn.

Between 2015 and 2019, what, if any, discussions did you have with Mr. Schram about living in Iceland?

A. Not many.

Q. When you say "not many," can you elaborate.

A. There was a time in which we were considering either going to Mexico or Iceland, but it's not a conversation that had any continuity. And always I remember Mexico had much more of a pull for both of us.

Q. Why did Mexico have much more of a pull for both of you?

A. Because we had more of a connection with my family, with the -- yeah, we used to go more -- we were more familiar with it.

Q. Did you and Mr. Schram ever discuss raising the children in Iceland?

A. No, sir.

Q. Did you ever discuss sending the children to school in Iceland?

A. No, sir.

Q. Between 2015 and 2019, did you and Mr. Schram ever discuss enrolling the children in any Icelandic language classes while living in New York?

A. No, sir.

Q. You mentioned earlier that you -- that PHC was used as a

rental property. Do you recall that?
A. Yes.
Q. Why did you use PHC as a rental property?
A. Primarily for income purposes.
Q. Did there subsequently come a time that PHC was sold?
A. Yes.
Q. When was that?
A. July 2021.
Q. Why did you sell PHC in July 2021?
A. Primarily because co-ops have very strict leasing rules -- you can't rent an apartment for more than X amount of years -- and I had already rented out Penthouse C way past the quota. And then because it was a very small apartment, we were never -- or I was never going to move back in there. So why not sell it. In fact, I had been trying to sell it for a long time.
Q. Do you remember when you initially listed PHC for sale?
A. Probably around two thousand -- yeah, probably around 2017. A long time ago.
Q. Was Mr. Schram aware that you had listed PHC for sale?
A. Yes.
Q. Did he have any objections to that?
A. No.
Q. Can you describe for the Court -- I'm sorry.
I'm going to turn to questions about Apartment 6A now,

Ms. Zarak.
A. Yes, sir.
Q. In particular the apartment building. Where in Manhattan is the apartment located?
THE COURT: I'm sorry. You cut out. Can you repeat that.
Q. Where in Manhattan is the apartment building located?
A. The building is on 81st Street between Central Park West and Columbus. It is right across the street from the Rose Planetarium and the Museum of Natural History. It is half a block away from Central Park. In fact, you have a view of the park from the window. This is the Upper West Side area of Manhattan.
Q. Now aside from you, Mr. Schram, and the children, when was the last time that somebody else lived in this apartment?
A. My sister Tamara lived there for six months in 2006.
Q. Is that sister Tamara the same sister who is on the -- who owns that apartment with you?
A. Yes.
Q. Can you describe for the Court Apartment 6A.
A. Yes, sir. It is 1200 square feet apartment -- between 1200 and 1300 -- it has very high ceilings; it has -- it is a two-bedroom apartment according to the floor plans and according to the usage, two-bedroom, two-bathroom; it has a living room with a chimney; it has a dining area, which we use

as a, you know, as a point of reunion, breakfasts, lunches, dinners; it has a kitchen and it has a -- a loft, which in -- which holds a queen size bed and which is technically, or at least for the purposes of my family, a third bedroom.

Q. When you say that it is a third bedroom, in what rooms do -- prior to July 2020, in what rooms of Apartment 6A were people sleeping?

A. All of them. So we had -- you must understand, Mr. Beyda, that my children were very young previous to July of 2020, so they were technically in bed with us. Their -- the baby was with me because -- the baby would be SZ -- because I was breastfeeding at the time, and then RZ and EZ slept in one of the bedrooms. I woke up there every morning just because they had either gone to get me or I had just slept there in the first place. Our nanny, Susana, slept in the other bedroom, and then my husband and I slept in the king size bed in the loft. However, as I said, you know, my children were not properly sleep trained, so their -- it was a -- a -- it wasn't very orderly. Nights weren't orderly in that period of time.

Q. And why was that? Was that because of their ages?

A. Yes, yes, because of their ages. SZ was less than a year. He was breastfed on demand. RZ was 2½. EZ was 5. So yeah, they would wake up many times in the middle of the night. I would just, you know -- there was a point at which I would just sleep downstairs with them.

Q. Approximately how much does it cost to maintain Apartment 6A in Manhattan each month?
A. I would say approximately $4,000. There's a maintenance fee, which goes -- it's $3,600, approximately, and then there's Spectrum, which I also cover. So I would pay $4,000 a month.
(Discussion off the record)
Q. Ms. Zarak, what, if any, expenses did Mr. Schram pay in connection with Apartment 6A prior to July 2020?
A. None, sir.
Q. What, if any, expenses did Mr. Schram pay towards apartment PHC while the two of you were living in it?
A. None.
Q. What, if any, expenses did Mr. Schram pay in connection with the Clinton Hill apartment in Brooklyn when the two of you were living in Brooklyn?
A. None.
Q. I'd like to direct your attention to July of 2020 and your family's traveling to Iceland, okay, Ms. Zarak?
A. Yes.
Q. While you were in Iceland, who maintained the -- did you maintain ownership of the Apartment 6A?
A. Yes, sir.
Q. And who of you and Mr. Schram paid the expenses in connection with that apartment?
A. I did.

Q. Why did you continue to pay the expenses in connection with that apartment while you were in Iceland?
A. Because it's our home.
Q. While you were living -- while you were in Iceland did you have your mail forwarded to your address in Iceland?
A. No, sir.
Q. What about Mr. Schram, did he have any mail forwarded from the Apartment 6A to Iceland?
A. No.
Q. Ms. Zarak, we were previously -- I had previously asked you to describe the apartment building's location in Manhattan, right? Can you describe for the Court some of the things that the children enjoyed doing in the neighborhood where the apartment building is located, prior to March 2020.
A. Yeah. They -- they were friends with -- they are friends with all of the doormen on all of the buildings on the -- on the street. Everyone knows them by -- by name. So they would enjoy just -- just walking down the block was an adventure. They would see all their friends. By friends, I mean in this specific case the doormen. They loved to go to all of the shops from Starbucks to the post office to the pharmacy to the grocery to the deli. They would -- they would love to scoot around with their father. They knew every playground by heart. They would run into people in the playground. They thoroughly enjoyed the museums. They knew every entrance to the Museum of

Natural History, all the secret pathways. We would go to the park every day. They -- we had different ice cream spots. RZ and I, every morning, we would have a coffee date in the coffee on the corner. Yeah, they -- they are very much Upper West Side kids. They knew absolutely everyone. They knew everyone's lives. They knew every dog in the dog park. They had a very active, energetic, happy life in their neighborhood.
Q. Ms. Zarak, I'm going to --
MR. BEYDA: Your Honor, Exhibit R 40 has been marked for identification, and there was no objection. I'm going to offer it into evidence and also ask to have that pulled up on the screen.
THE COURT: 40 will be admitted.
(Respondent's Exhibit 40 received in evidence)
MR. BEYDA: Thank you, your Honor. May I ask one of my paralegals to control the screen.
THE COURT: Sure.
MR. BEYDA: Thank you.
BY MR. BEYDA:
Q. Ms. Zarak, can you -- Ms. Zarak, actually, do you have Exhibit 40 on your screen?
A. Yes, sir.
THE COURT: Can you make that larger.
Thank you.
MR. BEYDA: Thank you.

Q. Ms. Zarak, who is in that picture? Can you identify the people?
A. Yes. This is RZ and myself on the playground on 85th -- 85th Street called Mariner Playground.
Q. And how far is that playground from the Apartment 6A?
A. That's four blocks away.
Q. How often would you and the children go to that playground in Manhattan?
A. This was one of our -- this is one of our favorite playgrounds. I say we would go there at least four or five times a week.
MR. BEYDA: Mr. Wu, can you please go to page 2. And please make it larger.
Q. Ms. Zarak, can you identify what this is a picture of.
A. Yes. That is the same playground. That is Mr. Schram, my sister Tamara, EZ, and Sophie. This is taken from the other side of the playground.
Q. Where is Mr. Schram in that picture?
A. He is on the right side with a blue sweater on his shoulder; my sister Tamara is standing next to him with a green jacket around her hips; and the two little girls in pink dresses are EZ and Sophie.
Q. And do you know when this picture was taken, in or about?
A. Well, judging by the size of EZ, I believe this probably was 2018 or -- yeah, probably 2018.

MR. BEYDA: Mr. Wu, can you please turn to page 6 of 38 in this exhibit.
Q. Ms. Zarak, who is in this picture?
A. This is EZ.
Q. And where is that picture taken?
A. The same -- the same playground.
Q. And when was this picture taken?
A. This picture was actually taken this summer, Mr. Beyda.
Q. Directing your attention to page 7 of this exhibit. Who is in this picture and where was it taken?
A. This is Mr. Schram and EZ, and this is the same playground. This, by -- judging by the size of EZ, this is probably 2018 as well.
Q. Directing your attention to page 18 of 38. Who is in this picture?
A. This is our superintendent Ray. This photo was taken outside of our building, and that is EZ and RZ.
Q. Directing your attention to page 19 of 38. When was this picture taken?
A. This picture was taken -- see, I'm trying to figure out if that is EZ or RZ inside that bundle. I think it's EZ, so this picture was taken in 2014.
Q. And where is that picture taken?
A. That is the corner of our street, outside the Metro station.

Q. Directing your attention to page 21 of 58 -- of 38. And then who is in that picture?
A. This is EZ.
Q. And where is that picture taken?
A. Every winter there's a -- a Christmas tree stand place in the corner of our street. This is EZ choosing a Christmas ornament.
Q. Directing your attention to page 22 of 38. Who is that and where was that picture taken?
A. This is EZ right outside our building, and this picture was taken in early 2020.
Q. Directing your attention to page 28 of 38. Who is that?
A. This is -- this is our doormen Freddie, and that is RZ.
Q. When was this picture taken?
A. Well, judging by RZ's size, this picture was probably taken in 2017 or early 2018.
Q. Directing your attention to page 29 of this exhibit. Who is in that picture?
A. This is Mr. Schram and EZ.
Q. And where was that picture taken?
A. This is our -- the corner of 81st Street and Columbus.
Q. And can you identify what Mr. Schram has in his right hand.
A. Yes. He has his scooter and EZ's scooter.
Q. How often would Mr. Schram and EZ go on scooters together while in Manhattan prior to July 2020?

A. I want to say every day or every other day, depending on the weather.
Q. Can you describe your observations of Mr. Schram and EZ when they were on their scooters together.
A. I think scooting was probably their favorite activity, primarily 'cause she loved it so much. She was very good at it and she took -- yeah, she started -- she started scooting before turning 2. It was amazing. So my husband had to buy a scooter to be able to not only catch up with her but go further out into the neighborhood. They -- yeah, they enjoyed it thoroughly, and it was very nice to watch.
Q. Where are those scooters at the present time?
A. They are here in Apartment 6A.
Q. And how did they get to Apartment 6A?
A. They -- they've always been in Apartment 6A.
Q. Were they ever brought to Iceland?
A. No.
Q. Directing your attention to page 33 of 38. Who is that and where is that?
A. So this is 81st Street between Central Park West and Columbus. The streets had been closed for the New York City Marathon. It was fun when that street was closed because they could run really in the middle of the street. We would joke that they were marathon runners. So this is EZ pretending to be a marathon runner. And judging by her size, this was

probably 2017.
Q. Directing your attention to page 36 of 38. Who is in that picture?
A. This is my mother, EZ, and RZ.
Q. Where was that picture taken?
A. This is taken outside the Beresford, which is next to our -- this is taken next to our home, on our door -- on our doorstep.
Q. Do you know when that picture was taken, in or about?
A. This picture, again, judging by the sizes of the children, it's either late 2017 or early 2018.
Q. And --
A. Well, by the weather, it's probably not early 2018. It would be colder. But it's most likely 2017. Well, no, 'cause RZ is walking. Two thousand -- I'd say, if RZ is walking, yeah, 2018.
Q. Directing your attention to page 37 of 38. Who is in that picture?
A. That is my father-in-law walking EZ to school.
Q. And when was that picture taken?
A. This picture was taken in January of 2020.
MR. BEYDA: Your Honor, thank you. I'm done with this exhibit.
I'm going to move on to Exhibit 96 that has been marked for identification, and there was no objection to that

exhibit. If I can please have Mr. Wu pull it up on the screen.

THE COURT: Are you moving it?

MR. BEYDA: Yes, your Honor.

THE COURT: All right. It's admitted.

(Respondent's Exhibit 96 received in evidence)

MR. BEYDA: To move things along, Mr. Wu, if you can please scroll through the 13 pages of this exhibit. And then I will ask Ms. Zarak a few questions, your Honor.

BY MR. BEYDA:

Q. Ms. Zarak, were you able to observe the pictures as they were being scrolled across the screen?

A. Yes.

Q. And what are these pictures of?

A. These pictures are my children scooting in New York City with their father throughout the years.

Q. And when you say children, are you saying children in plural?

A. I am saying -- well, I am saying, yes, in plural, referring specifically to EZ and RZ.

Q. Okay. Can you --

MR. BEYDA: I'm going to be done -- I'm done with this exhibit, your Honor. We can take this down.

I offer this. I believe I did. If I didn't -- I'm sorry. I did.

Q. Ms. Zarak, you previously testified about the children

going to the playground in the vicinity of the apartment building, correct?
A. Yes.
Q. While in Iceland, how often did the children go to the playground?
A. Almost never.
Q. What do you mean "almost never"?
A. Well, there's no playground culture in Iceland. There are no playgrounds. School -- schoolyards can be used after hours by anyone. However, there are no playgrounds.
Q. So what is the difference between the schoolyards and the playgrounds that you would attend with the children in Manhattan?
A. Well, they're just completely different. The schoolyards were specific to the school. They had limited -- no monkey bars, no slides. And there was no one, nobody ever there. It was -- you could go if you wanted. The -- the locks were open. They're open to the public. But there's no playground culture in Iceland.
Q. Compared to New York, how often would Mr. Schram go for a scooter ride with EZ while in Iceland?
A. He never did. We didn't bring the scooters to Iceland.
Q. Compared to New York, how often would you go for walks with the children in Iceland?
A. There were no walks in Iceland.

Q. What do you mean there were no walks in Iceland?

A. Well, first of all, the weather in Iceland is very different from New York. It's much more dramatic. It's -- to begin with, it's dark, you know, six months, seven months out -- I'd say six months out of the year, it's completely dark. The walks, quote-unquote walks, in Iceland would be to either drop them off or pick them up from school and back. If we wanted, we could walk downtown, but with three children and a stroller, with, you know, high winds and darkness, it's not something that we would oftentimes do. We lived in a hundred percent residential area. There were no coffee shops in our neighborhood, there were no restaurants in our neighborhood. There was a tiny convenience store across the street from the apartment, but other than that, it was just homes, no parks. Yes, we were close to the schools and that was great, but there were no walks in Iceland.

Q. Could you describe what, if any, routine there was each day with the children in terms of what you did with them while in Iceland.

A. So there -- they would go to school, come back home. That was the routine.

Q. How did that compare to the children's routine in Manhattan?

A. Completely different.

Q. How was it different?

A. The routine in New York includes classes, includes various entertainment, plans; it includes, as we were saying, walks; it includes even the walk back from school; included stopping on every shop to say hello; it included saying hi to our friends, to our -- you know, like I said on the previous answer. It's very lonely in Iceland. There's not a lot of people on the street. Everyone uses a car, so it's not like you walk down the street and say hello. It wasn't like a -- a neighborhood like it is here. So the activities in Iceland -- also because in Iceland people were very, very -- understandably so -- cautious about COVID, so for the first six months we were there, we barely socialized with anyone. If any -- if anything, we went to my in-laws' house. So our days were -- there's no point in comparison. The children would go to school and would come back home.

Q. You mentioned COVID for the first six months. How did -- actually, withdrawn.

Ms. Zarak, you had previously testified about -- I asked you questions about whether or not mail was being forwarded to you in Iceland. Do you remember?

A. Yes, sir.

MR. BEYDA: Okay. Your Honor, I am going to ask Mr. Wu to please pull up on the screen Exhibit 128 that has been marked for identification, and there is no objection, so I'm going to offer it.

THE COURT: It's admitted.

(Respondent's Exhibit 128 received in evidence)

Q. Ms. Zarak, can you please -- or actually, Mr. -- Ms. Zarak, can you identify what is on page 1 of this exhibit.

MR. BEYDA: And Mr. Wu, can you please enlarge it.

A. Yes. Yes, sir. These are examples of mail my husband continues to receive in Penthouse C -- in Apartment 6A. I am so sorry.

MR. BEYDA: And can you turn to page 2 of this exhibit, Mr. Wu.

Q. Ms. Zarak, can you please identify what this is.

A. Yeah, this is a stack of mail that my husband still receives at 11 West 81st Street, Apartment 6A.

Q. Do the two pages of this exhibit reflect all of the mail that Mr. Schram has had sent to -- has received at Apartment 6A since July 2020 to the present?

A. No. No, it's not even a third of it.

MR. BEYDA: Mr. Wu, can you please pull up Exhibit R 59. This is marked for identification and to which, your Honor, there is no objection.

THE COURT: Are you moving it?

MR. BEYDA: Yes, your Honor.

THE COURT: It's admitted.

(Respondent's Exhibit 59 received in evidence)

BY MR. BEYDA:

Q. Ms. Zarak, do you have a hard copy of this document in front of you, Ms. Zarak?
A. Yes, I do.
Q. Can you identify what this document, what this exhibit is.
A. This exhibit is a communication from EZ's teachers, Ms. Lifson and Ms. Sideris, who teach the kindergarten class.
Q. Can you please turn to page 2 of this exhibit.
MR. BEYDA: Mr. Wu, can you please enlarge that for the Court. Maybe a little smaller so we can see it, just -- thank you.
Q. Ms. Zarak, can you please identify what this is.
A. This is a drawing made by EZ on January 31st, 2020. It's a drawing of her and me going to get cheese sticks at Starbucks, and the title of the drawing is "My Neighborhood."
THE COURT: Can you scroll it up, please. I'm trying to read under the picture. Thank you.
Keep going. Okay. Thank you.
Q. And where is that? Where was that picture maintained?
A. This picture was with us, always with us. It is I think -- I brought it to Iceland.
Q. And why did you bring it with you to Iceland?
A. So that we could continue having the connection to our neighborhood and to the things we did together back home, for the time being.
Q. Directing your attention to page 4 of this exhibit. What

is that?
A. This is EZ. This is the cover of --
Q. Sorry. This is? You can finish that answer.
A. Yes. This is the cover of a kindergarten assignment. It was called the Star Name Book, and it included all of her favorite things, and this book is in the 6A apartment. The hard copy of the Star Name Book is in the C -- 6C apartment -- yes, 6A apartment.
Q. Who made that book with EZ, if anyone?
A. It was an ongoing assignment during her kindergarten year, so they would work on it in school, and then I would work on it with her at home.
Q. Did Mr. Schram also work on it with her at home?
A. No.
Q. Did you ever bring this book with you to Iceland?
A. No, sir.
MR. BEYDA: Your Honor, I'm done with this exhibit. We could take it down, if that's okay.
I'm going to ask the witness to please -- I'm going to ask Mr. Wu to please put on the screen Exhibit R 43, which has been marked for identification, and there was no objection, and I will offer it.
THE COURT: Admitted.
(Respondent's Exhibit 43 received in evidence)
MR. BEYDA: Actually, Mr. Wu, I do not need R 43. I

need R 39.

THE COURT: Are you withdrawing --

MR. BEYDA: I'm going to come back to it.

THE COURT: Okay. That's fine. Yes.

MR. BEYDA: So R 39 I will offer.

THE COURT: Admitted.

(Respondent's Exhibit 39 received in evidence)

BY MR. BEYDA:

Q. Ms. Zarak, let us know when you have that.

A. Yeah, I have it.

Q. What is R 39?

A. There is an Italian grocery store on Columbus and 82nd Street called Zingone's. It's very much a community neighborhood institution. It's family owned. We call it Mary's because the main -- the manager is Mary Zingone. This is a collage that Mary made of the regulars. So the regulars meaning the shop's regulars -- regular customers.

Q. Are you describing page 1 of 43 of this exhibit?

A. Yes, sir. It's a -- this is a picture of the collage Mary has on the -- on the door of Zingone's.

MR. MIN: Your Honor, I would object to that answer with respect to Mary and the purpose of the photo and why Mary --

THE COURT: Overruled.

Q. Ms. Zarak --

THE COURT: You object to the question, by the way, not the answer.
Q. Ms. Zarak, do you recognize anybody in that photograph?
A. Yes.
Q. Who?
A. EZ.
Q. Anybody else?
A. The girl under EZ is Jerry Seinfeld's daughter, and then the girl to the left with the green sweater is one of EZ's classmates who also lives in the neighborhood. Her name is Isabel. And then I believe that's it.
Q. And which picture is EZ? Where is EZ in this picture?
A. So EZ is in the middle at the top. She's wearing a green vest, and she is wearing -- she's holding a coconut water in her hand. She's standing.
Q. Okay. Yup. Thank you.
Now directing your attention to page 6 of 43 in this exhibit. Who is that?
A. This is Mr. Schram and EZ.
Q. Where was that taken?
A. So this is I would say 81st and Columbus. This is the -- the Nobel Prize winners monument outside of the Museum of Natural History. It's somewhere we would go often to either scoot or just walk around.
Q. And directing your attention to page 9 of this exhibit.

Who is that?
A. That's EZ getting a pedicure.
Q. And where was that picture taken?
A. This is our local manicure and pedicure shop. It's a block and a half away from the apartment. And all the ladies know my children by first name. EZ and I would go there as a girl date often, I'd say twice a month. It's called Savor Spa.
Q. Directing your attention to page 19 of 43 of this exhibit. Who is that?
A. This is Mr. Schram and RZ.
Q. Where is that?
A. This is somewhere in the Upper West Side.
Q. Directing your attention to page 20 of 43.
MR. BEYDA: Can you enlarge that, Mr. Wu.
Q. Ms. Zarak, can you identify what this picture is.
A. Yes, sir. There's a community garden on -- somewhere -- I think it's 93rd. Somewhere in the 90s. It's a community garden that holds various activities. This is an open concert. This is September 19 -- this is September 15, 2019, and the reason why I know this is because it was Mr. Schram's birthday.
Q. How often would you go to the community garden with the children?
A. Weather depending, we would go often. It's not close -- it's not open year round. I think it's closed in the winter. So we just went as much as we could. They had yoga classes and

concerts, and there's a, you know -- there's vegetables in the -- in the background. It's a very nice -- a very nice project.
Q. Ms. Zarak, directing your attention to page 30 of this exhibit. Where is that?
A. This is in Washington Square Park.
Q. And who is in that picture?
A. It's EZ.
Q. Can you elaborate for the Court on how the children -- how EZ -- your observations of her in terms of her enjoyment in a place like Washington Square Park on a day like the one depicted over there.
A. So I would observe her being free, happy, running up and down, talking to everyone, you know, getting into everyone's business, be it the bubble guy or the pianist. I remember there was a pianist in -- on Sundays in Washington Square Park. He was there that day. I saw her active and involved and curious and just out there, free. I think the word is free.
Q. Directing your attention to page 33 of this exhibit, who is in that picture?
A. This is -- this is Mr. Schram and EZ and then my sister Tamara and Sophie.
Q. And where was that taken?
A. This is a merry-go-round, a merry-go-round in Bryant Park.
Q. Can you describe -- were you present that day?

A. Yes. I took the picture.
Q. Can you describe to the Court, Mr. Schram -- I'm sorry. Can you describe the circumstances surrounding that picture being taken.
A. Mr. Schram used to work at a company called Workshop/APD, which had its offices two blocks away from Bryant Park, so we would often bring down the kids or I would oftentimes bring down the kids to either have lunch or coffee with him. And of course if my sister was around, she would tag along. My sister and Mr. Schram to this day have a very close relationship. So this picture is probably on one of those days. We probably just came down in the subway to have lunch and coffee and some time with Mr. Schram during either his lunch or his coffee break.
Q. How would you describe Mr. Schram's behavior during a day like the one depicted on page 33.
A. I would observe him happy, and he would actually really en -- he really liked it when we came to visit him at the office. Not a lot of -- not a lot of children go that often, I think, to visit their fathers at the office like we did. I saw him happy and enjoying -- enjoying the day and, you know, enjoying the kids. I would see him involved and relaxed.
Q. How often would Mr. Schram participate in activities like this with you and the children?
A. In New York City? All the time. Or as much as work

allowed. I'd say as much as work allowed. 'Cause he did have, you know, a tight work schedule. But this is why we came down to see him, right, to take -- to get the most out of it, let's say.
Q. Now you mentioned someone named Sophie in this picture, correct?
A. Yes.
Q. What is EZ's relationship to Sophie?
A. EZ and Sophie call themselves sisters. They are first cousins, but they are -- it's -- they're best friends. They're extremely close. They -- they're basically sisters. They love each other tremendously.
Q. Does Sophie live in the United States?
A. Yes, sir. Sophie lives in Miami.
Q. Directing your attention to page 42 of 43. Who is in that picture?
A. This is Mr. Schram, EZ and RZ on --
Q. Where is that picture taken?
A. This was taken at the community garden I previously mentioned. This was Mr. Schram's birthday. And the clown had made that hat for him.
Q. Ms. Zarak, how would you describe the children's roots in Manhattan, if you could answer that question.
A. The children are from Manhattan. If they are rooted anywhere, it's Manhattan. If you ask any of them where they

are from, they say New York. Everything they know is in Manhattan. They know where everything is. They are -- their roots are New York.

Q. How would you describe your roots in Manhattan?

A. My roots are by this point also in Manhattan. I spent almost equal amount of time in Manhattan that -- in New York that I ever did in Mexico. My closest friends are here. My professional undertaking, undertakings have for the most part been here. My primary network is here. My property is here. My -- my money is here. This is -- this is -- this is where I'm from. Even though I'm a Mexican citizen, if they ask me where are you from, I say Manhattan. So my roots are deep, sir.

Q. If asked where your children are from, what do you say?

A. New York.

Q. How would you describe -- withdrawn.

Prior to July 2020, how would you describe Mr. Schram's roots to New York?

A. I would say he was from New York. He had been here for over a decade. He also had friends here. He also had -- he had an uncle or a cousin here that we saw a few times. He -- we would go to the Scandinavian Society galas. He was close to the -- he was very close to the Icelandic community in New York. He was close to the -- to the consul. He once invited me to an evening with the Icelandic prime minister in New York.

I couldn't go 'cause I was -- SZ was little. He had a soccer team. He worked in -- I think total, he probably worked in three different companies. He had a master's degree from New York. It's where we met. It's where we got married. It's where we had children.

MR. BEYDA: Your Honor, this would be a good place for me to take a restroom break before I move on to a new topic.

THE COURT: Yes, that's fine. Why don't we take like a 10-, 15-minute break.

MR. BEYDA: Thank you, your Honor.

THE COURT: All right. See you all shortly.

(Recess)

THE COURT: All right. Ms. Zarak, I remind you that you remain under oath.

BY MR. BEYDA:

Q. Ms. Zarak, prior to -- actually, where has EZ attended school, in Manhattan?

A. EZ, she went to Broadway Presbyterian Church Nursery School. She went there for, I believe it was two years. The twos and then the threes group. And then she went to P.S.9, for kindergarten.

Q. What about either of your other two children; did they also attend school in Manhattan?

A. Yes. RZ went to Broadway Presbyterian Church Nursery School for the twos class.

Q. Focusing for a moment on EZ and her attendance at the Broadway Presbyterian Church Nursery School, how did you and Mr. Schram come to the decision to enroll EZ at that school?
A. The school was recommended to us by the children's pediatrician. We -- we saw the website together; we read about it. I went to visit it. And we just decided it was the kind of school we wanted. We both really liked it. The teachers came to the house to meet the kids. We really liked the faculty. We -- we never had second thoughts.
Q. Why did you go look at the school before enrolling EZ in it?
A. Because I wanted to get a better grasp of the classrooms. It's a very -- it's a tiny school, behind the church. So I wanted to see -- I wanted to see how was that working. So that's why I went to visit. I wanted to make sure that the place was adequate.
Q. And how did it come about that you and Mr. Schram came to the decision to enroll EZ in P.S.9 for kindergarten?
A. It's our in-zone school to begin with. We -- we were returning from Los Angeles, and Mr. Schram -- I think the first time I heard about P.S.9 was through an email Mr. Schram forwarded me, which said P.S.9. The school zone changed in the year we were in Los Angeles, so previous to Los Angeles we always thought P.S.87 was our in-zone school, but that year the zone changed right on our street, so north of 81st Street

became the zone for P.S.9. That's something that I wasn't aware of initially, but then Mr. Schram told me that P.S.9 was our in-zone school.
Q. Directing your --
MR. BEYDA: Your Honor, I'm going to ask Mr. Wu to bring up on the screen R 18 that is already in evidence.
THE COURT: Give me a minute.
Okay.
Q. Ms. Zarak, is R 18 the message you were just referring to that Mr. Schram sent you?
A. Yes. Yes, sir.
Q. And when did you receive that message from Mr. Schram?
A. March 11, 2019.
Q. Where were you on March 11, 2019, when you received that message from Mr. Schram?
A. We were in Los Angeles.
Q. And what, if any, discussions did you have with Mr. Schram about enrolling EZ in school in Manhattan in or about that time?
A. Oh, that was the conversation. We -- we discussed another school also very close to our home, which is the Rudolf Steiner School. It's just across the park from us. Again, as I mentioned, it was my understanding at that time that P.S. 87 was our zone, but we were rezoned, so the conversations we were having was, where are they going to go to school, we're going

back to New York.
Q. Now did there come a time that you went to go see P.S.9?
A. I didn't but Mr. Schram did.
Q. When was that?
A. In the year we went to -- we lived in Los Angeles, Mr. Schram came to New York once a month, more or less, so he took advantage of one of his trips and he visited the Rudolf Steiner School and he visited P.S. 9.
Q. Directing your attention to R 19 that is already in evidence.
MR. BEYDA: And Mr. Wu, if you could put that up on the screen.
Q. Ms. Zarak, can you identify what R 19 is.
A. Yes. Yes, sir. This is an email from Mr. Schram in which he is introducing me, I guess, to the staff at P.S.9.
Q. And why was Mr. Schram introducing you to the staff at P.S.9 at that time?
A. Because we had started the enrollment of EZ and he had -- he had started that. He had started doing that. He was also --
Q. I'm sorry. I didn't mean to interrupt you.
A. He was also arranging a meeting between me, EZ, and the teachers. The final step in registration was a physical interview, at least EZ had to be in person, and I was going to bring her, so he was also introducing me to the parent

coordinator and the admissions official so that I could then know what I was doing on the -- on the inter -- on the following meeting.
Q. And did that meeting actually take place?
A. Yes, yes. It took place on June 24, I believe.
Q. And who attended that meeting with EZ?
A. It was EZ, me, and SZ, who was one month.
Q. Why was -- where was the family living at that time?
A. We were still in California.
Q. And why did SZ go to that meeting with you and EZ?
A. 'Cause he was -- 'cause he was one month.
Q. And what happened after that meeting?
A. After the meeting EZ had a chiropractor appointment, so that's an appointment that actually had been arranged since before traveling; and he had a pediatrician appointment.
Q. Now directing your attention to the time period between January 1, 2019, and July 1, 2019, what, if any, schools in Iceland did Mr. Schram suggest you and he consider sending the children to?
A. None.
Q. What, if any, emails concerning schools in Iceland did Mr. Schram send you during that same period of time?
A. None.
Q. What, if any, discussions did you and Mr. Schram have about moving to Iceland during that period of time?

A. None.
Q. Why not?
A. 'Cause we were going back home to New York.
Q. Why were you going back home to New York at that time?
A. Because the only reason we had relocated to California was because I had been offered a once-in-a-lifetime job opportunity at Netflix. It was something that we couldn't pass. And the family was on board. However, I got pregnant a month after arriving in California, and unfortunately, I got fired, got subsequently fired from my job at Netflix exactly three weeks after giving notice of my pregnancy. So I was only at Netflix for five months. So after that, there was really no reason for us to be in California.
Q. And did you subsequently return to New York?
A. Yes. In -- in March, we were looking at schools.
In fact, I remember, we even considered coming before and me having SZ in New York, with the same OB-GYN which -- with which -- whom I had EZ and RZ.
MR. MIN: Move to strike, your Honor. There was no question pending.
THE COURT: That's true.
THE WITNESS: Oh, sorry. Sorry.
Q. Ms. Zarak --
THE COURT: But as I said before, it's a bench trial.
Q. Ms. Zarak, what grade was EZ in in September 2019?

A. Kindergarten.
Q. Did you physically go to the kindergarten class to observe EZ in school?
A. Yes, I did.
Q. And did Mr. Schram also go to EZ's kindergarten class in Manhattan to see her in school?
A. No, sir. Not that I recall.
Q. What were your observations of EZ in her kindergarten class in Manhattan?
A. I observed her happy, I observed her just out there getting to know all the kids. These were faces that she had previously seen in the neighborhood so she felt very much at ease. She -- she was always drawn to -- more to like the science stuff and the books. I once went to read a book to the class and she was very proud, sitting in -- at the front, and she was very much a part of P.S.9. She -- she spoke -- so she speaks Spanish, and one of her teachers was of Spanish descent, so she would translate for the teacher oftentimes when the children needed something, so that's something that made her very proud.
MR. BEYDA: I'd like to direct the witness's attention to R 27, and I believe there was an objection to this.
THE COURT: Yes, there are.
MR. BEYDA: Maybe I'll need to lay a foundation first, your Honor.
THE COURT: All right. Just give me a moment.

MR. BEYDA: Sure.

THE COURT: All right. Go ahead.

BY MR. BEYDA:

Q. Ms. Zarak, are you familiar -- have you received emails from an email address MySchools@MySchools.nyc?

A. Yes, sir, often.

Q. And from whom are those emails sent?

A. So, so MySchools.nyc is a portal. It's a point of communication between P.S.9 and the families and also between the DOE, the school, and the family. So communications from MySchools.nyc came from a faculty member or the principal or someone from the DOE.

Q. Okay. Ms. Zarak, don't look at any exhibits right now, okay?

A. Okay. Sorry.

Q. Now did you provide MySchools with your email address?

A. Yes.

Q. And to your knowledge did Mr. Schram also provide his email address to the administrative people affiliated with P.S.9?

A. No, sir. To my knowledge, no. You create an account. So I created an account with my email.

Q. And how often would you receive emails in connection with that account?

A. Very often.

Q. Were those solicited or unsolicited emails?

A. Unsolicited. Mostly unsolicited.
Q. Did you also receive emails from the children's classroom?
A. Yes.
Q. How often?
A. Those were more often. Those were almost every day.
Q. And what was the nature of those emails?
A. Things like homework, meeting reminders, lunch reminders, allergy reminders, weather warnings, holidays.
Q. Who is Rita Yoskowitz?
A. Rita Yoskowitz is the parent coordinator at P.S.9.
Q. And did you exchange communications with her?
A. Yes.
Q. How often?
A. I believe -- well, for -- for everything regarding admissions, you had to -- you had to communicate with her and with a woman called Elizabeth Masters. So I communicated with her at the beginning of the year. She's a person we met with that day on June 24 for the interview. I -- later in the year EZ was in kindergarten, I communicated with her probably once or twice. Once because there was a problem with the sink in EZ's classroom, and the second time because we were going to Mexico for COVID.
Q. Did Mr. -- to your knowledge did Mr. Schram also communicate with Ms. Yoskowitz over the years?
A. What period of time, please?

Q. From the time of EZ's enrollment in P.S.9 to the present.
A. Yes.
MR. BEYDA: Your Honor, at this point I'm going to ask the witness to please identify Exhibit 27.
THE COURT: You can ask her that. This appears to be a whole bunch of different emails and documents to me.
A. Yeah. R 27, sir? This is an email from MySchools to me saying thank you for registering with MySchools, thank you for creating your MySchools account.
Q. Can you turn to page 2.
A. Yes, sir.
Q. What is that?
A. This is the -- EZ's classroom. She was in K 108. This is the notification that I am part of the Google group.
Q. Can you turn to page 3.
A. Yes.
Q. What is that?
A. This is an email in which I'm trying to register for the lunch. There's an application in which -- there's -- there was a completely different form you had to fill out for lunch at school. So I was asking Rita Yoskowitz how do I do that, and she was saying, you're not able to do that yet, relax.
MR. BEYDA: Your Honor, I'm going to offer this exhibit at the present time.
THE COURT: The whole thing or the part that you've --

go ahead, Mr. Min.

MR. MIN: Sorry, your Honor.

THE COURT: No. Go ahead.

MR. MIN: We reiterate our objection on relevance and hearsay grounds. I still haven't heard the relevance, and it's not clear to me why they would be relevant.

THE COURT: The relevance objection is overruled. But the hearsay objection, this appears to be a whole series of different emails and documents, Mr. Beyda. Are you offering just the page you've asked about?

MR. BEYDA: I'm offering page 1 to show the -- page 1, page 2, page 3, page 4, page 5 --

THE COURT: Objection is sustained.

MR. BEYDA: Okay.

BY MR. BEYDA:

Q. Ms. Zarak, can you tell the Court how EZ was doing in school in or about March 2020.

A. She was doing great. She -- she had just started with homework, because kindergarteners didn't have homework at the beginning of the year, so we had just started for the first time in her life getting homework assignments, so we were getting into -- into that. Homework assignments were simple. They were usually drawings or art projects and they were starting to read letters and numbers. So she was doing great. She was enjoying it. By this point she had -- she had so many

friends. She was doing great.
Q. Prior to March 13, 2020, did you have any discussions with Mr. Schram about removing EZ from P.S.9?
A. No.
Q. You previously testified that EZ -- you described EZ in school. Do you remember?
A. Yes.
Q. Could you describe EZ in the morning before going to school.
A. Yeah. So waking up, you know, is never easy for anyone, waking up early. So they're -- waking up hard was always challenging, has always been. But she would run to school. She would literally run to school. Once the waking up part was resolved and she had some breakfast, she would run to school.
Q. And who would accompany her to school in the morning?
A. I would.
Q. Did Mr. Schram also accompany her?
A. A few times.
Q. So to your knowledge did you share your -- well, did you share your observations of EZ running to school in the morning with Mr. Schram?
A. Yes.
Q. What was his reaction to that?
A. He loved it. Mr. Schram worked so he couldn't always take her to school. However, he enjoyed it very much on the few

occasions when he could.
Q. Did you have any issues with the school in terms of the education that they were providing EZ?
A. None whatsoever. None.
Q. Did there come a time that RZ was enrolled in school?
A. Yes, sir.
Q. Where did he attend school? Where was he enrolled?
A. So he was enrolled in Broadway Presbyterian Church Nursery School on the twos program, which was held three times a week. So on the --
Q. What -- sorry.
A. On the other two days.
THE COURT: You've answered. You've answered the question.
Yes. Go ahead, Mr. Beyda.
Q. Why was he enrolled in that school?
A. Because it's the school where EZ had attended and we -- we had had a very positive experience. We wanted that continuity.
Q. When you say you wanted that continuity, can you elaborate on what you mean by "that continuity."
A. Well, the children, for example, had sibling friends, so there were children in EZ's class that had then a younger sibling in RZ's class, so we liked that. We liked that. We -- they also had the same teachers. So the teachers had previously met RZ when he accompanied me to pick up EZ. They

knew him since he was a baby. So having him in the -- in the class was almost organic. He knew them before even going to that school.
Q. Did you sign enrollment forms for EZ to attend her schools?
A. Can you repeat the question, sir, please.
Q. Were there applications submitted to EZ's schools for her attendance?
A. In what time period?
Q. Starting first with the Broadway Presbyterian school.
A. Yes.
Q. Who filled out those -- that application?
A. I filled it out and we both signed it. I believe we both signed it.
Q. Were there -- turning back to RZ for a moment, did you and Mr. Schram have any issues with the school, Broadway Presbyterian school, in or about March of 2020?
A. No.
Q. Did you discuss removing RZ from that school in March 2020?
A. No.
MR. MIN: Objection, relevance.
Q. I think --
THE COURT: Sustained.
Q. Ms. Zarak, what languages do you speak?
A. I speak English, Spanish, and French.
Q. What languages does EZ speak?

A. She speaks English, Spanish, and maybe 10 words of Icelandic.
Q. How did she learn 10 words of Icelandic?
A. From her dad, mainly. From the time she was in Iceland.
Q. Prior to March of 2020, what languages were spoken in your home?
A. English and Spanish.
Q. Prior to July 2020, did either -- did any of the children take any language classes?
A. EZ took -- Spanish was part of the P.S.9 curriculum, so I believe EZ took Spanish in school. However, she already knew it.
Q. Did you have any discussions with Mr. Schram about enrolling EZ in any Icelandic language classes?
A. No, sir.
Q. Who enrolled EZ in her Spanish class?
A. It was part of the P.S.9 curriculum, so it was given in school.
Q. Have you ever taken any Icelandic language classes?
A. I took an online Icelandic course that lasted for three months.
Q. When was that?
A. October -- this was October, November, and December of 2020.
Q. Why did you take the Icelandic language class at that time?

A. Well, I was in -- I was in Iceland at that time, and Iceland is probably the most complicated language you've ever heard. I needed it to just get around, be able to ask for a coffee.
Q. Did you attend all of your classes?
A. No, sir. Unfortunately, no.
Q. Why not?
A. Because the class took place at 7 p.m. at night when all of my children were literally on top of me. Also, we lived in a very small apartment so it was hard to even have a -- a space to focus.
Q. Did the program come to an end?
A. Yes, the program came to an end, and I didn't reenroll.
Q. Why didn't you reenroll?
A. 'Cause it was just impossible. The time was not possible for me and I was too busy with the kids.
Q. While the children were in Iceland, did they take any classes in Icelandic?
A. No, sir. Could you define classes, though.
Q. A language class.
A. No. A language class per se, no.
Q. Changing topics for a moment, Ms. Zarak.
THE COURT: Excuse me. Excuse me. Ms. Zarak, what do you mean by that when you say, "A language class per se, no"?
THE WITNESS: My -- RZ's school, we -- when we first

arrived, we couldn't find a school in English for RZ because there are no English-speaking preschools or international programs in Iceland, so RZ was enrolled in a preschool that was in Icelandic. So it's not that he was learning Icelandic per se; he was simply immersed in a school that took place in Icelandic.

THE COURT: All right. Thank you.

MR. BEYDA: Thank you.

BY MR. BEYDA:

Q. Ms. Zarak, during the course of the children's lives had you had the assistance of a child care provider?

A. Yes, sir.

Q. Who?

A. She -- her name is Susana. She has been working with us since the summer before RZ was born, so this is the summer of 2016. She lives with us.

Q. When did you meet Susana?

A. Well, I personally met her probably 15 years ago. She worked with other family members.

Q. When did Susana start living with your family --

A. The summer --

Q. -- meaning --

A. The summer of 2016.

Q. And how many days per week did she work with your family?

A. So she lived with us and she had -- she had Sundays off,

and then she would take occasional vacation.
Q. Can you describe the children's relationship with their -- with the nanny, with Susana.
A. So when my children are asked to make drawings of their family in school, they include Susana. So Susana is very much a second mother to my children.
Q. Prior to July 31st, 2020, what, if any, conversations did you have with Susana about her moving to Iceland?
A. Prior to July 1st, 2020?
Q. July 31st, 2020.
A. Ah, sorry. None. I mean, she -- prior to July 31st, 2020, none.
Q. Why not?
A. 'Cause we weren't sure.
Q. Weren't sure about what?
A. Where we were gonna spend the pandemic.
Q. Where was Susana in July of 2020?
A. In July of 2020, Susana was in Mexico with us. And then she took some time off to visit her children. She has adult children.
Q. To your knowledge did Mr. Schram have any conversations with Susana about moving with the family to Iceland?
A. No.
Q. Can you describe the children's attachment, if anything, to Susana.

MR. MIN: Objection. Asked and answered.

THE COURT: Sustained.

Q. Ms. Zarak, changing topics for a moment. Actually, withdrawn.

Did Susana accompany you, Mr. Schram, and the children to Iceland on or about August 1st, 2020?

A. No.

Q. Ms. Zarak, changing topics for a moment, prior to March 30 -- March 2020, what, if any, after-school activities did EZ participate in in Manhattan?

A. So I would -- I would -- I would joke that I was EZ's personal assistant and driver. So she had -- she was enrolled in the after-school program at P.S.9, where she took skateboarding and collage. She had gymnastics. She had swimming. She had gone previously to karate. So she actually had a pretty busy extracurricular calendar.

Q. And where were these activities located?

A. They were all in the Upper West Side area. You mean specifically?

Q. No. That's fine. That's fine.

When did these activities take place?

A. They would take place in the afternoons, either once or twice a week, depending on the activity.

Q. Did you attend these activities with EZ?

A. Always.

Q. What about Mr. Schram, did he attend these activities with EZ?
A. No, sir. I think he -- he -- he probably took her to gymnastics at some point 'cause he knew where the school was, but it was -- it was -- it was me. And Susana. And Susana.
Q. Describe what you observed of EZ at these activities.
A. I observed -- I observed her just active, engaged, busy, focused. She was very much a leader, giving instructions to everyone, telling stories. She -- she was particularly into gymnastics, so she would, you know -- she couldn't wait for the class, did not want the class to end. She was the last one to leave the floor. She was just loving it. I would observe her running around, jumping around, just loving it.
Q. Did Mr. Schram raise any issues with you concerning EZ's participation in these activities prior to March 2020?
A. No. Sorry. Can you repeat the question, sir.
Q. Did Mr. Schram raise any concerns with you regarding EZ's participation in these activities prior to March 2020?
A. Yes -- no, sir.
Q. Were you satisfied with the services provided by the providers of these activities?
A. Very much.
MR. BEYDA: Your Honor, Exhibit R 30, R 31, R 32, 33, 34, 35, and 36 all pertain to the same topic -- namely, the children's extracurricular activities -- to which there was no

objection, and I would offer them at this moment, and I have a couple quick questions to ask the witness about these.

THE COURT: All right. R 30 through 36 are admitted.

(Respondent's Exhibits 30 through 36 received in evidence)

MR. BEYDA: Mr. Wu, can you please pull up on the screen R 34.

BY MR. BEYDA:

Q. Ms. Zarak, do you have R 34 in front of you?

A. Yes, sir.

Q. Can you tell the Court what R 34 is.

A. This is an invoice, my invoice from New York Kids Club, which is a winter camp that EZ and RZ did in February of 2020.

Q. And why in February 2020 did you enroll EZ in the winter club for -- would that be for prospective -- withdrawn.

When would that program be taking place?

A. So there was a week off from school in February. It was called the winter break. So I enrolled them in the camp, so they would basically go, I believe for three hours or so, just for -- just for that week. However, the New York Kids Club is a place where we went. They had an indoor playground. It was great for winter.

Q. How often did you take the children to the New York Kids Club in Manhattan?

A. Well, for the camp, which was a week, and then after the

camp, I would take them -- if it was very cold, that's where I would take them. Probably, you know -- so during the winter months, I would take them perhaps once every two weeks, yeah.
Q. Directing your attention to Exhibit R 35. Can you please tell the Court what this is.
A. So this is Mary Kate. She was the -- the principal at New York Kids Club. She was letting me know that the summer camp was going to be extended.
Q. The summer camp for what year?
A. For 2020.
Q. Why were you exchanging communications with the kids club regarding summer camps for the summer of 2020?
A. Because -- so COVID kept changing our plans, but there was a point in which we were considering going to Iceland for June and July and coming home to New York in August.
Q. And when was this program going to be taking place?
A. It was going to be taking place in August of 2020. She was letting me know that the program had been extended until September, of 2020.
Q. Now directing your attention to page 2 of this document. There's an email from you dated July 10, 2020. Do you see that?
A. Yes, sir.
Q. As of July 10, 2020, did you have your plan solidified for the children for that summer?

A. No.
Q. Did you have discussion with Mr. Schram on or about this time about the children's enrollment in the New York Kids Club for the summer of 2020?
A. Yes.
Q. What, if any, extracurricular activities --
MR. BEYDA: I'm done with that exhibit. Sorry, Mr. Wu.
THE COURT: Before you leave that exhibit, where were you when you wrote this?
THE WITNESS: On Friday, July 10th, your Honor, I was in New York.
THE COURT: Thank you.
BY MR. BEYDA:
Q. Ms. Zarak, was RZ also enrolled in extracurricular activities in Manhattan?
A. Yes.
Q. What activities was RZ enrolled in?
A. RZ was enrolled in forest school once a week. As I said, his -- the Broadway Presbyterian Church Nursery School only met three days a week, so he was enrolled in forest school once a week, and then he used to go to gymnastics with EZ. Oh, and then -- well, the New York Kids Club winter camp also included RZ.
Q. And were those the same programs that EZ attended?

A. Yes.
Q. Why did RZ attend similar programs to the ones EZ attended?
A. For the -- for the continuity of -- of it, for the community purposes, because she loved them, and she couldn't wait for him to do it as well, so they could have something to discuss. Because we had very positive experiences with them, so why not include your next child in them? And also, in the case of the gymnastics, it was something they did together, and that was very nice.
Q. Sorry. I just need a moment.
Can you, Ms. Zarak, please compare the extracurricular -- or withdrawn.
What, if any, after-school activities did EZ participate in in Iceland between August 1, 2020, and July 1 -- June 1, 2021?
A. She didn't.
Q. What do you mean she didn't?
A. She had no extracurricular activities in Iceland.
Q. What about RZ during that same period of time?
A. He didn't.
Q. What about SZ during that same period of time?
A. SZ was with me all day and all night. I was his extracurricular activity.
Q. Now prior to March 2020, did EZ have playdates in Manhattan?

A. Yes, sir.
Q. And with whom were those playdates?
A. With kids from P.S.9 mostly, but also from kids from outside.
Q. What do you mean kids from outside?
A. So for example, with her cousin Maya, with my friend's children who are also her friends, so other New York friends not from P.S.9.
Q. Directing --
MR. BEYDA: Your Honor, R 37 is in evidence. May I ask the witness to please pull her hard copy, and if your Honor would like, I can ask Mr. Wu to put it on the screen.
Q. Ms. Zarak, can you identify what R 37 -- actually, it's a large document. Looking at page 1, who is that?
A. So this is RZ on his third birthday, and that is Ilya XXX XXXXXX, his best friend.
Q. Directing your attention to page 17. Who is that?
A. This is EZ and her best friend Franco.
Q. When you say her best friend Franco, where does Franco live?
A. In New York.
Q. How does EZ know Franco?
A. So EZ met Franco at a playground, and then it turned out that they were in the same school, P.S.9. They were in different kindergarten classes so they hadn't met in school,

but they met at the playground. And from then on, from then on, they just kept being friends.
Q. Did you have an opportunity to observe EZ with Franco?
A. Yes.
Q. To your knowledge did Mr. Schram also have an opportunity to observe EZ with Franco?
A. Yes.
Q. What did you observe of EZ with Franco?
A. EZ and Franco care about each other immensely. They play very well together. They communicate very well together. They take care of each other. They wait for each other after school. They are very much in synch. Now that they are 7, they're starting to use their mothers' phones to send messages to each other, which is something they actually did all throughout the -- the quarantine. So they -- they're very much in synch, and they're very cute together. They -- they are very good friends.
Q. Have you heard EZ ask for Franco?
A. Yes, constantly.
Q. Have you had an opportunity to hear them speak with one another?
A. Yes.
Q. How often would they speak? How often would they communicate with one another while EZ was in Iceland?
A. They would send -- because of the time difference, it was

hard to schedule actual calls, but they would send video messages to each other. I think I probably have at least three or four video messages from Franco on my phone from the time we were in Iceland, and then there's also a couple of messages from the time we were in Mexico. So for example, there's birthday messages from the time we were in Mexico. Franco -- that would be Franco's birthday.

Q. How often would the children --

MR. BEYDA: I'm done with this exhibit, your Honor. Mr. Wu can take it down.

Q. Ms. Zarak, how often would EZ have playdates while in Manhattan?

A. At least, I would say, if extracurricular -- if extracurricular activities allowed it, at least once or twice a week.

Q. How did that compare to EZ's time in Iceland and the scheduling of her playdates there?

A. So for the first six months in Iceland, there were no playdates. There were only playdates with a girl called Clementina, who is Tanya Sleiman's daughter. I didn't even really meet any of the other parents until December of 2020. So for the first six months there were no playdates or, if anything, a couple. You must understand, also, Mr. Beyda, that I didn't have any child -- I didn't have any help in Iceland so playdates were sometimes a salvation for me. Particularly when

I became friends with Tanya Sleiman, I would say -- if I had some sort of commitment, I would say, Tanya, could you please take EZ this afternoon, and she would. So playdates were also a break for me 'cause I was alone with three kids. And then she had three close friends. So there were playdates with those friends. However, EZ would oftentimes ask to go to their houses because -- I mean, she's 6, but she would think her house was too small.

Q. When you said that EZ had three close friends in Iceland --

A. Yes.

Q. -- how does that compare to the amount of close friends she has in Manhattan?

A. Oh, it doesn't compare. She has a lot more friends in Manhattan.

Q. Can you quantify that.

A. Sure. She has, you know -- she's friends with at least everyone in her class, and there are 20 kids in her class -- 25 kids in her class. So in terms of close friends, she has at least 15 friends in Manhattan.

Q. You said that for the first six months in Iceland there were no playdates.

A. Yes, sir.

Q. Do you remember that?

A. Yes.

Q. What if any relation did that have to COVID at that time?

A. It had everything to do. It had everything to do with COVID. COVID restrictions and the fact that we were new there. Really, we knew no one. We were in between airbnbs. It was -- it was pretty disorganized.
Q. What do you mean it was pretty disorganized?
A. Well, we were moving every -- once a month for the first three months we were there.
Q. Directing your attention to the period prior to March 2020 -- actually, withdrawn.
Directing your attention to the period prior to August 1, 2020, what, if any, activities would you personally engage in with the children in Manhattan?
A. Pre-COVID?
Q. The period prior to August 1, 2020.
A. Okay. So that's during COVID as well. Well, we were in Mexico starting in March. Okay. So, yeah. The years before. All kinds of -- all kinds of activities. As I said before, I had -- we had a lot of sort of traditions of our own. EZ and I -- Thursdays were parent-teacher day; we would go for ice cream on Thursdays. I would have, as I said, coffee dates with RZ in the morning. We would have sushis on Friday. We would get manicures and pedicures. We would go to the museums. We would go to the shops, to the supermarket, to the playgrounds, to the park. I -- we were lucky enough that we had friends that had children that were friends with the children, so we

would socialize like that. We would go to, you know, films in the park, marionette shows, you know, New York -- New York stuff.
Q. How did that relate to the things you would do with the children in Iceland when they were not in school?
A. It just doesn't compare, really. In Iceland -- so you must understand, Mr. Beyda, that it's dark all day in Iceland. So to begin with -- during the winter, at least; during the winter and late fall. So activities are obviously limited. How would it compare? It just doesn't compare. We were -- it was -- it was lonely in Reykjavík. We would -- we would see my in-laws often, that I can say, particularly my father-in-law. But we really had no other friends, primarily on those first months, and whenever the COVID restrictions were implemented, we were home a lot. You need a car to go anywhere in Iceland, so we were limited to our neighborhood, to the convenience store across the street, and to school. That was it.
Q. Did you travel with the children on public transportation in Manhattan?
A. Every day.
Q. Can you describe how the children behaved on public transportation in Manhattan.
A. So to give you an idea, RZ would stand by the window to listen for the M79 bus approach, and we would actually sometimes make it down -- run down and catch the bus, 'cause it

stopped in front of our -- in front of our house. So the -- taking the public transportation in itself was an activity. I don't know if -- if that makes sense. So it's not that it was part of an activity; it was the activity.
Q. What about the subway? What about the subway system?
A. The subway, the same. At 5 years old, EZ knew that the subway C and B stops were her lines.
Q. Upon your return from LA to New York, how did you feel?
A. Back home.
Q. Did you have discussions with Mr. Schram about how you felt at that time?
A. Yes.
Q. What did he tell you about how he felt to be back in New York in August 2019?
A. He was happy that he was walking again, because everything in LA requires a car. He was very excited about his new office space 'cause it was very big. It was much bigger than any of his previous office spaces. He was very excited about the project he had going on, particularly the -- he was doing the Icelandic office to the UN, I believe it was, the Icelandic consular office to the UN. EZ and myself even went to the open house. He was excited to be back.
Q. When you say new office space that he obtained, did he sign a new lease for an office at that time?
A. Yes, yes, he did.

Q. Do you know what the duration of that lease was?
A. I believe it was for the -- I believe it was for the year, although he might have gotten out of it early due to COVID.
Q. When you say for the year, was that starting in August and then going 12 months forward?
A. Yeah. I believe it was on a year basis.
Yes --
Q. There's no question.
A. Okay.
Q. Unless you didn't finish your answer. I apologize.
A. I think it was for longer. I think it was a two-year contract because he was very worried during COVID that he wouldn't be able to get out of the contract 'cause it was so much money. So I -- I actually -- my answer would be, I don't know, because I believe it was -- it was longer than a year.
Q. Now directing your attention to Exhibit R 75 that's been -- Exhibit R 75 that's been marked for identification.
MR. BEYDA: And there is no objection, your Honor, so I would be offering it.
THE COURT: It's admitted.
THE WITNESS: R 75. One second, please.
THE COURT: I have that already as admitted. Is that not correct?
MR. BEYDA: My apologies. Okay. It is already in.
THE WITNESS: R 75.

Yes, okay. One second. Sorry. I'm trying to find it.

THE COURT: It's in the second binder.

THE WITNESS: Yes.

BY MR. BEYDA:

Q. Ms. Zarak, who is Leila Fakouri?

A. Leila was our landlady in Los Angeles.

Q. And in August 2019, how did you feel to be back in Manhattan?

A. Relieved, happy, you know, tired from the move, and SZ, he was very young, but we were very happy to be back.

Q. Now in Exhibit R 75, Mr. Schram indicates -- and I'm only quoting from a portion of it -- "We're slowly settling in our old hood, enjoying Central Park extensively and walking about again." Did you share that same sentiment?

A. A hundred percent.

MR. BEYDA: No further questions on this exhibit, your Honor.

Q. Ms. Zarak, can you please take a look at Exhibit R 41 that is in evidence.

A. Yes, sir.

Q. Let us know when you're ready.

A. Yes, I'm ready.

Q. Where are these pictures taken?

A. In New York City, in various museums, public library, the

New-York Historical Society, the Museum of Natural History, the MOMA, the Color Factory, Book Culture that is now Strand, the Dia Beacon museum in Beacon. Yeah. At the Met.

Q. Thank you.

MR. BEYDA: I have no questions in particular on this exhibit beyond that question, your Honor. I'm done with this one. To move it along a little bit.

Q. Ms. Zarak, prior to COVID, did you and the -- how often did you and the children travel out of the country?

A. We would go -- I would say we went to Mexico prior to COVID, probably like, as I said, two or three times a year.

Q. Did you -- how often would you travel outside New York State?

A. If it wasn't to travel internationally and to go to Miami -- I mean, we did go to Miami a lot. So out of New York State, specifically -- oh, then we also went to Montclair, and that's New Jersey. I would say we would travel out of state once every month or two months, if you consider all those places.

Q. Did you have conversations with Mr. Schram and the children about traveling?

A. Yes --

Q. Did the children --

A. -- whenever we traveled.

Q. Would the children ask to go to various places?

A. Yes, yes.
Q. And did the children ever ask you to take them to Iceland?
A. No, sir.
Q. Were you ever present with Mr. Schram when the children asked to be taken to Iceland?
A. No, sir.
Q. Were you present with Mr. Schram when the children -- did the children ever ask to go to Mexico?
A. Yes, sir.
Q. How often?
A. Just all the time. All the time.
Q. Now, Ms. Zarak, what is the current status of your citizenship? Where are you a citizen?
A. So I have an approved green card. I'm just waiting for it physically. And in the meantime I have an O-1 visa, which is valid until July 2023, at which point I will never need a visa again 'cause I will physically have my green card.
Q. When did you start the process of applying for a green card?
A. In January of 2019.
Q. If you know, what is the current status of Mr. Schram's citizenship, in the United States?
A. Well, Mr. Schram and I are still married so he still has an approved green card, and he's also physically waiting for it. And Mr. Schram has an O-3 visa, which is attached to my visa,

which is valid until July of 2023. He's also from Iceland, which is part of the visa waiver program. So he could technically come to the United States without a visa if he wanted. But he has a visa, so that's not the case.
Q. What about the children? What is the current status of their citizenship?
A. The children are American citizens.
Q. Now did you and Mr. Schram hire attorneys in connection with your immigration status in the United States?
A. Yes.
Q. Did you share an attorney?
A. We each had our own immigration attorney, because we were here previous -- we were here many years before meeting, so we each had an immigration attorney. Mr. Schram works with a man called Scott, and I hired Teresa specifically for the green card, so even though they each did -- we were married, right, so they both at one point did things for the spouse. However, we each had our own immigration attorney.
Q. Did there come a time that either of you terminated the services of your immigration attorneys?
A. No.
Q. In or about March 2020 were you still working with an immigration attorney?
A. Oh, yes. Very actively so.
Q. Why?

A. Because Mr. Schram's visa was not renewed. In March 2020 we were informed that his visa was not renewed, so we had to leave this country to renew it at a consular office abroad.
Q. And then what in fact did you do upon learning that Mr. Schram's visa was not being renewed at that time?
A. Well, I initially panicked, 'cause it meant that, you know, we had to leave to resolve this. I remember even emailing his -- his good friend Tom, saying, please, Tom, hire him, you know, our entire life is here. I remember that email clearly. But then we sort of took matters, you know, into our hands, and it was like the perfect storm, because that was exact the week that the -- it was announced that the schools would be closing in New York for COVID, so it's like -- it was a perfect timing for us. We had to leave anyway. So we went to Mexico. And in Mexico, in -- we renewed our visas at the embassy, and we continued with other visa conversations, particularly Mr. Schram, and then we were saved from COVID matters.
Q. Who is Tom? What is Tom's last name?
A. Zoli.
Q. And how do you know Tom Zoli?
A. Tom Zoli is a principal at Workshop/APD and he's a good friend of my husband.
Q. When -- and what -- what did you -- what, if anything, did you ask -- withdrawn.

MR. BEYDA: I would like, your Honor, to offer R 70

into evidence. It has been marked for identification, and there was no objection.

THE COURT: It will be admitted.

(Respondent's Exhibit 70 received in evidence)

THE WITNESS: Yes.

BY MR. BEYDA:

Q. Ms. Zarak, let me know when you're ready.

A. Yes, sir, I'm ready.

Q. Okay. Directing your attention to the email that you sent to Thomas Julliard Zoli on March 12, 2020, do you see that?

A. Yes, sir.

Q. Why did you send him that message, at that time?

A. 'Cause we were panic -- we were panicking, you know, our -- our -- our lives -- our lives are in New York. We, you know -- my apartment, I -- I'm seeing it here on the screen, but I remember saying, my apartment, please hire him. You know, they were already working in a different capacity, so I was like, just hire him full time, please. And he's that close to the family. He actually had -- he had a very strong professional connection with my husband, and he also cared about him tremendously, so he was someone that I could confide in and that could also provide a solution.

Q. Did you advise Mr. Schram about your contact with Mr. Zoli?

A. Mr. Zoli did.

MR. MIN: Objection. Move to strike as

non-responsive.

A. No, I didn't.

THE COURT: Overruled. Overruled.

THE WITNESS: Oh, okay.

THE COURT: You can answer that. And you already did.

THE WITNESS: Sorry, your Honor. Mr. Zoli told Mr. Schram the very next day that he thought it was -- this was a sweet gesture and that he would happily help us out.

MR. MIN: Objection, your Honor. Hearsay. Move to strike as non-responsive.

THE COURT: The motion to strike as non-responsive is denied, but it is hearsay. That objection is sustained.

BY MR. BEYDA:

Q. Ms. Zarak, did there come a time that Mr. Schram spoke to you about your message to Mr. Zoli?

A. Yes.

Q. And what, if anything, did you and Mr. Zarak -- Mr. Schram discuss at that time?

A. Mr. Schram texted me saying that Tom had told me about -- that Tom had told him about the message and that they thought it had been very sweet, and that Tom was already looking into it.

Q. And when you say looking into it, what are you referring to?

A. Tom spoke with Andrew, the other partner, and they were --

they offered my husband a job.

MR. MIN: Objection. Hearsay.

MR. BEYDA: Not for the truth.

THE COURT: Hold on.

It's sustained.

MR. BEYDA: Your Honor, I'm going to offer R 153, which has been previously marked for identification. Actually, I think it's in evidence. It's actually in evidence.

THE COURT: 153?

MR. BEYDA: Yes. If Mr. Wu could pull that up.

THE COURT: Yes, it's in evidence.

BY MR. BEYDA:

Q. Ms. Zarak, let us know when you're ready, please. Thank you.

THE COURT: Can we make it a little larger, please.

A. I'm -- I'm ready.

Q. Okay. Can you turn to page 3 of this exhibit, Ms. Zarak.

A. Yes.

Q. Who is the gray in this message and who is the blue?

A. The gray is Mr. Schram and I am the blue.

Q. Directing your attention to the bottom of this page where it indicates, "Obviously. Tom showed me the email." Do you know what email Mr. Schram was referring to over there?

A. Yes, the previous exhibit. The email I wrote to Mr. Zoli.

Q. Do you see where it says "Not upset, babe"?

A. Yes, sir.
Q. Do you know what Mr. Schram was referring to over there?
A. To that email, to the fact that I had gotten in touch with Mr. Zoli.
Q. What was the -- what happened after your communications with Mr. Zoli and your discussion with Mr. Schram as they pertained to Mr. Schram's visa status?
A. So can I refer to this exhibit again? Or --
THE COURT: Which exhibit?
A. So on Exhibit -- on this one, R 153, at the bottom of page 4, it says that it was sweet, he forwarded to Matt and Andrew to get their feedback, they both said yes. So -- Matt and Andrew are the other two partners at Workshop/APD. And they both said yes to hiring Mr. Schram.
Q. What did their hiring Mr. Schram mean to you?
A. Oh, it meant everything. It meant that they would hire him, ergo provide a work visa that would allow us to come back and -- this is -- this is just while we got the approval of the green card. So this was sort of like a temporary solution while we got approval of the green card, because the green card process takes a long time. So this meant everything. This meant we could come back to New York, he was going to have a job, he was going to have a visa, and that glitch would be forgotten. However, this was COVID times, so let's just say that we could check -- we could check the visa problem.

Q. What do you mean, "we could check the visa problem"?
A. So immediately after these communications took place, Mr. Zoli, my husband, and his immigration lawyer started to apply for an H-1B lottery, because Mr. Schram would work for Workshop/APD too, and H1 visa. The H-1B lottery is a pretty big deal and --

MR. MIN: Objection, your Honor. The witness has no foundation or basis of knowledge on anything she's testifying as to what Mr. Zoli, the immigration lawyer, and Mr. Schram did or did not do, and then certainly at this point testifying as what the H-1B visa or the lottery process is like.

THE COURT: Do you want to establish a foundation, Mr. Beyda.

MR. BEYDA: Sure.

THE COURT: She may have one.

BY MR. BEYDA:
Q. Ms. Zarak, what is the basis of your knowledge for the H-1B process as it pertained to Mr. Zarak in or about March 2020 going forward.

THE COURT: Mr. Schram.

MR. BEYDA: Oh, sorry.

A. I was copied on all the emails.
Q. When you say copied on all of the emails, what emails are you referring to?
A. I'm referring to the email chain between Thomas Zoli, Scott

Goldsmith, Cait Mullan, his assistant lawyer, and Mr. Schram.

MR. BEYDA: Your Honor, at this point I'm going to offer into evidence R 68 that has been marked for identification, and there was no objection.

THE COURT: It will be received.

(Respondent's Exhibit 68 received in evidence)

Q. Ms. Zarak, just let us know when you're ready.

A. I'm ready.

Q. Can you identify what has been marked as R -- what is in evidence as R 68.

A. Yes, this is the email chain I was referring to. It was a long email chain throughout March and April. It describes all the process. So from the job offer, the job salary, that he would apply to the H-1B lottery, Caitlin let us know that the application had been in place, Caitlin let us know that he had won the H-1B lottery. This email chain contained dates, it contained information about the -- it's a, as you can -- it's a very long exhibit. It's -- it, you know --

Q. Directing your attention to page 6 of this exhibit. Do you see where it says, "The H-1B registration selection process has been completed and we are glad to report that Arnaldur has been selected"? Do you see that?

A. Yes, sir.

Q. Did you and -- how did you and Mr. Schram, how did you feel when you found out that, when you received this information?

A. I was very happy and relieved.
Q. Did you discuss that with Mr. Schram?
A. Yes.
Q. And what did he say to you?
A. He was also relieved.
Q. Relieved. How did the H1 -- how did being selected for the H-1B registration selection process impact Mr. Schram's future status, visa status?
A. Well, he could -- in every way. He could come back, he could come back to the USA, and therefore, I could come back.
Q. On or about March 28, 2020, were you and Mr. Schram having any discussions about relocating to Iceland?
A. I think on -- by March 28th, he was throwing certain things my way, but this was our plan.
Q. When you say "this was our plan," what do you mean, "this was our plan"?
A. Well, this is what we were focusing on, on him getting the job. You know, there's -- there's time frames. You know, immigration processes are -- are complicated.
Q. And --
A. So, yeah.
Q. Did Mr. --
A. This is what -- sorry, sorry, sorry.
Q. Did Mr. Schram subsequently move forward with submitting the registration for the H-1B lottery?

A. Yes. He won it.
Q. He won the lottery.
A. He got selected. That's the email from Ms. Mullan.
Q. Now Exhibit --

MR. BEYDA: Your Honor, I'm going to offer R 69 that's been marked for identification and to which there's no objection.

THE COURT: Received.

(Respondent's Exhibit 69 received in evidence)

Q. Ms. Zarak, can you please identify what R 69 is, when you have a chance to pull that up.
A. Yes, sir. This is an email from Scott, my husband's immigration lawyer. They are scheduling a call. And --

THE COURT: I'm sorry. Can you make this bigger, please.

Thank you.

I'm sorry, Ms. Zarak. Go ahead.

A. Yes. So my husband had filled out an initial questionnaire, or he -- my husband had answered some questions from Scott regarding the -- the H-1B and his status, and on this email they are scheduling a phone call, to discuss the H-1B.
Q. Would you say that Mr. Schram was active in this process?
A. Yes, he was completely hands on.
Q. Who paid -- did Mr. Schram have to pay his attorney for the

services provided to him to obtain --
A. Yes.
Q. -- regarding his immigration status?
MR. MIN: Objection.
THE COURT: Grounds?
MR. MIN: Foundation; lack of foundation.
THE COURT: Do you know, Ms. Zarak?
THE WITNESS: Yes, ma'am. I know.
Q. How do you know?
A. Because he's my husband. He -- he -- I -- I've had an immigration lawyer myself, and there are payments required for any of these processes.
Q. And to your knowledge, did Mr. Schram pay his attorneys for this, for the services provided to him?
A. Yes, he did.
MR. MIN: Objection.
THE COURT: On what grounds?
MR. MIN: Your Honor, the testimony, the foundation that was laid was her saying she had immigration lawyers and she knows that immigration lawyers have to be paid. That's not --
THE COURT: Overruled. Overruled.
BY MR. BEYDA:
Q. Ms. Zarak, do you know approximately how much money Mr. Schram paid his immigration lawyers over the course -- the

period -- how much he paid his immigration lawyers?

THE COURT: Sorry. Right now the question is, do you know. Don't tell me the amount. The question is, do you know.

A. May I ask what time period, Mr. Beyda?

Q. Yes. Give me one moment, please.

From October 2020 to -- I'm sorry, November 20 -- sorry.

MR. BEYDA: Actually, I'm going to do it a little bit differently, your Honor.

Q. Ms. Zarak, what is the Woods Law Group?

A. The Woods Law Group is Teresa Woods's practice. Teresa Woods is the immigration lawyer with whom we've been processing our green card.

Q. And what is the Margolis Law Firm?

A. The Margolis Law Firm is the law firm where Scott Goldsmith is a partner. Scott Goldsmith is Mr. Schram's immigration -- Mr. Schram's immigration lawyer.

Q. And did you make any payments to the Margolis Law Firm?

A. No, sir.

Q. Did you make any payments to the Woods Law Group?

A. Yes, sir.

Q. Directing your attention and the Court's attention to R 55 that's been marked for identification.

MR. BEYDA: And there are objections to this, your Honor.

A. I see.

MR. MIN: Mr. Beyda, which exhibit?

MR. BEYDA: 55.

THE COURT: 55.

MR. BEYDA: May I proceed?

THE COURT: Yes.

BY MR. BEYDA:

Q. Ms. Zarak, can you identify Exhibit R 55.

A. Yes, sir.

Q. What is it?

A. These are all the payments done by Mr. Schram to the Margolis Law Firm.

Q. And over what period of time?

MR. MIN: Objection, your Honor. Between --

THE COURT: Grounds?

MR. MIN: Well, he's asking documents about the exhibit, which is not in evidence. You know, this -- to the extent that he wants to lay a foundation, that's fine, but I think he's gone beyond foundation laying at this point.

THE COURT: I think that's true.

Ms. Zarak, you can't just read from this document.

THE WITNESS: I'm sorry.

THE COURT: So if you're able to answer independently, that's fine.

But I think, Mr. Beyda, you need to lay more of a

foundation.

BY MR. BEYDA:

Q. Were invoices sent by the Margolis Law Firm to the Apartment 6A in Manhattan?

A. Yes, sir.

Q. Did you discuss those invoices with Mr. Schram when they were received?

A. Occasionally.

Q. And did you discuss payments that Mr. Schram needed to make to the Margolis Law Firm?

A. Yes, sir.

MR. BEYDA: I'd offer this document, your Honor.

MR. MIN: Your Honor, this document is not what the questions are directed about. There's no -- this certainly doesn't look like an invoice to me. If the witness wants to answer questions about what she and Mr. Schram discussed regarding payments, that's one thing, but, you know, that has no connection to what this document is.

THE COURT: That's sustained.

I don't know what this is either, Mr. Beyda. You need to lay a better foundation about the document. Do you really need this?

MR. BEYDA: I'll move on. I'll move on.

THE COURT: Okay.

BY MR. BEYDA:

Q. I'm going to -- Ms. Zarak, I'm going to direct your attention to R 54.

Before I ask you any questions about this document -- don't look at it --

A. No.

Q. -- what services did the Woods Law Group provide to you and Mr. Schram in connection with your green card application?

A. We did it through her, so she is helping us through the entirety of the process, and then she also -- she also helped me obtain -- she also helped us obtain the O visas we eventually obtained in the summer of 2020.

Q. Were those O visas for both you and Mr. Schram?

A. Yes.

Q. And did Ms. -- did the Woods Law Group provide you with an invoice for those services?

A. Yes.

Q. Can you please take a look at Exhibit R 54 that's been marked for identification.

A. Yes, sir.

Q. Is that an invoice or a billing history that you received from the Woods Law Group?

A. Yes.

MR. BEYDA: Your Honor, I offer --

THE COURT: Hold on.

When did you receive this document?

THE WITNESS: I received this document recently.

THE COURT: Did you request it in connection with this litigation?

THE WITNESS: Yes, I did.

THE COURT: Not received. It's not a business record.

MR. BEYDA: It -- okay. Okay. I'll move on. I understand.

Your Honor, directing the witness's attention to Exhibit R 48. Page 2 of this document is in evidence.

THE COURT: All right. Let me just turn to this.

Yes, the second page only.

MR. BEYDA: May I continue?

THE COURT: Sure, the second page.

BY MR. BEYDA:

Q. Ms. Zarak, did you communicate with Teresa Woods by email?

THE COURT: Hold on. Hold on. This is not what we were calling the second page.

THE WITNESS: This is not it.

MR. BEYDA: I know. I know. That's the --

THE COURT: It shouldn't be displayed.

MR. BEYDA: Oh, sorry.

THE WITNESS: Can I look at it?

MR. BEYDA: Mr. Wu, when you're pulling this up, you're just going to page 2 of this exhibit.

THE COURT: And that's Bates stamp 626, right?

MR. BEYDA: Correct.

THE COURT: So Ms. Zarak, you can look at the page that has the number on the bottom ending in 626. We call those Bates numbers. You can look at Bates numbers.

THE WITNESS: Okay. Thank you, your Honor.

BY MR. BEYDA:

Q. Ms. Zarak, did you exchange emails with Teresa Woods?

A. On -- on what time period, sir?

Q. From January 1, 2020, to December 31, 2020.

A. Yes.

MR. BEYDA: And actually, your Honor, I'm going to ask to have page 1 of R 48 put on the screen for the witness to identify it and then I'm going to offer it.

THE COURT: Okay.

MR. MIN: Your Honor, the objection is hearsay.

THE COURT: I understand. He's going to ask some questions, so we'll see. There's no jury, so there's no harm in it being up on the screen.

BY MR. BEYDA:

Q. Ms. Zarak, did you receive an email from Ms. Woods on July 23rd, 2020?

A. I did.

Q. And was that an email that was sent to taniazarak@mac.com?

A. Yes.

Q. Is that your email address?

A. Yes.

MR. BEYDA: Your Honor, I'm going to offer this page of Exhibit R 48 as a communication that Ms. Zarak received and for -- not necessarily for the truth of the matter of what's contained therein but to go to her frame of mind at that time.

THE COURT: It will be received, but not for the truth; for the limited purpose of her state of mind.

MR. BEYDA: Understood.

(Respondent's Exhibit 48, Bates page 7625 received in evidence)

BY MR. BEYDA:

Q. Ms. Zarak, upon your receipt of document that is Bates marked 7625, page 1 of this exhibit, how did you feel?

A. I was very, very happy.

Q. Why?

A. Because my green card had been approved after, you know, I'd been living in this country on and off since 2004 on very different visas, under different circumstances, so this was -- this was a dream come true. This was a long-time dream come true.

Q. Did you share those feelings with Mr. Schram?

A. Yes.

Q. Did you have a discussion with Mr. Schram when you received this email?

A. Yes. Yes, sir.

Q. And can you describe that discussion that you had with Mr. Schram on or about July 23rd, 2020.
A. So it was actually perfect timing, because by July 20 -- by July 23, we had agreed to spend the school year in Iceland. Green cards take between 12 and 16 months to actually get, so it couldn't have been better for us.
Q. And describe Mr. Schram's reaction to you telling him about this email.
A. Yes, he agreed, same thing. He had been living here for many years under different kinds of visa, spending great amounts of money. We had a green card. We finally had our green cards approved. This is -- this was a big deal for us.
MR. BEYDA: Your Honor, I'm going to offer R 44 into evidence. There was no objection when it was previously marked.
THE COURT: All right. It will be received.
(Respondent's Exhibit 44 received in evidence)
THE COURT: And then, Mr. Beyda, please find a convenient breaking point. We'll break for lunch.
MR. BEYDA: Thank you.
THE COURT: You can inquire about the document if you have questions, and then --
MR. BEYDA: Thank you.
BY MR. BEYDA:
Q. Ms. Zarak, can you identify what -- can you actually turn

to the page that's Bates marked 5198. It's page 6 of the document.
A. Page 6?
Q. Yes.
A. Yes.
Q. Is that your signature?
A. Yes.
Q. And what is this document that you signed?
MR. BEYDA: Mr. Wu, can you make it larger.
THE COURT: Sorry?
MR. BEYDA: I was asking him to make it larger for you, your Honor. I'm sorry.
THE COURT: Oh, I have the hard copy. Thank you, though. I'm okay. Thank you.
A. So this is the entirety of my green card application. This -- it's my -- it's a petitioner's authorized signature.
Q. Now did you advise Mr. Schram that you were submitting this application on or about April 6, 2020?
A. Yes.
Q. Did he object at all?
A. No. He was a part of it. He was --
Q. What do you mean he was a part of it?
A. He's my husband, and we applied for green cards for both of us.
Q. And why were you applying for green cards specifically at

that time in 2020?
A. Because we -- we lived in New York, it was our intent to live in New York, our children are from New York. Because this was long time coming. These were our green cards.
Q. Where were you when you signed this application?
A. So I was in Mexico. We were in Mexico.
Q. Who provided the information that's attached to this application to your counsel?
A. You mean the remaining pages of the exhibit?
Q. Yes, ma'am.
A. I did, sir.
Q. Was Mr. Schram aware of --
A. Yes, he was.
Q. Did he assist at all?
A. He helped me put together the press. There's a lot of press here about me and my project. My green card is based on extraordinary ability, so it requires a lot of press and curriculum and, you know, all the juries I've been a part of, all the talks I've given, so it requires a lot of supporting material, and there's a lot of press out there about my projects, so he did help me assemble some of the press.
MR. BEYDA: Your Honor, I'm actually done with this exhibit and this topic, and it would be a good place to break for lunch.
THE COURT: All right. As I mentioned to you, I have

a court appointment from 1 to 2:30 today so I will see everyone shortly after 2:30.

MR. BEYDA: Thank you.

THE COURT: All right. Have a good lunch, everyone.

THE WITNESS: Thank you.

(Luncheon recess)

AFTERNOON SESSION

2:35 p.m.

THE COURT: All right. Mr. Beyda, we're back on the record.

And Ms. Zarak, I remind you you remain under oath.

BY MR. BEYDA:

Q. Ms. Zarak, are you familiar with -- actually, Ms. Zarak, do you have a New York identification card?

A. Yes, sir.

Q. What is that?

A. A New York identification card is a card provided by the New York State to residents of New York State and most -- you can use it for a variety of things, all kinds of -- well, you can use it as an identification, you can use it for a lot of things.

Q. When did you obtain a New York identification card?

A. I want to say 2018 or 2017, sir.

Q. Is that card -- do you still have that card?

A. Yes. I use it every day.

Q. While you were in Iceland did you terminate -- well, do you have to register that card?

A. Did I have to register, meaning?

Q. I'll rephrase it. I'll rephrase the question.

Did you ever return that card in August 2020?

A. No, sir.

Q. To your knowledge has Mr. Schram ever obtained a New York identification card?
A. I don't -- I wouldn't know.
MR. BEYDA: Your Honor -- actually, I'm going to move on.
Q. Prior to March 2020, Ms. Zarak, specifically between the time period of July 2019 to March 2020, what was your employment status?
A. I was a stay-at-home mom of three small kids.
Q. Prior to obtaining a job with Netflix, in the two years immediately before that, what was your employment status?
A. I was a stay-at-home mom of two kids.
Q. Earlier today you testified about being in Iceland on three separate occasions; do you remember that?
A. Yes, sir.
Q. During how many trips did the children or a child accompany you?
A. So EZ accompanied me on all those trips, so three times; RZ only accompanied me on one occasion, December 2017; and SZ had never been to Iceland before August 1st, 2020.
Q. During your most recent trip to Iceland prior to August 2020, how long were you in Iceland?
A. We were there for Christmas. We went initially for two weeks, but there was a blizzard, so we ended up staying for three weeks.

Q. During that trip to Iceland did you look for any real estate to purchase?
A. No, sir.
Q. What if any schools did you take tours of?
A. None.
Q. Did you have discussions during that trip about relocating from the United States to Iceland?
A. No, sir.
Q. Directing your attention to March, to March of 2020, before going -- in the three weeks prior to leaving the United States and going to Mexico, can you tell the Court what conversations you had with Mr. Schram about going to Iceland.
A. None, sir.
Q. Why were -- was there a specific place that you and Mr. Schram discussed going to immediately -- withdrawn.

Ms. Zarak, can you describe your relationship and your marriage with Mr. Schram to the Court in or about March 2020.
A. It was a roller coaster.
Q. What do you mean it was a roller coaster?
A. Mr. Schram would -- we had ups and we had downs. We -- I believe to a certain degree the coronavirus initially brought us together; like we immediately fell into this emergency mode mind-set. But our marriage had been bad for a while. There was a lot of professional instability on his end, there was tremendous amounts of work at home with me with the kids. It

was very hard to make him -- make him happy. He was volatile. I think that by March 2020, the severity of our marriage issues started to really materialize.

Q. Did you and Mr. Schram have arguments?

A. Yes.

Q. How often did you have arguments?

A. I think by --

THE COURT: Can I just ask, what does this have to do with issues in this case? This is not the matrimonial case. This is not even the child custody case.

MR. BEYDA: I'll move forward.

Q. You have previously testified about being in Los Angeles in connection with your employment with Netflix; do you remember?

A. Yes.

Q. Can you tell the Court what you did in connection with the children's education before moving to Los Angeles.

A. So before moving to Los Angeles, I went to Los Angeles specifically to look at schools; I researched schools online; I asked everyone I knew in Los Angeles about schools; I had phone interviews with teachers; I asked for references, saw websites, etc.

Q. Why did you do all of that?

A. Because I wanted to make sure that by the time we moved, I had found the correct school for my children and -- because we care about education deeply.

Q. Did you also go look at homes?
A. Yes, I did.
Q. And did Mr. Schram accompany you on either of these trips?
A. Not on the first one. On the first one, I went with RZ. We saw -- we only -- the only purpose of that trip was schools and houses, and then on the second trip, I went with -- everyone came along, and that was for my final interview. However, as a family, it was important for me that we sense it out, so it was important for me that on that final interview trip, everyone came along.
Q. When you were looking for a house in Los Angeles, was there anything in particular that you were looking for?
A. Yeah. We were looking for space, we were looking for proximity to school and to my office, which was in Hollywood. Primarily -- primarily space.
Q. When you say space, is that something bigger than Apartment 6A?
A. Yes, yes, it was. We were looking for something bigger than Apartment 6A.
Q. Ultimately did the children attend school in Los Angeles?
A. Yes.
Q. And who selected the schools?
A. I did. Mr. Schram -- I shared all of my research with Mr. Schram, and he agreed. He liked it as well.
Q. While you were in Los Angeles did you maintain the

residence in New York City?
A. Yes, sir.
Q. Why?
A. So that Mr. Schram could stay there when he came for work and because it's our home; it's our home.
Q. Did Mr. Schram in fact return to New York while you were in Los Angeles?
A. Yes, sir.
Q. How often would he return to New York?
A. I would say once a month, once every six weeks.
Q. Do you know why he was returning to New York at that frequency?
A. 'Cause he had active projects in New York.
Q. Before the family moved to Los Angeles, did you make any arrangements to have any personal property shipped from New York to LA?
A. Yes, sir.
Q. Can you tell the Court what arrangements, please.
A. Well, Netflix covered the relocation services on the way out. We shipped all of the things, with the exception of the essentials.
Q. When you say you shipped all of the things, what are you referring to, all of the things?
A. Well, everything we owned. Do you want specifics? No?
Q. Now when you say you left the essentials in New York, what

essentials are you referring to?
A. A bed, dining table, some chairs, a rug, a daybed that served as a sofa, winter clothes. You don't need winter clothes in LA.
Q. Now how does what you moved with your family -- how does what you brought to Los Angeles from New York compare to what you brought from New York to Iceland, in connection with that move?
A. It doesn't compare.
Q. Why not?
A. Because we only took the essentials to Iceland.
Q. When you say the essentials to Iceland, what are you referring to?
A. I mean clothes, toiletries, the favorite, you know -- a favorite toy selection, a favorite book selection; we brought a lot of coats, jackets. That was it. The bikes -- we did -- the children did take their bikes.
Q. Why did they take their bikes?
A. Because they were a gift from their grand -- their paternal grandparents, and Mr. Schram wanted sort of for them to see them on their bikes.
Q. Now, Ms. Zarak, directing your attention to Exhibit R 18 in evidence.
A. R 18?
Q. Yes.

A. Yes.
Q. Let me know when you're ready.
A. I'm ready.
Q. Can you tell the Court what this exhibit is.
A. So this is -- this is an email I sent from Los Angeles to -- to -- so remember I mentioned that the school -- we got rezoned when we were in Los Angeles. I thought that P.S. 87 was the school for my children, so I was saying that we were moving back from LA to the Upper West Side and that we needed a place for our daughter, EZ.
Q. And then directing your attention to page 1 of this exhibit, document Bates marked 3981, there's an email from Mr. Schram to you. Do you see that?
A. Yes.
Q. And why, to your knowledge, why did Mr. Schram send you that email at that time?
A. Because we had found out that P.S. 87 was not the school for EZ and because that was the next school for us, P.S. 9.
Q. And at that point were there any other schools in any other countries being discussed by you and Mr. Schram for the children to attend?
A. In any other countries? No. We were considering the Rudolf Steiner School in Manhattan.
Q. Now, Ms. Zarak, prior to -- withdrawn.
Ms. Zarak, on the date of your marriage did Mr. Schram

own any real estate in Iceland?
A. Yes, sir.
Q. What sort of real estate did Mr. Schram own in Iceland?
A. He had an apartment.
Q. Do you know when he acquired that apartment?
A. Before -- I want to say definitely before 2007. So before I -- before he moved to New York.
Q. During your marriage what was Mr. Schram using that apartment for?
A. He initially -- he had a long-term tenant, and then around the time of our wedding, he decided to put it on airbnb.
Q. And for what period of time did he have it on airbnb?
A. From the time of our marriage to -- until he sold it.
Q. When did Mr. Schram sell the real estate that he owned in Iceland?
A. I'm not exactly sure, but it was before we moved to LA, so I want to say 2018.
Q. Do you know why he -- did he discuss with you in advance the sale of that property?
A. No, sir.
Q. How did you come to learn that he had sold that property?
A. I think because -- because of -- of finances, of money, but only he had money from that sale.
Q. Did you ever stay in that apartment?
A. Not that I recall, sir, no.

Q. Subsequent to the sale of the property you were just describing, prior -- and prior to August 1, 2020, did Mr. Schram purchase any other real estate in Iceland?
A. Not to my knowledge.
Q. Now I'm going to direct the --
MR. BEYDA: Your Honor, I'm going to -- sorry. Withdrawn.
Q. Ms. Zarak, you were previously asked about your ownership of real estate; do you recall?
A. Yes, sir.
Q. When you heard -- did you hear Mr. Schram's testimony about the ownership of the Apartment 6A?
A. Yes, sir.
Q. Did you agree with his testimony about the ownership of Apartment 6A?
A. No, sir.
MR. BEYDA: Your Honor, I'm going to offer R 8 at this time into evidence. It's been marked for identification, and there was no objection.
THE COURT: Just give me one moment, please.
All right. It's admitted.
(Respondent's Exhibit 8 received in evidence)
BY MR. BEYDA:
Q. Ms. Zarak, can you please identify what -- actually, Ms. Zarak, directing your attention to what's in evidence as

R 8. Does this document reflect the owner of Apartment 6A?
A. Yes, sir.
THE COURT: Hold on. Hold on. Hold on.
Okay. I'm sorry. Go ahead.
Q. And on page 1 of this document, who is listed as the buyer of Apartment 6A?
A. I am.
Q. Do you see a date on this document? Actually, withdrawn. The document speaks for itself.
Mr. Wu, I'm done with this exhibit.
THE COURT: Hold on one moment, please.
All right. Thank you.
Q. Ms. Zarak, I would like to direct your attention to March 2020.
A. Yes.
Q. Did there come a time -- and can you describe New York City, from your perspective, in early March 2020.
MR. MIN: Objection. Vague.
THE COURT: Can you be a little more precise, Mr. Beyda.
MR. BEYDA: Yes.
Q. Ms. Zarak, as it relates to the COVID-19 pandemic, can you describe New York City in March 2020 while you were still in New York City.
A. Yes, sir. It was slowly becoming more hypervigilant. You

could feel tension on the streets. The media was starting to change the pace and tone of the communications. I believe that by the beginning of the second week of March, New York City was walking into an -- sorry? Ah. It was walking into, I guess you would say, emergency mode. You could hear sirens. You would see less people on the street. The, you know, people that could choose to stay at home slowly start staying at home. It was eerie. It was scary.

Q. How did you feel in New York City?

A. I was -- I was very worried. You know, with little kids, I was very concerned. There was a lot of uncertainty in terms of information. You would read different things in different newspapers. I was scared. We were scared. We were scared. But I think that still -- still under control.

Q. Did you have discussions with Mr. Schram about being scared?

A. Yes, yes.

Q. And what did he say to you?

A. I -- I would say Mr. -- Mr. Schram was a little more scared than me. He would -- he would talk about, for example, hospital supplies or he would talk about what if the schools closed; he would talk about -- I think he felt it more in Midtown, 'cause he worked in Midtown, and I believe that's an area of the city that immediately felt it, and so he was worried. He was very worried.

Q. Did there come a time that you received a message from the children's schools about them remaining open?
A. About closing?
Q. Closing.
A. Remaining open? Yeah, so I -- we received a communication from the school on the 13th.
Q. And what was that communication?
A. It was a Thursday. I don't know if it was the 12th or the 13th of March. But it was a Thursday.
Q. And what did that communication entail?
A. The communication said that beginning on Monday, school would be online. It initially said it was for a couple of weeks, and then it slowly extended until it became the extent of the year.
Q. Did you and Mr. Schram have a conversation after receiving that message?
A. We did, yeah.
Q. And what was that conversation?
A. Let's get out of here.
Q. And --
A. I remember him saying that the city -- that all the systems would collapse. I think those were his words, or something.
Q. What did you do following that communication with Mr. Schram?
A. I bought tickets for Mexico.

Q. Was Mr. Schram agreeable to you buying the tickets for Mexico?
A. Yes, he actually told me, buy the tickets now.
Q. And when were you scheduled to leave?
A. We were scheduled to leave Sunday, March 16.
Q. How was the decision made at that point, after receiving the message from the schools, to go to Mexico?
A. It was just where we decided to go. It was a no-brainer. Common sense.
Q. When you say common sense, why was it common sense to go to Mexico at that point?
A. Because we had my parents -- we were going to my parents' house. We would have help. We could quarantine with family members. The cases hadn't -- COVID hadn't affected Mexico as much; at that point, because it later got terrible. It was just -- we didn't think of anything else.
Q. Directing -- how would you describe the sense of urgency in Mr. Schram and your communication with him when it came to leaving New York?
A. Oh, he was scared. He wanted to leave. He wanted to leave ASAP.
Q. Directing your attention to Exhibit R 153 in evidence, specifically page No. 5 of 10.
Are you there? Do you see that?
A. Yes. I'm sorry. I'm here. I was seeing the hard copy.

Q. Do you see where it says, "Babe. Book the next flight. ASAP"?
A. Yes, sir.
Q. Is that a message from Mr. Schram?
A. Yes.
Q. Now it doesn't say book the next flight to any place in particular, does it?
A. No.
Q. And how did you know what he was referring to over there?
A. 'Cause there was a one other -- one only option. There was --
Q. Was there any discussion at that time about going to Iceland?
A. No, sir.
Q. Ultimately where did you, Mr. Schram, and the children go to in Mexico?
A. We went to Cuernavaca, Mexico, to my parents' house. My father was stuck in a different country due to COVID, and he was there for 10 months. So we never saw my father during our time in Mexico. It was just my mom there.
Q. And did you -- who was in the house with you, Mr. Schram, and the children while you were in Mexico?
A. My sister Tamara and her family also fled Miami; and then there was the people that work in the house, a gardener -- the people that work with my mom; and my mom; and us.

Q. When you went to Mexico, what sort of tickets did you purchase?
A. I bought our Mexico tickets one way.
Q. Why did you buy one-way tickets?
A. Because we didn't know what was gonna happen with the world. We didn't know what was gonna happen to New York. We didn't know how long we would be there. We were in the middle of a pandemic.
Q. When you bought those one-way tickets, was it your intention to permanently remain in Mexico?
A. No. No.
Q. Were there any discussions about permanently remaining in Mexico?
A. No.
Q. What did you and -- did you pack bags before going to Mexico?
A. Yes, we packed one suitcase each.
Q. How many suitcases did you pack when -- did you bring suitcases with you when you went to Iceland on or about August 1st, 2020?
A. Yes, sir, the same -- the same suitcases we took to Mexico.
Q. And how many suitcases did each of you have?
A. One each.
Q. When you went to Mexico, what was in the suitcases that you each had?

A. Essentials. Clothes, bathing suits, the school materials for EZ because we were going to be doing homeschooling. That was it. Toiletries.
Q. And when you went to Iceland, what was in the suitcases that you each had?
A. Similar, just not bikinis and -- more sweaters and scarves, but the essentials: clothes, toiletries, a couple of favorite toys, a couple of favorite books, pajamas.
Q. While you were in Mexico did the children attend school in any manner?
A. Yes, sir. RZ and EZ did.
Q. And how did they attend school while in Mexico?
A. Via Zoom.
Q. And how many days a week was EZ in Zoom school?
A. Every day.
Q. How many days per week was RZ in Zoom school?
A. Three days a week.
Q. How many hours per day was EZ in Zoom school?
A. So the day started with a class meeting, which was one hour, in which we sort of discussed -- the teacher sort of went over what the day would entail. Then there was an activity assigned for every day. One day it was art, the other day it was math, the other day it was science. Then there was a break in which she would go out and do an assignment. And then you had to submit the assignments by 1 p.m. So I would say a lot

of hours. A lot of hours. Definitely a lot of hours.
Q. What time did Zoom school begin for EZ?
A. At 7 a.m.
Q. Was that New York time or Mexico time?
A. Mexico time.
Q. And was that earlier or later than it was in New York?
A. It was 8 a.m. New York time. So earlier, to answer your question.
Q. Now did you hear Mr. Schram testify about one of the reasons for going to Mexico in the spring was because of the time difference and how that affected school?
A. Yes, sir.
Q. Did you agree with his testimony?
A. No, sir.
Q. Why not?
A. Well, because Iceland is five hours ahead of New York, so -- is that the question?
Q. Yes.
A. Or who are you referring -- yeah.
Q. Iceland being five hours ahead of New York, what does that -- how does that affect school?
A. Well, so then I guess if we would have done it that way, we would have started school at 2 p.m. and go on the entire afternoon. Yeah.
Q. Now can you describe -- would that be easier at 2? Would

starting at 2 p.m. be easier than starting at 7 a.m.?
A. No.
Q. Can you describe the Zoom school experience for the children while in Mexico.
A. Sure. So I guess here on this -- on this trial we've experienced a series of challenges with the audio, so now imagine that, the users being 25 5-year-olds and their sleep-deprived mothers. P.S. 9 had a very short amount of time to migrate their entire curriculum online. They experimented with a bunch of different platforms. So it wasn't -- it wasn't a -- it wasn't a smooth transition, to say the least. They eventually chose Google Classroom. So once that was decided, things sort of started to -- to march -- or move ahead. You had to -- there was -- it was very overwhelming. You had to use -- it was a different link for the group meeting, a different link for the -- it was tremendously overwhelming. And again, the children are 5-year-olds, so --
Q. When you say it was overwhelming, did you have discussions with Mr. Schram about it being overwhelming?
A. Yes, I did.
Q. What did the two of you discuss?
A. Well, I was doing most of it, so the discussions at that point were around, could you help me out a bit more here. Also, because on the days that RZ had homeschooling, the schedules would overlap, so I would be basically sitting in

front of a computer all day with both of them. The discussions were around how do we keep them focused and not distracted, because we're obviously at their grandmother's house, there's, you know, there's stim -- it's just -- yeah, it was a never-ending, ongoing conversation: Should we put them in a separate room? No, 'cause they get lonely. My sister was also there and she was also homeschooling her child, so this was an -- it was not -- it was ongoing conversations. Homeschooling was very challenging, for all of us.
Q. When you say "challenging for all of us," are you including EZ?
A. Yes, of course, of course.
Q. Can you be more specific of how it was challenging for EZ.
A. Well, it was just very difficult for her to sit still in front of a computer for three hours straight and pay attention to -- even though she had extraordinary teachers, you know, these are new technologies, these are new, you know -- she wasn't used to any of this. So she -- and she's a very active child. She's super energetic. So it was -- it was definitely challenging to keep her focused, just focused; let alone to do the homework, just focused on the lessons. And mainly kindergarten is a year where children learn how to read. And she was learning how to read through a computer. So, yeah, it was very challenging for her as well.
Q. Based on those challenges, how did you feel about the

possibility of EZ doing another year of Zoom school starting in September --
A. No.
Q. -- 2020?
A. No. It was something that at that point I think we wanted to avoid at all costs. Also for their emotional -- for their emotional health, you know.
Q. When you say "we wanted to avoid [it] at all costs," was that something that you and Mr. Schram discussed?
A. Yes.
Q. Were you in agreement?
A. Yes.
Q. So how would you avoid it at all costs?
A. I think that's the -- that is when the Iceland conversation came into being, because Iceland had done a tremendously good job in containing the pandemic and schools were open in Iceland.
Q. Now directing your attention to Exhibit R 110 that -- R 110 marked for identification.
MR. BEYDA: Your Honor, there is no objection, and I'm going to offer it.
THE COURT: All right. It will be received.
(Respondent's Exhibit 110 received in evidence)
Q. Ms. Zarak, could you just let me know when you have a hard copy of this.

A. R 10?
Q. R 110.
A. R 110. I'm so sorry. Here, give me one second. I thought you said R 10. Almost there. Almost there.
Yes, I'm here.
Q. Okay. Can you identify what this document is.
A. This is the What's App group between the mothers or I guess parents of K 108, EZ's class.
Q. Directing your attention to page 1 of this document --
A. Yes.
Q. -- Bates marked 2877 on the bottom right -- on the bottom.
A. Yes.
Q. What was the first -- in the first green box, what is that referencing, if you remember?
A. So during the pandemic -- sorry. I'm just -- it's a little warm in here.
During the pandemic -- so I'm the green one. So I'm the one in green. During the pandemic, my sister was also homeschooling Sophie, and the Zoom call was hacked. So some unknown man I guess sat in the class and then just started doing things.
Q. Got it. And directing your attention to page -- how did you feel when you heard that story?
A. Oh, I was terrified. I was in the room next door. My sister was terrified. She didn't know how much Sophie had

seen. It was horrible.
Q. Directing your attention to page 12 of 14, Bates No. 2980, message dated May 13th, '20.
A. On page 10?
Q. Page 12 of 14.
A. Okay. Yes.
Q. What were the circumstances surrounding you sending that message?
A. So P.S.9 is a very coveted school. They have very limited seats, particularly the pre-K class. They only have one pre-K classroom, and RZ got accepted into it. But because of coronavirus, we didn't know -- well, first of all, the mothers on this message thread also, you know -- Shelly said, "It's going to be different. We have to brace ourselves." So at this point nobody even knew if the school was going to continue online or would be on side or -- nobody knew anything. So it was very bittersweet to have RZ get a seat. And I apologize for my use of emoticons. But it was very bittersweet that he got a -- he got a seat in pre-K and we didn't know what was going to be happening next year, so "thank you, coronavirus" is obviously ironic.
Q. Now how would you describe the -- both yours and Mr. Schram's doing homework or classwork with the children during these Zoom school days?
A. Well, I was doing most of it. My husband -- when we first

arrived in Mexico, my husband asked for one of my sisters' childhood rooms to be set apart to be his office. So he would go into -- it was my sister -- my sister Ana's childhood room. So he sort of made that his office. He set up his laptop there. I think he even brought one of the house printers. I don't -- I don't remember quite well. But he just couldn't be bothered. He would close the door, and he would get extremely upset when the kids interrupted him. There were times in which I just -- because of overlapping schedules, I just needed him to help me with -- with RZ's classes. And luckily RZ -- I mean, RZ was 3 years old so his classes were reading books and, you know, singing songs, and his classes were of a different nature. He didn't have homework, he didn't have assignments, so it was something that he could do with RZ from his office. However --

Q. On or about May 13th of 2020, were you and Mr. Schram in agreement on what you would be doing with your family or where you would be living starting in, for example, for the next school year?

A. No.

Q. Directing your attention to page 13 of this document. There's a message from you. It says, "If schools remain closed in the fall, we will probably spend the next school year in Mexico." Do you see that?

A. Yes, sir.

Q. At that point in time was there any agreement between you and Mr. Schram as to where your family would be staying?
A. No agreement. No.
Q. And you wrote, "The uncertainty is killing me."
A. Yeah. It was.
Q. Was this a topic of conversation -- how often did you discuss this issue with Mr. Schram in or about this time?
A. Well, almost -- almost on a daily basis.
Q. Did there come a time that you and Mr. Schram started to discuss leaving Mexico in the spring of 2020?
A. Did you say leaving Mexico or living in Mexico?
Q. Leaving Mexico.
A. Oh, yes, yes.
Q. And when did that begin?
A. That began when the cases started to rise in Mexico and when we had more certainty about our visas.

(Continued on next page)

BY MR. BEYDA:
Q. Then what did you and Mr. Schram initially discuss if you were to leave Mexico?
A. We were going back to New York.
Q. And were there any other plans that were being discussed between you and Mr. Schram?
A. Not formally, no. The children were registered in PS 9.
Q. When you say "the children were registered in PS 9", was that for the upcoming school year?
A. Yes.
Q. Who was registered in PS 9 for the upcoming school year?
A. I think for, at least ut was -- because she was already enrolled and then for RZ which was -- he would have been starting to spearheaded the process that Mr. Schram was informed every step of the way.
Q. What, if any, conversations did you have with Mr. Schram about taking a family trip to Iceland during the summer?
A. Mr. Schram was throwing a lot of options my way and one of the plans was to spend the summer in Iceland and travel throughout the country.
Q. And was there also in connection with that discussion a plan to return some place?
A. Yes, in August.
Q. In August where would you have been returning?
A. To New York.

MR. BEYDA: Your Honor, R154 has been marked for identification and there was no objection. We'd like to offer it.

THE COURT: It will be admitted.

(Respondent's Exhibit 154 received in evidence)

Q. Ms. Zarak, let us now when you have R154.
A. I have it, yeah.
Q. Take a look at -- who is in page one?
A. This is EZ.
Q. Where is that picture taken?
A. In Mexico.
Q. What is EZ doing in that picture?
A. Home school.
Q. Can you turn to page two?
A. Yes.
Q. What is depicted in that picture?
A. RZ's class. So, it's the teacher and the students on the right.
Q. Can you take a look at page three?
A. Yeah.
Q. What is that?
A. This is RZ i class.
Q. Can you take a look at page six?
A. Yeah.
Q. What is that?

A. This is RZ in class. Oh, yeah RZ in class.
Q. Now, what, if any, concerns did you have about the children attending class via Zoom while in Mexico that you have not yet shared with the Court, if anything?
A. First, so cessation and I didn't want them to start hating school because they had to go to school under these circumstances. Yeah, I was concerned about their emotional wellbeing, as well as their education. As I said, it was a critical year for EZ because it's the year you learn, you begin reading and writing.
Q. Did Mr. Schram share those concerns?
A. I want to believe he did, yeah. We both care about education tremendously.
Q. When you say you "both care about education tremendously", how, if at all, did that impact your decision to ultimately leave Mexico?
A. A hundred percent.
Q. Now, when you left Mexico what was the status of the PS 9 and whether or not it would be open for in-person classes in September?
A. We didn't know. I believe we found out when we were in New York.
Q. That you found out what?
A. That it would continue, it would remain online or what they called hybrid, I think the hybrid model.

THE COURT: "Hybrid".

THE WITNESS: Sorry.

THE COURT: That's okay.

Q. How did you feel about your children participating in the hybrid model of the school starting in September 2020?

A. No. I didn't want that for my children.

Q. What about Mr. Schram, did he want that for the children, to your knowledge?

A. He didn't.

Q. Directing your attention to July 2020, Ms. Zarak. Did you return to New York at that time?

A. Yes.

Q. While in New York did you take your children to any medical appointments?

A. Yes.

Q. What medical appointments did you take your children to at that time?

A. They saw the pediatrician. RZ saw his dentist and they saw their chiropractor. We had been away for almost five months. So it was important for me to.

Q. Upon your return to New York, what did you discover?

A. I discovered that, well, New York had changed and I discovered that the schools would, as I said, not return to the classroom, yeah. And the pandemic was very much on.

Q. What were your observations of the city as a whole?

A. It was a little sad to be honest because even though it was more open than it was in March, a lot of people had left, a lot of people had left the Upper West Side. So, the energy of the streets of the neighborhood we knew even though all of our friends had the shops and stores were, there the energy overall was different. It was a different feeling to the Upper West Side.
Q. To your knowledge, had any of your friends left New York at that time?
A. Yes. A lot of our friends had left for COVID.
Q. And did they leave with their children?
A. Yes.
Q. What about the children's friends, had they left New York? Had some of them left as well?
A. Some of them had left but we managed to reconnect with people that were there while we were there.
Q. How did you feel being in New York at that time, July 2020?
A. We were very happy to be back. The kids were very, very happy to be back. However, they are, they were very happy to be back at the playground, back, you know, around. However, it was bitter-sweet for me.
Q. When you say "bitter-sweet", what do you mean?
A. Well, the word, the world was in turmoil. I still didn't know what was going to happen to us. It was bitter-sweet. I had also learned or we learned in July of 2020, we learned that

our Green Cards were approved.
Q. So, how did that impact on your discussions or your plans moving forward with Mr. Schram?
A. Well, it impacted everything.
Q. What do you mean?
A. Well, as I said previously, as you know, it's something I have been personally waiting for for years and still had to wait 12 months to actually get it. So, it's like almost having that piece of cake and.
Q. Were Mr. Schram's friends still in New York at this time?
A. I think -- No. Tom wasn't in New York. I think he was upstate and -- no. No. I think a lot of Mr. Schram's friends had left for COVID.
MR. BEYDA: Directing your attention, Ms. Zarak, to Exhibit R 64.
That's been marked for identification and there was no objection, your Honor, so I am going to offer it.
THE COURT: It'll be admitted.
(Respondent's Exhibit 64 received in evidence)
Q. Ms. Zarak, this document in evidence as dated July 28, 2020; do you see that?
A. Yes, sir.
Q. At this time did you and Mr. Schram make a decision about the travel plans at that time?
A. Yes. So, even though this email came on the 28th of July I

think it was the week prior or a few days, yeah. I think it was the week prior that I learned through the What's App K108 Moms group that this would be happening and my husband had already been communicating with a school in Iceland. We had already learned that schools would be in-person in Iceland. So, yes, by this time we had already decided to spend some time in Iceland due to the coronavirus.

Q. And at that time when you said we decided, what was your intention at that time when this decision was made?

A. Please, define "your intention".

Q. What did you understand the plan to be in July 2020 before you left New York for Iceland?

A. So, again, my husband was throwing different things at me. First, it was the winter but then we sort of concluded that it would be for the school year. So, we were going to Iceland so that the kids could go to school in-person in Iceland for the school year.

Q. Was there any dispute between you and Mr. Schram at that point about that issue?

A. No.

Q. Were there any arguments about that issue at the time?

A. No, no.

Q. During the last week of July 2020 what, if any, discussions did you have with the children about them moving to Iceland?

A. We didn't. We didn't say they were moving to Iceland. No

conversations.
Q. What, if any, discussions did you and Mr. Schram have together with any third parties about permanently leaving New York and moving to Iceland?
A. None, whatsoever.
Q. What, if any, conversations did you alone have with any of the children's schools about permanently moving to Iceland and the children no longer attending school there at that time?
A. None.
Q. To your knowledge, did Mr. Schram have any conversations with either of the children's schools at that time to tell them that the family was permanently leaving New York?
A. To my knowledge, nope.
Q. Before leaving New York in on July 31, 2020, what, if any, communications did you have with the children's medical providers about their records and their future services to the children?
A. Zero.
Q. When you say zero --
A. None.
Q. What about Mr. Schram, to your knowledge, did he have any conversations with the children's medical providers?
A. No.
Q. Before going to Iceland on or about July 31, 2020 and leaving New York -- Withdrawn.

In the last week of August Ms. -- actually, prior to returning to New York in July 2020, to your knowledge where did Mr. Schram keep his office supplies?
A. In his office.
Q. So, to your knowledge, did Mr. Schram continue to have access to his office while you were in Mexico?
A. Yes.
Q. Had you ever been to Mr. Schram's office in Manhattan?
A. Yes, many times.
Q. Where is that office located?
A. West 32nd Street or 38th Street. In the 30s, Midtown.
Q. How big was Mr. Schram's office?
A. I'd say at least 500 square feet.
Q. And Mr. Schram testified about some property that he kept in his office; do you remember that?
A. Yes, sir.
Q. Do you know what personal property outside of his work supplies Mr. Schram kept in his office?
A. Yes. He had a lot of books, shelves. He had a big table -- table that he used as his work desk. He had very sophisticated printers. In particular, one that is a 3D printer which is very big. He was actually building with his friend/colleague he was, they were working on building like a metal structure to hold all the printers on one place. Yeah. He had all sorts of drawing materials, you know, architecture.

Q. You know what did Mr. Schram do with all of the stuff that was in his office before you went to Iceland?
A. Before we went to Iceland he left it in his office.
Q. And then in the week before going Iceland, what did you do with that stuff?
A. He packed it.
Q. And what did he ultimately end up doing with all of that stuff?
A. He shipped to Iceland.
Q. Directing your attention to -- are you familiar with the Landakotsskoli?
A. Yes, sir.
Q. And that's the school where EZ was attending, correct?
A. Yes.
Q. Who selected that school for EZ?
A. Initially, Mr. Schram.
Q. And when you say "initially", did the two of you have discussions about that?
A. There was very little discussion. It was the only school in English. Well, there were two schools in English in Iceland. One was called the International School in Iceland. Then there was the Oldukot which had an international side. So, there was really no discussion. We really only saw those two schools but it was him who first contacted them and spoke to them, produced me to them, yeah.

Q. Prior to the children's enrollment in this school, did you speak to any parents at the school?
A. No. I didn't know anyone.
Q. Were your children introduced to any children at that school?
A. No.
Q. Aside from seeing the school online, were you privy to any other visuals of that school?
A. Well, it's rights next to the church where we got married. So, I had seen it. I recognized the building cause it was right next to the church. So I knew that was a school. But I never went inside that school except, I never went inside the school until EZ's graduation from first grade and this was because of coronavirus.
Q. What about the Oldukot school, had you been to that school before you RZ was enrolled there?
A. No, sir.
Q. Did you speak to any parents at that school?
A. No.
Q. Was RZ introduced to any children at that school?
A. No.
Q. So, why did you make the decision to enroll the children in those schools without having seen them or spoken to any parents or the children knowing any children there?
A. Well, I feel like I had no other choice. It was something

that my husband took upon. I wasn't even copied in the communications at the beginning. All communications with Oldukot were in Icelandic. So I didn't understand what things were about. The reason why I do remember that, the reason why RZ went to Oldukot was because we were advised that there were no preschools in English in Iceland. The principal, the head of the Oldukot on an email told us that there were with the exception of one that taught English occasionally and which my husband also researched Hally and Gially I don't know how to pronounce it. But other than that we were told there were no preschools in English. So Oldukot was the school that was in our zone in Iceland. It was two blocks away from the apartment. So, it's really the reason why we chose it because it was close to the apartment or to the -- it was actually close to the area where the Airbnbs were before we got the apartment.

Q. Now, the Landakotsskoli school can you describe the curriculum there?

A. So. It's in English. They have to learn French as a second language. It's just, you know it's attached to the UNESCO. So, it's a school for diplomats and business people, people that travel, all of the kids from of other countries. The curriculum was science, math, art, sports, flute, everything in English.

Q. And how did it make you feel to know that EZ was attending

a school of that nature with what you just described?
A. It was great. It was great. It was -- it was a relief.
Q. Why was it a relief?
A. Because it was in English and her education was almost not altered. You know, she continued on to first grade and it also allowed for us to come back and not have a problem with curriculums and such cause everything was in English.
Q. These issues that you and Mr. Schram discussed --
A. Yes.
Q. -- were in agreement that these were positives for EZ?
A. A hundred percent.
Q. Can you describe the COVID situation to your knowledge in Iceland in or about August 2020?
A. Yes. So, schools were open with limitations. For example, adults couldn't go inside the school. I believe lunches and recesses were separate. There were limitations to social gatherings. You couldn't, I think you couldn't, I think more than ten people were not allowed or actually, that might be more because Elisa had a birthday cake but there were limitations to social gathers. Some businesses were still open however. So, there was no curfew or life was as normal. Really, life was as normal as it could be amidst the situation of the world. But something that was interesting to me was that people were very, very -- people on their personal lives they were very, very careful. So, they would not socialize if

they didn't have to, they wouldn't. They really stick to their lives and their homes and they wouldn't go out if they didn't need to.
Q. How did that impact your decision to go to Iceland at that point?
A. That's why we went.
Q. Prior to leaving New York and going to Iceland the end of July 2020, did you pack any of your belongings?
A. For the Iceland -- yeah, I packed a suitcase. Simon shared a suitcase with me. Elisa packed her suitcase. RZ packed a suitcase and my husband packed a suitcase and then we packed some boxes. We packed, as I say we chose the favorite books. We chose the favor stuffies. We chose a couple of dress-ups disguises. You know, EZ is very much into princess dresses or at least was at that point and those had to come along. Yeah.
Q. Now --
A. Toiletries, of course, Tylenol, mom essentials.
Q. Did you pack boxes with any of the contents of the Apartment 6A property?
A. So, I think from the apartment we had less than 20 boxes and these were small boxes, mine. You don't think these were gigantic boxes. A lot of the things were my husband's. My husband packed a lot of things.
Q. When you say about "20 boxes", what was in those 20 boxes?
A. So, I think, again, as I said, a lot of the things were my

husband's. All of the items I just said to you, books, some toys, toiletries, the bike came. There was one box that carried coats. So, it was a larger box.

Q. Ms. Zarak, do you recall Mr. Schram testifying about the property that was brought from the apartment to Iceland?

A. Yes.

Q. Would you agree with his testimony about --

A. No.

I am interrupting you sorry, Mr. Beyda.

Q. Would you agree with his testimony about what was brought over from New York to Iceland?

A. Not completely, no.

MR. BEYDA: Directing your attention to Exhibit R159 that has been marked for identification.

Your Honor, there was no objection to this document, so I am going to offer it.

THE COURT: It'll be received.

(Respondent's Exhibit 159 received in evidence)

MR. BEYDA: Mr. Wu, could you make that larger, please.

(Pause)

Q. Directing your attention to page Bates marked 2128. It's page two of the PDF.

Ms. Zarak, see where it says "are you bringing all of your office things to the apartment?" "Are you loading all of

the boxes?"

And then Mr. Schram answers, "No, office studs stays". Only boxes that came from the apartment.

You asked, "Is it a lot?" "I don't know what to do about the kids." "It sounds like you have a lot to do."

And then he writes "20 boxes or so". "Not so bad".

What is Mr. Schram referring to when he says "20 boxes or so," over there to your knowledge?

A. To my knowledge he is referring to the boxes that came from the apartment.

Q. Now, who packed the boxes that contained the property from the apartment?

A. Mr. Schram.

Q. Did you have any discussions with him about the stuff that was being placed in the boxes while -- Withdrawn.

Did you have any discussions with Mr. Schram about the property from in the apartment that was being placed in the boxes?

A. I remember asking him once if I should bring more stuff and he said no.

Q. What, if any, arrangements were made with the apartment building to effectuate the removal of the personal property from the apartment?

A. None. He just communicated with our super I think or with a doorman on turn.

Q. Now, Ms. Zarak, I'd like to ask you some questions about the property that was left in the New York City apartment, specifically. Okay?

What of the children's property was not brought to Iceland with you on August 1, 2020?

A. Almost all of it. Almost all of their toys remained, all of their books, their scooters, their helmets, their art supplies, their chair, their little chair and their little table and chairs. They had an art board where they would draw that stayed. The strollers stayed with the exception of one. The crib stayed, the baby bed, SZ's tub stayed. So almost all of their stuff is still in the apartment.

Q. What about your personal property, what of it remained in the New York City apartment?

A. I would say 90 percent of my personal property stayed in the apartment. I brought, so most of my clothes stayed. All of my books stayed. All of my documents stayed. All of my work-related, you know my files, my everything stayed. All of my shoes stayed. My more important pieces of jewelry stayed. Our furniture stayed. The photographs stayed.

Q. What about the children's artwork, did you leave any of that in Manhattan?

A. Yes, with the exception of one or two pieces like the cheese stick drawing, everything stayed we have in boxes of files.

Q. Did you have any of the artwork hanging on the walls of the apartment?
A. Yes.
Q. What about pictures?
A. Yes.
Q. Did you remove those items from the apartment?
A. No.
Q. Did you have a sonogram when you were pregnant?
A. I had, yeah, I had some of those, yes.
Q. Did you have a picture of it?
A. Yes. I have some of those, yeah.
Q. Where did you keep that picture?
A. So, there's a sonogram photograph of SZ on the refrigerator in the Apartment 6A.
Q. Did you take that down when you left for Iceland?
A. No.
Q. Why did you leave all of these things in Apartment 6A at that time?
A. Because it's our -- it was our home. We were coming back when the pandemic allowed. We weren't going any where. We weren't leaving forever. So, we didn't need to bring the refrigerator sonogram picture or the strollers. I don't know. It wasn't that kind of trip.
Q. Ms. Zarak, who bought the plane tickets to go to Iceland?
A. Mr. Schram.

Q. When were they purchased?
A. I'm not sure but I would say very close to the -- I don't know. I would say the week before traveling.
Q. Do you know why they were not purchased earlier than that?
A. Well, because we didn't know. We weren't sure. Again, the uncertainty was daunting. It was daunting. We had no certainty about anything. I feel like until we learned that the schools would remain online and that the COVID pandemic was not going anywhere, that's when we decided and I believe that for sure we decided a week, I'd say a week when we bought the ticket or when he bought the ticket.
Q. Did you buy round trip, were round-trip tickets or one-way tickets purchased?
A. One-way tickets.
Q. Why not round-trip at that time?
A. For the same reason it was one-way to Mexico. There was a world pandemic. The borders were closed. Getting into Iceland was a challenge in itself. Mr. Schram had to write a lot of letters for us. He had to explain that I was his wife. There were serious travel restrictions between Schengen and the United States. So which had to go to Boston, like we didn't know. We just didn't know when we would be back.
Q. Where did you stay when you arrived in Iceland in August 2020?
A. We stayed at an Airbnb.

Q. How long did you remain at that Airbnb?
A. At that specific one, one week.
Q. After you stayed at the first Airbnb, where did you go?
A. We went to a second Airbnb.
Q. How long did you stay at that Airbnb?
A. I would say five nights.
Q. Who paid for that Airbnb?
A. I did.
Q. Why did you leave that Airbnb?
A. It was a very old house. It was a wooden house that had a lot of, it was noisy. There were a lot of spiders. It was dead cent -- it was right downtown. So, it was very loud. It wasn't working out for us. The kitchen was not very safe. The stove was open. And with the kids, you know it just didn't work out for us. It was a very old house.
Q. Did you, where did you go after that the second Airbnb?
A. We went to a third Airbnb.
Q. How long did you stay in that Airbnb?
A. In that Airbnb, luckily, we stayed longer. So we stayed I'd say for the month of September and October.
Q. Who paid for that Airbnb?
A. I did.
Q. How did you feel when you arrived in Iceland?
A. How did I feel, Mr. Beyda, in regards to what?
Q. Your arrival in Iceland from New York.

A. It was a combination of feelings for me but I must say I was relieved for the kids, the fact that the kids didn't have to wear a mask was a relief. It was good to be in a place where at that specific moment there was a sense of normalcy. Again, the uncertainty was daunting. It felt safe for the time being.

Q. Upon your arrival in Iceland did you open up a bank account?

A. No, sir.

Q. Did you close your New York bank accounts?

A. No, sir.

MR. MIN: Your Honor, I was going to say if this is a convenient time if we could take a two-minute restroom break.

THE COURT: That's fine. Why don't we take the afternoon break and resume at 4:10.

All right. Ms. Zarak, I remind you, you remain under oath. So you should not be speaking to counsel or anybody else about the substance of your testimony, right?

THE WITNESS: Yes, your Honor. I will stay in the office.

THE COURT: All right. Thank you.

You can go where ever you need to go but just don't talk about the substance of your testimony.

(Recess)

THE COURT: All right. Mr. Beyda.

MR. BEYDA: Your Honor, I am going to ask to have Exhibit R123 moved into evidence without objection. And if we could put that up on the screen please.

THE COURT: It'll be admitted, 123.

(Respondent's Exhibit 123 received in evidence)

Q. Ms. Zarak, I'm directing your attention to Bates page, Bates stamp 4558 of this exhibit page 7 of 11.

A. Yes.

Q. Directing your attention to the second paragraph of that email you indicated:

"I temporarily relocate to Iceland. My husband is Icelandic where schools remain open all through and things are as normal as they can be amidst these strange times."

Do you see that?

A. Yes.

Q. When you indicate, why did you send this message to Brandon Brito at that time?

A. Why? Did you say why, Mr. Beyda?

Q. Yes.

A. Brandon Brito was the head of content at -- at Apple and I was -- this is January 29 and I was in Iceland and Columbia University classmate and colleague had a project that I thought would be good for Apple. So, I was letting him know that I was temporarily in Iceland and I was telling him why I was temporarily in Iceland and I was asking if Apple had a Nordic,

if he had a Nordic counterpart.

Q. Now, aside from this percentage from Mr. Brito where you indicate I temporarily relocated to Iceland, were there any other individuals that you sent written communications to indicating that you'd temporarily relocated to Iceland?

A. Yes, sir.

Q. Approximately, how many people?

A. I'd say 20. At least 20.

Q. And over what period of time did you send those messages to these third parties?

A. All throughout, from the moment we made the decision to the moment we arrived to the time we were there.

Q. Was Mr. Schram aware of your communications with these third parties?

A. So the Columbia University classmate that I am referring to on this email is a close friend of Mr. Schram. So, yeah, I would say that Mr. Schram was aware of these communications.

MR. BEYDA: Directing your attention to the document marked R65 for identification.

And, your Honor, I offer it. There was no objection.

THE COURT: It's admitted.

(Respondent's Exhibit 65 received in evidence)

THE WITNESS: R65?

THE COURT: Yes, a different document, ma'am.

THE WITNESS: Yes.

THE COURT: If I have this, this already was admitted.

MR. BEYDA: Okay. I didn't have that noted. My mistake.

Q. Ms. Zarak, directing your attention to the email sent from you to Dear Rita on August 3, 2020, okay? Do you see where it indicates we have decided to spend the school year in Iceland?

A. Yes.

Q. Did you also tell people that you decided to spend -- other than Rita referenced in this email, did you tell other third parties that you and Mr. Schram decided to spend the school year in Iceland?

A. Yes.

MR. BEYDA: Ms. Zarak, I am going to direct your attention to the document that's been marked for identification as R84?

Your Honor, there's no objection to this document and I therefore offer it.

THE COURT: Yes. It'll be admitted.

(Respondent's Exhibit 84 received in evidence)

Q. Directing --

THE COURT: Wait a minute. Could you put that back up? Enlarge it again and put it back up.

(Pause)

THE COURT: All right. Thank you.

Q. Ms. Zarak, directing your attention to page four of this

document.
A. Yes.
Q. The bottom of that page is marked 17506.
A. Yes.
Q. There's a message you sent to on August 28, 2020 and it starts off, "Hi, favorite teacher". Do you see that?
A. Yes.
Q. In that message you indicate on August 28, 2020, "We'll be here for the school year and then see what happens", correct?
A. Yes.
Q. Why did you send that message at that time to this person?
A. Well, because we didn't know what would happen with COVID. Hopefully, if things went as planned COVID would reside and we'd come back after the school year but nobody knew that. So, we will see what happens.
Q. Thank you.

Ms. Zarak, I am going to direct your attention to the document that's been marked for identification as R90.

MR. BEYDA: And, your Honor, there is no objection and therefore, I am going to offer it.

THE COURT: It will be admitted.

(Respondent's Exhibit 90 received in evidence)

Q. Ms. Zarak, can you identify what this document?
A. Yes, sir. This is a Facebook communication between me and my friend Acacia.

Q. And in this message do you discuss you and your family going to Iceland?
A. Yes.
Q. Can you point us to those communications?
A. Yes. So, right in front of your screen in the blue that is me. I just learned that Acacia is in Italy and I am telling her that I am not far, that I am in Iceland escaping COVID. Acacia also previously she, last time I had seen her she was in New York. I am telling her that my husband is Icelandic and that we're spending some time there. And I say a year, two tops. And I also tell her that because she is a professional dancer, she is the lead dancer at a very prestigious dance company, I am telling her that I want to do a dance video with her.

MR. BEYDA: Thank you.

Directing your attention to the document marked R202 for identification.

And, your Honor, there was no objection and therefore I am offering it.

THE COURT: It will be admitted.

(Respondent's Exhibit 202 received in evidence)

THE WITNESS: One second.

THE COURT: Mr. Glasser, mute your line.

(Pause)

Q. Ms. Zarak, who is Allison Benson?

A. Allison Benson a producer. She is the producing partner of Sarah Jessica Parker.

Q. And in this message you indicate I temporarily relocated to Iceland. My husband is Islandic where school never closed and so on and so forth, correct?

A. Yes.

Q. Why did you send this message indicating that you temporarily relocated to Iceland at that time on January 28, 2021?

A. Because I had.

MR. BEYDA: Directing your attention to R201 that's been marked for identification and --

And, your Honor, I am going to offer it.

THE COURT: It'll be received.

(Respondent's Exhibit 201 received in evidence)

Q. In this document, Ms. Zarak, you indicate on December 7, 2020, we are spending the year in Iceland. Both New York and Mexico are still fighting it hard.

Do you see that?

A. I do.

Q. At that time was there any agreement between you and Mr. Schram to make Iceland your permanent home?

A. No, sir.

Q. Directing your attention --

MR. BEYDA: No further questions on this exhibit.

Directing your attention to the document marked for identification as R203.

If there is no objection then, your Honor, I offer it

THE COURT: Admitted.

(Respondent's Exhibit 203 received in evidence)

Q. Ms. Zarak, the date of this message is February 3, 2021, correct.

A. Yes, sir.

Q. As of February 3, 2021, why were you still sending out messages indicating for COVID reasons we temporarily relocated to Iceland and so on and so forth?

A. Because we had.

Q. As of February 3, 2021, was there a joint intention for you and Mr. Schram to remain as permanent, to remain permanently in Iceland?

A. No, sir.

Q. Why were you sending out networking messages like this while you were in Iceland?

A. I was trying to sell an Icelandic project to my U.S. contacts. So, I was basically just continuing on with my relationships in the states and trying to accommodate the project of a dear friend of my husband's just trying to potentially sell it to a streamer because of my experience, my career and, particularly, my relationships, this is something I could easily do from anywhere.

MR. BEYDA: Directing your attention to the document that's been marked for identification as R204.

Your Honor, there was no objection to this document and I am going to offer it.

THE COURT: It'll be admitted.

(Defendant's Exhibit 204 received in evidence)

(Pause)

Q. Ms. Zarak, R204, what is the date of the email sent on R204? What is the date of that email?

A. It's April 23, 2021.

Q. As of that time, April 23, 2021, was there a joint intention between you and Mr. Schram to permanently remain in Iceland?

A. No, sir.

Q. In that email you indicate that you decided to spend the school year in Iceland, correct?

A. Yes, sir.

Q. At that time was there any intention, joint intention between you and Mr. Schram to remain in Iceland beyond the school year?

A. No, sir.

Q. Was the intention at that time still to only spend the school year in Iceland?

A. Yes, sir. Yes. Delta, the delta variant hit Iceland pretty hard. So, for example, schools in Iceland, the only

time schools in Iceland have ever closed was March 2021. So, there was uncertainty again because of that. We still didn't know if schools in New York would open. I hadn't been in New York in almost a year. However, they discussed shared intent was the school year.

MR. BEYDA: Mr. Wu. I am done with Exhibit 204.

(Pause)

Q. Ms. Zarak, directing you're attention back to the Airbnb rentals in Iceland. Approximately, how much money did it cost each month to stay in an Airbnb rental?

A. 2500 euros a month,approximately $2,900, close to $3,000 a month.

Q. While you were in the Airbnb rentals in Iceland, did you and Mr. Schram have discussions about purchasing an apartment in Iceland?

A. Yes, sir.

Q. Can you tell the Court what those discussions entailed?

A. We actually had been talking about buying an investment property since before. So around March 2020 before, even before COVID was even what it became we were talking about potentially purchasing a small -- I mean a 50 square meter apartment in the Reykjavik area mainly for investment purposes. My husband was looking into getting investment loans for it and the idea was to put it on Airbnb.

MR. BEYDA: Ms. Zarak, directing your attention to the

exhibit marked for identification as R140.

Your Honor, there was no objection to this exhibit and I am offering it.

THE COURT: It'll be admitted.

(Respondent's Exhibit 140 received in evidence)

Q. Ms. Zarak, can you identify what that document?

A. Yes. This is a text message communication between Mr. Schram and me from February 27, 2020.

Q. What is the sum and substance of the conversation over here?

A. Well, the singer Bjork was selling one of her houses. It was a tiny house. I -- said 50 square meters but according to the communication here, it was 72 square meters. It was a tiny house in the center of town that was pretty affordable. I had just received the settlement from Netflix so I had some money just sitting in the bank making no interest. So the idea of purchasing a small property exclusively for Airbnb or long term rental purposes came up and this is what there conversation is about. I was very excited personally that it was owned by Bjork.

Q. Who is Bjork?

A. Bjork is a very famous Icelandic singer.

Q. What became of this discussion with Mr. Schram?

A. Nothing, sir, nothing came out of it.

Q. Districting your attention to Bates marked 1919 of this

document page four. Sorry. In the fourth blue box from the top, do you see that?

THE COURT: Where it says "like Rita".

Q. We know so many people visiting Iceland that we could continually rent it and even make money.

Do you see that Ms. Zarak?

A. Yes, sir.

Q. Was the discussions that you and Mr. Schram were having at that time about purchasing property, did they entail using the property as rental property?

A. A hundred percent.

Q. And did those discussions continue after that conversation that we're referencing in this exhibit?

A. No.

MR. BEYDA: Mr. Wu, you can take down the --

Q. Turning our attention now back to Iceland, Ms. Zarak, and the purchase of property in 2020. What, if any, discussions did you and the Mr. Zarak have about purchasing property in Iceland in 2020 -- in August 2020?

A. So, immediately, yes, immediately after arriving and leaving the Airbnb life we realized how expensive it was. My husband was continuously sending me links, real estate links and he sent me one of the options with this apartment, the apartment that we eventually ended up buying. However, we were considering all options. We were considering long-term

rentals. My husband was in communication with a couple that rented a fully furnished townhouse for a year. So buying property was one of many options and became eventually the option for us.
Q. How did you find the property that you ultimately purchased?
A. My husband sent me a link.
Q. And what was the purchase price?
A. Mr. Beyda this is very embarrassing. I don't know.
Q. How much money did you use -- who paid the deposit?
A. I paid the down payment. It was made in two installments and the total was $60,00.
Q. Why did you pay the deposit for the purchase of a piece of property in Iceland at that time?
A. Because I had the money sitting in the bank. Yeah, because I had the money. I was able to do that. And just it was more convenient for us long term to pay down payment than continue wasting our money in Airbnbs.
Q. At the time, what was your understanding of the real estate market in Iceland when this transaction took place?
A. So, my understanding was that this was historic low for a purchases that coronavirus crises that never seen the financial crisis of 2008 had the market been so low. My husband told me that there was a zero percent interest rate on mortgage loans and if you did the math what we would pay for mortgage monthly

was much less thanking what I was paying for the Airbnbs. So, common sense.
Q. Now, did you exchange any -- aside from the down payment, how did you obtain the remainder of the purchase price, the funds to purchase the apartment?
A. My husband got out a mortgage loan.
Q. And did you see any those documents?
A. No.
Q. Did Mr. Schram provide you with those documents?
A. No.
Q. Did you speak with the sellers of the property in connection with this transaction?
A. We met to sign the contract. We met the real estate agent and the owner once. I signed the contract. However, it was in Icelandic and I was never given a copy of the contract, the point where I can embarrassingly say that I don't know how much the apartment was. I should know that.
Q. Did Mr. Schram tell you how much it would cost each month to maintain the apartment?
A. Yes, sir. He said that it would be between 1200 and 1600 a month.
Q. And was that more or less than the amount of money you were paying to stay in the Airbnb?
A. That was much less.
Q. Who was making the payments in connection with the last two

Airbnbs that you in?
A. I was.
THE COURT: That's been asked and answered several times. Let's move along.
Q. Did you and Mr. Schram discuss who would be making the payments in connection with the apartment that was being purchased?
A. Yes, there was an arrangement made. The arrangements was that I would pay the down payment and that he would pay the mortgage, the monthly mortgage payments. It was discussed.
MR. BEYDA: Your Honor, I am going to ask to have marked for identification R219 and that exhibit was hand delivered to the Court yesterday and provided to counsel also by email yesterday. I do not know if there's an objection.
THE COURT: I don't have it. All right. Just a minute. It's going to be sent to me.
Is there an objection, Mr. Min?
MR. MIN: Your Honor, if I could just have one moment just to review it again.
THE COURT: Sure.
(Pause)
MR. MIN: Your Honor, we would object on hearsay and relevance grounds. I just want to state for the record that there was a ruling, your Honor. We will object on those grounds. There was a ruling, your Honor, I think when we

started to trial evidence was closed as of the Friday before trial. I will note because to some extent there are potential rebuttal exhibits we may want to use but I think rebuttal exhibits are different than exhibits that you plan on using with your direct witness. And certainly, we would object on those grounds Mr. Beyda providing this document yesterday on the eve of the second week of trial.

We also would have a hearsay and relevance objection on top of that.

MR. BEYDA: Your Honor, may I be heard?

THE COURT: Yes.

MR. BEYDA: This document is being offered at this time specifically in response and to addressed statements made by Mr. Schram on his direct-examination to which we could not have known in advance as to what he was going to specifically testify and did not intend initially to move this but now it is relevant to the issues and specifically to address Mr. Schram's testimony during his direct-examination.

THE COURT: That objection is overruled. Discovery is closed. This was not timely produced. Let me just take a look at something.

(Pause)

THE COURT: No, I'm not going to receive it. You can mark it but I am not receiving it. It was produced late. It is also hearsay.

MR. BEYDA: Your Honor, this is a party statement.

THE COURT: Mr. Beyda, you have my ruling.

BY MR. BEYDA:

Q. Ms. Zarak, did you exchange communications with Mr. Schram about the costs of the apartment?

A. Yes, I did, sir.

Q. And do you recall what Mr. Schram told you the cost of the apartment would be each month?

A. Yes. Like I said, between 1200 and $1600.

Q. And did Mr. Schram also provide --

THE COURT: It's also cumulative for the record. I recommend you pick up the pace a bit, Mr. Beyda.

Q. Ms. Zarak, can you, please, describe the apartment purchased in Iceland?

A. Describe the apartment in Iceland?

Q. Yes, please.

A. Yes, sir, the apartment in Iceland has to two bedrooms. One of them we used as our bedroom. The other one was a children's bedroom. There was one bathroom, a little room on the way to the bathroom and there was a small living room and the dining room and kitchen area was open. The apartment is 86.5 square meters which is around 900 square feet. We shared a backyard with the neighbors, and that was about it.

Q. Was this apartment bigger or smaller than the apartment in Manhattan?

A. Smaller.
Q. When you purchased this apartment, what was your intention with regard to the long term usage of it?
A. It's a similar --
THE COURT: Asked and answered, repeatedly.
Q. Ms. Zarak, did you and Mr. Schram furnish this apartment?
A. We -- not immediately not, we borrowed some chairs from his parents. We had not immediately, would be my answer.
Q. Ms. Zarak, during the course of this trial you were shown photographs of the apartment in Iceland; do you recall that?
A. Yes, sir.
Q. In fact, Mr. Schram used those documents during his direct-examination, correct?
A. Yes, sir.
Q. Did you notice anything about the pictures that Mr. Schram offered to the Court during his direct-examination concerning the apartment?
A. Yes, sir.
Q. What did you notice?
A. I noticed differences.
Q. What sort of differences did you notice?
A. I noticed that new shelves had been put up. I noticed that art, new art was on the walls. I noticed that there was no furniture. I noticed that the existing furniture had been moved around. I noticed that there were more stands on the,

quote/unquote, playroom which is the little room on the way to the bathroom. Yeah, I noticed significant change in the photographs.

Q. I'd like to direct your attention Ms. Zarak to February 24, 2021.

A. Yes.

Q. At that time do you recall exchanging messages with Mr. Schram?

A. Yes.

Q. Can you tell the Court what was going on in your relationship with Mr. Schram on or about February 24, 2021?

A. It was on the verge of collapse.

Q. Can you elaborate on that lease?

A. We were having a lot of problems, a lot of problems. We were talking about divorce.

THE COURT: Just give me one moment, please.

(Pause)

THE COURT: All right. Thank you. I'm sorry.

Q. Ms. Zarak, I am going to direct your attention to R 213 in evidence.

A. Yes, sir. R213?

Q. Yes.

A. 213? Yes. Found it. Sorry. It was in the wrong binder.

Q. Specifically, I am directing your attention to the communications that begin on February 24, 2021, at 6:16 a.m. do

you see that?
A. Yes, sir, I do.
Q. Over there you indicate I want to sell the apartment. You can't afford it and I am not going to pay for it. I don't like it. I'm serious.
Why did you send that message at that time?
A. Because Mr. Schram was trying to share with me or he was trying to split the mortgage payments in half with me. He was trying to get me to pay for the mortgage payment and that was not the agreement we had. Plus as I said, our relationship was on the verge of collapse.
Q. On this date, Mr. Schram and you discussed divorce, correct?
A. Yes, sir.
Q. In fact, you described everything as a "shit show"; do you remember that?
A. Yes. Pardon my French.
Q. Can you elaborate on what you meant when you said that?
A. Well, everything was going wrong. We were not getting along. He had changed a lot. He was very volatile. You know, things weren't going as planned. He wasn't making any money. I was alone with the kids. Yeah, it was again -- pardon my French -- a shit show.
Q. Did you subsequently learn about these stages that Mr. Schram exchanged with your mother?

A. Yes, sir, I did.
Q. And what was the nature of the -- what did Mr. Schram tell your mother?
A. Mr. Schram told my mother that we were getting a divorce.
Q. And do you know when he told your mother that the two of you were getting a divorce?
A. In February.

THE COURT: Isn't this already in evidence, Mr. Beyda?

MR. BEYDA: It is through Mr. Schram.

THE COURT: Right. You put it in through Mr. Schram. So why do you need to repeat it?

MR. BEYDA: All right.

Q. Ms. Zarak, were you in agreement at that time that your marriage was over and it was time to get a divorce?
A. In February 2021?
Q. Yes.
A. Yes, sir.
Q. After this exchange with Mr. Schram about getting divorced, did any of your family members come to Iceland?
A. Yes, sir.
Q. Who?
A. My sister Tamara.
Q. Why did your sister, Tamara, come to Iceland after this conversation about the divorce?
A. Well, she came for emotional support and she came because

my mother asked her to come check on me and she came also to, Sophie really wanted to see EZ, but she came for emotional support.
Q. Did anybody else other than your sister come to Iceland after this conversation about the divorce?
A. Yes, sir.
Q. Who?
A. Our nanny Susa.
Q. Why did your nanny come?
A. For the same reason she had previously been there but she left because two family members died of COVID. So, she came to provide emotional support and more.
Q. After this conversation on February 24, did you and Mr. Schram begin to discuss, did you plan a trip to New York?
A. Yes, sir.
Q. When was that?
A. That was in May of 2021.
Q. Did you ultimately go to New York?
A. Yes, sir, I did.
Q. Why did you go to New York in May of 2021?
A. My mother was going to be in New York and I hadn't seen her in over a year. I wanted to check on our apartment, on our things. I had to empty a storage bin and I also need a little break from Mr. Schram.
Q. Who accompanied you to New York?

A. Simon, SZ.
Q. How long were you in New York when you returned?
A. I was in New York for a total of five nights.
Q. Can you describe what you observed while you were in New York during that period?
A. So, New York was back. New York was back. I observed that the New York I knew from before March 2020 was back. Restaurants were open. The park was open. It was back. That energy that I had noticed was missing from the Upper West Side was back. New York was back.
Q. Did you communicate that to Mr. Schram?
A. Yes, I did.
Q. What was his reaction?
A. His reaction was noncommittal. No. And I wouldn't say there was a shared excitement.
Q. Did you tell him that you wanted to return to New York?
A. Yes, I did.
Q. Why did you tell him that at that time?
A. Cause it was my desire, it was the truth. It was time. I was there. It was open.
Q. How did it make you feel when you heard Mr. Schram's reaction to your excitement?
THE COURT: Hold on to your, excitement okay. Thank you.
A. I'd say I was hurt. I was reprized. I was confused. It

was a variety of emotions.
Q. Now, prior to going to New York and after the February 24, e-mails with text messages with Mr. Schram about divorce, did you apply to any schools in Iceland?
A. Yes, I did, sir.
Q. What did you apply to?
A. I applied to an MBA program that had been online the previous year and that they hadn't defined it would be online that year.
Q. Why did you apply at that time?
A. Well, as I said earlier, the Delta variant really hit Iceland hard. So, you know, I don't know. I guess I was considering my, all of my options. I was maybe hopeful that at moments that my marriage would survive. I don't know. I wanted to keep my options open. Also because as I said this uncertainty that was present all throughout the COVID and still is in many ways was present. So, that's why I -- and also because it came highly recommended by a friend.
Q. At the same time were you looking for any jobs in New York?
A. Yes, I was.
Q. Where?
A. I was offered a job to teach at Brooklyn College.
Q. When were you offered that position at Brooklyn College?
A. So, I believe the conversation started around March but the conversation was definitely going on in April.

THE COURT: Of what year?

THE WITNESS: Of 2021, your Honor.

THE COURT: Thank you.

MR. BEYDA: We provided the Court an opposing counsel with two additional, Exhibits R220 and R221 and proffer is the same as one made about R219 with regard to my offer.

THE COURT: Mr. Min?

MR. MIN: Your Honor, objections are the same.

THE COURT: Do we have these?

When did you receive these email, Mr. Beyda?

MR. BEYDA: In my prep with my client.

THE COURT: When?

MR. BEYDA: Subsequently to Mr. Schram's testimony.

THE COURT: During her testimony.

MR. BEYDA: Subsequent to Mr. Schram before me began. I have not spoken with Ms. Zarak about her testimony since she started.

MR. MIN: Your Honor, to some extent it seems like it would be part of your discovery request.

THE COURT: Hold on.

All right. I am not going to receive these into evidence. They can be marked but I am not going to receive them. You've already elicited to some testimony about the subject matter. You can do that, but the documents are not received.

MR. BEYDA: Thank you.

Your Honor, just for the, these documents were provided in discovery to counsel. This is not the first time they're seeing these.

THE COURT: All right well, that makes it even worse then that you didn't mark them.

BY MR. BEYDA:

Q. When you -- Ms. Zarak, while you were going back to being in New York in May of 2021 while in New York where did you stay?

A. I stayed in my apartment, Apartment 6A.

Q. Did there come a time that you returned to Iceland?

A. Yes, sir.

Q. Can you describe Mr. Schram's behavior upon your return to Iceland?

A. Mr. Schram was -- Mr. Schram insinuated that I went to a hotel. He insinuated that I went to quarantine at a hotel and not at home which would -- I guess it would have implied that I would not have seen my children, which is the reason why I was coming back so promptly. Mr. Schram was upset from the time I was in New York increasingly. So, yeah, things were tense. Things were tense. And also I had, in New York, had a conversation with my mother in which I had been informed of the extent of my mother's communication with Mr. Schram, not only from February but from previous occasions, in which it was very

clear that his intention was not only to get a divorce but --

MR. MIN: Objection, your Honor.

THE COURT: Sustained. You can't speak to his intention. You can speak to your understanding, but that's it.

THE WITNESS: Okay. Apologies.

THE COURT: That's okay.

MR. MIN: Your Honor, I'll also note, the testimony is based upon her conversation with her mother.

THE COURT: Not offered for the truth though. It's offered for her state of mind.

BY MR. BEYDA:

Q. Ms. Zarak, what was your frame of mind at that point based on the conversations you had with your mother?

A. My -- can you rephrase or -- frame of mind? Can you rephrase please, Mr. Beyda?

Q. What was -- based on the conversations you had with your mother, what was your sense of your marriage at that time?

MR. MIN: Objection.

THE COURT: Sustained.

Q. After you get back to Iceland, what happened? Where did you stay?

A. So, I had done very thorough research. So I'm a planner. I am a researcher.

THE COURT: No, no. The question is: When you got back to Iceland, where did you stay?

THE WITNESS: Okay.
A. So, I went to the apartment.
Q. What did Mr. Schram do?
A. Mr. Schram immediately left.
Q. For how long did he leave the apartment?
A. He left -- we didn't see him until the weekend, because we eventually went to quarantine at my father-in-law's summer house, where he met up with us. So, he left for four days.
Q. At that time did you have any discussions with Mr. Schram about your marriage?
A. Yes.
Q. What was discussed?
A. After returning from the summer house on Sunday, we had a discussion in which I expressed my desire to return to New York, and his response was that he couldn't give me any clarity because our marriage was doomed.
Q. And how did that make you feel?
A. That made me feel very upset. It made me feel confused. It made me feel -- yeah, I was very concerned about what would happen next.
Q. What, if anything, did Mr. Schram do with the passports after that conversation?
A. So, on June 2nd, 2021, Mr. Schram took the passports out of the house --
Q. Which passports did he take out of the house?

A. -- and left. He took his passport, he took EZ's passport, RZ's passport, and an old passport of mine.
Q. Did you -- did there come a time that you learned that he took those passports?
A. Yes, sir.
Q. When did you learn that?
A. Well, we always kept the passports in common -- in a special spot for them. And the passports weren't there.
Q. At that time did you have any plans to travel to Mexico?
A. Yes, sir, I did.
Q. What was the purpose of those travel plans to Mexico?
A. There was a family reunion that occurs every three years that had been postponed for COVID. It was highly anticipated. It was planned way ahead of time. And we were, to my knowledge, all going to go to that family event, which took place the last week of June in Mexico.
Q. When you say "all go," did that include Mr. Schram?
A. Yes, it did.
Q. And before you left -- when did you first start discussing going to Mexico with Mr. Schram for this family reunion?
A. It was just -- it was always in the plans. He told me -- in April he told me that he wasn't going to go 'cause it wasn't a priority, but obviously, I was going to go with the children.
Q. What did you say to -- how did you feel when Mr. Schram told you that he was not going to be accompanying you on this

trip?
A. To be honest with you, I wasn't surprised, just because of the state of our marriage. However, he did have a lot of fun on that last event. So, yeah, I mean I wasn't surprised but -- yeah, I don't know. I don't know how I felt about him not telling me.
Q. What, if anything, did Mr. Schram tell you about you taking the children to go on this trip?
A. That was still the plan. That wasn't changed or altered by him not going.

(Continued on next page)

Q. Where were you -- withdrawn.

Can you describe the -- can you describe the petitioner's demeanor when he told you he was not going to be accompanying you and the children to Mexico.

THE COURT: Back in April, you mean?

MR. BEYDA: Yes, your Honor.

A. His demeanor was similar to how it had been around that time, which was just, you know, he couldn't be -- he couldn't be bothered with it. He was -- he -- he had other priorities. It was a bit condescending, a bit, you know, unattached, non-committal, like, I have other things going on.

Q. Following your trip to New York and the return to Iceland, did you have any communications with the children's schools in New York?

A. Just with one.

Q. Which school?

A. P.S.9.

Q. Why did you communicate with P.S.9?

A. P.S.9 had reached out to families that had left for COVID, so I, you know -- I hadn't been in touch with them at all throughout, you know -- throughout the year. I wanted to see if they still even had spots for the children. As I've said more than once, these are very coveted spots, so I just wanted to get in touch and see, you know, how do we -- how do we do this, how do we preregister, what's -- what's the status of my

kids.
Q. At that time did you learn anything about the schools reopening?
A. Yes, the schools would be open in the -- in -- in person, in the fall.
Q. Did you discuss that with Mr. Schram?
A. Yes, Mr. Schram was aware.
Q. And did you -- what, if anything, did you say about returning to New York because the schools would be open?
A. Well, that it was time. That's what we had accorded.
Q. And what was his reaction?
A. His reaction was he wouldn't say no, he wouldn't say yes, he was flustered, he was increasingly angry, he would -- again, the same -- same demeanor. He would change a lot. He would -- yeah, easily frus -- yeah, yeah, and a little -- a little scary, to be honest.
Q. How did it make you feel to observe Mr. Schram's reactions?
A. It -- it scared me. It -- this was not the Mr. Schram that I knew from before.
Q. I -- do you know someone named Jonas?
A. Yes, I do.
Q. And who is Jonas?
A. Jonas is the father of -- Jonas was one of my only friends in Iceland. He -- he's the father of a classmate of EZ. He's American.

Q. How often did you speak with Jonas, if at all, while you were in Iceland?
A. I didn't -- again, for COVID reasons, I didn't really meet a lot of the parents until early 2021, perhaps. I became very close to Jonas on my last months in Iceland, so probably from February, March on.
Q. And what did you discuss with Jonas? What did you say to him? Don't tell me what he said to you.
A. Well, I said to him that I was worried about my marriage, that I was very alone in Iceland, that I felt like I had no agency, no support system, that I had no understanding of my husband or his plans or intentions or -- he was my friend. Jonas was my friend.
Q. Directing your attention to Exhibit -- the document that's been marked as 185 for identification.
MR. BEYDA: To which, your Honor, there was no objection and I offer it.
THE COURT: Received. R 185, you said, right?
MR. BEYDA: Yes, your Honor.
THE COURT: All right. Thank you.
(Respondent's Exhibit 185 received in evidence)
BY MR. BEYDA:
Q. Ms. Zarak, let us know when you're ready.
A. I'm ready.
Q. Can you identify this document.

A. Yes, sir.
Q. What is it?
A. This is a Facebook conversation between Jonas and me. It's from June 8. And Jonas had mentioned there was a women's shelter in Iceland, and I was --
MR. MIN: Objection.
THE COURT: Do you need a break, Ms. Zarak?
THE WITNESS: No. I'm here.
THE COURT: Okay.
MR. MIN: Your Honor, I had objected. I'm sorry. I'm not sure if the Court heard.
THE COURT: You objected after she answered.
MR. MIN: Well, I'm objecting to the portion of her testimony that talks about what somebody else said.
THE COURT: It's in the document that you didn't object to.
MR. MIN: Okay.
THE COURT: Overruled.
BY MR. BEYDA:
Q. Ms. Zarak, which box is -- are you the white or the green boxes in this document?
A. I am the white, sir.
Q. In this document, the message at 12:32 a.m. where you inquired, "Did you say there's a women's shelter," why did you ask about a women's shelter on June 8, 2021?

A. Well, my husband had been increasingly -- so as I said, he was angry, he -- his anger had increased, he had, as you know, taken the -- well, as I previously had said, he had taken the passports out of the house, he had left the house for three nights and then come back, he had been communicating with me sporadically, and on June -- on June 7, my husband came back from work, asked to go to my phone, took my phone from my hand, found nothing on my phone. And all this happened -- all this happened in front of the children and the nanny. I was -- I was very scared of Mr. Schram at that time.

Q. Now during the same period of time -- I'm sorry. Not during the same.

During the period of time from February to June 10th, 2021, were you in communication with Teresa Woods?

A. From February to June 2021? Yes.

Q. And what was the gist of your communications with Ms. Woods?

A. Just updates on the green card and travels.

Q. Were you -- did you request anything specific that she provide -- that she prepare for you in connection with your traveling?

A. Yes, sir. So I had to renew my O visa, so she prepared the package for me. She prepared a series of documents.

Q. Are you familiar with an expedite letter that was prepared?

A. Yes, sir, I am.

Q. Did there come a time that you received that expedite letter?
A. Yes, I did. Early -- in June. June -- June -- I think around June 12th.
MR. BEYDA: Your Honor, may I direct the witness to R 53 that's already in evidence, please.
THE COURT: Yes, I know it's in evidence. We already talked about this.
Q. Ms. Zarak, upon your receipt of Exhibit R 53 in evidence, in particular -- I'm sorry.
A. I'm sorry. I have the wrong binder. No, I don't have the wrong binder. One second.
I have it in front of me.
Q. Page 1 of R 53 indicates that this is an email that was sent by Ms. Woods to you and Mr. Schram, correct?
A. Yes.
Q. Did Mr. Schram object to you traveling after your receipt -- after both of your receipt of this email from Ms. Woods?
A. Did Mr. Schram object to me traveling? The answer is no, but he did have the passports.
Q. Did he subsequently give you the passports?
A. He subsequently gave me EZ's passport, the day before traveling.
Q. And where were you when he gave you that passport?

A. I was -- I was in the entrance of the apartment. He walked in from -- from work and went like this, gave me the passport. He left it on the kitchen counter.

Q. What, if any, communications did you have with P.S.9 before you were provided with EZ's passport at that time?

A. So on June 9th, my husband had -- and I had a conversation about the upcoming travel plans, and he said that the only way I could go to Mexico was if RZ stayed behind and if I immediately unregistered the children from P.S.9, which I immediately did.

Q. And --

MR. BEYDA: Your Honor, may I have a two-minute break.

THE COURT: Sure. Sure. You want an actual break or you just need to look at your --

MR. BEYDA: What time is the Court going to be able to accommodate us to tonight?

THE COURT: I'd like you to try to finish up.

MR. BEYDA: I will. I will be done very shortly.

THE COURT: Okay. All right. Then why don't we take a five-minute break if it will help you facilitate things.

MR. BEYDA: Thank you very much. I appreciate it.

THE COURT: Sure.

(Recess)

THE COURT: Mr. Beyda, back on the record.

MR. BEYDA: Thank you.

BY MR. BEYDA:

Q. Ms. Zarak, I'd like to direct your attention to the children's schools for a moment in Iceland. What, if any, issues did you encounter with the children's school in Iceland?

A. Well, the issues I encountered were primarily with RZ. RZ told us repeatedly that he --

MR. MIN: Objection.

THE COURT: Sustained.

MR. BEYDA: Your Honor --

THE COURT: No, no, no, no. You can't answer any more, and it's sustained, because RZ is not at issue in this proceeding.

MR. BEYDA: But your Honor, I think it goes to the -- Ms. Zarak's intentions and her frame of mind with regard -- it's not being offered for RZ's habitual residence or anything like that but Ms. Zarak, the mother's, frame of mind. That's all it's being offered for.

THE COURT: Where is RZ?

MR. BEYDA: RZ is in Iceland, but as it impacts on the other two children, and her.

THE COURT: No.

MR. BEYDA: Okay.

BY MR. BEYDA:

Q. Ms. Zarak, focusing specifically on EZ, I would like to direct your attention to Exhibit 207 that's been marked for

identification.

MR. BEYDA: To which there is no objection, which I offer.

THE COURT: It will be admitted. 207 is admitted.

(Respondent's Exhibit 207 received in evidence)

MR. BEYDA: Mr. Oza, can you make it larger for the Court, please.

BY MR. BEYDA:

Q. Ms. Zarak, can you identify this document.

A. This is an email from EZ's teacher, Estelle, to me, myself, and Mr. Schram.

Q. And what is the substance of -- sum and substance of this communication?

A. Well, EZ had been crying a lot and she had been saying that she didn't want to go to school, she had mentioned something about some kid kicking her. I wanted to make sure Estelle could keep an eye out to see if anything was off because EZ just kept saying she was afraid to go to school. EZ was just saying that she was afraid to go to school.

Q. How would you describe or compare EZ's attendance in school and her attitude towards going to school in Iceland compared to her attitude towards going to school in New York?

A. Well, she had never once in her lifetime said that she was afraid to go to school, so it was -- it was different.

Q. I would now like to direct your attention to what's been

premarked as Respondent's 192 for identification, to which there is no objection.

A. Mr. Beyda, could you please repeat the number.

THE COURT: Yes, I was just going to say the same thing. You cut out.

MR. BEYDA: R 192.

THE COURT: Okay. That will be admitted.

(Respondent's Exhibit 192 received in evidence)

BY MR. BEYDA:

Q. Directing your attention to the last page of this document, Bates stamped 8270. Do you recall exchanging text -- who is Mark, first?

A. Mark, Mark is Dr. Mark Nesselson. He's my children's pediatrician.

Q. Where is he located, his office?

A. In the Upper West Side of Manhattan.

Q. Does he continue to be the children's pediatrician?

A. Yes, he has.

Q. Was there ever a termination of his services over the years?

A. No.

Q. Directing your attention to November 1st, 2020, what was the circumstances surrounding the exchange of communications with Mark Nesselson at that time?

A. I was very con -- I was a little concerned 'cause --

because EZ grinded her teeth a lot when she was sleeping, and it was increasing. This is something that had never happened before to any of my children. So I texted Mark. I had read something online where it said that teeth grinding was as a result of having a stomach infection. And Dr. Mark Nesselson said it was most likely anxiety.

MR. MIN: Objection, your Honor. The document speaks for itself.

THE COURT: It does. And it said that.

MR. MIN: I'm sorry, your Honor?

THE COURT: He said, "I think that part of her constellation of her symptoms could be anxiety, which the touch work can address. Hope this is helpful. XO."

MR. MIN: Right.

BY MR. BEYDA:

Q. Ms. Zarak, I'm going to direct your attention to Exhibit R 158 that's been marked for identification.

MR. BEYDA: To which there has been no objection and I offer.

THE COURT: It will be received.

(Respondent's Exhibit 158 received in evidence)

A. One second, please.

THE COURT: You get a workout with the binders.

THE WITNESS: Yes. For sure. Thank you.

A. Yes, 158.

Q. Directing your attention to the communication of April 29, 2021.
A. Yes, sir.
Q. Who are the green boxes in this communication?
A. That would be me.
Q. And who are the brownish tan boxes?
A. It's Maya, Franco's mother.
Q. And what are you -- why were you communicating with Maya's mother *[sic]* at that time, on April 29, 2021?
A. EZ had been asking a lot about -- about -- she had been asking a lot about Franco.
Q. And what did you do in response?
A. So I -- I texted Maya and I said that EZ was very homesick, she had been very homesick for New York lately, so I was trying to, as it says, reconnect with her friends. They had been -- they had been sending messages to each other, but there was a point where that wasn't enough, so we started to talk about doing an actual call.
Q. And how often did you observe EZ to be homesick while in Iceland?
A. She was homesick. She was home -- she was homesick throughout the -- throughout the time we were there.
Q. Did you discuss that with Mr. Schram?
A. Yup, and Mr. Schram couldn't be bothered about it.
Q. Did he deny it?

A. Yeah, pretty much.
Q. Directing your attention to R 211 that's been marked for identification.
MR. BEYDA: And there's no objection, and I offer it.
THE COURT: It will be received.
(Respondent's Exhibit 211 received in evidence)
Q. Ms. Zarak, can you identify what this document is.
A. Yes, sir. This is a post that I made on the Icelands International Parents Group group, which I was a member of, and which was in many ways a lifesaver for me.
Q. Why was it a lifesaver? Withdrawn.
What is the date of this post? What year did you post it?
A. This is April 27, 2021.
Q. Why did you make this post at that time?
A. So during the spring and summer months in Iceland, it's bright out all day, and we was having a really hard time with that. The children were, you know -- I guess their circadian rhythms were completely off. They were -- it was very hard to put them down to sleep. They were overexcited. As I say on the post, their nervous systems were completely deregulated. We were having a very, very hard time with that. So I posted this to hear and to learn about other people's experiences, because what you heard from the Icelanders was that, you know, you -- you have blackout curtains. But blackout curtains

didn't do it for us.
Q. And did you have discussions with Mr. Schram about this issue?
A. Yes. Yes, I did.
Q. What was his reaction?
A. Blackout curtains.
Q. Directing your attention now to the document marked for identification as R 25.
MR. BEYDA: To which there is no objection and I offer.
THE COURT: It will be received.
(Respondent's Exhibit 25 received in evidence)
A. R 25?
Q. Yes. Sorry. R -- I apologize. R 24. R 24.
THE COURT: Also no objection, right?
MR. BEYDA: No objection.
THE COURT: Okay. Admitted.
(Respondent's Exhibit 24 received in evidence)
Q. Ms. Zarak, once you find that document, let us know.
A. Yes. I have it. R 24? I have it.
Q. Can you please turn to the last page of this exhibit, the page Bates 0506.
A. Yes.
MR. BEYDA: Mr. Oza, are you able to scroll to the top of that page for the Court and then just --

Q. Ms. Zarak, what is this page?
A. This is EZ's health examination form filled out by Dr. Nesselson.
Q. And when was this form filled out by Dr. Nesselson?
A. July 20 -- oh, Mr. Nesselson, Dr. -- yes, July 22, 2020.
Q. And why did you have this form filled out on -- by Dr. Nesselson on July 22, 2020?
A. Because we had an appointment with him. We hadn't seen him since before we left for Mexico, so they had a routine visit.
Q. But --
A. And --
Q. Directing your attention to the top portion of this page, it says, Child and Adolescent Health Examination Form, New York City Department of Health and Mental Hygiene, Department of Education. Why was the DOE, Department of Education form filled out by Dr. Nesselson on July 22nd, 2020?
MR. MIN: Objection.
THE COURT: What's the objection?
MR. MIN: As to why Dr. Nesselson took any action on that particular day.
THE COURT: Can you rephrase.
Q. To your knowledge, Ms. Zarak, do you know why this form is filled out by the doctor?
MR. MIN: Objection.
A. For school --

MR. MIN: Objection.

THE COURT: What's the objection?

MR. MIN: No basis of knowledge.

THE COURT: No. Overruled.

If you have an understanding of why the form was filled out, Ms. Zarak, you can tell me.

A. Yes. This was for -- to update P.S.9, I believe specifically. It was for -- it was for school purposes.

Q. And Ms. Zarak, what does DOE stand for?

A. Department of Education.

Q. Directing your attention, Ms. Zarak, to Exhibit -- sorry. It's not in evidence.

R 205.

MR. BEYDA: To which there is an objection, your Honor.

THE COURT: All right. Let me pull it up. So Ms. Zarak, you can wait. I have to look at it.

THE WITNESS: Yes. Sorry.

THE COURT: No problem.

Mr. Beyda, what's your --

MR. BEYDA: It's a message from my client, Ms. Zarak, is what we're offering, and then to the extent that there's a response to her email from a third party, it's just being offered for Ms. Zarak's state of mind and not for the truth of the matter contained therein.

THE COURT: The state of mind?

MR. BEYDA: I'm only offering it for Ms. Zarak's, not the third party's.

THE COURT: No. Overruled. And cumulative. It's not coming in. You've already been asking her about these appointments.

BY MR. BEYDA:

Q. Ms. Zarak, while you were in Mexico with EZ and SZ, did you continue to have communications with Mr. Schram?

A. In the summer of 2021, correct?

Q. Correct.

A. Yes, sir.

Q. And what, if anything, did you and Mr. Schram discuss about you coming to New York?

A. He -- he suggested that I come with EZ and SZ and that he stay with -- he suggested that I stay -- I come with EZ and SZ and that he stay with RZ.

Q. Prior to those conversations did you and Mr. Schram discuss -- actually, withdrawn.

Prior to those conversations and while you were in Iceland, did you and Mr. Schram discuss you coming to New York after Mexico?

MR. MIN: Objection, your Honor. Relevance.

THE COURT: Hold on.

No. Overruled. You can answer, Ms. Zarak.

A. Yes, Mr. Beyda.

MR. BEYDA: Your Honor, no further questions.

THE COURT: All right. Thank you. So we will break for the day.

After cross-examination, what's the remainder of your case, Mr. Beyda?

MR. BEYDA: Can I let Ms. Chawla speak to that, your Honor, if I might.

THE COURT: Oh, sure. I'm sorry.

MR. BEYDA: That's okay.

MS. CHAWLA: That's okay.

Your Honor, we are trying to narrow down our third-party witnesses. We do plan on calling Ms. Yoskowitz, but she is only available in the mornings, and we also plan on calling Ms. Sleiman. I'm trying to see if she is available at any point tomorrow. We also plan on calling Mandy Goldberg and Maria Ratkovic, your Honor, and I'm going to communicate with all of them now to see if they can testify tomorrow. The only person that I believe we may have to take out of order, your Honor, is Rita Yoskowitz because she works for the Board of Education and is only available between 9 a.m. and noon. And I know that I want to accommodate the Court's calendar as well.

THE COURT: So are you requesting to take her tomorrow first thing?

MS. CHAWLA: Yes, your Honor, if that works for

Mr. Min as well.

THE COURT: Mr. Min, is there an objection?

MR. MIN: Your Honor, can I have just 10 seconds to confer with co-counsel?

THE COURT: Sure. Sure.

(Pause)

MR. MIN: Your Honor, I mean, I would ask, because I don't think we've been provided this information -- oh.

THE COURT: You what?

MR. MIN: Oh, I'm sorry, your Honor. I didn't see you on the camera so I was just waiting.

THE COURT: I'm here.

MR. MIN: Oh. I would ask for an offer of proof on Ms. Yoskowitz to the extent that none was provided on the witness list with respect to the extent of her testimony and the relevance of it. I know there has been some communications that have been admitted into evidence. We're unsure what the nature or purpose of her testimony would be at this point.

MS. CHAWLA: Your Honor, if I may.

THE COURT: Sure.

MS. CHAWLA: Ms. Yoskowitz was the parent coordinator -- actually, she is the parent coordinator of P.S.9, and both the parties --

THE COURT: Right. I remember.

MS. CHAWLA: -- have had numerous communications with

her regarding enrollment of both EZ and RZ at P.S.9, and we believe that it's --

THE COURT: Go ahead. I'm sorry.

MS. CHAWLA: I was just going to say that we believe that it does go to show what the parties' intent was and what their plan was in terms of a shared intent with respect to habitual residence of the children.

THE COURT: First of all, I mean, is she cumulative of what you've already done with the documents themselves, and through Ms. Zarak and Mr. Schram?

MS. CHAWLA: Well, your Honor, she would be corroborating Ms. Zarak's testimony.

THE COURT: That's otherwise known as cumulative.

How long do you plan to be with each of these four witnesses?

MS. CHAWLA: Your Honor, not more than half an hour. Most of them will be 15, 20 minutes.

MR. MIN: Your Honor, just to clarify, earlier Ms. Chawla said that possibly Ms. Woods, Teresa Woods would testify. I just want to clarify that that means that she will not be --

THE COURT: Can we finish what we're doing first, Mr. Min? So I'm waiting for whether you object to her going out of turn.

MR. MIN: No, your Honor. To the extent that she will

testify, then no.

THE COURT: All right. She can take the stand first thing tomorrow. I have a court call first thing in the morning, but we'll resume as close to 9:30 as I can finish up that commitment.

MS. CHAWLA: Thank you, your Honor.

THE COURT: So she should be ready to testify then. And not more than the 20 minutes to half hour or so that you have said.

MS. CHAWLA: Understood.

THE COURT: And Mr. Min, you can cross-examine her, and then Mr. Min will cross-examine Ms. Zarak. And the rest of your witnesses are all available tomorrow?

MS. CHAWLA: Your Honor, I need to confirm with them, but I will do everything I can to make sure that they are.

THE COURT: They better be.

Okay. All right. So I'll see everyone as close to 9:30 as I can tomorrow morning.

MR. MIN: Your Honor, can I just clarify Ms. Woods. She wasn't listed --

THE COURT: I'm sorry. Yes. Ms. Woods.

Ms. Chawla, are you planning to call Ms. Woods?

MS. CHAWLA: No, your Honor, we are not.

THE COURT: All right. Thank you.

And what about Ms. Vasquez?

MS. CHAWLA: Your Honor, we are not planning on calling her.

THE COURT: All right. Let's go through the rest of your witnesses. Or is it fair to say if you didn't mention them, you're not calling them?

MS. CHAWLA: If I didn't mention them, your Honor, we are not calling them.

THE COURT: All right. Thank you.

MS. CHAWLA: Thank you, your Honor.

THE COURT: Anything else we should discuss before we adjourn? This could be off the record.

(Discussion off the record)

(Adjourned to October 13, 2021, at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of: Page

TANIA ZARAK

Direct By Mr. Beyda . . . . . . . . . . . . . . 739

RESPONDENT EXHIBITS

| Exhibit No. | Received |
|---|---|
| 30 through 36 | 793 |
| 110 | 850 |
| 123 | 876 |
| 128 | 763 |
| 140 | 885 |
| 154 | 856 |
| 158 | 915 |
| 159 | 869 |
| 185 | 907 |
| 192 | 914 |
| 201 | 881 |
| 202 | 880 |
| 203 | 882 |
| 204 | 883 |
| 207 | 913 |
| 211 | 917 |
| 24 | 918 |
| 25 | 918 |
| 39 | 766 |

RESPONDENT EXHIBITS CONTINUED


| Exhibit No. | Page |
|---|---|
| 40 | 753 |
| 43 | 765 |
| 44 | 826 |
| 48, Bates page 7625 | 825 |
| 59 | 763 |
| 64 | 860 |
| 65 | 877 |
| 68 | 815 |
| 69 | 817 |
| 70 | 810 |
| 8 | 839 |
| 84 | 878 |
| 90 | 879 |
| 96 | 759 |