UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ARNALDUR SCHRAM,

Petitioner,

v. 21 CV 6524 (MKV)

TANIA ZARAK,

Defendant.

------------------------------x

New York, N.Y.
October 13, 2021
9:15 a.m.

Before:

HON. MARY KAY VYSKOCIL,

District Judge

APPEARANCES

BURGER GREEN & MIN LLP
Attorneys for Petitioner Schram
BY: RICHARD MIN
KENNETH GLASSER

CHEMTOB MOSS FORMAN & BEYDA LLP
Attorneys for Respondent Zarak
BY: MICHAEL F. BEYDA
MUDITA CHAWLA

THE COURT: Good morning, everyone.

Are we ready to proceed?

MS. CHAWLA: Good morning, your Honor.

MR. MIN: Richard Min, on behalf of petitioner.

Good morning, your Honor.

MR. GLASSER: Kenneth Glasser, on behalf of petitioner.

Good morning, your Honor.

THE COURT: Good morning, Mr. Glasser.

MR. BEYDA: Michael Beyda, on behalf of respondent mother.

Good morning, your Honor.

THE COURT: Good morning, Mr. Beyda.

MS. CHAWLA: Mudita Chawla, on behalf of respondent.

Good morning, your Honor.

Good morning, counsel.

THE COURT: Good morning, Ms. Chawla.

And good morning -- do we have Mr. Schram? We do.

Good morning, Mr. Schram.

And good morning, Ms. Zarak.

All right. As I understand the plan for this morning, we're going to take a witness out of turn; is that correct?

MS. CHAWLA: That is correct, your Honor.

THE COURT: All right. Ms. Chawla, do you want to call your witness then?

MS. CHAWLA: I call Rita Yoskowitz to the stand.
THE COURT: Ms. Dempsey, would you swear Ms.~Yoskowitz.
Good morning ma'am.
THE WITNESS: Good morning.
RITA YOSKOWITZ,
called as a witness by the Respondent,
having been duly sworn, testified as follows:
DIRECT EXAMINATION
BY MS. CHAWLA:
Q. Thank you for being here with us today, Ms. Yoskowitz. Could you, please, tell the Court, are you employed?
A. Yes, I am.
Q. And where?
A. The Department of Education.
Q. And what is your job title?
A. My job title is a parent coordinator of the school.
Q. And which school are you the parent coordinator at?
A. PS 9, Sarah Anderson School, District Three --
Q. Could you just say the last part that you said?
A. In Manhattan.
Q. And how long have you been the parent coordinator at PS 9?
A. Going to my 18th year.
Q. And how long have you been working with the New York public school system?

A. Twenty-two.
Q. What are your responsibilities as a parent coordinator, Ms. Yoskowitz?
A. As a parent coordinator, my job really ultimately is to work with the parent population. I have to create a welcome environment for families to feel at home when they're in the school. My job is to work with the parent association, the meetings. Anything that's relating to parents coming to the school, that's what I do. Another part of that is of, my job is I do the admission process for the children coming in new to PS 9, and I have been doing that for a long time as well.
Q. Do you know the petitioner, Mr. Schram?
A. As a parent, yes.
Q. And when did you meet Mr. Schram?
A. I met him when they applied for the daughter when she was going to come to kindergarten. I think now she's in second grade. So, that's when he came to my office to ask a few questions about registration for the daughter.
Q. Do you remember when that was?
A. I don't know, two thousand what? What was that? Couple of years ago.
MS. CHAWLA: Your Honor, if I could have Respondent's 19 which is already in evidence put up on the screen, please.
(Pause)
MS. CHAWLA: Thank you, Mr. Wu, for enlarging it.

Q. Ms. Yoskowitz, if you could, please, take a look at this email?
A. Okay.
MS. CHAWLA: Mr. Wu, if you could scroll through, please.
(Pause)
Q. Ms. Yoskowitz, does this help you recall when you met Mr. Schram?
A. I want to see the date again.
(Pause)
THE COURT: You can't just read the date. That doesn't refresh your recollection.
THE WITNESS: No, no. That's just because what we were talking about here is this one is for recently when he recently asked me about re-enrolling EZ into the school. The original time that I met with him was when EZ was coming to kindergarten which is the original time that I met with him as parent.
THE COURT: Ms. Chawla -- and not reading from the document they're in evidence.
Q. Do you know Ms. Zarak, Ms. Yoskowitz?
A. Yes, of course.
Q. How do you know Ms. Zarak?
A. The same situation as a parent, as a mom of the children that was attending our school.

Q. And do you recall when you met Ms. Zarak?
A. I met this, parents of the kindergarten children, I meet them almost everyday because I greet the parents when they come to the school because I see these parents coming every single day with the children. So, that's how I know her. But then again, because she's always involved in the school and she comes to our PA meetings and our fund raisers. There's families that were always part of the school.
Q. Now, Ms. Yoskowitz, we're not going to be referring to the children by their names. We are just going to be referring to them by their initials.
Do you know EZ?
A. Personally, no. I really don't deal with children. The only time that we meet them is, I meet them is at the registration period when they have to come in with the paperwork and parent has to bring the child and we have to talk to the children about the language form. And so that then of course, I see them in the school but I don't know them. I don't know the students personally.
Q. Did you meet EZ for the registration period?
A. At that time, yes, because the registration was done in the premises. This is prior COVID, so, yes.
Q. Now, Ms. Yoskowitz, you previously said that Ms. Zarak was involved in the school and was always part of the school.
What did you mean by that?

A. It's just like I said, the family events, they're always here. They're attend the parent association meetings, the children that's what I meant, that they're active participants in the school, in the daily running of the school.
Q. Now, did EZ attend PS 9 at any time?
A. Yes.
Q. And what years, do you know?
A. I wasn't prepared to give the years when she started at PS 9 but she was kindergarten or first grade I think that they -- I'm not sure if the family left -- family left right before COVID. That's when the family left.
Q. And how do you know that the family left for COVID?
A. Because we were trying to clear up the roster. A lot of families left the country. They moved to different states so we had to reopen the following September. We had to have a clear investigation of how many people, how many students were returning. So I had to send a note. I was given a list of families who have left and we want to make sure that if they were coming back or not. So at that point I sent an email to Tania asking her if they were planning to return. She said they were leaving for COVID and that they were returning.
Q. Do you know why the Zarak/Schram family left for COVID?
A. Yes, because Tania sent me a very nice e-mail telling me that after several talks with the family they have decided to move to Iceland and they were just going there for just for the

COVID for the pandemic and then they would be returning.

Q. Did Ms. Zarak tell you how long the family planned to be in Iceland?

A. For a year, I think. Yeah, for a year.

Q. Now, did you have any conversations with Ms. Zarak about enrolling EZ for the 2021/2022 school year?

A. Yes.

Q. And can you, please, tell me what those conversations were?

A. Tania sent me an email and she want me to tell, to find out if RZ, the younger child, who was now applying it of kindergarten continue then was -- the school and that he was coming to, was returning to second grade and if it was any problem. So, what I respond is that he will have a spot in second grade or will not have a spot because he needed to enter the process of admission to kindergarten and what she had to do if she want or to receive at PS 9.

Q. And what, if any, further communication did you have with Ms. Zarak regarding enrolling either RZ or EZ?

A. Everything that I explained was explained cause I noted that when she asked me about the registration for the two children and I sent the information, soon after I don't know if it was one or two days after, I received an email from her husband and he was asking the same questions about registration for the children. So, instead of answering each one of them because I knew it was a family, so I would do, I e-mailed them

back with the information and the steps that need to be followed in order for "R" to get a seat at PS 9.
Q. Do you know if EZ is currently attending PS 9?
A. Yes, I know she is attending PS 9.
Q. And how is it EZ can attend PS 9?
A. Well, what do you mean "how"?
Q. How did it come about EZ is attending PS 9 for the 2021/2022 school year?

MR. MIN: Objection, your Honor; relevance, post the alleged wrongful removal retention.

THE COURT: What is the relevance, Ms. Chawla?

MS. CHAWLA: Your Honor, this goes to the issue, the crux of the issue which is the home state of the children which is the habitual residence of the children.

THE COURT: No. The objection is sustained. I also don't think there's any dispute where the child is going to school, is there?

MR. MIN: No, no, currently, no.

THE COURT: Okay.

BY MS. CHAWLA:
Q. Ms. Yoskowitz, have you had any further communication with Mr. Schram after he contacted you about enrolling the children for the 2021/2022 school year?
A. Well, like I said, I answer my email to the two of them explaining what needs to be happening in order for them to

secure a spot for the children. One of the things was process, how they need to, what they had to do in order to enter in the application process. And I told them the steps and I also said that all this is possible because they're still having a resident in New York and to confirm again with them to see if the resident was the same as before they left. And Tania said yes, and she sent me the address of the apartment which is in the zone of the school. Therefore, they will be residing in Manhattan, the same apartment that they had before they left and there was no issue that he would deny or not coming to PS 9. So, I assured him that she will have a seat in second grade and "R" will have a seat if they follow the steps that I told them to do. And so they did it. "R" got an offer for kindergarten and we told them, great. He said we sent paperwork that needs to be done for the children to attend PS 9 again. And so at the time soon after I send that I received an email from mom saying that she was withdrawing the application for the students to come to the school, and that was it. And so, I wanted to make sure I told them thank you for your final decision. So I will remove "R" from the roster because they retracted the offer. So he had an offer to come to PS 9 but since mom withdrew the offer, so I had to say okay. So, fine. So he won't have a seat right now and that was it. So I was --

Q. Now, turning your attention to the 2020/2021 school year. Did there come a time when you learned that EZ would not be

attending?

A. No. So then I received another mail from Tania telling me that she was in the city. She was in New York and that she wanted to continue the registration for "E" and I said OK, fine. So are you already in New York? She said, yes, we are in New York.

MR. MIN: Objection, your Honor. I think, this is not responsive to the question.

THE COURT: The question was for the 2020 to 2021 school year, not the current school year.

A. The current school year is 21/22.

Q. Did there tomorrow come a time when you learned for 2020/2021 school year that EZ would not be attending?

A. That's the year of COVID, that was the year that she was away and that's when mother, Tania, told me in email that they would be going to Iceland and that they would be attending a school there and so therefore, they are not returning to PS 9.

Q. Do you remember when you heard from Ms. Zarak that EZ would not be attending for the 2020 to 2021 school year?

A. What was that again?

Q. Do you remember when you heard from Ms. Zarak that EZ would not be attending PS 9 for the 2020 to 2021 school year?

A. That happened in June 2021.

Q. Are you sure about that date?

A. That's the communication that we started for the

registration for the current year which is 2021/2022.

Q. I am asking about the prior year.

MR. MIN: Objection, your Honor. Can we ask the witness not to be reviewing documents as she testifies?

THE COURT: Ms. Yoskowitz, you should not be looking -- please, put any documents aside.

What are you looking at, ma'am?

THE WITNESS: Just the dates because you are telling me about dates and it's a little confusing for me.

THE COURT: All right. What was the document you were looking at, please?

THE WITNESS: Just my dates of my emails. That's all.

THE COURT: Do you have emails in front of you?

THE WITNESS: Not right now.

THE COURT: No. Did you, when you say I was looking at dates of my email, where are you getting those dates from?

THE WITNESS: Just cause I wrote them down.

THE COURT: Okay. Can you please -- are you in counsel's office?

THE WITNESS: No. I am in my office.

THE COURT: Can you provide a copy of that to Ms. Chawla, please?

THE WITNESS: Of what?

THE COURT: Whatever you wrote down that you were looking at.

THE WITNESS: No. I just write down dates because I wanted to make sure of the year that you were talking about.

THE COURT: That's what I am talking about. Can you, please, get a copy of that scanned and provide it to counsel?

THE WITNESS: "Counsel" that means?

THE COURT: Ms. Chawla or Mr. Beyda.

THE WITNESS: Of course. Yeah.

THE COURT: All right. Thank you.

And that will be marked as Court Exhibit One.

THE WITNESS: Okay. So, that is you want me to send you is the one from when I heard from Tania about?

THE COURT: No. I want to see the notes that you were looking at that you made.

THE WITNESS: Oh, okay. All right.

THE COURT: Now, please, put all the documents aside and you should just answer the questions to the best of your recollection, and if you can't remember dates that's certainly understandable. Just say that. All right?

THE WITNESS: All right. This is my first time doing this, so.

THE COURT: It's not a problem at all. But if you don't remember, just say "I don't remember".

THE WITNESS: Well, thank you. Yes, I will.

THE COURT: Thank you.

Then counsel counsel's job is to show a document to

help you remember.

THE WITNESS: Oh, okay.

BY MS. CHAWLA:

Q. Your Honor, if I could have R65 which is in evidence put up on the screen, please.

(Pause)

THE COURT: Does Ms. Yoskowitz, have copies of these or are you going to ask her to look at the screen?

MS. CHAWLA: Your Honor, I did email Ms. Yoskowitz a copy of all of the exhibits that I am referencing now earlier.

THE COURT: I would like marked as Court Exhibit Two whatever you emailed.

MS. CHAWLA: Of course, your Honor. And I will send that to the Court and to counsel as well.

THE COURT: Yes.

Mr. Wu, if you could scroll up just so we could see the top of the date.

Q. Ms. Yoskowitz, if you could, please, take a look at this email?

A. Okay.

MS. CHAWLA: Mr. Wu, if you could scroll down just a little.

(Pause)

Q. Ms. Yoskowitz, is this the email that you received from Ms. Zarak letting you know that the family would be going to

Iceland for the school year?
A. Yes.
Q. And did you receive this e-mail on August 3, 2020, correct?
A. Right.
Q. Did you hear from -- Withdrawn.
The next time you heard from Ms. Zarak was in June of 2021 regarding reenrolling the children for the 2021/2022 school year, correct?
MR. MIN: Objection; leading.
THE COURT: Sustained. Please, rephrase your question.
Q. Ms. Yoskowitz, when was the next time that you heard from Ms. Zarak about enrolling the children for the 2021/2022 school year?
A. It had to be right after this email.
MS. CHAWLA: Mr. Wu, if I could, please, have respondents 172 which is in evidence put up on the screen.
THE COURT: If it is in evidence, sure. No problem. Yes, it is piece of it -- in evidence, the second and third page only, 92 and 93.
MS. CHAWLA: If I could just have those three pages, please.
Q. Ms. Yoskowitz, do you recognize this correspondence?
A. Yes.
Q. What do you recognize this to be?

A. This is a correspondence that I had to send to the families in my school that they were not, that they left the school due to COVID and I was asking them if they're planning to return. So, Tania received one because that's one of the families that we knew that they left to Iceland just for the pandemic.
Q. And this correspondence was on June 2, 2021, correct?
A. Right, correct.
Q. And EZ is enrolled at PS 9 for the 2021/2022 school year; is that correct?
MR. MIN: Objection.
THE COURT: It's been asked and answered.
MS. CHAWLA: Your Honor, I have no further questions for this witness.
THE COURT: All right. Thank you.
Cross? Is that Mr. Min or Mr. Glasser?
MR. MIN: Mr. Min, your Honor. One second so I can organize myself?
THE COURT: Yes.
(Pause)
CROSS-EXAMINATION
BY MR. MIN:
Q. Good morning, Ms. Yoskowitz.
A. Good morning.
Q. I'm going to --
MR. MIN: Your Honor, I'd like to offer in

Petitioner's Exhibit Six which is in evidence, your Honor. I apologize. It's been redacted and I think we've provided a redacted copy. So, we'd like to pull up the redacted admitted copy, your Honor.

THE COURT: One moment, please.

MR. MIN: Yes.

(Pause)

THE COURT: Okay. That's fine. Yes, thank you.

MS. CHAWLA: Your Honor, we did have an initial objection to this with respect to the statements not by respondent but if this is what -- I don't recall getting this redacted copy but we have no objection to this portion, your Honor.

THE COURT: All right. Mr. Min, for the sake of good order, are you intending to submit the redacted version to replace the original or you want to mark it "6A".

MR. MIN: Whatever your Honor thinks is the best process, I am fine either way.

THE COURT: Why don't you mark it "6A" and just get a copy of it to Ms. Chawla and to the Court, please.

MR. MIN: Yes, your Honor. I believe we dropped off courtesy copies but we'll doublecheck at the next break and just confirm.

THE COURT: You may well have. Thank you. You can proceed though.

Yeah, we are going call it 6A.

Q. Ms. Yoskowitz, this is email that Ms. Zarak sent you on June 9 canceling EZ's and RZ's registration process for the current school year?

A. Correct, yes.

Q. It's true that on approximately June 1 Ms. Zarak contacted you for the first time by telephone, June 1, 2021 with respect to the process for enrolling the children in the current school year?

MS. CHAWLA: Objection; facts not in evidence.

THE COURT: He's asking is that correct. Overruled.

A. I don't remember.

Q. Okay. But it was shortly before this email on June 9, correct?

A. Honestly, I don't remember the phone calls.

MR. MIN: Okay. I want to direct your attention to -- one second.

(Pause)

MR. MIN: 9293 which is admitted in evidence.

THE COURT: Tell me the number again.

MR. MIN: It's R172 Bates stamped Bates number 9293 which is admitted into evidence.

THE COURT: This is what you were just looking at?

MR. MIN: Yes, yes.

Q. Ms. Yoskowitz, do you recall writing to Mr. Schram and

Ms. Zarak on June 2 saying that you spoke with Tania yesterday?
A. Yes. I see it now.
(Cross-talk)
THE COURT: The question is not are you reading it. It's do you recall writing that?
A. Yes. I mean, I see that I wrote it.
THE COURT: Go ahead, Mr. Min, recalling, Mr. Min, the document is in evidence.
MR. MIN: Yes. Thank you.
Q. Does that refresh your recollection as to a phone call you had with Ms. Zarak on or about June 1 with respect to the process of enrolling the children into school for the current school year?
MS. CHAWLA: Objection; asked and answered.
THE COURT: Overruled.
A. Okay. The email that I wrote, it says I spoke with Tania yesterday and explained what needs to take place. And then what I continue writing is what I accept, same thing, exact same thing that I told Tania about.
THE COURT: Okay. He is asking you now reading this document do you have a recollection of the telephone call?
A. At the moment I don't but looking at e-mail that it says I spoke to Tania. So I must have spoke to her before and that's what I wrote in the email what I have talked to her about, admissions.

THE COURT: OK. Thank you. You've answered the question.

Q. Ms. Yoskowitz, you testified that a couple of days after Ms. Zarak first contacted you, Mr. Schram emailed you as well, correct?

A. Yes.

Q. And I believe you testified that he emailed you alone meaning that he did not CC or copy Ms. Zarak on that e-mail communication; is that correct?

A. No. And actually, he did not send an email directed to me. He sent an email to helpdesk@PS9.org. So he sent an email to that department, and the person who handles that responded. Well, I'm not able to help you with this, but I am going to CC Ms. Yoskowitz and she will be able to help you with your questions. And so, that's how the email came to me.

Q. Would it be fair to say that you were unaware that in early June 2021 as to the conversations Ms. Zarak and Mr. Schram were having between each other about the enrollment process for EZ and RZ --

MS. CHAWLA: Objection.

THE COURT: Overruled.

Did you have any, were you privy to personal conversations between Ms. Zarak and Mr. Schram?

THE WITNESS: No.

THE COURT: Counsel, we ought to move along here.

This is not productive.

MR. MIN: Your Honor, I have no further questions. But my understanding, I will receive a copy of Court's Exhibits One and Two, and based upon that which I don't expect, I may have further questions depending on what's on those.

THE COURT: All right. Ms. Yoskowitz, thank you very much.

No redirect, I assume?

MS. CHAWLA: No, your Honor.

THE COURT: All right. Thank you.

Ms. Yoskowitz, thank you very much for being here to try to help us sort this matter out. I hope you have a good rest of the day.

THE WITNESS: My pleasure.

Thank you.

THE COURT: Mr. Min, I think you're up for cross-examination of Ms. Zarak.

MR. MIN: Yes, your Honor.

MR. BEYDA: Your Honor, before we commence, before we begin this cross there was one exhibit that was marked for identification that I neglected to move into evidence. It will take me all of probably four minutes with Ms. Zarak this morning to move that into evidence, if I might. Since Mr. Min has not commenced his cross I ask for the Court as --

THE COURT: What exhibit are we talking about?

MR. BEYDA: Exhibit 194 to which there was no objection.

THE COURT: But there's no objection. Just move it in.

MR. BEYDA: I just would like to quickly ask Ms. Zarak a few questions about it, if that's -- it will take me a few moments.

THE COURT: Go ahead.

MR. BEYDA: Thank you.

THE COURT: This is R194?

MR. BEYDA: R194.

THE COURT: Yes.

MR. BEYDA: I personally do not see Ms. Zarak on my screen. I do not know --

THE WITNESS: I'm here but I'm so sorry. The lights in the conference room keep turning on and off.

THE COURT: I can see, Ms. Zarak.

TANIA ZARAK, resumed.

DIRECT EXAMINATION CONTINUED

BY MR. BEYDA:

Q. Ms. Zarak, can you identify what has been marked as Exhibit R194 and is now in evidence?

A. Yes, Mr. Beyda. This is Apartment 6A, our home.

Q. And can you just identify the four boxes on page one?

THE COURT: I'm sorry. This is Apartment 6A.

THE WITNESS: Yes, your Honor. This is Apartment 6A, our apartment.

THE COURT: I understand. Okay.

Thank you.

BY MR. BEYDA:

Q. Is that the front door of the apartment?

A. Yes, this is the first thing you see when you get out of the elevator.

Q. Is that the way you left the apartment when you left New York on July 31?

A. Yes.

Q. Directing your attention to page two of this document, what is that?

A. That is one of the bathrooms, one of the rooms, closets, the kitchen, the dining area.

Q. Does page two of this document reflect how you left the apartment on July 31, 2020?

A. Exactly, yes.

Q. Can you turn to page three.

Standing question for the 29 pages of this exhibit. Does that reflect the condition and items that were left in the apartment on July 31, 2020?

A. Yes, sir, yes.

MR. BEYDA: Mr. Wu, can you, please, turn to page six of this document and can you make that a little larger, Mr. Wu?

(Pause)

Q. The top right box, is that a picture of the sonogram that was left on the refrigerator?

THE COURT: Mr. Beyda, this is cumulative in the extreme. You've asked about this repeatedly. Ms. Zarak has said she left it. Mr. Schram said it was left. Why are we doing this? I understand. The picture of the sonogram was left there.

MR. BEYDA: Mr. Wu, can you just turn to page ten of this document.

(Pause)

Q. Are those --

A. Toys, scooters, books, art materials.

THE COURT: There is no question pending.

THE WITNESS: Sorry.

MR. BEYDA: Actually, Mr. Wu, if you can scroll from pages seven through ten and then Ms. Zarak can you identify whose possessions those are?

A. These are EZ and RZ's possessions. Some of them are SZ's but he is too young. That's Mr. Schram's scooter. That's EZ's scooter. These are mostly RZ and EZ's toys. SZ didn't play with toys at the time, but you know. And that's Mr. Schram's scooter. That's our, the children's play mat rolled there by the chimney. That is the children's drawing table by the wall. That is their, EZ's pink car which was subsequently taken over

by RZ. Those are book shelves with our books. Our art is still there.

Q. Directing your attention --

MR. BEYDA: Mr. Wu, if you could page down to page 21 of this document.

(Pause)

Q. What are those four boxes representing?

A. So, this is the bed where the children would sleep, the drawers full of clothes, baby clothes, some of my clothes, some of EZ's clothes, most of their books, all of our documents or the vast majority of our documents including Social Security cards, documents, birth records, school records. That's a television. Yeah, that's for the most part what we see, stuffies and diapers, coin bank, a coin bank.

Q. Ms. Zarak, are you now testifying about the totality of this document, meaning all of the pictures of this document just so this is clear?

A. I thought, Mr. Beyda, you just asked me about these four images. Everything I said is from these four images.

MR. BEYDA: Your Honor, no further questions.

THE COURT: Thank you.

Mr. Min.

THE WITNESS: So, just to confirm, you guys can see me, right? Because the lights are off.

THE COURT: Yes, we can see you.

But, Mr. Beyda, maybe you can have someone from your office take care of the lights but I can see Ms. Zarak very clear.

THE WITNESS: As long as you guys can see me. The lights are off.

MR. BEYDA: I did not see her.

THE COURT: But she is telling you she's sitting in the dark.

MR. BEYDA: That I will deal with, of course, but I was referring to myself.

THE COURT: Okay. Mr. Min.

MR. MIN: Yes, your Honor.

One second, your Honor.

CROSS-EXAMINATION

BY MR. MIN:

Q. Good morning, Ms. Zarak.

A. Good morning, Mr. Min.

Q. How much did you sell Penthouse C in July 2021 for?

A. I sold it for $875,000, approximately.

Q. And your settlement with Netflix was approximately $200,000?

A. No, sir. My settlement with Netflix was $400,000 that I have had to pay $160,000 lawyers fee. So, that came down to $240,000.

Q. Okay. And where are those funds? What did you do with

those funds after you received the Netflix settlement?
A. Those funds were in my bank account. I used them to live.
Q. And the Penthouse C sale, where did those funds go?
A. Those funds are in my account.
Q. It's true that your mother -- now, what's your mother's name?
A. My mother's name is Marta Quintana.
Q. It is true your mother has been trying to sell or rent Apartment 6A for quite some time, correct?
A. Apartment 6A, no, Mr. Min. Apartment 6A belongs, it belongs to me and my sisters.

MR. MIN: I want to direct your attention to Petitioner's Exhibit 166, which I believe is in evidence, your Honor.

MR. BEYDA: May I quickly log out and log back in while I'm not getting everybody's images on my computer. It'll take me a moment.

THE COURT: Sure. Go ahead while we find the exhibit.

(Pause)

MR. MIN: I apologize. Petitioner's 86.

(Pause)

THE COURT: That's admitted for a limited purpose.

MR. MIN: Yes, your Honor.

THE COURT: Ms. Zarak, if it's easier, they've called the document up on the screen.

THE WITNESS: Yes, that might be easier. Yes.

(Pause)

THE COURT: You should feel free to look at the entire document though if you wish. It's entirely up to you.

THE WITNESS: Yes.

(Pause)

MR. MIN: Your Honor, can the Court just refresh the limited purpose for which this document was admitted with respect to Ms. Zarak's statements, correct?

THE COURT: It was a hearsay objection and it was admitted, certain admissions made by Ms. Zarak.

BY MR. MIN:

Q. Ms. Zarak, on June 17, 2020, you wrote that the apartment is owned by my mother Marta CK, here you are referring to Apartment 6A, correct; yes or no?

A. Yes.

Q. Okay. And this was in connection with a communication you were having with someone named Peter Barnes, correct?

A. Yes.

Q. And Peter Barnes was interested in renting Apartment 6A for a two-year period, correct?

A. Incorrect.

Q. I want to -- do you see the message highlighted there?

A. Yes, sir.

Q. Do you see that?

A. Yes.
Q. Isn't it true that Mr. Barnes was seeking to rent out Apartment 6A for a two year lease around this time; yes or no?
A. Well, I am seeing it there but it's not a yes or no question/answer.
Q. But Mr. Barnes asked you regarding a two-year lease on 6A, correct?
A. Do you want me to tell you who Mr. Barnes is?
Q. Did Mr. Barnes ask you about a two-year lease on apartment 6A in or around June 2020?
A. He asked me. Okay.
Q. In response you wrote that in the past year she got an evaluation from two different brokers, you are referring to your mother, right? "She", meaning your mother?
A. Yes, correct.
Q. Okay. And one broker said 6500 a month. The other one said 7000, correct?
A. It's what it says on the email.
Q. Okay. And you wrote to Mr. Barnes that in effect your mother would suggest something in midway about 6800, correct?
MR. BEYDA: Your Honor, I believe these questions go to the portion of the document that's not in evidence.
THE COURT: That is true.
MR. MIN: Your Honor, the witness --
THE COURT: Hold on. I don't think the highlighted

portions are what's in evidence. Although I honestly don't recall. I'd have to go back and look. I think what's in evidence is what are admissions of Ms. Zarak, what were offered as admissions of Ms. Zarak. So, statements by Mr. Barnes are not in evidence. Statements by Ms. Zarak to the extent they're admissions are in evidence.

Go ahead, Mr. Min.

MR. MIN: Yes, your Honor.

THE COURT: But the document is in evidence. So, why are we asking Ms. Zarak if she wrote what is in the document? It's in evidence.

MR. MIN: Understand. I'd like to direct the witness's attention to Petition's Exhibit 166, which is in evidence.

(Pause)

THE COURT: Mr. Min, you should mute your line, please. It's probably not in the binder.

THE WITNESS: Yeah. Sorry. My petitioner exhibits go to 165. So, I will read it.

THE COURT: Go ahead, Mr. Min.

BY MR. MIN:

Q. Ms. Zarak, you wrote to Mr. Schram in 2018 that your mother was considering selling her apartment, correct? Apartment 6A is what you were referring to, correct?

A. Could you give me the specific date for context, please?

Maybe just scroll down a little. Yeah. February 24, 2018. Okay.

THE WITNESS: You can scroll back up, sir.

A. Yes. So, what I'm reading is my apartment won't sell. My mom is talking now about selling her apartment.

Q. But that apartment that you are referring to, "her apartment" is Apartment 6A, correct?

THE COURT: Are you asking about the second part, my mom is talking now about selling her apartment?

MR. MIN: Right. "Her apartment", meaning 6A, correct.

A. Yes, sir, correct.

Q. You described yesterday in your testimony, Apartment 6A as a two bedroom according to floor plans and usage; do you recall that?

A. Yes, I do.

Q. And then you described a lost space as a third bedroom with a king size bed?

A. It was a mistake. It's a queen size bed.

Q. Okay. But the apartment was not originally intended to be a two bedroom or three bedroom apartment; isn't that true?

A. Yes, it was.

Q. I want to direct your attention again to the document that was marked as Petitioner's Exhibit 86 that we were just looking at, specifically, Bates numbered page 549.

A. Yes.
Q. You were again corresponding with Mr. Barnes about showing him the Apartment 6A, correct?
A. Yes, sir.
Q. In June 2020, correct?
A. Yeah. I mean, August 20 I think it said but, yeah, around that time.
Q. Okay. And you were telling Mr. Barnes that the apartment has a living room. But aside from the living room there is an area that used to be a studio that you were using as a bedroom, correct?
A. Yes. But I also say there's a sofa. That sofa was a sofabed.
Q. But that space was not intended originally to be a bedroom, correct, in the layout of the apartment?
MR. BEYDA: Objection.
THE COURT: Sustained. The document says what it says. It's argumentative.
Q. In your testimony yesterday, Ms. Zarak, you said in response to Mr. Beyda's question as to why you moved from Brooklyn back to 6A, you said Why rent if you own? Do you recall that?
A. Yes, sir.
Q. You were paying the maintenance costs and other fees associated with 6A before you moved to Brooklyn, correct?

A. Before I moved to Brooklyn.
Q. You were paying the maintenance costs and fees associated with 6A before you went to Brooklyn, correct?
A. Yes.
Q. And then when you came back you were paying the maintenance fees and costs associated with 6A after you moved back in April 2016, correct?
A. Correct.
Q. Okay. But the time period you were living in Brooklyn between December 2015 and April 2016 you were not paying the maintenance fees on Apartment 6A, correct?
MR. BEYDA: Objection; relevance.
THE COURT: No. I'm going to allow it.
A. To be honest, Mr. Min, I don't remember.
Q. The maintenance costs for Apartment 6A is approximately 3200 to 3600, correct?
A. More to the 3600.
Q. Per month?
A. Per month, yeah.
Q. Yet, it's true though you only paid the maintenance fees associated with Apartment 6A when you, Mr. Schram and the children were residing in said apartment, correct?
A. Correct.
Q. You didn't pay those maintenance fees when you were living in Los Angeles for that approximate year?

MR. BEYDA: I don't think the witness was finished answering.

THE COURT: Yes, it was a yes or no question and she said "correct".

Go ahead, Mr. Min.

Wait for a question, Ms. Zarak.

Go ahead, Mr. Min.

MR. MIN: There's a question pending, your Honor. If I could ask the court reporter to read it back?

A. I know. I did not pay the maintenance fees when I was in Los Angeles or no.

Q. Okay. And you did not pay the maintenance fees when you were living in Iceland for the past approximately a year, correct?

A. Yes, I did, sir.

Q. You did. I want to direct your attention to document that from what account did you pay that maintenance cost?

A. From my bank account from my MasterCard account.

Q. Your MasterCard?

A. My Visa MasterCard.

Q. Not your Citibank account?

A. Yes, a Visa MasterCard.

Q. Okay. I want to direct your attention to a document that's been premarked -- Withdrawn, your Honor.

Your Honor, I'd offer Petitioner's 85 into evidence.

THE COURT: Give me one moment.

(Pause)

THE WITNESS: You said R85?

THE COURT: P85?

MR. MIN: Yes, P85.

THE COURT: Give me one moment to -- there are no objections. It'll be received.

(Petitioner's Exhibit 85 received in evidence)

THE WITNESS: I'm ready, sir.

Q. This is letter drafted by you on December 11, 2019, where you say Apartment 6A is owned by your family; is that correct?

A. Yes.

THE COURT: Can we make it slightly larger?

(Pause)

Q. In this letter you reiterate that the agreement between you and your family members is you, Mr. Schram and the children may occupy Apartment 6A as long as you are making payments related to Apartment 6A, correct?

A. Correct.

Q. Meaning that when you were not living there you had no obligation to pay for said expenses; isn't that true?

A. No. This is not a yes or no question, sir, but this is what the document says, yes. And it applied to my time in California? Yes. Did it apply to my time in Iceland? No.

Q. You and your two younger sisters each own an equal share of

Apartment 6A; is that true?
A. Yes.
Q. And therefore, according to your understanding, you have no unilateral authority to sell or rent that apartment; isn't that true?
A. Well, I am the one that uses it. I would say not unilateral but, yes, I have a priority.
Q. Well, when Mr. Schram tried to list Apartment 6A on an exchange website you told Mr. Schram he had no ability to do that because it was your mother's apartment?
A. I did it out of respect, Mr. Min. I recall that.
THE COURT: Hold on one second. Okay. Go ahead.
Q. That document that you were shown yesterday, Respondent's Exhibit Eight, which is the transfer of real property, the seller was your mother, correct?
A. The document that -- can you just --
MR. MIN: I'll withdraw the question.
Q. Your mother sold you Apartment 6A, correct?
A. I don't know if "sold me", is that correct word, but "transferred me", yes, that is correct.
Q. Right. And she transferred, not sold you that apartment because you did not pay any money for that apartment; isn't that true?
A. That is true, sir.
Q. It's true that your family has belongings -- withdrawn.

It's true that in or around July 31, 2020, your family had personal belongings located in Apartment 6A, correct?
A. Minimal.
MR. BEYDA: Objection. Can we understand what personal belongs?
THE WITNESS: And what family.
THE COURT: Overruled. She answered the question.
THE WITNESS: What family? Do you refer my extended family or my immediate family?
THE COURT: Any family. Let's stop the gamesmanship here. Any family.
And you said "minimal"; is that correct?
THE WITNESS: Yes.
THE COURT: Okay. Go ahead.
Q. Your father had clothes located in one of the closets in the apartment?
A. Minimal.
Q. Your mother had artwork hanging on the walls in the apartment?
A. Two.
Q. There was furniture in the apartment that belong today your family not to you or Mr. Schram, correct?
A. One sofa.
Q. There were household items or kitchen items that were in the apartment that did not belong to you or Mr. Schram,

correct?
A. No.
Q. When your mother visited New York in May of 2021, where did she stay?
A. With me.
Q. Where did she stay?
A. In Apartment 6A.
Q. You testified yesterday that Mr. Schram did not contribute any expenses towards Apartment 6A, but in fact, Mr. Schram contributed other expenses for the family while you were married, correct, in lieu of expenses directly for 6A?
A. Incorrect.
Q. Your testimony is that Mr. Schram provided no expenses on behalf of the family during the course of your marriage?
A. Workshop ATF provided insurance.
Q. During the course of your marriage, your mother provided you with monthly allowance, correct?
A. I wouldn't call it allowance. I would call it estate.
Q. She gives you approximately --
THE COURT: I'm sorry. You called it -- I didn't hear you.
A. "Estate".
THE COURT: "Estate" are you saying?
THE WITNESS: Well, yeah. She gives me part of my inheritance on a monthly basis.

THE COURT: Thank you.
Q. She gives you approximately between three thousand and seven thousand dollars per month on average?
A. $5,000, sir.
Q. Okay. Do you declare that money on your tax returns?
MR. BEYDA: Objection; relevance.
THE COURT: Sustained.
Q. You pay maintenance fees associated with Penthouse C, correct?
A. Not any more. I sold it.
Q. Prior to you selling the apartment you paid maintenance fees on apartment Penthouse C, correct?
A. With the money from the rent, yes.
Q. And you paid it to a company called Hayden; is that right?
A. No, sir.
MR. BEYDA: Objection; relevance.
MR. MIN: I didn't catch the answer and Mr. Beyda's answer.
MR. BEYDA: I made a relevance objection.
THE COURT: She answered it. It doesn't matter: It is irrelevant, which is why it doesn't matter.
MR. MIN: Your Honor, I'm happy to make an offer because I will have a few questions on this. I would like to offer P19 into evidence.
THE COURT: There's no objection. It is admitted.

(Petitioner's Exhibit 19 received in evidence)

Q. Your maintenance fees for Penthouse C were approximately $2800 a month, correct?

A. Yes, sir.

Q. I want to direct your attention to Bates numbered page 616.

A. Bates 616, yes.

THE COURT: One-six, I think he said. Right?

MR. MIN: It's six-one-six.

(Pause)

Q. Ms. Zarak, do you see that there is on September 16 a payment in the amount of 3200 made to Hayden Owners?

A. Yes, I do see it, yeah. But --

Q. And that's the maintenance fee associated with Apartment 6A, correct?

A. It usually goes to Midborough Management. So, I don't know. In this case I don't know what Hayden Owners Co would be.

Q. But is that the approximate amount of the maintenance fee for Apartment 6A?

A. Yes, sir, at the time, yeah.

Q. Understood. And page 618 do you see on September 1, 2019, a payment in the amount of 29 paid to Hayden Owners Co?

A. Yes.

Q. And it's for Penthouse C?

A. Yes, I do. So, then it is Hayden's Co. It's usually

charged from Midborough Management.

Q. Okay. So, I am going to direct your attention to --

THE COURT: Hold on. The question was, Is that the maintenance for Penthouse C?

THE WITNESS: Yes, your Honor, that was.

THE COURT: Thank you.

Q. I am going to direct your attention to June 2020.

THE COURT: Are you finished with this document?

MR. MIN: No, your Honor.

Q. Bates numbered page 721.

THE COURT: Same document okay.

Q. Do you see the payment made for 4700 on June 8?

A. Can you hold on one second?

Q. Sure, of course.

A. 721, Mr. Min?

Q. Yes.

A. I don't have 721. I have -- well, I can see it here.

THE COURT: On the screen, you mean?

THE WITNESS: Yeah. For some reason I don't have -- it goes from 689 to 784.

MR. MIN: The reason for that, your Honor, is these are Bates stamped. We put it in chronological order but the Bates stamp was not provided in chronological order. I apologize.

THE COURT: Can you enlarge this a little bit so

Ms. Zarak and I can see it?

(Pause)

THE COURT: All right. What's your question.

Q. Do you see that payment on June 8 to Hayden or 470 approximately?

A. Yes, sir, because this is June. There is some sort of a payment every June. So the maintenance fee every June is higher than it usually is. I don't know if that was your question but.

Q. And you see the payment on June 16 for approximately 1700?

A. Yes. So, that's Penthouse C. And for the same reason every June there's some sort of adjustment. I think it's tax related. I wouldn't know for sure.

Q. And then June, can I ask for the relevance of this, what this line of questioning is?

THE COURT: Mr. Min, are you finished with this line of questioning? Because I have to say I have questions myself about the relevance. Mr. Min, are we finished with this document?

MR. MIN: No, your Honor, I am not finished. I can give an offer of proof.

THE COURT: Yes, please.

MR. MIN: Your Honor, the relevance is that Ms. Zarak, according to these documents, were making payments on this apartment even while they were residing in Mexico and ceased

making payments with respect it to Apartment 6A when she left for Iceland. We believe that is relevant with respect to their intentions and the temporary nature of the move allegedly.

MR. BEYDA: That wasn't Ms. Zarak's testimony, your Honor.

MR. MIN: Which is why we're going through the document, your Honor, to demonstrate that and impeach her credibility.

THE COURT: I am going to allow it but you know you are getting cumulative here too. So, please, move on.

MR. MIN: Thank you.

Q. Ms. Zarak, I want to direct your attention to the time period of August 2020 and you see the payment there on August 18 in the approximate amount of 2800?

A. Yes, sir.

Q. That's for Penthouse C, correct?

A. Yes, sir.

Q. And there's no payment for Apartment 6A out of this account?

A. Out of this account, no, sir.

Q. In August 2020, correct?

A. Yes. Out of this account? No.

Q. This is the account that you historically were paying the maintenance on Apartment 6A, correct?

A. Up to that point, yes.

Q. You recall that there were discovery demand as made during the course of these proceedings?
A. Of course.
Q. You provide no other bank accounts aside from this bank account with respect to maintenance payments with regard to the Penthouse C or 6A, correct?
A. I provided no other bank accounts, correct, yeah.
Q. So, would it be fair to say that according to this bank account statements between the time period of August 2020 and May 2021, there were no maintenance payments paid out of this account with respect to Apartment 6A?
A. Out of this account that is correct, Mr. Min.
Q. Okay. When you were employed by Netflix you were, you had health insurance for you, Mr. Schram and the children, correct?
A. Yes, sir, I did.
Q. And when you were fired from Netflix, you Mr. Schram and the children were continued to be covered under COBRA benefits, correct?
A. Yes, sir.
Q. Those COBRA benefits ceased as of approximately March 2020, correct?
A. They ceased 18 months after my dismissal from Netflix.
Q. And after that you, Mr. Schram and the children did not have any health insurance in the United States, correct?
A. After those 18 months, that is correct, sir.

THE COURT: When were you dismissed, Ms. Zarak?

THE WITNESS: January 2019.

THE COURT: Thank you.

Q. You filed taxes for the tax year 2020, correct?

A. Yes, sir, I did.

MR. MIN: OK. I want to direct your -- I want to offer petitioner's Exhibit 49 into evidence?

THE COURT: Four-nine?

MR. MIN: Yes, your Honor.

THE COURT: It's admitted. There's no objection.

(Petitioner's Exhibit 49 received in evidence)

THE WITNESS: One second, please. I don't seem -- I don't have four-nine.

THE COURT: In the petitioner's binders, Ms. Zarak.

THE WITNESS: Yes, I am -- Four-nine is empty but I can see it here.

THE COURT: On the screen. You are okay with that?

THE WITNESS: Yes.

THE COURT: Okay.

THE WITNESS: Is this the only document in the exhibit, sir, just to make sure because I don't have it.

MR. MIN: Yes, Ms. Zarak, the 29 pages, yes.

Q. Do you recall as part of your New York State divorce proceedings you filed several sworn affidavits?

A. Do you recall as part of my divorce proceedings I signed

affidavits, sworn affidavit under oath?

Q. Yes.

A. I don't know the answer to that, sir.

Q. Well, you did initiate divorce proceedings in New York upon your arrival here, right?

MR. BEYDA: To say that we have been addressing the events leading up to the children leaving Iceland, this would be subsequent to, which was, I believe, Mr. Min's objection yesterday.

THE COURT: I'm sorry, Mr. Beyda. I didn't hear the beginning of what you said and it's starting in the middle of a sentence on what I can read. So, can you just repeat your I take it, you're objecting.

MR. BEYDA: I am objecting based on the timeframe that we're asking questions about, during yesterday's proceedings Mr. Min was objecting to questions that postdated the children leaving Iceland and the events of the divorce filing were certainly after the children leaving.

THE COURT: No. Overruled. You asked questions about her time in Mexico which was after she left Iceland. Is there really a controversy about whether Ms. Zarak initiated the divorce proceedings? You all told me that the first time I met you.

MR. BEYDA: It's in the stipulated facts.

THE COURT: So, let's move on, Mr. Min. they're part

of the stipulated facts. Do not ask about it.

MR. MIN: Your Honor, I am simply trying to get to her knowledge and understanding of signing sworn affidavits and sworn statements.

THE COURT: I can take judicial notice of that if it's relevant; can I not?

MR. MIN: Yes, your Honor.

THE COURT: Let's not waste time then.

BY MR. MIN:

Q. Ms. Zarak, in your divorce proceedings you stated that the parties filed taxes in New York for the year 2020; do you recall that?

A. I do not recall much. I do not recall that.

Did I, Mr. Min?

Q. We'll get back to that.

A. Okay.

Q. In fact, you filed alone tax returns in the year 2020?

A. Yes, that is correct. May I say why?

THE COURT: No. Let him ask the questions and then your lawyers can always do what's called "redirect".

THE WITNESS: Okay.

Q. It's true that no where in your 2020 tax return do you list any information with respect to Apartment 6A, correct?

A. It is true that in my 2020 tax return I do not mention 6A. I don't recall, Mr. Min.

Q. Well, with respect to declaring depreciation, you declared depreciation for your apartment Penthouse C for this year; do you recall that?
A. I do not recall much about my latest tax declaration. I was -- yeah.
THE COURT: Again, the document is in evidence.
MR. MIN: I want to direct your attention to what's been Bates named page 24675.
THE COURT: This is the same document?
MR. MIN: Yes, your Honor.
THE COURT: OK.
Q. You see there where it says on line 19 "cooperative maintenance"?
A. Yes.
Q. That amount $32,507 equals roughly $2700 per month which is the amount of maintenance fees associated with Penthouse C, correct?
A. Yes, 12 months, yes.
Q. And if we scroll up you, see the physical address of each property you listed Penthouse C, correct?
A. Yes.
Q. Okay. You don't list maintenance payments in the year 2020 for Apartment 6A, correct?
A. Correct.
Q. Did you consider your move to Mexico in 2020 to be

temporary or permanent?
A. Temporary.
Q. Did you consider your move to Iceland in July of 2020 to be temporary?
A. Temporary, yes.
Q. Yet, when you filed your tax return for the year 2020 -- and I want to direct your attention to Bates stamp 24684 -- you listed yourself as a New York City -- resident; do you recall that?
A. That was a suggestion of my accountant. No, I don't.
THE COURT: The question is did you list yourself that way, he is asking.
THE WITNESS: I don't recall.
THE COURT: But you recall that your accountant suggested it to you?
THE WITNESS: My accountant suggested a number of things, yes.
Q. And the number of months declared you lived in New York City was seven; do you see that in Section Eight on this page?
A. Yes.
Q. Okay. And the Section G, the enter the date you moved out of, moved into or out of New York State was July 31, 2020, it's the date you moved to Iceland, correct?
A. That is correct.
Q. Okay. So, for the seven months including the period you

lived in Mexico temporarily you considered yourself a resident of New York State, correct?
A. Correct.
Q. And in the five months that you so-called temporarily lived in Iceland you declared yourself a nonresident of New York state, correct?
A. Well, sir, I was in Iceland for my kids to go to school. That was going by default to be the school year. That was more than three months in Mexico. I had no idea when I would be back because there was a world pandemic. So, yeah, under the suggestion of my accountant that is probably what I entered.
Q. When you moved to LA in 2018 you also declared yourself a nonresident of New York for that time period on your 2019 taxes, correct?
A. I believe so, yes.
Q. Do you recall stating in your divorce proceedings that whenever the family traveled on vacation before COVID, you took clothes, some toys and books and toiletries?
A. On my divorce proceedings?
Q. Withdrawn.

THE COURT: Mr. Min, please, find a convenient time for the morning break.

MR. MIN: This would be a convenient time, your Honor.

THE COURT: All right. Let's take a ten-minute break. We'll see everyone at 11:10.

(Recess)

MR. MIN: Your Honor, we had e-mailed some documents. We just sent an e-mail. The hard copy should have been dropped off to the Court and opposing counsel with some new exhibits we marked. We may not offer it but they been marked anyway. We want to offer what's been marked as 175 which is Ms. Zarak's affidavit filed in divorce proceedings dated July 21, 2021.

THE COURT: Why are you starting at 175? I thought you were up to 168 with the last that I had.

MR. MIN: I think we went up to 174. That was before trial started, we were at 174.

THE COURT: This was amended. Is there any objection to these new exhibits? First of all, are the numbers to the new exhibits --

MR. MIN: 175, 176, 178, 175 to 179, 180 and then 184 because we got rid of three of them.

THE COURT: All right. Are there objections?

MR. BEYDA: I have not looked at them. I just received an email this moment with them.

MR. MIN: Your Honor, we had them sealed and hand delivered this morning. We may not refer to all of them.

THE COURT: Let's take whatever you have. We don't need to deal with something if it's not going to be --

MR. MIN: Right. So, 175 is the affidavit in the divorce proceedings dated July 21, 2021. We would offer that?

MR. BEYDA: My objection would be the timeliness of this submission and it being now proffered as an exhibit.

MR. MIN: Your Honor, with respect to that, that's fine. What we would like to do then is just ask the witness questions with respect to her statements within the document and we don't need to offer the entire document in and of itself.

THE COURT: All right. So, you are not offering it?

MR. MIN: No.

THE COURT: Let's go then with your examination.

MR. MIN: All right. I'd like to show the witness what's been premarked as Petitioner's 175.

Q. Ms. Zarak?

A. 175? I don't have 175, sir.

MR. MIN: We'll put it up on the screen for you.

(Pause)

Q. Do you know this document to be your affidavit you submitted in divorce proceedings in July 2021?

A. Yes, sir.

Q. I want to direct your attention to page three, paragraph four towards the top. Do you recall writing or do you recall signing a document that says, I also have a New York City identification card and we filed taxes in New York for 2020.

MR. BEYDA: Your Honor, I am going to object.

THE COURT: Sustained. Although, there isn't a

question, yes.

Go ahead, Mr. Min. I said to you before this is not in evidence but it is what it is and you can make evidentiary use of it.

MR. MIN: Okay.

THE COURT: What you are doing is not really a proper question.

MR. MIN: Understood.

Q. Did you state as part of your divorce proceedings that you and Mr. Schram filed taxes in New York for 2020?

MR. BEYDA: Objection; asked and answered.

THE COURT: No, that hasn't been.

Go ahead.

A. I am reading it here so, yes.

Q. That's not true though, correct? Only you filed taxes in New York for 2020?

MR. BEYDA: Testifying about reading from a document that's not in evidence because it's on the screen.

THE COURT: Correct. Just put the document aside, Ms. Zarak, and take the document down. It is not in evidence.

So, Ms. Zarak, now he is asking you, is the statement that you made that you and Mr. Schram filed taxes in New York for 2020 truthful?

A. I don't know a lot about taxes, Mr. Min. So, I just followed my accountant's advice. I wouldn't know -- the only

thing I know is that we filed separately. I am assuming that he filed in New York as well. That would be an assumption.

Q. And you made that statement in the divorce proceedings to support your contention that the move to Iceland was temporary, correct?

MR. BEYDA: Objection; relevance, as to what was going on in the divorce proceedings.

THE COURT: Sustained.

MR. MIN: I want to offer P80 into evidence, your Honor?

THE COURT: Eight-zero.

MR. MIN: Yes, your Honor.

MR. BEYDA: There is no objection, your Honor.

THE COURT: All right. It's admitted.

(Petitioner's Exhibit 80 received in evidence)

Q. I want to direct your attention to the Bates number 23314. Who is Nicole Seitelman?

A. Nicole Seitelman is one of my accountants.

Q. And on March 4th -- withdrawn.

And in March 2021, you and Ms. Seitelman were having communications with respect to the filing of your taxes for the year 2020, correct?

A. Correct.

MR. MIN: I want to direct your attention -- I want to offer P79. There is no objection, your Honor.

THE COURT: Admitted.

(Petitioner's Exhibit 79 received in evidence)

MR. MIN: And so we will pull that up.

Q. And March 23, you continued to have communications with Ms. Seitelman regarding your 2020 taxes, correct?

A. Yes, sir.

Q. And I want to direct your attention to page 23278. Ms. Seitelman asked you four questions that she wanted you to answer. Do you see that additional questions regarding your personal tax return?

A. Not on page 278.

Q. 23278 on the screen. Do you see the four questions that Ms. Seitelman asked you to answer?

A. Oh, I see, yeah, yeah. You mean additional questions, yeah. Sorry.

Q. Question four, she asked you, he's indicated when you exited New York City and when you moved to Iceland do you see that?

A. Yes, sir.

Q. And I want to direct your attention to what's been Bates numbered as 23277 on March 12, 2021. You responded to Ms. Seitelman in response to question number four I exited New York to relocate to Iceland on July 31, 2020; do you see that?

A. Yes, I see it.

Q. Okay.

A. Not permanent. Although --

THE COURT: Ms. Zarak, just answer the question's asked.

THE WITNESS: I'm sorry, your Honor.

Yes, Mr. Min, I see that.

Q. On both your 2019 and 2020 tax returns your address is listed as Iceland, correct?

A. Again, Mr. Min, I don't know much about taxes. I mean it's on the 2020. I wouldn't know about 2019. I just, I have tremendous trust in my accountants and I do whatever they tell me.

MR. MIN: I want to offer -- Withdrawn, your Honor.

Q. During the course of your communications with your accountants you provided them with your address in Iceland, correct?

A. Yes, sir.

Q. I want to direct your attention or?

MR. MIN: Your Honor, I'd like to offer a document that's been premarked as Petitioner's 121. No objection.

THE COURT: It'll be admitted.

(Petitioner's Exhibit 121 received in evidence)

THE WITNESS: Please, give me one second.

THE COURT: Sure.

(Pause)

MR. MIN: Your Honor, I won't ask any questions about

this document.
Q. When you moved to Los Angeles from New York in 2018 with Mr. Schram and your children, did you consider that move to be temporary?
A. I was offered a once-in-a-lifetime job opportunity that I believe was of tremendous importance for my family. We did not consider the move permanent. However, we were going to give it a shot.
Q. When you say I think you said tremendously important or valuable to your family -- and I apologize if I don't recall the exact word you used. That's because you had a career opportunity that was going to pay you a substantial amount of money; isn't that true?
A. Yes.
Q. Mr. Schram, in his conversations with you supported your move to Los Angeles because you had this career opportunity, correct?
A. Yes. Yes, yes I would say he was supportive.
Q. Even though he had reservations about moving to Los Angeles, correct?
A. Mr. Schram is not the most expressive person. He did email me some reservations. However, Los Angeles is a city where he went to undergrad, where he had a network, where he had friends. It is not like I was asking him to move to Kansas. So, he probably had reservations. I do remember an email

exchange where he expressed them. But he was not, it's a city that knew. It's a city that he knew. So, he seemed excited about it at times. It was oftentimes hard to read Mr. Schram.

Q. Yesterday you testified on direct at length about the roots you had in New York, your roots, your children's roots; do you recall that?

A. Yes, sir.

Q. You testified that you identified yourself as a New Yorker; is that true?

A. Yes.

Q. In July 2018, would you also say that your roots were in New York at that time?

A. In July 2018, if I may, is this a yes or no question or may I --

THE COURT: You can answer however.

A. In July 2018 Mr. Schram's salary was not enough for, to sustain the family, and I was home with two children. So, in July 2018 I was considering job opportunities. I realized that I had to, this was a family that was going to need two incomes. For various reasons the job opportunities I was starting to consider were not in New York. So, I would say that in July -- as much as I considered myself a New Yorker, I was starting to look outside of New York.

Q. Okay. So, but you did consider yourself a New Yorker at that time?

A. I have always considered myself a New Yorker.
Q. It's true -- withdrawn.
After you were fired in Netflix you filed a lawsuit against Netflix in California, correct?
A. For pregnancy discrimination, yes, sir.
Q. And as part of that lawsuit you, your lawyers drafted a complaint on your behalf, correct?
MR. BEYDA: Objection.
THE COURT: Grounds?
MR. BEYDA: Relevance.
THE COURT: I don't know. I am going to give him a little leeway. Did your lawyers draft a complaint in your lawsuit?
THE WITNESS: I would -- yes.
Q. Did you review a complaint before they filed it?
A. I most likely did, sir, yes.
Q. And in that complaint you stated -- in that complaint, isn't it true you stated that Ms. Zarak stated that she had uprooted her entire family including your son and daughter who were toddlers from New York to Los Angeles, please, because of her commitment to work for Netflix?
A. Yeah, that sounds true.
Q. As part of your move from Netflix you took the children out of school in New York. You un-enrolled them and you enrolled them in schools in Los Angeles, correct?

A. Not -- RZ was not in school previous to Los Angeles. He was one. So, EZ.

Q. Thank you for clarifying. You stopped paying the maintenance on Apartment 6A while you were in Los Angeles, correct?

A. Correct.

Q. And you rented a home for one year on a one-year lease in Los Angeles, correct?

A. Yes, correct.

Q. You moved by moving truck, belongings out of your Apartment 6A to your home in Los Angeles, correct?

A. Correct.

Q. You declared yourself a nonresident on your tax returns for the time period you were living in Los Angeles, correct?

A. Correct.

Q. When you moved to Iceland in August 2020 you un-enrolled EZ and RZ in school in New York and you enrolled them in school in Iceland, correct?

A. Correct.

Q. And you ceased paying or -- withdrawn.

You purchased a home in or around September 2020 in Iceland, correct?

A. Correct.

Q. And when you went to LA, just to sidetrack, you went partly because of your job or main reason because of your job offer at

Netflix, correct?
A. Not partly, a hundred percent because of my job opportunity at Netflix.
Q. When you moved to Iceland one of the reasons you move to Iceland was because Mr. Schram had job opportunities in Iceland, correct?
A. He had job conversations in Iceland.
Q. Prior to moving on July 31, 2020, isn't it true, Mr. Schram told you that he had job opportunities once he arrived in Iceland?
A. And those didn't materialize, sir.
THE COURT: Just answer the question though, did he tell you?
THE WITNESS: Yes, he told me that.
Q. And isn't it true on your resident permanent application in Iceland you listed the two reasons you moved today Iceland were due to COVID and because Mr. Schram had a job in Iceland?
A. I don't remember that, sir.
Q. Isn't there a document that might refresh your recollection as to reasons you listed on your permanent resident application?
A. Definitely.
Q. Would it be your resident permanent application?
A. Yes.
Q. We'll get back to that.

When you moved to Iceland for the time period you were in Iceland you also listed yourself as nonresident of New York on your taxes, correct?
A. I was following my accountant's advice.
THE COURT: Just, yes or no.
A. Correct.
MR. MIN: I want to direct your attention or I want to offer, your Honor, P93 and there is a hearsay objection but I will not be offering for any statements other than Ms. Zarak's.
THE COURT: That doesn't make it not hearsay.
MR. MIN: Understood, your Honor.
THE COURT: So, there's a hearsay objection. Do you want to respond?
MR. MIN: Yes, your Honor. I am going to offer it for party admission.
THE COURT: Pull it up.
THE WITNESS: P93?
THE COURT: Yes, but you could hold on until we deal with the objections.
MR. MIN: Your Honor, I am also offering it to impeach credibility.
THE COURT: I didn't hear you.
MR. MIN: Impeach credibility and state of mind, as well.
THE COURT: What portion are you offering?

MR. MIN: Ms. Zarak's e-mail portions, not the spots from the school.

So, the bottom of the first page and bottom of the second page, essentially, or the middle of the second page.

THE WITNESS: Can I see it too, or no?

THE COURT: Just hold on. But didn't we look at the bottom of the first page together already?

MR. MIN: We don't have it marked as "in evidence".

THE COURT: Neither do I.

MR. MIN: Okay.

THE COURT: That's why I was asking but all right and then the middle of the second page you are saying? And for what purpose are you offering this?

MR. MIN: Your Honor, with respect to -- well, there will be a later purpose but just in general, this document goes to her communications with the school for the relevant time period, her representations as her identification of her own self and also her state of mind at that time and also to impeach her credibility as to her testimony.

THE COURT: It's accepted as for her state of mind. So, the hearsay objection with respect to Ms. Zarak's emails only is overruled and it will be admitted for her state of mind.

MR. MIN: I'll put it up, your Honor.

THE COURT: Now, Ms. Zarak, you can look at it.

THE WITNESS: Thank you.

(Pause)

MR. MIN: Do you recall communicating with Landakotsskoli on June 30, 2021.

A. 2021?

Q. June 30 -- apologize. June 30, 2020.

A. Yes.

Q. Okay. And you were communicating with the school around this time to investigate the school to understand more about the school, correct?

A. Correct, yeah.

Q. And introducing yourself to the school you inquired to the school whether there were any Mexicans in the school, correct? You were referring to Mexican children, correct?

A. Yes.

Q. Okay. And the reason you asked that is because you identify yourself as Mexican, correct?

A. Well, I am.

Q. You didn't at any point ask Landakotsskoli whether there were any New Yorkers in this school?

A. Well, Laurie, herself is from New York.

MR. MIN: Move to strike as nonresponsive.

Q. Did you at any point ask Landakotsskoli whether there were any New Yorkers at school?

A. No, sir, I didn't but I did know Laurie was a New Yorker.

Q. You didn't identify yourself as a New Yorker at any point and not in this email?
A. No.
Q. I want to direct the witness's attention to R18 which is already in evidence.
A. R18, yes.
Q. Bates stamp page 13982; when ever you are ready.
A. Can I see it from the screen.
THE WITNESS: Is it okay if I see it from the screen?
THE COURT: Sure. Are you able to see that, Ms. Zarak?
THE WITNESS: Yes, your Honor.
Thank you.
THE COURT: Okay.
Q. These are communications you had with at that time PS 87 in New York, correct?
A. Yes, sir.
Q. Okay. And on March 11, 2019, you wanted to inform that you were planning on moving back from Los Angeles to New York, correct?
A. Yes, Mr. Min.
Q. Okay. And you identified your family not as a New York family coming back to New York but as an Icelandic/Mexican family, correct?
A. Correct.

Q. I want to direct your attention to an exhibit and I'd like to offer P57 into evidence. There's no objection.
A. P57?
THE COURT: It'll be admitted.
(Petitioner's Exhibit 57 received in evidence)
MR. MIN: One second, your Honor.
Q. Who is Marcia Mayer?
A. Marcia is a good friend of mine and a producing colleague. So, she's a work friend.
Q. She's a?
A. She's a work friend.
THE COURT: "Work friend".
Q. And you were communicating with her on or about March 14, 2020, which is a couple days after Mr. Schram was notified that his visa had been denied, correct?
A. Yes.
Q. Okay. This is also a day after you were notified that the schools in New York would be closing; isn't that true?
A. I believe so, yeah.
Q. Okay. I want to direct your attention to the Bates number 21543. In this document you wrote to Ms. Mayer that in order to protect our long terms of living in states, we are forced to leave until this gets resolved. We're flying to Mexico on Monday and Tuesday and we will be away until our new visa's kick-in in like six weeks.

Do you see that?
A. Yes, sir.
Q. Okay. So, on this day when you were aware that Ms. Schram's visa was denied and schools were about to close in New York it wasn't the only reason. The only reason you left United States on March 16 was not because of COVID, it was because of your immigration situation, correct?
A. Like we discussed yesterday, yes, sir.
Q. Later on in that same email you asked Ms. Mayer for a favor, correct?
A. Yes, sir.
Q. You asked her to fabricate a job offer letter in support of your O1 visa; isn't that true?
MR. BEYDA: Objection.
THE COURT: No. I'm going to allow it.
A. I was asking her to offer me a job similar to the correspondence with Tom Zoli.
Q. Well, you didn't say "job". You said but for my O1 visa "I need a job offer letter." You put "job offer" in quotes. Do you see that?
A. Yes, I see it, Mr. Min.
Q. Similar to the one for my Green Card; do you see that?
A. I see that, yeah.
Q. This wasn't a real job offer. This wasn't a job offer that you expected to consider and possibly take, correct?

MR. BEYDA: Objection.
A. No, it was.
THE COURT: The objection is overruled.
Q. And similar the Green Card, the Green Card -- withdrawn.
So, you asked for specifically a job offer going on, we can say that I be working for Tenacious as a producer on such and such project for "X" period of time; do you see that?
A. Yes.
THE COURT: Hold on. Okay. I see.
Thank you. Go ahead.
Q. Ms. Zarak, this real job offer, you're saying this would have resulted in was for such and such project for "X" period of time; is that your testimony?
A. We can say that I will be working for Tenacious as producer. I wasn't aware of what Tenacious was doing at the moment. So, if I had I would have listed names but.
Q. So, how was it your expectation when writing this e-mail that this would be a real job offer when you had no idea what projects they were working on?
A. Because I worked with her before and she is my friend. In fact, in fact many years ago I contacted one of Mr. Schram's witnesses regarding an American movie to be shown in Iceland. That movie never consolidated. So I never saw that witness again. That movie was with Ms. Nunez. So, Ms. Nunez is someone I've known for at least 15 years and we've worked

together on a number of projects. I know the kind of things she does. She knows the kinds of things I do. I didn't know at this time what she was doing. Ms. Nunez also is a mother of two young girls like myself. So I didn't even know if she was working at the time.

Q. When you said "many years ago", how long ago is that?

A. So, the first time I met Ms. Nunez she used to work in a company called Goldcrest and Goldcrest sold one of my films. That film was "The Girl". I did The Girl. The Girl came out in -- so, I don't know her for 17 years I know her for less. The girl came out in 2012. So, I know Ms. Nunez at least in 2010. So, that would be 11 years.

Q. Are you finished, Ms. Zarak?

A. Yes.

Q. Bonita Films is your film company, correct?

A. Yes.

Q. And below you say Bonita Films has done this for friends many times through the years and I obviously, never had any obligations for responsibilities of any sort with any of them. Isn't it true that by writing that you were asking Ms. Mayer for a "job offer" letter that was in fact not real and had no obligations or responsibilities in connection with it?

A. That could have no obligations or responsibilities of any sort. But that was to be discussed. I am interested in seeing what she replied.

Q. And you write right here --

THE COURT: Hold on. I am going to just admonish both of you, you are just arguing with each other.

Ms. Zarak, when there's not a question pending, you shouldn't be speaking. You shouldn't be offering things that you just want to say. That's what your lawyers are supposed to ask you about.

And, Mr. Min, stop raising your voice and stop being so argumentative. your questions are fair ground but let's rachet it down a little bit.

MR. MIN: Understood. Apologies, your Honor.

If I may just have one second, your Honor?

(Pause)

Q. Ms. Zarak, in that same paragraph, you wrote to Ms. Mayer that you enclosed a sample letter. Did you in fact enclose a sample letter?

A. If I say so, I probably did, yeah.

Q. Now, this job offer letter you sought from her you wrote above is similar to the one for your Green card, correct? Do you see that?

A. I see where I wrote it, yeah.

Q. And your Green card application was submitted less than a month after this email, correct, in early April?

A. I believe I signed. From the document that was shown yesterday I signed yes, you are right, Mr. Min, April.

Q. And it's true that as part of the Green Card application you also fabricated job offer letters so that you could try to secure a Green Card in the United States?

MR. BEYDA: Objection.

THE COURT: No. He can ask. Overruled.

You can answer, Ms. Zarak.

Did you fabricate the letter as part of your Green Card application?

A. I don't remember, Mr. Min.

MR. MIN: If we can scroll up here on the bottom of Bates numbered page 21542, Ms. Mayer writes to you that she's happy to help you and when do you need the letter by?

Do you see that?

A. "When do you need the letter by", yes.

Q. That was on March 14th the following day. If we can scroll up on March 15th, you respond that you can help her write it. I'll email it over. You review the letterhead and sign.

A. Yes, sir.

Q. And below that you say it's okay in capital letters to be a little creative with this.

Do you see that?

A. Yes, sir.

Q. Isn't it true that when you said you can be a little creative with this you're telling Ms. Mayer that she can pretty much invent whatever she wants to invent because it's not a

real letter, correct?
A. No, sir. I don't think I was -- I don't think it's what I was referring to.
Q. Do you see above that where Ms. Mayer says I have some grant applications out for that one referring to only in the movies. So, if you need supporting documents it'll be easy to provide.
Do you see that?
A. Yes.
Q. Didn't you understand that email to indicate that Ms. Mayer would help you fabricate this offer letter and provide supporting documents so that it seemed like a real opportunity?
A. No. I think what I meant was you can offer me a job on only in the movies.
Q. Any time since March 2020 have you received income from Tenacious?
A. No, sir.
Q. And on the basis, did you ever receive a signed letter from Ms. Mayer?
A. I don't recall, sir.
Q. As part of your O1 application, how many letters of the similar nature did you provide?
MR. BEYDA: Objection; relevance.
THE COURT: That objection is overruled.
MR. BEYDA: Objection. It assumes facts not in

evidence.

THE COURT: The question is objectionable as to form. Please put another question.

Q. As part of your O1 visa application, did you submit any letters from prospective employers similar to the ones that are being describing in the email?

MR. BEYDA: Objection. The -- (inaudible) and the parties joint intentions regarding where they would be living.

THE COURT: Overruled.

A. The "O" Visa requires potential job offers.

THE COURT: Did you submit letters as part of your O1 visa application?

THE WITNESS: I did.

THE COURT: Okay. Thank you.

A. How many such letters, I don't recall, sir.

Q. Do you recall from who you submitted such letters?

MR. BEYDA: Objection; relevance.

THE COURT: Overruled.

A. I don't recall, sir. This was a long time ago. Well, not that long but I don't recall.

Q. And that O1 visa application you submitted was granted, correct?

A. It was, sir.

Q. And that's the basis of your current immigration status in the United States, correct?

A. Correct. Until I received my Green Card.
Q. I want to direct your attention to a document that's in evidence, R44, your Green Card application.
THE COURT: Give me one minute.
(Pause)
THE COURT: This is in evidence already, right?
MR. MIN: Yes, your Honor.
THE COURT: Okay.
THE WITNESS: Sorry. R --
THE COURT: Mr. Beyda, by the way, this is why the relevance objections were overruled. You did put this whole issue in evidence.
MR. BEYDA: I understand.
(Pause)
THE WITNESS: Yes, I have a R44, Mr. Min.
MR. MIN: Thank you.
Q. Before we go into that document, have you derived any income between March 2020 and May 2021 from any of the companies you listed in support of your O1 visa application?
A. No, sir.
Q. Okay. So, to direct your attention to the first page --
THE WITNESS: Can I expand on that?
THE COURT: No. Your counsel can -- if your answer is no, it's no. If there's more to say, that's your lawyer's job.
THE WITNESS: Okay.

MR. MIN: Your Honor, just to direct the witness to Bates numbered page 25193 which is the first sized cover page of this document.

Q. You list your mailing address on your Green Card application as Mexico, correct?

A. Yes, sir.

Q. Okay. And to go to page six, part six of Bates number 25227 part 625227, goldcrest is a company you mentioned previously associated with Marcia Mayer?

A. Yes, many years ago. She is an independent producer now.

Q. And you continued your relationship with Goldcrest after Ms. Mayer departed from this company, correct?

A. Yes, sir.

Q. And in fact, Goldcrest wrote a letter on your behalf in support of your Green Card application, correct?

A. It's here, sir, yes.

Q. In fact, this was the only job offer letter with income attached to it that you put in support of your Green card application, correct?

A. I don't know. I don't know, sir.

Q. This job offer was for approximately 75,000 per year, correct?

A. Yes, sir.

Q. Have you at any time between March 2020 and May 2021 received income from Goldcrest?

A. Well, see during the COVID pandemic there had been no films shooting anywhere. So, the answer is no. But you must understand the context of this.

THE COURT: All right. You've answered. I get your point.

THE WITNESS: The answer is no, sir.

Q. You testified yesterday and you recently just testified that you have your Green Card, correct; is that your testimony?

A. I don't physically have it yet. I have it approved.

Q. Well, to be clear, your Green Card application was approved in around July 2020, correct?

A. Yes, sir.

Q. Your actual Green Card allowing you to be a lawful permanent resident of the United States has not been approved as of today, correct?

A. It has been, sir. After July 2020, I made one more payment. I submitted extra documents and I have an appointment pending with your U.S. surgeon, so.

Q. When is that?

A. This process has taken over my entire life. So, I don't know when the appointment with -- I don't even know if it has been properly scheduled. Again, COVID has changed every administrative process in the world. I don't have an answer for you but I can tell you that the last payment for the Green Cards for both Mr. Schram and myself was made from Iceland and

I can tell you -- I can tell you that the same, the same criteria of no criminal background checkup. I have had to do the same thing with the FBI, that's done recently. That was the a last set of documents I have had to submit to Teresa Woods.

THE COURT: All right. The question was simply, your Green Card is not yet approved; is that yes or no?

THE WITNESS: It's approved. As far as -- yeah, it's proved.

THE COURT: Go ahead, Mr. Min.

Q. And it's your testimony that it was approved on July 23, 2020; is that correct?

A. On July 2020? I had to do -- well, yes, it was approved in 2020. I had to do one more payment which I did in September and then I had to submit a last set of documents.

Q. When did you submit those documents?

A. Just recently, this summer.

Q. When?

A. I would have to go through my email, which I am not allowed. I don't have the exact date for you, sir. But I included an FBI checkup that was done, a background checkup or noncriminal record. I did that from Iceland.

Q. So, prior to June 17, 2021?

A. The criminal record I did, yes.

Q. And that was the last submission of documents for your

Green Card?
A. As far as I can recall, yes, sir.
Q. And at that moment you believed you understood yourself to be a lawful permanent resident of the United States?
A. Well, cause I had an "O" Visa, yes, that also made me a lawful resident of the United States. So, the same reason why I trust my, the same reason why I have an account and I trust my account and I have an extraordinary immigration lawyer and I trust my immigration lawyer. So, whatever she advised me, I did. And so, I can tell you with all certainty that it is lawful.
Q. OK. My question to you was when you submitted those documents, those FBI criminal documents while you were in Iceland prior to June 17, 2021, was it your understanding that at that time you were a lawful permanent resident of the United States?
A. Is the O1 -- I don't know.
THE COURT: If you don't know, you don't know.
A. Exactly, I don't know. The answer is, I don't know, Mr. Min.
Q. Okay. And in fact, in 2020 you were approved for an O1 visa, correct?
A. In 2020, yes, sir.
Q. And that approval wasn't until 2023, correct?
A. Yes, sir, correct.

Q. But the initial visas you received for the initial period of time from 2020 July to July 20201, correct?
A. No. So, the visa is granted for three years or the -- the visa was granted until 2023, yes, for three years I was saying the -- right. You have to renew the physical stamp you see on the passport, that you have to renew every year. That's how it's always been.
MR. MIN: Your Honor, I'd like to offer R115 into evidence.
THE COURT: It'll be received.
(Pause)
THE WITNESS: Yes, yes. Not the best picture of me, but okay.
THE COURT: Nobody likes their passport pictures or their driver's license.
Q. I will direct your attention to the passport page two is the visa you were issued in 2020, correct? The O1 visa?
A. Yes, sir. And I have a new one now.
Q. This particular visa expired after one year in July 2021; do you see that?
A. Exactly, yes.
Q. Scroll up two pages. And that is the visa you received on July 2021, correct?
A. Correct.
Q. And that expired next July 2022?

A. Correct. When I will do the same thing.
Q. Wouldn't it be fair to say that if you were a lawful permanent resident of the United States as of July 2021, you would not need an O1 visa to be renewed for a one-year period of time, correct?
A. Probably, Mr. Min. I would have to ask Teresa Woods.
Q. Withdrawn.
A. But see, if you see over there it says June 30, 2023, Mr. Min. If you see on bottom right corner it says June 30, 2023, with that is the real date when it expires.
THE COURT: There is no question pending.
THE WITNESS: Sorry, your Honor.
Q. After you received your Green Card approval notice on July 23, 2020, it's fair to say you understood there were additional steps you would have to take after that, correct?
A. Yes, sir. The surgeon doctor I was telling you about.
Q. Okay. Submit documents and also have an interview, correct?
A. Correct.
Q. The surgeon doctor I told you about and you would have to have an interview with United States Immigration Services as well, correct?
A. I believe so.
Q. As part of your Green Card application you listed Mr. Schram as a derivative applicant, correct?

A. Yes.

Q. Meaning that because he is your spouse, if you were approved for a Green card, he would be approved for a Green Card?

A. It is not an automatic process. He applied as well.

Q. He submitted a separate application from you; is that your testimony?

A. Not from me, no, from what I understand.

Q. A derivative?

A. Okay.

Q. Isn't it true that you understand that if you and Mr. Schram were not married, he would no longer be eligible to be a derivative under your Green Card approval process?

A. I asked Teresa Woods about this and she said that because we are so (technical interruption) for him to have his Green Card.

Q. Did you --

MR. MIN: Your Honor, I'd like to ask the witness to answer the question. I would make a motion to strike that.

THE COURT: That was responsive. That was her response to what you asked.

MR. MIN: Okay.

Q. Is it your understanding that if during the interview process it was disclosed that you had filed for divorce from Mr. Schram, that Mr. Schram might not be eligible to receive a

green card as a derivative of your application?
A. I wouldn't know, sir. I'm sorry. I've never done this before.
Q. I want to direct your attention to P79 which is in evidence.
A. Yes, I have it, sir.
Q. I want to draw your attention to Bates numbered page 2377.
A. Yes, sir.
Q. You wrote to Ms. Seitelman, your accountant, on March 12, 2021 and about nine months after you received your approval notice that if all goes well with the process I will get my Green Card at some point in late 2021 or early 2022, correct?
A. Yes, sir, that's what it says there, yes.
Q. So, you understood as you're testifying here and as of March 2021 that you did not in fact have your Green Card, correct?
A. Well, I don't physically have it, yes, correct. You are right.
Q. I want to direct your attention to Respondent's Exhibit 50 which is in evidence.
THE COURT: Give me one moment.
(Pause)
THE WITNESS: That is not what I have --
THE COURT: Hold on. R50 you are saying, right?
MR. MIN: R50 it might not be in evidence. I'm just

checking.

THE COURT: Yeah. I don't have it in evidence.

MR. MIN: I would offer it, your Honor.

THE COURT: All right. Let me just take a look.

(Pause)

THE COURT: OK. It'll be admitted.

(Petitioner's Exhibit 50 received in evidence)

MR. MIN: Going to the second page, page 736.

Q. Is this the email we've seen before where Ms. Woods told you that your Green Card had been approved, right?

A. Yes, sir.

Q. And if we scroll up to July 23, 2020, Bates numbered page 7630 on the bottom and say we are going to Iceland next week and staying there for the rest of the year, what civil documents do you need, I just want to make sure I have them and can get them to you.

Do you see that?

A. Yes.

Q. Okay. And do you see above that Ms. Woods says she will get you a list by the end of the day tomorrow of what -- do you see that?

A. No. I don't see that part where she says until the end of the day tomorrow. No, I don't -- there.

Q. I'm sorry?

A. Yeah.

Q. This is on July 23rd?
A. Yes.
Q. Did Ms. Woods get you the list of documents you had to provide?
A. Eventually, she did because I provided them.
Q. Do you recall when she gave you the list?
A. I don't remember, sir, if it was by the end of the day tomorrow.
Q. Okay. Was it shortly after July 23rd?
MR. BEYDA: Objection; relevance.
THE COURT: Sustained.
MR. MIN: Your Honor, I will have follow-up questions where this will be relevant. I'd like a little leeway.
THE COURT: I've given you leeway. The document is in evidence.
Q. Do you recall when she provided the list of documents?
A. No, sir, I do not.
Q. Okay. And you testified yesterday that this Green Card process was a long-time dream come true?
A. Yes, I did.
Q. You testified today that you've waited your entire life for this.
THE COURT: Mr. Min, if she is testified to it, it is in the record.
MR. MIN: Okay.

THE COURT: These are not proper questions.
Q. How long have you lived in the United States for?
A. So, on and off since 2004 without counting the year I lived here as, I wouldn't say a child but a teenager with my family.
Q. And?
A. You want a number?
Q. Hold on. Sorry.
A. No. I'm trying to add the years for you, Mr. Min. Is that an answer enough?
Q. That's a fine.
THE COURT: Thank you.
Q. Aside from your job at Netflix which lasted for several months in 2018, since 2013 you had not had a salaried job, correct?
MR. BEYDA: Objection; relevance. Her salaried job has nothing do with the issues in this case.
THE COURT: Sustained.
Q. You had not ever filed a Green card application prior to April 2020, correct?
A. Correct, sir.
Q. And as part of the Green Card application, in fact, the majority of the documents in support to illustrate your career in the film industry were from 2012 and prior, correct?
A. I'd say somewhere from before 2012, you mean the press?
Q. The press clips and your history as a producer, those were

all from 2012 and prior years, correct?
A. And prior years, yes, so.
Q. Including a lot of work you did in Mexico, as well?
A. Somewhere in Mexico, correct.
Q. And so it would be fair to say that you had the opportunity to apply for your Green Card between 2013 and 2020 but you chose not to, correct?
A. No. That would be unfair to say, sir.
Q. You corresponded with -- withdrawn.
Scott Goldsmith was as you testified Mr. Schram's immigration attorney in 2017?
A. Yes, sir.
Q. But you had significant correspondence with Mr. Goldsmith, correct, around that time?
A. Well, because I was, I am married to Mr --
THE COURT: Yes or no?
A. Yes. There must have been correspondence with Scott, yeah.
Q. You recall having correspondence with him with respect to applying for a Green Card, correct?
A. Yes, but we didn't -- so, the type of Green Card that I have it's based upon --
THE COURT: There's no question, Ms. Zarak. He just asked did you correspond in connection with applying for a Green Card. You are trying to anticipate where he is going and you have two competent lawyers who can do that. Okay? It'll

move faster if you just answer the question.

Go ahead, Mr. Min.

MR. MIN: Thank you, your Honor.

Q. You told Mr. Goldsmith in around 2017 that you would explore the Green Card option at some point in the future, correct?

A. I probably did, yes, sir.

Q. And in 2017 you told him that you and Mr. Schram were considering moving to Mexico in January of 2018 to try it out there, correct?

A. Probably. I wouldn't know for sure.

Q. So, considering the fact that this was a life-long dream of yours to receive a Green card after you received a notification on July 23; it's it true?

Withdrawn.

How long after you received notice on July 23rd did you begin to submit documents in support of your Green Card application?

A. I made a payment in September from my son which was part of that civil document process and then because of COVID a lot of these offices have backlog. So, for example, all the criminal background checks you couldn't just get those. I mean, in fact the office, it's the same reason why the Icelandic, the one-year Icelandic residency permit was delayed. All those offices were closed.

THE COURT: That is not responsive, Ms. Zarak. He just asked you how long after you received the notice did you begin to submit documents?

A. So, I began --

THE COURT: So, I am going to -- hold on. I am going to strike that. Because at some point this has to come into focus. Just answer the question.

How long after you received notice on July 23rd did you begin to submit documents in support of your Green Card application?

A. I would say six months later, Mr. Min.

THE COURT: Thank you.

Q. After you arrived to Iceland, August 1, 2020, you submitted your resident permit application sometime in early January 2021, correct?

A. Correct.

MR. MIN: I'm going to offer what's been premarked as Respondent's Exhibit 52, your Honor.

THE COURT: It'll be admitted.

(Respondent's Exhibit 52 received in evidence)

MR. MIN: And I want to direct the witness's attention to Bates numbered page 7746.

Q. Ms. Zarak, you wrote -- I apologize.

A. Yep. I'm here.

Q. You wrote to Ms. Woods on April 8th and this is

approximately nine months after you arrived in Iceland or after you received notice that I have not done much -- Green Card I have not uploaded any document to portal. Is there a deadline for that?

A. Yes, I see it.

Q. After receiving this life-long dream of receiving your Green Card approval notice, you waited nine months to submit, not even submit, to inquire about submitting documents in support of that application; isn't that true?

A. It's true, Mr. Min.

Q. And if we go above to Bates stamped, the same page, scroll up starting from the prior Bates stamped number 7745 which is dated April 15 you asked Ms. Woods:

Is there a deadline to complete the DS-260?

What is the DS-260, as far as you understand?

A. It's a form you need to fill out prior to any kind of immigration process. There is DS-160 and there's a DS-260. I would have to ask Teresa Woods, sir.

Q. You asked her, am I risking anything but not -- do you see that?

A. Of course.

Q. And so isn't it true that you were not in a hurry to receive the Green Card as of April 2021?

A. Well, I was dealing with a divorce, three children, a pandemic. So, yes, sir, it's true. I had not done much.

Q. You also said in that same section that your husband might not be continuing with the Green Card process and you wanted to know how that would affect your process, right?

A. Correct, sir.

Q. This is on April 15, 2021. So, isn't it true that as of April 15, 20201, you have had conversations with Mr. Schram and you understood that Mr. Schram had no intention of ever moving back to the United States?

A. Mr. Schram wanted to leave me, Mr. Min. Yes, I did know he didn't want to come back to the United States. Of course, I did.

Q. You did know that he did not want to come back to the United States?

THE COURT: She said "yes", Mr. Min. Move on.

MR. MIN: I just wanted to clarify.

THE COURT: No. Mr. Min, move on. It is not productive to keep arguing with her about documents. They say what they say and now she's answered your question. So, move on.

MR. MIN: I want to offer Petitioner's Exhibit 36.

There is no objection to that, your Honor.

THE COURT: It'll be admitted. You said respondent's?

MR. MIN: Respondent's 36.

THE COURT: I just had the wrong document. Give me one second.

(Pause)

THE COURT: And there's no objection to that, right?

MR. BEYDA: No, your Honor.

THE COURT: All right. Thank you. It'll be admitted.

MR. MIN: Thank you, your Honor.

(Respondent's Exhibit 36 received in evidence)

Q. I want to direct your attention to an email that begins on Bates numbered page 7759 and continues on to 7760, dated April 16, 21 from you to Ms. Woods.

A. Yes, sir.

Q. On that email, again, looking at page 7760 for paragraph number four mailing address and permanent address you wrote your mailing address is in Iceland and your permanent address is in Mexico. And then you write, should I invert, you didn't list your New York address anywhere in this email, correct, as either your mailing or permanent address?

A. Correct.

MR. MIN: Your Honor, I do --

Q. You also state below there in response to Bates numbered page 7762 in response to the languages you wrote Spanish, English, French, Icelandic learning; do you see that?

A. Yes, sir, I did.

Q. And this is in April 2021, right?

A. Um-hmm.

Q. And you testified yesterday -- Withdrawn.

Would it be fair to say that on April 2021 -- Withdrawn.

MR. MIN: Your Honor, I'd like to go back to Petitioner's Exhibit Five which is in evidence and we can just pull it up and --

THE COURT: Hold on. I don't show that in evidence.

MR. MIN: I'm sorry. There's no objection. Though, I'll offer it.

THE COURT: All right. It'll be admitted.

You can proceed.

MR. MIN: Thank you.

(Petitioner's Exhibit 5 received in evidence)

Q. I want to direct your attention to Bates numbered 7755. You were talking to Ms.~Woods on this day about renewing your visa, correct?

A. No -- yes.

Q. You were talking to Ms. Woods about renewing your visa on April 15, 2021?

A. Yes, sir, April 15, 2021.

Q. And on this date you wrote to her that your plan was or your idea is to fly back to Iceland through the U.S. in early August. You meant August 2021, correct?

A. Correct, sir.

Q. Because your plan in April 2021 was to continue to reside in Iceland, as starting in August 2021 when you were returned

there, correct?
A. No, sir, that's not what I was saying.
Q. While you were living in Iceland with Mr. Schram and the children you wanted your nanny, Susana, to come and help you with the children, correct?
A. Correct, sir, we all did.
Q. And you submitted several requests to have her come to Iceland, correct?
A. Correct.
Q. And the first one was in or around September 2021, correct?
A. September 2021, incorrect, sir, September 2020.
Q. September 2020. Thank you.
Yes?
A. Yes.
Q. And the second one was in about January 2021, correct?
A. Probably. Well, she left in January 2021. I wouldn't know the exact date of the second one, sir.
Q. There was another request made in around March 2021, correct?
A. Okay. Yes, that sounds more like it.
THE COURT: Excuse me. To whom are these requests made? Ms. Zarak, I am asking you.
THE WITNESS: These requests, so my husband consulted with an immigration lawyer in Iceland regarding Susana and we had to write requests to the -- it has an Icelandic name but

it's like, it's the entity that controlled traveling during COVID, all COVID-related travel restrictions.

THE COURT: Okay. Thank you. The Icelandic authority was really all I needed to know.

Thank you.

Q. Ms. Zarak, would that be the Directorate of Immigration, as far as you recall?

A. Well --

THE COURT: Didn't I just say that's all I need to know? Go ahead. If you are able to answer, Ms. Zarak, you can answer if you are able.

A. There were two different entities we were in communications with. I wouldn't know for sure which was -- again, this was all spearheaded by my husband so I wouldn't know for sure which one of the two.

MR. MIN: Ms. Zarak, your Honor, I'd like to offer Petitioner's Exhibit Five in evidence and there are no objections to that, your Honor.

THE COURT: All right. It's admitted.

Q. I would direct the witness's attention to Bates number 778.

A. Yes.

Q. This is an email you wrote on September 15, 2020 requesting permission, authorization for Susana to come to Iceland, correct?

A. Correct, sir, to -- yes.

Q. And you stated you live in Reykjavik with your husband and your children and the reason you wanted Susana to come to Iceland as you stated is because you had a project for ViacomCBS which was planning to shoot in Mexico in the spring of 20201, correct?
A. Correct. That was not a lie.
Q. Okay. And you needed Susana to come there to work as your executive assistant as part of this project, correct?
A. Correct. That's what it says.
Q. But that was a lie, correct?
MR. BEYDA: Objection.
THE COURT: No. She can answer.
Is that a lie?
THE WITNESS: No, not completely, no.
Q. Partially a lie?
MR. BEYDA: Is there a question?
THE COURT: He asked is it partially a lie. She said "not completely".
A. It is partially a lie, yeah, I guess you could say that, Mr. Min.
Q. Did she come after this request was made?
A. Can you just remind me the date?
Q. Sure. This is September 15 that the request was made. Did she come any time between September and December of 2020?
A. No, sir, she didn't.

Q. Okay. Did you in fact shoot this project called *(speaking Spanish)* in Mexico in the spring of 2021?
A. Unfortunately, due to COVID that project fell through. So, no, I unfortunately didn't.
MR. MIN: I want to direct your -- I want to offer Petitioner's Exhibits 104 and 105 into evidence, 104 and 106 and there is no objection to either.
A. Petitioner Four?
THE COURT: One-zero-four. They'll both be admitted 104 and 106 are admitted.
(Petitioner's Exhibits 104 and 106 received in evidence)
THE WITNESS: Yes.
THE COURT: All right. Are we looking at 104 first, Mr. Min?
MR. MIN: Yes, your Honor.
THE COURT: Okay.
Q. This is a letter you wrote on January 6 requesting Susana to be permitted to travel to Iceland, correct?
A. Yes, sir, correct.
Q. And the reason for that you gave was that you were developing a documentary featured film through your company Bonita Film based upon the lives of Mexican immigrants in Iceland, correct?
A. That's correct, yes.

Q. This was not true, correct, that you were developing a documentary feature film in Iceland?
A. No. That was true. It just never happened.
Q. And is it true that the purpose of Susana coming to Iceland at this time was to help you with this project?
A. Amongst other things.
Q. So, is this another example of the partial lie you testified to earlier with respect to your September application?
A. No, because she was going to help. I'm not -- a lot of people speak Spanish in Iceland, Mr. Min.
Q. Was she going to be providing any other services to you or your family on this expected trip?
A. Yes.
Q. And you did not disclose that as part of your request, did you?
A. And my husband's advice, no.
MR. MIN: Move to strike the last portion of the answer, your Honor?
THE COURT: Just answer the question, please. Did you disclose it?
A. No, Mr. Min, I didn't.
THE COURT: Thank you.
Q. And do you recall who this letter was sent to?
A. I think it was sent to the same person that the other

one -- her name is Suna? She controlled COVID travel restrictions in the Iceland-Schengen Area. I believe it was Asuna. It was the same entity, the previous one.
Q. And I want to direct your attention to 106.
A. Yes.
Q. Before I ask you questions about this document, did Susana arrive in Iceland after that request was made on January 6, 2021?
A. No, unfortunately, no.
Q. Isn't it true she came for approximately a couple weeks before she had to return to Mexico because of some deaths in her family?
A. Thank you, Mr. Min. Yes, she came for a week and had to leave because she lost two family members to COVID. You are right. I'm sorry.
Q. Okay. In March you submitted a very similar letter to the one you submitted in January, correct?
A. Yeah. Actually, it's exactly the same letter.
Q. And again, this was to the same authority you mentioned before that handled the travel?
A. Yes, and regarding the same project.
Q. While you were residing in Iceland, isn't it true that you communicated with Landakotsskoli with respect to EZ's enrollment there?
A. What time period, sir? I communicated with them everyday.

I mean it was my daughter's school.
Q. You communicated with them in English, correct?
A. Yes, of course.
Q. And you communicated with individuals to network for possible film projects in Iceland, correct?
A. I probably, did, yes, sir.
Q. And you communicated with those individuals in English, correct?
A. Yes, I did, sir, yes. I don't speak Icelandic.
Q. And you communicated with Hertz Rental Car company at various times while you were living in Iceland, correct?
A. Yes, yes.
Q. Okay. And you communicated when you went shopping to the supermarket, to the stores, to your neighborhood coffee shops and you communicated in English with people around the town of Reykjavik, correct?
A. Yes, I did, sir.
Q. When you submitted as we saw in the letters with respect to asking for Susana to come to Iceland you submitted those requests in English, correct?
A. Yes, sir.
Q. And as you've observed, several witnesses that have testified in this case have testified from Iceland have testified in English, correct?
A. Yes, sir.

MR. MIN: So, I want to direct your attention -- your Honor, I'd like to offer Respondent's Exhibit 171.

THE COURT: One second, please.

(Pause)

THE COURT: It'll be received. It's admitted.

(Respondent's Exhibit 171 received in evidence)

Q. I want to direct your attention to Bates number 13745.

Do you recall writing to -- withdrawn.

Who is this individual that you are corresponding with?

A. Yuky Wash Sheda, one of our closest friends in New York.

Q. Okay. And do you recall -- withdrawn.

Who is writing in green on the right hand side and who a writing in brown on the left hand side?

A. I am green.

Q. On August 26 you had been in Iceland for almost a month, correct?

A. Yes.

Q. And you wrote to your friend that everything is in English which is beautiful. You are referring to the life in Iceland, correct?

A. Yeah.

Q. You testified yesterday that you needed to learn Icelandic just to get around, just to order a cup of coffee was not true, was it?

A. I won't say it wasn't true, Mr. Min. I wouldn't say it wasn't true. The people I dealt with in my daily life, the teachers, my family, all that was in English and that was beautiful. Outside of the immediate system I wasn't lying. When I said that I needed to learn Icelandic, I mean I was in Iceland after all.

Q. Would you call it a partial lie?

A. No, I wouldn't.

Q. When you and Mr. Schram decided to move to Iceland in summer of 2020, what was the agreement? For how long you would stay in Iceland?

A. For the school year.

Q. So, when you moved to Iceland in 2020, why didn't you buy round-trip tickets for when the school year ended in Iceland?

A. Because there was a world pandemic going on. I didn't know if I would be able to even travel, sir, after the end of the school year.

Q. So, then how did you have an agreement to return to New York in specific moment in time when had you no idea whether you would be able to travel or what the COVID pandemic would look like at that point?

A. Because agreement between us as a marriage as a couple was to go there for the school year. He was throwing a lot of things my way. First, he said the summer, then he said the summer and winter, then he said the school year, then in his

testimony the other day he was saying four years. I mean, clearly, Mr. Schram was not being truthful with me.

Q. You are saying he is not being truthful because his numbers were not consistent; is that your testimony?

A. So. There's a number of communications where I said one or two years. And that's specifically because I didn't know what was going to be happening at the end of the school year, but the agreement between us was the school year and that's what was accorded and that was our plan. Again, we were two million people have died because of COVID, Mr. Min. Do you think I knew what was going to happen? I hadn't seen my father in two years due to COVID. I'm sorry. I had no clarity. The agreement between us was one school year. That's what I wrote on my Facebook. that's what I told all of my friends, my family, my colleagues, my co-workers, yes, sir.

Q. But you just stated that there were times where you said one to two years and not the school year and not one year?

A. Well, there were --

Q. Why did you tell those individuals that was one to two years and not just a school year you are saying the agreement was?

A. I would have to see the specific communication and give you some context.

Q. Were there certain circumstances that would lead you and Mr. Schram according to your testimony to agree that it would

be beyond one school year?

MR. BEYDA: Objection.

THE COURT: Hold on. Sustained.

Q. Did you and Mr. Schram have discussions about you and Mr. Schram and the children living in Iceland beyond one school year?

A. By faith my marriage was pretty much done. So, if I did, it was me being hopefully, perhaps, that the pandemic would allow to us return to New York and that our marriage would survive. That's what I mean that I would need to see communications to give you the proper context.

Q. But I am confused. You said you were hopeful you would able to go back to New York and continue the marriage?

A. I was hopeful that the pandemic and the pandemic would allow us as we had planned to come back to New York, that the schools would open in-person because the reason why we went to Iceland to begin with was so that our children could go to school in-person. So, I was hopeful. The Delta variant kicked Iceland's behind. Iceland decided to allow --

THE COURT: There is to question pending.

THE WITNESS: Sorry.

THE COURT: I understand what you are saying but there is no question.

Q. It's true that by late 2017 you and Mr. Schram had, were discussing the possibility of moving out of the United States,

correct?
A. Late 2017, it's possible, yes.
MR. MIN: I want to direct your attention to Petitioner's Exhibit 166 which is in evidence.
THE WITNESS: Please, give me one second.
I am back. One second, please. I don't have it. My petitioner exhibits end in 165.
THE COURT: Mr. Min, why don't we -- is Mr. Beyda able to provide the document?
MR. BEYDA: I can print out and have someone bring it over to her if it's acceptable to the Court.
THE COURT: All right. Why don't we break now for lunch, and in the meantime, Mr. Beyda, if someone from your office can get these additional exhibits into the room where Ms. Zarak is in case there are questions about them, I don't want to have to keep waiting to get them printed out.
MR. BEYDA: The ones sent on the seal?
THE COURT: No. The 166, 167, 168, the ones that were fully offered. I guess the others we -- if you have the others that came this morning you can put them in the room but so far they are not admitted.
MR. BEYDA: Thank you.
I will do that. All right. So, it's now 12:45. Let's plan to resume -- can people do 1:30?
Ms. Zarak, are you okay with that?

THE WITNESS: Yes, your Honor, yes. Thank you so much.

THE COURT: So, we'll resume at 1:30. All right? Everyone have a good lunch.

Ms. Zarak, I remind you, you remain under oath. So you can't speak with anyone about the substance of your testimony. All right?

THE WITNESS: Thank you.

(Luncheon Recess)

(Continued on next page)

AFTERNOON SESSION

1:34 p.m.

THE COURT: All right. Mr. Min? Ms. Zarak, you remain under oath.

THE WITNESS: Yes.

THE COURT: Thank you.

MR. MIN: Thank you, your Honor.

BY MR. MIN:

Q. Ms. Zarak, prior to June 2021, your children resided in New York for approximately eight months in the last three years, correct?

A. Prior to June 2021, my children resided -- how many months you said, Mr. Min?

Q. Approximately eight months.

A. In the last three years? So that would be -- let me go back. So 2019.

Q. From summer 2018 to summer 2021, when you moved to LA.

MR. BEYDA: Objection, your Honor. This is in the stipulated facts, as to where the parties were living when.

THE COURT: Let me just look.

A. I would say close to nine months, yes.

THE COURT: In any event, it's argumentative, but you have Ms. Zarak's answer.

Ms. Zarak, when there's an objection, you have to wait for me to rule.

THE WITNESS: Yes, your Honor.
Q. You testified yesterday about a cousin who resided in New York, but in fact, your cousin in New York moved out of New York in or around 2018; isn't that true?
A. No, sir.
Q. It's true that the children used to bike around Iceland quite frequently while they were living there in the past year, correct?
A. No, sir.
Q. Okay. Did any of your children ever bike to their grandparents' home in Iceland?
A. Not that I can remember, sir, no.
Q. Do you recall Mr. Schram ever sending you messages about the -- about RZ biking to his grandparents' home?
MR. BEYDA: Objection. Time frame?
THE COURT: First just answer generally. Do you recall ever, it says, he sending you messages about -- no, it just jumped, sorry -- about RZ biking to his grandparents' home?
A. Sending me messages. I don't recall off the top of my head, sir, no. Sorry.
Q. When RZ was attending Broadway Presbyterian in New York, he was going there three days per week, correct?
A. Yes, sir.
Q. What time did RZ's school at Broadway Presbyterian end

every day?
A. I believe it was from 1 to 2:30.
Q. It ended somewhere between?
A. It was a short -- it was a -- a short program. It was not a full-day program.
Q. Oh, I'm sorry. So the program itself was from 1 to 2:30 in the afternoon?
A. Give me one second, Mr. Min.
Q. Sure.
A. When RZ went to -- yes. So to begin with, the program was a short day, so it wasn't a full-day program. It was the afternoon -- it was the afternoon twos. He was -- threes. It was the afternoon threes. I am sorry, Mr. Min. I don't recall the exact time. The only thing I remember is that the homeschooling schedule overlapped. I don't remember the exact time RZ started at Broadway Presbyterian.
THE COURT: Let me just clarify something, though. Ms. Zarak, in your answer, you said earlier, 1 to 2:30. Are you saying that's when the program ended or it only lasted roughly an hour and a half each session?
THE WITNESS: Yeah, so it lasted -- it lasted roughly an hour and a half each session. I don't recall when it started. Sorry, Mr. Min.
THE COURT: All right. That's helpful. Thank you.
BY MR. MIN:

Q. SZ -- withdrawn.

EZ, when she went to P.S.9 during the school year 2020 -- 2019-2020, what were her school hours? When did it start and when did it end?

A. It started at 8:30, and it ended -- depending on if she had after-school or not, it either -- it either ended at 2:40 or at 4:00.

Q. Okay. And when did she have after-school? What determined when she had after-school?

A. I think it was Tuesdays and Thursdays she had skateboarding and she had collage. I -- to be honest with you, Mr. Min, I don't -- I don't know if it was Tuesdays or Thursdays or Wednesdays or -- but it was skateboarding and collage.

Q. Okay. And in Iceland, what were the hours of RZ's school?

A. Of RZ?

Q. RZ's school for the school year 2020-2021.

MR. BEYDA: Objection, relevance. RZ.

THE COURT: Sustained. You objected consistently, Mr. Min, to questions about RZ.

MR. MIN: Fair enough, your Honor.

Q. For EZ's school --

THE COURT: Thank you.

MR. MIN: I apologize.

Q. For EZ's school, what were the hours in Iceland?

A. So again, from 8:30 -- it was similar. And then there was

the option of picking her up at 2:30 or at 4, and we usually picked her up at 4 because that coincided -- that made it just one pickup for me. I didn't have to pick up one child and then the other. If I picked -- if I -- yes. So 4:00, sir. Usually around 4:00.

Q. Isn't it true that EZ and F, her friend that you testified to yesterday, did not have any structured playdates prior to you leaving for Mexico in March 2020?

A. I know for a fact that they met in the playground. Would that -- would that count as structured playdate?

Q. I'll rephrase the question. Did you ever organize a playdate for EZ and F prior to March 2020?

A. Prior to March 2020, no. I did not organize.

Q. The reason for that is you did not know the contact information for F's mom prior to May 2020, correct?

A. That is correct, sir.

Q. And in May 2020 you were in Mexico, correct?

A. Yes, sir.

Q. And the only time that F and EZ were in New York -- or withdrawn.

Was F in New York for the three weeks you spent in New York between Mexico and Iceland in 2020?

A. Yes, he was.

MR. MIN: I would like to offer Exhibit P -- R62.

THE COURT: R?

THE WITNESS: P or R?

MR. MIN: R62. I misspoke.

THE COURT: It will be admitted, no objection.

(Respondent's Exhibit 62 received in evidence)

MR. MIN: Your Honor, I'd like to offer P4.

THE COURT: Just give me one second, okay?

MR. MIN: Oh, sure.

THE COURT: Sorry.

MR. MIN: Yes.

THE WITNESS: Yes. So P4?

THE COURT: No questions on 62, right?

MR. MIN: No questions, your Honor.

THE COURT: All right. And I'm sorry. Now P?

MR. MIN: P4, your Honor.

THE WITNESS: Mr. Min, R60 what?

MR. MIN: R62.

THE COURT: But there's no questions on the document. So are you asking questions -- P4 will be admitted.

(Petitioner's Exhibit 4 received in evidence)

THE COURT: Do you want Ms. Zarak to pull it or do you have no questions?

MR. MIN: No questions, your Honor.

THE COURT: All right. You don't need to pull them out, Ms. Zarak.

THE WITNESS: Neither one?

THE COURT: Neither one.

THE WITNESS: Okay.

MR. MIN: Your Honor, I'd like to offer P48.

THE COURT: All right. Now I have a note that there's an objection about no certified translation. Has that been cured?

MR. MIN: Your Honor, no, but I would say that to the extent -- if there's anything in a foreign language in this document, we will not be offering that; we can redact that, those portions.

THE WITNESS: P48. P48. Give me one second.

THE COURT: Mr. Beyda?

MR. BEYDA: I'm looking at P48. It's multiple pages so I just need a minute.

Objection as well on hearsay.

THE COURT: Mr. Beyda, I don't know what's the matter with the sound system but I'm not hearing you. It keeps cutting in and out.

MR. BEYDA: Okay. Let me -- I'm going to actually plug in a set of headphones.

THE COURT: That's better.

This is a massive document, group of documents, including some photographs and -- the hearsay objection is sustained.

MR. MIN: Okay. I'd like to offer then Bates No.

page 17170.

THE COURT: The first page?

MR. MIN: Yes, your Honor.

THE COURT: Mr. Beyda?

MR. BEYDA: I'm looking. And my 17170 is an e -- just make sure I have -- it's an email that is hearsay.

THE COURT: All right. Let me just read it.

MR. MIN: Your Honor, I'll withdraw the offer and ask questions.

THE COURT: Hold on.

Okay. Go ahead.

BY MR. MIN:

Q. Ms. Zarak, how soon after you arrived in Iceland did you befriend Ms. Sleiman and her family?

A. I think we met them just a few weeks after arriving. My husband met them first.

Q. And you did develop a friendship with Ms. Sleiman, correct?

A. Yes, I did.

Q. Okay. And you communicated with her extensively while you were living in Iceland, correct?

A. Yes, I did.

Q. Coordinating playdates between EZ and her child C?

A. Amongst other things, yes.

Q. Okay. That also included activities outside of playdates such as ice hockey, skateboarding, correct?

A. Once ice hockey. I don't remember skateboarding, sir. I communicated with her a lot.
Q. Okay. And you often asked Ms. Sleiman to pick up EZ from school and bring EZ to her house, correct?
A. Yes, yes, yes, I did.
Q. And you would also --
A. She -- sorry, Mr. Min.
THE COURT: You've answered. You've answered.
Q. And you also offered and accepted to take C, her daughter, home after school for playdates, at your home, correct?
A. Yes, sir, I probably did.
Q. Okay. I want to direct your attention to Bates stamped No. 17174.
THE COURT: This is not in evidence.
MR. MIN: Oh, yes. I'm sorry. I would like to -- then I would like to offer what's been premarked as Bates stamp 17180. I'll offer that page.
THE COURT: Don't look at it yet, Ms. Zarak.
17180?
MR. BEYDA: The objection would be to hearsay.
THE COURT: Let me just read it.
Sustained.
MR. MIN: Your Honor, I'll offer simply that second email dated October 7th at 8:10 p.m. written by Ms. Zarak.
THE COURT: The objection is still sustained. You can

ask questions about the subject matter, but the document itself is hearsay.

MR. MIN: Understood.

BY MR. MIN:

Q. Ms. Zarak --

A. Yes, sir.

Q. -- it's true that your daughter EZ would often ask to have playdates with Ms. Sleiman's daughter C, correct?

A. Probably, yeah. She was one of her three good friends.

Q. She would often refer -- well, withdrawn.

Would she refer to those playdates sometimes as her playdates?

A. As her playdates, meaning EZ's?

Q. Yes. Would EZ -- would EZ often refer to those playdates as her playdates, or did you ever describe those playdates to be her playdates, as described by EZ?

A. Not that I recall, but if she's going on the playdate, I would assume it's her playdate.

Q. Okay.

A. Can you give me more context?

THE COURT: No. You've answered it. It's fine. Thank you.

Q. Did EZ and C celebrate Halloween in 2020 together?

A. I don't know if "celebrate" would be the word, but C came over to our house that day. Halloween is not really celebrated

in Iceland.
Q. What did you guys do at your house for Halloween?
A. They dressed up.
Q. Did you have something called a Halloween bingo hut?
A. This is the first time I hear that, sir. I -- well, it is -- it is an international school, so the bingo part would be in relation to the school or something we made up? I don't recall it. My answer would be I don't recall it, no. No. I don't think I know what a bingo hut is.
Q. Did C and EZ ever go ice skating together while in Iceland?
A. There was B's ice skating -- there was B's birthday party which took place at an ice skating rink. I actually remember that I asked C's father to please drop EZ off and bring her over 'cause I couldn't, so they went ice skating to B's party and then EZ accompanied C to a hockey class. C was enrolled in various extracurricular activities almost every day, and on one occasion perchance, too, EZ went along.
Q. And did C and EZ go to a pool party together in or around January 2021?
A. So it is freezing in Iceland in January '21 so I do not recall any pool party. I don't recall, sir, no. I might be wrong, but I don't recall, no.
Q. Well, do you recall them ever going to a pool party at all while they were living in Iceland?
A. A pool party?

THE COURT: Party, he's saying.

A. Not party. They -- they certainly went to pools together, but not -- I don't recall, Mr. Min -- I'm sorry -- a pool party.

Q. How frequently would they go to pools together?

A. Well, the -- the -- the school curriculum, it was part of -- they had sports class on Thursdays, in school. This was in the morning. And they would take them to the local pool. So because they were in the same classroom, I would say they went to the pool every Thursday together as part of the sports class.

I recall that our families, once, went to a pool together. I don't recall -- again, I don't recall.

Q. Did EZ have any swimming classes while she was living in New York prior to summer 2020?

A. Yes, she did.

Q. How often?

A. She went to the JCC pool class once a week. However, she developed an ear infection, so she never finished the year. But I'd say once a week. And also, also, Imagine Swimming. But Imagine Swimming was many, many -- like she was -- I don't think she was even 1 when she went to Imagine Swimming.

Q. Did EZ go skateboarding while she was in Iceland?

A. Not that I recall, sir, no.

Q. Did you coordinate any playdates with your children and

Jonas Moody's children, while in Iceland?

A. So Jonas Moody was hypervigilant about COVID so he didn't allow playdates for the first -- I mean, at least for the first semester we were there. Eventually, yes. Eventually, yes, definitely. However, they were of a different nature. They were more like, Hey, Tania, I have to take my son to the dentist. Can you please look over A. Sure. So it was like a playdate that sprung around caregiving support between each other. So yes, I mean, there were playdates with A.

Q. How often did EZ have sleepovers while you were living in Iceland?

A. She slept over C's house once. We had A, B, and C over our house once. If you're asking me how often, I would say every -- I mean, she had maybe four in total.

MR. MIN: I would like to offer P48, Bates stamped page 17301.

THE COURT: I'm sorry. What number?

MR. MIN: P48, Bates stamped 17301.

MR. BEYDA: Your Honor, I need -- my computer froze.

THE COURT: This is the same document. You don't need to look yet.

MR. MIN: It's page 126 of the pdf, your Honor, if it helps.

THE COURT: I have it. No, the Bates numbers are most helpful. I don't know what's with not understanding how to use

Bates numbers here.

Mr. Beyda, is there an objection to this?

MR. BEYDA: I'm pulling it up. My computer froze in between. This is P148?

MR. MIN: No, P48.

THE COURT: P48. And it's just a photograph.

MR. BEYDA: And I apologize. Because my computer was frozen, the Bates page number is?

THE COURT: 17301.

MR. BEYDA: Thank you.

No objection to the photograph.

THE COURT: It will be admitted. Thank you.

(Petitioner's Exhibit 48, Bates No. 17301 received in evidence)

THE WITNESS: Can you repeat the Bates number.

MR. MIN: Sure. I'll put it up on the screen as well.

THE WITNESS: Ah, okay.

THE COURT: It's probably easier that way, Ms. Zarak. You'll be able to see it, I think.

THE WITNESS: Yeah.

BY MR. MIN:

Q. Can you identify this document, please, Ms. Zarak.

A. Yes, of course. This is a photograph that Tanya Sleiman sent me. This is the day EZ went to C's hockey class.

Q. Did EZ also celebrate Greek Easter with Tania's daughter C

in 2021?

A. The family -- the family made -- because they are Greek, the family made brunch, and we were invited along, alongside -- I don't know -- I think it was like 15 people.

MR. MIN: Your Honor, I'd like to offer Petitioner's Exhibit 157. And there was an objection to that. I will state that the purpose of the document is for the photographs contained in the document.

THE COURT: I'm sorry. Let me just pull it up. What number?

MR. MIN: 157, your Honor.

THE COURT: I don't know why you mark these things as massive documents like this instead of separate documents. Let me just look.

So can you give me a Bates number, please.

MR. MIN: Yes, your Honor. We would start with Bates No. 13507 going all the way to the end of that document.

THE COURT: But are you telling me you're only offering the photographs, not the text?

MR. MIN: Yes, your Honor.

THE COURT: Mr. Beyda?

MR. BEYDA: That's from Bates pages ending 507 onward?

MR. MIN: Yes.

THE COURT: The photos only.

MR. BEYDA: Your Honor, I do have issue with this and

in the manner it's being presented, because the photos are not only, from what I can tell, of the children at issue in this case but there's also, accompanying some of the pictures -- and some of the pictures are just, quite frankly, blurry, and I -- so I do have an objection.

THE COURT: What's the objection? Blurry photos? That's overruled.

MR. BEYDA: That these photographs are not necessarily of the children at issue in this case, certain of them, that these photographs are not provided by a party in this case; I don't know who they're provided by; and I think that there's a better way of doing this, quite frankly.

THE COURT: Mr. Min, lay a foundation. Actually, no. The objection is overruled. There is, I recall -- I believe it's in the U.S. statute, not in the treaty itself, I believe in the U.S. statute adopting the treaty under which we're proceeding -- a provision that says authenticity will not be a basis for documents not being received. So the objections are overruled.

MR. BEYDA: I'm not questioning the authenticity. I just am not aware --

THE COURT: I know. The remainder of your objections are overruled, but you said the stuff about they weren't produced by a party and all of that; that all goes to authentication.

MR. BEYDA: Okay.

THE COURT: The pictures only are admitted.

Now, Mr. Min, you need to give the Court a substitute exhibit number, whatever this is. 155, I believe it is, right?

MR. MIN: 157. We'll label it 157A.

THE COURT: 157A, which will be the photos only.

MR. MIN: Yes. We'll redact the rest, your Honor.

(Petitioner's Exhibit 157A received in evidence)

MR. BEYDA: From page 505 onward.

MR. MIN: 507. 507.

THE COURT: Correct. So 157A is admitted as the photos beginning on the page with Bates No. TZ013507 through the end, but only the photographs.

All right. Go ahead, Mr. Min.

MR. MIN: Thank you.

BY MR. MIN:

Q. Ms. Zarak, can you -- well, we'll show you Bates stamp page -- Bates numbered page 13507 on the screen. Can you identify this document.

A. Yes. So this is the WhatsApp family group between my family and Mr. Schram's family. It's -- it is a WhatsApp group where we send -- continuously send pictures wherever we are. This is starting -- this is the -- this is when we were on the flight from Boston to Iceland, I believe. And from then on, on that chat, it would be only photos of Iceland.

Q. Okay. Thank you. And we'll leave it here for a second.

Do you recall, when you were flying to Iceland, that your father wrote to you, "Next Stop: A New Life"?

MR. BEYDA: Objection. Hearsay.

THE COURT: Sustained. Sustained. You don't need to answer, Ms. Zarak.

Hold on.

MR. MIN: Your Honor, I'm not asking the question --

THE COURT: I just said hold on.

Do you recall that that happened, Ms. Zarak?

THE WITNESS: I don't recall, but this was a WhatsApp group that was constantly used, so --

THE COURT: No, that's not the question. The question was: Do you recall your father saying, "Next Stop: A New Life"?

THE WITNESS: No. No, your Honor. No, Mr. Min. I mean, he might have. He -- but I don't --

BY MR. MIN:

Q. Is there a document that might refresh your recollection as to whether he said that to you?

A. Well, do you -- I have them here. Do you want me to --

THE COURT: Now he wants you to look at this and tell him, looking at this page, 3507, do you now have a recollection that your father said that?

THE WITNESS: Well, it's -- it's right there. "Next

Stop: A New Life."

THE COURT: Is that a yes?

THE WITNESS: It's a yes.

THE COURT: Okay.

BY MR. MIN:

Q. And it's true that -- well, withdrawn.

MR. MIN: One second, your Honor.

Q. I want to direct your attention to what's been Bates numbered as 13516.

A. 13516.

Q. Can you identify these photos, please.

A. Yes. This was a place we used to call Jump-Jump-City that was up for a few months in Reykjavík.

Q. Okay. And how often did you -- did your children go to the Jump-Jump-City?

A. Well, it wasn't up -- it was only up in the summer. We arrived there in August. They probably went once. Again, it was back up in the late spring, and we probably went twice.

Q. And I want to direct your attention to the next page, 13517. Can you identify this photograph, please.

A. Yes, of course. This is my children with the only cousin their age they have, A.

Q. And that's on Mr. Schram's side of the family?

A. Yes. He's the only first cousin their age they have.

THE COURT: That is not responsive. Just yes is

responsive.

THE WITNESS: Oh, yes. Yes, Mr. Min.

Q. I want to direct your attention to 13520.

A. 135 --

Q. Can you identify this photo, if you have it in front of you?

A. Yes, Mr. Min. This is EZ, RZ, and A.

Q. Where is this photo taken?

A. This photo is taken at -- by their grandparents' house, playing at seaside.

Q. Okay. I just -- what's the date of this photo?

A. According to -- it is August 16, 2020.

Q. Okay. I want to direct your attention to page 13523. Can you identify this photograph, whenever you have it in front of you.

A. I see it now, sir. I don't know -- I don't recognize that photograph. I mean, I recognize RZ. I don't know any other -- I don't know where that is, actually. I just recognize RZ making a funny face.

Q. Do you recognize that to be Iceland?

A. Well, it says, "Nurturing the Vikings," and we -- the Vikings, yes. Yes, sir, yeah. 9 -- 9/12/20, yes, that must be Iceland.

Q. I'll direct your attention to No. 13543.

A. 13543?

Q. Yes. Can you identify this photograph, please.
A. Yes, of course. I took it. That is my father-in-law and SZ.
Q. 48548.
A. 548.
Q. Can you identify these photographs, please.
A. Yes, sir. The first one is my husband pulling one of the children, and the other one is the children picking the snow outside -- that's probably outside the Icelandic apartment.
Q. The first photograph where you say Mr. Schram was pulling your child, pulling your child on what?
A. That's -- it's just like a plastic -- give me one second. It has a name. I don't recall the name of that. It's like a plastic sleigh? Would it be sleigh? Like a --
Q. And where were they going?
A. It's like a plastic thing. I think we were going to eat somewhere. That is downtown Reykjavík.
Q. Okay. 13550.
A. It's not sleigh. What is it?
Q. Can you identify this document, please.
A. Yes, sir. This is New Year's. We -- yes. This is New Year's Eve, and the children are watching fireworks, which is a big thing on New Year's in Reykjavík.
Q. And where was this photo taken?
A. This photograph was taken at my in-laws'.

Q. What was your observations of your children's reactions to watching the fireworks on New Year's Eve?
A. Well, they were -- SZ was terrified. EZ and RZ were thoroughly enjoying it, of course.
Q. Okay. Next page, 551?
A. That's -- oh.
Q. The top photograph; can you identify the top photograph.
A. Yes. The top photograph is me taking a little nap before New Year's, then -- before the new year arrived, even though I don't know why it says 4 p.m. And then that is -- so yeah, we were all waiting for 12:00 to -- to come, so we could go outside and do the fireworks. This is the children with A.
Q. And the next page, 552?
A. Yes, same thing. So 12:00 finally came and we all went outside to see the fireworks, which, again, is a big thing on New Year's Eve in Reykjavík. As you can see from the background, that is the bay. You can see the smoke, the -- it's -- it's a big thing on December 31st. So that is -- yeah.
Q. Oh, sorry. The next page, 553, can you describe these photographs.
A. Yes. So these are the three famous friends of EZ's. That is B, that is A, and C.
Q. Okay. And what's going on in the second photograph there?
A. So this is January 8, 2021. Well, nothing is going -- nothing is really going on. They're at the house.

Q. Is this -- where is this photo taken?
A. Well, yeah. Look at all the boxes. This is the apartment, Ránargata 17.
Q. We'll go to page 556. Who is this?
A. So this is EZ -- this is EZ that same day she went with C. She went to C's hockey class. I mean, I can't really say. I think it's more of a dress-up than a hockey class, but yes. So that's the day EZ went to C's hockey class and was able to join her at the very end.
Q. And -- okay. And we'll go to page 558.
And who are these people in the photos?
A. These are the "girls from Miami." That's my sister Tamara, my niece S, me, mother-in-law, brother-in-law, husband.
Q. And where is this photo taken?
A. This photo was taken at my father and my parents-in-law's house. They wanted to -- they wanted to --
THE COURT: You've answered. It was taken at your parents-in-law's house.
Q. And the next photo, who is in that photo?
A. So that would be the other side of the table. It's Susana, EZ, and RZ.
Q. Okay. We'll go to 561.
Can you identify this photograph.
A. This is Mr. Schram and EZ. They -- yes. Mr. Schram and EZ. They went to -- they went to the volcano. This is in May.

Q. Okay. And then 563? Can you identify these photographs.
A. I have no idea, sir, where that was. I -- I mean, in Iceland, obviously, but I didn't go or remember -- or recognize. But it's RZ, and then the top one I believe is EZ.
Q. Okay. And going down --
THE COURT: Hold on one minute. Go back to the top picture.
Is that EZ? Or you believe it's EZ?
THE WITNESS: No, no. That's EZ with the pink jacket.
THE COURT: Yes. Thank you. Okay.
Q. And going down, scrolling down the rest of the pages down to 70, can you identify who's in these photographs?
A. Of course. It's my -- it's my child. I don't -- I can't identify the photograph, though.
Q. And down to page 71 --
A. Yeah, no.
Q. -- to 73, can you identify who's in those photographs.
A. "The new Schram residents." I don't know. Yes -- that's EZ. That's RZ. I -- yeah, that's RZ. That's his jacket.
Q. Okay. No further questions on this document.
MR. MIN: I'd like to move petitioner's Exhibit 89, offer Petitioner's Exhibit 89 into evidence, your Honor. There were no objections to that exhibit.
THE COURT: It will be admitted then.
(Petitioner's Exhibit 89 received in evidence)

Q. Ms. Zarak, we've put it up on the screen, so whenever you're ready. If you want to pull it out, obviously that's fine. Whatever you prefer.
A. Yeah.
THE COURT: What's the question?
MR. MIN: Sorry, your Honor?
THE COURT: I said: What's the question?
MR. MIN: Oh.
Q. Can you identify this document.
A. Yes, this is -- this is my Instagram account. I recognize it thoroughly.
Q. And what's this a photograph of, the big one?
A. This is RZ -- this is RZ's birthday.
Q. Okay. And if you turn to the next page -- oh, when was RZ's birthday?
MR. BEYDA: Objection. We've --
THE COURT: I'm sorry. Mr. Beyda, are you saying something?
MR. BEYDA: Yes, your Honor. We've been through the issue with RZ and he's not a party, and we just went through a last photograph with RZ, and now we're talking about RZ again.
THE COURT: We can't extract RZ from the photographs.
MR. BEYDA: But the question asked --
THE COURT: Yes, the birthday is irrelevant.
MR. MIN: Just the time period the photograph was

taken.

THE COURT: What time period is this photo from, Ms. Zarak?

THE WITNESS: This is December.

THE COURT: Thank you.

BY MR. MIN:

Q. The next page, can you identify this photograph, please.

A. Yes. I took it, sir. This is EZ.

Q. Ice skating?

A. Yes, ice skating. Ice skating, yes.

Q. Where was this photo taken?

A. On -- they do -- they put up a ice skating rink -- I had actually forgotten about it. They put up an ice skating rink on a small plaza in -- during the Christmas holidays, on a small plaza in downtown Reykjavík.

Q. Okay. Page 4? We'll go to the last page.

Can you identify this photograph, please.

A. Yes, I can. That is -- this is EZ one day that she accompanied B -- the woman, Waleska, Waleska is B's mother, and she has horses. So this is on the one day EZ went with Waleska to feed her horses.

MR. MIN: Okay. No further questions on this document.

We would offer R127.

THE WITNESS: R127.

MR. MIN: I will -- your Honor, I think this might be a little duplicative, though it's responsive to an exhibit of -- an earlier exhibit. We don't actually need it. We won't offer it.

THE WITNESS: Oh, no?

THE COURT: Never mind. Never mind.

THE WITNESS: Oh, sorry. Okay.

THE COURT: I would ask you all to get rid of these duplicates, but go ahead.

MR. MIN: Yeah, I think we just got that. Petitioner's 84, your Honor, we would offer.

THE COURT: It will be admitted.

MR. MIN: There's objections, I will note.

THE COURT: Oh, I'm sorry. Thank you for pointing that out. This is 84, you said?

MR. MIN: Yes. P84, your Honor.

THE COURT: Yes. So what's your response to the objections?

MR. MIN: Again, we're using it for the photographs. You know, to the extent that this is Ms. Zarak's social media account, which she can, to the extent necessary, verify, you know, we're just asking her questions about the photographs. Her statements within this are not relevant, and we would stipulate to redact them, if necessary.

THE COURT: Mr. Beyda, do you object to a revised

exhibit with photographs only?

MR. BEYDA: No, I do not.

THE COURT: All right. The photos in P84 will be admitted as P84A. Mr. Min, you're to get around revised copies.

MR. MIN: Yes, your Honor.

(Petitioner's Exhibit 84A received in evidence)

BY MR. MIN:

Q. Ms. Zarak, can you identify this photograph on page 1 of this document.

A. Yes, sir.

Q. What is it?

A. This is EZ in Iceland.

Q. Okay. Where?

A. I wouldn't know how to pronounce. It's in the Westfjords.

Q. Okay. Around when was this photo taken?

A. This photo was taken exactly -- well, it says there June 13. So this was --

Q. Of what year?

A. 2021.

Q. And you posted this on your social media account?

A. Oh, yes, I did.

Q. And then the next page, can you identify these photographs.

A. Yes. These are waterfalls, beautiful waterfalls in Iceland.

Q. And when was this taken?
A. This was taken August 22. Actually, this was posted August 22, 2020. I don't -- I'm not sure if they were taken on that day.
Q. But were they taken after you arrived in Iceland on August 1st, 2020?
A. Yes.
Q. Can you identify if any of your children are in that photograph?
A. Yes, they are. Me too.
Q. The next -- page 6. We'll jump ahead to page 6 of the document. No. Go down to page 8. Skip ahead of some of these.
Can you identify this photo, these photographs, please.
A. Yes, these are my children. Yes. So these are my children, my sister, and my niece dog, dog sleighing, dog sleighing in Iceland. I don't know -- I don't know the name of the place.
Q. Which of your children went dogsledding this trip?
A. We all went. It's right outside the city.
Q. Was this a fun experience for your children, that you observed?
A. They were freezing, but I would say -- I think it was more of a fun experience for the adults than the children, but I'd

say this was a fun experience.

(Discussion off the record)

BY MR. MIN:

Q. Page 9, the next page, can you identify these photographs.

A. Yes, sir.

Q. What is this?

A. So these are the same waterfalls. This is my -- this is EZ and this is my niece S.

Q. And can you go to the next page.

Can you identify this photograph.

A. This is a screenshot -- this is a screenshot of a FaceTime call that is EZ when she went to the volcano, to the eruption.

Q. And isn't it true that EZ prior to this trip was very afraid of volcanoes?

A. She still is, yes, sir.

Q. Okay. She was afraid of volcanoes because she went to the Museum of Natural History in New York and watched a movie about volcanoes that caused her to be afraid, correct?

A. Well, that's where -- that's what it says above the picture, sir, so yes.

Q. Well, I don't want to refer to what it says above the picture. I'm asking you: Is that correct that she became afraid after watching a movie at the Museum of Natural History about volcanoes, in New York?

A. Yes, when she was 3 years old, we took her to see a 3D

picture, by mistake, of volcanoes, and she was subsequently traumatized with volcanoes. However, she went with her father and her grandfather to the eruption, which doesn't mean that she's not now afraid of volcanoes. She still is. But she's there.
Q. Let's go to page 13. Can you identify this photograph, please.
A. Yes. So that was the same weekend that it -- that my sister visited. That is the -- I mean, we took advantage of her visit to take her places. This is the geyser, and these are RZ, EZ, and S.
Q. And page 15.
A. This is --
Q. Can you identify this.
A. Yes, sir. This is a school that the teacher emailed the parents, it was too cold for gym, for gym class in school, so they took the children out to pick up trash from a local beach. So this is Reykjavík, and this is a -- this is EZ's class.
Q. So in lieu of gym class at school, the children from the school went to the local beach to pick up trash?
MR. BEYDA: Objection. Asked and answered.
THE COURT: Hold on. Hold on.
Go ahead, Mr. Beyda.
MR. MIN: I'll withdraw the question.
MR. BEYDA: I think Mr. Min withdrew the question.

THE COURT: Yes, I heard.

BY MR. MIN:

Q. Are your children, Ms. Zarak, Mexican citizens?

A. So they are by birth.

THE COURT: Mexican citizens, he asked.

MR. MIN: Yes, Judge.

A. Yes. So in Mexico, if you're -- one of your parents is a Mexican citizen, you are by default a Mexican citizen.

THE COURT: Okay. Thank you.

Q. And do the children have passports, Mexican passports?

A. No, sir. They only have --

Q. It's true that during the course of your marriage to Mr. Schram you and Mr. Schram discussed the possibility of living in Mexico with the children, correct?

A. Yes.

Q. Okay. In fact, when you were there in the spring of 2020, you and Mr. Schram looked at potential homes you could live in, in Mexico, correct?

A. We -- yes.

Q. Okay.

A. May I elaborate? No.

THE COURT: No. If the answer is yes, it's yes.

THE WITNESS: Yes, the answer is yes.

Q. When Susana is not working for you and your family, where does she primarily reside?

A. Well, she's work -- she resides with us, but on her vacation, on her time off, she goes to a place called Tlaxcala in Mexico.

MR. MIN: Your Honor, I'd offer P168, which had been previously marked for identification and --

THE COURT: I'm sorry. You're cutting in and out, Mr. Min.

MR. MIN: I apologize, your Honor. I'd offer P168 which had been previously marked for identification and discussed. And I believe the suggestion at the time, which I undertook, was to deal with it on cross-examination, which is what I'd like to do at this point.

THE COURT: And was there an objection preserved?

THE WITNESS: I don't have --

MR. MIN: This is one of those --

THE COURT: Hold on a minute, Ms. Zarak.

It's one of the later exhibits, I know.

THE WITNESS: Oh, thank you, thank you, thank you. Yes, I have them.

THE COURT: But was there an objection, Mr. Beyda?

MR. BEYDA: I have to pull up my -- I believe there was. I'm looking for my supplemental objections. One second.

There was an objection to hearsay and -- hearsay and --

THE COURT: There was? I'm sorry.

MR. BEYDA: There was a hearsay objection. I think that may be a foundation --

THE COURT: That's what you objected last time, I think, was foundation, right, and we said ask through the proper witness. That's all I'm recalling, but I don't have a copy of it in front of me.

MR. BEYDA: Yes, that's my recollection, but I do think that a foundation needs to be laid before we can -- I can consent. Just to hear what the examination is.

THE COURT: All right. Mr. Min?

MR. MIN: Okay. Can I show it to the witness to lay the foundation?

THE COURT: Let me just try to find it.

MR. MIN: Yes, your Honor.

THE COURT: Yes, you can show it to her.

MR. MIN: Thank you.

THE WITNESS: I have it here, Mr. Min.

MR. MIN: Oh, okay. Thank you.

BY MR. MIN:

Q. Ms. Zarak, can you take a look at this document and identify it, if you're able.

A. Oh, yes, sir. So this is -- this is an astrology reading I had. This is me transcribing -- so, you know, primarily for entertainment purposes, I had a conversation with an astrologer called Michael. He did a reading of my birth chart. He, you

know -- he does something called astro, astrocartography, which at the time I was very curious about; again, mainly for entertainment purposes. So this is me transcribing -- I was with him on the phone, and I was typing what the astrologer was telling me. This is not something that -- I mean, I don't know who talks like that -- maybe Walter Mercado -- but this is an astrology reading. This is the transcription of an astrology reading.

Q. Would it be fair to say that the locations that are depicted in this document are locations that you asked this person to evaluate in their profession, I guess, so to speak?

A. Well, not all of them. He's talking about Hawaii and Spain because it came on my chart. I have no connection to Hawaii or Spain. Definitely Iceland and Mexico and New York. And I guess Iceland, Mexico -- yeah, and Los Angeles too. But I don't know if -- I don't even remember when this was done. I don't know if Los Angeles was something he saw on my stars or I had told him about. But yeah, obviously I told him Mexico and New York. I mean, for obvious reasons, yes. The rest, I mean, I -- I couldn't say, sir. This is, again, some -- this is something I did for fun. And in fact, I probably did this in like 2017. I remember emailing it to my husband 'cause I thought it was so funny.

MR. MIN: Okay. I won't offer the document, your Honor.

Q. I will ask you some questions, though.
A. Yes. On the document?

THE COURT: Well, you previously offered it and it was overruled, so it wasn't received, but you're just not offering it again.

MR. MIN: Yes, your Honor. Sorry. To clarify, yes.

Q. Ms. Zarak, in 2017, late 2017, early 2018, why did you express interest -- or withdrawn.

Did you express interest to Mr. Schram about moving to Mexico?

A. Late -- you said late 2017, early 2018?
Q. Yes.
A. Yes. So by that time, it was obvious that we couldn't live solely out of my husband's income. The -- the -- the word I think he used was -- well, the money that came from my mother, it was just -- it was clear that I had to start looking for work as well. And I think Mexico was just a natural -- the natural pull. I mean, for -- Mexico was always the -- the first option for us. So yes, in -- we spoke about Mexico on more than one occasion.
Q. Would you say one of the reasons that seemed like a natural option for you and Mr. Schram is because of your professional connections there?
A. Partially, yes, sir. But if I may, I also have a lot of connections in his profession in Mexico, so that was also part

of the -- part of the appeal, that through my family's network, because my family in Mexico is in the construction business, it was a very, very appealing and interesting option for him to explore. It would have been very easy for him as well to get a job in Mexico.

MR. MIN: Okay. I want to, your Honor, offer Petitioner's Exhibit 148, Bates stamp -- Bates numbered pages 11897 through 11899.

THE WITNESS: 14 --

THE COURT: No. You can just hold on again, Ms. Zarak, because this is another one of these that were previously offered and there were objections to it.

Let me just find it. Mr. Beyda, do you have those pages?

MR. BEYDA: I do now in front of me.

THE COURT: All right. And are there objections to those pages?

MR. BEYDA: No, your Honor.

THE COURT: All right. Those will be admitted as 148A. Mr. Min, you need to provide copies.

(Petitioner's Exhibit 148A received in evidence)

MR. MIN: Understood, your Honor.

THE WITNESS: Mr. Min, could you please repeat the little red number.

MR. MIN: Sure. TZ011897 through TZ011899. Three

pages.

THE WITNESS: 907, 11907?

MR. MIN: 11897.

THE WITNESS: 897.

BY MR. MIN:

Q. Ms. Zarak, let me know when you're ready. We have it up on the screen, too, if it's easier.

A. I'm ready. Yes, I'm ready.

Q. Okay. I want to direct your attention to the message -- Mr. Schram is on the left in gray and you're on the right in blue; is that right?

A. Yes.

Q. Okay. And I want to direct your attention to the message dated February 4th at 1:03 p.m., where Mr. Schram says, "Let's move to Mexico." Do you see that?

A. Mm-hmm.

Q. Okay. Yes?

A. Yes, sir, I do.

Q. Okay. Now this was approximately a month before Mr. Schram's visa was denied, correct?

A. Well, Mr. Schram's visa was denied in December of 2019. However, his immigration lawyer was doing some sort of like re -- I don't know if it's -- he had to, I think -- yes, it was called request for more evidence. So we were -- yeah, we were definitely in a limbo in -- in that, you know, it wasn't until

March that the final refusal came about, but since December 2019, we knew that there were being issues.
Q. And this is approximately a month before you understood that the schools in New York City might close, correct?
A. Yes.
Q. But at this time you and Mr. Schram were already discussing leaving the United States, correct?
A. Well, no, not formally, sir, no. I mean, we had to -- we -- we had the, you know -- we had the visa matter over our head, but this wasn't -- this text conversation was in no -- well, I will let you continue. I'm sorry. So --
Q. Sure. You understood at this time, as you wrote below, that life in New York City was particularly hard, correct?
A. Well, Mr. Schram wasn't making any money, sir. Yes.
Q. All right.
A. I understand is what I'm saying. I understand what he's going through. I understand, yes.
Q. And you wrote that going to Mexico, or -- well, withdrawn.
Do you see your messages on the bottom of that page going to the messages going on the top of the next page, page 99? You were telling Mr. Schram some of the benefits that your family would enjoy by moving to Mexico -- having a driver, and another person in the house with Susana, Susa, Susana, the nanny, right?
A. Well, yeah, but he's asking me, right, what would our life

look like in Mexico? I'm answering his question, yes. He asks: How would our life look like in Mexico? So I'm answering his question.
Q. Okay.
A. So he continues asking me.
Q. When you were in Mexico, after you arrived in March 2020, you began exploring job opportunities, correct?
A. When I arrived -- job opportunities where, Mr. Min?
Q. In Mexico.
A. I didn't begin exploring them, no. I got an offer. Someone contacted me about a job in Mexico. But this is not something that I was looking for, if that's the question.
Q. But you considered this job opportunity in Mexico, correct?
A. Well, it paid 200 -- it paid the equivalent of $200,000. I would say yes.
Q. And is this a job offer you received from Bernardo Sepulveda?
A. Yes, sir.
Q. And in fact, you had two job conversations going on during the time period you were in Mexico, correct?
A. About work in Mexico?
Q. Yes, about work in Mexico.
A. I don't remember the other one, sir.
Q. Okay. And the only reason you -- well, withdrawn.
You declined this job opportunity, correct?

A. I did, sir.
Q. Okay. And the job opportunity would have been in Mexico for the next year or two, correct?
MR. BEYDA: Objection. Speculative.
THE COURT: If she knows. If she doesn't know, she doesn't know.
A. The job was in a city called Mérida, which is a city of -- it's on the coast of Mexico, so to begin with, it wasn't very --
THE COURT: No, no, no. No, no, no, no. The question was: Was the job for one year or two years? It was about the duration of the job, not about where it was.
THE WITNESS: Oh, about the duration?
A. I wouldn't know, Mr. Min, if there was even a specific time period. I -- I don't remember, Mr. Min, if there was a time period discussed.
THE COURT: Okay.
MR. MIN: I want to offer Respondent's 77 into evidence.
THE COURT: It will be received.
(Respondent's Exhibit 77 received in evidence)
MR. MIN: Your Honor, I'd like to offer Respondent's 84 into evidence, although I won't ask any questions about that.
THE COURT: Just give me a minute.

THE WITNESS: Just give me a minute.

THE COURT: He says he's not going to have any questions. You don't have to pull it.

77 you said first, correct?

MR. MIN: Yes. I will ask questions about 77, but I will not ask questions about 84.

THE COURT: All right. 84 I believe was admitted yesterday.

MR. MIN: Oh, yes, you're right. Your Honor, I have that in my notes. I apologize. I misspoke.

THE WITNESS: 77.

77. One second, please. Respondent's 77.

Okay. Yes.

BY MR. MIN:

Q. Okay. And this is a voicemail that you sent to Bernardo Sepulveda on July 6, 2020, correct?

A. Yes, sir.

Q. Okay. And at this time you and Mr. Schram had already made the decision to move to Iceland, correct?

A. Yes, sir.

Q. Okay. And so I want to direct your attention first to the middle of that, the page we're on. It's page 2 of the document, the first page of the translation. You write, "We are thinking the idea is to regroup." I don't know if you can see that. It's on the right-hand side, the -- and then the

next line is, "idea is to regroup in December."
A. On the right side?
Q. If you look at the screen, you'll see it's the end of the first line.
A. Okay.
THE COURT: Hold on. Hold on.
Okay.
MR. BEYDA: Your Honor, can Ms. Zarak have an opportunity to review this?
THE COURT: Sure.
But Ms. Zarak, at any time you can ask me for the opportunity to review a document in full, all right?
THE WITNESS: Thank you. Thank you, your Honor.
THE COURT: Sure.
MR. MIN: Your Honor, while she's doing that, can I request a one-minute nature break.
THE COURT: Sure. Why don't we come back at 3:00.
MR. MIN: Thank you.
(Recess)
THE COURT: Mr. Min.
MR. MIN: Yes, your Honor.
BY MR. MIN:
Q. Ms. Zarak --
A. I'm here, yes.
Q. Thank you. Isn't it true that on this date, July 26, 2020,

you were unsure whether or not you, Mr. Schram, and the family would ultimately end up in New York or Mexico after going to Iceland?
A. After going to Iceland in what period, sir?
Q. The period that you traveled, July 31st, 2020. This message is on July 26, 2020. When you wrote this message, or when you left this voicemail for Bernardo Sepulveda, isn't it true that you weren't sure whether you, Mr. Schram, and the children would end up in New York or Mexico after your trip to Iceland?
A. Is what you're saying we weren't sure we would end up in Mexico after Iceland?
Q. New York or Mexico after Iceland.
A. Mexico after Iceland. I don't think Mexico after Iceland was ever -- I don't know, Mr. Min.
Q. Okay. I want to direct your attention to the next page and four lines --
MR. MIN: I'll withdraw with the question, your Honor.
Q. Do you recall speaking with Jan Lochtenberg in or around March 2019?
(Reporter interrupted for clarification)
MR. MIN: Your Honor, I'm waiting for an answer. I'm not sure if I heard an answer.
A. Oh, I'm sorry. I don't remember specifically the date.
Q. Okay. But you were speaking to him at some point about

adding an extension on Penthouse C, correct?
A. Yes, sir.
MR. MIN: Your Honor, one second. I may have to sign out. I'm getting a "bad network quality" message on my computer and I froze after I asked that question, I saw nothing, so let me log out and log back in, if that's okay.
THE COURT: All right. We'll wait for you. I mean, you were fine coming through, but go ahead.
MR. MIN: Okay.
(Discussion off the record)
MR. MIN: Your Honor, I'd offer R101 into evidence.
THE COURT: It will be received.
(Respondent's Exhibit 101 received in evidence)
BY MR. MIN:
Q. I'll direct your attention, Ms. Zarak, to page 76, the second page, Bates numbered 76. On March --
A. Can you give me -- is it better this way? Because I can't do the binder and head thing. Can you hear me without this?
THE COURT: We can hear you fine. We can hear you fine. And the document is also on the screen, if that works for you, Ms. Zarak, but you do have a right to look at the whole document too. I mean, I'm not confining you to what's on the screen.
THE WITNESS: Thank you.
Q. March 19, 2019, you wrote an email to Mr. Lochtenberg

where -- and it's paragraph starting "Anyway." "Anyway, we are seriously considering returning to New York, and I wanted to ask you the following: Would the board approve a formal albeit initial conversation regarding building two bedrooms on top of PHC?" PHC referring to Penthouse C that you owned at that time, correct?

A. Yes, sir.

Q. Okay. And you wanted to build that extension because at that time you had three children or you were about to have three children and you needed more space, correct?

A. No, sir.

Q. Well, on the next paragraph, you wrote, "This would simplify our lives tremendously because we could fit and live there --"

MR. BEYDA: Objection. Your Honor, I'm sorry. I was muted. I didn't realize it. I was objecting that this is beyond the scope of the direct examination. There were no questions asked about remodeling or renovating or extending PHC during the direct examination.

THE COURT: I'm going to allow a little leeway.

BY MR. MIN:

Q. You wrote in the next sentence, "This would simplify our lives tremendously because we could fit and live there and finally SETTLE DOWN." Right? Isn't it true that up until that time period, you did not feel, along with Mr. Schram, that you

and your family had a place where you could settle down, correct?

A. No, sir.

Q. Not correct or no, you could not settle down?

A. Not correct.

Q. Then why did you write this to Mr. Lochtenberg in March 2019?

A. Because it was a passion project of Mr. Schram's, who is an architect, to build a second floor on P -- Penthouse C. It's a conversation that came to his mind from the very first time he stepped into Penthouse C, when we started dating, and the argument for him was that it would -- it would increase the market value of the property. So this conversation -- first of all, we didn't have means to do a project like this, and if anything, this email is motivated by the insistence of Mr. Schram to ask permission to the board, to the board of directors to do something like this.

Q. So you decided -- and you wrote to Mr. Lochtenberg in capital letters "SETTLE DOWN" because Mr. Schram had a passion project because Mr. Schram wanted the board's approval, not because you believed that this would allow you, Mr. Schram, and your three children to have a comfortable and appropriate living situation, in New York City.

MR. BEYDA: Objection. Argumentative.

THE COURT: Sustained to form. The form objection is

sustained.

Q. I want to direct your attention --

MR. MIN: And I offer Respondent's 83.

THE COURT: It will be admitted.

(Respondent's Exhibit 83 received in evidence)

Q. Who is L. Feinstein?

A. A friend of mine, Lynn Feinstein.

Q. Okay. And you left your friend a voice note on or about August 2020, the transcript of which is in front of you, correct?

A. Yes, sir.

Q. And in August 2020, you were in Iceland at that time, correct?

A. Yes, sir.

Q. Okay. And you wrote that you thought you'd settle down in Mexico because that's where you were from March to July, correct?

A. Yes, I'm reading, yes, sir.

Q. Okay. And that's because -- withdrawn.

I want to offer Respondent's Exhibit 82 into evidence.

THE COURT: It will be admitted.

(Respondent's Exhibit 82 received in evidence)

Q. Who is M. Nunes, Ms. Zarak?

THE COURT: I'm sorry? Hold on. Hold on.

All right. Did somebody say something after the

question, Who is M. Nunes?

THE WITNESS: I was answering, your Honor.

THE COURT: Oh, I'm sorry, Ms. Zarak. Go ahead. I thought there was an objection, but I can't -- go ahead. I'm sorry.

A. No problem. She's Marcia Nunez, my friend and colleague.

Q. And do you recall having conversations with her in December of 2020?

A. This one, yes.

Q. And I want to direct your attention to the sentence that starts with, "The idea," which is on the bottom of the page currently. So if we can scroll up. "The idea is to finish --" you write this to Ms. Nunes on December 13, 2020: "The idea is to finish the school year here and then decide if we go back to New York or, you know, it really all depends on when we get the green cards." Okay? Do you see that?

A. Give me one -- yes, I see it now.

Q. Okay. And it's true -- is it true that in December 2020, you returning to New York was dependent on you and Mr. Schram receiving your green cards, as you wrote to Ms. Nunes?

A. Amongst other things, yes.

Q. Do you recall in January 2020, prior to going to Mexico, prior to hearing anything about school closings in New York, you posted an article on Facebook entitled, "New York is losing residents at an alarming rate"?

A. I don't recall, Mr. Min.
Q. Is there a document that might help you refresh your recollection?
A. Yes, Mr. Min.
Q. Would that be your social media posts in January 2020?
A. Yes, Mr. Min.
MR. MIN: Your Honor, I'd like to show the witness a document. It's been premarked as Petitioner's 180.
THE COURT: Just a minute.
MR. MIN: This is one of the new exhibits that were premarked.
THE WITNESS: Yes. I don't have it.
MR. MIN: As of today.
THE COURT: Oh, the new ones. All right.
MR. MIN: Just using it to refresh recollection.
THE COURT: What are you trying to refresh her recollection about?
MR. MIN: About whether she posted an article with the headline on her Facebook account.
THE COURT: All right. Mr. Beyda, do you have the new documents that were --
MR. BEYDA: I do, your Honor.
THE COURT: You can look at it to see if it refreshes her recollection.
BY MR. MIN:

Q. Ms. Zarak, does this refresh your recollection as to whether in January 2020 you posted an article on social media, on your Facebook account, entitled "New York is losing residents at an alarming rate"?

A. It does.

Q. Okay. And did you post such an article on your social media account?

A. According to the image, yes, sir.

Q. And as a comment to your post, did you also write, as a question, "Is this a sign?"

THE COURT: Don't just read the document, Ms. Zarak. The document is not in evidence. So he's asking you: Do you know, did you do that?

THE WITNESS: I don't know. I don't remember.

Q. Is there a document that might help you refresh your recollection as to whether or not, when you posted the article about New York losing residents at an alarming rate, you also wrote, "Is this a sign," question mark?

A. Well, I just saw it, Mr. Min.

Q. Well, would you like to see it again to help refresh your recollection?

THE COURT: And "refresh your recollection," Ms. Zarak, did you talk to your lawyers about what that means? Did they explain to you what that -- okay. It doesn't mean look at the document and confirm that that's what the document

says. It means look at the document and do you now have, like a lightbulb that goes off, yes, I remember I wrote that. If you don't have an independent recollection after you look at the document, then it doesn't refresh your recollection. So you can look at the document, but don't just read it to me.

THE WITNESS: Thank you, your Honor. I don't need to look -- look at it again.

A. I don't remember, Mr. Min.

THE COURT: Okay.

Q. Isn't it true that you posted this article about New York losing residents at an alarming rate in January 2020 because you and Mr. Schram were in discussions about leaving New York with your family?

A. No, sir.

MR. MIN: I want to offer Petitioner's Exhibit 148, Bates numbered page 11932.

A. Petitioner 118?

Q. 148.

A. 148.

THE COURT: This is the thick document we looked at before, page 11932.

Mr. Beyda, I'll let you look at it. You have a hearsay and a relevance objection to this entirety of it, but I don't know about that one page.

MR. MIN: Your Honor, I'll start with the page before,

just because it has the date and some context as well, 11931 as well.

MR. BEYDA: Your Honor, I have no objection to that, those pages, 1931 through 933.

THE COURT: All right. Thank you. 932, right?

MR. BEYDA: Oh, 932. Sorry. 932.

THE COURT: All right. Mr. Min, again, you need to get me a revised -- this is going to be 148B.

MR. MIN: Understood, your Honor.

THE COURT: That will be admitted, pages Bates No. 11931-32, and it is admitted with no objection.

(Petitioner's Exhibit 148B received in evidence)

THE COURT: All right. Ms. Zarak, now you can pull the document if you'd like or else it's on the screen, whichever is better for you.

THE WITNESS: Thank you.

BY MR. MIN:

Q. Do you recall on March 4th having conversation with Mr. Schram about him feeling burned out emotionally and physically?

A. I do.

Q. Okay. And to go on to the next page, top of the next page, Mr. Schram wrote to you that "I don't know what else to do than simply leave the US;" do you see that?

A. I see it.

Q. Okay. And to be clear, you're writing on the right in blue and Mr. Schram is writing on the left in gray?
A. Yes, sir.
Q. Okay. And this is approximately a week, 10 days before the final notice that Mr. Schram's visa was denied and the notice on March 13th that the schools were about to be shut down, correct?
A. Correct.
Q. Okay. And if you scroll down, you respond, eventually, "Do you think we could all fit in that little house?"
MR. BEYDA: There's also --
Q. Do you see that?
MR. BEYDA: I'm sorry.
A. I see it.
Q. Isn't it true when you say, "Do you think we could all fit in that little house," you were referring to the house that Mr. Beyda asked you about yesterday in which the singer Bjork was selling her home in Iceland and you and Mr. Schram were discussing the purchase of that house?
A. I don't recall, sir.
Q. Okay. Do you recall what little house you were talking about that you, Mr. Schram, and the children could fit into on March 4th, 2020?
A. No, sir.
Q. You respond -- he responds, "I think we can do anything at

this point," and you respond, "But never heard back from the broker." Do you recall what broker you were discussing on this -- at this moment?
A. No, sir.
MR. MIN: Your Honor, I would offer the following page as well, 33, 933.
THE COURT: I'll let Mr. Beyda look at it.
MR. BEYDA: Are you offering this to refresh her recollection?
MR. MIN: Your Honor -- Mr. Beyda, I would offer it into evidence, and your Honor as well.
MR. BEYDA: No objection.
THE COURT: All right. So 148B will be Bates numbers 11931-33, and that's admitted with no objection.
(Plaintiff's Exhibit 148B (amended) received in evidence)
MR. MIN: And if we scroll down to the following page, 933, Ms. Zarak.
THE COURT: And just for the record, is this part of the same email chain?
MR. MIN: Text message chain, yes, your Honor.
THE COURT: Text message chain? Okay.
MR. MIN: Continuation of it.
Q. You continue to write, "I showed you last night, you are cc'd, yeah, asked about paying with cash." Paying with cash,

we're talking about paying with cash a home in Iceland where you, Mr. Schram, and the children could potentially live, correct?
A. I don't remember, Mr. Min.
Q. Okay. I want to -- in or around March 2020, after you and Mr. Schram understood that the schools in New York might not reopen in person, did you and Mr. Schram discuss moving anywhere else in the United States temporarily?
A. When -- when we understood that the schools wouldn't open when, Mr. Min?
Q. In mid-March. I believe you testified you received the notification approximately March 13th. And so after March 13th, did you and Mr. Schram have a discussion about temporarily leaving New York and staying somewhere else in the United States?
A. Not that I recall, no, sir.
Q. I want to direct your attention to R147.
MR. MIN: I'd offer it into evidence, your Honor.
THE COURT: It will be admitted.
(Respondent's Exhibit 147 received in evidence)
Q. Ms. Zarak, let me know whenever you're ready.
A. You said R147, correct?
Q. Yes, Ms. Zarak.
A. R147. I'm ready.
Q. Okay. On the bottom of Bates numbered page 11805, in this

conversation, I just want to direct your attention to that location. Who is L. Paz that you're corresponding with here?
A. Lima was -- she's a mother of a P.S.9 classmate of EZ and -- yeah.
Q. And you wrote to her that you have "no idea when we'll be back." Do you see that? And you're referring to being able to go back to New York, correct?
A. Correct.
Q. I want to direct your attention to --
MR. MIN: I'd offer R85 into evidence, your Honor.
THE COURT: Admitted.
(Respondent's Exhibit 85 received in evidence)
Q. Ms. Zarak, can you identify this document, please.
A. This is an Instagram post of mine.
Q. Okay. And this is from April 5, 2020, correct?
A. Yes, sir.
Q. Okay. And you're stating again here that -- in the middle -- "I don't know when we'll be able to come back," referring to being able to go back to New York, correct?
A. Yeah.
Q. Okay. In April and May 2020 you and Mr. Schram did not have an agreement about moving to New -- moving to Iceland; is that correct?
A. In April and May 2020?
Q. Yes.

A. We didn't have an agreement about moving anywhere, sir, no.
Q. And did Mr. Schram at any point in -- withdrawn.
At what point did you and Mr. Schram start discussing the option of moving to Iceland in the summer?
MR. BEYDA: Objection to the form.
THE COURT: Can you rephrase.
MR. MIN: Sure.
Q. At what point did you and Mr. Schram begin discussions about moving to Iceland after March 2020?
MR. BEYDA: Objection to the form. Same.
THE COURT: Sustained.
Q. Did you and Mr. Schram have discussions about moving to Iceland after March 2020?
A. Yes.
Q. And when did those discussions begin?
A. I don't remember an exact date, Mr. Min, but it was when we learned that the schools in Mexico and the schools in New York would not reopen in the fall.
Q. Isn't it true that Mr. Schram never agreed and never told you that he would return to New York after one school year in Iceland?
A. Isn't it true that Mr. Schram never told me?
Q. Never agreed that the family -- you, Mr. Schram, and the children -- would return to New York after one school year?
MR. BEYDA: Objection to the form. Could we break

that down, your Honor. I believe it was two questions.

THE COURT: No. Overruled.

A. Isn't it true that -- it's not true.

MR. MIN: Okay. Your Honor, I'd offer P173. P171. I misspoke. P171. Sorry.

THE COURT: 171?

MR. MIN: Yes.

THE COURT: And where is that? That's a late-designated exhibit? It's on your amended list, I see.

I have it. Thank you. I'm sorry.

THE WITNESS: P171?

THE COURT: All right. But as to -- hold on a minute. As to these that were on the amended list but not the earlier list, I do not have the objections list in my binder, so were there any objections to P171?

MR. BEYDA: I apologize.

MR. MIN: Your Honor, to be --

MR. BEYDA: I need to --

MR. MIN: Your Honor, to be clear --

MR. BEYDA: I don't have it. I have to pull it.

THE COURT: All right. Take a look at it.

Go ahead, Mr. Min. What were you going to say?

MR. MIN: I was going to say, your Honor, your Honor had directed Mr. Beyda, at least at one juncture, to provide objections to these additional documents, which he did receive

before our final pretrial conference. We have still not received any written objections about these documents.

THE COURT: That's why I don't have a list of objections.

MS. CHAWLA: Your Honor, we did file the amended objections and they were filed on ECF on October 4th.

THE COURT: All right. Can you take a look at it, please, Ms. Chawla, and tell me, is there an objection to P171. And what's the ECF number?

MS. CHAWLA: The ECF number is Document 47, your Honor.

THE COURT: Thank you.

MS. CHAWLA: And there was an objection. It was to hearsay and lacks foundation.

THE COURT: All right. Thank you.

All right. Mr. Min, you have the objections.

MR. MIN: Yes, your Honor. And your Honor, I would like to formally apologize to counsel. It was my error. I overlooked that, and I do apologize about that.

MR. BEYDA: Your Honor, may I have a moment to confer with my colleague about --

THE COURT: Hold on a minute. Hold on a minute. Thank you, Mr. Min, and Ms. Chawla, both of you.

All right. Go ahead, Mr. Beyda.

MR. BEYDA: May I have a moment to confer with my

colleague about this document?

THE COURT: Sure.

MR. BEYDA: Thank you.

THE COURT: Yes, sure.

(Pause)

MR. BEYDA: Thank you, your Honor. I appreciate it.

THE COURT: So --

MR. BEYDA: We have no objection to this document going into evidence.

THE COURT: All right. It will be admitted.

(Petitioner's Exhibit 171 received in evidence)

BY MR. MIN:

Q. Ms. Zarak, on March 31st, 2020, is it your testimony that --

A. May.

Q. I apologize. On May 31st, 2020, did you and Mr. Schram have communications about moving to Iceland, in or around this time?

A. Yes, it was -- it was one of the options, yes, sir.

Q. Okay.

A. Yes.

Q. And what were --

THE COURT: Give me one moment.

Is this the same document that was admitted as P122?

MR. MIN: Yes, your Honor. It does seem that way. Is

P122 admitted?

THE COURT: Admitted for a limited purpose.

MR. MIN: Yes. Yeah, it does seem like that's the case, and I'm happy to withdraw 171 and focus on 122 instead.

THE COURT: I don't really care which exhibit you use. My point is it's already been admitted and asked about.

MR. MIN: Yes, to Mr. Schram. I'd like to ask this witness.

THE COURT: Okay. Go ahead. Go ahead.

BY MR. MIN:

Q. So in or around May 31st, 2020, were you and Mr. Schram discussing moving to Iceland?

A. Yes, sir, among other options.

Q. Okay. And with respect to the option of moving to Iceland, did you and Mr. Schram discuss how long you might stay in Iceland for, in or around March -- May 31st, 2020?

A. No, sir.

Q. When did those conversations begin with respect to how long you, Mr. Schram, and the children might stay in Iceland for, if you were to move?

A. Again, there were tremendous amounts of uncertainty in the air. It was always centered around the schools, because if we were going to be anywhere, it was so our children could attend school in person. So I do not know when exactly those conversations began.

THE COURT: All right. Hold on. The entire answer, until we get to, "So I do not know when exactly those conversations began," is stricken. The last line, "So I do not know when exactly those conversations began," will remain.

You have to just answer the question, Ms. Zarak. All right?

THE WITNESS: Yes, your Honor.

THE COURT: All right. Go ahead, Mr. Min.

BY MR. MIN:

Q. Is it your testimony then that the conversations with respect to moving to Iceland or anywhere else were centered around the children's schooling?

A. Yes.

THE COURT: All right. Hold on. My last comments about striking the prior portion of Ms. Zarak's testimony is now revoked, because you just asked her about what I struck. Go ahead.

MR. MIN: Yes, your Honor. I wanted to keep that answer.

THE WITNESS: Mr. Min, could you pull the document down so I can see you. I don't see you.

MR. MIN: Sure. Yeah, and we'll pull it up if we have to refer to it again. That's fine. Let me know --

THE WITNESS: Thank you. That's better.

MR. MIN: Of course.

BY MR. MIN:

Q. Would it be fair to say, though, on March 31st, 2020, you had an understanding that the schools in New York would not be open for the following school year, correct?

A. On March 31st, 2020?

THE COURT: May. May.

Q. I'm sorry. May 31st, 2020. I meant, yeah, May 31st, 2020. Would it be fair to say you had an understanding that the schools in New York would not be open in person?

A. Not yet.

Q. Isn't it true that Mr. Schram sent you the email that you just saw with the comparison between New York and Iceland in or around May 31st, 2020, because he expressed interest in moving to Iceland not for a temporary period of time but as a long-term move?

MR. BEYDA: Objection. That calls for Mr. Schram's frame of mind.

THE COURT: Hold on.

No. Overruled.

A. I don't know, Mr. Min.

THE COURT: The question says he expressed an interest. Did he ever express that to you?

THE WITNESS: No, your Honor.

THE COURT: Okay.

Q. Isn't it true that on or around June 9th, 20 -- withdrawn.

I want to direct your attention to -- 2.

MR. MIN: Well, your Honor, I want to offer P148, Bates numbered page 12008.

THE COURT: This is the same exhibit, Mr. Beyda, that we looked at, so if you can just tell me whether that page is objected to.

MR. BEYDA: The page number, Mr. Min, can you please repeat that.

MR. MIN: 12008, Mr. Beyda.

MR. BEYDA: This is the -- you want to offer, Mr. Min, the full -- do you want to do the following page also, so you have the full date of --

MR. MIN: That's fine if that's what you want.

MR. BEYDA: For purposes of --

MR. MIN: Not a problem. That's fine.

MR. BEYDA: No objection.

THE COURT: So 12008-09, no objection?

MR. BEYDA: Correct.

THE COURT: All right. So P148C will be admitted without objection.

(Petitioner's Exhibit 148C received in evidence)

THE COURT: Okay. Ms. Zarak, do you have those two pages?

Okay. Thank you.

Go ahead, Mr. Min.

BY MR. MIN:

Q. I want to direct your attention to the middle of 12008, message Mr. Schram sent you on July 12th, 2020 --

THE COURT: All right. Could you please pull it up.

Q. -- where he wrote to you, "Talked to Freyr, he confirmed everything for Iceland. Basically whatever I would need work vise he would have ready when I was there and ready to work." Do you see that?

A. Yes.

Q. Okay. One of the reasons that you and Mr. Schram decided to go to Iceland is because Mr. Schram would have job opportunities and the ability to earn income in Iceland; isn't that true?

A. One of the --

MR. BEYDA: Objection.

THE COURT: I'm sorry?

MR. BEYDA: I believe this was asked and answered.

THE COURT: Overruled.

You can answer, Ms. Zarak, if you're able.

A. One of the reasons.

THE COURT: That's what he said, yes. Are you agreeing or are you asking a question, Ms. Zarak?

THE WITNESS: Yes.

THE COURT: You're agreeing.

THE WITNESS: Yes.

THE COURT: Okay.

BY MR. MIN:

Q. And in fact, you had mentioned earlier that Mr. Schram was struggling in New York because he was not making any money, right?

A. Yes, Mr. Min.

Q. And in July 2020, Mr. Schram was on an O-3 visa only, correct, yes or no?

A. July 2020, yes, sir.

Q. Okay. Which, as far as you understood, did not give him the ability to work in the United States, correct?

A. Yes, sir.

Q. Okay. And at that point Mr. Schram had no green card that would allow him to work in the United States either, correct?

A. At that point, correct.

MR. MIN: I'd like to offer the same document, page -- Bates numbered page 12013.

THE WITNESS: I'm ready, sir. If you're waiting for me, I'm ready.

THE COURT: No. I'm waiting for Mr. Beyda to see if he has an objection. In fairness, these are being sprung on him.

MR. BEYDA: Thank you. No objection.

THE COURT: All right. It's admitted without objection.

(Petitioner's Exhibit 148D received in evidence)

THE COURT: All right. Mr. Min, that's 148D like David, admitted without objection. Bates 12013.

BY MR. MIN:

Q. I want to direct your attention to the bottom of this page. You wrote to Mr. Schram on July 19, 2020, "Ballpark, how much are they paying you?" You were referring to how much Mr. Schram would be earning in Iceland for work, correct?

A. Correct.

Q. And Mr. Schram says, "Why?" You say, "Why not?" And then you say, "To see what kinds of properties I should be looking at but I'm done doing that." You're referring to looking at properties in Iceland based upon the income that Mr. Schram would be deriving, correct?

A. Correct.

MR. MIN: I want to offer P39 into evidence, your Honor. And there's no objection.

THE COURT: It will be received then.

(Petitioner's Exhibit 39 received in evidence)

Q. And I'd like to direct your attention to the Bates numbered page 9527.

MR. MIN: Your Honor, my colleague's computer is frozen, so if we can just give it a second.

A. Can you repeat, sir, the red number?

Q. Yes. 9257.

MR. MIN: If Ms. Zarak has it in front of her, I can ask her questions about it.

THE WITNESS: Yes, I have it.

THE COURT: Is Mr. -- there we go. Thank you.

Q. Who is Amy, Nan, and Diana?

A. They are the teachers of -- they are the principal and teachers of Broadway Presbyterian Church Nursery School.

Q. Okay. And you wrote on July 26th, "We decided to relocate to Iceland... I almost can't believe what I type as I type it... And we fly over next week."

"It was not an easy decision because we had just returned from Los Angeles, but, in a nutshell, schools are open in Iceland and life is as normal there as it could be.

"On the other hand, our green cards were recently approved, so we will be returning eventually. I am guessing next summer? 2022?" Do you see that?

A. Yes.

Q. Okay. So on July 26, 2020, would it be fair to say that there was no agreement between you and Mr. Schram to return to New York in the summer of 2021?

A. Incorrect.

Q. Would it be fair to say that your return to New York was contingent upon getting your green cards approved, to some extent?

A. COVID -- no. It's incorrect, sir. It's incorrect.

MR. MIN: One second, your Honor.
Q. Isn't it true that when you wrote this email on July 26, 2020, you had no idea when you, Mr. Schram, and your children would be able to come back to New York?
A. That's correct.
Q. And as a result, you and Mr. Schram and the children had no plan as to when you would return to New York.
A. We had a plan. We didn't know if it would happen.
Q. And is it your testimony then that that plan did not include having green cards -- or withdrawn.
Is it your testimony that irrespective of Mr. Schram's ability to work in the United States, that you, Mr. Schram, and the children would all return to New York in 2021 or 2022?
MR. BEYDA: Objection to the form.
THE COURT: Sustained.
THE WITNESS: Mr. Min, could you please bring the document up.
THE COURT: You don't have to answer.
THE WITNESS: No, I just want to see Mr. Min. It's easier for me to connect. I'm just seeing a document.
THE COURT: Ah, I see. So can you take the document down.
MR. MIN: Yes, your Honor.
THE COURT: Also, Ms. Zarak, on your screen --
THE WITNESS: Is there an option to see the people and

not the document?

THE COURT: Yes. To see the speakers.

THE WITNESS: There. Thank you.

THE COURT: Yes.

MR. MIN: Your Honor, I would offer within P148 Bates numbered page 12023.

THE COURT: All right. And I'm going to let Mr. Beyda take a look at it.

MR. BEYDA: No objection.

THE COURT: It will be received without objection as P148E like Edward.

(Petitioner's Exhibit 148E received in evidence)

MR. MIN: Ms. Zarak, we'll pull it up for you.

THE WITNESS: Thank you. Yes, thank you.

BY MR. MIN:

Q. And these are messages dated July 28, 2020. Can you just describe what you and Mr. Schram are discussing during these messages.

A. Yes, sir. I wanted to know what his day would be like because I had to schedule a nanny around it.

Q. You and Mr. Schram were discussing also packing up the boxes for the move to Iceland, correct?

A. We -- he was --

MR. BEYDA: Objection, your Honor. The document speaks for itself. It's in evidence.

THE COURT: Correct. Sustained.

MR. MIN: Your Honor, I mean, I -- the document speaks for itself, but I think some context about what they were discussing specifically within the document.

THE COURT: Then ask it independent of the document. This is what you keep doing, Mr. Min. You mark a document and then you just want to read from the document. So if you want to ask a question, put the document aside and ask a question. If you're offering the document, it's in evidence now.

MR. MIN: Okay. Your Honor, I won't ask any questions about the document.

BY MR. MIN:

Q. After the boxes from New York to Iceland arrived in middle of August, you stored those boxes at your brother-in-law's home in Iceland, correct?

A. I believe Mr. Schram rented a storage unit.

Q. And between middle of August and November 1st, when you moved into the home that you purchased in Iceland, you and Mr. Schram continuously took some of the boxes out of storage and would unpack them over time, correct?

A. I never once went to his storage unit, sir.

Q. Did you ever observe Mr. Schram bringing boxes that had been packed in New York to your residence in Iceland prior to November 1st, 2020?

A. What I remember, sir, is that when the -- the -- when it

arrived, he texted me saying, I will bring to the apartment the boxes that came from the apartment, and it was 20 boxes. That's what I remember.

Q. When you say it arrived, those were messages that you were shown yesterday that were on November 1st, 2020, not when they arrived in August 2020, correct?

A. Oh.

THE COURT: Did you say something, Mr. Beyda?

MR. BEYDA: I was objecting to the form.

THE COURT: Sustained.

MR. MIN: We'll show the witness R159 that was admitted into evidence yesterday.

THE COURT: For what purpose? To argue?

MR. MIN: Your Honor, to verify the date in which Ms. Zarak is testifying now as to when the boxes arrived.

THE COURT: Go ahead. It's in evidence.

BY MR. MIN:

Q. These are messages between you and Mr. Schram on November 1st regarding unloading boxes into your home that you purchased in Iceland on or around November 1st, correct?

A. Yes, sir. Can I see the date, please?

Yes. November 1st, exactly, yeah.

Q. But isn't it true that after the boxes arrived in mid-August 2020 -- or withdrawn.

MR. MIN: We can take this document down, your Honor.

I'd like to offer R79 into evidence.
THE COURT: It will be admitted.
(Respondent's Exhibit 79 received in evidence)
THE WITNESS: R79.
Q. Who is L. Viveros, Ms. Zarak?
A. She's my cousin.
Q. And I want to direct your attention to the bottom of the page here where it says, "As you saw on Facebook, our green cards were approved, so while we are like saving time using that time of waiting to do this." Isn't it true that when you sent this message to Ms. Viveros on July 28, 2020, you had no intention of coming back to New York until you and Mr. Schram received your green cards?
A. No, sir, it's not correct.
Q. You're Facebook friends with Mr. Schram on Facebook; would that be fair to say?
A. I -- I -- I think we still are.
Q. And you were in July and August of 2020, correct?
A. Yes.
Q. So would it be fair to say that you saw Mr. Schram's posts -- would it be fair to say that you saw his Facebook post on July 31st or July 30th, 2020, where he said, "Good-bye, New York, we will miss you, next chapter, Iceland"?
MR. BEYDA: Objection.
A. Yes.

THE COURT: On what grounds, Mr. Beyda?

MR. BEYDA: Form.

THE COURT: Overruled.

Q. Do you recall seeing the comment from a Mr. Bill Simonian asking, "Will you be back, Addi?

A. Yes, sir.

Q. Okay. And you recall Mr. Schram's response, "Anything is possible when the world has recovered from this turmoil we're in"?

A. Yes, sir.

Q. Okay. Isn't it true that this was the same day that your father wrote to you that "Next Stop: A New Life"?

MR. BEYDA: Objection. Hearsay.

MR. MIN: The testimony is already in evidence, your Honor.

THE COURT: We have this document. Is the document you're reading from in evidence, Mr. Min?

MR. MIN: No. I asked her a question as to whether or not she recalls receiving that message from her father. She said she did. And I'm referring to her testimony, not to any document.

THE COURT: And now you're asking her were the two things on the same day?

MR. MIN: Yes.

MR. BEYDA: I thought he was asking about what the

father wrote. I apologize. I thought he commented on a hearsay statement by the father. So I apologize if I misheard it.

THE COURT: He's telling me that that's in evidence.

MR. BEYDA: Okay. So maybe --

THE COURT: I recall seeing it in a document, but --

MR. MIN: And to be clear, I don't think the statement from the document is in evidence. Ms. Zarak testified that she recalled receiving a communication from her father to that effect.

THE COURT: Yes, okay.

I mean, Ms. Zarak, do you recall whether the statement that your father made to you, "Next Stop: A New Life," was the same day as the comment from Mr. Simonian, or Mr. Schram's response saying, "Anything is possible when the world has recovered from this turmoil"? Were those two things on the same day?

THE WITNESS: My turn?

THE COURT: If you know, yes, if you know.

THE WITNESS: I don't know, your Honor.

MR. MIN: Okay.

BY MR. MIN:

Q. Do you recall the date in which your father communicated to you "Next Stop: A New Life"?

A. It wasn't to me, Mr. Min. I don't recall. Apologies.

Q. Do you have an understanding as to what your father was referring to with respect to the next step *[sic]*?
A. No, sir.

MR. MIN: Your Honor, I would offer R165, Bates stamp pages 11742 to 11743.

THE COURT: Hold on. R165?

MR. MIN: Mm-hmm.

MR. BEYDA: Can you repeat the pages.

MR. MIN: Sure. 11742 to 11743.

THE COURT: All right. Hold on one second.

(Discussion off the record)

MR. BEYDA: Your Honor, I have no objection to these two pages, if that will speed it along.

THE COURT: All right. That's fine.

Then Mr. Min, you need to mark this as 165A.

MR. MIN: Yes, your Honor.

THE COURT: Admitted without objection.

Normally one does not pull out two pages from somebody else's exhibit and offer the two pages, but if Mr. Beyda has no objection, they'll be received.

(Respondent's Exhibit 165A received in evidence)

MR. MIN: Your Honor, I'd offer P56 into evidence. There are --

THE COURT: You have no questions on R165?

MR. MIN: No, your Honor.

THE COURT: Okay. What's the next number?

MR. MIN: P56. There was a hearsay objection. I will only be using the statements from Ms. Zarak.

THE COURT: You do realize that does not cure the hearsay objection, right?

MR. MIN: Yes, your Honor, but I'm informing Mr. Beyda if that helps him with his objection.

THE COURT: Okay.

MR. MIN: Because his objections were except as to certain admissions being made by respondent.

MR. BEYDA: And now you're in P56?

THE COURT: Yes. And you also realize the mere fact that Ms. Zarak may have made the statement doesn't make it an admission, right?

MR. MIN: Yes, your Honor.

THE COURT: What are you offering? The whole thing? 56?

MR. MIN: To the extent that there is objections about the other person's statements, then I will certainly redact those, if that cures the objection.

MR. BEYDA: My objection remains, and I think that if Mr. Min wants to ask questions about communications with the witness, he can ask without the exhibit in front of him.

THE COURT: The objection is sustained.

BY MR. MIN:

Q. Do you recall having communications with someone named Bonnie Hodes in or around August 2020?
A. Yes. Is -- is this a exhibit we're going to -- you were referencing or we're not going to -- okay. Sorry.
THE COURT: Just answer the questions now.
THE WITNESS: Yes. Okay.
A. Sorry, Mr. Min. I was waiting for the question on the other exhibit.
Do I recall having conversations with Bonnie Hodes in or around January?
Q. August. August 2020.
A. August. Probably. I don't remember exactly, but she's someone I speak with. Yes, probably, sir.
Q. Who is this individual?
A. She is a New York therapist. She was my therapist for a few years, and then she saw me and my husband a couple of times.
Q. And did you recall having communication with her with respect to your move to Iceland?
MR. BEYDA: Objection.
THE COURT: Grounds?
MR. BEYDA: Client-patient privilege if this is her therapist.
THE COURT: He just asked did you have conversations; he didn't ask the substance yet.

MR. BEYDA: Okay.

THE COURT: That's just a yes or a no.

MR. BEYDA: Your Honor, I believe the question was with regard to Iceland.

THE COURT: Ah, you're right. You're correct. Sustained.

BY MR. MIN:

Q. Was Ms. Hodes your therapist?

MR. BEYDA: Objection.

THE COURT: Just answer yes or no to that.

A. She was. And also, she also saw me and my husband a couple of times.

MR. MIN: Your Honor, we would offer Respondent Exhibit 80.

THE COURT: It will be admitted.

(Respondent's Exhibit 80 received in evidence)

MR. MIN: Your Honor, I'll offer Respondent's Exhibit 152.

THE WITNESS: 80.

THE COURT: I don't think he has questions on it, Ms. Zarak.

THE WITNESS: Oh.

THE COURT: He's just moving things into evidence.

152 is admitted.

(Respondent's Exhibit 152 received in evidence)

MR. MIN: I'd offer, your Honor, P64. And there were no objections.

THE COURT: I'm sorry. 64 or 164, did you say?

MR. MIN: 64, no 1.

THE COURT: 64. Okay. If there's no objection, that is admitted.

(Petitioner's Exhibit 64 received in evidence)

BY MR. MIN:

Q. Ms. Zarak, earlier I had asked you questions about the reasons you stated on your resident permit application in Iceland for why you and Mr. Schram moved to Iceland and you said looking at the document would help refresh your recollection, so I wanted to do that now.

MR. MIN: So your Honor, with the Court's permission, I'd like to put up on the screen a document to help refresh Ms. Zarak's recollection on that issue.

THE COURT: What is the document, please?

MR. MIN: The resident permit application.

THE COURT: The exhibit number.

MR. MIN: It's not premarked as an exhibit. Simply just to refresh recollection.

MR. BEYDA: Well, the witness -- your Honor, doesn't the witness need to tell us what might refresh her recollection?

THE COURT: No. He can show a witness anything he

wants to try to refresh her recollection. You know that famous quote.

MR. BEYDA: Thank you.

BY MR. MIN:

Q. Ms. Zarak, just take a look at this document and let me know when you've had a chance to look at it and if it helps you refresh your recollection as to the reasons you gave to the Icelandic authorities as to why you and Mr. Schram moved to Iceland.

A. Yeah, it's -- it's been refreshed. Thank you.

Q. Thank you. And so I repeat my question. Isn't it true that you told the Icelandic authorities that you moved to Iceland because of COVID and because Mr. Schram got a job opportunity in Iceland?

A. Yes, sir, that's what I said.

MR. BEYDA: Your Honor, may we have a quick sidebar, or a colloquy without the clients on the line? Because I have an issue right now.

THE COURT: Yeah. I don't know how we do that.

MR. BEYDA: I don't mind them even being on, but I would ask for the Court's --

THE COURT: Ms. Dempsey, is there any way to do this or do we just ask the clients to log off until we invite them back?

All right. Ms. Zarak and Mr. Schram, could you log

off and your lawyers will email you or text you when it's time to log back on.

THE WITNESS: Yes, of course.

THE COURT: Thank you.

(Petitioner and respondent not present)

MR. BEYDA: It might just take a moment, your Honor.

THE COURT: Let them log off.

Okay. Go ahead.

MR. BEYDA: It might just take a moment. But I'm curious to know why the document that was just put on the screen concerning paperwork submitted regarding citizenship, which was a requested bit of information during discovery in this case, was not produced.

THE COURT: I don't know if it was.

Mr. Min or Mr. Glasser?

MR. BEYDA: Your Honor, the petitioner's document productions were not Bates stamped like ours were, up to 25,000. We've basically received a chunk of documents in no particular order. That one did not look familiar at all.

MR. MIN: Your Honor, if Mr. Glasser can respond. I'm looking at the discovery documents right now while Mr. Glasser responds.

MR. GLASSER: The document that was just placed on the screen was produced by counsel for Ms. Zarak. There were two tranches of documents that they produced. One tranche did not

have Bates stamp numbers. That document that we displayed on the screen was part of their initial production, and I'm happy to direct Mr. Beyda to where in their discovery response that document was found.

MR. BEYDA: Okay. So there was a draft version of a document produced, and was that the draft version? Or --

MR. GLASSER: That is the only permit application that you produced, Mr. Beyda.

MR. BEYDA: All right. So your Honor, that was a draft document, and their representation was that this was something that was, I believe -- I actually don't have the word-for-word --

THE COURT: Hold on.

MR. BEYDA: If this was -- I don't know that this was a signed document that was submitted.

THE COURT: All right. But again --

MR. GLASSER: It's not in evidence.

THE COURT: Hold on. Her recollection can be refreshed with anything at all --

MR. BEYDA: I appreciate that.

THE COURT: -- right? And he asked her the question about what you stated in your application, she said, I don't recall, then he showed her something to refresh her recollection. She said: My recollection is now refreshed, yes, we gave that as a reason.

MR. BEYDA: But --

THE COURT: Mr. Beyda, I didn't hear what you're saying.

MR. BEYDA: I stand corrected on my approach on this -- to this issue, and we can move on. I don't want to take up the Court's time belaboring it.

THE COURT: All right. Thank you.

All right. So would you please each let your clients know we're going back on the record, or we're ready to resume.

And Mr. Min, I'll warn you too, you're getting very close to the end of your time here.

MR. MIN: Yeah, I only have a little bit left to go. I will try to hurry it up. I'm trying not to ask any questions on the exhibits, just to move it along.

MR. BEYDA: Mr. Oza, can you walk over to the room where Tania is to let her know to log back on.

THE WITNESS: I just returned.

THE COURT: Okay. Welcome back.

(Discussion off the record)

THE COURT: Mr. Min.

MR. MIN: Yes, your Honor. I'd offer P105 into evidence. There's no objection noted.

THE COURT: All right. That will be admitted.

(Petitioner's Exhibit 105 received in evidence)

MR. MIN: I'm just pulling it up.

THE WITNESS: Yes, pull it up, please. I'm lost with the binders.

MR. MIN: I'm not asking any questions, your Honor. I'm sorry.

THE COURT: He's not asking you anything yet, Ms. Zarak. He's just putting some documents into evidence.

THE WITNESS: Oh, okay.

MR. MIN: I'd like to offer P38 into evidence. No objection.

THE COURT: No objection, it's admitted.

(Petitioner's Exhibit 38 received in evidence)

MR. MIN: I'd like to pull up this exhibit and show the witness P38.

THE COURT: All right. Ms. Zarak, can you pull up P38. And he'll put it up on the screen as well for me.

Thank you.

BY MR. MIN:

Q. The bottom of this page, Bates numbered 8780, you wrote to Amy?

A. I'm just going to see, sir, because I -- I have a different --

Q. Sure.

A. Yes. I'm ready.

Q. Ms. Zarak, yesterday you testified that for the approximately for the first six months that you and the family

were residing in Iceland that you barely saw anyone and the children barely socialized with anyone outside of Tanya Sleiman's child C. Do you recall that?
A. Yes, sir.
Q. Okay. In this message on February 5th, 2021, which is approximately two months -- six months, six months, after you arrived in Iceland, you described EZ as a social butterfly and that she was doing very well.
A. In school.
Q. In school. Do you see that? Okay.
A. Yes, I do.
Q. Okay. EZ made a lot of friends in school in Iceland, correct?
A. In school, yes.
Q. In school. And how big was her class in Iceland?
A. I think it was 10, 15 kids, between 10 and 15 kids.
Q. When was the first time in 2021 that you approached Mr. Schram about returning to New York?
A. It was an ongoing -- I don't know, Mr. Min.
Q. Isn't it true that in or around February 2021, you began discussing with Mr. Schram the possibility of going back to New York?
A. Again, it was an ongoing conversation, Mr. Min. I don't remember an actual date.
MR. MIN: Your Honor, I'd like to -- withdrawn.

Q. Do you recall in your divorce proceedings stating in your affidavit that in February 2021 you started working on a Spotify podcast called *Señoras Punk*?
A. I believe so. I believe so, yes.
Q. Okay. And that you wrote, "In or around that time, as infection rates came down in New York and vaccination rates rose in New York, I began discussions with defendant about returning home to New York"?
A. Yes. I'm -- I -- I don't have the document with me, sir, but are you reading from the affidavit?
Q. Would it help to refresh your recollection if I showed you the paragraph that you wrote in the affidavit?
A. If that is okay with the Court, yes.
MR. MIN: Your Honor, I'd like to pull up --
THE COURT: Is your question did she write this?
MR. MIN: Well, I'd like to establish a time frame so I can ask follow-up questions, your Honor.
THE COURT: Okay. Go ahead.
MR. MIN: I'd like to show P175, page 10 of 20, paragraph 25.
Start on the prior page. Start on page 9, beginning paragraph 25.
THE WITNESS: Yes, sir, I remember now.
BY MR. MIN:
Q. Do you see the date there February 2021?

A. Yes.

Q. And then the last two words on that paragraph, "In or --" and we'll go to the next paragraph, next page. "In or about this time, I began discussions with defendant about returning home to New York."

A. Yes, sir.

Q. And Mr. Schram told you in response that he did not want to move back to New York this year, 2021, and he refused to give you any clarity as to when he might want to go back, correct?

THE COURT: Are you asking her if this is true or are you asking her if that's what she said, in this affidavit?

MR. MIN: Is that true.

Q. Is that true that Mr. Schram told you that?

A. Yes, it's true. This is February -- February of 2021, yes.

MR. MIN: I'd like to offer P82 into evidence. No objection, your Honor, noted.

THE COURT: All right. P82 will be received then.

(Petitioner's Exhibit 82 received in evidence)

Q. In March 2021, SZ got accepted into Oldukot, correct?

A. I was informed, yes, sir.

Q. And his school year in Oldukot would begin in or around early June 2021, correct?

A. No, sir.

Q. When would it begin?

A. I don't know, sir.

MR. MIN: Your Honor, we would offer P46 into evidence. There are objections.

THE COURT: The objection says no certified translation. Did you remedy that?

MR. MIN: Your Honor, I will open it up. I believe so, but I will open it up.

THE COURT: There is also a hearsay objection.

MR. MIN: Yes. I will withdraw my offer of P46.

THE COURT: Okay.

BY MR. MIN:

Q. In early 2021, you submitted an online registration for EZ for Landakotsskoli for the school year 2021-2022, correct?

A. Incorrect, sir. It wasn't a registration.

Q. What did you submit in early 2022 -- in early 2021 with respect to EZ and Landakotsskoli?

A. We received an email from Lori saying that because it's a small school and there's high demand for it, they wanted to -- I think the word she uses is "count heads" or "count seats," so it's not a registration, it's not a formal registration; it's like a placeholder, I would say.

Q. Well, I want to --

A. It was a Google form, I remember.

Q. Yeah.

MR. MIN: Your Honor, I would like to show the witness a document that's been premarked as Petitioner's 178, which is

an affidavit in the state court proceedings, a specific paragraph, if I may.

THE COURT: Is this her affidavit?

MR. MIN: Yes, your Honor, it's her affidavit.

THE WITNESS: P178?

MR. MIN: Your Honor, if I can put the particular paragraph on the screen?

THE COURT: Go ahead.

MR. MIN: Page 9, paragraph 23, so everyone can follow along.

THE COURT: Can you make it bigger?

Yeah. Thank you.

BY MR. MIN:

Q. Do you see there where you wrote, "While I filled out an online registration for EZ, it was early in the year and COVID was still an issue"?

A. Yes, sir, I see it. I see it.

Q. So was that untrue that you filled out an online registration or --

MR. BEYDA: Objection. Argumentative. This is something she filled out, your Honor.

THE COURT: Overruled.

A. I believe -- I didn't do an online registration so I believe, sir, this was a mistake on -- a wording mistake.

Q. Okay. So would it -- so between February and April --

withdrawn.

I'd like to move into evidence P37, but -- P154. There's no --

THE COURT: Wait. So not 37?

MR. MIN: No. P154. There's no objection, your Honor.

THE COURT: It will be admitted.

(Petitioner's Exhibit 154 received in evidence)

MR. MIN: And your Honor, I'd like to direct the witness's attention to page 37 of this document. I will get the Bates stamp.

THE COURT: All right. Can you pull it up, please.

THE WITNESS: P134?

MR. MIN: P154.

THE COURT: P154.

THE WITNESS: 154. 154.

BY MR. MIN:

Q. And it's Bates stamped 13081.

Who is Mandy Goldberg?

A. Mandy Goldberg is my best friend.

Q. Okay. And do you see that message -- I just want to direct your attention to that message on April 18th, where you say, "When we move back in or around the summer of 2022 (and we will, with or without Addi) my three children will go to the same school"?

A. Yes, sir, I see it.
Q. Okay. At this point in April of 2021, Mr. Schram had made it clear to you he had no intention of returning to New York to reside, correct?
A. Cor -- correct.
THE COURT: What's the date of this? April 18.
Q. And on this date, April 18th, it was your intention to reside in Iceland at least until summer of 2022, correct?
A. Let me -- let me regroup.
Well, the schools weren't -- yes, sir, correct.
Q. And you're writing in green on the right side and Mandy is writing in brown on the left side, correct?
A. Correct, sir.
MR. MIN: Okay. And I'd like to offer R152, a particular Bates stamp. R152, I understand, is in -- your Honor, so we'll pull that up. Bates stamp, Bates numbered page 12852.
Q. While we're doing that, Ms. Zarak, just to clarify, Addi is your husband's nickname, correct?
A. Yes, sir.
Q. 12852.
A. This has different --
THE COURT: Are you directing her to what's on the board or what you said, which is 12852? Mr. Min?
MR. MIN: Your Honor, we're going to pull this exhibit

down.

We're going to show P4, your Honor.

THE WITNESS: Petitioner's --

THE COURT: All right. This is already in evidence.

MR. MIN: Yes.

Q. Ms. Zarak, I'll direct your attention to page 2. You were communicating with someone in Iceland about gymnastics courses for EZ, correct?

A. Please give me one second, sir. P4?

Q. Yes.

A. And then what page?

Q. Page 2 of that document.

A. Yes, we will not be -- yes, sir.

Q. You were communicating with someone about gymnastics courses for EZ, correct?

A. Yes, sir.

Q. And these were for gymnastics courses in Iceland, correct?

A. Yes, sir.

Q. Okay. And you see your email on April 27, 2021, where you tell this person that you will not be here for the summer but you'll be here for the fall, and you requested information because EZ was dying to start gymnastics, correct? Do you see that?

A. Yes. Yes, sir.

Q. And you wrote that email on April 27th because at that

moment it was your intention to spend at least the school year 2021-2022 in Iceland, correct?

MR. BEYDA: Objection, your Honor. This has been asked and answered about what her intention was for that period of time.

THE COURT: No. Overruled.

A. I don't know, sir.

MR. MIN: Your Honor, we would offer P21, which there's no objection to.

THE COURT: It will be admitted.

(Petitioner's Exhibit 21 received in evidence)

Q. In May 2021 you traveled to New York, correct?

A. Yes, sir, late May.

Q. And you returned to New York from Iceland on approximately May 27th, 2021, correct?

A. Correct.

Q. And upon your return you expressed to Mr. Schram that you wanted to return to New York with the children, correct, at that time?

A. Correct.

Q. Okay. And Mr. Schram told you that he did not want to go back to New York at that time, correct?

A. Correct.

Q. And that was an intention that he had been continuously expressing to you since February of 2021, correct?

A. Correct.
Q. When did you and Mr. Schram purchase a trampoline for your backyard in May?
A. I didn't purchase it, Mr. Min.
Q. When was the trampoline purchased in May of 2021 for your backyard?
MR. BEYDA: Objection. Withdrawn.
THE COURT: I'm sorry. Hold on.
MR. BEYDA: I thought he asked a question about -- I thought -- actually, yes, I do object. Are you asking for a specific date in May, Mr. Min? Because the question was when did you purchase a trampoline in --
THE COURT: The form objection is sustained.
BY MR. MIN:
Q. Who purchased the trampoline in -- in May of 2021?
A. Mr. Schram.
Q. Do you know when he purchased that trampoline?
A. Yes.
Q. When did he purchase it?
A. He purchased it around the time of SZ's birthday, so beginning of May.
MR. MIN: Your Honor, we would offer P110 into evidence, and there are no objections.
THE COURT: Admitted.
(Petitioner's Exhibit 110 received in evidence)

MR. MIN: I'd like to offer P148, Bates Nos. 12372 to 12378.

THE COURT: For now, we're marking as 148F 12372 to 78, and give Mr. Beyda a chance to review it.

Q. Ms. Zarak, are you ready? I apologize?

THE COURT: We're waiting on Mr. Beyda.

I'm not rushing you, sir. I'm telling Mr. Min, you have pulled pieces out of an exhibit; you should have done this stuff ahead of time.

Mr. Beyda, any objection?

MR. BEYDA: I am going to object. I think at this point Ms. Zarak can answer any questions about her statements since she's here testifying.

THE COURT: The objection is hearsay?

MR. BEYDA: Hearsay.

THE COURT: Sustained.

BY MR. MIN:

Q. Ms. Zarak, do you recall having a conversation on June 2nd, 2021 by text message with Mr. Schram regarding P.S.9?

A. June 2nd. Can you -- do I recall having a conversation about P.S.9, June 2nd, 2021?

Q. Yes.

A. Yes.

Q. Okay. And Mr. Schram was upset because he believed you were trying to enroll the children at P.S.9 in or around

June 2nd, 2021 without his permission, correct?

MR. BEYDA: Objection to the form. Calls for Mr. Schram's frame of mind.

THE COURT: Sustained.

Q. It's true that Mr. Schram told you he was upset in or around June 2nd, 2021 because you had tried to enroll the children into P.S.9 without his authorization, correct?

A. He left the house, sir. He didn't tell me.

THE COURT: That's not the question. The question is, did he tell you that, that he was upset, in or around June --

THE WITNESS: No.

THE COURT: No?

THE WITNESS: Not that I recall.

THE COURT: Okay.

BY MR. MIN:

Q. Did Mr. Schram accuse you of trying to enroll EZ and RZ at P.S.9 without his authorization?

A. Yes.

Q. And is that the reason you understood he left the house on that day?

A. No.

Q. Isn't it true that Mr. Schram asked you to forward him all communication that you had with P.S.9 so that he could understand what, if any, actions you took to register EZ and RZ into that school in or around June 2nd, 2021?

A. Yes.
Q. And isn't it true that Mr. Schram was opposed to registering EZ and RZ at P.S.9 in early June 2021?
A. I don't know.
Q. Isn't it true that Mr. Schram accused you of -- withdrawn.
Isn't it true that Mr. Schram expressed to you that he was concerned that you would abduct or take the children to the United States and not return based upon these conversations you were having with P.S.9 in early June 2021?
MR. BEYDA: Objection to the form.
THE COURT: Sustained.
Q. Isn't it true that on June 2nd, 2021, you wrote to Mr. Schram, "I didn't register the children at P.S.9, they were registered last year and you know this"?
A. It's true -- yes.
Q. And isn't it true on the same day you wrote to Mr. Schram, "How can you think I wasn't coming back from my trip? There is absolutely no way I can even legally do that"?
A. Yes.
Q. Do you recall writing to Mr. Schram on that same day, "Addi, if I didn't come back from that trip, do you know the legal mess I would get myself in?"
A. The question is do I recall or did I write that?
Q. Did you write that to Mr. Schram on that day?
A. Yes. Yes, either way.

THE COURT: What are you reading from, Mr. Min, please?

MR. MIN: P140 -- P148.

THE COURT: I'm sorry?

MR. MIN: I'm sorry, your Honor. P148.

THE COURT: Page?

MR. MIN: That particular page is 12377, the last couple of messages, beginning 12376, so those two pages were read from. 12376 and 12377.

THE COURT: Thank you.

MR. BEYDA: Just so the record's clear, those pages, that's not in evidence.

THE COURT: She said she wrote it. You told him to ask and he asked.

MR. BEYDA: Yeah, no, I was just clarifying.

THE COURT: I know.

BY MR. MIN:

Q. Do you recall on that same day -- or did you write to Mr. Schram on the same day, "Call Rita and ask her, I am not in the process of registering anyone"?

A. Yes, sir.

Q. Okay. And Rita is Rita Yoskowitz.

A. Yes, sir.

Q. And you wrote that because you were trying to assuage Mr. Schram of any concerns that you were trying to register EZ

and RZ at P.S.9 in early June 2021, correct?
A. Could you rephrase that, sir.
Q. You wrote that message to Mr. Schram on June 2nd because you wanted to convince Mr. Schram that you had no intention of enrolling EZ or RZ without his permission at P.S.9 in early June 2021, correct?
A. Incorrect.
Q. On or around June 8th, 2021, SZ started an adjustment period at Oldukot, correct?
A. Correct.
Q. Okay. And you attended that adjustment period with SZ at Oldukot, correct?
A. Yes, I did.
Q. And as did Mr. Schram, correct?
A. Correct.
Q. I'd like to direct your attention to P148 and offer Bates number page 12385. 12385.
A. P? 1?
THE COURT: 48. And we'll mark that as 148G, like George.
A. Which -- which pages, Mr. Min?
Q. It's just page 12385, Ms. Zarak. And while your attorney is looking at that, if I may, I'll just --
A. Hold on.
Q. Ms. Zarak --

MR. MIN: Your Honor, I think we're waiting on a possible objection, so I don't think Ms. Zarak should be looking at it yet, right?

THE WITNESS: Sorry, sorry, sorry. I haven't found it yet anyway.

MR. MIN: Your Honor, while Mr. Beyda is considering that objection, may I ask a couple of just follow-up questions?

THE COURT: No. I mean, he can't concentrate on two things. It's not fair to put him concentrating on two things at once.

MR. MIN: Understood.

MR. BEYDA: The objection is hearsay, your Honor.

THE COURT: All right. Let me just look at it.

12385?

MR. MIN: Yes, your Honor.

THE COURT: Objection is sustained.

BY MR. MIN:

Q. Ms. Zarak, was there a birthday party on June 8th, 2021 that you attended?

A. Was there a birthday party on June 8, 2021?

Q. June 8, 2021, yes, at MiniGardurinn?

A. Yes, there was, yes.

Q. It was B's birthday party, right?

A. B? Yes.

Q. B as in --

A. Yes, B as in boy.
Q. We're trying to use initials.
A. Yes.
Q. And you wrote to Mr. Schram on June 8th to come and join you at B's birthday party, correct?
A. Yes.
Q. And did he come and join you?
A. Yes.
Q. What is an adjustment period at Oldukot?
A. I'm sorry, sir. Thank you. What is an adjustment period? It is -- the parents need to go with the child to school.
Q. How long does the adjustment period last?
A. It depends on the child.
Q. And this was for SZ, correct?
A. Yes.
Q. And it's true that you attended a couple of sessions at this adjustment period without Mr. Schram, correct, in early June?
A. This was not -- this was the second week of June, Mr. Min. I attended all of them without Mr. Schram. Mr. Schram went to one without me. Only one parent can go.
Q. Okay. And did you have an understanding at this time when school would formally commence for SZ at Oldukot?
A. He did very bad in the adjustment period, so no, I don't -- no, I did not have an understanding as to -- no.

MR. MIN: Your Honor, I'd offer P18. There are objections.

THE COURT: All right. Let me get it.

MR. BEYDA: Your Honor?

THE COURT: Yes.

MR. BEYDA: We've been going for like three and a half hours and we had a -- I think it was a 10-minute break. May I respectfully request maybe a 10-minute break at this point.

THE COURT: Let's just finish with this document first and then we'll talk about scheduling.

Are you standing by your objection, Mr. Beyda, to P18?

MR. BEYDA: Give me one second.

THE COURT: Actually, there seems to be an attorney-client privilege objection.

MR. BEYDA: And I do stand by that objection.

THE COURT: All right. It is marked but not received.

BY MR. MIN:

Q. Ms. Zarak, who is Helgi Porsteinsson?

A. He's my Icelandic lawyer.

Q. For what purpose is he your lawyer?

A. Well, he wasn't my lawyer. I hadn't retained him at the time. He was someone -- for what purposes? For -- for all purposes.

Q. Did you consult with this individual with respect to setting up an LLC in Iceland?

MR. BEYDA: Objection. Relevance, and privilege.

THE COURT: Overruled. He wasn't retained at this time.

MR. MIN: And I asked if she consulted with him.

MR. BEYDA: Consulting is also privileged.

THE COURT: Oh. All right. Hold on.

Ms. Zarak, you did volunteer the statement, "I hadn't retained him at the time." Had you consulted with him?

THE WITNESS: Well, at the time of -- are we talking about P18, Mr. Min?

THE COURT: Yes. I am.

THE WITNESS: Your Honor, sorry. So yes, so I was just consulting with him at this time.

THE COURT: All right. The objection is sustained. That's sufficient, Ms. Zarak. The objection is sustained.

BY MR. MIN:

Q. Did you have an intention to form an LLC in Iceland?

A. No, sir.

THE COURT: All right. Mr. Min, you are basically out of time. You've had equal time to the other side. How much more are you intending to go?

MR. MIN: Your Honor, I may have about half an hour more. And respectfully, your Honor, I mean, certainly we had about 45 minutes to an hour this morning for respondent's other witness, so --

THE COURT: We kept track of that, Mr. Min. We kept track of that.

Are you intending to have any redirect, Mr. Beyda?

MR. BEYDA: Yes, your Honor.

THE COURT: All right. Mr. Min, you have another half hour, then you're finished, then Mr. Beyda can redirect for a half hour, because you're at equal time right now.

MR. MIN: Understood, your Honor. Should we take a -- are we taking a short break, your Honor?

THE COURT: Yes.

(Discussion off the record)

(Recess)

BY MR. MIN:

Q. Ms. Zarak, you traveled from Iceland to Mexico on June 17th, correct?

A. Yes, sir.

MR. MIN: Okay. And I'd offer, your Honor, P152, where there's no objection.

THE COURT: No objection, it's admitted.

(Petitioner's Exhibit 152 received in evidence)

Q. Ms. Zarak --

A. Yes, sir.

Q. -- on June 15, your intention was to return to Iceland in or around June -- to mid-July, correct?

A. Mr. Min, I'm so sorry. Did you say P152?

Q. P152, yes, but I'm not asking questions -- I'm not pointing you to anything at this moment.
A. Okay. I'm so sorry.
Q. It's okay.
On June 15th, your intention was to return to Iceland in or around mid-July, correct?
A. On June 15. On June 15 -- on June 15, my husband still had my children's passports, sir, so I wasn't even sure if I was going to leave the country.
MR. MIN: Your Honor, I move to strike as non-responsive.
THE COURT: No. Overruled. I'm not striking. It's denied.
Q. I'd like to direct your attention to this document, P152, Bates stamp 12858.
A. P152. Can you please repeat --
THE COURT: Can you pull it up --
MR. MIN: Yes, your Honor.
THE COURT: -- please.
It's 12858, Ms. Zarak.
THE WITNESS: Thank you, your Honor.
Q. I just want to direct your attention to this message. You're writing in green, correct?
A. Yes, sir, I am.
Q. And Mr. Moody is writing in brown on the left?

A. Yes.
Q. Okay. And on June 15th, you wrote to him, "Regardless, we're back around mid-July." You meant to say, or you meant by that we'll be back in Iceland around mid-July, correct?
A. This was wishful thinking, Mr. Min. I -- on June 15, my husband still had my children's passports.
Q. But the question is, when you said, "We're back around mid-July," you meant back, meaning back in Iceland, correct?
A. Yes, I -- yes, that's what I meant.
Q. And when you wrote, "Things are better, and as much as the future is still uncertain, things are better," you meant your relationship with Mr. Schram at this moment was better, correct?
A. No, sir.
MR. MIN: Your Honor, we would offer P22, which had been admitted for the state of mind, not for the truth of the matter, and to the extent that makes a difference, I would certainly ask that the portion of Ms. Zarak's statements in the beginning of the document be admitted for the truth.
THE COURT: Let me look at it, please.
MR. MIN: Your Honor, I'll withdraw that offer and offer P23 separately, which had not been offered previously.
Withdrawn, your Honor. They're actually the same exhibit. And I'll move on to the next question.
I'd offer P20, your Honor, and there's no objection to

that document.

THE COURT: All right. That's admitted.

(Petitioner's Exhibit 20 received in evidence)

(Discussion off the record)

Q. Ms. Zarak, who or what is Heimaleiga Ehf? And I can spell that.

A. I know it's hard. They are a company that manages various airbnb properties in the Reykjavík area.

Q. You wrote to them on June 20th, 2021, that your mother is coming for a month in August and you wanted to know what small apartments were available. You meant your mother was coming, planning on coming to Iceland for a month in August, correct?

A. Mr. Min, I had left my 4-year-old behind in Iceland, so at this moment I was probably considering all options. So yes, I wrote that my mother was going in August.

Q. In Iceland.

A. Yes, sir, I did. But my 4-year-old had been forced to stay in Iceland.

THE COURT: That's not responsive.

A. Yes, Mr. Min, I wrote that I was inquiring about the potential of renting a property in the month of August.

Q. Isn't it true that you and Mr. Schram asked RZ whether he wanted to stay with Mr. Schram or go with you to Mexico?

A. No, sir.

MR. BEYDA: Objection.

THE COURT: Sustained.

Q. On June 20th, 2021, you were in Mexico, correct?

A. Yes, sir.

Q. When did you first consult -- without saying what the consultation pertained to or what was discussed, but when did you first consult United States attorneys with respect to any children -- issues regarding your children?

MR. BEYDA: Objection. Privileged.

THE COURT: Not when.

MR. BEYDA: Okay.

THE COURT: Don't tell me any substance, Ms. Zarak. He's just asking when.

A. I don't remember the exact date, Mr. Min.

Q. Okay. It's true that you -- do you recall when you retained your current attorneys, your attorneys who represent you in court today?

A. I do not remember, Mr. Min.

Q. Do you recall responding to a series of interrogatories as part of the discovery process in this case?

A. Do I recall -- can you repeat that, sir. I'm a little tired. Can you repeat that question, please.

Q. Of course. Responding to a series of interrogatories as part of the discovery process in this case.

A. Interrogatories from who, sir?

Q. From --

A. Oh, from you.
Q. Yes.
A. From you. Yes. Yes, I do. I do.
MR. MIN: Your Honor, I would ask the Court to take -- well, it's not on ECF.
We would offer into evidence a document that's been premarked as Petitioner's 176, which is Respondent's Response to Petitioner's First Set of Interrogatories.
THE COURT: It will be admitted.
(Petitioner's Exhibit 176 received in evidence)
BY MR. MIN:
Q. And Question No. 9, when asked the date you retained the law firm of Chemtob Moss Forman & Beyda, you responded June 21st, 2021, correct?
A. Correct.
Q. Would it be fair to say you consulted with US attorneys, not necessarily Chemtob Moss, but US attorneys prior to June 21st, 2021?
MR. BEYDA: Objection to the form. Context, substance, about what?
Q. Regarding issues pertaining to your children.
A. No, sir. It would not be correct to say that I had conversations with lawyers before June 2020 -- I mean, 2021.
Q. But before June 21st, 2021.
A. Yes. You're asking me if I consulted with lawyers before

June 21st, 2021, correct?
Q. Yes.
A. My answer was, no, not that I recall.
Q. Did you consult with any lawyers in Iceland with respect to issues pertaining to your children prior to July 2021?
MR. BEYDA: Objection, your Honor. We just answered questions about the prior counsel that was being referenced by Mr. Min before we took the break -- I think his first name was Helgi -- and the witness answered what she consulted with him about, and it was all matters.
THE COURT: Now he's asking specifically with regard to the children. I'm going to allow it.
MR. BEYDA: Okay.
THE WITNESS: I can answer Mr. Min?
THE COURT: Yes.
A. I did not consult with lawyers regarding my children in Iceland pre -- prior to June 2021.
Q. Prior to July 2021.
A. I did not. Regarding my children, I did not.
Q. And it's true that you didn't file any legal proceedings in Iceland pertaining to your children prior to July 2021, correct?
A. That's correct.
MR. MIN: I want to offer, your Honor, Petitioner's Exhibit 148, Bates number page 12352.

THE COURT: Give me a minute.

What page?

MR. MIN: 12352.

THE COURT: And this will be 148H.

A. 12 --

THE COURT: I. I'm sorry.

MR. MIN: I, your Honor, right?

THE COURT: That's what I'm told. This is your issue and problem to get the exhibit in.

MR. MIN: Understood.

MR. BEYDA: Same objection to hearsay.

THE COURT: All right. Let me pull it up.

All right. There's a hearsay objection, Mr. Min.

MR. MIN: Oh, yes, your Honor. I apologize.

Your Honor, I mean, I think it's party admission with respect to testimony that respondent just stated with respect to her seeking the services of counsel in the United States, or in Iceland.

THE WITNESS: Can I see it or not yet?

THE COURT: No, not yet.

It's not a party admission.

MR. MIN: Your Honor, it's an inconsistent statement.

THE COURT: The gray is Mr. Schram and the blue Ms. Zarak, right?

MR. MIN: Yes.

THE COURT: I'm going to admit it for the fact that the exchange took place but not for the truth.

MR. BEYDA: Including Mr. Schram's statements?

THE COURT: Yeah, for the fact of the conversation, not the truth.

(Petitioner's Exhibit 148I received in evidence)

THE WITNESS: Mr. Min, can you tell me the red number, please.

MR. MIN: Sure, it's 12352.

THE WITNESS: 12352. 12352.

BY MR. MIN:

Q. Do you recall --

THE COURT: Let her find it, please.

A. Yes, Mr. Min.

Q. These messages were on May 24th, 2021, correct?

A. Yes, sir.

Q. And did you in fact have a divorce lawyer at that time?

A. I was furious. I didn't. I didn't.

Q. And you wrote to -- and you were furious because Mr. Schram was trying to get you to quarantine, correct?

A. No, sir. I was furious because he had texted my mother saying that he was going to leave me. And I had just had a conversation with my mother in New York, after not seeing her in a year, in which my mother told me the entirety of the conversation. So this is why I say, "Don't forget to text my

mom to tell her."

MR. MIN: Your Honor, I move to strike as non-responsive.

THE COURT: Denied.

Q. You wrote to Mr. Schram, "If you make this harder for me, you will never see me again." Do you see that?

A. Yes, sir.

Q. Was it your intention by writing this message that you were threatening Mr. Schram that you would take the children and disappear?

A. No, sir, it was not.

Q. Did Mr. Schram -- isn't it true that Mr. Schram expressed to you concern that based upon this message, he was fearful that you would take the children and disappear?

A. No, sir.

Q. Isn't it true that Mr. Schram expressed to you that as a result of your financial resources or your family's financial resources and your citizenship and the children's citizenship in Mexico, that you may be able to take the children and disappear?

A. No, sir.

MR. BEYDA: Your Honor, I'm going to log out and log back in in between questions right now because I don't see the Court, if that's okay.

THE COURT: Hold on. Am I not turned on?

THE WITNESS: Yeah, I don't see the Court either. There.

THE COURT: I think -- okay. Thank you.

BY MR. MIN:

Q. Why did you travel to Mexico in June 2021?

A. To attend a family event that occurs once every three years, and which we had planned -- it was in our calendar for as long as I could remember.

A family event that Mr. Schram was also going to attend.

THE COURT: All right. You've answered.

THE WITNESS: Sorry, your Honor.

MR. MIN: Your Honor --

THE COURT: That's all right.

MR. MIN: -- I want to offer Respondent's Exhibit 113.

THE COURT: It will be admitted.

(Respondent's Exhibit 113 received in evidence)

MR. MIN: And I'd like to direct the witness's attention to Bates page numbered 97.

THE COURT: Are you going to pull it up?

MR. MIN: Yes.

BY MR. MIN:

Q. Bottom of the page, do you recall writing -- or withdrawn.

Who is this person or what is this organization that you're writing to on January 8, 2021, with the subject matter

Help?
A. Yes, this is the -- I don't know if I can pronounce that. I believe this is the -- ah, this is the immigration people in Iceland, the UTL, Directorate of Immigration.
Q. And you wrote to them in January 2021 because you wanted to receive your resident permit as soon as possible, correct?
A. Yes, sir.
Q. Okay. And you told them that you needed to go to Mexico; by home country, you meant Mexico, correct?
A. Yes.
Q. So you wanted to go back to your home country, Mexico, to receive a prestigious ceremony -- for a prestigious ceremony because you're receiving a very important award in June, correct?
A. Which was sadly canceled due to COVID.
THE COURT: He just asked if that's what you wrote.
A. Yes, sir, that's what I wrote.
MR. MIN: One second, your Honor. We may be done.
Q. Ms. Zarak, at no point did you tell Icelandic immigration authorities that you had to return to Mexico in June 2021 for a family reunion that had been in the works for three years, correct?
A. Yeah, no, they didn't -- no, yeah, I didn't tell them that, sir.
MR. MIN: One second, your Honor.

No further questions, your Honor.

THE COURT: All right. We can go off the record for a minute, please, to just talk about scheduling.

(Discussion off the record)

THE COURT: We discussed scheduling issues and logistics off the record.

Mr. Min had advised the Court previously that he has oral argument in the Second Circuit tomorrow afternoon. It had been the Court's hope and expectation that we would have been finished with evidence at this point, since I've cleared two additional trial days, but given the importance of this matter, I'm not prepared to cut off evidence, as I might otherwise do. So tomorrow will be a dark day. But I have a 10:00 criminal matter on Friday morning that should be concluded by 11, so we'll resume at 11:00 on Friday for the close of evidence. And the parties need to plan accordingly.

All right. I then advised counsel that I do not want closing arguments but I would like post-trial submissions or post-hearing submissions in the form of proposed findings of fact and conclusions of law. The parties have agreed that they will submit those by close of business, I suppose, on October 21st.

I wanted to be back on the record (a) to memorialize that, but (b) I want to raise an issue with counsel. I asked you, I think at the start of all of this -- maybe it was our

pretrial conference two weeks ago now -- whether the issue was the habitual residence, what is the habitual residence of EZ and SZ. I think one of you started to answer me, and then we got diverted and we never got back to it. Obviously that is an issue that I have to decide. However, as the Court understands things, if I decide the habitual residence of these two children is New York, that's the end of the inquiry. If I decide their habitual residence was Iceland, there is then, as I understand it, a second question, which is whether the children were wrongfully removed. Do the parties agree with what I've stated so far?

MR. MIN: No, your Honor.

THE COURT: All right. I'll hear from you first. Why not?

MR. MIN: With respect, the wrongful nature of a removal comes down to whether it violated custody rights. There is no issue with respect to Mr. Schram's custody rights in this case. There's no issue as to him exercising custody rights. That has not been made an issue in this case. So --

THE COURT: That was my next question, that nobody has educated the Court on that issue. So I suppose this really isn't your issue, Mr. Min, since obviously that's your position, but what I want to know is from the other side. If I were to find that the habitual residence of these children was Iceland, is there a contention or is there any dispute that the

taking therefore would have been wrongful? That's to Mr. Beyda and Ms. Chawla. Right?

MR. BEYDA: Your Honor, is that an issue that I can -- and I apologize. I'm not able to give the Court an answer to the question right now. Is that an issue we can break on and then I can address on Friday with the Court more cogently after I think about your Honor's question and the issues your Honor presented? I haven't thought about it in that context the way your Honor just phrased it.

THE COURT: That's fair enough, but I have to tell you, I'm just bewildered that, you know, the lawyers involved in this case have handled -- you've told me this repeatedly how many cases you've handled, and this issue didn't occur?

MR. MIN: Your Honor, from my perspective, this is not an issue. As I said before --

THE COURT: I know that. I said that already, Mr. Min. I said that already. It's not your issue.

MR. BEYDA: And I would just -- I'm just respectfully requesting to be able to address --

THE COURT: That's fine.

MR. BEYDA: -- the inquiry --

THE COURT: I'll expect an answer, though, on Friday morning, first thing, please. All right?

MR. BEYDA: Yes.

THE COURT: All right. Is there anything else we

should talk about?

All right, then. Good luck with your argument, Mr. Min. I hope everyone has a good evening, and I will see everybody on Friday. I hope everybody, including most particularly Ms. Zarak and Mr. Schram, get some needed rest tomorrow. All right?

MR. MIN: Your Honor, may I actually just follow up on two very short things. And I apologize.

Ms. Chawla had said that she had two additional witnesses yesterday. There were four. We did Ms. Yoskowitz. So can I just get the identification of the two remaining.

THE COURT: Yes, that's fair.

MS. CHAWLA: Marijta Ratkovic and Mandy Goldberg.

MR. MIN: Okay. Ms. Sleiman is not going to testify anymore.

MS. CHAWLA: Correct.

MR. MIN: And your Honor, I'm sure this is clear, I just want my client to be rest assured, but -- that of course Mr. Beyda and respondent cannot discuss the testimony until Friday, correct?

THE COURT: Yes. Ms. Zarak remains under oath, and you are prohibited from discussing with anyone the substance of your testimony. All right? But I am sure she understands that.

THE WITNESS: Yes, I do.

THE COURT: Thank you.

THE WITNESS: Thank you, your Honor.

THE COURT: All right. Thank you, everyone. Have a good night.

ALL PARTICIPANTS: Thank you, your Honor.

(Adjourned to October 15, 2021, at 11:00 a.m.)

INDEX OF EXAMINATION

Examination of: Page

RITA YOSKOWITZ

Direct By Ms. Chawla . . . . . . . . . . . . . . 931

Cross By Mr. Min . . . . . . . . . . . . . . . . 944

TANIA ZARAK

Direct By Mr. Beyda . . . . . . . . . . . . . . 950

Cross By Mr. Min . . . . . . . . . . . . . . . . 954

PETITIONER EXHIBITS

Exhibit No. Received

85 . . . . . . . . . . . . . . . . . . . . 963

19 . . . . . . . . . . . . . . . . . . . . 968

49 . . . . . . . . . . . . . . . . . . . . 973

80 . . . . . . . . . . . . . . . . . . . . 982

79 . . . . . . . . . . . . . . . . . . . . 983

121 . . . . . . . . . . . . . . . . . . . . 984

57 . . . . . . . . . . . . . . . . . . . . 994

50 . . . . . . . . . . . . . . . . . . . . .1011

5 . . . . . . . . . . . . . . . . . . . . . .1020

104 and 106 . . . . . . . . . . . . . . . . .1024

4 . . . . . . . . . . . . . . . . . . . . . .1039

48, Bates No. 17301 . . . . . . . . . . . . .1047

157A . . . . . . . . . . . . . . . . . . . .1050

89 . . . . . . . . . . . . . . . . . . . . .1057

PETITIONER EXHIBITS CONTINUED


| Exhibit No. | Page |
|---|---|
| 84A | 1061 |
| 148A | 1070 |
| 148B | 1086 |
| 148B (amended) | 1088 |
| 171 | 1094 |
| 148C | 1098 |
| 148D | 1101 |
| 39 | 1101 |
| 148E | 1104 |
| 64 | 1114 |
| 105 | 1118 |
| 38 | 1119 |
| 82 | 1122 |
| 154 | 1125 |
| 21 | 1128 |
| 110 | 1129 |
| 152 | 1139 |
| 20 | 1142 |
| 176 | 1144 |
| 148I | 1147 |

RESPONDENT EXHIBITS


| Exhibit No. | Received |
|---|---|
| 52 | 1016 |
| 171 | 1028 |
| 36 | 1019 |
| 62 | 1039 |
| 77 | 1074 |
| 101 | 1078 |
| 83 | 1081 |
| 82 | 1081 |
| 147 | 1089 |
| 85 | 1090 |
| 79 | 1107 |
| 165A | 1110 |
| 80 | 1113 |
| 152 | 1113 |
| 113 | 1149 |