UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In the Matter of E.Z. and S.Z.

ARNALDUR SCHRAM,

Petitioner,

v. 21 Civ. 6524 (MKV)

TANIA ZARAK,

Respondent. Remote Bench Trial
------------------------------x

October 15, 2021
11:35 a.m.

Before:

HON. MARY KAY VYSKOCIL,

District Judge

APPEARANCES

BURGER GREEN & MIN LLP
Attorneys for Petitioner
BY: RICHARD MIN, ESQ.

GALLET DREYER & BERKEY, LLP
Attorneys for Petitioner
BY: KENNETH GLASSER, ESQ.

CHEMTOB MOSS FORMAN & BEYDA LLP
Attorneys for Respondent
BY: MICHAEL F. BEYDA, ESQ.
MUDITA CHAWLA, ESQ.

(Case called)

THE DEPUTY CLERK: Good morning, your Honor.

THE COURT: Good morning, Ms. Dempsey. Good morning, everyone.

THE DEPUTY CLERK: Counsel, starting with petitioner, please state your name for the record.

MR. MIN: Richard Min on behalf of petitioner, your Honor. Good morning, your Honor. Good morning, counsel.

THE COURT: Good morning, Mr. Min.

MR. GLASSER: Kenneth Glasser on behalf of petitioner. Good morning, everyone.

THE COURT: Good morning, Mr. Glasser.

MR. BEYDA: Good morning, your Honor, and counsel. Michael Beyda on behalf of the respondent mother.

THE COURT: Good morning, Mr. Beyda. Your volume is a little low. But I can hear you.

MS. CHAWLA: Good morning, your Honor. Good morning, counsel. Mudita Chawla also for the respondent mother.

THE COURT: Good morning, Ms. Chawla.

All right. And good morning, Ms. Zarak and Mr. Schram.

MR. SCHRAM: Good morning.

THE COURT: All right. So before we resume testimony, when we broke on Friday, I had asked counsel a question about the issues that are pending before the Court, and I had posited

the question that if I were to find the habitual residence of the children was New York, obviously that's the end of the inquiry, but if I were to find that their habitual residence was Iceland, does the respondent concede that the taking would then have been wrongful. And Mr. Beyda, you asked for time to consider that and get back to me.

MR. BEYDA: Yes, your Honor. And I'm just making sure -- I did change my headset. Are you able to hear me better now?

THE COURT: Yes, it's much better. Thank you.

MR. BEYDA: Great.

So yes, your Honor, in response to your question, I would preface it with the following: Although I don't see how -- although I think that New York is the habitual residence of the children and that is obviously our case, were the Court to find under the circumstances over here that Iceland is the habitual residence of the children and that there was an intention on the part of the parties jointly to make Iceland their home, I do appreciate that it would be up to the Court then to send the children back and return them to Iceland.

THE COURT: So I don't need a secondary finding in either case --

MR. BEYDA: No.

THE COURT: -- right?

MR. BEYDA: No.

THE COURT: Okay. All right. Mr. Min, you agree with that, right?

MR. MIN: Yes, your Honor.

THE COURT: All right. I believe, Mr. Min, you were completing your, or conducting your cross-examination of Ms. Zarak, right?

MR. MIN: Your Honor, I was complete, but as Mr. Beyda did on Wednesday, I would just like to offer a couple exhibits that there were no objections to, and then I will be completely done and Mr. Beyda can go to redirect, as he pleases.

THE COURT: All right.

MR. MIN: Petitioner --

THE COURT: Hold on. Hold on.

MR. MIN: Sure.

I'm not going to ask any questions, your Honor, I'm just going to offer them, and there are no objections.

THE COURT: All right. I guess I'll leave it to you all to confirm that there are no objections. I think I left my notes upstairs in my chambers. Excuse me one second.

All right. Mr. Min, go ahead. And obviously, Mr. Beyda, you'll check and confirm whether there are any objections.

MR. MIN: P3, Petitioner's 3, Petitioner's 27, and Petitioner's 29.

THE COURT: Any objection, Mr. Beyda?

MR. BEYDA: No, your Honor.

THE COURT: All right. They will be received then.

(Petitioner's Exhibits 3, 27, and 29 received in evidence)

MR. MIN: Your Honor --

THE COURT: And with that -- I'm sorry. With that, Mr. Min, you have no further questions of Ms. Zarak?

MR. MIN: I have no further questions. I did want to note -- and I emailed Ms. Moya -- with respect to the prior days' trial transcript, there was just one error on an exhibit that was admitted. It was my confusion. I had initially said P36, I corrected myself to R36 on the record, but the record reflects that P36 was admitted. I emailed Ms. Moya just to let her know that I think the correction should be made, but I just wanted to note it for the record.

(Discussion off the record)

THE COURT: All right. Mr. Beyda then, I believe you have the floor.

I just am going to remind everyone, as we discussed, the evidence needs to conclude today. So you need to proceed accordingly.

MR. BEYDA: Thank you, your Honor, and to the Court.

Ms. Zarak -- your Honor, may I please have P86 put on the screen for the witness. It is a document in evidence and was shown to her during the cross-examination.

THE COURT: All right. Thank you.

THE WITNESS: Do you want me to get it, Mr. Beyda?

MR. BEYDA: Yes. If you have a hard copy over there, please pull that document.

THE WITNESS: P86.

THE COURT: And I'm going to rely on the versions you're calling up, so if you can just please make them large enough for me to see them, I'd appreciate it.

TANIA ZARAK, resumed.

REDIRECT EXAMINATION

BY MR. BEYDA:

Q. And Ms. Zarak, if you can please take a look at this document and let us know when you're done reviewing it.

A. Yes. One minute.

THE COURT: And this document, P86, you're saying?

MR. BEYDA: Yes, your Honor.

THE COURT: Can you make that a little bigger, please.

And you said this is in evidence. My notes say it's in evidence for limited purpose, i.e., supposed admissions by Ms. Zarak, not for the truth.

A. Yeah, I think I'm -- I think I'm very familiar with this.

Q. There's no question yet. Just --

THE COURT: She's just telling you she's ready.

MR. BEYDA: Yes. I just wanted to keep her --

Q. Ms. Zarak, who is Peter Barnes?

A. Peter Barnes is our neighbor. He lives in Apartment 7A of 11 West 81st Street.

Q. And why were you exchanging messages with Peter Barnes in or about June of 2020?

A. Because his apartment had flooded. He had an emergency.

Q. And what was the nature of the communications with Mr. Barnes?

A. He needed an immediate place to stay.

Q. Did Mr. Barnes -- and where did he want to stay?

A. In apartment --

MR. MIN: Objection. Objection.

THE COURT: Sustained.

Q. Did he ask you -- what was your understanding of where -- why he was contacting you?

A. My understanding was that he reached out to a few neighbors, and I was one of them.

Q. Did Mr. Barnes subsequently stay in Apartment 6A?

A. He stayed for a few nights, with his fiancée.

Q. And were those arrangements that he made with you or your mother?

A. With me, sir.

Q. Aside from that period of time, were there any other times that Mr. Barnes stayed in Apartment 6A?

MR. MIN: Objection.

A. No.

THE COURT: What's the objection?

MR. MIN: Basis of knowledge.

THE COURT: She can only tell me what she knows.

MR. MIN: Then I object as to the form of the question, then.

THE COURT: Overruled. That's true with every question. The witness can only tell me what they know.

Ms. Zarak, to your knowledge were there any other times that Mr. Barnes stayed in Apartment 6A?

THE WITNESS: No, ma'am, no. No, your Honor.

THE COURT: Thank you.

MR. BEYDA: Thank you.

And I'm done with P86 at the moment, your Honor. We can take that off the screen, if that's acceptable to the Court.

THE COURT: Sure.

BY MR. BEYDA:

Q. Ms. Zarak, you were asked questions about Apartment 6A; do you recall that?

THE COURT: She was asked a lot of questions about 6A. You've got to be more specific.

Q. You were asked questions about the description of Apartment 6A; do you recall that?

A. Yes, Mr. Beyda.

MR. BEYDA: Your Honor, I'm going to now offer Exhibit

R105, to which there was no objection. And I would ask that the witness please take a look at it.

THE COURT: It will be received.

(Respondent's Exhibit 105 received in evidence)

THE COURT: Are you going to put it up, Mr. Beyda? Thank you.

BY MR. BEYDA:

Q. Ms. Zarak, please let us know when you're ready.

A. I'm ready, Mr. Beyda.

Q. Ms. Zarak, what is Exhibit 105 in evidence?

A. This is a floor plan, the floor plan of Apartment 6A.

Q. Now in looking at the document that's on the screen in front of you, if you can, because it might be easier to describe -- Ms. Zarak, are you able to look at the computer screen?

A. Yes, yes.

Q. Okay. The box on the bottom right of Exhibit 105, do you see that?

A. Yes, sir.

Q. Okay. Which room of the apartment is that?

A. That is a room where the children sleep.

Q. Okay. The box above it -- actually, before I go to that box above it, did anybody else sleep in that room?

A. Yes, there's the loft. The loft is for -- for whatever reason, it's not depicted, but it's right there, so we would

sleep on the loft.
Q. And then above it, in the box above, which room of the apartment is that?
A. That's the living room.
Q. Okay. And then on the left-hand side of your screen, there is, it says -- well, which room is all the way to the left on the blueprint?
A. That is the other bedroom.
THE COURT: On the bottom left. Right?
THE WITNESS: On the bottom, exactly. So the tiled area is a hallway. That's the bedroom where it says chamber.
Q. And above that, what is above the chamber?
THE COURT: Where it says kitchen, you mean.
MR. BEYDA: I'll move forward.
THE COURT: Yes.
Q. Ms. Zarak --
A. I don't know if it's chamber in French or chamber, but --
THE COURT: The document is in evidence. It says what it says.
THE WITNESS: Okay.
Q. Ms. Zarak, you were asked about expenses paid in connection with Apartment 6A while you were in Iceland; do you recall that?
A. Yes, sir.
Q. Okay. And you testified about certain expenses being paid

on a credit card; do you recall that?
A. Yes, sir.
MR. BEYDA: Your Honor, I'm going to offer Exhibit R119, to which there was no objection.
THE COURT: It will be received.
(Respondent's Exhibit 119 received in evidence)
MR. BEYDA: Ms. Zarak, if you could please pull Exhibit R119.
And Mr. Oza, if you could please put it on the screen for the Court.
THE WITNESS: Give me one second, Mr. -- 119, correct, sir?
MR. BEYDA: Yes.
THE COURT: It may be just as easy, Ms. Zarak, for you to see them on the screen. It's up to you, though.
THE WITNESS: Yeah, I -- I can't -- yes, I cannot find 119 at this -- but I'm here. Yes.
MR. BEYDA: Mr. Oza, can you just scroll through this so that --
THE WITNESS: Oh, I found it, I found it, I found it. Sorry. It was the same binder.
BY MR. BEYDA:
Q. Ms. Zarak, what is Exhibit 119?
A. Exhibit 119 are my Spectrum invoices for I believe -- yeah, so this is -- this is my Spectrum account for Apartment 6A.

Q. And who paid the bills for the Spectrum account while you were in Iceland?
A. I did.
MR. BEYDA: Okay. I'm done with Exhibit 119.
Q. Ms. Zarak, you were asked by Mr. Min about certain personal belongings in Apartment 6A; do you recall that?
A. Yes, sir.
Q. You mentioned that your father had clothes in one of the closets; do you recall that?
A. Yes, sir.
Q. Why -- first, what of your father's clothing was in an apartment in -- was in Apartment 6A?
A. Just a couple of winter jackets and winter scarves, winter -- winter stuff. And my father lives in Mexico, where he does not use scarves and gloves.
Q. To your knowledge, why was that left in Apartment 6A?
A. I don't even know when the last time my father was in New York, but it's because it gets cold in New York. I think he was here for Christmas, so he left his winter coat in my apartment.
Q. Okay.
A. And there were not a lot --
THE COURT: Ms. Zarak, I'm going to just remind you, do not volunteer things. Let the lawyers ask the questions, okay?

THE WITNESS: Okay. Sorry.

Q. You were asked by Mr. Min about your mother staying -- where your mother stayed when she came to see -- when the two of you were together in New York in May of 2021. Do you recall that?

A. Yes, sir.

Q. Why did your mother stay with you in Apartment 6A in May of 2021?

MR. MIN: Objection.

THE COURT: Grounds?

MR. MIN: It goes to someone else's state of mind.

THE COURT: Not necessarily.

Go ahead, Ms. Zarak.

A. I hadn't seen my mom since the year before, due to COVID. Why would she not stay with me? I don't -- I invited her to stay with me. She -- I wanted to spend time with her. Yeah, I had not seen her in a very long time.

Q. Ms. Zarak, you were asked questions about Mr. Schram's contribution to expenses during the marriage; do you recall that?

A. Yes.

MR. BEYDA: Your Honor, I'm going to offer R139, to which there was no objection.

THE COURT: It will be received.

(Respondent's Exhibit 139 received in evidence)

Q. Ms. Zarak, can you please take a look at this document and let us know when you're ready.
A. Yes, sir. One second, please.
R139?
Q. Yes.
A. It was the same binder. Here, one second, please. 139. Yes. Okay. Give me one second.
Yes.
Q. Okay. Please review the document.
A. Yes, I'm ready, sir.
Q. Can you please describe for the Court the circumstances surrounding you and Mr. Schram exchanging these communications from February through May -- through June 2021.
A. Yes, sir. I was trying to understand why he was still asking me for money when I was already paying so much. There's different, you know -- this is a conversation that extended to a few. But to give you an example, the arrangement had been to -- that I would pay the down payment of the apartment and he would pay for the mortgage. But then come early 2021, he wanted me to pay half of the mortgage payments. So, you know, as it happened often with Mr. Schram, arrangements were not being kept. So this is more or less the nature of -- of this correspondence.
Q. Directing your attention to Bates page 6954 of this document.

A. Yes, sir.
Q. Are you there?
A. Yes, I am.
Q. Okay. There's a line item, it says "Mortgage 1835" in one column and then -- for January, and then 1835 for February. Do you see that?
A. Yes, sir.
Q. Which mortgage is that referring to?
A. That is the mortgage in the -- it refers to the apartment in Iceland.
And as you can see on top, it says --
THE COURT: No, no, no. You've answered the question.
Q. What was your understanding as to why Mr. Schram sent you this breakdown of expenses on February 15, 2021? Actually, I'm going to withdraw that question. I'm going to withdraw that question.
Ms. Zarak, the 1835 referenced on Bates page 6954 for the mortgage --
A. Mm-hmm.
Q. -- was that more or less than the payment in connection with the airbnbs that you were paying before the acquisition of the Iceland apartment?
A. Significantly less.
MR. BEYDA: Your Honor, I'm done with Exhibit 139.
THE COURT: Okay.

MR. BEYDA: Your Honor, may I please have put on the screen P49 that petitioner put in evidence during the cross-examination.

THE COURT: If it's in evidence, you can. I'm sorry. The number?

MR. BEYDA: P49.

THE COURT: 49.

Yes, it's in evidence. This is a tax return, right?

MR. BEYDA: Yes, your Honor.

THE WITNESS: P39. I don't have it, Mr. Beyda.

MR. BEYDA: All right. We'll use the screen to keep this moving.

THE WITNESS: Yes.

BY MR. BEYDA:

Q. Directing, actually, your attention to Bates page 4671, it's page 1 of this -- I'm sorry -- it's page 2 of this document.

A. Mm-hmm.

MR. BEYDA: Mr. Oza can you -- thank you.

Mr. Oza, can you focus on the top portion of this document. Thank you.

Q. Ms. Zarak, whose home address is listed on this tax return?

A. I have no idea.

Q. When you say you have no idea, did you ever live at -- and pardon my pronunciation -- Sorlaskjol 1 in Reykjavík?

A. No, sir.
Q. Do you know who lives at that address?
A. No.
Q. Directing your attention to page 2 of this document, 4672, Bates page 4672. This tax return is dated May 13, 2021, Ms. Zarak. At that time why did you and Mr. Schram file separate tax returns for 2020?
A. So we were already discussing divorce to start, but the year before, I had paid his taxes, I had paid the entirety of his taxes, so I didn't want to pay his taxes again, particularly if we were having conversations about divorce.
Q. Ms. Zarak, going back to the address on page 1, do you recall the addresses of the airbnbs that you stayed at in Iceland?
A. Yes, sir. None -- this is not any of them.
Q. Do you know who gave your accountant that address?
A. Mr. Schram.
MR. MIN: Objection. Non-responsive to the question.
THE COURT: So you want us to do this in two steps -- do you know who did it and then who?
MR. MIN: Well, your Honor, I'd like to know how she knows that.
THE COURT: Ms. Zarak, do you know who gave this information to the accountant?
THE WITNESS: Yes, your Honor.

THE COURT: How do you know that?

THE WITNESS: Because -- how do I know this? Because it was my husband and it was our accountant.

THE COURT: No, but you told us Mr. Schram gave the information to the accountant. How do you know that?

THE WITNESS: Because he told me.

THE COURT: The accountant told you or Mr. Schram told you?

THE WITNESS: Mr. Schram told me.

THE COURT: That he had given your address to your accountant to prepare your tax returns.

THE WITNESS: Again, I -- I trust -- yes. However, that wasn't our address. So I just let them -- I trust my accountant greatly, and at, you know, at times I trusted my husband.

There was a reason behind why he was giving that address. I just went on with it. I know they had -- they --

THE COURT: No more questions pending.

Mr. Beyda, go ahead.

MR. BEYDA: Thank you.

BY MR. BEYDA:

Q. Did Mr. Schram have communications with your accountant that you were aware of?

THE COURT: In connection with these tax returns?

MR. BEYDA: Yes, your Honor.

THE COURT: You can answer now.

A. Yes, sir.

Q. Okay. And did he have communications with the accountant in 2019, for example, in connection with that tax return?

A. Yes, sir.

MR. BEYDA: Your Honor, I'm done with this exhibit as well.

THE COURT: All right. I have one question.

To your knowledge, Ms. Zarak, did Mr. Schram use the same accountant to prepare his tax returns?

THE WITNESS: No. He chose not to.

THE COURT: Thank you.

THE WITNESS: You mean, your Honor, for that specific year, correct, 20 --

THE COURT: Yes.

THE WITNESS: Okay. Yes, no, he chose someone else.

BY MR. BEYDA:

Q. Ms. Zarak, you were asked questions about whether you identified yourself as a New Yorker; do you recall that?

A. Yes.

MR. BEYDA: Your Honor, I'm going to offer Exhibit R160, to which there was no objection.

THE COURT: It will be received.

(Respondent's Exhibit 160 received in evidence)

Q. Ms. Zarak, can you please identify what has been marked as

Exhibit R160 in evidence.
A. These are Facebook posts of me -- of mine. There are three different ones. Do you mean the first one?
Q. Yes, please.
A. Yes.
Q. On page 2 of -- actually, the page that's on the screen in front of you, you wrote, in that message, "I always miss New York but today I miss New York more." Why did you indicate that on November 7, 2020, if you recall?
A. Yes, sir. It was around the election.
Q. Okay. Now you indicate in this message, in the fourth line, towards the end, you indicate, "I am part of something real, important, something vibrating that breathes like a gigantic lung." What are you referring to over there?
A. I'm referring to New York.
Q. You mentioned, "It was my grandfather's favor city, and it's also my mother's." Was it also your favorite city, or is it also your favorite city?
A. Without a doubt.
Q. Now on page 2 of this document, on July 30th, 2020, you indicate, "Nueva York, see you in December," with a heart. Do you see that?
A. I do.
Q. What was your thought process at that time as to what was going on on July 30th with regard to that message?

A. Mr. Beyda, I think I was being hopeful that we would be back, that things would get better, that New York would weather the COVID storm, that schools would open. This was me being hopeful.

Q. Thank you.

MR. BEYDA: Your Honor, I'm done with Exhibit 160 at the moment.

Q. Ms. Zarak, you were asked questions about your -- I'm sorry. I'll wait for you. Are you ready?

A. Mm-hmm.

Q. You were asked questions about your O-1 visa application. Do you recall that?

A. Yes, sir.

Q. At the time you were preparing a O-1 visa application, were you in communication with Mr. Schram about that application?

A. Yes, sir.

Q. What was the nature of your communications regarding that application? Withdrawn. I'll be more specific.

Did you keep him abreast as to the status of that application?

A. Of course.

Q. And what, if any, involvement did Mr. Schram have in you preparing information for that application?

A. Similarly to the green card; it was a matter of helping me -- helping me assemble supporting documents.

Q. Did Mr. Schram ever object to you submitting an O-1 visa application?

MR. MIN: Objection.

A. No.

THE COURT: Overruled.

Q. Now you were asked, Ms. Zarak, about your green card application; do you recall that?

A. Yes, sir.

Q. And you were specifically asked about income you earned from the companies referred to in that green card application; do you recall that?

A. Yes, sir.

Q. Can you explain for the Court your financial circumstances and income earned between March 2020 and the submission of your green card application.

MR. MIN: Objection.

THE COURT: What's the objection?

MR. MIN: If my understanding of the question is correct, I think the question was about income earned between March 2020 and the date the green card application was submitted, which was April 6, 2020. I would object on relevance grounds.

THE COURT: No. That's overruled. You opened the door on that.

Go ahead. You can answer, Ms. Zarak, if you

understand the question.

THE WITNESS: I understand the question, and if I -- I understand the question.

A. My industry was hit severely, if not completely, by the COVID pandemic, so no movies were being made, no TV shows were being made, you know, business halted, so there -- there was no income, Mr. Beyda.

MR. BEYDA: Okay. Your Honor, may we please put on the screen, or show the witness Exhibit R44 that is in evidence.

THE COURT: Sure.

THE WITNESS: Yes, sir, I have it.

Q. Okay. At the time this document was submitted, where were you staying, physically, you and your family?

A. We were staying at my parents' house in Mexico.

Q. In this exhibit, page Bates marked 25193, there's a mailing address listed. Do you see that?

A. Yes, sir.

Q. Whose address is that?

A. That is the address of my parents' house in Mexico, where I was at the time.

Q. Ms. Zarak, what is the address, if you know offhand, that's listed in your passport from Mexico?

A. The same address, sir. This is my -- this is my childhood home.

MR. BEYDA: Your Honor, I'm done with this exhibit also. I'm going to move on.

THE COURT: Yes.

Q. Ms. Zarak, you were shown -- Mr. Oza -- or Ms. Zarak, can you please pull Exhibit R150 in evidence.

MR. BEYDA: Mr. Oza, can you please put that on the screen for the Court.

Q. Do you see that, Ms. Zarak?

A. I do.

Q. Okay. Directing your attention to the bottom right of this visa, the United States of America visa, there's a reference, it says PED-30JUN2023. What is that referring to?

A. That is the expiration date, the real expiration date.

Q. And in connection with this visa, what, if anything, did you have to do each year?

A. You had to renew the stamp. So this lovely -- this lovely picture of me, the stamp, you had to renew it, but the actual visa expires on June 30, 2023. It's something they do with O visas, for whatever reason.

MR. BEYDA: Okay. Your Honor, I'm going to ask Mr. Oza to take this document off the screen. I'm done with it.

THE WITNESS: Yes, please.

Q. Ms. Zarak, you were asked questions about the timing of when you filed a green card application; do you recall that?

THE COURT: Why don't you just ask the question, Mr. Beyda.

Q. Ms. Zarak, why did you wait until April 2020 to submit a green card application?

A. Well, we had been living with O visas, you know -- it's a hassle, but we had been living with different visas for many years; however, for the type of green card that I applied for, which was based on extraordinary abilities, there are certain quotas you have to -- to reach, and one is based on salary, so after my time at Netflix, let's just say I -- it was -- I could -- it's like I reached that quota. You need to have a certain level of salary in order -- even if -- even if not long term, in order to sort of -- in order to -- what would be the word -- to -- to be -- to be able to apply for the extraordinary ability green card.

Q. Ms. Zarak, approximately how much money did you pay your immigration attorneys in connection with your green card application?

A. Close to $12,000 -- close to $12,000, because it included Mr. Schram.

Q. When you say it included Mr. Schram, what did it include? What did you pay for on behalf of Mr. Schram?

A. The processing of the --

MR. MIN: Objection.

THE COURT: Basis?

MR. MIN: I think it goes to certainly relevance and also goes to, well, hearsay information.

THE COURT: The relevance objection is sustained. I wondered why you didn't make it earlier, but it's sustained.

BY MR. BEYDA:

Q. Ms. Zarak, prior to you sending information to your attorney Teresa Woods, had you made previous attempts to communicate with her?

A. On what time frame, Mr. Beyda?

Q. Directing your attention to the time period between January 1, 2021, and May 1, 2021.

A. Yes.

Q. Can you describe your communication, the process of communicating with Ms. Woods while you were in Iceland during the COVID pandemic.

A. Yes, Mr. Beyda. So I -- I did make a payment in September, so it was -- it was sporadic. Ms. Woods is -- she's, you know -- the Teresa Woods Law Group is a one-person operation. She has small children, and it wasn't always -- she -- I can't say she's the fastest respondent, so it took -- it just lagged because, you know, because she was also homeschooling and it was -- it was COVID. She was -- I think at that point she didn't have -- she didn't even have an assistant. So --

MR. MIN: Objection, your Honor.

THE COURT: Sustained.

MR. BEYDA: I'll move on.
Q. Ms. Zarak, you were asked by Mr. Min what you understood Mr. Schram's intentions to be as of April 2021 in terms -- with regard to returning to the United States. Do you recall that?
A. Yes, sir.
Q. Did you express your intentions to him at that time?
A. Yes, sir.
MR. MIN: Objection. Asked and answered.
THE COURT: No. Overruled.
You can answer, Ms. Zarak. I think you did, actually. Yes, you answered.
Q. At that time did you ever tell him that you had an intention to make Iceland your new permanent home?
MR. MIN: Objection.
A. No.
MR. MIN: Objection. Leading.
THE COURT: The objection is sustained. You're leading, on a most critical question.
Q. What, if anything, did you tell Mr. Zarak -- Mr. Schram at that time about your intentions concerning Iceland?
MR. MIN: Objection.
THE COURT: Grounds?
MR. MIN: Leading.
THE COURT: No, that's not leading.
A. My intentions were to be there --

THE COURT: No, no, no, no. Hold on. Hold on. The question is: What did you tell Mr. Schram about your intentions, not what were your intentions.

A. What I told him was that as soon as we had clarity regarding the openings of the schools in New York, we would be going back, as it was our original plan from day one.

Q. Upon your return from New York in May of 2021, what specifically did -- what, if anything, did you tell Mr. Schram about your intentions concerning New York at that time?

A. I told him that school would be opening.

Q. And what, if anything else, did you tell him?

A. That it was time to go back, that I wanted to go back.

Q. Ms. Zarak, upon your return to Iceland in May 2021, what, if any, of the children's personal property did you bring with you from New York to Iceland?

A. Zero.

Q. What, if any, of your personal property did -- that was left in New York in July 2020 did you bring to Iceland at that time?

A. Zero.

Q. Did you bring any of Mr. Schram's personal property at that time?

A. No, sir.

Q. Why not?

A. Why would I, if -- if we were going back?

Q. Did Mr. Schram ask you to bring any of your -- any of the children or his property back from New York to Iceland in May 2021?
A. No, sir.
Q. Were there even discussions in May of 2021 about bringing any property back, property from New York, in Apartment 6A, to Iceland, with Mr. Schram?
A. No, sir.
MR. BEYDA: Your Honor, may I please show the witness P35 in evidence.
THE COURT: Yes.
THE WITNESS: P35. Yes, sir.
Q. Directing your attention to Bates page 7755, it's page 2 of this exhibit.
A. Yes, sir.
Q. Okay. What, if anything, transpired -- or withdrawn.
What if anything did you learn after April 15th, 2021, when you sent this email to Teresa Woods?
MR. MIN: Objection.
THE COURT: Sustained.
Q. Ms. Zarak, what, if anything, did you learn about New York after you sent this email on April 15th, 2021, to Teresa Woods?
MR. MIN: Objection.
THE COURT: Grounds?
MR. MIN: Vague as to form.

THE COURT: No, that's overruled.

A. You mean about -- I learned that the schools would be opening in the fall.

Q. What, if any, impact did that have on your intentions as to where you would reside going -- where you would be staying with the children going forward?

A. It had an absolute impact on my intentions.

Q. And when you say an absolute impact on your intentions, can you just be clear for the record what that was.

A. After sending this email to Ms. Woods, I found out that the schools in New York would be reopening in the fall and therefore, that we could go back to New York, like it had always been planned. My intention was to go back to New York because my children could go back to school in New York.

MR. BEYDA: Your Honor, may I please direct the witness's attention to Exhibit R176, to which there was no objections.

THE WITNESS: R176.

THE COURT: It will be admitted.

(Respondent's Exhibit 176 received in evidence)

THE WITNESS: My -- sorry, sorry, sorry, sorry.

MR. BEYDA: I actually have -- I have no questions about this exhibit.

Oh, wait. You know what? I do. Sorry.

THE WITNESS: Mr. Beyda, which, R176?

MR. BEYDA: Yes.

THE WITNESS: Would you mind sharing the --

MR. BEYDA: It is on the screen. And I'm actually going to direct your attention to the page Bates 21760.

THE WITNESS: Yeah, I don't -- 21760. Got it.

BY MR. BEYDA:

Q. Okay. In this message as of September 23rd, 2020, you indicate that, "I temporarily moved to Reykjavík," correct?

A. Mm-hmm.

Q. Who is Matt Solo?

A. Matt Solo is a literary agent at WME, which is a William Morris Endeavor, a very big talent agency in New York.

Q. During your cross-examination you mentioned a Viacom project. Do you recall that?

A. Yes.

Q. Is this the Viacom project that you were referring to?

A. Yes.

Q. What is *Posada Para Amor*?

THE COURT: Are you reading from something?

MR. BEYDA: Yes, your Honor. It's page -- Bates page 2184 of this document.

THE COURT: Could we turn to it, please.

Q. Ms. Zarak, do you recall being asked about *Posada Para Amor*?

A. Yes.

Q. What is that?
A. That was a Viacom project I was writing.
Q. What, if anything, came about -- came of that project?
A. It sadly fell through because of COVID.
Q. Now you were asked questions about Susa coming to Iceland and the application submitted in connection with that process, correct?
A. Yes, sir.
Q. What, if any, role did Mr. Schram have in the submission of paperwork for Susa to come to Iceland?
MR. MIN: Objection. Objection.
THE COURT: What's the grounds?
MR. MIN: Relevance.
THE COURT: Overruled.
A. Mr. Schram -- may I --
THE COURT: Yes, you can answer. Yes.
A. Mr. Schram contacted his immigration lawyers regarding Susana, put the plan together, and --
MR. MIN: Objection.
THE COURT: I said overruled.
MR. MIN: Basis of knowledge, your Honor. Hearsay.
THE COURT: You can cross her on that.
You can continue, Ms. Zarak.
A. And then I submitted the application. So I was explained how we had to do it and then I -- I submitted the application.

MR. BEYDA: Your Honor, I'm done with this exhibit. 176.

THE COURT: Okay.

Q. Ms. Zarak, you were asked by Mr. Min about a Hertz rental car; do you recall that?

A. Yes, sir.

Q. What if anything happened to the Hertz rental car that you were using in Iceland?

A. Mr. -- Mr. Schram returned it.

Q. Do you know when he returned it?

A. Soon after I left.

Q. When you say soon after you left --

THE COURT: Hold on. Hold on. Are you guessing or do you know that?

THE WITNESS: No, no, I know that.

THE COURT: Okay. You looked uncertain; that's why I'm asking.

Q. How do you know that?

A. Because he told me.

Q. When you say soon after you left, how soon?

A. A couple of weeks after I left.

THE COURT: Left when?

THE WITNESS: I left on June 17, 2021.

Q. And when you say a couple of weeks, can you be more specific in the time frame.

A. Yes, Mr. Beyda. As soon as I left, it seems like his brother took over. He gave -- he gave his brother the car. Oh.

MR. MIN: I'm sorry. I had audio issues.

A. I have the -- do you want me to put the -- the --

THE COURT: No, it's fine. It's fine. Thank you.

A. From -- from -- from what he told me, via text, he -- as soon as I left, he gave the car to his brother, for his brother to use, and then soon thereafter, in the next week, he returned the car to Hertz.

MR. MIN: Objection, your Honor, just to relevance of the actions that were taken with respect to the car after she left Iceland.

THE COURT: Mr. Min, you're not supposed to wait until after a question is answered to object on the grounds of relevance. It is what it is now. I don't disagree with you that I don't know what it has to do with anything, but --

BY MR. BEYDA:

Q. Ms. Zarak --

MR. BEYDA: Your Honor, may I please put on the screen P152 that was put in evidence during the cross-examination of Ms. Zarak.

THE COURT: Sure.

Q. Ms. Zarak, do you recall being shown communications that you exchanged with Jonas Moody?

A. Yes, sir.
Q. Did there come a time that you forwarded any documents to Mr. Moody?
A. Yes, sir.
Q. What did you forward Mr. Moody?
A. I forwarded him a document, I -- regarding my son SZ.
Q. Do you know what document you sent him?
A. I sent him what turned out to be his citizenship certificate, his Icelandic citizenship certificate.
Q. Why did you send that to Mr. Moody?

MR. MIN: Objection. Outside the scope of cross-examination.

THE COURT: Sustained.

MR. BEYDA: Your Honor, I'm going to offer Exhibit R198, to which there was no objection.

THE COURT: It will be received.

(Respondent's Exhibit 198 received in evidence)

THE WITNESS: R198.

Yes, Mr. Beyda.

BY MR. BEYDA:
Q. Did you have an opportunity to look at this document?
A. Yes.
Q. What is it?
A. This is an email where Mr. Schram forward -- forwarded me that document, that document that I was asking Jonas about.

That document.
Q. When you received that document, did you know what it was?
A. No.
Q. Why did you ask Jonas what this document was and not Mr. Schram?
MR. MIN: Objection. Outside the scope of cross-examination.
THE COURT: Sustained. Sustained. It also lacks any foundation.
MR. BEYDA: May I please direct the witness's attention to --
THE COURT: Before you take that down, I have a question for Ms. Zarak. Do you know what is written underneath where it says "See attached"? I assume that's Icelandic?
THE WITNESS: Yeah. I have no idea.
THE COURT: Thank you.
MR. BEYDA: May I please direct the witness's attention to P152 in evidence, Bates pages 12854.
THE WITNESS: P152. Pages?
MR. BEYDA: The Bates pages, 2854.
THE WITNESS: 2854.
MR. MIN: Your Honor, can I just -- Mr. Beyda, could you repeat the exhibit again.
MR. BEYDA: P152.
MR. MIN: Oh, P. I'm sorry. I'm on the wrong one.

If I could just have a moment to pull it up.

BY MR. BEYDA:

Q. Actually, if you could please take a look at the page -- I think it's the page before, 12853, the bottom of that page, Ms. Zarak.

A. Yes.

Q. Okay.

THE COURT: Isn't this the same page we just looked at?

MR. BEYDA: It is. I was -- I had the wrong exhibit. So --

Q. Ms. Zarak, this is -- these are your communications with Mr. Moody, correct?

A. Yes.

Q. At the time that you -- on May 27th, 2021, why were you in communication with Mr. Moody and not Mr. Schram about this document?

MR. MIN: Objection.

THE COURT: Sustained.

Q. Why were you in communication with Mr. Moody about this document?

MR. MIN: Objection.

THE COURT: Mr. Beyda, I thought that I already sustained a relevance and an outside the scope of the cross objection to this exact line of questioning, about this exact

document.

MR. BEYDA: Right. Your Honor, this document was put in evidence by Mr. Min on the cross-examination of Ms. Zarak, so as far as scope goes, this is what was specifically being addressed.

THE COURT: That's true. Go ahead. All right. You're right.

BY MR. BEYDA:

Q. Ms. Zarak, are you able to answer the question as to why you were communicating with Mr. Moody on May 27th, inquiring as to what this document that you received from Mr. Schram was?

A. Yes, I am, Mr. Beyda. So I didn't trust Mr. Schram. He was doing certain things behind my back. He had told me this document was something else. I needed to confirm with someone I trusted at the time. I wanted to know -- I don't speak Icelandic. I am not familiar with Icelandic institutions. I wanted to see what this document was, and what it implied.

Q. Did you subsequently discuss this document with Mr. Schram?

A. Did I subsequently discuss this document with Mr. Schram. I didn't. Not that I recall.

Q. Ms. Zarak, you were asked -- can you please turn to page 12858 of this exhibit.

MR. BEYDA: Mr. Oza, can you please make it larger for the judge.

Q. Ms. Zarak, you were asked questions about this exchange of

messages by Mr. Min; do you recall that?
A. Mm-hmm, yes.
Q. You indicate, "Things are better, and as such, as the future is still uncertain (when is it not?), I am back on my feet again." At the bottom of the first green box. What are you referring to over there?
A. I was referring to a couple of things. I was referring to my mind-set, my state of mind, but also, I was referring to the fact that I was given back one of the passports and I was going to be able to go to Mexico.
Q. And when were you given back the passports --
A. The --
Q. -- as it relates to this message on June 15th, 2021?
A. So on June 15th, we had already had the communication that the passports -- the passport would be given back, so it was a, you know -- it was a fact that I would be traveling, but the physical, the actual passport was not given back to me until the evening of June 16, when Mr. Schram arrived from outside the house and went like this. Yeah.
MR. BEYDA: Your Honor --
Q. And then you indicate in the second green box on that page, "I am so grateful our paths have crossed." What are you referring to over there?
A. Verbatim. I was so grateful that I had met him.
THE COURT: And this is an exchange with Mr. Jonas

Moody, right?

THE WITNESS: Yes, your Honor.

THE COURT: And he's in Iceland?

THE WITNESS: Yes, your Honor.

THE COURT: Thank you.

BY MR. BEYDA:

Q. Ms. Zarak, why were you grateful that you had met Mr. Moody?

MR. MIN: Objection. Asked and answered.

THE COURT: Sustained.

MR. BEYDA: Your Honor, I'm done with this exhibit. We can take it down off the screen.

Q. Ms. Zarak, you were shown pictures of EZ wearing hockey gear; do you recall that?

A. Yes, Mr. Beyda.

Q. Did there ever come a time that EZ was enrolled in a hockey class in Iceland?

A. No.

Q. Why, to your knowledge, was EZ not enrolled in a hockey class in Iceland?

A. Because she didn't understand Icelandic.

Q. What, if any, impact did her not understanding Icelandic have on her enrollment in any other after-school activities in Iceland?

A. It had a hundred percent impact. It was the reason why she

was not enrolled in any after-school activities or extracurricular. She did a trial class and didn't like it because she couldn't understand the coach nor the girls. She did a soccer trial class.

Q. Directing your attention to Exhibit P157A, I believe it is. It's page 507 onwards.

MR. BEYDA: Your Honor, this is where the photographs were moved in, I believe it was.

THE COURT: Correct. Only the photographs are in evidence.

MR. BEYDA: I'm just looking for a Bates number to direct everyone to. Sorry.

BY MR. BEYDA:

Q. Directing your attention to Bates page 13510.

A. 135 -- 13510.

Yes.

Q. Actually, if you could go to page 3507 first.

A. Yes.

Q. Okay.

A. 3507. Uh-huh.

Q. You were asked questions about comments made by I think your father-in-law in or about this time concerning these photographs; do you recall that?

A. The comments of --

THE COURT: Why don't you just ask a question so we

can move this along.

MR. BEYDA: I apologize. It just got -- my recollection, your Honor, is that we moved these photographs in, and I just want to make sure I'm correct. And all of the other text was redacted and is not part of the record; is that correct?

THE COURT: I don't have the redacted versions of anything. Mr. Min, you're going to get those to us?

MR. MIN: Yes, your Honor. I've spoken with opposing counsel. We're going to cross-check all final exhibits and then we will have them to your chambers, or to the courthouse on Monday. That's the plan.

THE COURT: Okay. Thank you.

So your question is whether the commentary under the photo is admitted?

MR. BEYDA: Yes. And my recollection is actually that it's not, but if I'm mistaken, then I do have a question. And --

MR. MIN: Your Honor, that is my recollection also.

THE COURT: I'm sorry?

MR. MIN: I said I was going to agree with Mr. Beyda. That was my recollection.

THE COURT: I was going to say my notes say photos only.

MR. BEYDA: Okay. So I can move on.

BY MR. BEYDA:
Q. Directing your attention too Exhibit P89.
A. Yes, I am here.
Q. You could actually look at it on the screen. It will be maybe a little bit quicker.
MR. BEYDA: Mr. Oza, if you can just quickly scroll through these pages so that the witness can see them.
Q. Ms. Zarak, in New York did you take the children -- have you ever taken the children to a zoo?
A. Yes.
Q. Where is the closest zoo to your apartment?
A. The Central Park Zoo.
Q. How often would the children go to the Central Park Zoo?
A. A lot. I -- I wouldn't know, Mr. Beyda. You know, weather depending, but a lot.
Q. You were shown pictures of the children participating in certain activities in Iceland; do you recall that?
A. Yes, I do.
Q. Why did the children participate in those activities while in Iceland?
A. Why did the children participate in those activities?
Q. Yes.
A. Well, the whole point of us going to Iceland was for the children to have as normal a life as possible amidst a world pandemic. So the reason why we took them to those activities

were, I -- were we not gonna take them to those activities? Yes, so the reason why I took them to those activities was because they were available and we could do it and it was safe and we were there.

And they're children.

THE COURT: You've answered, Ms. Zarak. I understand.

Q. Ms. Zarak, directing your attention to the spring of 2020.

A. Mm-hmm.

Q. Withdrawn.

Ms. Zarak, you were asked about certain communications you had with third parties by Mr. Min; do you recall that?

A. Yes, Mr. Beyda.

MR. BEYDA: Your Honor, may we please put on the screen R77.

THE COURT: Just one moment, please.

MR. BEYDA: Yes, your Honor.

THE WITNESS: Okay. This one I can see from the screen.

THE COURT: All right. This one has been admitted, right?

MR. BEYDA: Yes, your Honor.

THE COURT: All right.

BY MR. BEYDA:

Q. Ms. Zarak, Mr. Min was asking you who Bernardo Sepulveda is, correct?

A. Yes, Mr. Beyda.
Q. Directing your attention to the middle of this page, 13 lines down from the top. You indicate as of June -- July 26, 2020, "We are leaving our stuff in New York. It's not a permanent move." Do you see that?
A. Yes, I do, sir.
Q. Why did you feel it necessary to tell Mr. Bernardo that on July 26, 2020?
A. Because it wasn't a permanent move.
Q. And then you indicate, "We are taking like a third of our stuff." Do you see that?
A. Yes. Yes.
Q. And where did the remaining 2/3 stay?
MR. MIN: Objection as to form. Assuming a fact not in evidence.
THE COURT: Sustained. In any event, Mr. Beyda, the document is in evidence.
MR. BEYDA: Your Honor, may I please show the witness R79 that was moved into evidence during cross.
THE COURT: Can you just tell me the number of that last exhibit you were looking at. Was it 77?
MR. BEYDA: Yes. Yes, your Honor, it was.
THE COURT: All right. Thank you. R79?
MR. BEYDA: Yes.
THE COURT: Okay. That's in evidence.

BY MR. BEYDA:

Q. Ms. Zarak, directing your attention to page 2 of this document, nine lines from the top, the sentence that begins, "We left."

A. Mm-hmm.

Q. "We left the apartment in New York the same, we took, like, a third part of our stuff. We don't see this as something permanent, we see it as... something, I don't know, for the school year, tops, waiting for everything to go back to normal here so that we can go back." Why did you send that message to Letitia Viveros on July 28, 2020?

A. Because that was our plan and she's my cousin, and that's what we were gonna do.

Q. Directing your attention to R83 that was moved into evidence during your cross-examination. If you could please focus your attention four lines from the top. You indicate, "Look, we came to Iceland for a year, I'm going to live this year in Iceland. It was a difficult decision... I thought I'd settle down in Mexico, because we've been there from March till July, but there are no schools in Mexico," and so on and so forth. Why did you send this message to Lynn Feinstein on or about August 4th, 2020?

A. Because she's one of my best friends, and that was my plan.

MR. BEYDA: May I please direct the witness --

Q. Ms. Zarak, to your knowledge, was it your plan or was it

both yours and Mr. Schram's plan?

A. To my knowledge, it was both me and Mr. Schram's plan, our plan, the family plan.

Q. Ms. Zarak, I'm going to direct your attention to R147 that was moved into evidence during your cross-examination.

On page 1 of this document, just to make sure, to confirm, you're the blue boxes, Ms. Zarak; is that correct?

A. Yes.

Q. You indicate, on April 25, '20, "I don't think I would have made it in New York." Do you see that?

A. Yes, Mr. Beyda.

Q. What are you referring to on April 25th of 2020 in this communication?

A. I think we were worried about our lives. If I recall, this is a text message with a mother -- I don't have the exhibit in front of me 'cause I -- I couldn't find the binder, but from what I remember, this is Limor.

MR. BEYDA: Mr. Oza, at the top left of this page.

A. Yeah, I knew it. So Limor also had three small children, same ages as mine, so, you know, it was -- I -- I had -- I had great -- she's, you know -- they initially stayed in New York and then they also left. I had tremendous amount of respect for her for staying in an apartment with three little kids, so, you know, what I mean is: Go, Limor. I don't think I would have made it. Just -- yeah, it's verbatim. I admire her

tremendously. And she never -- I think they also left for COVID.
Q. Directing your attention to R152 that was moved into evidence during your cross-examination.
A. Okay. That I do have. R152.
Q. It's on the screen if that will save --
A. Yes, yes.
Q. Okay. Ms. Zarak, I'm directing your attention to the middle of the screen right below the November -- 11/23/20.
A. Mm-hmm.
Q. Or above it, actually.
A. Mm-hmm.
Q. You indicate, "My husband is from here. We decided to spend the year here because of COVID. So far so good."
Who is -- why did you send this message to Amanda Krentzman on November 23rd, 2020?
A. Amanda Krentzman is a woman from Netflix that got fired during her maternity leave, so I wanted to touch base and see how she was. She was also going to -- I'm sorry. I'm talking too much. The question is, because that was what was happening. We were spending the year in Iceland for COVID. This is November. So the plans hadn't changed. We were there. It's what we were doing.
Q. Now at the bottom of this page Bates marked 11716, you're asked, "Have you guys kept your place in New York?" Do you see

that?

A. Yes.

Q. And you indicate, "Yes, we kept it. I think we'll be here 1-2 years." Correct?

A. Yes, yes.

Q. At that point in November, why -- I'm sorry.

At that point on November 24th, 2020, why did you write "1-2 years"?

A. Well, I think at that point nobody knew what -- how long the coronavirus would go, when would -- schools would open, when we would be back home. She was in a similar situation. Her husband is Danish, so they had gone to Denmark while New York got better. So I -- the reason why I said I think we'll be here for one or two years is because in November 24, 2020, I didn't know the schools would be open next summer. I didn't know if the schools would be open in two years. I don't think anyone knew if the schools would be open, or when -- I wish I had known. So that's why, Mr. Beyda, because I didn't know -- I didn't -- I just didn't know.

MR. BEYDA: Your Honor, I'm done with this exhibit.

THE COURT: All right. Mr. Beyda, please find a convenient breaking point so that we can take the lunch recess.

MR. BEYDA: Yes. This would be it, because I'm moving on to another exhibit.

THE COURT: All right. How long are you going to be

with Ms. Zarak?

MR. BEYDA: Another 15 to 20 minutes.

THE COURT: All right. And then after that you have two additional witnesses?

MR. BEYDA: Yes, your Honor.

THE COURT: All right. I'd like to do a relatively short lunch because, as I say, we need to be finished today. Can people do a half hour?

MR. BEYDA: Yes, your Honor.

MS. CHAWLA: Yes, your Honor.

THE COURT: Mr. Min?

MR. MIN: Yes, your Honor. Could I ask for -- could we return at 1:45 -- 40 minutes? Is that okay?

THE COURT: Sure.

MR. MIN: Good. Thank you.

THE COURT: 1:45. I'll see everyone then.

MS. CHAWLA: Thank you, your Honor.

THE COURT: I'm sorry. Ms. Sellin, does that work for you?

(Discussion off the record)

(Luncheon recess)

AFTERNOON SESSION

1:49 p.m.

THE COURT: All right. Good afternoon, everyone. Thank you for getting back promptly.

Mr. Beyda.

BY MR. BEYDA:

Q. Ms. Zarak, yesterday during your cross-examination you were shown a variety of text messages from Exhibit P148; do you recall?

Ms. Zarak, you're muted.

MS. CHAWLA: You're on mute.

A. Sorry, sorry. Yes, I recall.

Q. Okay.

MR. BEYDA: Your Honor, may we please -- I'm going to ask to have admitted as -- I guess it would be 148J I think is what we're up to.

THE COURT: I believe, yeah.

MR. BEYDA: And it's the two pages that would come prior to 148B. It's Bates pages 11929 and 11930.

THE COURT: All right. Ms. Zarak, don't look at it yet. Let's see if Mr. Min has -- I assume you have no objection, since it was your exhibit.

MR. MIN: No objection, your Honor. I thought I was muted. No objection.

THE COURT: Did you want a minute to look at it,

Mr. Min?

MR. MIN: Yes, your Honor. I'll just take a quick look.

Mr. Beyda, 929-930, correct?

MR. BEYDA: Yes, sir.

MR. MIN: No objection, your Honor.

MR. BEYDA: Thank you.

THE COURT: No objection, did you say?

MR. MIN: No objection, yes, your Honor.

THE COURT: All right. Thank you. It will be received.

(Petitioner's Exhibit 148J received in evidence)

BY MR. BEYDA:

Q. Ms. Zarak, do you have those two pages in front of you?

A. Yes. 929, 930.

THE COURT: If you can just make it a little bigger.

MR. BEYDA: And please scroll to the top.

Q. Ms. Zarak, on March 3rd, the document that's now in evidence, there's a -- there's the blue and the gray boxes again, correct?

A. Yes.

Q. The gray boxes are Mr. Schram, correct?

A. Yes.

Q. Okay. Mr. Schram, on March 3rd, 2020, mentioned a meeting, meeting Tom later today. Do you see that?

A. Yes.
Q. Do you know what that meeting -- what led up to that meeting taking place?
A. Not without reading this document, sir.
Q. Moving down to the middle of this page, there's a reference, "Expo in Iceland put on hold because of virus." Do you see that?
A. Yes, I do.
Q. Can you describe the circumstances, the -- Mr. Schram's demeanor at the time that you were exchanging these communications on March 3rd, 2020.
A. He was --
MR. MIN: Objection. Objection, your Honor.
THE COURT: Sustained.
Q. Do you know what expo in Iceland Mr. Schram was referring to over there?
A. Yes, I believe I remember, yes.
Q. Okay. Can you -- what was it?
A. He was -- he was going to build a pavilion for a -- for a expo.
Q. Was he going to Iceland in connection with that?
A. Not initially, no. He was doing it from -- he was doing it from his office, because it -- the -- from what I understand, first is drawings.
Q. And then on that same day Mr. Schram indicates, "We should

start thinking about leaving." Do you see that?
A. Yes.
Q. Was that the first time that you received a message like that from Mr. Schram in March?
A. Yes.
Q. And what was the context that you and he were communicating about that you would start thinking about leaving?
A. I think it had to do with his work. In March 3, you know, we -- we knew we were having visa issues, and I think he was concerned about money and work. He says things in Iceland have been put on pause. I believe the conversation was around -- I think because of the time period -- this is March -- this is before we, you know -- COVID was very much on, but it hadn't been decided, you know -- so yeah, Mr. Beyda, I believe this -- this had to do with income.
Q. Directing your attention to the box, "Expo in Iceland put on hold because of virus."
A. Yeah, so -- yeah.
Q. Was there a correlation between that message and the message, "We should start thinking about leaving"?
A. Yes, yes, completely, yeah.
MR. BEYDA: Your Honor, I'm done with this exhibit.
Q. Ms. Zarak, I don't need that exhibit anymore. But what was the correlation between the expo in Iceland being canceled because of the virus and starting to think about leaving?

A. Well, coronavirus was playing a factor on our -- our decisions, lives, you know, upcoming plans for the children. It had --

That was the correlation, the reason why -- the only reason -- the only reason why --

THE COURT: You answered the question. You've answered the question.

Q. Actually, I'm going to ask you to please take a look at 11929 again, Ms. Zarak, the bottom of that page.

A. Mm-hmm.

Q. The bottom four blue boxes, can you read those, please.

A. Yes.

Q. Let us know when you're done.

A. Yes.

Q. Okay. The reference, "If I get the money for the house in Iceland, could that be an immediate income?" What are you referring to over there?

A. Well, it was the -- I'm referring to that little house that Bjork used to own that we wanted to buy, or we were considering to buy, to put on airbnb market, so I thought if we buy it and we put it up for rent immediately, well, then we have immediate income.

Q. And then can you turn to 11930.

A. Yes.

Q. Is that a con --

MR. BEYDA: Actually, your Honor, I'm done with this exhibit and this topic.

THE COURT: Okay.

Q. Directing your attention, Ms. Zarak, to R153 that's in evidence.

MR. BEYDA: Again, this was moved in yesterday during the cross-examination. And if you can -- might have been actually before the cross.

THE COURT: It was, but it doesn't really matter. It's in evidence.

Q. Directing your attention to Bates page 11938.

A. 11938. This one, yes.

Q. Could you please read over that page and let us know when you're ready.

A. 11938?

Q. Yes.

THE COURT: Could we stop jumping around on the screen, though.

Q. There's a reference to meeting Tom at the end of the day in the second gray box from the top. Do you see that?

A. Yes.

Q. What did that message mean to you?

A. That message was --

MR. MIN: Objection, your Honor. Relevance. Objection as to form, relevance of what it meant to her.

THE COURT: Sustained.
Q. Did you know what that --
THE COURT: I don't even know what you're asking, Mr. Beyda.
MR. BEYDA: Sure.
Q. Did you know why Mr. Schram would be meeting with Tom at the end of the day on March 12, 2020?
A. Yes.
Q. Why was he meeting with Tom that day?
A. Regarding work, working at Workshop/APD, regarding a job.
Q. Do you know whether or not that meeting took place?
A. It did.
Q. And did you discuss that meeting with Mr. Schram?
A. I did.
Q. And to your knowledge was -- withdrawn.
Did Mr. Schram share with you the details of that meeting that he had with Tom?
A. Some of them, yeah.
Q. What did he tell you?
A. That Tom was going to talk to the other partners and they were going to offer him a job, so they had to get started with his immigration lawyer in order to speed up the process.
He basically was offered a job.
MR. MIN: Objection. Move to strike the last portion.
THE COURT: I'm going to strike it. There wasn't a

further question pending.
Q. To your knowledge, what, if any, offers of employment were extended to Mr. Schram at that time?
MR. MIN: Objection.
THE COURT: Grounds?
MR. MIN: Laying a foundation.
THE COURT: Overruled.
You can answer, Ms. Zarak, if you're able.
A. Yes, a job was offered to Mr. Schram to work at Workshop/APD.
MR. BEYDA: Your Honor, I'm done with this exhibit. We could take it off the screen.
Q. Ms. Zarak, in February 2021, or directing your attention to February 2021, was Mr. Schram clear in his intentions on -- regarding where he wanted the family to reside after that academic year for EZ?
MR. MIN: Objection.
THE COURT: What's the objection?
MR. MIN: As to form. It's vague; was Mr. Schram clear.
THE COURT: No.
You can answer, Ms. Zarak.
A. He was not clear.
Q. Can you elaborate on how he was not clear.
A. Sure. He would change; he was -- he would avoid the

conversations; he was non-committal; he spoke about divorce; spoke about divorce to my mother, spoke about divorce to his friend, spoke about divorce to me. My personal assumption was that if he was talking about divorce, he wouldn't go back to New York. However, he would sway. It was not consistent.

Q. Yesterday Mr. Min was asking you questions about whether it was clear to you in February 2021 as to what Mr. Schram's intentions were. Do you remember that?

A. Yes, I do.

Q. What, if anything, about Mr. Schram and his intentions was clear to you in February 2021?

MR. MIN: Objection. Asked and answered. On cross.

THE COURT: It doesn't matter. He's allowed on redirect to clarify.

You can answer, Ms. Zarak.

A. That he wanted to get a divorce.

Q. Ms. Zarak, yesterday you were asked -- sorry, not yesterday. During the cross-examination by Mr. Min you were asked about SZ's adjustment period at Oldukot; do you remember that?

A. Yes, sir.

Q. You said it went very bad; do you remember that? Can you elaborate.

A. Yeah, I said he didn't adjust.

Q. Can you elaborate on why he didn't adjust at that -- during

that period at the school.

A. May I elaborate on the adjustment period, in itself?

THE COURT: Let your lawyer ask the questions. He asked you why didn't he adjust, if you know.

THE WITNESS: Yes. Oh, yes, I know, I know. I was with him.

A. SZ was -- had just turned 2, and suddenly he was thrown into the dynamic of being in a classroom where there are three Icelandic-speaking teachers and maybe 20 Icelandic-speaking -- well, I mean, they're toddlers, but -- and then he was forced -- the adjustment period partially consisted on me leaving, so he would have this -- these fits. That's -- the teachers would have to call me back. It didn't work out. The adjustment period didn't work out.

Q. Did you share that with Mr. Schram?

A. Yes, I did, and the teachers shared it with Mr. Schram, the teachers shared it with me. The adjustment period did not work out, and they asked to schedule another one altogether.

MR. BEYDA: No further questions, your Honor.

THE COURT: All right. Thank you.

Mr. Min, are you expecting further questions?

MR. MIN: Your Honor, I would request some further questions on recross based upon the redirect that we just heard.

THE COURT: I'm going to keep you on a very tight

leash. You had plenty of time.

MR. MIN: Yes. There are some issues that were not done on direct that I would like to address.

THE COURT: I understand. That's why I said let's go. But only issues that were not issues that you had the opportunity to explore.

MR. MIN: Understood.

RECROSS EXAMINATION

BY MR. MIN:

Q. Ms. Zarak, while living in Iceland, isn't it true that Mr. Schram spoke to SZ almost entirely in Icelandic?

A. No.

Q. Isn't it true that you told Mr. Schram, while living in Iceland, that you wanted English to be the home language because Mr. Schram was speaking too much to the children in Icelandic?

A. No.

Q. But isn't it true that Mr. Schram told you that if the children were to be spoken to in English primarily that Susana, for example, who spoke to the children in Spanish, could no longer be the children's nanny?

A. No.

Q. You testified on redirect just now that -- I want to direct your attention to P148, Bates No. 11929.

THE COURT: Is this the new part we just marked?

MR. MIN: Yes. 148J, your Honor.

THE COURT: Yes. Thank you.

THE WITNESS: And which --

THE COURT: Just -- can you pull it up, Mr. Min.

MR. MIN: Yes. We're pulling it up, your Honor.

THE COURT: All right. It's on the screen, Ms. Zarak.

BY MR. MIN:

Q. The house you're talking about, if you get the money for the house in Iceland, could that be immediate income, that was referring to the Bjork house you testified to on Wednesday?

THE COURT: She just said that on --

Q. And I want to direct your attention to P3 in evidence. This person you reached out to was also regarding that same Bjork house, correct? "If I pay with cash, what's the best price you could offer?"

A. Yes.

Q. All right. On March 3rd.

And I want to direct your attention to P148, Bates No. 11931.

MR. MIN: Which was marked as B, 148B, your Honor, marked as.

Q. And these are messages on March 4th -- if we can scroll down a little bit, to the next page -- where you write, "Do you think we could all fit in that little house?" On March 4th, you were referring to that Bjork house that you wrote to the

broker about paying in all cash, correct?
A. Do you see the little wink, Mr. Min?
Q. Mm-hmm.
THE COURT: Just answer the question, Ms. Zarak. Is the reference about the Bjork house when you say, "Do you think we could all fit in that little house?" I believe that was already asked and answered, but --
THE WITNESS: It was already asked and answered, yes.
THE COURT: Just answer the question, Ms. Zarak. Are you talking about the Bjork house?
THE WITNESS: Sorry, your Honor.
A. Yes.
THE COURT: Thank you.
Q. Okay. With respect to your green card application, does it say anywhere in your green card application, Respondent's Exhibit 44 in evidence -- does it mention Netflix anywhere in that green card application?
MR. BEYDA: Objection. I mean, she's going to have to go through this entire --
A. Yes.
THE COURT: Mr. Min, the document is in evidence, right? You can make your arguments.
Q. Ms. Zarak, I want to direct your attention to Bates stamp page 25212 of that document.
A. Can you -- what is the exhibit number, sir?

Q. Sure. R44.

A. R44. Give me one second. Okay. Bates stamp?

THE COURT: 25212.

THE WITNESS: 25212. 212. 25212. Yes.

Q. And just for your reference, you can look at the page before, but this is the letter that was submitted on your behalf as part of your green card application, correct?

A. Correct, yeah, this is --

Q. And it talks in part in paragraph 2 about you serving as a juror in --

MR. BEYDA: Objection.

THE COURT: Mr. Min, we're not going to spend -- hold on. Sustained. We're not going to spend the afternoon going through a document with you asking what the document says. It is in evidence.

MR. MIN: Okay. Thank you, your Honor.

THE COURT: Save it for your argument.

MR. MIN: Understood.

I want to direct the witness's attention to 25218.

MR. BEYDA: Objection, if there's a question on this.

THE COURT: There's no question.

MR. MIN: One second, your Honor.

BY MR. MIN:

Q. Ms. Zarak, do you see Section 9 on Bates stamp page 25218 as one of the --

THE COURT: That's the question, do you see it?

MR. MIN: I just want to direct her attention to that.

Q. "Evidence for services, or evidence that the alien has commanded a high salary or other significantly high remuneration for services, in relation to others in the field"?

A. Yes, sir.

Q. Okay. And I want to direct your attention to the following page, the following two pages. It's true that your attorney listed three categories of reasons why you should be granted a green card based upon extraordinary abilities but did not include your level of compensation as any of the criteria for being awarded a green card, correct?

MR. BEYDA: Objection.

THE COURT: She can answer.

A. Give me one second.

Give me one second, Mr. Min.

THE COURT: Mr. Min, this is not proper recross.

MR. MIN: I'm happy to move on, your Honor, then. Your Honor, I mean, of course, the purpose of this is Ms. Zarak testified about why -- on redirect about --

THE COURT: And the document is in evidence.

MR. MIN: Understood.

THE COURT: All you're doing is making your closing argument.

MR. MIN: Understood. Your Honor, I'm happy to move

on.

BY MR. MIN:

Q. Ms. Zarak, I'll withdraw my question.

Ms. Zarak, what did Mr. Schram tell you -- or withdrawn.

Do you recall the questions being asked about SZ's citizenship document and your conversations with Mr. Moody on redirect?

A. Yes, sir.

Q. What did Mr. Moody tell you was that document you asked him about?

A. That was SZ's citizenship document.

Q. And what did Mr. -- apologies. What did Mr. Schram tell you that that document was?

A. Mr. Schram told me different things. Mr. Schram forwarded to me so SZ could travel to me -- could travel with me to New York, without specifying what it was. And then when we went to the National Registry, Mr. Schram simply said that we -- that those were the papers that were needed in order for the children to be in the system, which is what he kept repeating. So, yeah. So -- and for example, I never signed EZ's paper.

Q. Isn't it true that Mr. Schram --

THE COURT: All right. That is not responsive, Ms. Zarak, the last sentence of what you said. The question was: What did Mr. Schram tell you the document was?

Q. Isn't it true Mr. Schram told you that it was SZ's citizen confirmation?
A. I don't recall, Mr. Min.
Q. I want to direct your attention to R198 in evidence. Mr. Schram sent you this document on May 18th at approximately 8:56 a.m., correct?
A. Yes.
Q. Okay. And with respect to the words under "See attached," did you understand that to be like a sign-off, like a -- not a greeting but the opposite of a greeting?
MR. MIN: I apologize for the word escaping me, your Honor.
Q. Like a closing for an email?
MR. BEYDA: Objection.
THE COURT: Overruled.
A. You're asking me what the word in Icelandic means?
THE COURT: No. He's asking you if you understood it to be like a sign-off or a salutation or a good-bye.
THE WITNESS: I'm sorry, your Honor. I have no idea.
Q. I want to direct your attention to the next page. Would it be fair to say you did not understand the words on this page, for the most part?
A. Oh, it would be more than fair to say, yeah. I mean, I recognize my child's name.
Q. Understood. I want to direct your attention to the next

page. And this next page was part of the email as well, correct?
A. It was, yeah.
Q. All right.
A. Oh.
Q. Do you see on the top line where it says Translation, correct?
A. Mm-hmm.
Q. And you see Box No. 1, it says Registers Iceland? If we could scroll back up.
A. Yes.
Q. And you see Box No. 1 on the page before, correct?
A. Correct.
Q. And if we scroll back to the next page, you can see on Box No. 2, it says Certificate of Citizenship, correct?
A. Correct.
Q. Okay. And if you scroll back up, Box No. 2, you can see a word, right? There's a Box No. 2 on the page above, right?
MR. BEYDA: Objection, Judge. This is in evidence.
THE COURT: I'm going to give him a little latitude on this.
Q. I want to direct your attention to P140.
MR. MIN: Or your Honor, I'd offer into evidence P148, Bates stamp page 012341.
THE COURT: All right. That will be marked as K. And

then give Mr. Beyda a chance to take a look at it.

MR. MIN: Your Honor, can I ask the witness not to turn to that page until it's admitted.

THE COURT: Yes. Ms. Zarak, wait till we decide if it's going to come in, okay?

THE WITNESS: Yes.

MR. BEYDA: What was the page number? Sorry.

THE COURT: 12341.

MR. MIN: 12346. I'm sorry, your Honor. I don't know -- yeah. 12346, your Honor. I wrote it -- I rescind my offer and I offer P148, Bates numbered page 12346, to clarify for the record.

THE COURT: All right. We're waiting to see if Mr. Beyda has an objection.

MR. BEYDA: I'm curious to know what it's being offered for.

MR. MIN: Your Honor, it's being offered for the statements made on May 18th at 8:45 a.m. by Mr. Schram.

MR. BEYDA: Then I do have an objection.

THE COURT: I don't understand what that means. What is it being --

MR. BEYDA: Meaning if it's being offered for Mr. Schram's statement, then it's hearsay.

THE COURT: Let me pull it up. 12346?

MR. MIN: 12346, yes, your Honor.

Your Honor, it's not being offered for the truth.

THE COURT: Hold on, please. Hold on.

All right. The objection is overruled. It's not being admitted for the truth of the matter but it is being admitted for the fact that the statement was made and transmitted to Ms. Zarak, and I'm admitting it for that purpose.

(Petitioner's Exhibit 148K received in evidence)

MR. MIN: Thank you, your Honor. We'll pull it up.

BY MR. MIN:

Q. Ms. Zarak, so at 8:56 on May 18th, Mr. Schram sent you what you later found out to be SZ's citizenship confirmation, yet on May 18th, 11 minutes earlier, Mr. Schram wrote to you, "I have the citizenship confirmation for SZ. Mailing it over." Do you see that?

A. Yes, I see it, sir.

Q. So isn't it true Mr. Schram told you exactly what the document was that you were -- that he was emailing over to you?

A. Well, he texted me -- yes, he -- yes, he texted me here.

MR. MIN: Your Honor, I have no further questions.

THE COURT: Thank you.

Mr. Beyda, who is your next witness?

I'm sorry. I assume you're finished with Ms. Zarak, right?

MR. BEYDA: Yes, I am, your Honor.

THE COURT: All right. Ms. Zarak, thank you very much. You're excused. You're obviously welcome to stay with us, but you are no longer under oath.

THE WITNESS: Thank you.

(Witness excused)

THE COURT: Your next witness, Mr. Beyda.

MS. CHAWLA: Your Honor, we have two other witnesses.

THE COURT: I'm sorry, Ms. Chawla. Please forgive me. I keep doing that.

MS. CHAWLA: Completely fine, your Honor.

We have two witnesses that are on standby, so I'm just going to text them to see who's available first.

THE COURT: All right. Thank you.

It's not all right, actually. I'm sorry.

MS. CHAWLA: Your Honor, could we take five minutes and then that way we can come back and I can have them both available?

THE COURT: That's a good idea. Yes, why don't we resume at 2:30. Thank you.

MS. CHAWLA: Thank you.

(Recess)

THE COURT: All right. Ms. Chawla, would you call your next witness.

MS. CHAWLA: Yes, your Honor. I call Mandy Goldberg to the stand.

THE COURT: Ms. Dempsey, would you swear the witness.

THE DEPUTY CLERK: Ms. Goldberg, please raise your right hand.

(Witness sworn)

THE DEPUTY CLERK: Please state and spell your name for the record.

THE WITNESS: Mandy Goldberg. M-A-N-D-Y, G-O-L-D-B-E-R-G.

THE COURT: All right. Good afternoon, Ms. Goldberg. Thank you for being here to help us sort through this matter.

Ms. Chawla, please?

MANDY GOLDBERG,

called as a witness by the Respondent,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. CHAWLA:

Q. Thank you, Ms. Goldberg. I just want to let you know that we won't be referring to any children by their names. We're referring to all children by their initials. So in the event you have children, feel free to just use their initials or just say "my child."

In what city do you reside, Ms. Goldberg?

A. I live in Nyack, New York.

Q. And for how long have you lived in Nyack?

A. Six weeks.

Q. And where did you reside prior to Nyack?
A. I was in Brooklyn for 17 years.
Q. Are you currently employed?
A. Yes.
Q. And what do you do?
A. I produce branded content videos for CNN.
Q. Are you currently married?
A. Yes.
Q. And do you have any children?
A. One child.
Q. And is your child a girl or a boy?
A. A little girl. She's 2½.
Q. Do you know the respondent Tania Zarak?
A. I do.
Q. And for how long have you known Ms. Zarak?
A. Since 2005, so 16 years.
Q. And where did you --
A. 16½ maybe.
Q. I'm sorry. I didn't mean to cut you off.
Where did you meet Ms. Zarak?
A. We were working at our film company called Esperanto in Tribeca.
Q. And did there come a time when you met the petitioner Mr. Schram?
A. Yes. She brought him to my birthday party in 2013 so I

could meet him.

Q. Now prior to March of 2020, did your child have any play dates with any of Mr. Schram and Ms. Zarak's children?

A. I wouldn't call it a playdate. They were a little too young.

THE COURT: She's 2½.

A. Yeah, so, I mean, we hung out. They were in strollers, but we were all together. We went I think to a playground, but I don't think the kids even knew how to walk yet.

Q. Turning your attention to March of 2020, did you have any discussions with Ms. Zarak about the family leaving New York City?

A. I found out after they arrived in Mexico that they left New York, but I didn't know beforehand.

MR. MIN: Objection. Non-responsive. Move to strike, your Honor. Non-responsive to the question.

THE COURT: Overruled.

BY MS. CHAWLA:

Q. Did you have any conversations with Ms. Zarak once she was in Mexico?

A. A few.

Q. And did she at any time tell you why the family had gone to Mexico?

MR. MIN: Objection.

THE COURT: It's a yes or no. What's the objection?

MR. MIN: Well, hearsay, but I'll withdraw it.

THE COURT: It's not hearsay.

Go ahead, ma'am. You can answer.

A. The short answer is yes.

Q. And did she tell you why?

A. Yes.

Q. What was that reason?

MR. MIN: Objection.

A. As she explained it --

MR. MIN: Objection.

THE COURT: Sustained. That's sustained.

Q. Did she tell you how long the family planned to be in Mexico?

A. No.

Q. Now did there come a time when you learned that the family was back in New York City?

A. Yes.

Q. And when was that?

A. July 2020.

Q. And how did you learn that the family was back in New York?

A. I believe I got a text from Tania saying, we're here for a short time.

Q. Did you have any understanding as to why the family had gone to Mexico?

MR. MIN: Objection. Relevance.

MS. CHAWLA: Your Honor, if I may, it goes to the whole crux of this trial.

THE COURT: Hold on. Let me just read this.

You can answer. Did you have an understanding, yes or no?

THE WITNESS: I did, yes.

Q. What was your understanding?

MR. MIN: Objection.

THE COURT: Grounds?

MR. MIN: Relevance, calls for hearsay. How else would she have an understanding?

THE COURT: Overruled.

THE WITNESS: I can answer?

THE COURT: Yes. I'm sorry. You can answer.

A. My understanding was that having three kids in a New York City apartment with remote schooling for the eldest was -- was tough, and since they had the option to be in a country -- to be in a place where there was more support, more space, less -- less crowded, the way New York was feeling so scary, and also with lower COVID numbers at that time, that was my understanding.

Q. Do you know why there was remote schooling?

A. Yes.

Q. And what was the reason?

A. It was unsafe for anybody to be in close proximity with

anybody else, especially kids.
Q. Did you have any discussions with Ms. Zarak about the family going to Iceland?
A. Yes.
Q. And what did she say?
MR. MIN: Objection.
THE COURT: Grounds?
MR. MIN: Hearsay.
THE COURT: It's not offered for the truth, it's offered for the fact that Ms. Zarak made the statements, correct?
MS. CHAWLA: Yes, your Honor, correct.
THE COURT: Overruled. You can answer.
A. I was told that they were going because the COVID was so under control there that it was kind of easier to live for the time being, and especially because they had found an English-language school program for their eldest daughter, so she wouldn't have to be doing remote schooling, and that there were schooling options for the middle child as well.
Q. Did Ms. Zarak at any time tell you how long the family would be in Iceland?
MR. MIN: Objection.
Withdrawn. I'll withdraw. Withdraw my objection.
THE COURT: You can answer.
A. For the school year of 2020 through 2021.

Q. Did you have any communications with Ms. Zarak while she was in Iceland?
A. Yes.
Q. And at any point in those conversations did she tell you that she was not returning to New York?
A. No.
Q. Did she at any point in those conversations tell you that the family intended to stay in Iceland permanently?
A. No.
MS. CHAWLA: Your Honor, I have no further questions for this witness.
THE COURT: All right. Thank you very much.
Mr. Min, are you handling this, or Mr. Glasser?
MR. MIN: Your Honor, I will. If I could just have one moment to confer with counsel, co-counsel?
THE COURT: Yes.
MR. MIN: Thank you.
THE COURT: Ms. Goldberg, if you can just give them a minute.
CROSS EXAMINATION
BY MR. MIN:
Q. Hi. Good afternoon.
Did Ms. Zarak ever tell you that one of the reasons -- or withdrawn.
Did Ms. Zarak ever tell you that Mr. Schram had

obtained employment in Iceland?
A. No.
Q. Did Ms. Zarak ever tell you that they had purchased a house in Iceland?
A. I don't remember.
Q. Did Ms. Zarak ever tell you that she had applied to an MBA program in Iceland?

MS. CHAWLA: Objection, your Honor. Beyond the scope.

THE COURT: I'm going to allow it.

A. The answer is no.

MR. MIN: One second.

Your Honor, no further questions.

THE COURT: Thank you.

Anything on redirect, Ms. Chawla?

MS. CHAWLA: No, your Honor.

THE COURT: All right. Ms. Goldberg, thank you very much for being here to help us sort through this. I appreciate it.

THE WITNESS: Thank you.

THE COURT: I hope you have a good rest of the day and a nice weekend.

THE WITNESS: Likewise. Thanks.

MS. CHAWLA: Thank you, Ms. Goldberg.

THE COURT: I appreciate it. Thank you.

(Witness excused)

MS. CHAWLA: Your Honor, I am going to text her because I didn't want them both being on at the same time. So if you could give me three minutes, I will text her and have her log right in.

THE COURT: Yes. We'll wait. Thank you.

MS. CHAWLA: Thank you.

(Pause)

THE COURT: And who is this witness going to be, Ms. Chawla?

MS. CHAWLA: Your Honor, this is Marija Ratkovic.

THE COURT: Thank you.

(Discussion off the record)

THE COURT: All right. Good afternoon, ma'am. Thank you for being with us.

Ms. Chawla, you can call your witness.

MS. CHAWLA: Your Honor, I call Marija Ratkovic to the stand.

THE COURT: Ms. Dempsey?

THE DEPUTY CLERK: Ms. Ratkovic, please raise your right hand.

(Witness sworn)

THE DEPUTY CLERK: Thank you. Please state and spell your name for the record.

THE WITNESS: My name is Marija Margeta Ratkovic.

THE COURT: And can you spell it please for the

record, ma'am.

THE WITNESS: Yes. First name, M-A-R-I-J-A, middle name, M-A-R-G-E-T-A, Ratkovic, R-A-T-K-O-V-I-C.

THE COURT: All right. Thank you.

We're hearing a lot of background noise. I don't know what that's coming from, but if people who are not asking the questions or answering the questions would please mute their lines, I think that would help.

All right. Ms. Chawla?

MARIJA MARGETA RATKOVIC,

called as a witness by the Respondent,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. CHAWLA:

Q. Thank you for being here, Ms. Ratkovic. We will not be using any of the children's names, so in the event that you have children, you don't need to use their names either. We're just referring to the Zarak children by their initials, and you can either refer to your child as "my child" or by their initials as well.

In what city do you reside?

A. New York City.

Q. I'm sorry. I didn't hear you.

A. New York City.

Q. And how long have you resided in New York City?

A. About nine years; nine, ten.
Q. And are you currently employed, Ms. Ratkovic?
A. Yes.
Q. And how are you employed?
A. I'm part time.
Q. And what do you do?
A. I'm a group fitness instructor. I teach cycle --
(Reporter interrupted for clarification)
(Discussion off the record)
A. I teach indoor cycling.
THE COURT: Indoor cycling, are you saying?
THE WITNESS: Yes. I'm a group fitness instructor.
Q. Ms. Ratkovic, do you have any children?
A. Yes.
Q. And how many children do you have?
A. I have two children.
Q. How old are your children?
A. One is 7 and the second one is 5.
Q. Do you know the respondent Tania Zarak?
A. Yes.
Q. And for how long have you known Ms. Zarak?
A. I knew her for about two years, something like that, two and a half, two.
Q. I'm sorry. Did you say two years? I'm having a hard time hearing you.

A. Two.
Q. Two years?
A. Two years, yes.
MS. CHAWLA: Your Honor, I would ask Petitioner's 147 be moved into evidence. I don't have any questions on that, but I do offer that into evidence.
THE COURT: Mr. Min, is this you handling -- or in any event, it's your exhibit, so I assume you have no objection?
MR. MIN: No objection, your Honor.
THE COURT: All right. P147 is admitted.
(Petitioner's Exhibit 147 received in evidence)
MS. CHAWLA: Thank you, your Honor.
BY MS. CHAWLA:
Q. How do you know Ms. Zarak?
A. My child and her child are very good friends. They knew -- they know each either from kindergarten. That's how I know her, through my kids.
Q. And what school was your child in kindergarten?
A. P.S.9.
Q. And was EZ also at P.S.9?
A. Yes.
Q. Do you know Mr. Schram?
A. Do I know who?
Q. Mr. Schram.
A. Yes.

Q. Arnaldur Schram?
A. Yes.
Q. Turning your attention to July 2020, did there come a time where you had a conversation with Mr. Schram?
A. Yes.
Q. And can you please tell the Court what that conversation was.
A. It was about Tania and their family moving to Iceland for one year because of COVID. They were going for that time. And I had, you know -- I had conversation with him about it, you know, what was going on and why are they moving and what the plans are for the future, and that's what he told me is that it's just -- they're just going for COVID so kids can go to school, so they can have a normal life, because in July, New York City was better but not out of the Woods yet.
Q. And how long was this conversation that you had with Mr. Schram?
A. I don't recall exactly, but probably about a half hour, more or less, 45 minutes, or so.
Q. And do you recall where this conversation occurred?
A. Yes.
Q. And where was that?
A. It was at a playground at 85th Street and Central Park West.
Q. And who else was present at the playground besides you and

Mr. Schram?
A. All the kids, my kids, his kids, and Tania.
Q. Was Ms. Zarak present?
A. Yes.
Q. Did you have any conversations with Ms. Zarak about the family's plan to go to Iceland?
A. Yes, I did.
Q. And what did Ms. Zarak tell you?
A. She told me that, you know, they're going for one year to escape the COVID situation and, you know, to give -- to provide kids with, you know, better life through COVID so they can go to school and -- it was good for the kids, she was telling me. She did not like the idea of going there, she was not crazy about it, but I think because of the situation, she felt like she had to do it, for the kids. But she also told me that they would be back next year, that that was the plan, to come back in a year, you know, they would be living in New York.
Q. While the family was in Iceland, did you have any conversations with Ms. Zarak?
A. Yes.
Q. And in those conversations did Ms. Zarak tell you that she was intending to stay in Iceland?
A. No. She was telling me that they would, you know -- in July or next summer, you know, she never told me that she wants to stay forever.

MR. MIN: Your Honor, I'm sorry. I did not catch most of that last answer.

THE COURT: All right. Hold on. Hold on. Don't repeat it. Don't repeat it.

Can the court reporter read it back, please.

(Record read)

THE COURT: Thank you.

All right. Ms. Chawla, go ahead.

BY MS. CHAWLA:

Q. How would you describe the relationship between EZ and your child?

MR. MIN: Objection, your Honor. Time frame? Anything beyond --

A. They were --

THE COURT: I'm sorry. Hold on, ma'am.

Go ahead, Mr. Min.

MR. MIN: I'm sorry, your Honor. Objection, time frame, because certainly any nature of their relationship after the wrongful removal is irrelevant.

THE COURT: Ms. Chawla, you do need to limit it to --

MS. CHAWLA: I will narrow it down.

THE COURT: -- prior -- go ahead.

BY MS. CHAWLA:

Q. When, approximately, did your child and EZ meet, if you know?

A. They approximately met in kindergarten, so approximately two years, two and a half years ago. The kids knew each other first before I met Tania. The kids are friends from the playground and then from kindergarten.

Q. So from the time your children met until June 17th of 2021, how would you describe the relationship between your child and EZ?

A. Excellent. They love each other. They're very good friends.

MS. CHAWLA: Thank you, your Honor. I have no further questions for this witness.

THE COURT: All right. Thank you.

Mr. Min, are you handling cross?

MR. MIN: Yes, your Honor. If I could just have one moment to confer with co-counsel.

THE COURT: Sure.

If you could just bear with us for a moment, please, okay? Thank you.

(Pause)

CROSS EXAMINATION

BY MR. MIN:

Q. Good afternoon. How are you?

A. Good afternoon.

Q. When you were corresponding with Ms. Zarak while she was living in Iceland, I want you to explain your testimony that

she said that they would be returning in July or next summer. What did you mean by that?

A. Well, that her plan was to return in the summer, or in a year, next year. I don't remember what time.

(Reporter interrupted for clarification)

THE COURT: First of all, I don't know why, but your screen is jumping all over the place.

(Discussion off the record)

A. So I don't remember exactly what time that we talked to, there were several conversations, and every time I would ask, are you guys coming back, she would tell me yes, we are coming back. That's the plan. I was asking her, you know, how was Iceland, she was asking me how was New York, you know, stuff like that.

MR. MIN: Your Honor, if I could request -- and I do apologize, but if I could request the court reporter to read back just so I have -- I did not -- still did not hear all of that, but if the court reporter did, if I could ask to have it read back.

THE COURT: Is the court reporter able to read it back?

(Record read)

BY MR. MIN:

Q. Ms. Ratkovic, do you recall when Ms. Zarak said she was planning on coming back?

A. I don't. We had few conversations. I really don't.
Q. Okay. Was there any time Ms. Zarak gave you a specific date or a month when she was going to be returning to New York?
A. No, no, she did not. I just --
Q. Thank you. At any point did Ms. Zarak tell you that she applied to an MBA program in Iceland?
MS. CHAWLA: Objection, your Honor.
THE COURT: Overruled. You can answer. Did Ms. Zarak ever tell you that?
A. No.
Q. Did Ms. Zarak ever tell you that she and Mr. Schram had purchased a home in Iceland, a house?
MS. CHAWLA: Objection.
A. No.
THE COURT: Overruled.
Q. Did Ms. Zarak tell you that she applied for a resident permit in Iceland?
MS. CHAWLA: Objection.
THE COURT: Overruled.
A. No.
THE COURT: Are we getting an answer?
A. No. I said no.
THE COURT: Thank you. I didn't hear. Thank you.
Q. Did Ms. Zarak ever tell you that Mr. Schram had secured employment in Iceland?

MS. CHAWLA: Objection.
A. I don't recall.
THE COURT: Overruled.
Q. Ms. Ratkovic --
A. I don't know. Yeah.
Q. Ms. Ratkovic, it's true that you and Ms. Zarak did not communicate with each other until in or around May 2020, correct, over text message or telephone?
A. I don't recall. I think we did spoke via email sooner. I just don't remember.
Q. Isn't it true that your child F, who is in the same school as EZ, your child F and EZ did not have any structured playdates until July 2020? And by structured playdates, I mean a playdate that you and Ms. Zarak organized for the children.
A. Actually, they had playdates organized by me and Tania.
Q. When?
THE COURT: Before July 2020?
A. Yeah, before. I don't remember, but we had it.
Q. Before March 2020?
A. After. Not before, after March 2020.
Q. Well, isn't it true that between March 2020 and July 2020, Ms. Zarak was in Mexico, correct?
A. Yes.
Q. And your child -- was your child in Mexico during those months?

A. No.
Q. So then the first opportunity -- withdrawn.
MR. MIN: No further questions, your Honor.
THE COURT: All right. Ms. Chawla, any redirect?
MS. CHAWLA: Your Honor, just a few questions.
REDIRECT EXAMINATION
BY MS. CHAWLA:
Q. Ms. Ratkovic, could you please tell the Court what your child and EZ did during their playdates.
MR. MIN: Objection. Outside the scope of cross.
THE COURT: No, it's not.
MS. CHAWLA: No.
THE COURT: Overruled.
A. They played together. You know, they did a lot of stuff together, ice cream, snacks, running around. They're really good friends.
Q. And have you had an opportunity to observe EZ during the playdates with your son F?
A. Yes.
Q. And could you please describe to the Court what you have observed of EZ during these playdates.
A. That she was very happy, that they get along really well, you know -- I don't know. They're just two great kids. They really like each other.
Q. I'm sorry, Ms. Ratkovic. I didn't hear the last part of

what you said.
A. EZ really loves F and he loves her too, like the love only two children can have for each other.
MS. CHAWLA: Thank you very much.
I have no further questions, your Honor.
THE COURT: All right. Anything further, Mr. Min?
MR. MIN: No, your Honor.
THE COURT: All right. Thank you very much for being here and helping us this afternoon. You're excused. Thank you.
THE WITNESS: Thank you. Bye.
(Witness excused)
THE COURT: Mr. Beyda or Ms. Chawla, any further witnesses?
MS. CHAWLA: No, your Honor.
THE COURT: All right. Is there any further evidence or does the respondent rest?
MR. BEYDA: Your Honor, just one second?
THE COURT: Sure.
MR. BEYDA: There are actually a few photos, a few exhibits that were marked for identification to which there were no objections that I would move in.
THE COURT: Go ahead.
MR. BEYDA: R99.
THE COURT: All right. I'm sorry. Just let me get

your list in front of me. I had the wrong list.

MR. BEYDA: Thank you.

THE COURT: R99 will be admitted.

(Respondent's Exhibit 99 received in evidence)

MR. BEYDA: R208.

MR. MIN: Mr. Beyda, could you repeat that one more time.

MR. BEYDA: The first one was R99. The second one was R208.

THE COURT: R208?

MR. BEYDA: Yes.

THE COURT: Is admitted.

(Respondent's Exhibit 208 received in evidence)

MR. BEYDA: The third one is R97. Then we have R98.

THE COURT: Hold on. Hold on.

R97 will be admitted.

(Respondent's Exhibit 97 received in evidence)

MR. BEYDA: Then R98, and one last one after that.

THE COURT: R98 is already in, I believe. No?

MR. BEYDA: I did not have it noted. That could be my mistake.

THE COURT: No, apparently I might be mistaken, so that will be admitted then. I'm sorry.

(Respondent's Exhibit 98 received in evidence)

MR. BEYDA: The last one is R121.

THE COURT: R121. Amended photos? What does that mean?

MR. BEYDA: Let me just pull it up. We submitted an amended exhibit list at one point during the course of --

THE COURT: Oh, I see. I understand.

So that will be admitted. There is no objection to that either.

(Respondent's Exhibit 121 received in evidence)

MR. BEYDA: That is all, your Honor.

THE COURT: Anything further?

MR. BEYDA: No, your Honor.

THE COURT: Respondent rests?

MR. BEYDA: Yes, your Honor.

THE COURT: All right. That concludes the evidence then? Mr. Min?

MR. MIN: Yes, your Honor.

THE COURT: All right. So that concludes the evidentiary portion of this hearing. As we discussed last week, the parties will submit simultaneously their post-trial submissions, and I think you agreed on the 21st, correct?

MR. BEYDA: Yes, your Honor.

MR. MIN: Yes, your Honor.

THE COURT: All right. So we will look for those submissions on the 21st then.

MR. BEYDA: Should we, I think your Honor said close

of business, but we've been going a little later in the evening. I'm not sure what close of business means to the Court, and Mr. Min, I want to make sure we're on the same page.

THE COURT: Do you want to talk to each other?

MR. BEYDA: We could do that off line, your Honor. Thank you.

THE COURT: Why don't we go off the record, but I'd like you to talk to each other so we put on the record when we're going to have it, and then we'll close out the hearing.

MR. MIN: Thank you.

(Discussion off the record)

THE COURT: The parties will submit their post-trial submissions by midnight, well, 11:59 p.m., on October 21st.

Mr. Beyda, I think you told us you're then leaving on a trip, so I wish you a good trip.

MR. BEYDA: Thank you, your Honor.

THE COURT: I wish the parties well, and we will try to get you a decision as promptly as we can.

MR. MIN: Your Honor, may I inquire just regarding the exhibits.

THE COURT: Do you want this on the record?

MR. MIN: I don't need it on the record, your Honor.

THE COURT: All right. Let's go off the record.

(Discussion off the record)

o0o

INDEX OF EXAMINATION

Examination of: Page

TANIA ZARAK

Redirect By Mr. Beyda . . . . . . . . . . . . . . 6

Recross By Mr. Min . . . . . . . . . . . . . . . .61

MANDY GOLDBERG

Direct By Ms. Chawla . . . . . . . . . . . . . . .72

Cross By Mr. Min . . . . . . . . . . . . . . . . .78

MARIJA MARGETA RATKOVIC

Direct By Ms. Chawla . . . . . . . . . . . . . . .81

Cross By Mr. Min . . . . . . . . . . . . . . . . .87

Redirect By Ms. Chawla . . . . . . . . . . . . . .91

PETITIONER EXHIBITS


| Exhibit No. | Received |
|---|---|
| 3, 27, and 29 | 5 |
| 147 | 83 |
| 148J | 52 |
| 148K | 70 |


RESPONDENT EXHIBITS


| Exhibit No. | Received |
|---|---|
| 105 | 9 |
| 119 | 11 |
| 121 | 94 |
| 139 | 13 |
| 160 | 19 |
| 176 | 30 |
| 198 | 35 |
| 208 | 93 |
| 97 | 93 |
| 98 | 93 |
| 99 | 93 |