USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__11/2/2021__

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---

In the Matter of E.Z., and S.Z.

ARNALDUR SCHRAM

　　　　　　　　　　Petitioner,

　　　　　　　　　　　　-against-

TANIA ZARAK,

　　　　　　　　　　Respondent.

---

1:21-cv-06524-MKV

**DECISION AND ORDER**

MARY KAY VYSKOCIL, United States District Judge:

　　　Petitioner Arnaldur Schram, a citizen of Iceland, and Respondent Tania Zarak, a citizen of Mexico, met in the summer of 2013 in New York City.  They were married about two years later.  The couple had two children in New York.  By 2017, the expense of living in the City, the small size of their apartment, their tenuous immigration status, and the distance from their families had taken a toll and they began looking elsewhere to settle down.  Thus began a journey that saw the family relocate three times in three years as they searched for a city to put down roots and settle down permanently with their children.  The last move, instigated in part by the Covid-19 pandemic, saw the family relocate to Petitioner's home country of Iceland.  After about a year in Iceland, Respondent traveled with two of their now three children to Mexico ostensibly for a family reunion, telling Petitioner and several friends that she planned to return to Iceland after the Mexico visit.  Instead, Respondent removed the two children to New York and initiated divorce proceedings.

# BACKGROUND

Petitioner, the children's father, now petitions the Court, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980. Art. 13(b), T.I.A.S. No. 11670, 1343 U.N.T.S. 89, reprinted in 51 Fed. Reg., 10,494 (Mar. 26, 1986) ("Hague Convention"), implemented in the United States through the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001 *et seq.* (formerly codified at 42 U.S.C. §§ 11601 *et seq.*) ("ICARA"), seeking the return of his two children, E.Z. and S.Z., to Iceland. (Petition [ECF No. 1]). Petitioner alleges that the children, E.Z., now aged seven, and S.Z., now aged two, who are citizens of both the United States and Iceland, were wrongfully removed to the United States by their mother, Respondent, without Petitioner's knowledge or consent on or about July 21, 2021.

## A. The Statutory Framework

The Hague Convention was adopted in 1980 and provides that a child wrongfully removed from her country of "habitual residence" ordinarily must be returned to that country. The Convention was adopted "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention pmbl. "The Convention's drafters were particularly concerned by the practice in which a family member would remove a child to jurisdictions more favorable to his or her custody claims in order to obtain a right of custody from the authorities of the country to which the child had been taken." *Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012) (internal quotation marks and alterations omitted). "The Convention's remedy of repatriation is designed to preserve the status quo in the child's country of habitual residence and deter parents from

2

crossing international boundaries in search of a more sympathetic court." *Souratgar v. Lee*, 720 F.3d 96, 102 (2d Cir. 2013) (internal quotation marks omitted).  To that end, "[t]he Convention does not establish substantive standards for resolving the merits of any underlying custody dispute.  Rather, the Convention's focus is simply upon whether a child should be returned to her country of habitual residence for custody proceedings." *Mota*, 692 F.3d at 112 (citation omitted).  The Court notes that Petitioner has already commenced custody proceedings in Iceland. (Tr. at 416:10–14).

To prevail on a claim under the Hague Convention, a petitioner must show by a preponderance of the evidence that (1) the child was habitually resident in one State and has been removed to or retained in a different State;[1] (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention. *Gitter v. Gitter*, 396 F.3d 124, 130–31 (2d Cir. 2005).  Respondent does not contest the second two elements here, (Tr. at 1161:12–25), and so the only issue before the Court is whether the children were habitual residents of Iceland at the time Respondent removed them to New York.

**B.  <u>Procedural History</u>**

Petitioner filed this petition on August 2, 2021.  (*See* Petition).  On August 18, 2021, following an Order to Show Cause hearing, the Court set a schedule for expedited discovery,

---

[1] Under the Convention, a "State" refers to a Country except that "[i]n relation to a State which in matters of custody of children has two or more systems of law applicable in different territorial units . . . any reference to habitual residence in that State shall be construed as referring to habitual residence in a territorial unit of that State."  Hague Convention Art. 31.  As such, the relevant focus in the Court's inquiry of the children's habitual residence is New York vs. Iceland, not the United States vs. Iceland.

pre-hearing submissions, and an evidentiary hearing.  [ECF No. 12].  Both parties submitted

exhibit lists, witness lists, and pre-hearing memoranda.  [ECF Nos. 19–27, 34–35, 37, 39–43].

Over the course of eight days in October 2021, the Court conducted an evidentiary hearing.[2]

During the hearing, in addition to the parties' testimony, the Court heard testimony from a total

of five witnesses called by Petitioner, and four witnesses called by Respondent.  Petitioner's

witnesses included several friends from Iceland: Phaedon Sinis, Waleska Giraldo Thorsteinsson,

Halfdan Pedersen, Arni Bjorn Helgason; and an Icelandic Immigration lawyer, Inga Lilly

Brynjolfsdottir.  Respondent's witnesses included two friends from New York: Marija Ratkovic,

and Mandy Goldberg; the Parent Coordinator at the children's former school in New York, Rita

Yoskowitz; and an Icelandic Immigration and Asylum lawyer, Arndis Anna K. Gunnarsdottir.

The Court also considered the joint stipulation of facts and documentary evidence submitted by

the parties, which consisted of over 100 exhibits, including, *inter alia*, text messages, emails,

financial documents, and photographs.  After the evidentiary hearing concluded, in lieu of

closing arguments, the parties submitted proposed findings of fact and conclusions of law.  [ECF

Nos. 48, 49].

    The Court observed the demeanor and testimony of the witnesses and has considered

carefully the parties' submissions and arguments as well as the entire evidentiary record.  In

accordance with Federal Rule of Civil Procedure 52(a), this Order constitutes the Court's

findings of fact and conclusions of law.  The Court's factual findings are based in part on the

credibility determinations made during the hearing.  To the extent any finding of fact includes

---

[2] On consent of the parties, the evidentiary hearing was conducted on the Microsoft Teams
platform, with witnesses testifying remotely, although the Court was present in the Courtroom.

conclusions of law, it is deemed a conclusion of law, and vice versa.  For the following reasons, the petition is granted.

## I.   FINDINGS OF FACT

### A. Background

Petitioner is an Icelandic citizen who was born and raised in Iceland.  (Joint Stipulation of Facts (Jt. Stip. Facts) [ECF No. 46] ¶¶ 4, 6).  He attended university in the United States in 1999 and came to New York in 2007, (Tr. at 422:1–423:1), where he later attended Columbia University from 2009 to 2010, (Tr. at 427:2–5).  Respondent is a Mexican citizen who was born and raised in Mexico.  (Jt. Stip. Facts ¶¶ 1, 3).  She first came to New York in the 1990s and attended a year of high school in Manhattan.  (Tr. at 741:1–8).  She also attended college and graduate school in New York.  (Tr. at 423:25–424:7).  Prior to meeting Petitioner, Respondent worked in a film company owned by Robert De Niro in Tribeca and also ran a film division, Argo, in Mexico City.  (Tr. at 122:5–10).  Neither party is a United States citizen.  (Tr. 99:14–15, 807:12–17).

The parties met in the summer of 2013 when both were residing in New York.  (Jt. Stip Facts ¶ 7).  They married about two years later in a civil ceremony on April 9, 2015, (Jt. Stip Facts ¶¶ 8–9), followed by a religious wedding ceremony in Iceland on September 19, 2015, (Jt. Stip Facts ¶ 10).  After the parties were married, they continued to reside in New York.  (Tr. at 99:16–18).

The parties are the parents of three children: E.Z., born in 2014 in New York; R.Z., born in 2016 in New York; and S.Z., born in 2019 in California.  (Jt. Stip. Facts ¶ 11, Tr. at 429:3–19).  The children are all dual American and Icelandic citizens.  (Jt. Stip. Facts ¶ 12).

Throughout their marriage, the couple was fairly transient, frequently relocating their home and their children.  During the six years before the Petition was filed in this matter, the couple moved five times and lived for extended periods of time in four different cities.  E.Z., born in 2014, lived for about four years in three different residences in New York where she was born, in Los Angeles for a year, then another eight months in New York, in Mexico for four months, and lastly, Iceland for about a year, until removed to New York by Respondent in July 2021.  S.Z., born in 2019, lived for two months in Los Angeles where he was born, eight months in New York, four months in Mexico, and about a year in Iceland until he was likewise removed to New York by Respondent in July 2021.

## B. The Couple's Early Life In New York

In about early 2014, before the couple was married, Petitioner moved in with Respondent at 11 West 81st St., Penthouse C, which was an alcove studio apartment owned by Respondent. (Tr. at 103:10–14, 170:19–171:7, 428:7–20, 742:17–21, 743:1–3, 172:11–14).  Shortly after they married, in December 2015, the parties moved to Brooklyn where they resided for four months in a rental apartment.  (Tr. at 171:3–16, 742:22–25).  However, because of Petitioner's commute from Brooklyn, Respondent's unhappiness with the home and neighborhood, and the expense of the apartment, in April 2016, the parties moved back to 11 West 81st St., this time living in Apartment 6A.  (Tr. at 101:18–21, 146:19–21, 171:3–16, 742:22–25; 743:15–22).  Respondent co-owned equal shares of Apartment 6A with her two sisters, which she had received from her mother, and did not have sole authority to sell it.  (Tr. at 743:7–14, 963:25–964:7).  The family did not pay rent for Apartment 6A, but paid maintenance expenses in the amount of around $3,200-$3,600 per month, (Tr. at 111:25–112:6, 751:1–5), and utilities for an additional $400 a month (Tr. at 751:1–5).

6

Apartment 6A is a one bed, two bath apartment with a large living room, an adjacent TV room, and a mezzanine loft space in the TV room, (Tr. at 101:22–102:2; Ex. P.86), though the apartment was a two-bedroom "according to the floor plans," (Tr. at 749:20–750:4, 1167:10–1168:14; Ex. R.105).  Petitioner felt that the apartment was small, especially since the family also had a live-in nanny.  (Tr. at 102:9–13, 750:5–25).  Respondent and Petitioner did not even have their own room, but instead had to sleep in a loft space in the children's room.  (Tr. at 750:5–25, 1167:20–1168:1).

While residing in New York, the children, who were born in 2014 and 2016 (Jt. Stip. Facts ¶ 11), had active lives, playing in parks, visiting the library and museums, socializing with other families, and doing other child friendly activities, (Tr. at 430:18–431:12, 752:10–743:7, 754:1–760:3, 779:5–19).  They regularly interacted with Petitioner's cousin who also resided in New York.  (Tr. at 746:1–5).  In addition, they interacted with Respondent's immediate family two to three times a year, (Tr. at 381:9–11), when her family members would visit New York or the parties would travel with the children to Mexico or Miami, (Tr. at 101:9–11, 744:18–745:17).

Petitioner is an architect and worked as a contractor for a firm called Workshop APD where he was paid a monthly salary like an employee.  (Tr. at 102:21–22, 103:23–104:10, 104:19–21).  In addition to his contract work with Workshop APD, Petitioner rented his own office space in New York to work independently.  (Tr. at 126:12–14).  He also had employment working on various projects in Iceland as well as prospects for additional work in Iceland, (Tr. at 104:22–105:5), primarily from a company called THG Architects for which Petitioner used to work when he lived in Iceland.  (Tr. at 105:11–15).

During this time, Respondent was not employed outside the home.  (Tr. at 102:23–24, 103:2–7, 831:6–12).  Respondent received income of about $5,000 a month from her mother,

which she described as "part of an estate" and income from renting out Penthouse C.  (Tr. at 103:8–13, 103:19–22, 966:16–25, 967:2–4).

### 1.   By 2017 The Family Began Looking To Leave New York

By 2017, Petitioner and Respondent each were frustrated with their lives in New York. Petitioner "didn't feel like [they] had roots there," was frustrated with the expenses, his lack of immediate family nearby, and he felt that the apartment was too small.  (Tr. at 100:19–25, 101:14–17, 102:14–20).  His continued presence in the United States was also contingent on the annual renewal of a visa.  (Tr. at 106:7).  He and Respondent began discussing the possibility of relocating outside of New York.  (Tr. at 99:19–15, 100:4–8, 106:10–13, 1031:24–1032:2). Around 2017, Respondent expressed to Petitioner that she also had some issues with New York, including that she was anxious, despondent, and frustrated about job opportunities in New York, and annoyed that the apartment was too small.   (*See* Tr. at 107:2–10).  At the same time Respondent expressed to Petitioner that she felt far from her family.  (*See* Tr. at 107:2–10). Respondent also told Petitioner separately in late 2017 to early 2018 that she did not like living in New York anymore, that she was anxious to go somewhere else closer to family, and that she possibly wanted to relocate out of New York.  (Tr. at 121:9–15).  In 2017, Respondent began trying to sell Penthouse C, the only property in New York in which she had full sole ownership. (Tr. at 748:17–23).

This conversation about where to make their home intensified from 2017 into 2018.  The couple frequently discussed various potential options for relocating their family, including to Mexico (Respondent's home country), (Tr. at 112:21–113:5, 113:9–12, 1069:7–1070:5), to Iceland (Petitioner's home country), (Tr. at 113:13–22, 129:17–23, 130:2–5; Ex. P.167), to Miami (where Respondent's sister resided), and to Cuba (where Respondent considered

8

studying), (Tr. at 113:23–114:6, 114:7–15).  The couple discussed relocating to Mexico because

the living arrangements were more affordable and Respondent had a job network there, but they

were concerned about their physical safety, earthquakes, and pollution.  (Tr. at 112:21–113:5,

113:9–12, 1069:7–1070:5).  The couple discussed relocating to Iceland in February 2018 because

it would provide job security for Petitioner, free healthcare and education, more affordable

housing options, and proximity to Petitioner's family.  (Tr. at 113:13–22).  Respondent had

expressed reservations about going to Iceland prior to 2018, (Tr. at 130:2–4), but by March 2018,

expressed interest in moving there.  (Ex. P.167).  Petitioner texted Respondent that he was

surprised and encouraged by her interest.  (Tr. at 129:17–23, 130:2–5; Ex. P.167).  Around the

same time, the parties also discussed relocating to Miami or Cuba at times.  (Tr. at 112:7–11).

Respondent expressed to Petitioner interest in relocating to Miami because her sister lived there,

but Petitioner was not interested in this idea because of the logistical problems of finding work

and housing in Miami.  (Tr. at 113:23–114:6).  Respondent had also expressed to Petitioner an

interest in relocating the family to Cuba because there was a film school that she was interested

in attending there.  (Tr. at 114:7–15).  However, Petitioner described relocating to Cuba as

merely a "fun idea" that the couple talked about, and they never took any concrete steps to move

to there.  (Tr. at 114:7–15).

     The Court does not find credible Respondent's attempt to minimize this ongoing dialogue

by testifying that these conversations were fleeting and nothing serious.  (Tr. at 747:3–24).

Indeed, at other times in her testimony, Respondent conceded that "it's possible" that the couple

were discussing moving out of the United States in late 2017.  (Tr. at 1031:24–1032:2).  She

further testified that in late 2017 she had been interested in moving to Mexico because the family

did not have enough income to stay in New York and she had professional connections that

would aid both her and Petitioner's careers there.  (Tr. at 1069:7–1070:5; Ex. P.148A).  In February 2018, Respondent texted Petitioner about leaving New York for a year to relocate to Mexico and then making a long-term decision.  (Tr. at 110:9–19; Ex. P.166).  Moreover, Respondent first began trying to sell Penthouse C, the only apartment in the city that she exclusively owned, in around 2017.  (Tr. at 748:17–23).  At this time, she texted Petitioner that she felt "stuck" and was concerned that Penthouse C would not sell.  (Ex. P.166).

During this time, Petitioner actively pursued job opportunities in Iceland to cultivate his relationship with Iceland and possibly create a path to moving there.  (Tr. at 105:16–106:3). Between 2017 and 2018, Petitioner had conversations with THG Architects in Iceland about an opportunity for a partnership at the firm.  (Tr. at 114:16–23, 115:13–23).  Respondent also explored job opportunities outside of New York and even went to Miami in early 2018 to explore a potential job there.  (Tr. at 123:2–13).  While this trip did not immediately result in a job, in May 2018, Respondent received an offer for a job in Los Angeles with Netflix.  (Tr. at 124:5–14, 126:4–7).  She was excited about these job opportunities, (*See* Tr. 124:2–4), all of which were non-New York based.

In or around May 2018, Respondent accepted the job at Netflix and the family relocated to Los Angeles for Respondent to pursue what she described as a "once-in-a-lifetime job opportunity."  (Tr. at 124:11–14, 126:4–7, 778:5–13, 988:24–989:3, 986:16–23).  Respondent testified that the move was motivated by the fact that the family did not have enough income to support itself in New York.  (Tr. at 986:16–23).

## C.  California Residence

### 1.  The Family's Life In Los Angeles

10

The family moved to Los Angeles on June 30, 2018.  (Tr. at 130:8–13).  Petitioner

testified that he thought the move would be permanent because the family packed up all their

belongings, registered the children in school in Los Angeles, leased a car for three years, and

fundamentally relocated to Los Angeles.  (Tr. at 130:20–131:4, 149:12–15).  Petitioner told his

friends that the couple had no plans of returning to New York.  (Tr. at 130:17–19).  Petitioner

also closed his New York office, opened an office in Los Angeles for his own firm, (Tr. at

131:22–4), and cut his ties with his long-term business relationships in New York, starting fresh

in Los Angeles, (Tr. at 132:5–133:5).

Respondent contends that they did not consider the move to be permanent, (Tr. at 985:2–

8), but the Court does not credit this assertion.  Respondent herself testified that when they

moved to Los Angeles, they shipped almost all their personal belongings to Los Angeles and left

behind only a small amount of furniture, (Tr. 835:22–836:4), much of which they did not own,

(Tr. at 134:24–135:5).  The Court also finds it implausible that Respondent would accept a

"once-in-a-lifetime job opportunity" in Los Angeles, (Tr. at 778:5–13, 988:24–989:3), and

relocate her entire family, (Tr. at 134:2–13), if the intent was to move back to New York.

Moreover, while she was in California, the family stopped paying maintenance fees for

Apartment 6A in New York (Tr. at 962:10–11) and Respondent declared herself a nonresident of

New York on her federal tax returns.  (Tr. at 978:12–15).

While in Los Angeles, the family lived resided in a rental house (Jt. Stip. Facts ¶ 14) that

they leased for one year, (Tr. at 133:17–21).  The family registered the children for school in Los

Angeles.  (Tr. at 131:1–4, 133:14–16, 834:20–21).

Petitioner continued to work from Los Angeles, both on his own project and with

Workshop APD on another ongoing project.  (Tr. at 131:5–19).  Petitioner often had to travel

between Los Angeles and New York for both projects.  (Tr. at 131:10–12, 131:16–19, 133:10–13, 835:6–13).  Respondent maintained her extended family's apartment in New York City during this time so that Petitioner could stay there when he went to New York for work.  (Tr. at 149:16–437:2, 834:25–835:13).

Respondent was fired from her job at Netflix in December 2018.  (Tr. at 20–23).  Petitioner told Respondent that he had a job opportunity from Workshop APD to open an office in Los Angeles, but that it would be a three-year commitment.  (Tr. at 151:6–22, 151:23–152:3).  Respondent was supportive of staying longer in Los Angeles, (Tr. at 152:4–6), but, ultimately Petitioner did not accept the Los Angeles job offer because he did not want to continue to live long-term in Los Angeles for the same reasons that he had been frustrated with New York, (Tr. at 152:7–19).

### 2.  The Family Discusses Where To Live After California

When Respondent was fired from Netflix, the couple again discussed options for where to move, including Mexico, Iceland, Miami, and New York.  (Tr. at 152:20–153:4).  At the time, the couple ruled out Mexico because of a recent earthquake.  (Tr. at 166:18–23).  Petitioner prepared a comparison of the costs of living in Los Angeles against the costs of living in Iceland.  (Ex. P.128).  Respondent texted Petitioner in December 2018 that if he got a job in Iceland, she would possibly consider moving there.  (Ex. P.148, at Bates No. 12000).  However, the couple could not agree at that time on moving either to Mexico or Iceland, leaving New York as the only option then on the table.  (Tr. at 166:16–167:2).

The parties discussed renovating Penthouse C in New York and moving back to that apartment.  (Tr. at 172:1–6).  They considered building out the apartment and adding a second story on top of the penthouse apartment.  (Tr. at 172:7–22, 1078:25–1079:7; Ex. R.101).  The

couple explored these options so that Penthouse C would be big enough for them to live in comfortably.  (Tr. 172:7–10).  Respondent sent an email to the building's board on March 19, 2019, in which she stated that the couple wanted to renovate Penthouse C so that they could simplify their lives, all fit and live in the apartment, and settle down.  (Ex. R.101).  However, the board did not approve the proposed renovations.  (Tr. at 174:18–23).

While the couple was still residing in Los Angeles, the couple's youngest child, S.Z. was born in May of 2019.  (Tr. at 176:1–5).

### D.  The Couple's Life In New York In Late 2019 And Early 2020

On July 31, 2019, now with a third child, the family moved to New York and into Apartment 6A (the coop Respondent co-owned with her sisters), the same apartment they previously felt was too small when they had only two children.  (Tr. at 150:24–151:5, 175:1–3; Jt. Stip. Facts ¶ 15).  They paid up the remainder of the lease on their car in Los Angeles and sold the car to a dealership.  (Tr. at 177:22–25).  Petitioner closed his Los Angeles office and reopened his office in New York.  (Tr. 178:18–25).

The family could not fit all the furniture from Los Angeles into Apartment 6A, so they put some of the furniture and other belongings into Petitioner's New York office space.  (Tr. at 178:1–13).  The sleeping arrangements in Apartment 6A were even tighter now with a third child.  The nanny slept in the bedroom on a pullout sofa, the three children slept on a bed in the television room with Respondent, and Petitioner slept in the loft space.  (Tr. at 176:11–17).

Petitioner continued to work on the existing project with Workshop APD and the project from Iceland.  (Tr. at 178:13–17).  However, he had difficulty with his job because there was little to do for both projects at that time.  (Tr. at 179:4–14).  After leaving Netflix, Respondent was no longer discussing film industry opportunities, but was instead interested in becoming a

post-partum doula.  She also explored developing a product line: a healing cream for women who had had cesarean operations.  (Tr. at 179:18–180:1).

By this time, there were difficulties with the couple's marriage.  Respondent specifically felt that part of these problems stemmed from Petitioner's professional instability and the tremendous amount of work for her in raising their three children.  (Tr. at 832:14–833:5).

The children adjusted well to New York during this time period.  E.Z., who was about five years old in 2019, began attending school at P.S. 9, (Tr. at 448:3–19, 773:16–21), and had an active social life.  She enjoyed playdates with other children, attending activities at the school, and participating in activities such as swimming, gymnastics, karate, going to the library, and going to museums.  (Tr. at 455:9–456:7, 469:22–470:19, 475:9–476:5, 477:3–10, 491:8–504:23, 506:10–525:15, 526:13–529:4, 530:5–531:20, 752:10–743:7, 754:1–760:3, 779:5–19, 783:16–784:1, 784:8–785:1, 785:16–786:3; Exs. R.37, R.41, R.94, R.95).  The family also had friends in New York with children the same ages as their children with whom they would arrange playdates.  (Tr. at 460:20–461:10, 463:4–465:9, 771:5–14).  E.Z. became particularly close with the child of Marija Ratkovic who was called as a hearing witness by Respondent.  (Tr. at 1245:1–9).

Both parents enjoyed aspects of living in New York.  Petitioner testified that he liked the schools, Central Park, walking around Manhattan, and spending time with his children.  (Tr. at 454:1–6, 457:17–23, 459:23–460:7, 460:20–461:10, 463:4–19; Ex. R.75).  Respondent testified that she liked the feeling of New York City and all it had to offer.  (Tr. at 1178:6–19; Ex. R.160).

### 1.  New York Still Was Not A Long-Term Option

After moving to New York in 2019, Petitioner still did not consider New York to be a viable long-term option for settling down, (Tr. at 175:13–25), and the couple continued to

discuss moving out of New York, (Tr. at 180:2–5, 186:8–17).  In one exchange, Petitioner texted Respondent that they should move to Mexico.  (Tr. at 181:2–8; Ex. R.10).  Respondent agreed that during the marriage, the couple discussed the possibility of moving with the children to Mexico.  (Tr. at 1065:12–15).  In a later text message in February 2020, Respondent texted Petitioner that life was "particularly" hard in New York.  (Ex. P.148A).

Throughout this time in New York, the couple also continued to consider Iceland as a potential place to make their home.  Respondent texted Petitioner in February and March 2020 about purchasing a home in Iceland that was owned by Bjork, an Icelandic pop star.  (Tr. at 885:6–24, 1213:15–22; Exs. R.140, R.148J).  On March 4, 2020, in response to a text from Petitioner in which he expressed his ongoing frustrations with New York, Respondent texted to ask if Petitioner thought they could all live in the Bjork house in Iceland.  (Tr. at 1220:22–1221:12; Ex. P.148B).  Even if these conversations were not meant to be completely serious, as Respondent now seems to contend, (Tr. at. 1220:22–1221:12 (referring to a wink emoji in the text message)), the Court nonetheless finds it significant that in early 2020 — even before New York schools shut down because of the Covid pandemic — the parties were researching the Icelandic real estate market.

In March 2020, Petitioner first learned about the spread of Covid-19.  (Tr. at 534:24–535:6).  The parties received information during the week of March 1, 2020 that the children's schools would close due to Covid.  (Tr. at 535:11–16, 842:1–14).  Upon learning that the schools were closing, the couple immediately purchased plane tickets to leave New York and go to Mexico.  (Tr. at 182:14–18, 535:21–536:4, 536:20–537:5, 842:15–843:9; Ex. R.153).  Prior to that weekend, the couple had not made any confirmed plans to leave New York.  (Tr. at 536:11–

15

19, 538:6–9).  At the time the couple purchased tickets to go to Mexico in March 2020, they did

not discuss going to Iceland.  (Tr. at 188:3–5, 542:3–14, 844:12–14).

    While the Covid pandemic and the closing of New York's schools precipitated the

couple's immediate departure from New York, the record evidence makes clear that Covid was

not the only reason the family left New York in March 2020.  The record is clear that the couple

could not afford to live in New York City.  (*See*, *e.g.*, Tr. at 100:19–25, 101:14–17, 102:14–20,

986:16–23, 1069:7–1070:5; Ex. P.148A).  Moreover, on March 12, 2020, Petitioner learned that

his O-1 Visa was not being renewed.  (Tr. at 185:7–9).  As such, the family needed to leave New

York relatively quickly so that the couple could renew Petitioner's visa at a consular office

abroad.  (Tr. at 182:19–183:3, 536:5–10, 544:19–25, 809:1–17; Exs. P.57, R.70).

    On the same day Petitioner's visa renewal was denied, Petitioner texted with Respondent

about his frustrations with his visa issues and living in New York, telling her that he felt that they

had "been banging [their] head against the wall for a while now," that they were also "going

crazy over lack of money," and that they had two great options on the table in Mexico and

Iceland.  (Tr. at 186:1–14; Ex. R.153).  Respondent answered that "the real reason is because we

love New York and New York suddenly got hard, too hard, perhaps, for us . . . Maybe even

impossible . . . That's been hard for me to accept."  (Ex. R.153).  Petitioner reasonably

understood this text to mean that the parties could not live in New York.  (Tr. at 187:2–8).  Later

that day, Petitioner texted Respondent that he hoped that the pandemic would be a blessing in

disguise because it would get them to act on their ongoing and continuous issues with living in

New York.  (Tr. at 187:12–22; Ex. R.119).

**E.  The Family's Time In Mexico In 2020**

On March 16, 2020, the family traveled to Mexico.  (Tr. at 189:3–5).  The couple expected their stay in Mexico to be of a short duration.  (Tr. at 189:9–12).  Indeed, the family packed only a single suitcase each.  (Tr. at 189:6–8, 845:22–846:3).  And, while the family was in Mexico in spring 2020, Respondent continued to list herself as a resident of New York for tax purposes.  (Tr. at 977:25–978:3; Ex. P.49, at Bates No. 24684).

However, while in Mexico, Respondent received a job offer there, which she considered but ultimately rejected.  (Tr. at 1073:6–1074:1).  On June 2, 2020, she messaged a friend "I have two job conversations (can't really call them offers yet) going on but both would be in Mexico." (Ex. R.84).  The couple also looked at potential homes while in Mexico.  (Tr. at 1065:16–19).

While the family was staying in Mexico, E.Z. completed kindergarten at P.S. 9 via Zoom and R.Z. completed nursery school at Broadway Presbyterian Church Nursery School via Zoom. (Jt. Stip. Facts ¶ 16).  However, the couple did not like that the children had to attend school remotely because it was hard for the children to focus.  (Tr. at 563:1–8, 848:3–849:24, 856:10– 857:17; *see* Ex. R.154).  The couple was concerned about another year of remote schooling.  (Tr. at 563:9–13, 569:22–570:4, 849:25–850:12).

While in Mexico, the couple continued to try to resolve Petitioner's immigration issue. Petitioner and Respondent were in contact with a friend and a partner at Workshop APD, Tom Zoli, about hiring Petitioner to work there and sponsoring him for a visa, which would have enabled the couple to return to the United States after being in Mexico for a few months.  (Tr. at 546:18–548:16, 810:9–24; Ex. R.70).  In March 2020, Mr. Zoli agreed to hire Petitioner and to sponsor him for a visa.  (Ex. R.68).  The job offer from Workshop APD allowed Petitioner to apply for an H-1B visa.  (Ex. R.68).  On March 19, 2020, Petitioner submitted an application for

an H-1B visa, which would have allowed Petitioner to return to the United States in October to work.  (Tr. at 548:17–549:17; Ex. R.68).

While in Mexico, the couple's marital problems worsened and their relationship further deteriorated.  (Tr. at 832:14–833:5).  While the emergency of the Covid pandemic initially brought the couple closer together, Respondent testified that the relationship became a "roller-coaster" while in Mexico.  (Tr. at 832:14–833:5).  At the time, Petitioner told a close friend of the family, Halfdan Pedersen, an Icelander who testified at the hearing, that he and Respondent were having marital issues.  (Tr. at 37:16–19, 38:1–5).

In about April 2020, Petitioner and Respondent began discussing leaving Mexico when it became clear that the pandemic would continue and Covid cases in Mexico began to rise.  (Tr. at 190:21–191:1, 854:9–16).  The parties discussed either staying in Mexico or moving to Iceland.  (Tr. at 191:2–21, 1095:11–13).  This conversation was very fluid due to the Covid pandemic and the focus changed multiple times.  Initially, the parties discussed plans to go to Iceland for a trip during the summer of 2020.  (Tr. at 555:18–20, 794:11–15, 1095:21–24).  Eventually, the parties' plans began to lean toward a more long-term relocation to Iceland.  On May 31, 2021, Petitioner sent Respondent an analysis comparing the costs of living in New York and Iceland.  (Ex. P.122).  On June 26, 2020, Respondent re-sent Petitioner a text message (which she previously had sent to him in December 2018 while they were still in Los Angeles (Tr. 200:9–19)) stating that if he got "this Icelandic job," that she thought they could possibly discuss moving to Iceland that summer.  (Ex. P.148, at Bates No. 12000).  The parties ultimately decided in May or June of 2020 to relocate to Iceland.  (Tr. at 205:6–8, 616:13–15).  By July 2020, Petitioner decided not to pursue the application for the H-1B visa.  (Tr. at 551:22–25; Ex. P.134).

**F.  The Family Moves To Iceland**

18

### 1.  The Couple Plans Their Relocation To Iceland

In the summer of 2020, the couple moved their family to Iceland.  The relocation to Iceland was not spontaneous, but well planned out.  While in Mexico, Petitioner reached out to THG Architects in Iceland and was offered a job.  (Tr. at 203:16–23; Ex. P.148C).  While they were still in Mexico, the parties investigated schooling options for the children in Iceland, (Tr. at 205:9–206:12), and in May 2020, the family reached out to schools in Iceland, (Tr. at 583:22–585:2).  Petitioner filled out the enrollment for E.Z. to attend school in Iceland and she was admitted after a short waitlist period.  (Tr. at 589:15–590:5).  Before their move, the couple also explored housing in Iceland.  (Tr. at 205:9–206:12).  On July 19, 2020, Respondent asked how much money Petitioner would be earning in Iceland in order "[t]o see what kinds of properties [she] should be looking at . . . ."  (Tr. at 1101:5–15; Ex. P.148D).

### 2.  The Couple's Intent In Relocating To Iceland

The reason why the family decided to move to Iceland is hotly contested and goes to the crux of a critical issue in this case: what the shared intent of the parties was when they relocated to Iceland in the summer of 2020.  The parties agree that the move was instigated, at least in part, by the fact that schools were open in Iceland.  (Tr. at 583:8–13, 588:24–589:12, 850:8–17).  Petitioner also contends he and Respondent moved to Iceland for job opportunities, stability, for a larger home, economic concerns, and due to the couple's overall problems with life in New York.  (Tr. at 203:9–15, 211:6–25; Ex. P.112).  As noted, before moving, Petitioner secured a job offer with THG Architects in Iceland.  (Tr. at 203:16–22, 206:13–21).  By contrast, Respondent contends that they moved to Iceland strictly so that the children could attend school in person while New York schools were closed.  (Tr. at 850:13–17, 857:14–858:9, 861:11–20, 867:12–868:6).  The Court finds Respondent's contention to be less than fully candid.  By the time the

19

family relocated to Iceland, Respondent was also concerned about the cost of living in New

York, which was part of the reason the family previously had moved to Los Angeles.  (Tr. at

124:11–14, 126:4–7, 986:16–23).  On cross-examination, Respondent conceded that one of the

reasons the family moved to Iceland is because Petitioner had job opportunities there.  (Tr. at

1099:10–25, 1115:11–15; P.148D).  In addition, it was attractive to the couple that health care

and education were free for Icelandic residents.  (*See* Tr. at 113:13–22).  As such, the Court finds

that the family moved to Iceland both because of schools remaining open there and because, in

light of Petitioner's job opportunity there, coupled with the costs of living, the couple could

better afford to live in Iceland than in New York City.  Moreover, the couple's immigration

status in the United States remained unsettled.  (*See* Tr. at 826:1–6; Exs. R.147, R.165).

The parties now also hotly contest their agreement as to how long the parties would

remain in Iceland.  It is extremely compelling to the Court in assessing credibility that Petitioner

candidly does not contend that the parties agreed to relocate to Iceland *permanently*.  Instead, he

credibly maintains merely that they agreed to relocate to Iceland for an indeterminate period of

time.  He testified that the couple agreed that they would move to Iceland for a few years and see

how it goes.  (Tr. at 212:5–12, 224:10–22, 617:4–11).  Petitioner testified that he did not discuss

with Respondent definitively where the family might move if they ultimately decided to leave

Iceland, but he concedes that they did not take Mexico and the United States off the table as

future options.  (Tr. at 212:13–25, 213:7–20, 855:1–25).  Indeed, Petitioner's consistent

contention that he and Respondent never agreed to *permanently* relocate to Iceland, despite the

obvious benefit such testimony would have to his case, lends significant credibility to

Petitioner's testimony in general.  Moreover, his testimony is supported by a text message he

sent to a friend around July 2020 in which he stated that the family was preparing to

"potentially" permanently move to Iceland and that they were going to take Iceland "one year at a time but things need to get substantially better in the [United States]" for him to want to go back.  (Ex. P.112).

Respondent contends that their mutual agreement was that they only moved to Iceland for the duration of the Covid pandemic and would return to New York after it was over.  (Tr. at 850:13–17, 857:14–858:9, 861:11–20, 867:12–868:6).  Respondent presents text messages in which she indicated to friends and school personnel in New York that the family was leaving either temporarily, (Exs. R.123, R.202, R.201, R.203), for the school year, (Tr. at 879:8–15; Exs. R.65, R.204, R.152), or in some messages, two years, (Tr. at 1030:5–15; Exs. R.90, R.152, P.39).  Respondent's witnesses further testified that Respondent had communicated to them an intent to return to New York once Covid had subsided.  (Tr. at 935:12–936:4, 1235:2–25, 1242:6–15, 1243:5–17).  Yet, at the same time, there were many instances where Respondent's communications reflected that she was not committed to returning to New York after moving to Iceland.  For example, in one communication, Respondent told a friend that the couple's idea was to finish the school year in Iceland and then decide if they go back to New York, though that depended on when the couple get their green cards.  (Ex. R.82).  There were other communications in which Respondent indicated that should the family decide not to stay permanently in Iceland, that they would perhaps then relocate to Mexico.  (*See* Ex. R.83).  By way of example, in a voice message on July 26, 2020, she indicated to a friend that the couple's plan was to go to Iceland and then regroup in December to decide whether they would remain in Iceland for the school year, go to New York, or go to Mexico.  (Ex. R.77).  Respondent even testified on cross examination that the couple's return was dependent on receiving green cards "amongst other things."  (Tr. at 1082:18–21).  In another text message, Respondent indicated to a

21

friend that the couple were "trying [Iceland] out for a year," (Ex. R.171), which, in light of all the evidence, the Court finds to mean that the couple agreed to settle down in Iceland for an indefinite period of time, thereby making it their habitual residence, although they left open the possibility that after a year or two, they would decide whether it was a suitable place to remain *permanently*.

Though the parties' testimony diverges on this point, the Court, after considering both sides' evidence regarding their intent to relocate to Iceland, credits the testimony of Petitioner. Considering the totality of the record, the testimony of all the witnesses, and the contemporaneous documentary record, the Court credits Petitioner's contention that the parties shared an intent in the summer of 2020 to leave New York and to relocate to Iceland for an indefinite period of time. Their shared intent was to re-evaluate Iceland after about a year or two, and decide if they wanted to remain there, move back to New York, or move to Mexico. The Court observed Petitioner's demeanor and testimony. His answers throughout the proceeding were matter of fact, objective, and forthright. In contrast, the Court finds Respondent's version of events uncompelling. Respondent's demeanor during the evidentiary hearing was more that of an advocate rather than an objective fact witness. She continuously volunteered information when there was no question pending, (*see*, *e.g.*, Tr. at 778:16–22, 952:9–15, 1008:8–12, 1014:20–1015:1, 1031:14–23), she was at times argumentative, (*see*, *e.g.*, Tr. at 965:1–13, 998:2–7, 1018:5–11, 1030:3–15), and there were numerous instances in which the Court felt the need to admonish her for being unresponsive, (*see*, *e.g.*, Tr. at 989:8–14, 990:1–6, 998:2–10, 1004:19–1005:9, 1142:9–21, 1150:11–17, 1220:22–1221:12, 1224:13–25). Of significance, the Court repeatedly refused to strike testimony given that this was a bench trial. (Tr. at 12:4–6, 225:17–20, 392:11–13, 605:2–3, 704:22–23, 810:25–811:5). Yet, at times,

Respondent's testimony was so unresponsive that the Court felt compelled to strike her testimony.  (Tr. at 1016:1–7, 1095:18–1096:6).  The Court observed that Respondent answered freely and expansively on direct, but became non-responsive and combative on cross.

The Court also finds it significant that Respondent has a history of being less than truthful with both United States and Icelandic immigration authorities.  For example, a few days after Petitioner was notified that his visa had been denied, Respondent asked a friend and colleague of hers to fabricate a job offer letter in support of her O-1 visa.  (*See* Tr. at 994:7–9; Ex. P.57).  In her email, Respondent informed her friend that she "need[ed] a 'job offer' letter" to support her O-1 visa application, that the letter should say that Respondent would be working as a producer for her friend "on such and such project for X period of time," and that Respondent, through her own film company, "ha[d] done this for friends many times through the years and [Respondent] obviously never had any obligations or responsibilities of any sort with any of them."  (Ex. P.57).  In this email, Respondent also assured her friend that "you would have nothing to worry about."  (Ex. P.57).  In a follow-up email Respondent sent the next day, Respondent further told her friend that Respondent could help her friend write the letter and Respondent encouraged her friend to "be a little creative" with the letter.  (Ex. P.57).  The Court does not find credible Respondent's testimony that Respondent was asking her friend for a real job offer with respect to what she herself characterized as "the job offer" letter she was requesting from her friend to support her O-1 visa application.  (*See* Tr. at 995:12–996:2).  In fact, Respondent conceded that since March 2020, Respondent never earned income from this "job."  (Tr. at 1000:15–17).

As another example of Respondent's history of being less than candid regarding immigration matters, while the family resided in Iceland, Respondent sent misleading

23

information to Icelandic immigration officials to secure entry into Iceland for the family's nanny. Specifically, Respondent sent three letters to Icelandic immigration authorities in which she claimed that the nanny was integral to ongoing film projects that Respondent had in Iceland and Mexico. (Ex. P.5 (September 2020 letter), P.104 (January 2021 letter), P.106 (March 2021 letter). However, there were no such projects. In fact, Respondent admitted she "partially [] lie[d]" in these letters. (Tr. at 1023:1–20). Respondent's history of being less than truthful on United States and Iceland immigration documents reinforces the inescapable view the Court came to that Respondent is willing to stretch the truth to get what she wants. The Court finds she has done so with respect to critical issues here.

### 3. The Couple Travels To New York To Pack Their Belongings

Before they left Mexico, the parties decided to obtain an O-1 visa for Respondent and an O-3 visa for Petitioner, for the purpose of traveling to New York in July 2020 to pack their belongings before moving to Iceland. (Tr. 219:12–220:2; Tr. 552:16–21). The family left Mexico in July 2020, (Tr. at 189:23–24, 854:9–16), and returned to New York for three weeks to pack for their move to Iceland, (Tr. at 225:5–8).

The family packed up a significant amount of their personal belongings and all Petitioner's belongings from his New York Office before closing it. (Tr. at 226:20–227:4, 225:9–16, 864:1–9, Exs. P.115, R.104). In all, the family shipped 72 boxes of belongings for the move to Iceland. (Tr. at 226:20–227:4, Ex. P.115). The family packed bicycles, helmets, their books and children's books, toys, winter and spring clothing, artifacts, plates, glass and silverware, household appliances, kitchenware, and artwork. (Tr. at 227:1–4, 231:5–8). The family did, however, leave behind some personal belongings, including a sonogram picture of

24

S.Z., and furniture and artwork that belonged to Respondent's mother.  (Tr. at 227:5–228:2, 629:22–21, 630:14–21, 636:20–637:4, 638:4–639:5, 229:16–24).  The couple did not remove everything from the New York apartment that Respondent co-owned with her sisters because the couple hoped they would return for Christmas and grab anything they had left behind before returning to Iceland.  (Tr. at 630:22–631:2).  Respondent contends that the family only brought a small number of items to Iceland and that the family packed only 20 small boxes.  (Tr. at 836:11–21, 868:18–869:3, 869:24–870:10, Ex. R.159).  She contends that almost all the children's property remained in New York and 90 percent of her personal property remained. (Tr. at 871:4–872:23).  However, Respondent admits that Petitioner is the one who packed the boxes for the move.  (Tr. at 870:11–25).  The Court also finds it implausible that the family returned to New York from Mexico in the summer of 2020 for *three weeks* en route to Iceland to pack only twenty small boxes.  (Tr. at 225:5–8).  Moreover, Petitioner's inventory of what he packed to ship from New York to Iceland confirms that the family shipped a significant volume of belongings to Iceland.  (Ex. P.115).

### 4.  The Couple Establishes A Home In Iceland

The family arrived in Iceland on August 1, 2020.  (Jt. Stip. Facts ¶ 18).  E.Z. had already been an Icelandic citizen from 2015, shortly after his birth, and the parties obtained Icelandic citizenship for R.Z. and S.Z. when they arrived in August 2020.  (Tr. at 347:17–24).  Petitioner's parents, two brothers, their children, and his extended family live in Iceland.  (Tr. at 101:1–8, 746:11–14, 379:14–21).  While living in Iceland, Respondent declared herself a nonresident of New York for tax purposes.  (Tr. at 978:4–11; Ex. P.49, at Bates No. 24684).  Respondent stopped making maintenance payments for Apartment 6A during her time in Iceland.  (Tr. at

976:12–24; Ex. P.19).  The couple also took out a long-term car rental at Hertz and, in March 2021, purchased a car.  (Tr. 345:23–346:15).

For the first three months in Iceland, the family stayed in a series of three different Airbnbs in the downtown area of Reykjavik.  (Tr. at 231:25–232:16, 646:6–11, 873:23–874:22).  However, within two weeks of arriving in Iceland, the parties made an offer on an apartment in Reykjavik, which they eventually purchased in November 2020 (the "Iceland Apartment").  (Tr. at 646:22–25).  The family moved into the apartment on November 1, 2020, (Tr. at 234:14–16), with the belongings they had shipped from New York, (Tr. at 235:8–10).  They also purchased some new furniture as well.  (Tr. 235:11–236:1, 238:6–21; Exs. P.44, P.118).  This was the first and only home the couple were able to purchase together, and it was something they had talked about for a while.  (Tr. at 234:3–13).  Petitioner testified sincerely and poignantly that he was excited because "this was the opportunity to finally have a home of [their] own."  (Tr. at 234:5–6).  Significantly, Respondent paid the $60,000 down payment for the purchase of the apartment.  (Jt. Stip. ¶ 20).  Petitioner obtained a mortgage loan from an Icelandic bank to finance the balance of the purchase price.  (Jt. Stip. ¶ 21).

Respondent contends that they bought the Iceland Apartment because the Airbnbs they stayed in when they first arrived in Iceland were too expensive.  (Tr. at 886:16–887:4, 887:11–888:2).  Petitioner agreed that purchasing a property was cheaper than continually staying at Airbnbs.  (Tr. at 652:18–22).  Respondent now claims that she bought the apartment as an investment property and that the couple intended to rent out the apartment on Airbnb.  (Tr. at 884:13–25, 886:8–11, 887:11–888:2; Ex. R.140).  However, before purchasing a home, the parties had explored a long-term rental option, including a fully furnished one year lease on a townhouse, but did not pursue it.  (Tr. at 648:4–15, 886:20–887:4).  Significantly, in the fall of

2020, Respondent was also still trying to sell Penthouse C, the only property in New York in which she had full sole ownership.  (Tr. at 748:17–23).  In fact, she sold the property in July 2021.  (Tr. at 748:5–21).  The Court finds it implausible that at the same time Respondent was trying to sell her apartment in New York, the city to which she contends she intended to return, Respondent decided to begin investing in the Icelandic real estate market, in a country she now contends she always intended to leave.

The family moved into the Iceland home on November 1, 2020, (Tr. at 234:14–16), and never used it as an Airbnb rental.  The apartment in Iceland had two bedrooms, a playroom, one bathroom, and a backyard.  (Tr. at 337:24–338:18, 25:7–11, 33:6–7, 891:17–23).  The Iceland Apartment was similar in size to Apartment 6A, (Tr. at 339:21–24), but was smaller in terms of square footage, (Tr. at 652:23–654:7, 891:24–892:1).  Petitioner liked that the apartment was a true two-bedroom apartment with an additional playroom, (Tr. at 701:7–11), and that R.Z. and E.Z. had their own bedroom, (Tr. at 701:12–14).  As she had with their other apartments and Airbnbs, (*see*, *e.g.*, Tr. at 743:15–22 (Respondent did not like the neighborhood where the Brooklyn apartment was located), 874:9–15 (Respondent did not like the Airbnb's in Iceland that the family rented), Tr. at 107:2–10 (Respondent expressed issues with the size of Apartment 6A); Ex. R.101 (Respondent expressed issues with the size of Penthouse C)), Respondent expressed to Petitioner issues with the size of the Iceland Apartment.  (Tr. at 660:6–9).

Evidencing an intent to make it a long-term home, the family had discussions about renovating the Iceland Apartment.  During one of his visits to the Iceland Apartment, Mr. Pedersen, Petitioner's close friend, spoke to Petitioner and Respondent about potential renovations for the home.  This included possible plans about a little shack in the backyard, and "[h]ow to potentially open up the flat and have a staircase leading to the backyard[] with a little

balcony." (Tr. at 25:14–21).  They also discussed, "artwork on the walls and some carpeting in the kids' room."  (Tr. at 25:14–21).  Mr. Pedersen is not aware of any renovations ever being made, (Tr. at 34:24–35:3), although, he was aware that the family put in a carpet and hung framed pictures, (Tr. at 45:20–25).  Petitioner also testified that the parties did not initially hire anybody to renovate the apartment, but that they painted the children's bedroom.  (Tr. at 656:13–19).

Respondent applied for a residency permit in Iceland in the fall of 2020.  (Tr. at 347:25–348:25).  On her application, Respondent listed that the family moved to Iceland because of Covid and Petitioner's job prospects.  (Tr. at 1115:11–15).  In May 2021, Respondent was notified that her application for an Icelandic Residency Permit was approved.  (Jt. Stip. ¶ 19).  Respondent's Residency Permit remains valid until May 2022.  (Jt. Stip. ¶ 19).  On February 2, 2021, Respondent also applied for an Icelandic system ID number, called a kennitala number (the Icelandic equivalent of a social security number). (Tr. at 310:10–12; Ex. P.105).  The parties also registered the children as domiciles in Iceland and obtained kennitala numbers for them so that they could attend school there.  (Tr. at 346:16–347:12, 354:13–355:2).

At the same time, Respondent did not take steps necessary to permit her to live in the United States.  Respondent had received an email from her immigration attorney on July 23, 2020 that her Green Card application had been approved, (Tr. at 824:20–826:12; Ex. R.48), news that Respondent described as exciting and a "long-time dream come true," (Tr. at 825:12–826:12).  Yet, nine months later, in April 2021, Respondent was living with her family in Iceland and still had not done much to finalize her Green Card application.  In spring of 2021, Respondent inquired of her attorney about submitting the necessary documents and whether she was risking anything by taking so long.  (Tr. at 1016:25–1017:23; Ex. R.52).

28

The family also made efforts to bring the family's nanny to Iceland to assist the parents in caring for the children and managing the household.  (Tr. at 366:17–25).  Respondent specifically wanted their nanny from New York to work for the family in Iceland because she felt more comfortable with her.  (Tr. at 662:5–7, 1021:3–6).  Eventually the nanny was able to come to Iceland in January 2021, though shortly thereafter she had to travel to Mexico for two months due to a death in her family.  (Tr. at 367:1–9).  However, after the nanny returned to Iceland in March 2021, she remained with the family until June 2021, when Respondent brought the nanny with her to Mexico for an ostensibly temporary visit.  (Tr. at 368:1–7).

Respondent, who speaks English, Spanish, and French, (Tr. at 786:23–24), took a three-month Icelandic language class in the fall of 2020, (Tr. at 345:8–22, 787:19–23).  She did not complete the course, (Tr. at 788:5–11), but was nevertheless able to live normally in Iceland.  As a general matter, Respondent was able to navigate life in Iceland communicating in English, including with Landakotsskoli (E.Z.'s school in Iceland), with individuals to network for film projects in Iceland, with the rental car company, with employees at the supermarkets and stores in which she shopped, with immigration authorities, and with parents of E.Z.'s friends.  (Tr. at 1026:22–1027:25; Ex. R.171).  Shortly after arriving in Iceland, on August 26, 2020, Respondent texted a friend that "everything is in English which is beautiful."  (Ex. R.171).

As previously discussed, Petitioner found employment in Iceland at THG Architects. (Tr. at 88:9–15, 203:16–23; Ex. P.148C).  Respondent also explored job options in Iceland and had discussions with several friends and connections there.  In September 2020, she spoke with a former producer and current talent agent, Arni Bjorn Helgason, an Icelander, at his office about opportunities.  (Tr. at 8:18–9:13, 11:5–15).  Mr. Helgason was called by Petitioner to testify at the hearing.  Around August 2020, Respondent also told Mr. Pedersen, who also testified at the

29

hearing, that she had already met with several people in the film industry in Iceland.  (Tr. at 26:6–19).  Respondent expressed to Mr. Pedersen an interest in working in the film industry in Iceland, particularly on a feature film that she was getting involved with on a financial level. (Tr. at 26:23–27:5).  After arriving in Iceland, Respondent reached out to her university network and Petitioner introduced her to some filmmakers he knew.  (Tr. at 340:2–11).  Respondent also expressed to Petitioner that she was interested in doing a documentary about a volcanic island near Iceland.  (Tr. at 340:22–341:1, 341:25–342:6).  Respondent also continued to network and work on projects that she already had, work she said she could do from anywhere.  (Tr. at 882:17–25).

Throughout their time in Iceland, the couple's marital difficulties intensified.  By February 2021, Petitioner and Respondent discussed divorcing.  (Tr. at 660:13–663:2, 894:3–23, 895:13–17; Exs. R.213, R.218).  On February 24, 2021, Petitioner texted Respondent that he "couldn't agree more" with her referring to their marriage as "a sh[]t show," and that he thought "the only thing left for [them] to do is get this divorce over with."  (Ex. R.213).  In response, Respondent texted Petitioner that same day that she wanted to sell the apartment in Iceland.  (Ex. R.213).  However, after these text messages, the parties stopped talking about divorce for a time and the argument ended.  (Tr. at 661:4–17).  Respondent testified that, even after this argument, she continued to hope that the marriage would survive.  (Tr. at 898:2–18).

### 5.  The Children Settle Into Their New Home

The Covid situation was not as severe in Iceland as it was in New York and the schools were not closed when the family arrived in Iceland.  (Tr. at 647:11–17).  E.Z. attended the International School of Iceland at Landakotsskoli ("Landakotsskoli") with the daughters of Waleska Giraldo Thorsteinsson and Phaedon Sinis, both of whom testified at the hearing about

their daughters' friendships with E.Z.  (Tr. at 64:3–6, 92:8–13, 369:21–23, 864:10–25).

Landakotsskoli has separate English and Icelandic programs and E.Z attended the English

program.  (Tr. at 66:20–67:3).  Ms. Thorsteinsson was of the opinion that the English program

was more academically challenging.  (Tr. at 67:20–23).  Respondent thought it was a relief that

they could send E.Z. to Landakotsskoli because it was in English.  (Tr. at 866:17–867:11).  The

school was within walking distance of the family's home.  (Tr. at 706:4–11).  The parties

discussed trying to register S.Z. for school, but he was only a year and four months old at the

time and was waitlisted.  (Tr. at 370:19–371:14).  Eventually, in June 2021, S.Z. started an

"adjustment period" at a school called Oldukot.  Respondent attended these sessions with S.Z.

(Tr. at 1134:8–10).  According to Respondent, the adjustment period did not work out because

S.Z. got upset when Respondent left, and she had to return.  (Tr. at 1217:25–1218:18).  The

Court attaches little significance to the "difficult adjustment period" since it is not at all

uncommon for children at S.Z.'s young age to cry when a parent leaves or become upset when

they are first adjusting to starting pre-school.  (*See* Tr. at 1217:17–1218:14).

  While obviously different from life in New York, E.Z. adjusted well to life in Iceland and

had an active social life there.  All parties agree that E.Z. was in a friend group with Ms.

Thorsteinsson's daughter, Mr. Sinis' daughter, and possibly one or two other girls.  (Tr. at

56:21–57:11, 57:20–58:11, 82:9–19, 56:12–13, 77:1–10, 78:23–25, 372:25–373:6, 373:20–23,

800:9–10).  E.Z. had playdates and sleepovers with her friends.  (Tr. at 374:13–377:1, 1046:10–

14).  Ms. Thorsteinsson estimated that her daughter had about two to three playdates with E.Z. a

month.  (Tr. at 69:25–70:4).  On one of those playdates, E.Z. went to Ms. Thorsteinsson's stables

and got to help Ms. Thorsteinsson feed her horses.  (Tr. at 58:19–22, 1059:18–21; Ex. P.89 at

pg.4).  On another occasion, E.Z., attended a birthday party for Ms. Thorsteinsson's daughter at

an ice rink.  (Tr. at 1044:10–17).  On multiple occasions, E.Z. also accompanied her friends to their hockey classes.  (Tr. at 1044:11–17, 1047:23–24).  Mr. Sinis testified that E.Z. also socialized with his daughter relatively frequently, about once every week or two weeks, on a spontaneous basis when the children wanted a playdate.  (Tr. at 80:17–82:4).  Indeed, even after Respondent removed E.Z. to New York in 2021, Ms. Thorsteinsson's daughter sent a birthday present to E.Z.  (Tr. at 65:16–66:4).

E.Z. also participated in extracurricular activities in Iceland including music lessons, karate, soccer, and basketball.  (Tr. at 378:1–11, 379:4–13).  Moreover, while in Iceland, E.Z. enjoyed ice skating (Tr. at 1059:7–15; Ex. P.89 at pg. 3) and a weekly swimming class (Tr. at 1045:18–20).  The parties registered E.Z. at a gymnastics club for the 2021–2022 school year. (Tr. at 407:13–14; Ex. P.91).

The children also enjoyed family and social activities, including sight-seeing trips around Iceland and time spent with their family relatives.  (Tr. at 385:14–391:13, 703:22–704:5, 705:21–706:3, 706:17–707:1; Ex. P.109).  In Iceland, the family went to museums and zoos (Tr. at. 703:25–704:5), and they took bike rides around the city and took trips to their extended family's summer house (Tr. at 705:25–706:1).  While in Iceland, E.Z. also visited Iceland's scenic natural attractions such as the "Westfjords" (Tr. at 706:1–3, 1061:9–20; Ex. P.84A at pg. 1), the "beautiful waterfalls in Iceland" as Respondent referred to them (Tr. at 1061:24–1062:10, 1063:4–8; Ex. P.84A at pgs. 2, 9), a volcano (Tr. at 1063:11–12; Ex. 84A at pg. 10), and a geyser (Tr. at 1064:8–11; Ex. P.84A at pg. 13).  On one trip, E.Z. went dog sleighing with her cousin who was visiting from the United States.  (Tr. at 1062:14–21; Ex. P.84A at pg. 8).

While her Icelandic vocabulary was limited, this clearly did not inhibit E.Z.'s socialization in Iceland.  (Tr. at 786:25–787:4, 787:13–15, 788:17–21).  Many people in Iceland

32

speak English.  In fact, the Court notes that, during the evidentiary hearing, four Icelandic witnesses were called by the parties, two of Petitioner's friends from Iceland and two Icelandic immigration lawyers.  All four witnesses testified in English.  Ms. Thorsteinsson testified that during E.Z.'s playdates with her daughter, the children would mostly speak in English and only a little Spanish or Icelandic.  (Tr. at 59:3–60:8, 68:3–19, 69:7–12).

S.Z. also acclimated well to Iceland.  He began socializing with other children in Iceland, specifically during pickups at his siblings' schools, when there were playdates at the house, and with his cousins.  (Tr. at 406:6–10).  S.Z., at around two years old, was young enough that he had not mastered any language while in Iceland.  However, when Respondent removed him from Iceland, S.Z. had started babbling in Spanish, English, and Icelandic.  (Tr. at 405:23–406:3).

While in Iceland, the children also strengthened their relationship with their father's side of the family.  Petitioner's parents lived a four-minute drive away from the Iceland Apartment. (Tr. at 380:13–15).  The children interacted with their Icelandic grandparents about two or three times a week.  The grandparents often picked the children up from school and hosted the family for dinner.  (Tr. at 380:16–22).  The children also interacted with Petitioner's siblings (their uncles) and cousins and their children about once every two weeks.  (Tr. at 380:23–381:2, 1052:19–1053:7; Ex. P.157A).  They also celebrated several holidays with their family in Iceland including Christmas in 2020.  (Tr. at 707:10–17).

The Court finds Respondent's contention that the children failed to adjust to Iceland and that their social lives deteriorated in Iceland to be an exaggeration and not credible.  Respondent complains that there was a lack of "playground culture" in Iceland.  (Tr. at 760:8–10). Respondent is critical that Petitioner did not ride scooters with the children anymore and claims that Iceland was not "walking friendly."  (Tr. at 760:20–25).  She testified that the weather was

"dramatic" and "different from New York." (Tr. at 761:1–16, 802:4–17). Respondent also cites to other observations she had of E.Z. to bolster her assertion that E.Z. did not acclimate well to Iceland. While in Iceland, Respondent texted her pediatrician in New York that E.Z. was grinding her teeth more and the doctor said that it was possibly anxiety. (Tr. at 914:10–915:6; Ex. R.192). Respondent claims that E.Z. was homesick throughout her time in Iceland, (Tr. at 916:19–917:1; Ex. R.158), did not like going to school, that one of the other children kicked her, and that E.Z. was afraid of going to school, (Tr. at 913:14–19, R.207). She testified that the children had trouble sleeping because the sun was always out in the spring and summer months in Iceland, (Tr. at 917:16–918:6; Ex. R.211), although at the same time, Respondent also complained that its completely dark six months of the year in Iceland (Tr. at 761:3–9). Respondent also claimed that E.Z. was very limited in enrolling in extracurriculars because of the language barrier. (Tr. at 1198:22–1199:4).

Respondent concedes however that the family did walk to and from school, as well as to and from downtown Reykjavik. (Tr. at 761:3–16). Respondent further claims that the children had no extracurricular activities in Iceland from August 1, 2020 to July 1, 2021, (Tr. at 796:13–21), and asserts that for the first six months in Iceland, there were no playdates except for with one girl and that Respondent did not meet any other parents until December 2020. (Tr. at 799:16–800:8). However, the Court does not find this testimony compelling with respect to the critical issue in this matter. First, Respondent concedes that the lack of playdates initially was caused by Covid restrictions and the family's recent relocation. (Tr. at 800:25–801:7). Moreover, Respondent's testimony is belied by other evidence. For example, by February 2021, Respondent herself described E.Z. as a "social butterfly" and doing well in school. (Tr. at 1120:5–9; Ex. P.38). Respondent also admitted that E.Z. made a lot of friends in school. (Tr. at

34

1120:12–14).  And, Respondent testified that she arranged playdates for E.Z. with the children of

other friends in Iceland.  (Tr. at 1041:13–1042:5, 1043:7–9, 1045:25–1046:9).  Respondent

testified that the daughter of Ms. Sleiman, a friend Respondent made in Iceland, was one of three

good friends E.Z. had in Iceland.  (Tr. at 1043:7–9).  Respondent herself testified that E.Z. did

participate in social activities in Iceland including ice skating, swimming, sleep overs, and sled

riding.  (Tr. at 1044:10–17, 1045:2–22, 1046:10–14, 1052:11–1057:4, 1059:7–23, 1061:9–

1064:18; Exs. R.48 at Bates No. 17301, P.57A at Bates No. 13516, 13517, 13520, 13523, 13543,

13550, 13551, 13552, 13556, 13558, 13561, 13563, P.89, P84A).  The totality of the record

evidence, including the testimony of Petitioner, Mr. Sinis, Ms. Thorsteinsson, and Respondent's

own messages to friends, (*see*, *e.g.*, Ex. P.38), clearly establishes that E.Z. had adjusted well to

living in Iceland.

### 6.   The Couple's Marriage Further Deteriorates, But Respondent Continues Efforts To Remain In Iceland

The evidence indicates that beginning in the late winter of 2021 and continuing until her

ultimate return to New York in July 2021, as the couple's marital problems further worsened,

Respondent's — but not Petitioner's — intent began to waver between remaining in Iceland and

returning to New York.  In February 2021, Respondent began discussions with Petitioner about

returning to New York, but Petitioner confirmed that he did not wish to leave Iceland.  (Tr. at

897:6–25, 1121:25–1122:14).  At that time, the couple had a heated fight in which they brought

up the possibility of getting a divorce and on February 24, 2021, Respondent texted Petitioner

that she wanted to sell the Iceland Apartment.  (Tr. at 660:13–663:2, 894:3–23, 895:13–17; Exs.

R.213, R.218, R.213).  Respondent learned on April 15, 2021 that schools in New York would

be opening in the fall and this led her to want to return to New York.  (Tr. at 1187:21–1188:14).

In May 2021, Respondent took a trip to New York with S.Z. to visit her mother and saw that New York was back to a more normal condition.  (Tr. at 896:13–897:11; *see also* Tr. at 410:25–411:16).  Respondent testified that she then told Petitioner at this time that she wanted to return to New York.  (Tr. at 897:16–20).  Around this time, she expressed to Mr. Pedersen that she missed Mexico and New York and that there were no career options for her in Iceland.  (Tr. at 29:1–5, 30:3–11).  On June 1, 2021, without telling Petitioner, Respondent had a call with the parent coordinator for P.S. 9, Ms. Yoskowitz, about how to finalize registration of E.Z. and R.Z. into P.S. 9.  (Tr. at 673:10–15).

There is, however, ample evidence that at the same time Respondent took actions that reflect that she continued to share Petitioner's intent to make Iceland their home during the critical time period leading up to when she removed E.Z. and S.Z. from Iceland to New York.  In the spring of 2021, Respondent expressed interest in pursuing her education in Iceland.  (Tr. at 342:15–20).  She applied for and was accepted into a two-year MBA program at Reykjavík University.  (Tr. at 342:14–343:10, 898:2–18).  She stated that she applied for the program because she was considering all her options, was hopeful that her marriage would survive, and because there was so much uncertainty during Covid.  (Tr. at 898:10–18).  On May 11, 2021, Respondent contacted Landakotsskoli and told them that she wanted to take a tour of the school because R.Z. might attend there.  (Ex. P.21).  And, in June 2021, Respondent told a family friend, Ms. Thorsteinsson, that the family was taking it day-by-day.  (Tr. at 60:16–61:5, 66:10–19).  Significantly, in June, Respondent emailed Ms. Yoskowitz, to cancel E.Z. and R.Z.'s pre-registration process for the 2021-2022 school year, stating that the prior sign-up of the children at P.S. 9 in New York was a misunderstanding.  (Ex. P.6).  At the same time, the couple took steps to enroll the children in school in Iceland for the 2021–2022 school year.  (Tr. at 394:14–395:4,

396:15–397:10, 716:5–15, 716:23–717:1).  In June 2021, Petitioner emailed a school official at the school in Iceland, with Respondent copied on the email, that he wanted the children enrolled in the school for the 2021-2022 school year.  (Ex. P.22).  Respondent herself also filled out a google form indicating that E.Z. would be attending Landakotsskoli for the 2021–2022 school year, (Tr. at 1123:11–22, 1124:14–24, 396:6–14), and, on June 10, 2021, emailed Landakotsskoli about enrolling E.Z. into both violin and piano lessons (Ex. P.95).  S.Z. was also enrolled in school in Iceland in June 2021, (Tr. at 402:17–403:6), and Respondent attended the adjustment period for S.Z. at this time, (Tr. at 1134:8–13).

### 7.  Respondent Plans Visit To Mexico

In the spring and summer of 2021, the couple talked about plans to travel to Mexico for a family visit in connection with a reunion of Respondent's family long scheduled for June 2021 in Mexico.  (Tr. at 668:20–669:3, 903:9–16).  Respondent's family held a family reunion every two to three years (Tr. at 669:1–3) and Respondent told Petitioner that she wanted to go to the summer 2021 reunion with the children.  (Tr. at 670:1–5).  During their conversations, the parties discussed that the trip to Mexico in June 2021 would be a temporary visit and that Respondent, E.Z., and S.Z. would thereafter return to their home in Iceland.  When she left for Mexico, Respondent told Petitioner that she would return to Iceland after her trip.  (Tr. at 411:23–25, 412:6–9).  In fact, Respondent told several others that she would return to Iceland after her trip to Mexico.  In late spring 2021, Respondent mentioned to Ms. Thorsteinsson that their children could visit summer camps in Iceland in August after Respondent returned from her vacation to Mexico.  (Tr. at 62:7–18, 63:12–24).  About two weeks before her trip to Mexico, Respondent told Mr. Pedersen that she was about to travel there for a family reunion and that she would then return to Iceland.  (Tr. at 30:13–31:5).  On June 15, 2021, Respondent texted a close friend of

37

hers in Iceland, Jonas Moody, that "things are better," that she was going to Mexico, and that she would be returning to Iceland around mid-July.  (Ex. P.152).  There is no record evidence reflecting that at any time Respondent indicated that she intended to abandon Iceland after she visited Mexico for the family reunion.

However, on June 2, 2021, shortly before the anticipated departure to Mexico for the family reunion, Petitioner received an email from P.S. 9 indicating that the children were enrolled in the school in New York for the upcoming school year.  This enrollment was done by Respondent without Petitioner's knowledge or consent.  (Tr. 593:17–594:2, 673:3-7; Ex. R.172). This revelation led to an argument between the parties and Petitioner started to suspect that by secretly enrolling the children at P.S.9, Respondent was planning to remove the children to New York after her upcoming trip to Mexico.  (Tr. 673:3-675:19).  In response, Petitioner initially balked at anyone traveling to Mexico.  Petitioner asked his father to take the passports of E.Z. and R.Z., which Petitioner later took back and hid in the Iceland Apartment because he feared Respondent would take the children.  (Tr. at 670:17–671:12, 671:19–23, 672:8–25).  Ultimately, Petitioner agreed to let Respondent go to Mexico, but with only E.Z. and S.Z.  (Tr. at 679:4–18). He did this because he was afraid that, due to their deteriorating marriage, Respondent would take the children out of Iceland.  (Tr. at 670:17–671:12, 671:19–23, 672:8–25).

### G.  Respondent Removes the Children to New York

On June 17, 2021, Respondent flew from Iceland to Mexico with E.Z., S.Z., and the children's nanny.  (Jt. Stip. Facts ¶ 22).  The ostensible reason for the trip was for the family to visit Mexico to attend Respondent's family reunion and thereafter return to Iceland.  While in Mexico at this time, on June 20, 2021, Respondent wrote to a company that manages Airbnb properties in Reykjavik that her mother was coming to Iceland in August for a month and asked

if apartments were available.  (Ex. P.20).  Respondent testified that at this time she was still considering all her options.  (Tr. at 1142:9–18).

Sometime between June 20, 2021, and July 21, 2021, however, Respondent's intent to return to Iceland apparently changed and, on July 21, 2021, Respondent traveled from Mexico to New York with E.Z. and S.Z.  (Jt. Stip. Facts ¶¶ 23–24).  Petitioner became aware within about a week that Respondent was in New York with E.Z. and S.Z.  (Tr. at 692:3–23).  The Court finds that contrary to what Respondent now contends, the *couple* never changed their shared intent that, in the summer of 2021, the habitual residence of the children was Iceland.  Rather, it is apparent that Respondent unilaterally decided to remove E.Z. and S.Z. to New York, rather than return to Iceland as she had told Petitioner and many of their friends she would do.  (*See*, *e.g.*, Tr. at 30:13–31:5, 62:7–18, 63:12–24, 411:23–25, 412:6–9; Ex. P.152).  It appears that Respondent removed the children and took them with her to New York perhaps due to the escalating marital difficulties.  The Court finds it striking that, at no time during her testimony did Respondent profess that the couple had changed their intent to make their home in Iceland, nor did she offer an explanation of why she left Mexico and took E.Z. and S.Z. to New York or when she decided to do so.  Indeed, she offered no explanation whatsoever of how or why she ended up in New York in July 2021 with two of the couple's three children.

On the same day she arrived in New York, Respondent filed an action for divorce in New York State Supreme Court, New York County.  The action is currently pending before the Honorable Kelly O'Neill Levy.  (Jt. Stip. Facts ¶ 25).  That same day, Respondent filed an Emergency Order to Show Cause seeking, among other things, a temporary restraining order for interim sole custody of the children and for Petitioner to return R.Z. to New York, (Jt. Stip. Facts ¶ 26).  Justice O'Neill Levy denied the application.

39

On August 2, 2021, Petitioner filed custody proceedings in Iceland.  (Tr. at 416:10–14).

On August 13, 2021, Petitioner filed a petition in this Court under the Hague Convention,

implemented in the United States through ICARA, seeking the return of E.Z. and S.Z. to Iceland.

(Jt. Stip. Facts ¶ 27).

## II.    CONCLUSIONS OF LAW

Before proceeding to the merits of this case, it is important to note that a court

considering a Hague Convention petition has jurisdiction only over the wrongful removal or

retention claim and cannot consider the merits of any underlying custody disputes.  *See* Hague

Convention, art. 16.  "[T]he Convention's focus is simply upon whether a child should be

returned to her country of habitual residence for custody proceedings."  *Mota*, 692 F.3d at 112;

*see* 22 U.S.C. § 9001(b)(4) (providing that a court may only determine rights under the

Convention, not the merits of custody disputes).  Therefore, the court's inquiry in determining

the habitual residence of E.Z. and S.Z. is not "'the best interests of the child,' as it is in a []

custody case; rather it is the specific claims and defenses under the Convention."  *Velozny on*

*behalf of R.V. v. Velozny*, No. 20 CIV. 6659 (GBD), 2021 WL 3115870, at *3 (S.D.N.Y. July 22,

2021).  As such, the Court has not considered any of the evidence before it for the purpose of

determining the custody rights of the children.

### A.  Habitual Residence

The Hague Convention, does not provide any definition of "habitually resident."  *Gitter*,

396 F.3d at 131.  "[T]he Convention instructs courts to interpret the expression according to 'the

ordinary and natural meaning of the two words it contains,'" *Armiliato v. Zaric-Armiliato*, 169 F.

Supp. 2d 230, 236 (S.D.N.Y. 2001) (quoting *In Re J. (A Minor)* [1990] 2 A.C. 562, 578 (U.K.

House of Lords) (Lord Brandon)).

The Second Circuit has not defined the term, but has instructed that in determining "habitual residence," district courts should apply a two-part test:

> First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared.  In making this determination the court should look, as always in determining intent, at actions as well as declarations.  Normally the shared intent of the parents should control the habitual residence of the child.  Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

*Hofmann v. Sender*, 716 F.3d 282, 291–92 (2d Cir. 2013) (quoting *Gitter*, 396 F.3d at 134); *see Saada v. Golan*, 930 F.3d 533, 539 (2d Cir. 2019).

Recently, the Supreme Court clarified that "a child's habitual residence depends on the totality of the circumstances specific to [a given] case."  *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020).  The Court noted that "locating a child's home is a fact-driven inquiry," and "courts must be sensitive to the unique circumstances of the case and informed by common sense."  *Id.* at 727 (internal quotation marks omitted).  Accordingly, "[b]ecause children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations.  No single fact, however, is dispositive across all cases."  *Id.*  "In other words, the parents' last shared intent is a relevant consideration, but it is by no means dispositive of the habitual residence inquiry."  *Grano v. Martin*, 443 F. Supp. 3d 510, 535 (S.D.N.Y. 2020), *aff'd*, 821 F. App'x 26 (2d Cir. 2020).

"[A] wide range of facts other than an actual agreement, including facts indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's residence in that place has the quality of being 'habitual.'"  *Monasky*, 140 S. Ct. at 729.

41

"The bottom line: There are no categorical requirements for establishing a child's habitual residence – least of all an actual-agreement requirement for infants." *Id.* at 728.  In instructing courts to look at the totality of the circumstances, the Supreme Court has provided a non-exclusive list of facts the Court can consider: "a change in geography combined with the passage of an appreciable period of time," "age of the child," "immigration status of child and parent," "academic activities," "social engagements," "participation in sports programs and excursions," "meaningful connections with the people and places in the child's new country," "language proficiency," and "location of personal belongings." *Id.* at 727 n.3 (citation omitted).  It is the petitioner's burden to "establish[] by a preponderance of the evidence a child's habitual residence at the time of the contested removal." *Guzzo v. Cristofano*, 719 F.3d 100, 107 (2d Cir. 2013).

        **1.   The Parents Shared An Intent To Abandon
            New York And To Relocate Indefinitely To Iceland**

The Court begins its analysis with an evaluation of the shared intent of the parties.  It is the intent of the parents "at the latest time that their intent was shared" that is relevant to a determination of habitual residence.  *Gitter*, 396 F.3d at 134.  This inquiry in turn involves two questions: whether the parents formed a shared, "settled intention" to "abandon" the child's previous habitual residence, *id.* at 132, and whether the parents "have mutually intended that the child acquire a new habitual residence" in a new location, *id.* at 133; *accord Berezowsky v. Ojeda*, 765 F.3d 456, 468 (5th Cir. 2014) (courts "usually [] try to determine when the parents last had a shared plan regarding their child's future[] and what that plan entailed").

A settled intention to abandon a prior habitual residence need not be expressly declared "if it is manifest from one's actions; indeed one's actions may belie any declaration that no

abandonment was intended." *Mozes*, 239 F.3d at 1075.  "Often parents will not agree about what their shared intentions were once litigation is underway, and so we must take account of the parents' actions as well as what they say." *Norinder v. Fuentes*, 657 F.3d 526, 534 (7th Cir. 2011).  Moreover, "one need not have this settled intention at the moment of departure; it could coalesce during the course of a stay abroad originally intended to be temporary." *Mozes*, 239 F.3d at 1075.

Petitioner contends that in July 2021, when Respondent brought E.Z. and S.Z. to New York from the vacation in Mexico for the family reunion and made clear that she intended to stay in New York, the habitual residence of E.Z. and S.Z. was Iceland.  Respondent claims that she acted properly in taking the children to New York when she left Iceland for the family reunion in Mexico because New York remained the habitual residence of the family even when they moved to Iceland.  The question of whether the family abandoned New York and established a new habitual residence in Iceland is difficult here because this family, throughout the six years Petitioner and Respondent were married, was largely transient.  Between 2015 (the year the couple were married) and 2021 (when Respondent removed the children from Iceland to New York), the family relocated *five times* and lived for a period of time at *six different addresses* in *four cities across three countries*.  The habitual residence of the children, all of whom were aged seven or younger when they moved to Iceland, had previously changed twice in the three years leading up to the move to Iceland: once when they moved to California and again when they moved from Los Angeles to New York.  *See* Hague Convention Art. 31.

In evaluating the habitual residence of E.Z. and S.Z. in July of 2021, the Court is mindful of the unsettled nature of the family's residence prior to the move to Iceland.  The record is clear that throughout their marriage the parties were in constant discussion about where they should

43

make their home and considered at various times at least four other cities or countries before

moving to Iceland.  (Tr. at 112:21–113:5, 113:9–12, 1069:7–1070:5; Exs. P.148A, P.166

(considering Mexico), 113:13–22, 129:17–23, 130:2–5, 885:6–24, 1213:15–22; Exs. P.167,

P.148, at Bates No. 12000, R.140, R.148J, R.148B (considering Iceland), 113:23–114:6, 114:7–

15 (considering Cuba or Miami)).  While such discussions are not sufficient to change a child's

habitual residence, *see Gitter*, 396 F.3d at 133 ("[A] change in geography is a necessary

condition to a child acquiring a new habitual residence."), these discussions however further

support the Court's conclusion that the family was not firmly rooted in New York as Respondent

contends.  *See Papakosmas v. Papakosmas*, 483 F.3d 617, 627 (9th Cir. 2007) (when a child's

tenure in a country can be characterized as being "in a permanent state of flux," their relative

attachment to that country must be considered weaker).

The Court concludes that the family intended to abandon New York when they moved to

Iceland in August 2020.  The inquiry here is not straightforward because, throughout their

marriage, the parties were indecisive with respect to their permanent long-term plans and both

parties are in agreement that the decision to move to Iceland was not meant to be a definitive

plan to move to Iceland permanently.  However, although "[d]etermining intent when the parents

disagree about their child's habitual residence is an Augean chore[,] . . . it is necessary to look

beyond the subjective intent of the parents to the objective manifestations of that intent."

*Armiliato*, 169 F. Supp. 2d at 237.  Here, the objective facts surrounding the parties' move to

Iceland support the Court's finding of a shared intent to abandon New York indefinitely when

the couple moved its family to Iceland and set down roots in Iceland.  The family had been

discussing leaving New York as early as 2017 and were clearly not content to remain there as a

long-term plan.  (*See, e.g.*, 99:19–15, 100:4–8, 106:10–13, 110:9–19, 1031:24–1032:2, 1069:7–

44

1070:5; Exs. P.166, P.148A).  Indeed, before 2020 — when Respondent explored jobs in other

cities, (*see* Tr. at 123:2–13), and accepted a job at Netflix that might have resulted in a

permanent relocation to California, (*see* Tr. at 124:5–14, 126:4–7, 130:20–131:4, 149:12–15,

835:22–836:4) — the parties had already acted on the shared view that they could not afford life

in New York City and the resulting plan to abandon New York.  Even prior to the news that

schools would shut down in New York, Respondent was texting Petitioner about Icelandic real

estate listings.  (Tr. at 885:6–24, 1213:15–22, 1220:22–1221:12; Exs. R.140, R.148J, P.148B).

The exit from New York in March 2020 was clearly precipitous, but as Petitioner texted his wife,

he viewed it as a blessing in disguise for them and a chance to act on their long-standing issues

with life in New York.  (Tr. at 187:12–22; Ex. R.119).  The Court's conclusion that the parties

jointly abandoned New York as their habitual residence in the spring of 2020 is supported by the

fact that while the parties were in Mexico, to which they first relocated after leaving New York,

Respondent considered accepting a job offer there and the family even looked at potential

homes.  (Tr. at 1065:16–19, 1073:6–1074:1; Ex. R.84).

     The Court finds that once the couple decided to move to Iceland, their shared intent was

to remain there indefinitely, though not necessarily permanently.  *Grano*, 443 F. Supp. 3d at 537

(finding that the child's habitual residence was where the family intended to relocate

indefinitely).  The Court finds credible Petitioner's candid explanation that they intended to stay

for a few years, "see how it goes," and see if they would have a better life there.  (Tr. at 212:5–

12).  While the couple left the door open to returning to the United States or elsewhere at some

point, at the relevant time when Respondent took the children from Iceland under the pretext of

visiting family in Mexico, clearly the family's home was Iceland.  *Mozes*, at 1077 (even if "the

petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous

duration[,]  [s]ometimes the circumstances surrounding the child's stay are such that, despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the stay last indefinitely"); *see also Koch v. Koch*, 450 F.3d 703, 713 (7th Cir. 2006); *Ruiz v. Tenorio*, 392 F.3d 1247, 1253 (11th Cir. 2004).

This shared intent is not only supported by some of Respondent's messages to her friends, but also the parties' "objective manifestations of that intent" in planning their move and once they arrived in Iceland.  *See Armiliato*, 169 F. Supp. 2d at 237.  The record establishes that the couple moved a large quantity of personal possessions, household goods, and all of Petitioner's belongings from his New York Office from New York to Iceland.  (Tr. at 226:20–227:4, 225:9–16, 864:1–9, Exs. P.115, R.104).  In total, the family packed up 72 boxes to ship to Iceland from New York.  (Tr. at 226:20–227:4; Ex. P.115).  The shipment of a large quantity of personal belongings supports a conclusion that the child's habitual residence changed.  *See Silverman v. Silverman*, 338 F.3d 886, 898 (8th Cir. 2003) (considering the shipment of the family's household goods to the new country); *Koch*, 450 F.3d at 714 (same); *see also Monasky*, 140 S. Ct. at 727 n.3 (listing "location of personal belongings" as a relevant consideration in the habitual residence inquiry).

Significantly, for the first time in their married life, the couple bought a home in Iceland, (Tr. at 234:3–13), and Respondent paid the deposit for the purchase of the apartment, (Jt. Stip. ¶ 20).  The couple also had discussions about renovating the apartment.  (Tr. at 25:14–21).  At around the same time Respondent put money down on an apartment in Iceland, she was trying to sell the apartment she owned in New York.  (Tr. at 748:5–23).  "[T]he purchase of a home in the new country and the sale of a home in the former country" is an objective manifestation of an intent to reside in a location habitually.  *Maxwell v. Maxwell*, 588 F.3d 245, 252 (4th Cir. 2009);

*see also Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995) (purchase and renovation of a house supports that the parents intended to habitually reside in the new country); *Silverman*, 338 F.3d at 898 (sale of home in prior country supports that the family's habitual residence changed).

As soon as the family arrived in Iceland, the couple obtained Icelandic citizenship for their two children, R.Z. and S.Z., who were not yet Icelandic citizens. (Tr. at 347:17–24). Respondent applied for and obtained a residency permit in Iceland. (Tr. at 347:25–348:25; Jt. Stip. ¶ 19). The couple also applied for kennitala numbers for Respondent and the children and the family registered the children as domiciles in Iceland. (Tr. at 310:10–12, 346:16–347:12, 354:13–355:2; Ex. P.105). While in Iceland, at the same time, Respondent failed to take actions to secure a green card, which left her immigration status in the United States tenuous. (Tr. at 1016:25–1017:23; Ex. R.52). These attempts to secure immigration status for the family in Iceland, while abandoning efforts to secure immigration status in the United States, further support that the family intended to habitually reside in Iceland. *See Monasky*, 140 S. Ct. at 727 n.3 (listing "immigration status of child and parent" as a relevant consideration in the habitual residence inquiry). Moreover, the Court also finds it significant that when the couple moved to Iceland, Respondent declared herself a nonresident of New York on her U.S. tax returns.

It is significant that before traveling to Iceland, Respondent and Petitioner investigated schools in Iceland for their children. (Tr. at 205:9–206:12, 583:22–585:2). In fact, the couple signed E.Z. up for school. (Tr. at 589:15–590:5). Tellingly, the parties had begun the registration process for E.Z. to continue in the same school in Iceland for the 2021-2022 school year. (394:14–395:4, 396:15–397:10, 716:5–15, 716:23–717:1, Tr. at 1123:11–22, 1124:14–24, 396:6–14). The family also signed S.Z. up for an adjustment period at a nursery school, which Respondent attended with S.Z. (Tr. at 402:17–403:6, 1134:8–13). Arranging for the immediate

and long-term schooling of children in a new country further supports that the child's habitual

residence changed to that new country.  *See Feder*, 63 F.3d at 224; *Silverman*, 338 F.3d at 898;

*Monasky*, 140 S. Ct. at 727 n.3 (listing "academic activities" as a relevant consideration in the

habitual residence inquiry); *see also Armiliato*, 169 F. Supp. 2d at 238 ("The steps the parents

have taken to acclimate their child to her surroundings is another objective manifestation of

intent to habitually reside in a locale.  Those steps may include an attempt to establish a regimen,

school attendance, and the presence of family, friends and doctors." (citing *Mozes*, 239 F.3d at

1078)).

Other facts support the conclusion that the parties made Iceland the habitual residence of

their family, including E.Z. and S.Z., when they moved to Iceland in the summer of 2020.

Respondent began taking Icelandic language lessons.  (Tr. at 345:8–22, 787:19–23).  The couple

signed E.Z. up for extracurricular activities in Iceland including music lessons, karate, soccer,

basketball, and a swimming class.  (Tr. at 378:1–11, 379:4–13, 1045:18–20).  The parties

registered E.Z. at a gymnastics club for the 2021–2022 school year.  (Tr. at 407:13–14; Ex.

P.91).  The couple took steps to enroll E.Z. in school in Iceland for the 2021–2022 school year.

(Tr. at 394:14–395:4, 396:6–397:10, 716:5–15, 716:23–717, 1123:11–22, 1124:14–24; Ex. P.22).

On June 10, 2021, only one week before her trip to Mexico, Respondent emailed Landakotsskoli

about enrolling E.Z. into both violin and piano lessons.  (Ex. P.95).  In June 2021, Petitioner and

Respondent also enrolled S.Z. in school in Iceland.  (Tr. at 402:17–403:6, 1134:8–13).

Moreover, the parties are in agreement that they moved to Iceland in part because of

Petitioner's job opportunities there.  (*See* Tr. at 203:9–15, 211:6–25, 1099:10–25, 1115:11–15;

P.148D, P.112).  In fact, Petitioner closed his office in New York and secured a new job in

Iceland.  (*See* Tr. at 203:16–23; Ex. P.148C).  That Petitioner "quit [his] job[] in [New York] and

sought new employment in [Iceland]," further supports that the family intended to abandon New York and make their home in Iceland. *Berezowsky*, 765 F.3d at 474; *see also Feder*, 63 F.3d at 224 (pursuit of employment in the new location militates toward finding that the habitual residence changed).

While the record seems to indicate that Respondent's intent to remain in Iceland wavered as the couple's marital problems continued to worsen in 2021, the facts also demonstrate that the couple never abandoned their joint plan to make Iceland the habitual residence of the family indefinitely. There is evidence that Respondent intended to remain in Iceland and continue to work on her marriage. For example, in the spring of 2021, Respondent applied for a two-year MBA program in Iceland because she was still hopeful that her marriage would survive. (Tr. at 898:2–18). This intent to work on her strained marriage only further supports that she intended to remain in Iceland at this time. *See Nicolson v. Pappalardo*, 605 F.3d 100, 105 (1st Cir. 2010) (when one parent left Australia with the child to come to the United States but was still considering returning to Australia to reconcile with her husband, the habitual residence of the child remained Australia). Respondent told Ms. Thorsteinsson, the parent of E.Z.'s friend, that Respondent hoped her children could visit the summer camps in Iceland in August after she returned from her vacation to Mexico. (Tr. at 62:7–18, 63:12–24). In the summer of 2021, Respondent was also involved in enrolling E.Z. and S.Z. in school in Iceland for the following academic year. (*See*, *e.g.*, Tr. at 1123:11–22, 1124:14–24, 396:6–14, 1134:8–13; Exs. P.22, P.95). Significantly, when she traveled to Mexico, Respondent left R.Z., one of her three children, in Iceland, powerful evidence that she intended to return.

The shared intent of the parties to make Iceland the family's habitual residence when they moved there in 2020 is also supported by a comparison with the objective facts surrounding the

49

family's *other relocations*.  When the couple moved to Los Angeles, Respondent declared herself a nonresident of New York for tax purposes, (Tr. at 978:12–15), as she again did when the couple moved to Iceland, (Tr. at 978:4–11; Ex. P.49, at Bates No. 24684).  Conversely, when the family moved to Mexico in March 2020, which was not meant to be permanent at least at the time of that trip, she continued to list herself as a resident of New York.  (Tr. at 977:25–978:3; Ex. P.49, at Bates No. 24684).  When the family moved to Los Angeles, they packed almost all their property except for a small number of possessions they left behind in the apartment Respondent owned with her siblings, (*see*, *e.g.*,Tr. at 130:20–131:4), as they did when they moved to Iceland (*see*, *e.g.*, 226:20–227:4, 225:9–16, 864:1–9, Exs. P.115, R.104).  Conversely, when the family traveled to Mexico, the family packed only a suitcase for each family member.  (Tr. at 189:6–8, 845:22–846:3).  When the family moved to Los Angeles, they signed the children up for school there, (*see*, *e.g.*, Tr. at 130:20–131:4), as they did in Iceland, (see, e.g., (Tr. at 64:3–6, 92:8–13, 205:9–206:12, 369:21–23, 583:22–585:2, 589:15–590:5, 864:10–25; Exs. P.38, P.22).  Conversely, the children continued to attend New York school via Zoom while they were temporarily in Mexico, (Jt. Stip. Facts ¶ 16; Tr. at 563:1–8, 848:3–849:24, 856:10–857:17; *see* Ex. R.154).  When the family moved to Los Angeles, the move was motivated by a job opportunity, (*see*, *e.g.*, Tr. at 124:11–14, 126:4–7, 778:5–13, 988:24–989:3, 986:16–23), as was, at least in part, the move to Iceland, (*see*, *e.g.*, Tr. at 203:9–15, 211:6–25, 1099:10–25, 1115:11–15; P.148D, P.112).  Conversely, the couple did not go to Mexico for work.

As such, the Court finds that the parties had a shared intent in the fall of 2020 to abandon New York and to establish a new habitual residence for themselves and the children in Iceland.  Petitioner candidly expressed that the intent was to go to Iceland for two or three years and "see how it goes."  (Tr. at 212:7–8).  He does not try to claim this was a shared intent to make Iceland

the family home permanently.  However, that the couple may have not meant to permanently live in Iceland does not mean that they did not intend to habitually reside there.  Key here is that "although residing habitually in a place means that a person has, in some sense, settled there, 'it need not mean that's where you plan to leave your bones.'" *Koch*, 450 F.3d at 717 (quoting *Mozes*, 239 F.3d at 1074); *see also Berezowsky*, 765 F.3d at 467; *Silverman*, 338 F.3d at 898. The family must merely have a "sufficient degree of continuity to be properly described as settled." *Silverman*, 338 F.3d at 898 (quoting *Feder*, 63 F.3d at 223).  However, "[i]t is entirely natural and foreseeable that, if a child goes to live with a parent in that parent's native land on an open-ended basis, the child will soon begin to lose its habitual ties to any prior residence.  A parent who agrees to such an arrangement without any clear limitations may well be held to have accepted this eventuality." *Koch*, 450 F.3d at 718 (quoting *Mozes*, 239 F.3d at 1082).  In fact, "[w]hen the child moves to a new country accompanied by both parents, who take steps to set up a regular household together, the period need not be long [to establish a new habitual residence]." *Shah v. Federbush*, No. 19-CV-4485 (VEC), 2019 WL 5060496, at *9 (S.D.N.Y. Oct. 9, 2019) (quoting *Mozes*, 239 F.3d at 1078); *Norinder*, 657 F.3d at 534.  To the extent that Respondent may have harbored a hope to return to New York at some indeterminate time in the future, that hope alone is not sufficient to negate Iceland as the habitual residence of E.Z. and S.Z. in the summer of 2021.  *See Koch*, 450 F.3d at 717 ("[A]fter some period of time in [a] new environment, the habitual residence of the children will change regardless of the parents' hopes to someday return to the prior residence.").

Even if in February 2021, when Respondent began telling Petitioner she was unhappy and wanted to return to New York (Tr. at 1122:2–14), she had given up on the previously shared intent to make Iceland the family's habitual residence, her unilateral intent at that time is

irrelevant to the Court's inquiry.  Having agreed with Petitioner to make Iceland their home for

an indeterminate, if not permanent period of time, Respondent cannot unilaterally change the

habitual residence of the children.  *Gitter*, 396 F.3d at 134 (it is the intent of the parents "at the

*latest time that their intent was shared*," that is relevant to a determination of habitual residence)

(emphasis added); *accord Calixto v. Lesmes*, 909 F.3d 1079, 1084 (11th Cir. 2018) ("The

'unilateral intent of a single parent' will not suffice to change a child's habitual residence.");

*Darin v. Olivero-Huffman*, 746 F.3d 1, 11 (1st Cir. 2014) ("One parent's wishes are not

sufficient, by themselves, to effect a change in a child's habitual residence.").  And yet, that is

precisely what Respondent has attempted to do.

     The cases on which Respondent relies to assert that the habitual residence of the children

did not change to Iceland when they left New York are inapposite.  In *Smith v. Smith*, a married

couple with four children moved from the United States to Argentina for the husband's work and

resided there for two years before the mother removed the children back to Texas where they had

previously lived.  976 F.3d 558, 559–560 (5th Cir. 2020).  The court concluded that the

children's habitual residence had never shifted to Argentina and denied the father's petition for

their return.  *Id.* at 563.  However, in *Smith*, the evidence of an intent to return to the United

States was far more compelling than in this case.  Most importantly, the father specifically had

represented to the mother that the move to Argentina was only for two years and that the money

he earned there would be used to buy a house in the United States.  *Id.* at 560.  Moreover, both

parents were U.S. citizens, the husband's contract included a provision for "home leave" which

referred to the United States, he was only provided a 24-month housing allowance and the family

continued to rent in Argentina, and none of the parties owned property or had family in

Argentina.  *Id.*  The facts here are clearly distinguishable.

*Farr v. Kendrick*, 824 F. App'x 480 (9th Cir. 2020) is similarly unpersuasive.  In *Farr*, a father petitioned under the Convention for the return of his two children to Mexico from Arizona.  *Id.* at 481.  The couple had moved to Mexico on what the mother "credibly" viewed as a temporary basis, believing they would only remain in Mexico for three to five years.  *Id.* at 481–82.  The Ninth Circuit affirmed the district court's conclusion that the children's habitual residence never shifted from the United States to Mexico.  *Id.* at 481.  However, unlike in this case, the indicia that the parents always intended to return to the United States in *Farr* were clear.  The parents were both U.S. citizens, all of the mother's family and most of the father's family were in the United States, the couple only considered returning to the United States, and indeed, the father had sent the mother an email while in Mexico with a "detailed [] 'plan of action' for their return to the United States, setting forth decisions they needed to make 'very soon,' such as which United States city they would move to."  *Id.* at 481–82.  Respondent cannot point to any such definitive indicia of intent to maintain New York as the habitual residence when the family moved to Iceland.

Finally, Respondent now contends for the first time in her post hearing submission, (*see* Respondent's Proposed Findings of Fact and Conclusions of Law [ECF No. 48], at 45–46), that there was no shared intent to make the family's home in Iceland because her intent to relocate to Iceland was conditional on her liking Iceland, which she claims she did not.  She is correct that if one party has a conditional intent to relocate, and the other party does not, "it cannot be said the parents 'shared an intent.'"  *Mota*, 692 F.3d at 115; *see also Grano*, 443 F. Supp. 3d at 535 (collecting cases).  However, the Second Circuit instructs that a conditional intent does not preclude the establishment of a habitual residence where, as here, "the family had established itself in the new country of residence, with a sense of settled purpose."  *Hofmann*, 716 F.3d at

53

293 n.4.  Tellingly, at no time during her testimony did Respondent describe any conversation

regarding a condition on the family's relocation to Iceland.  Neither Petitioner or Respondent

have "specifically and persuasively testified to their shared understanding" that the relocation to

Iceland was conditional on Respondent liking Iceland.  *Hofmann*, 716 F.3d at 287.  Here, the

facts establish that Respondent *intended to remain in Iceland as late as her visit to Mexico in*

*July 2021*, immediately prior to her removing E.Z. and S.Z. to New York.  (*See*, *e.g.*, Tr. at

30:13–31:5, 62:7–18, 63:12–24, 411:23–25, 412:6–9; Exs. P.20, P.152).  By then, the family had

clearly established itself in Iceland.

       Even if there were evidence of a conditional intent with respect to the relocation to

Iceland, the Court does not find credible the claim made by Respondent that she did not like

Iceland after she arrived there.  Shortly after arriving in Iceland, Respondent texted a friend that

"everything is in English [in Iceland] which is beautiful."  (Ex. R.171).  In November 2020, the

family purchased a home in Iceland.  (Tr. at 646:22–25).  Significantly, Respondent paid the

$60,000 down payment for the purchase of the apartment.  (Jt. Stip. ¶ 20).  The Court finds it

implausible that, three months after arriving in Iceland, Respondent would have paid a $60,000

down payment for a home in Iceland if she did not like living in Iceland, at least at that time.

Respondent was also happy that E.Z. was adjusting well to Iceland.  In February 2021,

Respondent described E.Z. as a "social butterfly" and was happy that E.Z. was doing well in

school.  (Tr. at 1120:5–9; *see* Ex. P.38).

       Though the record reflects that E.Z. (and to the extent he could, given his young age,

S.Z.) acclimated to Iceland, Respondent now contends that she never did.  However, even if

Respondent had established that she never acclimated to Iceland, it is the acclimation of E.Z.

(and to the extent he could acclimate, S.Z.) to Iceland and whether both E.Z. and S.Z. were at

home in Iceland when they were removed that is relevant here.  *See Gitter*, 396 F.3d at 134

("[T]he court should inquire whether the evidence unequivocally points to the conclusion that *the child* has acclimatized to the new location." (emphasis added)); *Monasky*, 140 S. Ct. at 726

("The place where *a child* is at home, at the time of removal or retention, ranks as the child's

habitual residence." (emphasis added)).  Further, to the extent that S.Z. may have been too young

to acclimate to his new environment in Iceland, that would only put more weight on the Court's

conclusion that the parents' last shared intent was to make Iceland the family's habitual

residence.  *See Guzzo*, 719 F.3d at 109 n.7.  ("[W]hen the child involved is very young . . .

acclimatization is not nearly as important as the settled purpose and shared intent of the child's

parents in choosing a particular habitual residence." (quoting *Whiting v. Krassner*, 391 F.3d 540,

550 (3d Cir. 2004))).

### 2.  The Totality Of The Circumstances Establish That E.Z. and S.Z.'s Home At The Time They Were Removed Was Iceland

Under *Monasky*, the parties' last shared intent is not, in and of itself, dispositive of what

the "habitual residence" of E.Z. and S.Z. was at the time they were removed to New York.  The

conclusion that the family's habitual residence was Iceland at the time the two children were

removed by Respondent is also strongly supported by the totality of the evidence set forth above

— *i.e.*, objective facts suggesting that E.Z. and S.Z. were at home in Iceland.

As the Supreme Court instructs, at bottom, the habitual residence inquiry is designed

simply to ascertain where a child "is at home[] at the time of removal or retention."  *Monasky*,

140 S. Ct. at 726.  While intent is helpful to that determination, so too are the objective facts

regarding where the child actually lives.  Not only do the couple's actions while in Iceland

suggest that their intent was to live there for an indeterminate amount of time, but relevant facts

also suggest that E.Z. and S.Z. were at home in Iceland when Respondent removed them to New York. As noted, to the extent that S.Z. may have been too young to acclimate to his new environment in Iceland, it would only put more weight on the Court's conclusion that the parents' last shared intent was to make Iceland the family's habitual residence. *See Guzzo*, 719 F.3d at 109 n.7. Nevertheless, the facts here support the conclusion that both E.Z. and S.Z. had acclimated to and were at home in Iceland. E.Z. and S.Z. were citizens of Iceland. (Tr. at 347:17–24). E.Z. was attending school in Iceland and had several friends there. (Tr. at 64:3–6, 92:8–13, 369:21–23, 864:10–25). She also had an active social life, which included playdates and sleepovers with the three or four friends she made in Iceland. (Tr. at 374:13–377:1, 1046:10–14). While in Iceland, she attended birthday parties (Tr. at 1044:10–17), her friends' hockey classes (Tr. at 1044:11–17, 1047:23–24), extracurriculars such as music lessons, karate, soccer, and basketball (Tr. at 378:1–11, 379:4–13), and ice skating and swimming classes (Tr. at 1059:7–15, 1045:18–20; Ex. P.89 at pg. 3). She also enjoyed family and social activities, including visiting museums and zoos (Tr. at. 703:25–704:5), taking bike rides around the city (705:25–706:1), and sight-seeing some of Iceland's scenic natural attractions (Tr. at 706:1–3, 1061:9–20, 61:24–1062:10, 1063:4–8, 1063:11–12, 1064:8–11, 1062:14–21; Ex. P.84A at pgs. 1–2, 8–10, 13). S.Z., only about two years old at the time, had also begun to socialize in Iceland with other children. (Tr. at 406:6–10). And he participated in family activities, went on family outings, and visited along with his parents and siblings with Petitioner's parents, brothers, and their cousins. (*See*, *e.g.*, Tr. at 1054:1–3; Ex. 157A, at Bates No. 13543, 13550, 13551).

Significantly, in Iceland, the children lived in the first and only home the couple had purchased together. (Tr. at 234:3–13, 646:22–25). The children also had significantly more family in Iceland than they had in New York City. (Tr. at 101:1–8, 746:11–14, 379:14–21). As

such, the children often interacted with their extended family.  (Tr. at 380:16–22, 380:23–381:2, 1052:19–1053:7; Ex. P.157A).

The Court is mindful that E.Z.'s Icelandic language skills are limited.  However, that circumstance does not weigh heavily for a number of reasons.  First, the Court finds that E.Z. was able to function normally in Iceland because a great deal of the Icelandic population speaks English.  (*See, e.g.*, Tr. at 59:3–60:8, 66:20–67:3, 68:3–19, 69:7–12, 866:17–867:11, 1026:22– 1027:25; Ex. R.171).  The school she attended had a whole program for English speaking children and, by Respondent's own account, E.Z. appears to have been thriving there.  (Tr. at 1120:5–9; Ex. P.38).  Moreover, given her young age and the general proficiency of young children with language, it is likely that E.Z.'s language skills would have continued to improve.

The Court has also considered that, by virtue of their removal to New York by Respondent, E.Z. and S.Z. are currently separated from their sibling, R.Z., who remains in Iceland with Petitioner.  Under *Monasky*, the separation of the removed children from his or her sibling is a factor a court may properly consider as part of the totality of the circumstances.[3]  In this case, Respondent left her then four-year-old, R.Z., to reside in Iceland, while she removed then six-year-old E.Z. and two-year-old S.Z. to New York.  The three siblings have now been separated for several months by 2,700 miles, five time zones, and an ocean.  "[T]he Court is

---

[3] In pre-*Monasky* cases involving certain defenses under the Convention, courts in this Circuit frequently declined to separate siblings where a defense applied only to one removed sibling and not others.  Those decisions reasoned that "children's relationships with their siblings are the type of intimate human relationships that are afforded a substantial measure of sanctuary from unjustified interference by the state." *Application of Blondin v. Dubois*, 78 F. Supp. 2d 283, 290 n.9 (S.D.N.Y. 2000) (Chin, *J.*), *aff'd sub nom. Blondin v. Dubois*, 238 F.3d 153 (2d Cir. 2001) (quoting *Aristotle P. v. Johnson*, 721 F.Supp. 1002, 1005–06 (N.D. Ill. 1989); *Ermini v. Vittori*, 758 F.3d 153, 167 (2d Cir. 2014).

disinclined to further fracture the family unit," and weighs this as another factor counseling the return of E.Z. and S.Z. to their home country of Iceland where they last were at home with their parents and brother, R.Z., as a family. *Broca v. Giron*, No. 11 CV 5818 SJ JMA, 2013 WL 867276, at *9 (E.D.N.Y. Mar. 7, 2013), *aff'd*, 530 F. App'x 46 (2d Cir. 2013).

Returning E.Z. and S.Z. to Iceland would also further the purpose of the Convention. *See Souratgar v. Lee*, 720 F.3d 96, 102 (2d Cir. 2013). Prior to their removal from Iceland to New York by Respondent, the children were at home in Iceland and Respondent had told Petitioner and others that she intended to return to Iceland with the children after the family trip to Mexico. (Tr. at 30:13–31:5, 62:7–18, 63:12–24, 411:23–25, 412:6–9). Moreover, one of the couple's three children still resides with their father in Iceland, the habitual residence of the family. Respondent altered this status quo by removing the children from their home in Iceland. In directing the return of E.Z. and S.Z. to Iceland, the Court does no more than restore the status quo, *Souratgar*, 720 F.3d at 102, leaving resolution of the underlying matrimonial and custody dispute for resolution in other proceedings, *Mota*, 692 F.3d at 112.

*        *        *

The Court has reviewed all the relevant evidence, the testimony and credibility of the parties and their witnesses, and considered all of the objective facts surrounding the family's relocation to Iceland. Based on the record developed by the parties and the totality of the circumstances, the Court concludes that the habitual residence of E.Z. and S.Z. at the time Respondent took them from the country was Iceland.

At bottom, the Court concludes that Respondent did exactly what the Convention was adopted to prevent: she wrongfully removed the children from their habitual residence and

brought them to what she perceived as a more favorable forum where she immediately initiated custody proceedings. *See Souratgar*, 720 F.3d at 102.

### III.   <u>CONCLUSION</u>

The Court finds that Petitioner has proven by a preponderance of the evidence that E.Z. and S.Z. were habitual residents of Iceland at the time Respondent removed them to New York, after telling Petitioner and others that she intended to return to Iceland after going to Mexico for a long-planned family reunion.  Respondent does not contest that Petitioner has otherwise established the other two elements of his claim under the Convention.  (Tr. at 1161:12–25).

Accordingly, IT IS HEREBY ORDERED that the petition is GRANTED.  E.Z. and S.Z. shall be returned to Iceland, their country of habitual residence.  On August 18, 2021, the Court issued an order directing Respondent to surrender the passport and travel documents for both E.Z. and S.Z. to her counsel.  [ECF No. 12].  Counsel for Respondent is ordered to release the passports of E.Z. and S.Z. to counsel for Petitioner.  The parties shall coordinate to ensure the prompt and safe return of the children to Iceland.

Because the Hague Convention requires the "prompt" repatriation of the child to the country of habitual residence, this Court will grant a stay of return until November 17, 2021, at 5 p.m. to permit a stay application to be made to the United States Court of Appeals for the Second Circuit if Respondent so desires, and otherwise denies a stay pending appeal.  The parties should use this time to coordinate the children's orderly return to Iceland.

The Clerk of Court is respectfully requested to enter judgment in favor of Petitioner and close this proceeding.

**SO ORDERED.**

Date:   **November 2, 2021**
       **New York, NY**

                                  **MARY KAY VYSKOCIL**
                                **United States District Judge**

60